IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-01793-CMA-KLM

CONCEALFAB CORPORATION, a Colorado corporation,

Plaintiff,

v.

SABRE INDUSTRIES, INC., a Delaware corporation, and MIDWEST UNDERGROUND TECHNOLOGY, INC., an Illinois corporation,

Defendants.

---

**AMENDED COMPLAINT**

---

Plaintiff ConcealFab Corporation ("ConcealFab"), by its attorneys Silver & DeBoskey, A Professional Corporation, as and for its Amended Complaint against Sabre Industries, Inc. ("Sabre") and Midwest Underground Technology, Inc. ("MUTI"), alleges and states as follows:

**PARTIES**

1. Plaintiff ConcealFab is a Colorado corporation with a principal place of business at 3275 Fillmore Ridge Heights, Colorado Springs, Colorado 80907.

2. Defendant Sabre is a Delaware corporation with a principal place of business at 8653 East Highway 67, Alvaredo, Texas 76009.

3. Defendant MUTI is an Illinois corporation authorized to conduct business in Colorado, with a principal place of business at 2626 Midwest Court, Champaign, Illinois 61822. MUTI is a wholly-owned subsidiary or division of Defendant Sabre. For the remainder of this Complaint, Sabre and MUTI are collectively referred to as "Sabre."

## JURISDICTION AND VENUE

4. This Court has jurisdiction over the subject matter and parties to this action pursuant to 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000 exclusive of interest and costs. This Court also has jurisdiction to render declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

5. This Court has personal jurisdiction over Sabre, which regularly has and continues to do business in Colorado pursuant to C.R.S. § 13-1-124. Additionally, for a period of time relevant to the allegations in this Complaint, Sabre had employees in Colorado.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

## GENERAL ALLEGATIONS

7. ConcealFab and Sabre are entities that each participate in the Small Cell, Distributed Antennae System and outdoor Distributed Antennae System segments of the telecom market, and each has product lines, customer relationships and intellectual property.

8. ConcealFab and Sabre began discussions in 2014 to combine the two businesses.

9. On or about July 25, 2014, ConcealFab and Sabre executed a Mutual Non-Disclosure Agreement ("NDA") requiring both parties to keep in confidence all "Confidential Information" they learned during their discussions, and prohibiting either party from using such confidential information for any purpose other than evaluating and engaging in discussion regarding their potential business relationship. "Confidential Information" included, among other information, any past, present, and future business affairs such as finances, customer and/or supplier information, products, services, organizational structure and internal practices, forecasts, sales and other financial results, records and budgets, and all business, marketing, development, sales and other commercial strategies. "Confidential Information" also included trade secrets, or

know-how, tools, methods, techniques, designs and other information that derives potential or actual economic value from not being generally known to, or readily ascertainable through proper means by persons who can obtain economic value from its disclosure or use. The NDA remains in effect.

10. On or about February 3, 2015, ConcealFab and Sabre executed a Term Sheet outlining the key categories and terms from which a definitive agreement to combine the two businesses would be developed.

11. Also on or about February 3, 2015, Sabre delivered to ConcealFab Chief Executive Officer Jonathan Fitzhugh a written Employment Agreement. Under the Employment Agreement, Sabre agreed to employ and pay Mr. Fitzhugh a signing bonus of $125,000.00 within thirty days of his being hired. Sabre also agreed to pay him an annual base salary of $300,000. In the event Sabre terminated Mr. Fitzhugh without cause, the Employment Agreement required Sabre to pay Mr. Fitzhugh severance equivalent to his then base salary for a period of one year. The Employment Agreement had been negotiated between Sabre and Mr. Fitzhugh, but would not be executed by either party until Mr. Fitzhugh ceased to be employed by ConcealFab.

12. Following execution of the Term Sheet and several weeks of inactivity by Sabre, Sabre informed ConcealFab that it wanted to re-structure the agreement. It proposed a Licensing Operating Agreement ("LOA"), purportedly to allow the companies to operate jointly until a definitive agreement to combine the two businesses was in place.

13. Upon information and belief, Sabre proposed the LOA in order gain access and rights to ConcealFab's Confidential Information and trade secrets without the necessity of performing pursuant to the Term Sheet.

14. Under the LOA, ConcealFab agreed to give a newly-created Sabre segment, called Sabre Engineered Product Group ("Sabre EPG"), exclusive use of all its intellectual property, including processes, designs and systems. This term was consistent with the Term Sheet.

15. Under the LOA, the parties agreed that certain ConcealFab employees, including Mr. Fitzhugh, would cease to be employees of ConcealFab and would become employees of Sabre EPG. This term was consistent with the Term Sheet.

16. Under the LOA, the parties agreed that certain work and opportunities would be marketed, closed, and operated through Sabre EPG, and that all related financial transactions would be processed through Sabre EPG. This term expanded upon the Term Sheet, which required the parties to establish an interim plan/agreement to allow for combined efforts in marketing, business development, customer relationships and manufacturing.

17. The parties agreed that Sabre would provide all working capital for Sabre EPG, including the payment of ConcealFab vendors. This term expanded upon the Term Sheet, which contemplated that the parties' interim plan/agreement would include identification of responsibilities and economic arrangements.

18. Under the LOA, Sabre agreed to pay ConcealFab up to $250,000 to satisfy obligations under a Consulting Agreement between ConcealFab and its former CEO, Michael Slattery. Of the maximum $250,000 Sabre agreed to pay, $120,000 was earmarked to cover the remaining $12,000-a-month base compensation due to Mr. Slattery under the Consulting Agreement. The LOA both required Sabre to pay the $120,000 to ConcealFab in March 2015, and gave Sabre discretion to determine how and when it paid the $120,000 to ConcealFab. This

latter term was at variance with the Term Sheet, which required a lump-sum payment from Sabre to ConcealFab.

19. Under the LOA, Sabre had no obligation to reach a definitive agreement with ConcealFab unless ConcealFab met certain financial milestones either during the first six months of the LOA or in the following six months, if Sabre chose to unilaterally extend the term of the LOA by that period. This term was at variance with the Term Sheet, which targeted finalization of a definitive agreement to combine the two businesses within a maximum of 75 days.

20. Under the LOA, Sabre had the exclusive right to purchase ConcealFab for a period of six months, and could extend that period of exclusivity by another six months at its unilateral option. This term was at variance with the Term Sheet, which prohibited ConcealFab from finding another buyer for a period of only 60 days.

21. In the event the LOA was terminated, the LOA required ConcealFab to give Sabre "most favored nation" status, a 20 percent discount on pricing, and the right to market and sell certain of its established, proprietary products, principally its government-relevant SATCOM "conceal shelters" and its commercially-relevant antenna pattern optimizers "back lobe suppressors." This term was at variance with the Term Sheet, which gave Sabre no rights regarding ConcealFab's concealed shelters or back lobe suppressors in the event a definitive agreement to combine the two businesses was not consummated.

22. In the event the LOA was terminated, the LOA deemed any intellectual property developed by Sabre EPG during the pendency of the LOA the property of Sabre. This term was at variance with the Term Sheet, which gave Sabre no rights regarding intellectual property in the event a definitive agreement to combine the two businesses was not consummated.

23. In the event the LOA was terminated, the LOA gave Sabre the unrestricted right to use whatever it learned regarding ConcealFab's equipment-concealing streetlight pole capabilities during the pendency of the LOA. This term was at variance with the Term Sheet, which gave Sabre no rights regarding ConcealFab's pole capabilities in the event a definitive agreement to combine the two businesses was not consummated.

24. In the event the LOA was terminated, the LOA provided that Mr. Fitzhugh's Employment Agreement would also be deemed terminated as "resignation for good reason." This term was at variance with the Term Sheet, which made no reference regarding Mr. Fitzhugh's status under the Employment Agreement in the event a definitive agreement to combine the two businesses was not consummated. Mr. Fitzhugh and ConcealFab intended that the severance payment due to him under the Employment Agreement would be paid to ConcealFab in the event the LOA was terminated, and advised ConcealFab shareholders of as much.

25. In the event the LOA was terminated, the LOA provided that certain amounts Sabre paid to ConcealFab would revert to a one-year note due to Sabre, with an interest rate "to be determined at the formal execution of the LOA," and guaranteed by all ConcealFab intellectual property. This term was at variance with the Term Sheet, which did not require ConcealFab to repay any amounts to Sabre in the event a definitive agreement to combine the two businesses was not consummated.

26. A majority of ConcealFab shareholders approved the LOA on or about March 11, 2015.

27. On or about March 12, 2015, ConcealFab and Sabre executed the LOA.

28. No interest rate was determined at the formal execution of the LOA.

29. ConcealFab entered the LOA with the understanding that the Employment Agreement would be executed and performed.

30. Mr. Fitzhugh and the agreed-upon employees were terminated by ConcealFab, were hired by Sabre EPG, and became employees of Sabre EPG on or about March 15, 2015. Sabre refused to execute the Employment Agreement, but paid Mr. Fitzhugh the base salary identified in the Employment Agreement.

31. ConcealFab marketed, closed and operated the designated work and opportunities through Sabre EPG and, as a result, Sabre obtained Confidential Information about ConcealFab customers, suppliers, representatives and opportunities.

32. ConcealFab provided invoices from its vendors to Sabre EPG during the pendency of the LOA. However, Sabre has failed and refused to pay all invoices incurred during the pendency of the LOA. Unpaid vendors have since looked to ConcealFab for payment.

33. With respect to the Consulting Agreement, Sabre did not pay ConcealFab $120,000 in March 2015. Rather, it paid ConcealFab $12,000 in March 2015, and $12,000 in April 2015, but failed to make any payment to ConcealFab in May 2015.

34. In an attempt to leverage payment of the unpaid amounts due under his Consulting Agreement, Mr. Slattery challenged the validity of the LOA and Term Sheet by letter dated May 7, 2015.

35. On or about May 9, 2015, ConcealFab disclosed Mr. Slattery's May 7, 2015 letter to Sabre. Sabre treated Mr. Slattery's May 7, 2015 letter as pretext for terminating the Term Sheet and LOA.

36. On May 27, 2015, Sabre recorded a UCC-1 Financing Statement with the Colorado Secretary of State, alleging a right in "all right, title and interests of [ConcealFab] in any Intellectual Property."

37. Sabre terminated the Term Sheet and LOA by letter dated June 3, 2015.

38. No promissory note exists between Sabre and ConcealFab.

39. Sabre failed to pay the signing bonus owed to Mr. Fitzhugh under the Employment Agreement, and also has refused to pay the severance due to Mr. Fitzhugh upon termination of the LOA or upon termination of the Employment Agreement.

40. On or about June 5, 2015, Sabre informed ConcealFab that it intended to fulfill several outstanding customer orders submitted during the pendency of the LOA. ConcealFab had already substantially completed the orders, and Sabre could have permitted ConcealFab to fulfill the orders or purchased the products from ConcealFab to fulfill the orders itself in order to mitigate damages to ConcealFab. The orders also included ConcealFab products and trade secrets for which Sabre had no licensing or marketing rights following termination of the LOA.

41. On or about June 16, 2015, Sabre threatened to pursue business opportunities ConcealFab had marketed and operated through Sabre EPG during the pendency of the LOA.

42. Less than an hour later, Sabre contacted a representative with an exclusive ConcealFab contract to solicit information about a $2 million opportunity he was pursuing for ConcealFab. When ConcealFab asked Sabre to stop interfering with its exclusive contractual relationship with that representative, Sabre then contacted the end-customer, DAS Group Professionals, directly in an attempt to divert its business from ConcealFab to Sabre. Sabre has continued to contact the representative through its vendors.

43. On July 20, 2015, ConcealFab discovered the existence of the UCC-1 Financing Statement when it attempted to secure financing against its accounts receivable. As a result of the UCC-1 Financing Statement, ConcealFab received a less favorable loan term than it was initially quoted.

44. On July 24, 2015, ConcealFab demanded that Sabre terminate its UCC-1 Financing Statement. To date, Sabre has refused to do so.

45. On June 30, 2015, Mr. Slattery filed suit against ConcealFab for breach of his Consulting Agreement. ConcealFab has engaged attorneys to defend that claim.

46. Since its termination of the LOA, Sabre has asked ConcealFab vendors to produce parts for its use that contain ConcealFab trade secrets.

47. Since its termination of the LOA, Sabre, through its Vice President of Engineered Products, Patrick Cochran, has misrepresented to customers that ConcealFab's contractual partnerships to certify ConcealFab products are its contractual relationships to certify Sabre products.

48. The Term Sheet acknowledged that ConcealFab has significant customer penetration at key accounts including CCI, Verizon and AT&T. Since its termination of the LOA, Sabre, through Mr. Cochran, has wrongfully contacted one or more of these key accounts and disclosed ConcealFab's Confidential Information and/or trade secrets in an attempt to win business. Sabre has also falsely told these key accounts that it terminated the LOA and Term Sheet because of ConcealFab's deficiencies in either or both of its engineering and manufacturing capabilities.

49. Mr. Fitzhugh has assigned to ConcealFab all of his right, title and interest to recover any and all monetary damages owed to Mr. Fitzhugh by either or both of the Defendants for breach of the Employment Agreement.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract – NDA and LOA)**

50. ConcealFab incorporates the allegations contained in paragraphs 1 through 49 herein.

51. ConcealFab and Sabre entered into the NDA.

52. ConcealFab performed according to the NDA.

53. Sabre has breached the NDA by, at minimum, using ConcealFab's Confidential Information to:

a. fulfill customer orders containing ConcealFab trade secrets;

b. target key accounts for which ConcealFab has significant customer penetration;

c. contact ConcealFab vendors and representatives; and

d. contact existing and prospective ConcealFab customers.

54. ConcealFab and Sabre entered into the LOA.

55. ConcealFab performed according to the LOA.

56. Sabre has breached the LOA by, at minimum:

a. failing and refusing to pay the remaining $96,000 due to ConcealFab to satisfy its obligations under Mr. Slattery's Consulting Agreement;

b. failing and refusing to pay ConcealFab vendors who submitted invoices during the pendency of the LOA;

c. failing and refusing to pay the severance contemplated by the Employment Agreement and the LOA; and

d. wrongfully encumbering ConcealFab's assets by recording a UCC-1 Financing Statement with the Colorado Secretary of State.

57. Sabre's breaches of the NDA and LOA have caused ConcealFab to sustain damages in an amount to be proven at trial, plus interest, costs and attorneys' fees.

**SECOND CLAIM FOR RELIEF**
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

58. ConcealFab incorporates the allegations contained in paragraphs 1 through 57 herein.

59. The covenant of good faith and fair dealing was implied into the LOA.

60. Sabre breached its obligations of good faith and fair dealing by, at minimum:

a. paying the $120,000 earmarked to cover the base compensation due to Mr. Slattery under the Consulting Agreement in a piecemeal fashion in order to induce Mr. Slattery to challenge the LOA and Term Sheet;

b. paying the $120,000 earmarked to cover the base compensation due to Mr. Slattery under the Consulting Agreement in a piecemeal fashion that has now caused Mr. Slattery to sue ConcealFab for breach of contract;

c. terminating the LOA based on the pretexts of allegations Mr. Slattery made in response to Sabre's failure to pay the $120,000 earmarked to cover his base compensation under the Consulting Agreement in order to obtain ConcealFab's Confidential Information and trade secrets;

d. choosing to fulfill customer orders itself when ConcealFab had already substantially completed the orders;

e. entering the LOA in order to avoid performance of the Term Sheet;

f. entering the LOA in order to gain access to ConcealFab's Confidential Information and trade secrets for later competitive uses;

g. entering the LOA for the purpose of securing "most favored nation" status, discounts, marketing and intellectual property rights upon termination of the LOA; and

h. entering the LOA in order to prevent ConcealFab from pursuing any other acquisition opportunities for a period of at least six months and as long as 12 months.

61. Sabre has acted in bad faith.

62. Sabre's breaches of good faith and fair dealing have caused ConcealFab to sustain damages in an amount to be proven at trial, plus interest, costs and attorneys' fees.

**THIRD CLAIM FOR RELIEF**
**(Breach of Fiduciary Duty)**

63. ConcealFab incorporates the allegations contained in paragraphs 1 through 62 herein.

64. Sabre and ConcealFab were joint venturers who owed each other fiduciary duties of loyalty and full, fair, open and honest disclosure of everything affecting the relationship.

65. Sabre breached its fiduciary duty to ConcealFab by, at minimum:

a. entering the LOA in order to avoid performance of the Term Sheet;

b. entering the LOA in order to gain access to ConcealFab's Confidential Information and trade secrets for later competitive uses;

c. entering the LOA for the purpose of securing "most favored nation" status, discounts, marketing and intellectual property rights upon termination of the LOA;

d. entering the LOA in order to prevent ConcealFab from pursuing any other acquisition or fundraising opportunities for a period of at least six months and as long as 12 months; and

e. entering the LOA with no intention of performing according to its terms.

66. Sabre's breaches of fiduciary duty have caused ConcealFab to sustain damages in an amount to be proven at trial, plus interest, costs and attorneys' fees.

**FOURTH CLAIM FOR RELIEF**
**(Misappropriation of Trade Secrets Pursuant to C.R.S. §§ 7-74-101 to 7-74-110)**

67. ConcealFab incorporates the allegations contained in paragraphs 1 through 66 herein.

68. Sabre has breached its duty pursuant to the NDA to maintain secrecy regarding ConcealFab's trade secrets.

69. Sabre has disclosed or used ConcealFab's trade secrets by, at minimum:

a. fulfilling customer orders that included ConcealFab products and trade secrets for which it has no licensing or marketing rights following its termination of the LOA;

b. misrepresenting to customers that ConcealFab's contractual partnerships are its contractual partnerships;

c. targeting key accounts for which ConcealFab has significant customer penetration;

d. contacting ConcealFab vendors and representatives; and

e. contacting ConcealFab customers.

70. ConcealFab has not consented to Sabre's use of its trade secrets.

71. Sabre's misappropriation of trade secrets has caused ConcealFab to sustain damages in an amount to be proven at trial, plus interest, costs and attorneys' fees.

**FIFTH CLAIM FOR RELIEF**
**(Tortious Interference with Contractual Relationship)**

72. ConcealFab incorporates the allegations contained in paragraphs 1 through 71 herein.

73. ConcealFab has existing contractual relationships with vendors, representatives and lenders.

74. Sabre has intentionally and improperly interfered with ConcealFab's contractual relationships by, at minimum:

a. contacting ConcealFab vendors to ask that they produce parts for its use that contain ConcealFab trade secrets;

b. contacting ConcealFab representatives regarding opportunities they are pursuing exclusively on behalf of ConcealFab;

c. recording an invalid UCC-1 Financing Statement, which may cause lenders to declare ConcealFab in default under existing loan agreements.

75. Sabre's tortious interference has caused ConcealFab to incur damages in an amount to be proven at trial, plus interest, costs and attorneys' fees.

**SIXTH CLAIM FOR RELIEF**
**(Tortious Interference with Prospective Business Relations)**

76. ConcealFab incorporates the allegations contained in paragraphs 1 through 75 herein.

77. ConcealFab has a prospective business relationship with DAS Group Professionals through its exclusive contractual relationship with EPIC Marketing.

78. Sabre has intentionally and improperly interfered with ConcealFab's prospective business relationship by, at minimum:

a. using ConcealFab's Confidential Information to pursue the opportunity for itself;

b. contacting the EPIC Marketing representative pursuing that opportunity to solicit information regarding the opportunity; and

c. contacting DAS Group Professionals directly to divert its business from ConcealFab to Sabre.

79. ConcealFab has a prospective business relationship with its lenders.

80. Sabre has intentionally and improperly interfered with ConcealFab's prospective business relationship with ConcealFab's lenders by, at minimum:

a. recording a UCC-1 Financing Statement with the Colorado Secretary of State even though there is no security agreement between Sabre and ConcealFab; and

b. refusing to terminate its UCC-1 Financing Statement, despite demand by ConcealFab.

81. The Term Sheet acknowledged that ConcealFab has significant customer penetration at key accounts including CCI, Verizon and AT&T.

82. Sabre has intentionally and improperly interfered with ConcealFab's prospective business relationship with these key accounts by, at minimum:

a. using ConcealFab's Confidential Information to pursue the key accounts for itself; and

b. disclosing ConcealFab's Confidential Information to win business from the key accounts.

83. Sabre also intentionally and improperly interfered with ConcealFab's ability to pursue any other acquisition opportunities by inducing ConcealFab to enter the LOA when Sabre had no intention of performing.

84. Sabre's tortious interference has caused ConcealFab to incur damages in an amount to be proven at trial, plus interest, costs and attorneys' fees.

**SEVENTH CLAIM FOR RELIEF**
**(Trade Disparagement)**

85. ConcealFab incorporates the allegations contained in paragraphs 1 through 84 herein.

86. Sabre has made and continues to make false statements harmful to ConcealFab by telling key accounts it terminated the LOA and Term Sheet because ConcealFab lacked adequate engineering and/or manufacturing capabilities.

87. Sabre has made such statements intending that they will result in pecuniary harm to ConcealFab, or recognizing that they are likely to do so.

88. Sabre knew the statements are false or acted in reckless disregard to their truth or falsity.

89. Sabre's trade disparagement has caused ConcealFab to incur damages in an amount to be proven at trial, plus interest, costs and attorneys' fees.

**EIGHTH CLAIM FOR RELIEF**
**(Declaratory Judgment Pursuant to 28 U.S.C. §§ 2201 and 2202)**

90. ConcealFab incorporates the allegations contained in paragraphs 1 through 89 herein.

91. Sabre wrongfully recorded a UCC-1 Financing Statement with the Colorado Secretary of State even though there is no security agreement between Sabre and ConcealFab.

92. Pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. §§ 2201 and 2202, this Court has the power to declare the rights, status and legal relations of ConcealFab and Sabre.

93. An actual existing and *bona fide* antagonistic and actual justiciable controversy exists between ConcealFab and Sabre with respect to the UCC-1 Financing Statement, which can be determined only by declaratory judgment.

94. By reason of the conduct of Sabre in recording and failing to terminate its UCC-1 Financing Statement, ConcealFab seeks a declaration that the UCC-1 Financing Statement is invalid.

**NINTH CLAIM FOR RELIEF**
**(Fraud in the Inducement)**

95. ConcealFab incorporates the allegations contained in paragraphs 1 through 94 herein.

96. Sabre made misrepresentations of material fact in order to induce ConcealFab to enter the LOA including, at minimum, that:

a. the purpose of the LOA was to allow the companies to operate jointly until a definitive agreement to combine the two businesses was in place;

b. it intended to perform the LOA; and

c. it would execute the Employment Agreement when Mr. Fitzhugh ceased to be employed by ConcealFab.

97. Those misrepresentations of material fact induced ConcealFab to enter the LOA.

98. ConcealFab was justified in relying upon the misrepresentations.

99. ConcealFab is entitled to the difference between the actual benefit of the benefits it received under the LOA and the value of those benefits if they had been as represented.

**TENTH CLAIM FOR RELIEF**
**(Unjust Enrichment)**

100. ConcealFab incorporates the allegations contained in paragraphs 1 through 99 herein.

101. At ConcealFab's expense, Sabre received benefits including, at minimum:

a. "most favored nation" status, a 20 percent discount on pricing, and the right to market and sell certain of its established, proprietary products, principally its government-relevant SATCOM "conceal shelters" and its commercially-relevant antenna pattern optimizers "back lobe suppressors;"

b. ownership of any intellectual property developed by Sabre EPG during the pendency of the LOA; and

c. the unrestricted right to use whatever it learned regarding ConcealFab's equipment-concealing streetlight pole capabilities during the pendency of the LOA.

102. Sabre received these benefits under circumstances that would make it unjust for Sabre to retain the benefits without paying.

**ELEVENTH CLAIM FOR RELIEF**
**(Breach of Contract – Employment Agreement)**

103. ConcealFab incorporates the allegations contained in paragraphs 1 through 102 herein.

104. Sabre and ConcealFab's assignor, Mr. Fitzhugh, entered into the Employment Agreement.

105. Mr. Fitzhugh performed according to the Employment Agreement.

106. Sabre has breached the Employment Agreement, and caused recoverable damages to Mr. Fitzhugh by, at minimum, failing to pay Mr. Fitzhugh the $125,000.00 signing bonus within thirty days of his hire, and by failing to pay Mr. Fitzhugh the severance payment required by the Employment Agreement.

107. Sabre's breaches of the Employment Agreement have caused Mr. Fitzhugh to sustain damages in an amount to be proven at trial, plus interest, costs and attorneys' fees.

108. Mr. Fitzhugh lawfully assigned his right to recover the damages from Sabre's breaches of the Employment Agreement to ConcealFab, and ConcealFab, as his assignee, may recover such damages fro Sabre.

WHEREFORE, Plaintiff ConcealFab Corporation respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendant Sabre Industries, Inc., award Plaintiff

compensatory damages against Defendant for the amounts proven at trial and to the fullest extent provided by law; declare the UCC-1 Financing Statement Sabre recorded with the Colorado Secretary of State invalid; award Plaintiff its costs and attorneys' fees against Defendant; and grant Plaintiff such other and further relief as may be required by law or equity.

Dated: June 13, 2016

Respectfully submitted,

*s/Angela D. DeVine*

Thomas M. Haskins III
Martin D. Beier
Angela D. DeVine
SILVER & DEBOSKEY, P.C.
1801 York Street
Denver, CO 80206
Phone: (303) 399-3000
FAX: (303) 399-2650
haskinst@s-d.com
beierm@s-d.com
devinea@s-d.com

ATTORNEYS FOR PLAINTIFF

FP3683