**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-01793-CMA-KLM

CONCEALFAB CORPORATION, a Colorado corporation,

Plaintiff

v.

SABRE INDUSTRIES, INC., a Delaware corporation, and MIDWEST UNDERGROUND TECHNOLOGY, INC., an Illinois corporation

Defendants

---

# ANSWER TO AMENDED COMPLAINT AND COUNTERCLAIMS

---

Sabre Industries, Inc. ("Sabre") and Midwest Underground Technology, Inc. ("MUTI" and together with Sabre, "Defendants"), through undersigned counsel, submit this answer and affirmative defenses to the Amended Complaint and counterclaim against the Plaintiff as follows:

## ANSWER

1. Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 1.

2. Defendants admit the allegations in paragraph 2.

3. Defendants admit the allegations in paragraph 3.

4. Paragraph 4 contains legal conclusions for which no response is required. To the extent the Court determines a response is required, Defendants deny the allegations in paragraph 4.

5. The first sentence of Paragraph 5 contains legal conclusions for which no response is required. To the extent the Court determines a response is required, Defendants deny the allegations in the first sentence. Of paragraph 5. Defendants deny the remaining allegations.

6. Paragraph 6 contains legal conclusions for which no response is required. To the extent the Court determines a response is required, Defendants deny the allegations in paragraph 6.

7. Defendants admit that Sabre and MUTI are entities that participate in the Small Cell, Distributed Antennae System and outdoor Distributed Antennae System segments of the telecom market and admit that they have product lines, customer relations, and intellectual property. Defendants deny knowledge or information sufficient to form a belief as to the allegations regarding ConcealFab in paragraph 7.

8. Defendants admit the allegations in paragraph 8.

9. Defendants admit that Sabre and ConcealFab executed a mutual non-disclosure agreement ("NDA") however state that the document was fully executed on August 4, 2014. Defendants respectfully refer the Court to the NDA for a true and complete description of the contents therein and otherwise deny the allegations in paragraph 9, including the allegations in the last sentence of paragraph 9.

10. Defendants admit that ConcealFab and Sabbre executed a non-binding Term Sheet on February 3, 2015. Defendants respectfully refer the Court to the Term Sheet for a true and complete description of the contents therein and otherwise deny the allegations in paragraph 10.

11. Defendants deny the allegations in paragraph 11 and state that although drafts of an employment agreement between Sabre and Jonathan Fitzhugh were circulated, an agreement between the parties was never reached and no written employment agreement was ever executed.

12. Defendants deny the allegations in paragraph 12.

13. Defendants deny the allegations in paragraph 13.

14. Defendants deny the allegations in paragraph 14 and respectfully refer the Court to the LOA for a true and complete description of the contents therein. Defendants further state that the LOA is not a binding and enforceable contract.

15. Defendants deny the allegations in paragraph 15 and respectfully refer the Court to the LOA for a true and complete description of the contents therein.

16. Defendants deny the allegations in paragraph 16 and respectfully refer the Court to the LOA for a true and complete description of the contents therein.

17. Defendants deny that the LOA was ever a binding and enforceable contract. Defendants otherwise deny the allegations in paragraph 17. However, Defendants admit that Sabre provided all working capital for Sabre SPG, including the payment of ConcealFab vendors during the pendency of the void LOA.

18. Defendants deny that the LOA was ever a binding and enforceable contract and respectfully refer the Court to the LOA for a true and complete description of the contents therein. Defendants otherwise deny the allegations in paragraph 18.

19. Defendants deny that the LOA was ever a binding and enforceable contract and respectfully refer the Court to the LOA for a true and complete description of the contents therein. Defendants otherwise deny the allegations in paragraph 19.

20. Defendants deny that the LOA was ever a binding and enforceable contract and respectfully refer the Court to the LOA for a true and complete

description of the contents therein. Defendants otherwise deny the allegations in paragraph 20.

21. Defendants deny that the LOA was ever a binding and enforceable contract and respectfully refer the Court to the LOA for a true and complete description of the contents therein. Defendants otherwise deny the allegations in paragraph 21.

22. Defendants deny that the LOA was ever a binding and enforceable contract and respectfully refer the Court to the LOA for a true and complete description of the contents therein. Defendants otherwise deny the allegations in paragraph 22.

23. Defendants deny that the LOA was ever a binding and enforceable contract and respectfully refer the Court to the LOA for a true and complete description of the contents therein. Defendants otherwise deny the allegations in paragraph 23.

24. Defendants deny that the LOA was ever a binding and enforceable contract and respectfully refer the Court to the LOA for a true and complete description of the contents therein. Defendants otherwise deny the allegations in the first two sentences of paragraph 24. Defendants further deny that there was ever a binding and enforceable employment agreement and deny knowledge or

information sufficient to form a belief as to the allegations in the last sentence of paragraph 24.

25. Defendants deny that the LOA was ever a binding and enforceable contract and respectfully refer the Court to the LOA for a true and complete description of the contents therein. Defendants admit that the parties contemplated that certain amounts actually paid by Sabre to ConcealFab would revert to a one-year note due to Sabre. Defendants otherwise deny the allegations in paragraph 25.

26. Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 26.

27. Defendants deny the allegations in paragraph 27 and state that ConcealFab never properly executed the LOA.

28. Defendants deny the allegations in paragraph 28.

29. Defendants deny that ConcealFab ever entered into the LOA and otherwise deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 29.

30. Defendants admit that Sabre EPG hired and paid the salaries of certain ConcealFab employees, including Mr. Fitzhugh. Defendants admit that they did

not execute an employment agreement with Mr. Fitzhugh. Defendants otherwise deny the allegations in paragraph 30.

31. Defendants deny the allegations in paragraph 31.

32. Defendants deny the allegations in the first two sentences of paragraph 32. Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence of paragraph 32.

33. Defendants admit that they paid ConcealFab $12,000 in March 2015 and $12,000 in April 2015 and admit that they did not make a payment to ConcealFab in May 2015 because Defendants learned in May 2015 that ConcealFab did not properly enter into the LOA.

34. Defendants deny knowledge or information sufficient to form a belief as to the allegations in paragraph 34.

35. Defendants admit that ConcealFab disclosed Mr. Slattery's May 7, 2015 letter to Sabre on or about May 9, 2015. Defendants deny the allegations in the second sentence of paragraph 35.

36. Defendants admit the allegations in paragraph 36.

37. Defendants admit that on or about June 3, 2015 they sent a letter to ConcealFab terminating the parties' relationship under the non-binding and unenforceable Term Sheet and LOA.

38. Defendants admit the allegations in paragraph 38.

39. Defendants deny the allegations in paragraph 39.

40. Defendants deny the allegations in paragraph 40.

41. Defendants deny the allegations in paragraph 41.

42. Defendants deny the allegations in paragraph 42.

43. Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 43. Defendants otherwise deny the allegations in paragraph 43.

44. Defendants admit the allegations in paragraph 44.

45. Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 45.

46. Defendants deny the allegations in paragraph 46.

47. Defendants deny the allegations in paragraph 47.

48. Defendants deny the allegations in paragraph 48.

49. Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 49 but otherwise state that the Defendants never entered into an employment agreement.

All allegations not specifically admitted are denied.

## FIRST CLAIM FOR RELIEF
## (Breach of Contract – NDA and LOA)

50. Defendants restate their answers to the allegations contained in paragraphs 1 through 49 herein.

51. Defendants admit the allegations in paragraph 51.

52. Defendants deny the allegations in paragraph 52.

53. Defendants deny the allegations in paragraph 53, including sub-paragraphs a-d.

54. Defendants deny the allegations in paragraph 54.

55. Defendants deny the allegations in paragraph 55.

56. Defendants deny the allegations in paragraph 56, including sub-paragraphs a-d.

57. Defendants deny the allegations in paragraph 57.

## SECOND CLAIM FOR RELIEF
## (Breach of Implied Covenant of Good Faith and Fair Dealing)

58. Defendants restate their answers to the allegations contained in paragraphs 1-57 herein.

59. Defendants deny the allegations in paragraph 59.

60. Defendants deny the allegations in paragraph 60, including sub-paragraphs a-h.

61. Defendants deny the allegations in paragraph 61.

62. Defendants deny the allegations in paragraph 62.

**THIRD CLAIM FOR RELIEF**
**(Breach of Fiduciary Duty)**

63. Defendants restate their answers to the allegations contained in paragraphs 1-62 herein.

64. Paragraph 64 contains legal conclusions for which no response is required. To the extent the Court determines a response is required, Defendants deny the allegations in paragraph 64.

65. Defendants deny the allegations in paragraph 65, including sub-paragraphs a-e.

66. Defendants deny the allegations in paragraph 66.

**FOURTH CLAIM FOR RELIEF**
**(Misappropriation of Trade Secrets Pursuant to C.R.S. §§7-74-101 to 7-74-110)**

67. Defendants restate their answers to the allegations contained in paragraphs 1-66 herein.

68. Defendants deny the allegations in paragraph 68.

69. Defendants deny the allegations in paragraph 69, including sub-paragraphs a-e.

70. Defendants deny that they have used ConcealFab's trade secrets and therefore deny the allegations in paragraph 70.

71. Defendants deny the allegations in paragraph 71.

**FIFTH CLAIM FOR RELIEF**
**(Tortious interference with Contractual Relationship)**

72. Defendants restate their answers to the allegations contained in paragraphs 1-71 herein.

73. Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 73.

74. Defendants deny the allegations in paragraph 74, including sub-paragraphs a-c.

75. Defendants deny the allegations in paragraph 75.

**SIXTH CLAIM FOR RELIEF**
**(Tortious Interference with Prospective Business Relations)**

76. Defendants restate their answers to the allegations contained in paragraphs 1-75 herein.

77. Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 77.

78. Defendants deny the allegations in paragraph 78, including sub-paragraphs a-c.

79. Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 79.

80. Defendants deny the allegations in paragraph 80, including sub-paragraphs a-b.

81. Defendants deny the allegations in paragraph 81 and respectfully refer the Court to the Term Sheet for a true and complete description of the contents therein.

82. Defendants deny the allegations in paragraph 82, including sub-paragraphs a-b.

83. Defendants deny the allegations in paragraph 83.

84. Defendants deny the allegations in paragraph 84.

**SEVENTH CLAIM FOR RELIEF**
**(Trade Disparagement)**

85. Defendants restate their answers to the allegations contained in paragraphs 1-84 herein.

86. Defendants deny the allegations in paragraph 86.

87. Defendants deny the allegations in paragraph 87.

88. Defendants deny the allegations in paragraph 88.

89. Defendants deny the allegations in paragraph 89.

**EIGHTH CLAIM FOR RELIEF**
**(Declaratory Judgment Pursuant to 28 U.S.C. §§ 2201 and 2202**

90. Defendants restate their answers to the allegations contained in paragraphs 1-89 herein.

91. Defendants deny the allegations in paragraph 91.

92. Paragraph 92 contains legal conclusions for which no response is required. To the extent the Court determines a response is required Defendants deny the allegations in paragraph 92.

93. Paragraph 93 contains legal conclusions for which no response is required. To the extent the Court determines a response is required Defendants deny the allegations in paragraph 93.

94. Paragraph 94 contains legal conclusions for which no response is required. To the extent the Court determines a response is required Defendants deny the allegations in paragraph 94.

**NINTH CLAIM FOR RELIEF**
**(Fraud in the Inducement)**

95. Defendants restate their answers to the allegations contained in paragraphs 1-94 herein.

96. Defendants deny the allegations in paragraph 96, including sub-paragraphs a-c.

97. Defendants deny the allegations in paragraph 97.

98. Defendants deny the allegations in paragraph 98.

99. Defendants deny the allegations in paragraph 99.

**TENTH CLAIM FOR RELIEF**
**(Unjust Enrichment)**

100. Defendants restate their answers to the allegations contained in paragraphs 1-99 herein.

101. Defendants deny the allegations in paragraph 101, including sub-paragraphs a-c.

102. Defendants deny the allegations in paragraph 102.

**ELEVENTH CLAIM FOR RELIEF**
**(Breach of Contract – Employment Agreement)**

103. Defendants restate their answers to the allegations contained in paragraphs 1-102 herein.

104. Defendants deny the allegations in paragraph 104.

105. Defendants deny the allegations in paragraph 105.

106. Defendants deny the allegations in paragraph 106.

107. Defendants deny the allegations in paragraph 107.

108. Defendants deny the allegations in paragraph 108.

## AFFIRMATIVE DEFENSES

109. The Amended Complaint fails to state a claim for relief. Defendants incorporate by reference their previously filed Motion to Dismiss.

110. The Amended Complaint fails to state a claim for relief for breach of an employment agreement because no agreement was ever entered into between the Defendants and Jonathan Fitzhugh.

111. Plaintiff's claims for relief are barred by the doctrine of unclean hands or *in pari delicto*.

112. Granting Plaintiff's demand in the Amended Complaint would result in unjust enrichment.

113. Plaintiff has failed to mitigate its damages, if any.

114. Any damages alleged by Plaintiff were caused in whole or in part by a person or persons that are not parties to this lawsuit.

115. Plaintiff's claims for tortious interference (claims five and six) are barred by the economic loss rule.

116. If the LOA is deemed a valid contract, Plaintiff's claim for unjust enrichment is barred by the existence of express contract(s) that cover the same subject matter as the implied-in-law contract.

## SABRE'S COUNTERCLAIMS

Sabre and MUTI assert the following counterclaims against Plaintiff:

1. Sabre and MUTI (together "Sabre") incorporate by reference their responses and allegations as set forth in paragraphs 1 through 116 above.

2. Sabre is a Delaware corporation with a principal place of business at 865d East highway 67, Alvarado, Texas 76009.

3. MUTI is an Illinois corporation with a principal place of business at 2626 Midwest Court, Champaign, Illinois 61822.

4. Plaintiff ConcealFab has alleged in Paragraph 1 of the Amended Complaint that it is a Colorado Corporation with a principal place of business at 3275 Fillmore Ridge Heights, Colorado Springs, Colorado 80907.

5. The United States District Court for the District of Colorado has subject matter jurisdiction over these Counterclaims pursuant to 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000 exclusive of interest and costs.

6. Plaintiff is subject to personal jurisdiction in this Court because Plaintiff is a resident of Colorado and because Plaintiff has availed itself of this Court.

7. Venue for this action is proper in this Court pursuant to 28 U.S.C. §1391(b)(1) because the Plaintiff/Counterclaim Defendant is a resident of Colorado.

## General Allegations

8. Sabre is a leading producer of highly engineered structures used for electric transmission and distribution and wireless telecommunication, offering a complete range of engineering towers, poles and related services.

9. MUTI is a wholly-owned subsidiary of Sabre that installs, inspects, services and maintains the products produced by Sabre.

10. Although Sabre and MUTI (together "Sabre") participate in a wider market, and produce a broader array of products than does ConcealFab, the parties in this action are competitors in a specific niche area of the telecom industry—namely the Small Cell, Distributed Antennae System ("DAS") and outdoor Distributed Antennae System ("oDAS") segments of the industry.

11. Beginning in or around July 2014, Sabre and ConcealFab began discussions concerning the exploration of a potential strategic alliance.

12. In furtherance of their discussions, on or about August 4, 2014, ConcealFab and MUTI executed a Mutual Non-Disclosure Agreement (the "NDA").

13. From November 2014 through February 2015, Sabre and ConcealFab exchanged drafts of a term sheet outlining the key terms from which a definitive agreement to combine the two entities would be developed.

14. On or about December 26, 2014, ConcealFab Chief Executive Officer Jonathan Fitzhugh delivered to Sabre a chart listing all of ConcealFab's upcoming business opportunities. In connection with the delivery of this list, ConcealFab represented to Sabre that at a base case scenario, ConcealFab would earn over $7 million in revenue in 2016.

15. Also on or about December 26, 2014, ConcealFab, through Mr. Fitzhugh, represented to Sabre that it was developing key customers and had a lucrative deal in its pipeline to provide products to Hill Air Force Base ("Hill AFB") in northern Utah.

16. ConcealFab's list of upcoming business opportunities was attractive to Sabre and was the driving force behind Sabre's interest in potentially merging or acquiring ConcealFab.

17. On February 4, 2015, Sabre delivered to ConcealFab a fully executed Term Sheet ("Term Sheet"). The Term Sheet expressly stated that it is non-binding on either party and establishes only the intent of the organizations to work

diligently to develop a formal agreement around the basics of the key points as outlined in the term sheet.

18. On February 16, 2015, Jon Fitzhugh of ConcealFab sent Sabre a draft interim agreement with the stated goal of resolving ConcealFab's need for cash.

19. Upon information and belief, both before and after the execution of the Term Sheet, ConcealFab did not have sufficient cash to continue operating and was either insolvent or at risk of insolvency in the near future.

20. After receiving the draft interim agreement from ConcealFab, Sabre informed ConcealFab of its desire to get at least an interim agreement in place as soon as possible.

21. On February 20, 2015, Jonathan Fitzhugh of ConcealFab sent Sabre an email informing Sabre that a lot more deals than he originally anticipated are coming to fruition and that ConcealFab would realize an additional $300,000 in previously unforecasted revenue in mid to late March 2015. One such instance during which this representation was made was in an email from Mr. Fitzhugh to Sabre, dated February 17, 2015.

22. During the negotiations for the interim agreement, ConcealFab also represented to Sabre that the Hill AFB contract was going to be awarded to ConcealFab in March at the latest.

23. On March 13, 2015, Sabre executed the interim agreement, thereafter referred to as the Interim Plan / Licensing Operating Agreement (the "LOA").

24. The LOA declared the term of the agreement to begin upon execution and continue through August 30, 2015.

25. Prior to Sabre executing the LOA, ConcealFab represented to Sabre that all of ConcealFab's existing shareholders and option holders would need to vote to approve the LOA structure in accordance with ConcealFab's corporate governance documents.

26. The LOA expressly required ConcealFab to receive 100% shareholder approval of the LOA in order to enter into the Agreement.

27. ConcealFab knew prior to signing the LOA that its corporate governance documents required it to receive 100% shareholder approval in order to enter into the LOA.

28. ConcealFab solicited a shareholder vote on or about March 10, 2015.

29. In soliciting a shareholder vote, ConcealFab expressly represented to its shareholders that the proposed LOA transaction is not a sale, lease or other disposition of all, or substantially all, of the property of ConcealFab.

30. Under ConcealFab's corporate governance documents, only a controlling amount of shareholders is required to approve a Change of Control

Transaction, which is defined as a sale, lease or other disposition of all, or substantially all of the property of ConcealFab, whereas all other transactions require 100% shareholder approval.

31. ConcealFab's former chief executive officer, and largest shareholder, Michael Slattery did not vote to approve the LOA.

32. Despite receiving less than 100% shareholder approval, on or about March 13, 2015, ConcealFab delivered to Sabre an LOA signed by Jonathan Fitzhugh. The signed LOA states that the LOA was executed on or about March 9, 2015 but in reality it was fully signed on March 13, 2015.

33. ConcealFab did not inform Sabre that Michael Slattery, ConcealFab's largest shareholder, did not vote to approve the LOA. Instead, by withholding this information, ConcealFab led Sabre to believe that the LOA was approved by 100% of ConcealFab's shareholders.

34. Following ConcealFab's delivery of the signed LOA to Sabre, Sabre began performing under the LOA as if ConcealFab had received 100% shareholder approval.

35. Under the LOA, Jon Fitzhugh and other agreed-upon employees were to be terminated from ConcealFab as of an agreed upon date and become

employees of Sabre. Following the to-be-decided hire date, Sabre was to be responsible for any and all liabilities of such employees.

36. In connection with the LOA, ConcealFab delivered to Sabre a draft employment agreement for the employment of Jonathan Fitzhugh and Sabre. Sabre and Mr. Fitzhugh never executed nor agreed to the terms of that draft agreement.

37. Although an employment agreement was never executed, Sabre agreed to and did pay Mr. Fitzhugh a base salary of $300,000 per year beginning on or around March 13, 2015.

38. Also pursuant to the LOA, Sabre paid the salaries of the other ConcealFab employees who were terminated by ConcealFab after the signing of the LOA. In total, Sabre paid ConcealFab employees over $257,000 during the pendency of the LOA.

39. Under the LOA, the parties also agreed that Sabre would provide all working capital for the combined entity, Sabre EPG, including the payment of ConcealFab's paid and unpaid accounts payable. In total, Sabre made over $110,000 in payments towards these ConcealFab accounts.

40. Under the LOA, Sabre also agreed to pay up to $250,000 to satisfy ConcealFab's employment obligations, including an obligation for ConcealFab to pay its former CEO Michael Slattery $120,000 under a consulting agreement

between ConcealFab and Slattery. Prior to signing the LOA, ConcealFab attempted to hide the fact that Mr. Slattery was not owed a lump sum payment of $120,000 but rather could be paid in installments under the Consulting Agreement. Sabre learned of this fact and therefore Sabre agreed to pay Mr. Slattery the $120,000 in 10 monthly installments of $12,000. Sabre made two payments of $12,000 in March and April 2015 in satisfaction of this term in the LOA.

41. Further, upon signing the LOA, Sabre agreed to and did make an initial deposit of $160,000 to ConcealFab which was to be earmarked as pre-paid licensing fees to ConcealFab's existing entity, CFG.

42. The LOA expressly stated that in the event it is terminated without acquisition, and the licensing fees from CFG were insufficient to repay the $160,000 deposit, the balance due would revert to the form of a 1-year note at Sabre's incremental borrowing rate payable in monthly installments. The note was to be guaranteed by a security interest in ConcealFab's intellectual property.

43. The LOA also provided that upon termination, the amounts paid by Sabre to ConcealFab employee/contractor obligations would revert to a 1-year note due Sabre guaranteed by all the intellectual property of ConcealFab at a rate equal to Sabre's incremental borrowing rate.

44. On or about May 9, 2015, ConcealFab disclosed to Sabre a letter from Mr. Slattery, dated May 7, 2015 in which Mr. Slattery stated that the board of directors of ConcealFab have breached their fiduciary duties to ConcealFab by permitting MUTI and/or its affiliate companies to take control or possession of all of ConcealFab's assets without shareholder approval. This was the first time that Sabre learned that ConcealFab did not have 100% shareholder approval of the LOA as required by the express terms of the LOA.

45. In total, from March 13, 2015 through approximately May 29, 2015, Sabre incurred over $600,000 in ConcealFab related expenses under the LOA.

46. During that same time period, none or nearly none of the purchase orders promised by ConcealFab came to fruition. Accordingly, ConcealFab was on pace to generate less than $50,000 in revenue in 2015.

47. On May 28, 2015 Sabre delivered to ConcealFab a draft promissory note by which Concealable was to promise to pay Sabre the principal sum of $621,559.30 which represented the amounts paid to ConcealFab under the LOA.

48. ConcealFab refused to sign the promissory note.

49. On or about June 3, 2015, Sabre delivered to ConcealFab a letter that effectively terminated the cooperative arrangement between Sabre and

ConcealFab. In the June 3 Letter, Sabre reminded ConcealFab of its obligation to execute a promissory note for the amounts owed to Sabre.

50. To protect its interests and to ensure repayment of Sabre's over $600,000 investment in ConcealFab, on May 27, 2015, Sabre recorded a UCC-1 Financing Statement with the Colorado Secretary of State listing as collateral, all right, title and interests of ConcealFab in any Intellectual Property.

51. After separating from ConcealFab, Sabre continued to pursue purchase orders with customers to which it had a relationship prior to, during and after its arrangement with ConcealFab, including Ericsson and Cincinnati Bell.

52. In one instance, Sabre received a purchase order from Cincinnati Bell for a bracket mounting system that, upon information and belief, is similar to but distinct from, and superior to the bracket mounting system currently being manufactured by ConcealFab.

53. On February 22, 2015, Scott Gay, an account manager at Sabre, received a call from a representative of Cincinnati Bell during which the representative informed Mr. Gay that ConcealFab's CEO, Jonathan Fitzhugh improperly told him that Sabre had no right to fabricate and sell Sabre's bracket mounting systems.

54. Sabre does have a right to fabricate and sell its bracket mounting systems to Cincinnati Bell or any other customer.

55. In addition to Cincinnati Bell, ConcealFab has also falsely and improperly stated to other common customers including CCI, Verizon and AT&T that Sabre has stolen ConcealFab's intellectual property.

**FIRST COUNTERCLAIM**
**(Fraudulent Inducement)**

56. Sabre incorporates the allegations contained in paragraphs 1-116 above and Counterclaim paragraphs 1-54 above.

57. ConcealFab made several misrepresentations of material fact in order to induce Sabre to enter into the LOA, including, but not limited to:

a. ConcealFab had significant and lucrative pending or upcoming purchase orders that were going to provide significant revenue to ConcealFab in 2015 and 2016;

b. ConcealFab was going to land the Hill AFB contract in March 2015 at the latest;

c. ConcealFab had considerable existing purchase orders that would inject considerable revenue in 2015; and

d. ConcealFab received 100% shareholder approval prior to entering into the LOA.

58. ConcealFab's misrepresentations did in fact induce Sabre to enter into the LOA.

59. Sabre was justified in relying on the misrepresentations because ConcealFab expressly represented in the LOA that it received 100% shareholder vote and because ConcealFab repeatedly provided updated, yet false, information regarding promised purchase orders.

60. In each of ConcealFab's representations concerning upcoming purchase orders, ConcealFab provided specific information regarding likely contract date and total revenue per year.

61. Sabre's reliance on ConcealFab's representations resulted in damage to Sabre in the amount it paid to ConcealFab under the LOA.

**SECOND COUNTERCLAIM**
**(Unjust Enrichment)**

62. Sabre incorporates the allegations contained in paragraphs 1-116 above and Counterclaim paragraphs 1-61 above.

63. The LOA was not a valid contract because ConcealFab did not properly accept the terms of the LOA.

64. At Sabre's expense, ConcealFab received the following benefits under the LOA:

a. payment of ConcealFab payroll in the amount of approximately $257,000;

b. payment of paid time off to ConcealFab employees in the amount of approximately $10,000.

c. initial Deposit for licensing fees in the amount of $160,000.

d. payment of $24,000 to cover ConcealFab's obligations to Michael Slattery;

e. payments of ConcealFab working Capital in the amount of approximately $110,000;

f. additional miscellaneous payments to ConcealFab during the pendency of the LOA; and

g. knowledge and information regarding Sabre's trade secrets and other intellectual property.

65. ConcealFab received these benefits following its misrepresentation that it had properly executed the LOA.

66. ConcealFab's receipt of these benefits was therefore done under circumstances that make it unjust for ConcealFab to retain the benefit without paying for it.

**THIRD COUNTERCLAIM**
**(Trade Disparagement)**

67. Sabre incorporates the allegations contained in paragraphs 1-116 above and Counterclaim paragraphs 1-66 above.

68. ConcealFab has and continues to make false statements harmful to Sabre by telling key accounts that Sabre is improperly using ConcealFab intellectual property.

69. ConcealFab has made such statements intending that they will result in pecuniary harm to Sabre, or recognizing that they are likely to do so.

70. ConcealFab knew the statements are false or acted in reckless disregard for their falsity.

71. ConcealFab's trade disparagement has caused Sabre to incur damages in an amount to be proven at trial, plus interest, costs and attorneys' fees.

## FOURTH COUNTERCLAIM
## (Tortious Interference with Contractual Relations)

72. Sabre incorporates the allegations contained in paragraphs 1-116 above and Counterclaim paragraphs 1-71 above.

73. Sabre had a valid purchase order from Cincinnati Bell for a bracket mounting system.

74. ConcealFab intentionally induced Cincinnati Bell to terminate the existing purchase order with Sabre. by falsely alleging to Cincinnati Bell that Sabre did not have the right to sell Sabre's own bracket mounting system.

75. ConcealFab acted improperly by falsely telling Cincinnati Bell that Sabre did not have the right to sell Sabre's own bracket mounting system.

76. ConcealFab's actions caused Sabre to incur damages in an amount to be proven at trial.

**FIFTH COUNTERCLAIM**
**(Breach of Contract)**

77. Sabre incorporates the allegations contained in paragraphs 1-116 above and Counterclaim paragraphs 1-76 above.

**78.** The LOA was never properly executed and thus is not a valid contract.

**79.** In the event the LOA is deemed a valid contract, ConcealFab has breached the LOA by, at a minimum:

- **a.** Receiving less than 100% shareholder and option holder approval of the LOA structure prior to entering into the LOA;
- b. Refusing to execute a promissory note due to Sabre for the prepayments/deposit licensing fees paid by Sabre to ConcealFab;
- c. Refusing to execute a promissory note due to Sabre for the amounts paid by Sabre to ConcealFab employees; and

d. Refusing to acknowledge that post-termination of the LOA, Sabre has the right to retain the property rights of Intellectual Property developed by the new Sabre EPG segment.

80. ConcealFab's breaches of the LOA have caused Sabre to sustain damages in an amount to be proven at trial, plus interest, costs and attorneys' fees.

**Request for Relief**

WHEREFORE, for the reasons set forth in Sabre and MUTI's Answer to Plaintiff's Amended Complaint and in Sabre and MUTI's Counterclaims, Sabre and MUTI respectfully request that this Court enter judgment in their favor and grant the following relief:

A. Dismissal of Plaintiff's Amended Complaint against Defendants with prejudice;

B. An order awarding Defendants compensatory damages against Plaintiff for the amounts proven at trial and to the fullest extent provided by law; and

C. Such other and further legal and equitable relief as this Court deems just and proper.

D. An Order awarding costs incurred in bringing this action.

DATED: July 5, 2016

Respectfully submitted,

*s/ Alan D. Schindler*

Laura A. Menninger
Jeffrey S. Pagliuca
Alan D. Schindler
HADDON, MORGAN AND FOREMAN, P.C.
150 East 10th Avenue
Denver, CO 80203
Phone: 303.831.7364
Fax: 303.832.2628
Email: lmenninger@hmflaw.com;
jpagliuca@hmflaw.com;
aschindler@hmflaw.com

*Attorneys for Defendants Sabre Industries, Inc. and Midwest Underground Technology, Inc.*

**CERTIFICATE OF SERVICE**

I certify that on July 5, 2016, I electronically filed this *Answer to Amended Complaint and Counterclaims* with the Clerk of Court using the CM/ECF system which will send notification to the following:

Thomas M. Haskins, III
Martin D. Beier
Angela D. DeVine
SILVER AND DEBOSKEY, P.C.
1801 York Street
Denver, CO 80206
haskinst@s-d.com
beierm@s-d.com
devinea@s-d.com

*Via email to:*
Timothy Rossetti
Sabre Industries, Inc.
Midwest Underground Technology, Inc.
trossetti@sabreindustries.com

*s/ Nicole Simmons*
Nicole Simmons