# APPENDIX

Confidential

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

Tel 217-819-3040
Fax 217-819-3041

Sabre Industries Telecom Services

---

To: Jon Fitzhugh

From: Doug Huff

Re: Term Sheet

Date: February 3rd, 2015

---

TERM SHEET

The parties Midwest Underground Technology Inc (MUTI) and Conceal Fab (CF) are entities that each participate in the Small Cell, DAS, and oDAS segments of the telecom market. (MUTI and Sabre may be used interchangeably in this agreement) Each organization has product lines, customer relationships, and intellectual property that position themselves in leadership positions in this space.

- MUTI brings the following: manufacturing capability, engineering expertise as it relates to power, battery-back up, and radio enclosures (including thermal dissipation, NEMA/GR487 compliance, etc.), backed by a large and credible parent organization, Sabre, and customer credibility with key accounts such as CCI, AT&T, VzW, Sprint, and others.
- CF brings the following: RF expertise as it relates to antenna concealment, PIM mitigation, and RF interference mitigation, engineering expertise as it relates to sound suppression, electrical integration, and total system integration. In addition, CF has significant customer penetration at key accounts including CCI, Verizon, and AT&T; plus an established marketing/sales footprint with several leading Manufacturing Reps, National Distributors, and OEM partners. CF is working in both the commercial and government markets and an important aspect of the government market is maintaining small business status at this time as CF works to be an approved secure facility with appropriate clearances.

The market is forecasted to grow significantly as the carriers continue to plan to invest at meaningful levels in the Small Cell, DAS, and oDAS segments to complement their macro networks over the coming years. The combined organization would have the opportunity to be in a market leadership position as compared to others currently in this space.

Each organization believes that combined efforts in developing products for the Small Cell, DAS, and oDAS, markets will result in significant market penetration and adoption by our customers in a relatively short period of time of the products that will be designed and produced. It will also optimize capital outlays, and marketing and sales efforts, as the parties combine their core competencies to develop world class product lines.

To capitalize on each party's strengths, maximize market penetration, and optimize capital / investment outlays, MUTI and CF have been in discussions to set a plan in place to combine the organizations to facilitate a strategic relationship, acquisition, and investment by MUTI of CF. This term sheet outlines the key categories and terms for which the basis of a definitive agreement will be developed.

Confidential

MUTI
Sabre Industries Telecom Services

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

Tel 217-819-3040
Fax 217-819-3041

Outline of Key Terms and Basic Outline to support development of definitive agreement:

1. MUTI to pay $1.2M that will yield the following
   a. Purchase of all the non-cash assets of ConcealFab Corporation (including but not exclusive to all IP, processes, designs, etc.). These assets will be setup in a new Sabre entity within our products group and will manage all commercial and governmental products and complementary services that are awarded. The current and remaining entity post this asset acquisition will change its name to 'CFG Systems', whose primary function is Government Contracting of Engineering Services and Products.
      i. CFG Systems will be licensed to utilize the IP, designs, processes, etc that will support the business needs of the remaining governmental contracting entity, assuming this arrangement doesn't compromise the validity of CFG Systems as a cleared, small business contracting entity.
      ii. MUTI entity will utilize the name "ConcealFab Commercial Products" as consideration of the transaction
      iii. ConcealFab Corporation to use $1.2M as follows:
         1. Extinguish $843,750 liquidation preference on Preferred stock (not including Fitzhugh's portion)
         2. Fund employee obligations of ~$250,000
         3. Extinguish ~100k of existing SMB Commercial Loan through Vectra Bank
         4. The remaining $200k of private debt will be extinguished and paid back through a royalty agreement on all awarded contracts through CFG Systems based upon Sales generated by the CFG systems entity, until it reaches $230k in royalties in year 1, if it takes more than 1 year, the balance owed grows by ~7k/quarter until the full balance is extinguished.
      iv. All existing shareholders and option holders must vote (per ConcealFab Corporation's bylaws) to approve this transaction, specifically noting that any economic consideration above and beyond the $1.2M will be solely from future earn outs.
         1. Full releases will be provided by each shareholder and option holder

   b. CFG Systems – Will remain as noted in 1(a) as an independent contracting entity utilized for the Governmental engineering, services and product resale business for both legacy ConcealFab government products and MUTI government products as managed by the new MUTI entity and with consideration to the maintenance of its small business and cleared facility status.
      i. All options in the remaining CFG systems entity will be eliminated or converted to common stock
      ii. MUTI will receive a 45% fully diluted stake in CFG Systems as part of the executed transaction.
      iii. Government products and services not requiring small business or cleared facility status or benefiting from CFG Systems' past performance will run through the MUTI – Sabre / 180 organization
      iv. MUTI will provide working capital to CFG Systems to fund the operation of CFG systems
         1. Sabre to create or provide working capital at an amount to be determined, at Sabre's incremental cost of capital
         2. This working capital to be utilized to extinguish any remaining net working capital liabilities (net of any current portion of debt) plus working capital required for growth.

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

Tel 217-819-3040
Fax 217-819-3041

MUTI
Sabre Industries Telecom Services

3. There will be no distributions from CFG Systems to shareholders until a point where any debt balance or working capital investment has been fully extinguished.

v. CFG Systems will provide MUTI with the exclusive right to provide and meet all product, service, and consulting needs when they are able to provide such items at competitive rates and prices as defined in 2(b)(i).

vi. The agreement will provide for a MUTI option to buy out the remaining 55% equity of CFG Systems at a 5x multiple of 55% of the total EBITDA at the 3 year anniversary, which will coinside with the end of MUTI's fiscal year, or on a trailing 12 month basis at each MUTI fiscal yearend interval thereafter less any outstanding working capital or debt that had been provided. At any time prior to year 3, MUTI will have the right of first refusal on any offer to purchase CFG Systems.

2. Earn-out
   a. For the 4 fiscal years ending in April beginning with FYE 4/16, ConcealFab shareholders of record as of closing and in accordance with their share ownership (will have the ability to earn additional payouts in accordance with the following schedule):
      i. 20% of the EBITDA generated by the commercial combined product lines of Conceal Fab and the current MUTI - Sabre / 180 line servicing the small cell, DAS, and oDAS markets, parties will develop a list of products, both existing and to-be-developed that will be included as part of the earn out
      ii. 25% of the EBITDA generated by the combined governmental combined product lines of Conceal Fab and the current MUTI – Sabre / 180 line servicing the small cell, DAS, and oDAS markets, parties will develop a list of products, both existing and to-be-developed that will be included as part of the earn out.
      iii. The list will include, but is not limited to integrated small cell poles where radios are housed inside the poles, back lobe suppressors, oDAS pole tops, RF Transparent Shelters and other products within the product lines of ConcealFab and Sabre / 180.
      iv. All new products not on the list will be reviewed and if approved by the President of the Sabre Telecom Group, will be inserted into the suite of products for qualification and inclusion in the earn-out calculation. Sabre covenants that it will not create or sell products that compete with ConceaFab/180 products and exclude them from the earn-out.
      v. Product line is defined strictly as "manufactured products" for purposes of the earn-out and do not include any installation/maintenance services (but does include Engineering Services that are sold in conjunction with the ConcealFab/180 products within the P&L), consulting, or other contributions unless explicitly agreed to in writing (such as potentially EBITDA generated by non-manufactured products that are only available through the small business or cleared facility status of CFG Systems).
      vi. At the completion of the final term of the earn-out, any revenue and attached EBITDA for orders that were received prior to the final earn-out term will count towards the final earn-out calculation as long as these orders are delivered and invoiced within 60 days of the final term end and EBITDA from these revenues will be calculated using the prior 6 month average EBITDA margin of the P&L.

MUTI
Sabre Industries Telecom Services

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

Tel 217-819-3040
Fax 217-819-3041

---

b. A separate financial segment/ P&L will be established that will account for all product sales, manufacturing, associated direct, indirect, and G & A expenses (as per the explicitly defined EBITDA allowable expenses defined below) that will facilitate proper financial reporting for the product group as identified.
   i. Manufacturing will be provided from the Sabre Telecom Group at quoted transfer pricing levels at market competitive rates, which will be determined as being within 12.5% of the average of at least 2 reputable manufacturers when/if a dispute arises over the reasonability of Sabre Telecom Group's quoted transfer prices.

c. Financial statements will be in line with GAAP accounting and the EBITDA calculation will be a defined term within the formal agreement.

d. EBITDA is defined as follows:
   i. "**EBITDA**" means, with respect to any Earn-out Period, net income, plus (without duplication and to the extent reflected as an expense, charge or other deduction in the calculation of such net income), interest expense, income taxes, depreciation and amortization of the Company for such period, with each of the foregoing components being determined in accordance with GAAP consistently applied.
   ii. Direct corporate costs attributable to the business will be allocated to the business (such as insurance) and any indirect cost allocation will be structured between the parties prior to executing a formal purchase agreement.

3. Other financial items
   a. Additional terms supporting MUTI 45% share issuance in CFG Systems
      i. There will be no further issuance of options or alteration to the capital structure without the written approval of MUTI and ConcealFab shareholders of record

   b. MUTI and ConcealFab Corporation to be fully aligned on shareholder agreements, commitments, and capital / corporate structure prior to closing.

   c. Change of control of MUTI or Sabre
      i. The agreement will provide for continued consideration of the earn-out opportunity as outlined in this term sheet.
      ii. The successor will provide a process that maintains the performance / earn-out opportunity for ConcealFab shareholders in accordance with the intent of this agreement. The successor may also provide a buy-out option at their discretion that would be subject to ConcealFab shareholder majority approval.

   d. Minimum / Floor
      i. No floor or minimum to be established. Future earn-out opportunities will be solely based on performance of the segment. It is the full intention of MUTI to invest in this business to support the economic growth opportunities afforded by this business line. The required investment level will be determined and approved through Sabre's standard business planning process.

4. Employees & Leadership
   a. MUTI

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

Tel 217-819-3040
Fax 217-819-3041

Sabre Industries Telecom Services

i. Jon Fitzhugh will resign from ConcealFab and join MUTI and will be responsible for the Small Cell / DAS / Government products business. Jon will maintain an oversight role with the CFG Systems. An agreed upon employee base will transition to MUTI and accept employment packages (including non-compete language) and become key team members developing this combined product segment.
ii. Jon Fitzhugh will be the Executive VP of Engineered products serving the Small Cell / oDAS / DAS segment responsible for P & L, business development, marketing, sales, and liason with manufacturing entities.
iii. Jon Fitzhugh's liquidation preference in the Preferred Stock will not be taken out of the $1.2M purchase price, rather it will be covered as part of his MUTI employment package.

b. CFG Systems – all employee, board, etc. provisions contemplated below are subject to due diligence to be performed to determine whether they violate affiliation concerns, which both parties agree is meant to be avoided
   i. An agreed number of employees and a designated leader will remain with the government segment operating entity under small business and cleared facility clearance provisions to facilitate opportunities currently under review in this segment.
   ii. Board seats
      1. CF board to expand to 5 with MUTI appointing 2 members and CF appointing 3 members with Jon Fitzhugh occupying one of the 3 CF board seats made available.
   iii. Mentor / Protégé program application through the DHS has been prepared and submitted to mitigate affiliation concerns

5. Current Opportunities
   a. The organizations currently agree that there are opportunities that are in demand of immediate action and will begin collaborating on integrating each other's product into the respective sales channels for specifically agreed to opportunities including Verizon, CCI, Ericsson and others upon the execution of this term sheet.
   b. Within 10 days from the execution of this agreement, the parties will establish an interim plan / agreement that will allow for combined efforts in the marketing, business development, customer relationships, and manufacturing areas. This will include the identification of the responsibilities of each organization and the economic arrangement associated with these specific opportunities.

6. Non-Binding
   a. This agreement is non-binding on either party and establishes only the intent of the organizations to work diligently to develop a formal agreement around the basics of the key points as outlined in this term sheet.
   b. In case a deal does not consummate, the parties agree not to solicit or hire key employees

7. Due diligence
   a. Subject to customary and typical due diligence including customer, distribution, and manufacturing relationships, IP, process review, and financials.

8. Exclusivity
   a. For a period of 60 days post the execution of this agreement, an exclusivity period will begin to allow for MUTI and CF to formulate an agreement acceptable for both parties. During this time, CF will not solicit,

MUTI
Sabre Industries Telecom Services

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

Tel 217-819-3040
Fax 217-819-3041

---

receive, share documents, or take any other action that would be in conflict with the goal of developing a formal agreement as so noted above.

9. Closing target
   a. Closing to be targeted for a maximum of 75 days post the execution of this term sheet and all efforts will be put forth to reduce this time frame to a 60 days.

Agreed to this 3rd day of February 2015

| | |
|---|---|
| Jonathan Fitzhugh<br>Fab | Peter J. Sandore, CEO Conceal<br>Sabre Industries, Inc. |

Confidential

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

MUTI
Sabre Industries Telecom Services

Tel 217-819-3040
Fax 217-819-3041

## Addendum A

- Base & Upside Case

| Opportunity | Potential Lifetime Value | Base Case ($k) | | Upside Case ($k) | | Comments |
|---|---|---|---|---|---|---|
| | | FY 2016 Rev. | FY 2016 EBITDA | FY 2016 Rev. | FY 2016 EBITDA | |
| **CFG Systems** | | | | | | |
| Hill AFB | $21M | 2,000 | 400 | 6,000 | 1,400 | Engineering Services only, blended EBITDA between pass through opportunities (3% mark up) and in- |
| Air Force Space Command (L3 Prime) | $0.3M | 75 | 25 | 150 | 50 | Engineering Design work and contracting |
| GDAIS Warthog | $3.5M | 120 | 40 | 240 | 80 | Engineering/Design Services and contracting |
| Shelter Expeditionary Defense System | $1.2M | 120 | 40 | 240 | 80 | Engineering design work and contracting |
| **Total CFG Systems** | **$26M** | **2,315** | **505** | **6,630** | **1,610** | |
| **CF/Sabre Government** | | | | | | |
| Air Force Space Command (L3 Prime) | $1.5M | 750 | 400 | 750 | 400 | Shelter production |
| GDAIS Warthog | $32M | 800 | 300 | 1,600 | 800 | Prototype and Shelter Production |
| Shelter Expeditionary Defense System | $11M | 800 | 200 | 1,600 | 800 | Production of Reinforced Wall Systems |
| **Total CF/Sabre Government** | **$44.5M** | **2,350** | **900** | **3,950** | **2,000** | |
| **CF Commercial (w/o 180)** | | | | | | |
| Crown Castle | | 400 | 80 | 1,300 | 260 | Primarily SouthEast and CA |
| JMA/CSS | | 250 | 50 | 1,000 | 200 | Nationwide (OEM agreement) |
| AT&T | | 350 | 70 | 900 | 180 | Primarily NorCal |
| FiberTech | | 75 | 15 | 500 | 100 | Multiple mid-west regions |
| Verizon | | 400 | 80 | 1,200 | 240 | Multiple Verizon Regions (incl., PA, OR, NY) |
| Ericsson | | 200 | 40 | 1,000 | 200 | Nationwide (OEM opportunity) |
| CommScope | | 500 | 100 | 1,100 | 220 | Nationwide (OEM opportunity) |
| **Total CF Comm** | | **2,175** | **435** | **7,000** | **1,400** | |
| **Total CF Opportunities** | | **6,840** | **1,840** | **17,580** | **5,010** | |

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

MUTI
Sabre Industries Telecom Services

Tel 217-819-3040
Fax 217-819-3041

---

In support of Item #5 in the Term Sheet, the parties agree to amend the term sheet with the following adjustments to facilitate an accelerated ability to execute business opportunities and to support the working capital requirements of the business.

The term sheet and the LOA below are inclusive of all Sabre Telecom entities and may pertain to Sabre, MUTI, or Cellxion as the Sabre Telecom Group fully considers which entity under it's umbrella will control and account for the new reporting segment, licensing agreement, and acquisition being contemplated. The exclusivity period will be extended for an additional 30 days from the date provided in the term sheet, and upon execution of the LOA, the exclusivity time frame will be extended through the time frame in which the LOA is active and operating.

The intent is that all significant terms of the executed term-sheet will remain in place with an interim plan set to govern the relationship through a "Licensing Agreement" as outlined below. The intent is to provide the business the ability to respond timely to business needs, integrate the business approach, recognize synergies, and facilitate the closing of the transaction within the time constraints set as per the timing noted below or sooner.

***<u>Interim Plan / Licensing Operating Agreement (LOA):</u>***

1. Timing / Term
    a. The term of this LOA will begin upon execution and the initial term will be from execution through 8.30.15.
    b. Sabre will be provided the sole exclusive right to effectuate the acquisition at any time during the term of the LOA at the terms outlined in the Term Sheet as adjusted only by any alteration noted in this LOA.
    c. At the conclusion of the initial term, Sabre will have the exclusive right to complete the acquisition as per the terms of the term sheet, extend the LOA for an additional -6month term, or terminate the LOA.
    d. If Sabre elects to extend the LOA with this 6 month renewal feature, at the conclusion of this renewal, Sabre must either complete the acquisition or terminate the LOA unless both parties agree to continue with the LOA or a new structured arrangement.
    e. Conceal Fab & Sabre agree that if ConcealFab reaches $4.5MM (50% of ConcealFab Standalone plus Synergies) in booked or recognized business (priced to provide a 20% EBITDA margin related to the Sabre Fiscal Year ending 4/16) and has positive EBITDA by the August decision date,or $7.65MMMM (85% of ConcealFab Standalone plus Synergies) in booked or recognized business (priced to provide a 20% EBITDA margin related to the Sabre Fiscal Year ending 4/16) and has delivered $1M of positive EBITDA by the February decision date.( during the term as noted will trigger the acquisition at the latest of the completion of the current term according to the terms of the term sheet as adjusted by this LOA. Booked business is defined as the receipt of formal purchase orders

2. Operation of LOA
    a. Sabre will set up a financial reporting segment under their engineered product group that would capture all financial related results associated with the term sheet as outlined and agreed in the term sheet.
        i. Employees
            1. Jon Fitzhugh and agreed upon employees will be terminated from CF as of an agreed upon date (targeted for 3/9/15) and these employees will go through the typical Sabre onboarding process.
            2. CF is responsible for any and all liabilities of these employees prior to the Sabre hire date.

MUTI
Sabre Industries Telecom Services

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

Tel 217-819-3040
Fax 217-819-3041

---

ii. In addition to his Sabre EPG responsibilities, Jon Fitzhugh will be provided a waiver to allow him the ability to operationally manage the CFG business and the employees left within the remaining entity via the mentor / protégé agreement that has been approved between CF and Sabre by the Government.

iii. All commercial and non-small business / non-cleared facility work and opportunities will be marketed, closed, operated, and all financial transactions will run through this new Sabre reporting segment.

iv. Any Sabre products requiring small business or a cleared facility status will be run through the CFG P&L, when possible

v. Any orders post execution of this agreement not dependent on CFG's small business or cleared facility status will be run through the new Sabre reporting segment.

The current CF company will be renamed CFG as noted in the term sheet and operate as indicated in the term sheet (Item 1b) with the exception of Sabre's 45% fully diluted stake, which will not be executed until the purchase transaction is completed.

3. Financial and investment considerations
   a. The term sheet provides for a purchase price of $1.2M that would be used as follows
      i. Extinguish $843,750 liquidation preference on Preferred stock (not including Fitzhugh's portion)
      ii. Fund employee obligations of ~$250,000
      iii. Extinguish ~$100k of existing SMB Commercial Loan through Vectra Bank
   b. Under the temporary LOA structure these amounts will be handled as outlined below:
      i. The $843,750 liquidation preference on Preferred stock would not be funded and will be addressed as per the term sheet at time of acquisition.
         1. It is understood that if the LOA is extended for an additional renewal of 6 months that this preference would increase by 25% to approximately $1.1M as of Nov 1, 2015
         2. If Sabre elects to execute the renewal term, this ~$210K of increased preference on Preferred stock would be either additional purchase price at acquisition or would revert to a break-up fee if Sabre would elect to terminate the LOA during or at the conclusion of the renewal term.
         3. Any break-up fee would be able to be offset against any funds due Sabre from CFG
      ii. The employee obligations of ~$250K will be funded as follows
         1. Employee/Contractor buyout in March in the amount of $120K. This will be funded through a prepayment / deposit fee licensing fee.
         2. Commissions as earned monthly during the term of the LOA in accordance with the employee's agreement. This amount is expected to be less than 90K, but will be calculated as per the commissions as outlined in the consulting agreement.
         3. The amounts paid during the time of the LOA (March payment and any commission payments) will be deducted from the $250K (payments may not exceed $250K) at closing that is scheduled as per the term sheet, which is the maximum that can be credited against the $1.2MM purchase price.
         4. If for some reason the LOA is terminated, the amounts paid related to these employee / contractor obligations would revert to a 1-year note due Sabre guaranteed by all IP at a rate equivalent to their incremental borrowing rate, to be defined by the formal execution of this agreement. however, Sabre would first have the right of offset for any monies due to CFG from Sabre.
      iii. The ~$100K of existing SMB Commercial Loan will be continued to be paid through CFG and the change in the amount due at closing will be adjusted off of the $1.2M purchase price based on the then current balance.

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

MUTI
Sabre Industries Telecom Services

Tel 217-819-3040
Fax 217-819-3041

---

iv. The remaining $200K of private debt will be remain in place until Sabre completes the acquisition, after which time it will be converted as outlined in the Term Sheet. As with the prepaid licensing fees, at no time will CFG make any distributions to shareholders until this debt is extinguished either through the cash flow generation of the CFG entity or the licensing fees received from Sabre as outlined in this agreement.

c. Provisions of LOA
   i. Conceal Fab will provide to Sabre an exclusive use of all IP, including processes, designs and systems, etc. that are currently held by CF. New products, designs, and engineered products will be developed within the Sabre EPG to support our customers.
   ii. "Conceal Fab Commercial Products" will be made available for utilization as a trade name by Sabre
   iii. All business development efforts with the exception of those outlined for CFG will be completed through the new Sabre EPG.
   iv. Sabre will provide the working capital to the new EPG segment within Sabre
      1. To be clear, no current A/R or A/P of CF will move over to the new Sabre EPG segment that will be set up.
   v. All new business purchase orders, not dependent on CFG's small business or cleared facility received post the execution of this LOA will run through the Sabre EPG segment.
   vi. Any Sabre products requiring small business or a cleared facility status will be run through the CFG P&L, when possible
   vii. Sabre will provide working capital at an amount to be determined to CFG at Sabre's incremental cost of capital (method of funding to be determined as noted below-+--)
      1. Sabre will pre-pay / deposit licensing fees to CFG at an amount to be agreed upon at the execution of and during the duration of this LOA. This amount must be repaid to Sabre prior to any distributions to CFG shareholders. This includes an immediate infusion of cash to ConcealFab in the amount of $160k on March 13th to be utilized as source of funds to pay current A/P as per listing received 3/11/15 and as per agreement, 2015 and an additional $120K (with scheduled payment amounts to be determined) for the Employee/Contractor which must be utilized to effectuate a buyout of the current consulting agreement.
      2. The pre-payment of licensing fees / deposit may be increased upon mutual agreement during the term of the LOA.

Pre-payments / deposit licensing fees shall be repaid by CFG to Sabre or offset against licensing fees earned and due to CFG from Sabre. In the event the LOA is terminated without an acquisition and the licensing fees due CFG from Sabre are not sufficient to offset balances due to Sabre from CFG, then the balance due will revert to the form of a 1-year note at Sabre's incremental borrowing rate payable in monthly installments, with the rate to be determined at the formal execution of the LOA. This note will be guaranteed by a security interest in the IP of Conceal Fab. The security interest may be executed upon after 60 days of non-payment of the monthly installment payments at Sabre's discretion.

d. Licensing Fees
   i. Sabre will accrue licensing fees due CFG at the rates and per the calculations outlined in section 2 (i – v) of the term sheet as generated by the Sabre entity.
   ii. Licensing fees will be accrued by CFG and due Sabre at the rate of 45% of the EBITDA generated by the CFG entity.
   iii. These amounts will be paid within 60 days of the final term of the LOA or acquisition whichever is sooner as calculated by generally accepted accounting principles.
   iv. Sabre will retain the right to offset funds due to CFG for any amounts that may be owed from CFG to Sabre (to include but not limited to pre-paid licensing fees, and the elimination of employee obligations as outlined in 3(b)(ii).

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

MUTI
Sabre Industries Telecom Services

Tel 217-819-3040
Fax 217-819-3041

4. Additional provisions
   a. All existing shareholders and option holders must vote (per Conceal Fab Corporation's By-Laws) to approve this LOA structure in accordance with Conceal Fab's corporate governance documents.
      i. The shareholders have evaluated, understand, and acknowledge all risk elements associated with this LOA structure and agreement and acknowledge that non-performance in achieving the forecasts as set forth may negatively impact their equity and holdings in CF.
   b. If the LOA is terminated for any reason, orders that have been received prior to termination will be continued to be paid as per the terms of the LOA for the duration (both from a Sabre and CF perspective)
   c. All 3rd party costs associated with drafting and executing the interim LOA agreement will be the sole responsibility of Sabre, any 3rd party costs up to $10K borne by CFG will be reimbursed by Sabre upon the execution of the LOA.
   d. Jon Fitzhugh will also be provided a waiver to allow him to continue to negotiate in good faith the purchase and sale agreement on behalf of Conceal Fab
   e. In the event the LOA is terminated at any time....
      i. The employees may be terminated / released by Sabre and able to return to CFG at their discretion
      ii. Jon Fitzhugh's employment agreement shall terminate as "resignation for good reason" in the event of termination of the LOA.
      iii. Licensing rights
         1. Licensing rights originally provided as of the date of execution of this LOA to Sabre for the concealed shelters and back lobe suppressors will be discontinued and all rights shell be the exclusive property of CF thereafter. Sabre will be provided "most favored nation" status on these products and will be offered pricing at e 20% discount off of list / market pricing and the right to market and sell these products as manufactured by CF
         2. Sabre will retain the exclusive IP rights to their radio cages and shroud portfolio as outlined in Exhibit A. CF will be offered pricing at a 10% discount off of list / market pricing and the right to market and sell these products as manufactured by Sabre.
         3. Any IP developed by the new Sabre EPG segment (excluding further improvements in the concealed shelters and back lobe suppressors) will be the property of Sabre. CF will be provided a pricing discount to be determined based on the gross margins of the newly developed products and afforded the ability to market and sell these products.
         4. The organizations agree that each have specific pole capabilities and designs that will be shared and that upon the termination of the LOA, will compete on this product line with no restrictions.

Agreed to this 9th day of March, 2015

Jonathan Fitzhugh
Conceal Fab

Peter J. Sandore, CEO
Sabre Indusrles, Inc.

**From:** Doug Huff <dhuff@sabreindustries.com>
**Sent:** Thursday, March 12, 2015 4:25 PM
**To:** Timothy Rossetti; Pete Sandore
**Subject:** Fwd: Hourly Employees.xlsx

I told Jon i wanted this confirmed prior to funding....

Fyi

-------- Original message --------
From: Jon Fitzhugh <jfitzhugh@concealfab.com>
Date:03/12/2015 5:05 PM (GMT-05:00)
To: Doug Huff <dhuff@sabreindustries.com>
Cc:
Subject: RE: Hourly Employees.xlsx

We received an affirmative vote from a majority both the Preferred class standalone and the Common plus Preferred classes combined, per the below requirements from both the Investor Rights Agreement and the Articles of Incorporation.

__From the Investor Rights Agreement__
2. Drag-Along Rights & Obligations.
a. Change of Control. If the Board of Directors and Shareholders holding shares sufficient to approve a transaction constituting a Change of Control transaction under Colorado law and the Articles of Incorporation then in effect (the "Requisite Holders") (such transaction to be referred to as a an "Approved Sale"), all Shareholders shall, in their respective capacities, consent to, and vote all of their Shares in favor of, and raise no objections against, the Approved Sale, and if the Approved Sale is structured as (i) a merger or consolidation of the Company or a sale of all or substantially all of the Company's assets, each Shareholder shall waive any dissenters' rights, appraisal rights or similar rights in connection with such merger, consolidation or asset sale, or (ii) a sale of shares of capital stock of the Company, each Shareholder shall agree to sell all of such Shareholder's Shares on the terms and conditions approved by the Requisite Holders and the Board; provided, that in an Approved Sale, each Shareholder receives the same total consideration and benefits per Share of the respective class held by it as each other holder of a Share of a respective class receives.

__**From the Articles of Incorporation**__
1.4 Deemed Liquidation Events.
1.4.1 Definition. Each of the following events is a "***Deemed Liquidation Event***" unless the Requisite Holders elect otherwise by written notice received by the Corporation at least five (5) days prior to the effective date of any such event:
(b) the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Corporation or any subsidiary of the Corporation of all or substantially all the assets of the Corporation and its subsidiaries taken as a whole, or, if substantially all of the assets of the Corporation and its subsidiaries taken as a whole are held by such subsidiary or subsidiaries, the sale or disposition (whether by merger or otherwise) of one or more subsidiaries of the Corporation, except where such sale, lease, transfer or other disposition is to the Corporation or one or more wholly owned subsidiaries of the Corporation.

**Voting.**
2.1 General. On any matter presented to the stockholders of the Corporation for their action or consideration at any meeting of stockholders of the Corporation (or by written consent of stockholders in lieu of meeting), each holder of outstanding shares of Preferred Stock may cast the number of votes equal to the number of whole shares of Common Stock into which the shares of Preferred Stock held by such holder are convertible as of the record date for determining stockholders entitled to vote on such matter. Fractional votes shall not be permitted and any fractional voting rights available on an as-converted basis (after aggregating all shares into which shares of Preferred stock held by each holder could be converted) will be rounded to the nearest whole number (with one-half being rounded upward). Except as provided by law or by the other provisions of these Articles, holders of Preferred Stock shall vote together with the holders of Common Stock as a single class on an as-converted basis, shall have full voting rights and powers equal to the voting rights and powers of the holders of Common Stock, and shall be entitled, notwithstanding any provision of these Articles, to notice of any stockholder meeting in accordance with the Bylaws of the Corporation.

---

**From:** Jon Fitzhugh
**Sent:** Thursday, March 12, 2015 2:50 PM
**To:** 'Doug Huff'
**Subject:** Hourly Employees.xlsx

Here you go.

Voting stuff to follow.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-01793-CMA-KLM

CONCEALFAB CORPORATION, a Colorado corporation,

Plaintiff

v.

SABRE INDUSTRIES, INC., a Delaware corporation, and MIDWEST UNDERGROUND TECHNOLOGY, INC., an Illinois corporation

Defendants

---

**DEFENDANTS SABRE INDUSTRIES, INC. AND MIDWEST UNDERGROUND TECHNOLOGY, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FOURTH SET OF WRITTEN DISCOVERY REQUESTS**

---

Defendants Sabre Industries, Inc. ("Sabre") and Midwest Underground Technology, Inc. ("MUTI") (collectively, "Sabre"), through undersigned counsel, hereby responds and objects to Plaintiff's Forth Set of Written Discovery Requests to Defendants (the "Requests").

**GENERAL OBJECTIONS**

1. Sabre objects to the Requests to the extent they attempt to impose any requirement or discovery obligation greater than or different from those under the Federal Rules of Civil Procedure, the local rules of this Court or any Orders of the Court.

2. Sabre objects to the Requests to the extent they seek documents or information protected by the attorney/client privilege, the work-product doctrine, Rule 408 of the Federal Rules of Evidence or any other applicable privilege.

3. Sabre objects to the Requests to the extent they seek documents or information outside of Sabre's possession custody or control.

4. Sabre objects to the Requests to the extent they seek information which is not relevant to the claims or defenses of any party and not proportional to the needs of the case, considering the factors set forth in the F.R.C.P. 26(b).

5. Sabre objects to the Requests to the extent they are overly broad, unduly burdensome and/or propounded for the improper purpose of annoying, embarrassing, or harassing Sabre.

6. Sabre objects to the Requests to the extent they are vague and ambiguous.

7. Sabre objects to the Requests to the extent they seek confidential or proprietary information. Sabre will produce such information pursuant to the Modified Stipulated Protective Order dated May 6, 2016 (Dkt. # 55).

8. Sabre incorporates by reference every general objection set forth above into each specific response set forth below. A specific response may repeat a General Objection for emphasis or for some other reason. The failure to include any General Objection in any specific response does not waive any General Objection to that request.

9. Sabre's response is made to the best of Sabre's present knowledge, information and belief. Sabre, through its attorneys of record, have not completed investigation of the facts relating to this case, have not completed discovery in this action, and have not completed preparation for trial. Defendants' responses to Plaintiff's requests are based on information currently known to them and are given without waiving Defendants' right to use evidence of any subsequently discovered or identified facts, documents or communications.

10. Sabre reserves the right to supplement this Response in accordance with Fed. R. Civ. P. 26(e).

**OBJECTIONS AND RESPONSES TO PLAINTIFF'S INTERROGATORIES**

**INTERROGATORY No. 1:** State all reasons you terminated the LOA, and for each, identify all persons with knowledge of the reason and all documents supporting the reason.

**RESPONSE:** Sabre objects to Interrogatory No. 1 to the extent it seeks to invade the attorney-client privilege and attorney work-product doctrine. Sabre further objects that Interrogatory No. 1 seeks information that is best suited for oral discovery (fact deposition or Rule 30(b)(6) examination), or a deposition by written questions. The Plaintiff issued its Fed. R. Civ. Pro. 26(a)(1) Initial Disclosures on or around December 10, 2015, in which Plaintiff listed eight (8) potential Sabre / MUTI witnesses. Discovery is set to close in this matter on March 31, 2017. Yet, in the over 15 months since Plaintiff served its Initial Disclosures Plaintiff has set no depositions or Rule 30(b)(6) examinations in the case it initiated. Additionally, the Parties have produced thousands of pages of records relevant to

this case, many of which support the Defendants' business decision to terminate the LOA. At some point, written discovery must give way to formal oral discovery.

Without waiving its objections, the Term Sheet signed by the Parties provides that the "[A]greement is non-binding on either party and establishes only the intent of the organizations to work diligently to develop a formal agreement around the basics of the key points as outlined in this term sheet." CONCEALFAB 000178 - CONCEALFAB 000184. The Term Sheet is incorporated into the LOA. Without waiving its objections, Sabre further states that its determination to terminate the Term Sheet and LOA was a business decision made by multiple parties within the Sabre organization, and, based, in part, on Section 4 of the LOA as stated a letter from Peter Sandore, President and CEO Sabre Industries to Jon Fitzhugh which was sent to the Plaintiffs on or around June 3, 2015, and which document speaks for itself. See SABRE002370.

**INTERROGATORY No. 2:** With respect to your contention in Response to Interrogatory No. 6 of your Responses and Objections to Plaintiff's Fourth Set of Written Discovery Requests to Defendants that, "post-termination of the LOA, ConcealFab has represented to Sabre customers and potential customers that Sabre does not have the right to produce and/or market products that contain intellectual property developed by the Sabre EPG segment":

a. state when the representation occurred;
b. state how the representation was made;
c. identify all persons who made the representation; and
d. identify all persons who heard or received the representation.

**RESPONSE:** Sabre objects to Interrogatory No. 2 on the grounds that it seeks information outside of Sabre's possession custody or control. Sabre is not aware of the specifics as to when, how, by whom and to whom the statements referenced in paragraph 68 of the Counterclaims were made. Subject to and without waiving this objection, and by way of example, on February 22, 2016, Scott Gay, a Sabre employee, received a phone call from Keith Galey at Cincinnati Bell, during which Mr. Galey stated that he had received a call from Mr. Fitzhugh in which Mr. Fitzhugh told Mr. Galey that Sabre had no right to fabricate and sell certain products because the intellectual property for those products belongs to ConcealFab. Upon information and belief, Mr. Fitzhugh made similar remarks to other key Sabre accounts. Sabre reserves the right to supplement its response to Interrogatory No 2.

**Interrogatory No. 3:** Identify all lawsuits and/or arbitrations to which you have been a party in the past five years, and for each provide the name of all adverse parties, the case number and the jurisdiction in which the case was filed.

**RESPONSE:** Sabre objects to Interrogatory No. 3 to the extent that it seeks Interrogatory No. 3 seeks information that that is both overbroad and irrelevant to this cause of action. Interrogatory No. 3 requests information that is (1) wholly unrelated to this

lawsuit in terms of time (both before and after the dates at issue in his case), and (2) not "relevant to the claim or defense of any party" pursuant to Fed.R.Civ.P. 26(b)(1). Sabre is a large corporation that, for example, has pending state court collections actions, which are completely irrelevant to this action, and, yet, which information would be responsive Interrogatory No. 3.

## OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS FOR ADMISSION

**Request for Admission No. 1:** Admit that the correspondence previously produced and labeled SABRE000309 is genuine.

**RESPONSE:** Admit.

**Request for Admission No. 2:** Admit that the correspondence previously produced and labeled SABRE000406 is genuine.

**RESPONSE:** Admit.

**Request for Admission No. 3:** Admit that the correspondence previously produced and labeled CONCEALFAB 000045-54 is genuine.

**RESPONSE:** Deny. Sabre has reviewed the document identified as CONCEALFAB 000045-54, this document appears to have been produced by Plaintiff and not by Sabre pursuant to Sabre's document collection. Accordingly, Sabre cannot affirm that the document identified as CONCEALFAB 000045-54 is genuine

**Request for Admission No. 4:** Admit that the correspondence previously produced and labeled SABRE000511 is genuine.

**RESPONSE:** Admit.

**Request for Admission No. 5:** Admit that the correspondence previously produced and labeled SABRE000486 is genuine.

**RESPONSE:** Admit.

**Request for Admission No. 6:** Admit that the email address from which Doug Huff sent and received emails on behalf of you was dhuff@sabreindustries.com.

**RESPONSE:** Admit.

**Request for Admission No. 7:** Admit that the email address from which Tony Sabatino sent and received emails on behalf of you was tsabatino@sabreindustries.com.

**RESPONSE:** Admit.

**Request for Admission No. 8:** Admit that the email address from which Pete Sandore sent and received emails on behalf of you was psandore@sabreindustries.com.

**RESPONSE:** Admit.

**Request for Admission No. 9:** Admit that the email address from which Timothy Rossetti sent and received emails on behalf of you was trossetti@sabreindustries.com.

**RESPONSE:** Admit.

Dated: March ~~23~~ 24, 2017.

**GOOSMANN LAW FIRM, PLC**

By: EMLally

Elizabeth M. Lally, AT0013010
410 5th Street
Sioux City, IA 51101
Phone: 712-226-4000
Fax: 712-2244517
lallye@goosmannlaw.com
**ATTORNEY FOR DEFENDANTS SABRE INDUSTRIES, INC. AND MIDWEST UNDERGROUND TECHNOLOGY, INC.**

## VERIFICATION

I, Tim Rossetti., under penalties of perjury hereby state:

That I am the Chief Financial Officer and Executive Vice President for Sabre Industries, Inc.'s herein; and that I have read the above and foregoing Sabre Industries, Inc.'s Responses And Objections To Plaintiff's Forth Set Of Written Discovery Requests To Defendants and know the contents thereof, and that the statements and allegations therein contained are true and correct to my best knowledge, except as to the statements and allegations stated upon information and belief, which I believe to be true to the best of my knowledge.

Timothy P. Rossetti

Tim Rossetti



ConcealFab Appendix 000019

**CERTIFICATE OF SERVICE**

I certify that on March 24, 2017, I served the above Responses and Objections to Plaintiff's Fourth Set of Written Discovery via email to:

Angela D. DeVine
SILVER AND DEBOSKEY, P.C.
1801 York Street
Denver, CO 80206
devinea@s-d.com

*s/ Chasity Raub-Medina*
Chasity Raub-Medina

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-01793-CMA-KLM

CONCEALFAB CORPORATION, a Colorado corporation,

Plaintiff,

v.

SABRE INDUSTRIES, INC., a Delaware corporation, and
MIDWEST UNDERGROUND TECHNOLOGY, INC., an
Illinois corporation,

Defendants.

**Affidavit for Mr. Steve Sathre**

I, Steve Sathre ("Affiant') being first duly sworn, deposes and says that Affiant has personal knowledge of and is competent to testify to the following facts:

1. Affiant is employed by the Information Technology Department of Sabre Industries, Inc., ("Sabre"), Defendant in the above captioned matter.

2. Affiant has been employed in the Information Technology field in general for 22 years. Affiant has been employed by the Information Technology Department of Sabre since August, 2013, his current title is Director, IT.

3. As part of his work for Sabre, Affiant is acquainted with systems and procedures for the creation and short and long term retention of Sabre's electronically stored information ("ESI").

4. As a result of the ConcealFab's initial Written Discovery Requests issued to Defendant, I undertook certain discovery planning with Sabre's former counsel at Haddon, Morgan and Foreman, P.C.

5. The majority of the documents requested by the Plaintiff's initial Written Discovery Requests are and were stored in electronic form within the possession, custody, or control of Sabre.

6. This material was and is stored on Microsoft's Office 365 Cloud service in their native file format, i.e. with searchable metadata.

7. During the months of February and March 2016, I and Mark G. Owens worked with Sabre's then legal counsel Haddon, Morgan and Foreman, P.C. to develop a list of "key" words and / or terms designed to find the information sought by Plaintiff's initial Written Discovery Requests.

8. My team and I also worked with Sabre's then legal counsel to develop a list of "key" custodians involved in the above captioned case who might have information relevant and responsive to Plaintiff's initial Written Discovery Requests.

9. My team and I then ran a series of searched based on these "key" search words, search terms and custodians across Microsoft's Office 365 Cloud service, and provided the responsive documents in .PST format to Haddon, Morgan and Foreman, P.C.

10. I have reviewed the PDF copies of the documents identified pursuant to Plaintiff's Request for Production contained in Plaintiff's Forth Set of Written Discovery Requests issued to Defendant labeled: SABRE000309; SABRE000406; SABRE 000511; and SABRE000486. I have no reason to believe that they are not true and accurate PDF copies of the original, native PST documents maintained by Sabre in the ordinary course of its business, and originally produced to Plaintiff's former counsel.

11. I have reviewed the document identified as CONCEALFAB 000045-54, this document appears to have been produced by Plaintiff and not by Sabre pursuant to Sabre's document collection. Accordingly, I cannot affirm that the document identified as CONCEALFAB 000045-54 is genuine.

12. I have also reviewed the list of e-mail handles identified pursuant to Plaintiff's Request for Production contained in Plaintiff's Forth Set of Written Discovery Requests issued to Defendant.

13. I affirm that each of the e-mail handles listed below is an official e-mail handle that was issued to and used by the current or former Sabre employee assigned to the e-mail handle as part of their job duties.

14. I affirm that Doug Huff sent and received emails on behalf of Sabre at using the following e-mail address: dhuff@sabreindustries.com.

15. I affirm that Tony Sabatino sent and received emails on behalf of Sabre at using the following e-mail address tsabatino@sabreindustries.com.

16. I affirm that Pete Sandore sent and received emails on behalf of Sabre at using the following e-mail address psandore@sabreindustries.com.

17. I affirm that Timothy Rossetti sent and received emails on behalf of Sabre at using the following e-mail address trossetti@sabreindustries.com.

I affirm, under the penalties for perjury, that the foregoing representations are true.

Dated this 21 day of March, 2017.

Steve Sathre

SUBSCRIBED AND SWORN to before me this 21st day of March, 2017.

Notary Public

NOTARIAL SEAL IOWA
SHERYL A. MURPHY
Commission Number 733096
My Commission expires
February 22, 2020

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-01793-CMA-KLM

CONCEALFAB CORPORATION, a Colorado corporation,

Plaintiff

v.

SABRE INDUSTRIES, INC., a Delaware corporation, and
MIDWEST UNDERGROUND TECHNOLOGY, INC., an
Illinois corporation

Defendants

---

**DEFENDANTS SABRE INDUSTRIES, INC. AND MIDWEST UNDERGROUND TECHNOLOGY, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S THIRD SET OF WRITTEN DISCOVERY REQUESTS TO DEFENDANTS**

---

Defendants Sabre Industries, Inc. ("Sabre") and Midwest Underground Technology, Inc. ("MUTI", and together with Sabre, "Sabre"), through undersigned counsel, hereby respond and object to Plaintiff's Third Set of Written Discovery Requests to Defendants (the "Requests").

**GENERAL OBJECTIONS**

1. Sabre objects to the Requests to the extent they attempt to impose any requirement or discovery obligation greater than or different from those under the Federal Rules of Civil Procedure, the local rules of this Court or any Orders of the Court.

2. Sabre objects to the Requests to the extent they seek documents or information protected by the attorney/client privilege, the work-product doctrine, Rule 408 of the Federal Rules of Evidence or any other applicable privilege.

3. Sabre objects to the Requests to the extent they seek documents or information outside of Sabre's possession custody or control.

4. Sabre objects to the Requests to the extent they seek information which is not relevant to the claims or defenses of any party and not proportional to the needs of the case, considering the factors set forth in the F.R.C.P. 26(b).

5. Sabre objects to the Requests to the extent they are overly broad, unduly burdensome and/or propounded for the improper purpose of annoying, embarrassing, or harassing Sabre.

6. Sabre objects to the Requests to the extent they are vague and ambiguous.

7. Sabre objects to the Requests to the extent they seek confidential or proprietary information. Sabre will produce such information pursuant to the Modified Stipulated Protective Order dated May 6, 2016 (Dkt. # 55).

8. Sabre incorporates by reference every general objection set forth above into each specific response set forth below. A specific response may repeat a General Objection for emphasis or for some other reason. The failure to include any General Objection in any specific response does not waive any General Objection to that request.

9. Sabre's response is made to the best of Sabre's present knowledge, information and belief. Sabre, through its attorneys of record, have not completed investigation of the facts relating to this case, have not completed discovery in this action, and have not completed preparation for trial. Defendants' responses to Plaintiff's requests are based on information currently known to them and are given without waiving Defendants' right to use evidence of any subsequently discovered or identified facts, documents or communications.

10. Sabre reserves the right to supplement this Response in accordance with Fed. R. Civ. P. 26(e).

**OBJECTIONS AND RESPONSES TO PLAINTIFF'S INTERROGATORIES**

**INTERROGATORY No. 1:** With respect to the allegation in paragraph 25 of your Counterclaims that "ConcealFab represented to Sabre that all of ConcealFab's existing shareholders and option holders would need to vote to approve the LOA structure in accordance with ConcealFab's corporate governance documents":

a. state when the representation occurred;
b. state how the representation was made;
c. identify all persons who made the representation; and
d. identify all persons who heard or received the representation.

**RESPONSE:**

a. The representation was first made on or about February 24, 2015.

b. On or about February 24, 2015 Jon Fitzhugh sent an email in which he stated: "As discussed, ConcealFab is not in a position to continue waiting for progress to occur and given several of the provisions of the LOA that will likely require significant 'back and forth' negotiations, *in addition to the requirement for all ConcealFab Shareholders and Option holders to vote in favor of the LOA*, we are likely 2-3 weeks from signing a deal and receiving funding. *See* CONCEALFAB 001795-CONCEALFAB 001796 (emphasis added).

In addition, as of February 26, 2015, all drafts of the LOA that were exchanged between ConcealFab and Sabre contained a provision that stated in sum and substance: "All existing shareholders and option holders must vote (per ConcealFab Corporation's By-Laws) to approve this LOA structure in accordance with ConcealFab's corporate governance documents." *See* CONCEALFAB 001802-001812.

c. Jonathan Fitzhugh, Chris Odell, Duncan Stewart.

d. Douglas Huff
805 Foxhollow Run
Milton, GA 30004
Tel: (678) 592-6860

**Interrogatory No. 2:** If you contend the LOA provided that the amounts paid by Sabre to ConcealFab employee/contractor obligations would revert to a 1-year note due Sabre guaranteed by all the intellectual property of ConcealFab at a rate equal to Sabre's incremental borrowing rate upon termination of the LOA, state all facts upon which you base your contention, identify all documents which support your contention, and identify all persons with knowledge of those facts or documents.

**RESPONSE:** Section 3(b)(ii)(4) of the final LOA states:

"If for some reason the LOA is terminated, the amounts paid related to these employee/contractor obligations would revert to a 1-year note due Sabre guaranteed by all IP at a rate equivalent to their incremental borrowing rate, to be defined by the formal execution of this agreement." *See* e.g. CONCEALFAB 002036 - 002046.

Anyone who has read the final LOA has knowledge of these facts, including but not limited to, Douglas Huff, Tony Sabatino, Jonathan Fitzhugh, Chris Odell and Duncan Stewart.

**Interrogatory No. 3:** With respect to the allegation in paragraph 57(a) of your Counterclaims that ConcealFab misrepresented that it "had significant and lucrative pending or upcoming purchase orders that were going to provide significant revenue to ConcealFab in 2015 and 2016":

a. state when the representation occurred;

b. state how the representation was made;
c. identify all persons who made the representation;
d. identify all persons who heard or received the representation; and
e. describe all the ways in which the representation was false.

**RESPONSE:**

a. The misrepresentation referenced in paragraph 57(a) of Sabre's Counterclaims was made by ConcealFab on several occasions from at least February 15, 2015 to April, 2015.

b. The misrepresentation referenced in paragraph 57(a) of the Counterclaims was made both via email and orally through conversations between primarily Jonathan Fitzhugh and Douglas Huff. Specific examples, include:

- CONCEALFAB 001675 - CONCEALFAB 001679; February 17, 2015, Email from Fitzhugh to Patrick Cochran and Doug Huff containing ConcealFab Revenue Forecast; ConcealFab Base Case/Upside Case provided to Sabre from Fitzhugh.

- CONCEALFAB 001677; February 17, 2015, ConcealFab Revenue Forecast from Fitzhugh to Patrick Cochran and Doug Huff contains multiple forward looking statements, "(Hill Airforce Base) Expected award in March, at the latest;" "(L3 Communication) Multiple shelter award in March/April;" "(SVP) Modest forecast, 200-400 poles possible."

- CONCEALFAB 001687; February 17, 2015, Email from Fitzhugh sent a document entitled "ConcealFab Sales Pipeline" that listed ConcealFab's commercial and government contracts and the timing and size of revenue generation. *See* e.g. CONCEALFAB 001687.

- CONCEALFAB 001787; February 20, 2015, Email from Fitzhugh to Huff/Fitzhugh attached revenue forecasts and stated: "Truth be told, I think his commission payout will be a lot higher because a lot more deals than I anticipated are starting to hit. We believe another 300K of unforecasted revenue will hit in mid/late March for a shelter."

- CONCEALFAB 000201-CONCEALFAB 000203: April 21, 2015, Email from Fitzhugh to Huff and Tony Sabatino: "May/June/July/August of the attached spreadsheet forecasts ~$1.8M of revenue in aggregate. The SVP deal alone covers that revenue forecast, while the Ericsson/JMA/CommScope partnership have an opportunity to ramp up and help supply the growth we expect later in the year, in addition to the follow-on order expected from SVP. The fact that AFB Hill is again in play is pure upside if it happens...I know I have the pipeline to support the attached forecast which supported the term sheet and my expense level."

c. Jonathan Fitzhugh

d. Douglas Huff
805 Foxhollow Run
Milton, GA 30004
Tel: (678) 592-6860

Tony Sabatino
Sabre Industries, Inc.,
8653 East Highway 67,
Alvarado, TX 76009
Tel: (817) 852-1700

e. This representation was false because ConcealFab did not actually have significant and lucrative pending or purchase orders that provided significant revenue to ConcealFab in 2015.

**Interrogatory No. 4:** With respect to the allegation in paragraph 57(c) of your Counterclaims that ConcealFab misrepresented that it "had considerable existing purchase orders that would inject considerable revenue in 2015":

a. state when the representation occurred;
b. state how the representation was made;
c. identify all persons who made the representation;
d. identify all persons who heard or received the representation; and
e. describe all the ways in which the representation was false.

**RESPONSE:**

a. The misrepresentation referenced in paragraph 57(c) of the Counterclaims was made by ConcealFab on several occasions and in several fashions during the period from at least February 15, 2015 to April, 2015.

b. The misrepresentation referenced in paragraph 57(c) of the Counterclaims was made both via email and orally through conversations between primarily Jonathan Fitzhugh and Douglas Huff. Specific examples, include:

- CONCEALFAB 001687; February 17, 2015, Email from Fitzhugh sent a document entitled "ConcealFab Sales Pipeline" that listed ConcealFab's commercial and government contracts and the timing and size of revenue generation. *See* e.g. CONCEALFAB 001687.

c. Jonathan Fitzhugh

d. Douglas Huff
805 Foxhollow Run

Milton, GA 30004
Tel: (678) 592-6860

e. This representation was false because ConcealFab did not in fact have considerable existing purchase orders that injected considerable revenue in 2015.

**Interrogatory No. 5:** With respect to the allegation in paragraph 68 of your Counterclaims that "ConcealFab has and continues to make false statements harmful to Sabre by telling key accounts that Sabre is improperly using ConcealFab intellectual property":

a. state when the statements occurred;
b. state how the statements were made;
c. identify all persons who made the statements;
d. identify all persons who heard or received the statements; and
e. describe all the ways in which the statements are false.

**RESPONSE**: Sabre objects to Interrogatory No. 5 on the grounds that it seeks information outside of Sabre's possession custody or control. Sabre is not aware of the specifics as to when, how, by whom and to whom the statements referenced in paragraph 68 of the Counterclaims were made. Subject to and without waiving this objection, by way of example, on February 22, 2016, Scott Gay, a Sabre employee, received a phone call from Keith Galey at Cincinnati Bell, during which Mr. Galey stated that he had received a call from Mr. Fitzhugh in which Mr. Fitzhugh told Mr. Galey that Sabre had no right to fabricate and sell certain products because the intellectual property for those products belongs to ConcealFab. Upon information and belief, Mr. Fitzhugh made similar remarks to other key Sabre accounts.

**Interrogatory No. 6:** State all facts upon which you base the allegation in paragraph 79(d) of the Counterclaims that ConcealFab has refused "to acknowledge that post-termination of the LOA, Sabre has the right to retain the property rights of Intellectual Property developed by the new Sabre EPG segment."

**RESPONSE**: Section 4(e)(iii)(3) of the LOA states in relevant part: "Any IP developed by the new Sabre EPG segment (excluding further improvements in the concealed shelters and back lobe suppressors) will be property of Sabre." Sabre bases the allegation in paragraph 79(d) of the Counterclaims on the fact that post-termination of the LOA, ConcealFab has represented to Sabre customers and potential customers that Sabre does not have the right to produce and/or market products that contain intellectual property developed by the Sabre EPG segment. Sabre reserves the right to supplement this response in the event it learns of additional information for which to base this allegation during the discovery period.

**Interrogatory No. 7:** Identify all intellectual property rights developed by the Sabre EPG segment between March 13, 2015 and June 3, 2015.

**RESPONSE:** Prior to and during the time period between March 13, 2015 and June 3, 2015, Sabre developed and continued to develop multiple engineered products supporting the same, shared market space as ConcealFab; Sabre Product identification of these units are as follows, and which are identified in more detail on SABRE002296:

SmartStack™ full family of integrated round pole solutions to house Remote Radios, power solutions (rectifiers and BBU controllers), Batteries and additional equipment e.g. fiber splice tray's, passive components (hybrid combiners, splitters) and lightning arrestors etc.

SmartStack Cubic™ full family of integrated square/rectangle pole solutions to house Remote Radios, power solutions (rectifiers and BBU controllers), Batteries and additional equipment e.g. fiber splice tray's, passive components (hybrid combiners, splitters) and lightning arrestors etc.

Radio Cages single or multiple remote radio housing for pole mounted solutions, shroud like unit with high thermal capacity due to extensive grated opening in structure for ventilation. Also houses additional equipment including but not limited to, Power Supply Unit, Passive components (Combiners, Splitters). Supporting multiple OEM radio equipment including but not limited to TE, Samsung, Ericsson, ALU.

Shrouds fully family of remote radio & power cabinet shrouds that can be pole mounted, pedestal mounted and or as ground furniture. Units are typical NEMA style enclosures included but not limited to 3R, 4R etc. Housing multiple equipment including but not limited to Remote Radios, power solutions (rectifiers and BBU controllers), Batteries and additional equipment e.g. fiber splice tray's, passive components (hybrid combiners, splitters) and lightning arrestors etc.

Sabre reserves the right to supplement this response in the event it learns of additional information.

**Interrogatory No. 8:** Identify all purchase orders received by the Sabre EPG segment between March 13, 2015 and June 3, 2015, and for each:

a. identify the customer;
b. identify the product(s), good(s) and/or service(s) purchased;
c. state the amount of money received by the Sabre EPG segment and/or you pursuant to the purchase order;
d. state the amount of money retained by the Sabre EPG segment and/or you; and
e. state the amount of money paid to ConcealFab.

**RESPONSE**: Sabre directs the plaintiff to SABRE002324-SABRE002326 – EPG Orders – 3/13/15 through 6/3/15 and related Purchase Orders SABRE 002297-SABRE002323 produced contemporaneously herein.

a. See SABRE002324-SABRE002326; SABRE002297-SABRE002323;
b. See SABRE002324-SABRE002326; SABRE002297-SABRE002323;
c. All funds were retained by the Sabre EPG segment;
d. No funds were paid to ConcealFab.

**Interrogatory No. 9:** Identify all invoices received by the Sabre EPG segment between March 13, 2015 and June 3, 2015, and for each:

a. identify the contractor or supplier submitting the invoice for payment;
b. identify the amount of the invoice;
c. state the amount of money paid by the Sabre EPG segment and/or you.

**RESPONSE**: Sabre directs the plaintiff to SABRE002324-SABRE002326 – EPG Orders – 3/13/15 through 6/3/15 and SABRE002327-SABRE002345, produced contemporaneously herein. Sabre reserves the right to supplement this response.

**Interrogatory No. 10:** For each response to the Requests for Admission below that is not an unqualified admission, state all facts and identify all documents upon which you based your qualified admission or denial.

**RESPONSE**: Sabre objects to this Request on the grounds that it constitutes nine separate and distinct interrogatories. Without waiving its General and Specific Objections, Sabre responds that for each response to the Requests for Admission below that is not an unqualified admission, Sabre directs ConcealFab to the facts and documents specifically identified in each Response.

## OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS FOR PRODUCTION

**Document Request No. 1**: For each response to the Requests for Admission below that is not an unqualified admission, produce all documents and other tangible things that support your qualified admission or denial.

**RESPONSE:** Sabre objects to this Request on the grounds that it constitutes nine separate and distinct requests for production.

**<u>Document Request No. 2</u>**: Produce all documents that were reviewed, referred to, or relied upon in the preparation of your responses to the above Interrogatories and below Requests for Admission.

**RESPONSE:** Sabre directs ConcealFab to the documents previously produced by the parties to this litigation, the documents specifically identified by Bates number in Sabre's Responses, and the documents listed below and produced contemporaneously herein:

- Sabre Payroll Distributions to ConcealFah, March 12, 2015 to June 15, 2105, Summary; SABRE002346-SABRE002347;
- ConcealFab Aging Summary, SABRE002348;
- ConcealFab Aging Detail, SABRE002349-002364;
- Summary of PO to SABRE002324-SABRE002326 – EPG Orders – 3/13/15 through 6/3/15;
- Purchase Orders for Sabre EPG, SABRE 002297-SABRE002323; and
- Invoices related to Sabre EPG, SABRE002327-SABRE002345.

## <u>OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS FOR ADMISSION</u>

**<u>Request for Admission No. 1</u>**: Admit you were informed that ConcealFab was not awarded the Hill Air Force Base contract no later than March 6, 2015. *See* document previously produced and labeled SABRE000309.

**RESPONSE***:* Sabre admits that it received the document previously produced and labeled SABRE000309. Sabre admits that on or around March 6, 2015, Doug Huff was purportedly informed by Fitzhugh that "a small company called 'SIE'" was going to be awarded the Hill AFB contract, but Sabre further states that on or before April 21, 2105, Sabre was told by Fitzhugh that the Hill AFB contact was "again in play." CONCEALFAB000201-CONCEALFAB000202.

**<u>Request for Admission No. 2:</u>** Admit you were informed that ConcealFab "received an affirmative vote from a majority [of] both its Preferred class standalone and the Common plus Preferred classes combined" no later than March 12, 2015. *See* document previously produced and labeled SABRE000406.

**RESPONSE**: Admit.

**<u>Request for Admission No. 3</u>**: Admit you were never informed that ConcealFab received unanimous shareholder approval of the LOA.

**RESPONSE:** Deny. ConcealFab executed the LOA on or about March 13, 2015 and in so doing, ConcealFab represented that it received unanimous shareholder approval of the LOA pursuant to Section 4(a) therein.

**Request for Admission No. 4:** Admit that you prepared the Employment Agreement.

**RESPONSE:** Deny. Jonathan Fitzhugh, Chris O'Dell, Duncan Stewart of ConcealFab and Douglas Huff and Carey Ellinghaus of Sabre exchanged various drafts of the Employment Agreement starting on or around January 7, 2015 (see CONCEALFAB000045-000046; CONCEALFAB000047-CONCEALFAB000054) until at least January 15, 2015, (CONCEALFAB001142; CONCEALFAB001143-CONCEALFAB001151) which the Employment Agreement was never finalized or fully executed by the parties. Various drafts of the Employment Agreement are contained in ConcealFab's document production to date; including:

- CONCEALFAB 000045-000046; CONCEALFAB 000047-CONCEALFAB 000054;
- CONCEALFAB 001043; CONCEALFAB 001044-CONCEALFAB 001052;
- CONCEALFAB 001053; CONCEALFAB 001054-CONCEALFAB 001062;
- CONCEALFAB 001063; CONCEALFAB 001064-CONCEALFAB 001072;
- CONCEALFAB 001073; CONCEALFAB 001074-CONCEALFAB 001082
- CONCEALFAB 001084; CONCEALFAB 001085-CONCEALFAB 001093;
- CONCEALFAB 001102; CONCEALFAB 001103-CONCEALFAB 001111;
- CONCEALFAB 001112; CONCEALFAB 001113-CONCEALFAB 001121;
- CONCEALFAB 001122; CONCEALFAB 001123-CONCEALFAB 001131;
- CONCEALFAB 001132; CONCEALFAB 001133-CONCEALFAB 001141;
- CONCEALFAB 001142; CONCEALFAB 001143-CONCEALFAB 001151.

**Request for Admission No. 5:** Admit that you did not pay the March 2015 Founders Payment until May 5, 2015. *See* document previously produced and labeled SABRE000511.

**RESPONSE:** Admit.

**Request for Admission No. 6:** Admit that you did not pay the April 2016 Founders Payment until May 5, 2015. *See* document previously produced and labeled SABRE000511.

**RESPONSE:** Admit.

**Request for Admission No. 7:** Admit that you never paid the $27,310.60 described as "CF Payroll 6/1/2015-6/7/2015 estimated" on the document previously produced and labeled SABRE000689.

**RESPONSE:** Admit.

**Request for Admission No. 8:** Admit that you never paid the $4,000.00 described as "CF Hourly Payroll for Week Ending 5/31/15, To Be Paid June 5," on the document previously produced and labeled SABRE000689.

**RESPONSE:** Deny. Sabre paid the hourly payroll for week ending 5/31/15 and payable 6/5/15; the amount paid was $4,307.40, of which $1,389.40 was payout of PTO upon termination. See CF Payroll Distribution March 15, 2015 to June 15, 2016, SABRE002346-SABRE002347 produced contemporaneously herein.

**Request for Admission No. 9:** Admit that you never paid the $60,326.53 described as "AP Unpaid (March through May 31)" on the document previously produced and labeled SABRE000689.

**RESPONSE:** Deny. The AP Aging for CF vendors that remains unpaid totals $66,897.54, see updated AP Aging Summary, and AP Aging Detail, SABRE002348-SABRE002364 produced contemporaneously herein.

Dated: February 21, 2017.

**GOOSMANN LAW FIRM, PLC**

By: s/ Elizabeth M. Lally
Elizabeth M. Lally, AT0013010
410 5th Street
Sioux City, IA 51101
Phone: 712-226-4000
Fax: 712-2244517
lallye@goosmannlaw.com
**ATTORNEY FOR DEFENDANTS SABRE INDUSTRIES, INC. AND MIDWEST UNDERGROUND TECHNOLOGY, INC.**

**VERIFICATION**

I, Stanley Clayton McGee, Jr., under penalties of perjury hereby state:

That I am the Vice President of Finance Sabre Industries, Inc.'s herein; and that I have read the above and foregoing Sabre Industries, Inc.'s Responses And Objections To Plaintiff's Third Set Of Written Discovery Requests To Defendants and know the contents thereof, and that the statements and allegations therein contained are true and correct to my best knowledge, except as to the statements and allegations stated upon information and belief, which I believe to be true to the best of my knowledge.

Stanley Clayton McGee, Jr.

**CERTIFICATE OF SERVICE**

I certify that on February 21, 2017, I served the above Responses and Objections to Plaintiff's Third Set of Written Discovery via email to:

Angela D. DeVine
SILVER AND DEBOSKEY, P.C.
1801 York Street
Denver, CO 80206
devinea@s-d.com

*s/ Chasity Raub-Medina*
Chasity Raub-Medina

**From:** Doug Huff <dhuff@sabreindustries.com>
**Sent:** Friday, March 06, 2015 8:45 AM
**To:** Pete Sandore; Timothy Rossetti
**Subject:** Conceal Fab...

Pete,

I have been pushing Jon hard to get feedback from Hill AFB and told him we would like that feedback prior to executing.

Just spoke with him and they were "sideswiped" as he said and were told this morning that the award was going to go to a small company called "SIE" vs Conceal Fab. They had been told since December that award was forthcoming. We should discuss prior to executing the agreement I sent over this morning.

Jon is available between 1PM and 2PM and after 3:30 EST today.

Please let me know when you are available.

Dch

**Angela D. DeVine**

---

**From:** Jonathan Fitzhugh <jfitzhugh@concealfab.com>
**Sent:** Monday, April 24, 2017 6:45 PM
**To:** Angela D. DeVine
**Subject:** FW: Signed on my end...
**Attachments:** C Fab - Term Sheet - LOA 3 12 Final JF Signed.pdf

[redacted]

---

**From:** Jonathan Fitzhugh
**Sent:** Thursday, March 12, 2015 10:13 AM
**To:** Doug Huff <dhuff@sabreindustries.com>
**Subject:** Signed on my end...

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

Tel 217-819-3040
Fax 217-819-3041

Sabre Industries Telecom Services

To: Jon Fitzhugh

From: Doug Huff

Re: Term Sheet

Date: February 3rd, 2015

---

TERM SHEET

The parties Midwest Underground Technology Inc (MUTI) and Conceal Fab (CF) are entities that each participate in the Small Cell, DAS, and oDAS segments of the telecom market. (MUTI and Sabre may be used interchangeably in this agreement) Each organization has product lines, customer relationships, and intellectual property that position themselves in leadership positions in this space.

- MUTI brings the following: manufacturing capability, engineering expertise as it relates to power, battery-back up, and radio enclosures (including thermal dissipation, NEMA/GR487 compliance, etc.), backed by a large and credible parent organization, Sabre, and customer credibility with key accounts such as CCI, AT&T, VzW, Sprint, and others.
- CF brings the following: RF expertise as it relates to antenna concealment, PIM mitigation, and RF interference mitigation, engineering expertise as it relates to sound suppression, electrical integration, and total system integration. In addition, CF has significant customer penetration at key accounts including CCI, Verizon, and AT&T; plus an established marketing/sales footprint with several leading Manufacturing Reps, National Distributors, and OEM partners. CF is working in both the commercial and government markets and an important aspect of the government market is maintaining small business status at this time as CF works to be an approved secure facility with appropriate clearances.

The market is forecasted to grow significantly as the carriers continue to plan to invest at meaningful levels in the Small Cell, DAS, and oDAS segments to complement their macro networks over the coming years. The combined organization would have the opportunity to be in a market leadership position as compared to others currently in this space.

Each organization believes that combined efforts in developing products for the Small Cell, DAS, and oDAS, markets will result in significant market penetration and adoption by our customers in a relatively short period of time of the products that will be designed and produced. It will also optimize capital outlays, and marketing and sales efforts, as the parties combine their core competencies to develop world class product lines.

To capitalize on each party's strengths, maximize market penetration, and optimize capital / investment outlays, MUTI and CF have been in discussions to set a plan in place to combine the organizations to facilitate a strategic relationship, acquisition, and investment by MUTI of CF. This term sheet outlines the key categories and terms for which the basis of a definitive agreement will be developed.

Sabre Industries Telecom Services
2626 Midwest Court Champaign, IL 61822
www.mutionline.com
Tel 217-819-3040
Fax 217-819-3041

Outline of Key Terms and Basic Outline to support development of definitive agreement:

1. MUTI to pay $1.2M that will yield the following
   a. Purchase of all the non-cash assets of ConcealFab Corporation (including but not exclusive to all IP, processes, designs, etc.). These assets will be setup in a new Sabre entity within our products group and will manage all commercial and governmental products and complementary services that are awarded. The current and remaining entity post this asset acquisition will change its name to 'CFG Systems', whose primary function is Government Contracting of Engineering Services and Products.
      i. CFG Systems will be licensed to utilize the IP, designs, processes, etc that will support the business needs of the remaining governmental contracting entity, assuming this arrangement doesn't compromise the validity of CFG Systems as a cleared, small business contracting entity.
      ii. MUTI entity will utilize the name "ConcealFab Commercial Products" as consideration of the transaction
      iii. ConcealFab Corporation to use $1.2M as follows:
         1. Extinguish $843,750 liquidation preference on Preferred stock (not including Fitzhugh's portion)
         2. Fund employee obligations of ~$250,000
         3. Extinguish ~100k of existing SMB Commercial Loan through Vectra Bank
         4. The remaining $200k of private debt will be extinguished and paid back through a royalty agreement on all awarded contracts through CFG Systems based upon Sales generated by the CFG systems entity, until it reaches $230k in royalties in year 1, if it takes more than 1 year, the balance owed grows by ~7k/quarter until the full balance is extinguished.
      iv. All existing shareholders and option holders must vote (per ConcealFab Corporation's bylaws) to approve this transaction, specifically noting that any economic consideration above and beyond the $1.2M will be solely from future earn outs.
         1. Full releases will be provided by each shareholder and option holder

   b. CFG Systems – Will remain as noted in 1(a) as an independent contracting entity utilized for the Governmental engineering, services and product resale business for both legacy ConcealFab government products and MUTI government products as managed by the new MUTI entity and with consideration to the maintenance of its small business and cleared facility status.
      i. All options in the remaining CFG systems entity will be eliminated or converted to common stock
      ii. MUTI will receive a 45% fully diluted stake in CFG Systems as part of the executed transaction.
      iii. Government products and services not requiring small business or cleared facility status or benefiting from CFG Systems' past performance will run through the MUTI – Sabre / 180 organization
      iv. MUTI will provide working capital to CFG Systems to fund the operation of CFG systems
         1. Sabre to create or provide working capital at an amount to be determined, at Sabre's incremental cost of capital
         2. This working capital to be utilized to extinguish any remaining net working capital liabilities (net of any current portion of debt) plus working capital required for growth.

MUTI
Sabre Industries Telecom Services

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

Tel 217-819-3040
Fax 217-819-3041

3. There will be no distributions from CFG Systems to shareholders until a point where any debt balance or working capital investment has been fully extinguished.

v. CFG Systems will provide MUTI with the exclusive right to provide and meet all product, service, and consulting needs when they are able to provide such items at competitive rates and prices as defined in 2(b)(i).

vi. The agreement will provide for a MUTI option to buy out the remaining 55% equity of CFG Systems at a 5x multiple of 55% of the total EBITDA at the 3 year anniversary, which will coinside with the end of MUTI's fiscal year, or on a trailing 12 month basis at each MUTI fiscal yearend interval thereafter less any outstanding working capital or debt that had been provided. At any time prior to year 3, MUTI will have the right of first refusal on any offer to purchase CFG Systems.

2. Earn-out
   a. For the 4 fiscal years ending in April beginning with FYE 4/16, ConcealFab shareholders of record as of closing and in accordance with their share ownership (will have the ability to earn additional payouts in accordance with the following schedule):
      i. 20% of the EBITDA generated by the commercial combined product lines of Conceal Fab and the current MUTI - Sabre / 180 line servicing the small cell, DAS, and oDAS markets, parties will develop a list of products, both existing and to-be-developed that will be included as part of the earn out
      ii. 25% of the EBITDA generated by the combined governmental combined product lines of Conceal Fab and the current MUTI – Sabre / 180 line servicing the small cell, DAS, and oDAS markets, parties will develop a list of products, both existing and to-be-developed that will be included as part of the earn out.
      iii. The list will include, but is not limited to integrated small cell poles where radios are housed inside the poles, back lobe suppressors, oDAS pole tops, RF Transparent Shelters and other products within the product lines of ConcealFab and Sabre / 180.
      iv. All new products not on the list will be reviewed and if approved by the President of the Sabre Telecom Group, will be inserted into the suite of products for qualification and inclusion in the earn-out calculation. Sabre covenants that it will not create or sell products that compete with ConceaFab/180 products and exclude them from the earn-out.
      v. Product line is defined strictly as "manufactured products" for purposes of the earn-out and do not include any installation/maintenance services (but does include Engineering Services that are sold in conjunction with the ConcealFab/180 products within the P&L), consulting, or other contributions unless explicitly agreed to in writing (such as potentially EBITDA generated by non-manufactured products that are only available through the small business or cleared facility status of CFG Systems).
      vi. At the completion of the final term of the earn-out, any revenue and attached EBITDA for orders that were received prior to the final earn-out term will count towards the final earn-out calculation as long as these orders are delivered and invoiced within 60 days of the final term end and EBITDA from these revenues will be calculated using the prior 6 month average EBITDA margin of the P&L.

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

Tel 217-819-3040
Fax 217-819-3041

Sabre Industries Telecom Services

b. A separate financial segment/ P&L will be established that will account for all product sales, manufacturing, associated direct, indirect, and G & A expenses (as per the explicitly defined EBITDA allowable expenses defined below) that will facilitate proper financial reporting for the product group as identified.
   i. Manufacturing will be provided from the Sabre Telecom Group at quoted transfer pricing levels at market competitive rates, which will be determined as being within 12.5% of the average of at least 2 reputable manufacturers when/if a dispute arises over the reasonability of Sabre Telecom Group's quoted transfer prices.

c. Financial statements will be in line with GAAP accounting and the EBITDA calculation will be a defined term within the formal agreement.

d. EBITDA is defined as follows:
   i. "**EBITDA**" means, with respect to any Earn-out Period, net income, plus (without duplication and to the extent reflected as an expense, charge or other deduction in the calculation of such net income), interest expense, income taxes, depreciation and amortization of the Company for such period, with each of the foregoing components being determined in accordance with GAAP consistently applied.
   ii. Direct corporate costs attributable to the business will be allocated to the business (such as insurance) and any indirect cost allocation will be structured between the parties prior to executing a formal purchase agreement.

3. Other financial items
   a. Additional terms supporting MUTI 45% share issuance in CFG Systems
      i. There will be no further issuance of options or alteration to the capital structure without the written approval of MUTI and ConcealFab shareholders of record

   b. MUTI and ConcealFab Corporation to be fully aligned on shareholder agreements, commitments, and capital / corporate structure prior to closing.

   c. Change of control of MUTI or Sabre
      i. The agreement will provide for continued consideration of the earn-out opportunity as outlined in this term sheet.
      ii. The successor will provide a process that maintains the performance / earn-out opportunity for ConcealFab shareholders in accordance with the intent of this agreement. The successor may also provide a buy-out option at their discretion that would be subject to ConcealFab shareholder majority approval.

   d. Minimum / Floor
      i. No floor or minimum to be established. Future earn-out opportunities will be solely based on performance of the segment. It is the full intention of MUTI to invest in this business to support the economic growth opportunities afforded by this business line. The required investment level will be determined and approved through Sabre's standard business planning process.

4. Employees & Leadership
   a. MUTI

MUTI
Sabre Industries Telecom Services

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

Tel 217-819-3040
Fax 217-819-3041

i. Jon Fitzhugh will resign from ConcealFab and join MUTI and will be responsible for the Small Cell / DAS / Government products business. Jon will maintain an oversight role with the CFG Systems. An agreed upon employee base will transition to MUTI and accept employment packages (including non-compete language) and become key team members developing this combined product segment.
ii. Jon Fitzhugh will be the Executive VP of Engineered products serving the Small Cell / oDAS / DAS segment responsible for P & L, business development, marketing, sales, and liason with manufacturing entities.
iii. Jon Fitzhugh's liquidation preference in the Preferred Stock will not be taken out of the $1.2M purchase price, rather it will be covered as part of his MUTI employment package.

b. CFG Systems – all employee, board, etc. provisions contemplated below are subject to due diligence to be performed to determine whether they violate affiliation concerns, which both parties agree is meant to be avoided
   i. An agreed number of employees and a designated leader will remain with the government segment operating entity under small business and cleared facility clearance provisions to facilitate opportunities currently under review in this segment.
   ii. Board seats
      1. CF board to expand to 5 with MUTI appointing 2 members and CF appointing 3 members with Jon Fitzhugh occupying one of the 3 CF board seats made available.
   iii. Mentor / Protégé program application through the DHS has been prepared and submitted to mitigate affiliation concerns

5. Current Opportunities
   a. The organizations currently agree that there are opportunities that are in demand of immediate action and will begin collaborating on integrating each other's product into the respective sales channels for specifically agreed to opportunities including Verizon, CCI, Ericsson and others upon the execution of this term sheet.
   b. Within 10 days from the execution of this agreement, the parties will establish an interim plan / agreement that will allow for combined efforts in the marketing, business development, customer relationships, and manufacturing areas. This will include the identification of the responsibilities of each organization and the economic arrangement associated with these specific opportunities.

6. Non-Binding
   a. This agreement is non-binding on either party and establishes only the intent of the organizations to work diligently to develop a formal agreement around the basics of the key points as outlined in this term sheet.
   b. In case a deal does not consummate, the parties agree not to solicit or hire key employees

7. Due diligence
   a. Subject to customary and typical due diligence including customer, distribution, and manufacturing relationships, IP, process review, and financials.

8. Exclusivity
   a. For a period of 60 days post the execution of this agreement, an exclusivity period will begin to allow for MUTI and CF to formulate an agreement acceptable for both parties. During this time, CF will not solicit,

Sabre Industries Telecom Services

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

Tel 217-819-3040
Fax 217-819-3041

receive, share documents, or take any other action that would be in conflict with the goal of developing a formal agreement as so noted above.

9. Closing target
   a. Closing to be targeted for a maximum of 75 days post the execution of this term sheet and all efforts will be put forth to reduce this time frame to a 60 days.

Agreed to this 3rd day of February 2015

Jonathan Fitzhugh
Fab

Peter J. Sandore, CEO Conceal
Sabre Industries, Inc.

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

MUTI
Sabre Industries Telecom Services

Tel 217-819-3040
Fax 217-819-3041

## Addendum A

☐ Base & Upside Case

| Opportunity | Potential Lifetime Value | Base Case ($k) | | Upside Case ($k) | | Comments |
|---|---|---|---|---|---|---|
| | | FY 2016 Rev. | FY 2016 EBITDA | FY 2016 Rev. | FY 2016 EBITDA | |
| **CFG Systems** | | | | | | |
| Hill AFB | $21M | 2,000 | 400 | 6,000 | 1,400 | Engineering Services only, blended EBITDA between pass through opportunities (3% mark up) and in- |
| Air Force Space Command (L3 Prime) | $0.3M | 75 | 25 | 150 | 50 | Engineering Design work and contracting |
| GDAIS Warthog | $3.5M | 120 | 40 | 240 | 80 | Engineering/Design Services and contracting |
| Shelter Expeditionary Defense System | $1.2M | 120 | 40 | 240 | 80 | Engineering design work and contracting |
| Total CFG Systems | $26M | 2,315 | 505 | 6,630 | 1,610 | |
| **CF/Sabre Government** | | | | | | |
| Air Force Space Command (L3 Prime) | $1.5M | 750 | 400 | 750 | 400 | Shelter production |
| GDAIS Warthog | $32M | 800 | 300 | 1,600 | 800 | Prototype and Shelter Production |
| Shelter Expeditionary Defense System | $11M | 800 | 200 | 1,600 | 800 | Production of Reinforced Wall Systems |
| Total CF/Sabre Government | $44.5M | 2,350 | 900 | 3,950 | 2,000 | |
| **CF Commercial (w/o 180)** | | | | | | |
| Crown Castle | | 400 | 80 | 1,300 | 260 | Primarily SouthEast and CA |
| JMA/CSS | | 250 | 50 | 1,000 | 200 | Nationwide (OEM agreement) |
| AT&T | | 350 | 70 | 900 | 180 | Primarily NorCal |
| FiberTech | | 75 | 15 | 500 | 100 | Multiple mid-west regions |
| Verizon | | 400 | 80 | 1,200 | 240 | Multiple Verizon Regions (incl., PA, OR, NY) |
| Ericsson | | 200 | 40 | 1,000 | 200 | Nationwide (OEM opportunity) |
| CommScope | | 500 | 100 | 1,100 | 220 | Nationwide (OEM opportunity) |
| Total CF Comm | | 2,175 | 435 | 7,000 | 1,400 | |
| **Total CF Opportunities** | | 6,840 | 1,840 | 17,580 | 5,010 | |

MUTI
Sabre Industries Telecom Services

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

Tel 217-819-3040
Fax 217-819-3041

In support of Item #5 in the Term Sheet, the parties agree to amend the term sheet with the following adjustments to facilitate an accelerated ability to execute business opportunities and to support the working capital requirements of the business.

The term sheet and the LOA below are inclusive of all Sabre Telecom entities and may pertain to Sabre, MUTI, or Cellxion as the Sabre Telecom Group fully considers which entity under it's umbrella will control and account for the new reporting segment, licensing agreement, and acquisition being contemplated. The exclusivity period will be extended for an additional 30 days from the date provided in the term sheet, and upon execution of the LOA, the exclusivity time frame will be extended through the time frame in which the LOA is active and operating.

The intent is that all significant terms of the executed term-sheet will remain in place with an interim plan set to govern the relationship through a "Licensing Agreement" as outlined below. The intent is to provide the business the ability to respond timely to business needs, integrate the business approach, recognize synergies, and facilitate the closing of the transaction within the time constraints set as per the timing noted below or sooner.

***Interim Plan / Licensing Operating Agreement (LOA):***

1. Timing / Term
    a. The term of this LOA will begin upon execution and the initial term will be from execution through 8.30.15.
    b. Sabre will be provided the sole exclusive right to effectuate the acquisition at any time during the term of the LOA at the terms outlined in the Term Sheet as adjusted only by any alteration noted in this LOA.
    c. At the conclusion of the initial term, Sabre will have the exclusive right to complete the acquisition as per the terms of the term sheet, extend the LOA for an additional -6month term, or terminate the LOA.
    d. If Sabre elects to extend the LOA with this 6 month renewal feature, at the conclusion of this renewal, Sabre must either complete the acquisition or terminate the LOA unless both parties agree to continue with the LOA or a new structured arrangement.
    e. Conceal Fab & Sabre agree that if ConcealFab reaches $4.5MM (50% of ConcealFab Standalone plus Synergies) in booked or recognized business (priced to provide a 20% EBITDA margin related to the Sabre Fiscal Year ending 4/16) and has positive EBITDA by the August decision date,or $7.65MMMM (85% of ConcealFab Standalone plus Synergies) in booked or recognized business (priced to provide a 20% EBITDA margin related to the Sabre Fiscal Year ending 4/16) and has delivered $1M of positive EBITDA by the February decision date.( during the term as noted will trigger the acquisition at the latest of the completion of the current term according to the terms of the term sheet as adjusted by this LOA. Booked business is defined as the receipt of formal purchase orders

2. Operation of LOA
    a. Sabre will set up a financial reporting segment under their engineered product group that would capture all financial related results associated with the term sheet as outlined and agreed in the term sheet.
        i. Employees
            1. Jon Fitzhugh and agreed upon employees will be terminated from CF as of an agreed upon date (targeted for 3/9/15) and these employees will go through the typical Sabre onboarding process.
            2. CF is responsible for any and all liabilities of these employees prior to the Sabre hire date.

MUTI
Sabre Industries Telecom Services

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

Tel 217-819-3040
Fax 217-819-3041

ii. In addition to his Sabre EPG responsibilities, Jon Fitzhugh will be provided a waiver to allow him the ability to operationally manage the CFG business and the employees left within the remaining entity via the mentor / protégé agreement that has been approved between CF and Sabre by the Government.

iii. All commercial and non-small business / non-cleared facility work and opportunities will be marketed, closed, operated, and all financial transactions will run through this new Sabre reporting segment.

iv. Any Sabre products requiring small business or a cleared facility status will be run through the CFG P&L, when possible

v. Any orders post execution of this agreement not dependent on CFG's small business or cleared facility status will be run through the new Sabre reporting segment.

The current CF company will be renamed CFG as noted in the term sheet and operate as indicated in the term sheet (Item 1b) with the exception of Sabre's 45% fully diluted stake, which will not be executed until the purchase transaction is completed.

3. Financial and investment considerations
   a. The term sheet provides for a purchase price of $1.2M that would be used as follows
      i. Extinguish $843,750 liquidation preference on Preferred stock (not including Fitzhugh's portion)
      ii. Fund employee obligations of ~$250,000
      iii. Extinguish ~$100k of existing SMB Commercial Loan through Vectra Bank
   b. Under the temporary LOA structure these amounts will be handled as outlined below:
      i. The $843,750 liquidation preference on Preferred stock would not be funded and will be addressed as per the term sheet at time of acquisition.
         1. It is understood that if the LOA is extended for an additional renewal of 6 months that this preference would increase by 25% to approximately $1.1M as of Nov 1, 2015
         2. If Sabre elects to execute the renewal term, this ~$210K of increased preference on Preferred stock would be either additional purchase price at acquisition or would revert to a break-up fee if Sabre would elect to terminate the LOA during or at the conclusion of the renewal term.
         3. Any break-up fee would be able to be offset against any funds due Sabre from CFG
      ii. The employee obligations of ~$250K will be funded as follows
         1. Employee/Contractor buyout in March in the amount of $120K. This will be funded through a prepayment / deposit fee licensing fee.
         2. Commissions as earned monthly during the term of the LOA in accordance with the employee's agreement. This amount is expected to be less than 90K, but will be calculated as per the commissions as outlined in the consulting agreement.
         3. The amounts paid during the time of the LOA (March payment and any commission payments) will be deducted from the $250K (payments may not exceed $250K) at closing that is scheduled as per the term sheet, which is the maximum that can be credited against the $1.2MM purchase price.
         4. If for some reason the LOA is terminated, the amounts paid related to these employee / contractor obligations would revert to a 1-year note due Sabre guaranteed by all IP at a rate equivalent to their incremental borrowing rate, to be defined by the formal execution of this agreement. however, Sabre would first have the right of offset for any monies due to CFG from Sabre.
      iii. The ~$100K of existing SMB Commercial Loan will be continued to be paid through CFG and the change in the amount due at closing will be adjusted off of the $1.2M purchase price based on the then current balance.

iv. The remaining $200K of private debt will be remain in place until Sabre completes the acquisition, after which time it will be converted as outlined in the Term Sheet. As with the prepaid licensing fees, at no time will CFG make any distributions to shareholders until this debt is extinguished either through the cash flow generation of the CFG entity or the licensing fees received from Sabre as outlined in this agreement.

c. Provisions of LOA
   i. Conceal Fab will provide to Sabre an exclusive use of all IP, including processes, designs and systems, etc. that are currently held by CF. New products, designs, and engineered products will be developed within the Sabre EPG to support our customers.
   ii. "Conceal Fab Commercial Products" will be made available for utilization as a trade name by Sabre
   iii. All business development efforts with the exception of those outlined for CFG will be completed through the new Sabre EPG.
   iv. Sabre will provide the working capital to the new EPG segment within Sabre
      1. To be clear, no current A/R or A/P of CF will move over to the new Sabre EPG segment that will be set up.
   v. All new business purchase orders, not dependent on CFG's small business or cleared facility received post the execution of this LOA will run through the Sabre EPG segment.
   vi. Any Sabre products requiring small business or a cleared facility status will be run through the CFG P&L, when possible
   vii. Sabre will provide working capital at an amount to be determined to CFG at Sabre's incremental cost of capital (method of funding to be determined as noted below-+--)
      1. Sabre will pre-pay / deposit licensing fees to CFG at an amount to be agreed upon at the execution of and during the duration of this LOA. This amount must be repaid to Sabre prior to any distributions to CFG shareholders. This includes an immediate infusion of cash to ConcealFab in the amount of $160k on March 3rd, 2015 and an additional $120K (with scheduled payment amounts to be determined) for the Employee/Contractor which must be utilized to effectuate a buyout of the current consulting agreement.
      2. The pre-payment of licensing fees / deposit may be increased upon mutual agreement during the term of the LOA.

Pre-payments / deposit licensing fees shall be repaid by CFG to Sabre or offset against licensing fees earned and due to CFG from Sabre. In the event the LOA is terminated without an acquisition and the licensing fees due CFG from Sabre are not sufficient to offset balances due to Sabre from CFG, then the balance due will revert to the form of a 1-year note at Sabre's incremental borrowing rate payable in monthly installments, with the rate to be determined at the formal execution of the LOA. This note will be guaranteed by a security interest in the IP of Conceal Fab. The security interest may be executed upon after 60 days of non-payment of the monthly installment payments at Sabre's discretion.

d. Licensing Fees
   i. Sabre will accrue licensing fees due CFG at the rates and per the calculations outlined in section 2 (i – v) of the term sheet as generated by the Sabre entity.
   ii. Licensing fees will be accrued by CFG and due Sabre at the rate of 45% of the EBITDA generated by the CFG entity.
   iii. These amounts will be paid within 60 days of the final term of the LOA or acquisition whichever is sooner as calculated by generally accepted accounting principles.
   iv. Sabre will retain the right to offset funds due to CFG for any amounts that may be owed from CFG to Sabre (to include but not limited to pre-paid licensing fees, and the elimination of employee obligations as outlined in 3(b)(ii).

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

Tel 217-819-3040
Fax 217-819-3041

Sabre Industries Telecom Services

4. Additional provisions
   a. All existing shareholders and option holders must vote (per Conceal Fab Corporation's By-Laws) to approve this LOA structure in accordance with Conceal Fab's corporate governance documents.
      i. The shareholders have evaluated, understand, and acknowledge all risk elements associated with this LOA structure and agreement and acknowledge that non-performance in achieving the forecasts as set forth may negatively impact their equity and holdings in CF.
   b. If the LOA is terminated for any reason, orders that have been received prior to termination will be continued to be paid as per the terms of the LOA for the duration (both from a Sabre and CF perspective)
   c. All 3rd party costs associated with drafting and executing the Interim LOA agreement will be the sole responsibility of Sabre, any 3rd party costs up to $10K borne by CFG will be reimbursed by Sabre upon the execution of the LOA.
   d. Jon Fitzhugh will also be provided a waiver to allow him to continue to negotiate in good faith the purchase and sale agreement on behalf of Conceal Fab
   e. In the event the LOA is terminated at any time....
      i. The employees may be terminated / released by Sabre and able to return to CFG at their discretion
      ii. Jon Fitzhugh's employment agreement shall terminate as "resignation for good reason" in the event of termination of the LOA.
      iii. Licensing rights
         1. Licensing rights originally provided as of the date of execution of this LOA to Sabre for the concealed shelters and back lobe suppressors will be discontinued and all rights shall be the exclusive property of CF thereafter. Sabre will be provided "most favored nation" status on these products and will be offered pricing at a 20% discount off of list / market pricing and the right to market and sell these products as manufactured by CF
         2. Sabre will retain the exclusive IP rights to their radio cages and shroud portfolio as outlined in Exhibit A. CF will be offered pricing at a 10% discount off of list / market pricing and the right to market and sell these products as manufactured by Sabre.
         3. Any IP developed by the new Sabre EPG segment (excluding further improvements in the concealed shelters and back lobe suppressors) will be the property of Sabre. CF will be provided a pricing discount to be determined based on the gross margins of the newly developed products and afforded the ability to market and sell these products.
         4. The organizations agree that each have specific pole capabilities and designs that will be shared and that upon the termination of the LOA, will compete on this product line with no restrictions.

Agreed to this 9th day of March, 2015

Jonathan Fitzhugh
Conceal Fab

Peter J. Sandore, CEO
Sabre Industries, Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:15-cv-01793-CMA-KLM

CONCEALFAB CORPORATION, a Colorado corporation,

Plaintiff,

v.

SABRE INDUSTRIES, INC., a Delaware corporation, and MIDWEST UNDERGROUND TECHNOLOGY, INC., an Illinois corporation,

Defendants.

---

**AFFIDAVIT OF JONATHAN FITZHUGH**

---

Affiant, Jonathan Fitzhugh, being first duly sworn upon his oath, deposes and states as follows:

1. I am over the age of 18 and am qualified to make the statements contained in this affidavit.

2. I am the Chief Executive Officer of ConcealFab Corporation ("ConcealFab").

3. On February 17, 2015, I sent an email to Patrick Cochran and Doug Huff at Sabre to which I attached a spreadsheet with several tabs. The first two tabs contained revenue forecasts for three revenue generating divisions at ConcealFab—the small business government section, which was to remain separate from Sabre and be renamed "CFG Systems," and the other two divisions, CF Government and CF Commercial, which were to be combined with Sabre. The first tab included columns for the months of March 2015 through April 2016. The numbers in each of those columns were revenue projections by month. The second tab included columns for the months of February 2015 through April 2016, but identified $0 in projected revenue for the month of February 2015. The third tab of the spreadsheet I emailed on February 17, 2015 contained base case scenarios and upside case scenarios for opportunities projected in fiscal year 2016.

4. An accurate and genuine copy of the February 17, 2015 email, and the attached spreadsheet with multiple tabs, were produced in this lawsuit and labeled CONCEALFAB 001675-1687. The first tab is labeled CONCEALFAB 001676. The

second tab is labeled CONCEALFAB 001677-1678. The third tab is labeled CONCEALFAB 001679.

5. One of the other tabs of the spreadsheet I emailed on February 17, 2015 was entitled "ConcealFab Sales Pipeline," which again divided revenue projections between the left-behind CFG Systems and the Sabre-combined CF Government and CF Commercial divisions. This spreadsheet did not show existing contracts with customers. Rather, this spreadsheet identified several business opportunities by anticipated revenue, and the probability of those opportunities coming to fruition. None of the opportunities had a 100 percent probability of being realized, and none of the opportunities had been realized as of February 17, 2015. The "ConcealFab Sales Pipeline" was produced in this lawsuit and labeled CONCEALFAB 001687. An accurate and genuine copy of CONCEALFAB 001687 is attached to ConcealFab's Motion for Partial Summary Judgment.

6. None of the spreadsheets I emailed to Sabre on February 17, 2015 identified past or existing ConcealFab contracts, or past or existing ConcealFab revenues. Rather, each identified predictions regarding further contract opportunities and future revenue projections.

7. The ConcealFab Board of Directors approved the LOA on or about March 9, 2015.

8. A sufficient majority of the ConcealFab shareholders approved the LOA on or about March 11, 2015.

9. On March 12, 2015, I emailed an executed copy of the LOA to Doug Huff at Sabre. An accurate and genuine copy of that email with its attachment was produced in this lawsuit, labeled CONCEALFAB 003211-3222, and is attached to ConcealFab's Motion for Partial Summary Judgment.

10. Later that same day, Doug Huff asked me for confirmation regarding the ConcealFab shareholder vote, as it was a precursor to Sabre funding the initial $160,000 loan to CFG Systems. On March 12, 2015, I confirmed by email that a majority of ConcealFab shareholders had voted in favor of the LOA pursuant to ConcealFab's bylaws. A copy of my email to Doug Huff was produced by Sabre in this lawsuit, and labeled SABRE 000406.

11. On March 13, 2015, Doug Huff sent me a version of the LOA executed by Sabre. He asked me to sign the same page that had been signed by Sabre. An accurate and genuine copy of that email message from Doug Huff, with its attachments, has been produced in this lawsuit and labeled CONCEALFAB 003223-3235.

12. On March 14, 2015, I sent Doug Huff an email to which I attached by signature to the LOA. An accurate and genuine copy of that email message, with its attachment, has been produced in this lawsuit and labeled CONCEALFAB 003236-3237.

Further Affiant sayeth naught.

______________________________
Jonathan Fitzhugh

STATE OF COLORADO )
) ss:
COUNTY OF DENVER )

This Affidavit is subscribed and sworn to before me this 24th day of April 2017 by Jonathan Fitzhugh.

______________________________
Notary Public
My Commission Expires: ________________

JENNIFER BIVINS STILLWELL
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20144026547
MY COMMISSION EXPIRES 07-08-2018

ConcealFab Sales Pipeline

*($ in millions)*

| Commercial | Revenue | Margin | Probability | Timing for Win | Timing for Revenue Generation | |
|---|---|---|---|---|---|---|
| FiberTech Networks (mid-west build out - VZW)) | 0.5 | 0.6 | 0.8 | Q1, 2015 | Q2, 2015 | 0.40 |
| Cincinnati Bell (Missouri build out - VZW) | 0.7 | 0.6 | 0.5 | Q1, 2015 | Q2, 2015 | 0.35 |
| Unite Fiber (mid-west build out, VZW) | 0.3 | 0.6 | 0.5 | Q1, 2015 | Q2, 2015 | 0.13 |
| Crown Castle (FL, CA) | 0.8 | 0.6 | 0.8 | Q1, 2015 | Q2, 2015 | 0.64 |
| Verizon Wireless (FL, CA, MD, Great Plains) | 0.8 | 0.6 | 0.7 | Q2, 2015 | Q3, 2015 | 0.56 |
| AT&T (CA, Pacific NW, MD, NJ) | 0.6 | 0.6 | 0.7 | Q2, 2015 | Q3, 2015 | 0.42 |
| H&M Networks (KY MotorSpeedway, ATL Falcons Stadium) | 0.4 | 0.6 | 0.7 | Q3, 2015 | Q4, 2015 | 0.28 |
| JMA (OEM partnership) | 1.0 | 0.6 | 0.9 | Q1, 2015 | Q2, 2015 | 0.90 |
| Ericsson (OEM parternship) | 1.5 | 0.6 | 0.5 | Q2, 2015 | Q3, 2015 | 0.75 |
| CommScope (OEM partnership) | 1.1 | 0.6 | 0.7 | Q2, 2015 | Q3, 2015 | 0.77 |

| Government | Revenue | Margin | Probability | Timing for Win | Timing for Revenue Generation | |
|---|---|---|---|---|---|---|
| Hill Air Force Base - TSRT - Prime Contract | 6.0 | 0.2 | 0.9 | Q1, 2015 | Q2, 2015 | 5.40 |
| L3 Com - MCCC | 1.1 | 0.7 | 0.9 | Q1, 2015 | Q2, 2015 | 0.99 |