**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-01793-CMA-KLM

CONCEALFAB CORPORATION, a Colorado corporation,

Plaintiff,

v.

SABRE INDUSTRIES, INC., a Delaware corporation,
and MIDWEST UNDERGROUND TECHNOLOGY, INC.,
an Illinois corporation,

Defendants.

---

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56**

---

Defendants, Sabre Industries, Inc. ("Sabre") and Midwest Underground Technology, Inc. ("MUTI") (collectively, "Defendants" or "Sabre"), by counsel, in support of their Motion for Partial Summary Judgment pursuant to Fed. R. Civ. P. 56 state as follows:

**NATURE OF THE CASE**

Sabre and ConcealFab Corp. ("Plaintiff" or "ConcealFab") (collectively the "Parties") each participate in the Small Cell, Distributed Antennae System and outdoor Distributed Antennae System segments of the telecom market. Each has product lines, customer relationships, and intellectual property. From February 2015 until June 2015, the Parties worked together, pursuant to a series of contracts, toward what they hoped would be a definitive agreement to combine the two businesses. In spite of the Parties' best efforts, Sabre terminated the cooperative arrangement, and ConcealFab initiated this action related to the failed venture in August 2015.

## STANDARD OF REVIEW

The purpose of Rule 56 is to facilitate the entry of a judgment without a trial. *See, In re Ribozyme Pharmaceuticals, Inc. Securities Litigation*, 209 F.Supp.2d 1106, 1109 (D.Colo. 2002). This Court may grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986). The movant bears the initial burden to show an absence of evidence that would support the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the movant meets this burden, the responding party must come forward with evidence to demonstrate a genuine issue for trial." *Id.* "A genuine dispute means that the party opposing the Rule 56 motion has produced enough contrary evidence that had such evidence been presented at trial, no directed verdict could be entered in accordance with Fed. R. Civ. P 50(a)." *Ribozyme Pharmaceuticals*, 209 F.Supp.2d at 1110.

## STATEMENT OF UNDISPUTED FACTS

1. The Parties participate in the Small Cell, Distributed Antennae System and outdoor Distributed Antennae System segments of the telecom market. (Am. Compl., p. 2, ¶7 [Dkt. 68]); Answer & Countercl., p. 2, ¶7; pg. [Dkt. 70]).

2. In July 2014, ConcealFab and Sabre began discussions concerning a potential strategic alliance or joining of the businesses. (Am. Compl., pg. 2, ¶8 [Dkt. 68]; Answer & Countercl., p. 2, ¶8; p. 17, ¶11 [Dkt. 70]).

3. On August 4, 2014, the Parties executed a Mutual Non-Disclosure Agreement ("NDA"). (Answer & Countercl., p. 3, ¶9).

4. On February 3, 2015, ConcealFab and Sabre executed a Term Sheet outlining the key categories and terms from which a definitive agreement to combine the two businesses would be developed. (Answer & Countercl., p. 18, ¶13 [Dkt. 70]; Pl.'s Reply to Countercl., ¶13 [Dkt. 71]).

5. Also, on February 3, 2015, ConcealFab CEO Jonathan Fitzhugh ("Fitzhugh") began the process of negotiating an Employment Agreement with Sabre. (Am. Compl., p. 3, ¶11 [Dkt. 68]; Answer & Countercl., p. 3, ¶11 [Dkt. 70]).

6. On March 13, 2015, the Parties executed an Interim Plan / Licensing Operating Agreement ("LOA"). (Answer & Countercl., p. 20, ¶23 [Dkt. 70]; Reply to Countercl., ¶23 [Dkt. 71]).

7. Under the LOA, ConcealFab agreed to give a newly-created Sabre segment called Sabre Engineered Product Group ("Sabre EPG") exclusive use of all its intellectual property, including processes, designs and systems. (Am. Compl. p. 4, ¶14 [Dkt. 68]).

8. On or about March 15, 2015, Sabre EPG hired and paid the salaries of certain ConcealFab employees, including Mr. Fitzhugh. (Am. Compl., p. 4, ¶30 [Dkt. 68]; Answer, p. 6, ¶30 [Dkt. 70]).

9. Fitzhugh and Sabre exchanged no fewer than eleven (11) drafts of the Employment Agreement. (Movant's Appx. 97- 126; Fitzhugh Dep., 58:9-18; 64:21 67:22: 71:3 82:5 87:4, discussing Fitzhugh Dep. Exs. 6 through 16).

10. Fitzhugh was represented by legal counsel in the drafting of the Employment Agreement. (Movant's Appx., pp. 95 - 96 Fitzhugh Dep. 56:20-25; 57:1-8, 13-17).

11. ConcealFab was represented by legal counsel in the drafting of the Employment Agreement. (Movant's Appx., p. 96, Fitzhugh Dep. 57:9-12; 20-24).

12. The Employment Agreement was never fully executed by the Parties. (Answer & Countercl., p. 7, ¶30 [Dkt. 70]).

13. On June 3, 2015, Sabre delivered to ConcealFab a letter that effectively terminated the cooperative arrangement between the Parties. (Answer & Countercl., p. 7, ¶37 [Dkt. 70]).

14. The Parties never entered into an Asset Purchase Agreement ("APA"). (Movant's Appx., p. 236, Relevant Odell R. 30(b)(6), 30:12-16; *see also* Movant's Appx., pp. 265, 271 Relevant Stewart R. 30(b)(6), 28:4-11; 34:6-14).

15. The Parties never entered in a Stock Purchase Agreement ("SPA"). (Movant's Appx., pp. 97-99, Fitzhugh Dep., 58:24-25, 59:1-12, 60:11-13; *see also* Movant's Appx., p.236, Relevant Odell R. 30(b)(6), 30:17-21).

16. On August 19, 2015, ConcealFab filed its initial Complaint against Sabre related to the failed cooperative arrangement between the Parties. (Dkt. 1).

## <u>ARGUMENT</u>

### A. CONFLICT OF LAWS

ConcealFab has alleged various claims against Sabre arising from the NDA, LOA, and the Term Sheet, which is incorporated into the LOA. For example, Plaintiff's Claim 1 alleges "Breach of Contract – NDA / LOA." (Am. Compl., p. 10, ¶¶50-57 [Dkt. 68]). Section 11 of the NDA provides, in part: "Miscellaneous: This Agreement shall be governed by and construed in accordance with the laws of the State of Iowa, without regard to conflict of laws principles." (Movant's Appx. p. 3, NDA, p. 3, § 11). However, neither the Term Sheet nor the LOA contain a choice of law provision. (Movant's Appx. p. 6-12, Term Sheet; Movant's Appx. p. 13-16, LOA).

"Colorado courts generally look to the Restatement (Second) of Conflict of Laws to answer conflict of laws questions." *Francis v. Starwood Hotels & Resorts Worldwide, Inc*., 2011

WL 3351320, at *3 (D.Colo. 2011). Colorado has adopted the "most significant relationship" test under the Restatement (Second) of Conflict of Laws (the "Restatement") for both tort and contract actions. *ITT Spec. Risk Servs. v. Avis Rent A Car*, 985 P.2d 43, 47 (Colo.App. 1999). Courts evaluate various contacts in deciding which state has the most significant relationship to the occurrence or transaction and to the parties under the principles stated in the Restatement. Factors relevant to the choice of law inquiry include: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

Here, the Parties contracted and negotiated the Term Sheet and LOA from various states. ConcealFab is a Colorado corporation with a principal place of business in Colorado Springs, while Sabre is a Delaware corporation with its principal place of business in Alvarado, Texas, and MUTI is an Illinois corporation with its principal place of business in Champaign, Illinois. ConcealFab largely preformed its obligations under the Term Sheet and the LOA in the State of Colorado, although Sabre executives and other employees performed their obligations under the Term Sheet and LOA from various states, including Iowa, Texas, Pennsylvania, and North Carolina. Accordingly, the Court is faced with the issue of whether Colorado law should apply to the Parties' causes of action which arise from the Term Sheet and LOA.[1]

**B. THE PARTIES' RESPECTIVE BREACH OF CONTRACT CLAIMS**

[1] Sabre's arguments regarding the LOA and Term Sheet assume Colorado law applies. Sabre's arguments regarding the NDA assume Iowa law applies.

Both Sabre and ConcealFab have alleged causes of action for breach of contract stemming from their failed business relationship. This section addresses both ConcealFab's claims against Sabre and Sabre's counterclaim for breach against ConcealFab.

### 1. ConcealFab's Claim 11 (Breach of Fitzhugh's Employment Agreement) Should be Dismissed via Summary Judgment

Count 11 of Plaintiff's Amended Complaint alleges that Sabre breached the Employment Agreement with Fitzhugh. (Am. Compl., p. 19 – 20, ¶¶103-108 [Dkt. 68]). Mr. Fitzhugh has assigned to ConcealFab all of his right, title and interest to recover any and all monetary damages owed to Mr. Fitzhugh by either or both of the Defendants for breach of the Employment Agreement." (Am. Compl., ¶49.). As a threshold issue, the Court must first decide if it has subject matter jurisdiction over Plaintiff's claim for breach of contract related to the Employment Agreement.

#### a. The Court Lacks Subject Matter Jurisdiction over Plaintiff's Claim for Breach of the Fitzhugh Employment Agreement

Plaintiff alleges that this "Court has jurisdiction over the subject matter and parties to this action pursuant to 28 U.S.C. § 1332." (Am. Compl., p. 2, ¶4 [Dkt. 68]).[2] Pursuant to Paragraph 27 ("Arbitration") of the Employment Agreement, the Parties agreed to arbitrate any dispute related to the Employment Agreement with the exception of disputes brought pursuant to Paragraph 12 ("Confidential Information"), Paragraph 13 ("Nondisclosure") and Paragraph 14 ("Non-Competition / Non-Solicitation"). (Movant's Appx., p. 33, ¶27). Plaintiff's claims under the Employment Agreement sound in common-law breach of contract only, and are not asserted

---

[2] All courts have an "independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006).

pursuant to Paragraphs 12, 13, or 14 of the Agreement. (Am. Compl., p. 19–20, ¶¶103-108 [Dkt. 68]). The Arbitration provision is not a mere venue clause that can be waived. Rather, it is a jurisdictional clause providing that the Parties shall arbitrate, among other things, "claims by the Employee for breach of this Agreement, (and) the interpretation or application of this Agreement." (Movant's Appx., p. 33, ¶27). "Subject matter jurisdiction cannot be conferred or waived by consent, estoppel, or failure to challenge jurisdiction early in the proceedings." *See Laughlin v. Kmart Corp*., 50 F.3d 871, 873 (10th Cir. 1995). "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *United Food and Commercial Workers International Union, Local 7 v. King Soopers, Inc.*, 2015 WL 1041618, at *1 (D.Colo. 2015). Based upon the foregoing, Claim 11 should be dismissed due to a lack of subject matter jurisdiction.

**b. The Employment Agreement Is Void *Ab Initio***

Should the Court find that it has subject matter jurisdiction to determine Plaintiff's claim for breach of the Employment Agreement, the Agreement provides that it shall be governed by Colorado law. (Movant's Appx., p.31; ¶20). To prove a breach of contract in Colorado, Plaintiff must prove, among other things, the existence of a contract. *Baumann v. American Family Mut. Ins. Co*., 2012 WL 122850, at *4 (D.Colo. 2012). The burden of proof is on the Plaintiff to establish the existence of a contract.

On February 3, 2015, Sabre and Fitzhugh began the process of negotiating a written Employment Agreement. (Am. Compl., p. 3, ¶11 [Dkt. 68]; Answer, p. 3, ¶11 [Dkt. 70]). The Employment Agreement was never fully executed by the Parties. (Answer & Countercl. p. 6-7, ¶30 [Dkt. 70]). Pursuant to Colorado law, however, "common law contract principles ... allow for the formation of contracts without the signatures of the parties bound by them." *Bourret v. Aspect*

*Management Corp.,* 2013 WL 6073637, at *2 (D.Colo. 2013). Therefore, pursuant to Colorado law, the Employment Agreement constitutes a contract.

Sabre and Fitzhugh exchanged no fewer than eleven (11) drafts of the Employment Agreement, and every draft of the Employment Agreement contained substantially the same language as Paragraph 1 of the "final," non-red line version:

> "1. **Effective Date**: ….This Agreement shall automatically terminate without any action on the part of any person and be void *ab initio* if the Asset Purchase Agreement is terminated in accordance with its terms, and neither Sabre nor any other person shall have any liability to Employee under this Agreement if the Closing (as defined in the Stock Purchase Agreement) does not occur."

(Movant's Appx., p. 19 *cf*., Movant's Appx., p. 28; Movant's Appx. 39-162; Fitzhugh Dep. 58:9-18; 64:21 67:22: 71:3 82:5 87:4).

Over the course of at least eleven (11) drafts of the Employment Agreement, the only change to Paragraph 1 was to strike the word "Stock" from line four and to replace it with "Asset." (Movant's Appx., p. 19 *cf*., Movant's Appx., p. 28). Paragraph 31 of the Employment Agreement contains an integration clause stating that it is the complete agreement between the Parties concerning Fitzhugh's employment. (Movant's Appx., p. 35, Employment Agreement, ¶31).

"The primary goal of contract interpretation is to determine and effectuate the intent and reasonable expectations of the parties at the time the contract was signed." *Professional Bull Riders, LLC v. Perfect Blend International, LLC*, 2016 WL 54115, at *4 (D.Colo. 2016). "Such intent is determined from the language of the contract itself, and written contracts that are complete and free from ambiguity will be enforced pursuant to their plain language." *Id*. Black's Law Dictionary defines the term "void *ab initio*" as meaning "null from the beginning, as from the first moment when a contract is entered into." *Black's Law Dictionary*, p. 1604 (8th ed. 2004).

The only ambiguity in Paragraph 1 of the Employment Agreement is whether the Parties anticipated eventually entering an APA, SPA, or a SPA pursuant to a larger APA. It is clear from the Employment Agreement that the Parties anticipated a future, definite agreement wherein Sabre would purchase ConcealFab's assets, outstanding stock, or both; and, if such a purchase did not occur, the Employment Agreement was void *ab initio*. Neither an APA or SPA occurred—there was no closing of an APA or SPA, and, accordingly, the Employment Agreement is void *ab initio*. (Movant's Appx., p. 236, Relevant Odell R. 30(b)(6) at 30:12-21; Movant's Appx., pp. 265, 271, Relevant Stewart R. 30(b)(6) at 28:4-11; 34:6-14; Movant's Appx., p. 97-99, Fitzhugh Dep. 58:24-25, 59:1-12, 60:11-13.)

Fitzhugh testified that he was unaware of what "void a*b initio*" means. (Movant's Appx., p. 97, Fitzhugh Dep. 58:18). Regardless, Fitzhugh is a college graduate and has an MBA from Harvard. (Movant's Appx., p. 37-38, Fitzhugh CV). Fitzhugh and Conceal Fab were represented by counsel in the drafting of the Employment Agreement. (Movant's Appx., p. 95-96, Fitzhugh Dep. 56:20-57:24). If ConcealFab or Fitzhugh found the contract language to be ambiguous, and if they didn't know what "void a*b initio*" means, they both had ample opportunity to revise Paragraph 1 and to get further clarification. "Where, as here, sophisticated parties who are represented by counsel have consummated a complex transaction and embodied the terms of that transaction in a detailed written document, it would be improper for [the] court to rewrite that transaction by looking to evidence outside the four corners of the contract to determine the intent of the parties." *White Wave, Inc. v. Dean Foods Co*., 2001 WL 1833980, at *4 (D.Colo. 2001). "This is an area of law where formalities are important, as they are the method by which sophisticated businessmen make their contractual rights definite and limit the authority of the courts to redo their deal." *White Wave*, 2001 WL 1833980, at *4.

The Employment Agreement, by its own terms, provides that the contract is void *ab initio* under the undisputed facts of this case; therefore, no employment contract exists in this matter and Fitzhugh was, effectively, employed by Sabre EPG as an at will employee. As a result, if the Court finds it has subject matter jurisdiction, Plaintiff's Claim 11 should be dismissed via summary judgment for this additional reason.

### 2. ConcealFab's Claim 1 (Breach of NDA) Should be Dismissed via Summary Judgment

In Claim 1 of its Amended Counterclaim, ConcealFab contends Sabre breached the NDA and the LOA. This Section (2) focuses on Sabre's purported breach of the NDA. Section 3, below, addresses the claim that Sabre breached the LOA.

Under Iowa law (which applies to the NDA), to support a claim for breach of contract Plaintiff must show (1) the existence of a contract; (2) the terms and conditions of the contract; (3) Plaintiff has performed all the terms and conditions required under the contract; (4) Sabre breached the contract; and (5) Plaintiff has suffered resulting damages. *Iowa Mortgage Ctr., L.L.C. v. Baccam*, 841 N.W.2d 107, 110–11 (Iowa 2013). Plaintiff cannot show that Sabre breached the NDA.

ConcealFab contends Sabre violated the NDA by "using ConcealFab's Confidential Information to fulfill customer orders containing ConcealFab trade secrets." (Am. Compl., p. 10 ¶¶51-53 [Dkt. 68]). Even assuming ConcealFab can establish the existence of a trade secret (discussed more thoroughly below), the LOA provides that "any orders post execution of this agreement not dependent on CFG's small business or cleared facility status will be run through the new Sabre reporting segment." (Movant's Appx., p. 14, LOA, ¶3(c)(vii)). Thus, *Sabre had the right to complete the purchase orders* running through the new Sabre EPG segment.

Plaintiff further alleges Sabre violated the NDA by (a) targeting key accounts for which ConcealFab has significant customer penetration; (b) contacting ConcealFab vendors and representatives; and (c) contacting existing and prospective ConcealFab customers. (Am. Compl., p. 10 ¶53 [Dkt. 68]). However, ConcealFab cannot show Sabre has disclosed any "confidential information" as defined by the NDA to any of ConcealFab's vendors, representatives, or existing and prospective customers of either ConcealFab or Sabre. Indeed, Mr. Fitzhugh, ConcealFab's Rule 30(b)(6) witness concerning the NDA and Plaintiff's trade secrets, testified as follows:

> Q: …[C]onfidential information is defined in the NDA, for example, as a term of art, and so that would have been information that was given to Sabre. Do you have any reason to believe that they've disclosed that confidential information after the business relationship between you ended?
>
> A: I can't point to a specific example, if that's what you're asking me.

(Movant's App., p. 202, Relevant Fitzhugh Rule 30(b)(6), p. 223:10-17). Accordingly, Sabre's is entitled to summary judgment as to Plaintiff's claim it breached the NDA.

**3. ConcealFab's Claim 1 (Breach of the LOA) Should be Dismissed via Summary Judgment**

Assuming Colorado law applies to the LOA, as set forth above, a breach of contract claim requires proof of four elements: (1) the existence of a contract; (2) performance by the plaintiff; (3) failure to perform the contract by the defendant; and (4) resulting damages. *Baumann*, 2012 WL 122850, at *4. Plaintiff cannot meet its burden to establish all of these elements.

ConcealFab has alleged, but cannot demonstrate, that Sabre breached the LOA by refusing to pay the remaining $96,000 to Mr. Slattery owing under his Consulting Agreement. (Am. Compl. p. 10, ¶56(a)). Sabre, however, had proposed (and ConcealFab agreed to accept) the Slattery buyout in a "piecemeal" / monthly fashion. (Movant's Appx., p. 274, Dep. Ex. 45

[Redacted]). Sabre then made these "Employee / Contractor buyout" payments at the monthly rate of $12,000, and ConcealFab accepted these payments. (Movant's Appx., pp. 281-285, Relevant Portions of Fitzhugh R. 30(b)(6), p. 93:22-25; 94-95:1-20; 173:1-15; 174:1-16). Sabre then properly terminated the LOA, which included terminating its monthly payment toward Slattery's "consulting agreement."

ConcealFab has further alleged, but cannot show, Sabre breached the LOA by refusing to pay the severance contemplated by the Employment Agreement and the LOA. (Am. Compl. p. 10, ¶56). If the Court finds it has subject-matter jurisdiction as to the Employment Agreement, and finds the Agreement is "void *ab initio*," as discussed above, Fitzhugh was effectively an "at will" employee of Sabre and no severance would be due pursuant to the plain terms of the Agreement.

#### 4. Sabre is Entitled to Summary Judgment with respect to Its Counterclaim 5 (Breach of Contract against ConcealFab)

ConcealFab has breached the plain language of the LOA by refusing to sign a Promissory Note per the Parties' agreement. Again, applying Colorado law, Sabre must also prove: (1) the existence of a contract; (2) performance by the plaintiff or justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff.

The LOA is a valid contract pursuant to Colorado law, and was approved by ConcealFab's Board and by a majority of majority of ConcealFab shareholders. (Am. Compl., p. 6, ¶26). As shown in detail in this Motion, Sabre performed its obligations under the LOA. In relevant part, Sabre paid the working capital needs of ConcealFab and CFG "at Sabre's incremental cost of capital" via the pre-payment / deposit of licensing fees to ConcealFab as well as paying ConcealFab's obligations to Mr. Slattery (Am. Compl., p. 4, ¶30 [Dkt. 68]; Answer, p. 6, ¶30 [Dkt.

70]; Movant's App., pp. 174, 177-178, 183-185, Relevant Fitzhugh R. 30(b)(6), 74:1-16; 103: 1-22; 104:1-2; 161:16-25; 162:1-25; 163:1-9). All in all, during the pendency of the LOA, from approximately March 12, 2015 to June 6, 2015, Sabre paid working capital and other expenses on behalf of ConcealFab or former ConcealFab employees in an amount not less than $608,966.69. (Movant's App. 272-273, McGee Affidavit).

In the event the LOA was terminated without an acquisition of ConcealFab by Sabre, and the licensing fees due CFG from Sabre were insufficient to offset balances due to Sabre from CFG, the funds Sabre expended to ConcealFab and the new CFG entity for Slattery's "employee / contractor" obligation, as well as the initial deposit of $160,000 and other prepaid licensing fees / working capital contributions, were to revert to a 1-year note due Sabre, and guaranteed by a security interest in ConcealFab's IP. (Movant's Appx., p. 14, LOA at ¶3(b)(ii)(4); *see also* Movant's Appx., p. 15, LOA, ¶3(c)(vii)(1)-(2)). Sabre properly terminated the non-binding LOA / Term Sheet. ConcealFab has refused to sign a Promissory Note. Accordingly, the Court should enter summary judgement in Sabre's favor finding that ConcealFab breached the LOA.

**C. ConcealFab's Claim 2 (Breach of Implied Covenant of Good Faith and Fair Dealing) Should be Dismissed via Summary Judgment**

"In Colorado every contract contains an implied covenant of good faith and fair dealing." *Art Corporate Solutions, Inc. v. Laney*, 2016 WL 949744, at *2 (D.Colo. 2016). "A violation of the duty of good faith and fair dealing gives rise to a claim for breach of contract." *City of Golden v. Parker*, 138 P.3d 285, 292 (Colo. 2006). "The duty of good faith and fair dealing may be relied upon <u>when the manner of performance under a specific contract term allows for discretion on the part of either party</u>." *Parker*, 138 P.3d 285, 292. (Emphasis added). Plaintiff bears the burden

of proving Sabre breached the covenant as to each of the alleged breaches, and has no evidence to meet that burden.

**1. ConcealFab Agreed to Accept and did Accept Sabre's Payments of the Funds Earmarked for Slattery's "Consulting Agreement" as Monthly Payments**

ConcealFab claims that Sabre violated the implied covenant of good faith and fair dealing, in part, by: (a) paying the $120,000 earmarked for payments to ConcealFab's founder, Slattery, in a "piecemeal fashion" in order to induce Slattery to challenge the LOA and the Term Sheet; and (b) paying the $120,000 "in a piecemeal fashion that…caused Slattery to sue ConcealFab for breach of contract." (Am. Compl., p. 11, ¶60(a)-(b) [Dkt. 68]).

The LOA states, in part, "Employee / Contractor buyout in March in the amount of $120K. This will be funded through a prepayment / deposit fee licensing fee." (Movant's Appx., p. 14, LOA, ¶3(b)(ii)(1)). Regardless, Sabre proposed and ConcealFab agreed to accept the Slattery buyout in monthly payments. (Movant's Appx., p.274, Dep. Ex. 45 [Redacted]). Sabre then made these "Employee / Contractor buyout" payments at the monthly rate of $12,000, and ConcealFab accepted them. (Movant's Appx., pp. 281-285, Relevant Portions of Fitzhugh R. 30(b)(6), p. 93: 22-25: 94-95:1-20; 173:1-15; 174:1-16). Accordingly, ConcealFab cannot complain that Sabre breached the implied covenant of good faith and fair dealing by paying Slattery's Consulting Agreement payments on a monthly basis as outlined above.

**2. Sabre had a Right to Terminate the Term Sheet and LOA, and Properly Exercised its Right to Terminate**

ConcealFab claims Sabre violated the implied covenant of good faith and fair dealing, in part, by "terminating the LOA based on the pretexts of allegations Mr. Slattery made in response to Sabre's failure to pay the $120,000 earmarked to cover his base compensation under the

Consulting Agreement in order to obtain ConcealFab's Confidential Information and trade secrets." (Am. Compl., p. 11, ¶60(c) [Dkt. 68]).

Section 1(a) of the LOA states that the initial term of the LOA would continue from execution of the agreement, approximately March 9, 2015, through August 30, 2015. However, nothing in the LOA or the Term Sheet prevented Sabre from terminating the relationship of the Parties prior to August 30, 2105. Additionally, Sections 4(b) and 4(e)(i)-(iii) of the LOA discuss the Parties' right to terminate the LOA and the Term Sheet as well as certain rights of the Parties upon termination of the LOA / Term Sheet. (Movant's Appx., p. 16, LOA, ¶4).

"The implied covenant of good faith and fair dealing may not be used to invalidate contractual terms that the parties negotiated and agreed on, <u>including a right to terminate the contract</u>." *Rocky Mountain Chocolate Factory, Inc. v. SDMS, Inc*., 2007 WL 4268962, at *6 (D.Colo. 2007). Sabre had the right to terminate the LOA and the Term Sheet prior to August 30, 2015, and Sabre properly exercised its right to do so. Accordingly, ConcealFab cannot complain that Sabre breached the implied covenant of good faith and fair dealing by terminating the LOA / Term Sheet.

### 3. The Covenant of Good Faith and Fair Dealing does not apply to Claims regarding Pre-Contractual Negotiations or Representations

ConcealFab claims Sabre violated the implied covenant of good faith and fair dealing, in part, by: (e) "<u>entering</u> the LOA in order to avoid performance of the Term Sheet; (f) <u>entering</u> the LOA in order to gain access to ConcealFab's Confidential Information and trade secrets; (g) <u>entering</u> the LOA for the purpose of securing 'most favored nation' status, discounts, marketing and intellectual property rights upon termination of the LOA; and (h) <u>entering</u> the LOA in order

to prevent ConcealFab from pursuing any other acquisition opportunities. (Am. Compl., p. 12, ¶60(e)-(h) [Dkt. 68]). (Emphasis added).

The duty of good faith and fair dealing "does not govern pre-contractual negotiations or representations." *Amoco Oil Co*, 908 P.2d 493, 498 (Colo. 1995)*; see also Amato v. Mesa Laboratories, Inc*., 2015 WL 5321446, at *4 (D.Colo. 2015). The allegations in paragraph 60(e)-(h) of the Amended Complaint, even if they were true, all relate to Sabre's purported reasons for entering the LOA and the Term Sheet, and, therefore, they do not state a claim for breach of the covenant of good faith and fair dealing. As such, ConcealFab cannot meet its burden of proof, and Sabre is entitled to summary judgment as to Claim 2 in ConcealFab's Amended Complaint.

### D. The Economic Loss Rule Bars ConcealFab's Tort Claims (Claim 3, Breach of Fiduciary Duty & Claim 2(d), Breached the Covenant of Good Faith and Fair Dealing by Completing Customer Orders)

"Whether Colorado's economic loss rule bars a claim is a question of law." *Benton v. Avedon Engineering, Inc*., 2012 WL 5869126, at *7 (D.Colo. 2012). The economic loss rule provides that "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Id*. The stated purpose of the economic loss rule is three-fold: "(1) to maintain a distinction between contract and tort law; (2) to enforce expectancy interests of the parties so that they can reliably allocate risks and costs during their bargaining; and (3) to encourage the parties to build cost considerations into the contract because they will not be able to recover economic damages in tort." *Id*.

"In determining whether the economic loss rule is applicable, the Court must focus 'on the source of the duty alleged to have been breached.'" *Id*. A duty arising in tort must be "sufficiently independent of the contract to preclude application of the economic loss rule." *Avedon*

*Engineering, Inc*., 2012 WL 5869126, at *7. A tort duty that is sufficiently independent of the contract at issue must meet two conditions: "first, the duty must arise from a source other than the relevant contract: second, the duty must not be a duty also imposed by the contract." *Id.* Broadly, "[t]ort obligations generally arise from duties imposed by law...without regard to any agreement or contract," and "[c]ontract obligations, on the other hand, 'arise from promises made between parties [to] allocate risks and costs during bargaining.'" *Id*.

The Court must first determine "whether the duties between these commercial parties were governed by a set of interrelated contracts." *Id*., at *8. Next, the Court must identify the source of the duty in dispute. *Id*. To do so, the Court evaluates: "(1) whether the relief sought in negligence is the same as the contractual relief; (2) whether there is a recognized common law duty of care in negligence; and (3) whether the negligence duty differs in any way from the contractual duty." *Id*. As applied to this matter, ConcealFab's claims that Sabre (1) breached its alleged fiduciary duties owed to Plaintiff as a result of the LOA and (2) breached the covenant of good faith and fair dealing by completing customer orders are not sufficiently independent of the relevant contract (the LOA), and, therefore, are the precluded via the economic loss rule.

**1. ConcealFab's Claim Three (Breach of Fiduciary Duty) is Precluded by the Economic Loss Doctrine and Should Be Dismissed via Summary Judgment**

To recover for breach of fiduciary duty, ConcealFab must prove: (1) Sabre was acting as a fiduciary of ConcealFab; (2) Sabre breached a fiduciary duty to ConcealFab; (3) ConcealFab incurred damages; and (4) Sabre's breach of fiduciary duty was the cause of ConcealFab's damages. *Brecheisen v. Banner Resources,* 2016 WL 7868821, at *6 (D.Colo. 2016).

ConcealFab contends "Sabre and ConcealFab were joint venturers who owed each other fiduciary duties of loyalty and full, fair, open and honest disclosure of everything affecting the

relationship." (Am. Compl., p. 12, ¶64 [Dkt. 68]). "It is axiomatic that a claim for breach of fiduciary duty necessarily requires as a precondition the existence of a fiduciary relationship between the parties." *Alley v. Aurora Loan Services LLC*, 2011 WL 3799035, at *8 (D.Colo. 2011). "Entering into a conventional business relationship generally does not create a fiduciary relationship." *Id*.

Each of ConcealFab's claims relates to Sabre's alleged breach of its fiduciary duties which stem from the LOA, i.e., a contract between commercial parties, "the object of which was a purely economic benefit." *Avedon Engineering, Inc*., 2012 WL 5869126, at *10. Specifically, ConcealFab argues that Sabre breached the fiduciary duties it owed to ConcealFab by entering the LOA: (a) in order to avoid performance of the Term Sheet; (b) to gain access to ConcealFab's Confidential Information and trade secrets for later competitive uses; (c) for the purpose of securing "most favored nation" status, discounts, marketing and intellectual property rights upon termination of the LOA; (d) to prevent ConcealFab from pursuing any other acquisition or fundraising opportunities for a period of at least six months and as long as twelve months; and (e) with no intention of performing (the LOA) according to its terms. (Am. Compl., p. 12-13, ¶65(a)-(e) [Dkt. 68]).

The contractual duties between the Parties cannot serve as grounds for a tort claim that, if successful, would award ConcealFab additional compensation for Sabre's alleged breach of its duties in negotiating and / or entering the LOA. Where, as here, the purported evidence of a breach of fiduciary duty would constitute a breach of a contract's express or implied terms, a claim for breach of fiduciary duty is barred by the economic loss rule. *Tara Woods Ltd. Partnership v. Fannie Mae*, 731 F.Supp.2d 1103, 1118 (D.Colo. 2010). Because there is no evidence Sabre breached any fiduciary duty continued in the LOA / Term Sheet, and no evidence

(or allegations) that any duty existed outside the terms of the Parties' contracts (the LOA and the Term Sheet), the economic loss rule bars ConcealFab's claim for breach of fiduciary duty.

### 2. ConcealFab's Claim Two Subpart (d) (Breach of the Covenant of Good Faith and Fair Dealing by Completing Customer Orders) is Barred by the Economic Loss Rule and therefore Subject to Dismissal via Summary Judgment

ConcealFab claims Sabre violated the implied covenant of good faith and fair dealing, in part, by "(d) choosing to fulfill customer orders itself when ConcealFab had already sustainably completed the orders." (Am. Compl., p. 12, ¶60(d)- [Dkt. 68]). Neither the Term Sheet nor the LOA was binding on either Party. Sections 4(b) and 4(e)(i)-(iii) of the LOA also clearly discuss the Parties' right to terminate the LOA as well as certain rights of the Parties upon termination. (Movant's Appx., p. 16, LOA). Further, Sabre had the right to complete the purchase orders running through the new Sabre EPG segment, and Sabre did, in fact, fulfill those orders post termination of the relationship. The LOA provides that "any orders post execution of this agreement not dependent on CFG's small business or cleared facility status will be run through the new Sabre reporting segment." (Movant's Appx., p. 14, LOA, ¶3(c)(vii). ConcealFab alleges that Sabre's completion of these orders has "caused ConcealFab to sustain damages in an amount to be proven at trial." (Am. Compl., p. 12, ¶60(d)- [Dkt. 68]).

Again, the contractual duties between the Parties cannot serve as grounds for a tort claim that, if successful, would award ConcealFab additional compensation for Sabre's alleged breach of its duties under the LOA or the Term Sheet. Because there is no evidence (let alone allegations) that ConcealFab sustained damages related to Sabre's completion of these orders that exist outside the terms of the Parties' contracts (the LOA and the Term Sheet),

ConcealFab's claim for damages related to Sabre's completion of these orders is barred by the economic loss rule.

### E. ConcealFab's Claim Five (Tortious Interference with Contractual Relationship) is Subject to Dismissal via Summary Judgment

To sustain a claim of intentional interference with contractual relationship, it is ConcealFab's burden to prove Sabre: (1) was aware of the existence of the contract; (2) intended that one of the parties breach the contract; (3) induced the party to breach the contract or make it impossible for him or her to perform; and (4) acted "improperly" in causing the breach." *Hertz v. Luzenac Grp*., 576 F.3d 1103, 1118 (10th Cir. 2009).

ConcealFab alleges that Sabre tortiously interfered with its contractual relationships, in part, by contacting ConcealFab vendors to ask that they produce parts for its use that contain ConcealFab trade secrets. (Am. Compl., p. 17, ¶74(a) [Dkt. 68]). ConcealFab alleges that it has a "trade secret" as to the fabrication of its bracket design for JMA (Movant's Appx., p. 201, Relevant Fitzhugh R. 30(b)(6), p. 222:14-25). As demonstrated below, ConcealFab has not pointed to a viable trade secret, nor has ConcealFab pointed to a vendor that was asked to produce an item for Sabre containing a viable ConcealFab trade secret. (Movant's Appx., p. 201, Relevant Fitzhugh R. 30(b)(6), p. 222:14-25).

ConcealFab further alleges that Sabre tortiously interfered with its contractual relationships by contacting ConcealFab representatives regarding opportunities they were pursuing exclusively on behalf of ConcealFab. Namely, ConcealFab's "exclusive opportunity with Silicon Valley Power ("SVP") via a sales representative with Epic Marketing, which was, in turn, working with a company called DAS Group Professionals or DGP." (Movant's Appx., p. 181-182, p. 200, Relevant Fitzhugh R. 30(b)(6), p. 151:13-25; 152:1-6; 219:4-15). ConcealFab's

claim of tortious interference with regards to the SVP opportunity fails as a matter of law because ConcealFab actually received the contract in late 2015, and, therefore, it cannot show that Sabre induced any of the parties involved to breach the contract or make it impossible perform the contract impossible. *Daniluk v. Norfolk Southern Railway Company*, 2015 WL 148560, at *3 (D.Colo. 2015) ("If the contract has been fully performed, then there has been no interference").

ConcealFab alleges that Sabre tortiously interfered with its contractual relationships by recording an invalid UCC-1 Financing Statement, which may cause lenders to declare ConcealFab in default under existing loan agreements. While Sabre, via its due diligence, was generally aware that ConcealFab had various loans, ConcealFab did not disclose the loan documents to Sabre. Additionally, two different sections of the LOA specifically provide in the event of termination of the agreement, ConcealFab's financial obligations to Sabre would revert to a 1-year note due Sabre guaranteed a security interest in ConcealFab's IP. (Movant's Appx., p. 14, LOA at ¶3(b)(ii)(4); *see also* Movant's Appx., p. 15, LOA, ¶3(c)(vii)(1)-(2)).

While Sabre's UCC-1 may have been deemed invalid, Sabre did not intend that ConcealFab would be in breach in any of its loan covenants; nor was Sabre trying to induce ConcealFab or any other party to breach ConcealFab's loan covenants; nor was Sabre acting improperly by attempting to enforce this part of the LOA post-termination. Further, ConcealFab has not established that it suffered any harm, only that it "*may*" be harmed. Based upon the foregoing, Claim 5 should be dismissed.

**F. ConcealFab's Claim Six (Tortious Interference with Prospective Business Relations) Should be Dismissed via Summary Judgment**

"Tortious interference with prospective business relations requires essentially the same elements as tortious interference with a contract, except that the former does not require an

existing contract, only a “prospective contractual relation.” *Daniluk*, 2015 WL 148560, at *3. “While the existence of an underlying contract is not required for this tort, there must be a showing of improper and intentional interference by the defendant that prevents the formation of a contract between the plaintiff and a third party*.” Omedelena v. Denver Options, Inc*., 60 P.3d 717 (Colo.Appx. 2002). Interference with “another's prospective contractual relation” is tortious only if there is a reasonable likelihood or reasonable probability that a contract would have resulted. *Daniluk*, at *3.

ConcealFab alleges that Sabre tortiously interfered with its “prospective business relationship with DAS Group Professionals through its exclusive contractual relationship with EPIC Marketing.” (Am. Compl., p. 15, ¶¶77-78 [ECF 68]). Again, ConcealFab’s claim of tortious interference with regards to the SVP opportunity fails because ConcealFab received the contract in late 2015. Therefore, ConcealFab cannot show that Sabre tortiously interfered with the SVP relationship, or alternatively, that ConcealFab suffered any harm. (Movant’s Appx, pp. 181-182, Relevant Fitzhugh R. 30(b)(6), pp.151:13-25; 152:1-6).

ConcealFab alleges that Sabre intentionally interfered with ConcealFab’s prospective business relationship with ConcealFab’s lenders by recording a UCC-1 Financing Statement with the Colorado Secretary of State, and refusing to terminate the filing. (Am. Compl., p. 15-16, ¶¶77-78 [ECF 68]). While Sabre’s UCC-1 was deemed invalid, Sabre was attempting to enforce its post-termination rights under the LOA. There is no evidence that the UCC-1 prevented the formation of a contract between the Plaintiff and a potential lender. In fact, Fitzhugh testified that ConcealFab was able to get funding. (Movant’s Appx., pp. 178-180, 205; Relevant Fitzhugh R. 30(b)(6), p. 118:2- 25; 119:1-25; 120:1-11; 226:8-25).

ConcealFab also claims Sabre intentionally interfered with ConcealFab's significant customers. (Am. Compl., p. 16, ¶¶81-82 [ECF 68]). In fact, the Term Sheet clearly states that both Parties brought key accounts such as CCI, AT&T, Verizon into the working relationship. (Movant's Appx., p. 6, Term Sheet, ¶2 *cf.* ¶3). ConcealFab and Sabre have always known that they compete in the same, relatively small marketplace. Additionally, post termination of the LOA, ConcealFab has continued to received purchase orders / contracts from CCI a/k/a Crown and Castle, Verizon, and AT&T. (Movant's Appx., pp. 205-206, Relevant Fitzhugh Rule 30(b)(6), p. 225:15-25; 226:1-4). Accordingly, ConcealFab's claims for tortious interference with prospective business relations fails since it received the SVP / EPIC / DGP contract, received loans to operate its business, and continued to receive purchase orders from its "significant" customers after Sabre's termination of the LOA.

### G. ConcealFab's Claim 9 (Fraud in the Inducement) Should be Dismissed via Summary Judgment

Pursuant to Claim 9, ConcealFab alleges that "Sabre made misrepresentations of fact to induce ConcealFab to enter the LOA," and, inter alia: (a) that the purpose of the LOA was not to allow the Parties to operate jointly until a definitive agreement could be put into place; (b) that Sabre never intended to perform the LOA; (c) and that Sabre would execute the Employment Agreement with Fitzhugh. (Am. Compl., p. 17-18, ¶¶96–97 [Dkt. 68]). "Inducement means the 'act or process of enticing or persuading another person to take a certain course of action.'" *Liberty Savings Bank, FSB v. Webb Crane Service, Inc*., 2005 WL 1799300, at *3 (D.Colo.,2005), *see also* Black's Law Dictionary, p. 790 (8th ed. 2004)). To establish fraudulent representation, ConcealFab must prove that: (1) Sabre made a false representation of a past or present fact, (2) the fact was material, (3) at the time the representation was made, Sabre

knew the representation was false or was aware that it did not know whether the representation was true or false, (4) Sabre made the representation with the intent that ConcealFab would rely on it; (5) ConcealFab relied on the representation; (6) ConcealFab's reliance was justified; and (7) the reliance caused ConcealFab damages. *Electrology Laboratory, Inc. v. Kunze*, 169 F.Supp.3d 1119, 1145–46 (D.Colo. 2016). The evidence clearly shows that ConcealFab cannot not meet its burden.

**1. The Employment Agreement**

ConcealFab has presented no evidence Sabre did not intend to fully execute the Employment Agreement at the time the Parties negotiated the LOA. As discussed above, the parties exchanged no fewer than eleven (11) drafts of the Employment Agreement. (Movant's Appx, pp. 90-128; Fitzhugh Dep. 51:21-25; 58:8-25; 62:8-25; 63:1-65:6; 65:7; 68:13; 68:15 -20; 71:1-16; 71:17-25; 77:20-25; 78-79:1; 82–83:3;85-3-11; 86:12-25; 87:1-25; 89:1-13). Regardless of the fact that Sabre did not fully execute the Employment Agreement. Further, Sabre paid Fitzhugh's salary during the LOA term, and issued him a company credit card and paid the bill and incurred substantial expenses (Movant's Appx., pp. 272-263, McGee Aff.). These are not the actions of a party committing fraud. Conceal Fab has no evidence to prove a fraud claim and the evidence before the Court proves the opposite.

**2. The Negotiation of The LOA**

ConcealFab has produced no evidence that Sabre entered the LOA in bad-faith. Both the Term Sheet and the LOA are non-binding and provide for termination of the agreements. The Term Sheet states that it is "non-binding on either party and establishes only the intent of the organizations to work diligently to develop a formal agreement…subject to customary and typical due diligence including…process review and financials." (Movant's Appx., p. 3, Term Sheet, ¶¶6

7). Initial due diligence showed that ConcealFab needed an immediate cash infusion to pay its outstanding accounts payable. Accordingly, among other reasons, the LOA was negotiated to provide “an immediate infusion of cash to ConcealFab in the amount of $160K…to be utilized as a source of funds to pay current A/P.” (Movant’s Appx. 15, LOA, ¶3(c)(vii)(1)-(2). Again, ConcealFAb has no evidence to prove a fraud claim and the evidence before the Court proves the opposite.

**3. Sabre’s Performance under the LOA**

The evidence shows that Sabre performed under the LOA. As shown above, Sabre preformed its obligations to provide ConcealFab with an immediate cash infusion to clear up its outstanding A/Ps, and continued to pay ConcealFab / CFG’s working capital needs until Sabre terminated the agreement. (Movant’s Appx., p. 272-287, McGee Affidavit). Additionally, at least as early as April 8, 2015, Sabre proposed a work-flow in order to integrate ConcealFab and Sabre’s manufacturing capabilities to allow the Parties to operate jointly until a definitive agreement could be put into place. Such evidence supports Sabre’s intent to be honest and to “make decisions based on EBITD to the company and in the best interest of both CF and Sabre.” (Movant’s Appx, p. 275]). In late April 2015, Joe McLaurin, Director of Production Reporting & Systems with Sabre Industries, visited ConcealFab’s facility and made detailed suggestions regarding how to best integrate and streamline the Parties’ production, engineering, and staffing. (Movant’s Appx. 278-280). McLaurin then visited ConcealFab a second time in May 2015, and again, made specific recommendations in terms of combining and streamlining the operations. (Movant’s Appx. 277-278). ConcealFab was resistant to almost all of Sabre’s recommendations concerning combining the operations and making the new Sabre EPG and CFG entities profitable. Movant’s Appx., pp. 186-199; Relevant Fitzhugh R 30(b)(6) 185:16–25: 186-198).

All of the above show that Sabre cannot be liable for fraud in the inducement. ConcealFab simply has no evidence from which a reasonable finder of fact could conclude that Sabre fraudulently induced ConcealFab to enter into the LOA.

### H. ConcealFab's Claim 7 (Trade Disparagement) Should be Dismissed via Summary Judgment

ConcealFab alleges that Sabre disparaged it by making "false statements…by telling key accounts it terminated the LOA and the Term Sheet because ConcealFab lacked adequate engineering and / or manufacturing capabilities." (Am. Compl., p. 16, ¶86 [Dkt.68]). "With respect to trade disparagement, Colorado has adopted the following definition from the Restatement: 'One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and (b) he knows that the statement is false or acts in reckless disregard to its truth or falsity.'" *Pfenninger v. Exempla, Inc*., 116 F.Supp.2d 1184, 1197–98 (D.Colo. 2000); *Restatement (Second) of Torts* § 623(A) (1976). ConcealFab has *no evidence whatsoever* of the alleged disparagement. However, assuming, *arguendo,* statements such as those alleged were made to "key accounts," there is no evidence Sabre or its employees did not believe those statements to be true.

Certainly, Sabre's decision to terminate the LOA and the Term Sheet was a business decision based on numerous factors. Sabre professionals did find, in their opinion, however, that ConcealFab's engineering capabilities were delayed because final approval went through one person, and further noted that ConcealFab had low production volume with up to 90% of its fabrication work being outsourced. (Movant's Appx, p. 278-280; *see also* Movant's Appx. 275-

277). ConcealFab was resistant to Sabre's recommendations to streamline and/or improve its engineering and manufacturing/production capabilities. (Movant's Appx., pp. 186-199; Relevant Fitzhugh R 30(b)(6), 185:16–25; 198:25). Regardless, ConcealFab presents no evidence that the unnamed Sabre employees who allegedly disparaged the Plaintiff's "engineering and / or manufacturing capabilities did so with "reckless disregard to its truth or falsity." In fact, the evidence points to the fact that ConcealFab did lack adequate engineering and / or manufacturing capabilities. Again, since ConcealFab lacks evidence to support this claim, it should be dismissed.

### I. ConcealFab's Claim 4 (Misappropriation of Trade Secrets (C.R.S. §§ 7-74-101 to 7-74-110) Should be Dismissed via Summary Judgment

#### 1. The Court Lacks Subject Matter Jurisdiction over Plaintiff's Claim Under the Colorado Uniform Trade Secrets Act

Plaintiff alleges that Sabre violated the NDA by misappropriating ConcealFab's trade secrets pursuant to C.R.S. §§ 7-74-101 to 7-74-110. (Am. Compl., p. 13-14, ¶¶ 68-70 [Dkt. 68]). Under the plain language of the NDA, however, the Court does not have subject matter jurisdiction to decide this claim pursuant to *Colorado* law. Section 11 of the NDA provides, in part: "Miscellaneous: This Agreement shall be governed by and construed in accordance with the <u>laws of the State of Iowa</u>, without regard to conflict of laws principles." (Movant's Appx. p. 3, NDA, § 11). Accordingly, ConcealFab may not pursue a claim under Colorado's Uniform Trade Secrets Act, and Claim 9 is subject to summary judgment for this reason alone.

#### 2. Plaintiff Cannot Establish it has Protectable Trade Secrets or that Sabre Misappropriated Them

Should the Court find it has subject matter jurisdiction over Plaintiff's misappropriation of trade secrets claims arising from the NDA pursuant to the Colorado Uniform Trade Secrets Act,

ConcealFab must show: (i) it possessed a valid trade secret, (ii) the trade secret was disclosed or used without consent, and (iii) Sabre knew, or should have known, that the trade secret was acquired by improper means. *Christou v. Beatport*, LLC, 2014 WL 1293296 (D. Col. Mar. 31, 2014); C.R.S. § 7-74-102(2). The factors the Court should consider in determining whether a trade secret exists include:

> (1) whether proper and reasonable steps were taken by the owner to protect the secrecy of the information; (2) whether access to the information was restricted; (3) whether employees knew customers' names from general experience; (4) whether customers commonly dealt with more than one supplier; (5) whether customer information could be readily obtained from public directories; (6) whether customer information is readily ascertainable from sources outside the owner's business; (7) whether the owner of the customer list expended great cost and effort over a considerable period of time to develop the files; and (8) whether it would be difficult for a competitor to duplicate the information.

*Hertz v. Luzenac Group*, 576 F.3d 1103, 1115 (10th Cir. 2009).

The burden of proof is on ConcealFab to establish each of the elements of the misappropriation of trade secrets claim. As alleged, ConcealFab claims Sabre misappropriated its trade secrets by: (a) fulfilling customer orders that included ConcealFab "trade secrets" post termination of the LOA / Term Sheet; (b) misrepresenting to customers that ConcealFab's contractual partnerships were those of Sabre; (c) targeting of ConcealFab's key accounts; (d) contacting Plaintiff's vendors and representatives; and (e) "contacting ConcealFab's customers." (Am. Compl., p. 13-14, ¶¶ 68-70 [Dkt. 68]). Fitzhugh was ConcealFab's designated Rule 30(b)(6) witness regarding trade secrets. He testified that the trade secrets allegedly misappropriated by Sabre included: (a) bracket design / fabrication methods; (b) production methods of a 12" pole; (c) wrongful contacting of key accounts; (c) customer lists; (d) contractual relationships; and (e) pricing. (Movant's Appx., pp. 201-205, Relevant Fitzhugh R. 30(b)(6), 222:14-25; 223:1- 25; 224:8-25; 225:1-14). Each of these are addressed in turn.

Production methods of ConcealFab's 12" pole: The Parties clearly contemplated their various pole technologies, and competition with one another regarding the same in the event of the termination of the LOA. Pursuant to the LOA, "In the event the LOA is terminated at any time…. [t]he organizations agree that each have specific pole capabilities and designs that will be shared and that upon the termination of the LOA, will compete on this product on this product line with no restrictions." (Movant's Appx., p. 16, LOA, ¶ 4(e)(iii)(4)). Even if Plaintiff could show that the production methods of its 12' pole is a trade secret, Sabre's use of any knowledge it may have learned during the pendency of the LOA regarding the same would not be "misappropriation" pursuant to the clear terms of the LOA.

ConcealFab's "key" accounts, customer lists, and contractual relationships: The Term Sheet clearly states that each party brought customer relationships with some of the same, key accounts--CCI, AT&T, and Verizon--into the Parties' business relationship. (Movant's Appx., p. 6**,** Term Sheet ¶ 2, *cf.* ¶3). ConcealFab and Sabre have always known that they compete in the same, relatively small marketplace. Additionally, courts have found that a customer list is not a trade secret when the customers' identities and contact information is ascertainable from public sources and because other customer information is also ascertainable by proper means*. See e.g., Frontrange Solutions USA, Inc. v. Newroad Software, Inc.,* 505 F.Supp.2d 821 (D.Colo. 2007).

ConcealFab's pricing: Price quote information obtainable from sources independent of Plaintiff are not secret and thus, cannot constitute trade secrets. *Southwest Stainless, LP v. Sappington*, 582 F.3d 1176, (10th Cir. 2009). Sabre is an established company operating within the same relatively small marketplace as the Plaintiff, and with internal pricing models of its own.

ConcealFab has no evidence that it has a protectable "trade secret" in its pricing, or that Sabre has used this "protected" information.

Misappropriation: Assuming, *arguendo*, all of the above are found to be "trade secrets," ConcealFab cannot show Sabre "misappropriated" the information—i.e. acquired the knowledge via improper means such as theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy. *Christou*, 2014 WL 1293296. ConcealFab has produced **no evidence** to show Sabre entered the LOA in bad-faith. Sabre's good-faith is evidenced, in large part, by Sabre's payment of the working capital needs of ConcealFab and the new Sabre EPG and CFG. From approximately March 12, 2015 to June 6, 2015, Sabre paid working capital and other expenses on behalf of ConcealFab or former ConcealFab employees in an amount not less than $608,966.69. (Movant's Appx., pp. 272-273, McGee Affidavit). ConcealFab cannot establish that Sabre "misappropriated" any of its alleged trade secrets by using improper means such as theft, misrepresentation, breach, or inducement to obtain any of ConcealFab's alleged "trade secrets." Accordingly, ConcealFab's claims for misappropriation of trade secrets are subject to summary judgment for this reason alone.

## CONCLUSION

WHEREFORE, Defendants, Sabre Industries, Inc., and Midwest Underground Technology, Inc., respectfully request an Order Granting Defendants Partial Summary Judgment as to Claims 1 through 7, 9 and 11 of Plaintiff's Amended Complaint.

Defendants further request summary judgment in favor of Sabre as to its breach of contract (Fifth) counterclaim against ConcealFab.

Dated April 28, 2017

**GOOSMANN LAW FIRM, PLC**

By: s/ Elizabeth M. Lally

Elizabeth M. Lally, AT0013010
Jeana L. Goosmann, AT0002984
410 5th Street
Sioux City, IA 51101
Phone: 712-226-4000
Fax: 712-2244517
lallye@goosmannlaw.com
goosmannj@goosmannlaw.com
**ATTORNEYS FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

I hereby certify on the 28th day of April, 2017, a true and correct copy of the foregoing was filed and served electronically upon the following:

Angela DeVine
Silver & DeBoskey, P.C.
1801 York Street
Denver, CO 80206
DevineA@s-d.com

*s/ Chasity Raub-Medina*
Chasity Raub-Medina