# MOVANT'S APPENDIX

## p. 1 - 213

### REDACTED

# MUTUAL NON-DISCLOSURE AGREEMENT

This mutual non-disclosure agreement (the "Agreement") made and entered into on 07-25-2014 (the "Effective Date") is by and between Midwest Underground Technology, Inc., its affiliates, parent corporation and subsidiaries (collectively "MUTI") and ConcealFab corporation (the "Company"), who cumulatively may be referred to herein as the "Parties" or individually as a "Party".

WHEREAS, the Parties wish to explore a business opportunity of mutual interest, and in connection with this opportunity, each Party may disclose to the other certain business and/or technical information that is non-public, confidential or proprietary in nature (the "Confidential Information"); and

WHEREAS, the Party disclosing such Confidential Information ("Disclosing Party") desires the Party receiving such disclosures ("Receiving Party") to keep any Confidential Information private and confidential and the Receiving Party is willing and able to keep such Confidential Information private and confidential; and

WHEREAS, the Parties acknowledge that most of the Confidential Information provided by the Disclosing Party is the result of substantial expenditures of time, money, and business/technical expertise and the unauthorized use or dissemination of Confidential Information would cause significant harm to the Disclosing Party;

NOW THEREFORE, in consideration of the mutual covenants, promises and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each Party, the Parties do hereby agree as follows:

<u>**Section 1 – Confidential Information.**</u> Except as set forth in Section 2 below, the term Confidential Information shall mean all non-public, confidential or proprietary information, whether tangible or intangible, disclosed before, on or after the Effective Date by a Disclosing Party (or an End Customer) to a Receiving Party or its' employees, officers, directors, partners shareholders, agents, accountants, attorneys or advisors (collectively "Representatives"), whether disclosed orally, in writing or electronic form and whether or not such disclosures are marked, designated or otherwise identified as "confidential" including, without limitation:

(a) past, present and future business affairs such as finances, customer and/or supplier information, products, services, organizational structure and internal practices, forecasts, sales and other financial results, records and budgets, and all business, marketing, development, sales and other commercial strategies;

(b) know-how, trade secrets, tools, methods, techniques, designs, and other information which derives economic value, actual or potential, from not being generally known to, or readily ascertainable through proper means by persons who can obtain economic value from its disclosure or use (collectively "Trade Secrets");

(c) all designs, specifications, documentation, components, source code, object code, images, icons, schematics, drawings, protocols, processes or depictions, in whole or in part, of any of the foregoing;

(d) any third-party confidential information included with, or incorporated in, any information provided by Disclosing Party to Receiving Party or Receiving Party's Representatives.; and

(e) all notes, analyses, compilations, reports, forecasts, studies, samples, summaries or interpretations prepared by the Disclosing Party for the Receiving Party or its Representatives that contain, are based on, or otherwise reflect or are derived from, in whole or in part, any of the foregoing.

<u>**Section 2 – Exclusions from Confidential Information**</u>. Except as required by applicable federal, state or local law or regulation, the term Confidential Information as used in this Agreement shall not include information that:

EXHIBIT SD
20 3-13-17
Fitzhugh 30(b)(6)

CONCEALFAB 000185

(a) at the time of disclosure is, or thereafter becomes, generally available to and known by the public other than as a result of, directly or indirectly, any violation of this Agreement by the Receiving Party or any of its Representatives;

(b) at the time of disclosure is, or thereafter becomes, available to Receiving Party on a non-confidential basis from a third-party source, provided that such third party Is not and was not prohibited from disclosing such Confidential Information to the Receiving Party by a contractual obligation or otherwise;

(c) was known by or was in the possession of the Receiving Party, as established by documentary evidence, prior to being disclosed by or on behalf of the Disclosing Party; or

(d) was or is independently developed by Receiving Party or its Representatives, as established by documentary evidence, without reference to or use of , in whole or in part, any of the Disclosing Party's Confidential Information.

<u>**Section 3 – Responsibilities.**</u> Subject to the exceptions articulated in Section 4 below:

(a) MUTI and Company shall each keep in confidence, and shall cause their respective Representatives to keep in confidence, all Confidential Information disclosed to either of them by the other and shall use such Confidential Information only for the purposes of evaluating and engaging in discussion concerning a potential business relationship between the Parties and other mutually agreed upon objectives of the Parties where this Agreement is incorporated by reference therein.

(b) The Receiving Party shall protect and safeguard the confidentiality of all Confidential Information with at least the same degree of care as the Receiving Party would protect its own Confidential Information, but in no event with less than a commercially reasonable degree of care;

(c) Dissemination of Confidential Information shall be limited to the Representatives of the Receiving Party whose duties justify their need to know such information and then only on the basis of a clear understanding by these Representatives of their obligation to maintain the confidential status of the Confidential Information and to restrict the use of the Confidential Information solely to the use granted under this Agreement. The Receiving Party shall be responsible for the breach of this Agreement by its Representatives

(d) All Confidential Information, including all tangible embodiments, copies, reproductions and summaries thereof, and any other information and materials provided by Disclosing Party to Receiving Party shall remain the sole and exclusive property of the Disclosing Party.

(e) The Receiving Party shall immediately report to the Disclosing Party any attempt by the Receiving Party's Representatives to use or disclose any portion of the Confidential Information without authorization from the Disclosing Party, and shall cooperate with the Disclosing Party in every reasonable way to help the Disclosing Party regain possession of the Confidential Information and prevent its further unauthorized use.

(f) The Receiving Party may not, or allow its Representatives to, reverse engineer, decompile or disassemble any software, hardware or technology disclosed to the Receiving Party.

(g) At the Disclosing Party's request, the Receiving Party shall return (or, at the Disclosing Party's option, destroy) all originals, copies, reproductions and summaries of Confidential Information in the possession of the Receiving Party or its Representatives, and shall destroy all copies of any analyses, compilations, studies or other documents prepared by the Receiving Party or its Representatives for the Receiving Party's use containing or reflecting any Confidential Information, and such destruction and/or return shall be certified in writing to the Disclosing Party.

<u>**Section 4 – Exception.**</u> The obligations of confidentiality imposed by this Agreement do not apply to any Confidential Information which, based on the advice of legal counsel, is required to be disclosed pursuant to operation of law or legal process, governmental regulation or court order, provided that the Receiving Party receiving such legal demand or order promptly informs the Disclosing Party

thereof and cooperates with the Disclosing Party in contesting such request or order and in obtaining appropriate protection orders, subject to the payment by the Disclosing Party of all out-of-pocket expenses incurred by the Receiving Party providing such cooperation at the request of the Disclosing Party.

**Section 5 – No Obligation.** Nothing herein shall obligate either Party to proceed with any transaction between them and each Party reserves the right, in its sole discretion, to terminate any discussion contemplated by this Agreement.

**Section 6 – No Warranty.** ALL CONFIDENTIAL INFORMATION IS PROVIDED "AS IS" AND THE DISCLOSING PARTY MAKES NO WARRANTIES, EXPRESS, IMPLIED OR OTHERWISE, AS TO THE ACCURACY, COMPLETENESS, OR PERFORMANCE OF THE CONFIDENTIAL INFORMATION.

**Section 7 – No License.** By disclosing information to the Receiving Party, the Disclosing Party does not grant any express or implied rights, permission of use or licenses to the Receiving Party with respect to any patents, copyrights, trademarks, trade secrets or other proprietary rights of the Disclosing Party. Nothing in this Agreement shall obligate either Party to disclose any information to the other Party.

**Section 8 – Term.** The obligations of the Parties hereunder shall survive until such time as all Confidential Information of a Disclosing Party becomes publically known or is made generally available through no action or inaction of the Receiving Party or its Representatives.

**Section 9 – Remedies.** Each Party agrees that any violation or threatened violation of this Agreement may cause irreparable injury to the other Party, entitling the other Party to seek, without limitation, injunctive relief including but not limited to specific performance in any court of competent jurisdiction, and may, in addition, pursue any other available remedy, at law or in equity, including the recovery of damages. In the event that either Party violates any of the provisions of this Agreement, the prevailing Party shall be entitled to recover all of its reasonable expenses, including attorney's fees through appeals, incurred in addressing such violation.

**Section 10 – Non-Solicitation.** Both Parties represent and warrant that, during the term of this Agreement that they will not, directly or indirectly, or on behalf of another entity, recruit, solicit, induce or attempt to recruit, solicit or induce the employees of the other Party who either participated in the business negotiations, services or projects amongst or between the Parties to leave his or her employment to go to work, as an employee, consultant or contractor for another telecommunications services or professional services firm, or one of similar import.

**Section 11 – Miscellaneous.** This Agreement shall bind and inure to the benefit of the Parties hereto and their respective successors and assigns. This Agreement shall be governed by and construed in accordance with the laws of the State of Iowa, without regard to conflict of laws principles. Each Party hereto submits to the jurisdiction of the federal and state courts of Iowa and waives any objection to venue with respect to actions brought in such courts. Any failure to enforce any provision of this Agreement shall NOT constitute a waiver thereof and no modification or alteration to the terms and conditions set forth in this Agreement shall be valid unless signed in writing by the Parties. If any provision of this Agreement shall be held illegal, invalid or unenforceable by a court of competent jurisdiction, then the remaining provisions of this Agreement shall remain in full force and effect.

**Section 12 – Notices.** Any notice, approval, request or other communication issued pursuant to this Agreement shall be given in writing and deemed to have been delivered on (i) the delivery date if delivered personally to the Party to whom the same is directed; (ii) one (1) business day after deposit with a commercial overnight carrier, with written verification of receipt, to the address of the Party to

whom the same is directed as set forth below; or (iii) three (3) days after being mailed by certified mail, postage prepaid, return receipt requested:

| | |
|---|---|
| If to MUTI: | MUTI<br>2626 Midwest Court<br>Champaign, IL 61822<br>(217) 819-3040 |
| If to Company: | ConcealFab Corporation<br>3265 Fillmore Ridge Heights<br>Colorado Springs, CO 80907<br>719-599-3400 |

[ SIGNATURE PAGE FOLLOWS ]

This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one instrument. A signed copy of this Agreement delivered by e-mail, fax, facsimile or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

IN WITNESS WHEREOF, the undersigned have duly executed this Mutual Non-Disclosure Agreement and agree to its binding and effective nature upon proper execution hereof.

MIDWEST UNDERGROUND TECHNOLOGY, INC.

By: ______________________ Date: 8-4-14

Name: Scott Kisting

Title: Sr. Vice President

ConcealFab Corporation

By: ______________________ Date: 7/25/2014

Name: Jonathan Fitzhugh

Title: CEO

# TERM SHEET

# Movant’s Appx., pp. 6-16

## FILED UNDER RESTRICTION

# Interim Plan / Licensing Operating Agreement

# Movant's Appx., p. 13-16

## FILED UNDER RESTRICTION

**Vicki E. Pennington**

| | |
|---|---|
| **From:** | Jonathan Fitzhugh |
| **Sent:** | Thursday, January 15, 2015 12:51 PM |
| **To:** | Duncan Stewart; Chris Odell |
| **Subject:** | Documents to Discuss/Approve at Board Meeting |
| **Attachments:** | Jonathan Fitzhugh's Employment Agreement Jan 15 2015.pdf; C Fab - Term Sheet - 1 15 15 JF.pdf |


**Jonathan Fitzhugh**
**Chief Executive Officer**
www.ConcealFab.com
**719-599-3400 office**
**617-851-9018 mobile**



This e-mail and any attachments are for the intended recipient(s) only and may contain proprietary, confidential material. If you are not the intended recipient, (even if the email address above is yours) do not use, retain, copy or disclose any part of this communication or any attachment as it is strictly prohibited and may be unlawful. If you believe that you have received this e-mail in error, please notify the sender immediately and permanently delete. This email may be a personal communication from the sender and as such does not represent the views of the company.

Thank you for your cooperation and assistance.





EXHIBIT
16
Fitzhugh 3/13/17

CONCEALFAB 001142

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is entered into between Jonathon Fitzhugh ("Employee") and Sabre Industries, Inc., ("Sabre"). In consideration of the obligations and rights described below, the parties agree to be bound as follows:

1. Effective Date. The period of Employee's employment under this Agreement will commence on the date of consummation of the acquisition of Conceal Fab Corporation, a Colorado corporation ("Conceal Fab") by Sabre and other certain parties (such date, the "Effective Date"). This Agreement shall automatically terminate without any action on the part of any person and be void *ab initio* if the Asset Purchase Agreement is terminated in accordance with its terms, and neither Sabre nor any other person shall have any liability to Employee under this Agreement if the Closing (as defined in the Stock Purchase Agreement) does not occur.

2. Employment. Sabre shall employ the Employee, and the Employee accepts employment with Sabre, upon the terms and conditions set forth in this Agreement. Sabre may not terminate the employment of Employee or reduce his responsibilities during the period commencing on the Effective Date and, subject to the Termination provision in Paragraph 24, ending on the later of (i) the fourth anniversary of the Effective Date, and (ii) the last day of Sabre's 2019 fiscal year (the "Non- Termination Period").

3. Position and Duties. The Employee's title shall be Executive Vice President – DAS and Small Cell Product Segment, reporting to the President – Telecom Segment, and the Employee shall have the usual and customary duties, responsibilities and authority assigned to such position. The Employee shall devote substantially all of the Employee's active business time and attention to the business and affairs of Sabre. The Employee shall perform the Employee's duties and responsibilities to the best of the Employee's abilities in a diligent, professional and non-negligent manner. The Employee will promote the goodwill of Sabre, and avoid any conflicts between the Employee's private interests and Sabre's interests.

4. Compensation. During the Employee's employment, the Employee shall be paid a base salary of $300,000 per year, less all applicable federal, state, and/or local taxes, payable in accordance with Sabre's normal payroll practices. [In addition, Sabre shall pay Employee and additional $725/month to supplement the cost of a vehicle of his choice.]

5. Severance; Release of Claims; Other Obligations.

(a) If Sabre terminates the Employee without "Cause" (as defined in Paragraph 25) after expiration of the Non-Termination Period, or Employee resigns at anytime for "Good Reason" (as defined in Paragraph 25) and conditioned upon Employee's execution, delivery, and non-revocation of a mutual release of claims within 30 days after such termination of employment and the Employee's compliance with the terms and conditions of this Agreement, the Employee shall receive severance pay equivalent to his base salary at the end of employment (but in no event less than the compensation set forth in Paragraph 4), for a period of one (1) year ("Severance Period"), less all applicable federal, state, and/or local taxes, on the same dates as other employees who are paid weekly by Sabre. In the event no employees are paid by Sabre at any time during the Severance Period, Sabre shall pay the weekly amount on each Wednesday until expiration of the Severance Period. Sabre shall pay each installment either by direct deposit or check (at Employee's option), sent to the Employee via regular mail by United States first-class mail, postage prepaid, or a similarly reliable service at Sabre's option beginning the first regular payday once the revocation period for any signed release expires.

(b) Upon any termination of the Employee's employment with Sabre, the Employee shall promptly resign from any positions with Sabre whether as an officer, director, employee fiduciary or otherwise and shall execute any documents reasonably required to effectuate the resignation.

(c) If the Employee ends his or her employment voluntarily, or is terminated for "Cause" as set forth in Paragraphs 24 and 25, the Employee shall not be entitled to any severance set forth in this Paragraph 5.

If the Employee violates any of the provisions of this Agreement or does not execute an irrevocable release, any severance shall cease and the Employee shall repay Sabre any severance already paid to the Employee hereunder.

6. Benefits. As of the Effective Date, Employee will be eligible to participate in Sabre's benefit plans subject to the Sabre policies and the plan provisions. Employee shall specifically be eligible for 3 weeks of Personal Time Off ("PTO") and holiday pay pursuant to MUTI's existing policy and holiday calendar.

7. Sign-On Bonus. Employee shall receive $125,000 within thirty (30) days of his hire date as a sign-on bonus. This bonus amount must be repaid if the Employee is terminated for "Cause" or resigns from his employment without Good Reason within his first twelve (12) months of employment.

8. Fiscal Year Bonuses. Employee shall also be eligible for a 50% target bonus and a 2X maximum bonus of 100% of base salary under Sabre's Executive Incentive Compensation Plan ("EICP") based upon the achievement of performance goals (which may be EBITDA or additional performance goals). The Employee's eligibility for any fiscal year bonus is subject to the terms of the EICP. Sabre may amend or terminate the EICP at any time for any reason and all payments shall be subject to the approval of the compensation committee of the Board of Directors of Sabre (the "Compensation Committee").

9. Business Expenses. While employed by Sabre, upon presentation of appropriate documentation, Employee shall be reimbursed in accordance with Sabre's business expense reimbursement policy as in effect from time to time, for all reasonable business expenses incurred in connection with the performance of the Employee's duties hereunder and Sabre's policies with regard thereto.

10. Stock Options. Employee shall receive a grant of 250,000 stock options within 30 days under the KSBR Holding Corp. 2012 Equity Incentive Plan and will be subject to the terms and conditions of an option agreement. KSBR Holding Corp. may amend or terminate the KSBR Holding Corp. 2012 Equity Incentive Plan at any time and for any reason.

11. Non-Disparagement. The Employee agrees not to make statements that in any way disparage, or make any comments, statements, or the like that may be considered to be derogatory or detrimental to the good name or business reputation of Sabre its officers, directors, agents, and/or employees. Sabre agrees not to make statements that in any way disparage, or make any comments, statements, or the like that may be considered to be derogatory or detrimental to the good name or business reputation of Employee.

12. Confidential Information. The Employee acknowledges and agrees that Sabre is engaged in a highly competitive business. Sabre's involvement in this business has required and continues to require the expenditure of substantial amounts of time, money and resources, and the use of skills, knowledge and expertise developed over a long period of time. As a result, Sabre has developed and will continue to develop certain valuable Confidential Information that is unique and valuable to Sabre's business, and the disclosure of which to others by the Employee would cause Sabre great and irreparable harm. The Employee acknowledges that such Confidential Information has been, and will be, disclosed to the Employee, in whole or in part, during employment.

The term "Confidential Information" means: Trade secrets and other confidential and proprietary business information of Sabre and includes, without limitation, (i) any process, data, plans, products, customer lists, compilation of information, trade secrets, or know-how, which is used in Sabre's business, and which gives Sabre an opportunity to obtain an advantage over competitors who do not know or use it, (ii) information which Sabre has not disclosed to the public or which is not readily ascertainable by persons or entities outside Sabre's business (without expending significant time and effort) through no wrongful act of the Employee or of others, (iii) information to which access has been restricted by Sabre to only select employees, and (iv) information which Sabre has spent significant time and money in developing or in acquiring.

All "Confidential Information" is and shall remain Sabre's exclusive property, and the Employee further agrees

that all information developed by Sabre and used by the Employee in connection with the Employee's employment is confidential and valuable property of the Sabre, and that any such information developed by the Employee during employment is and shall remain the exclusive property of Sabre. The Employee recognizes and acknowledges that Sabre's business matters and affairs are valuable to Sabre and included within the definition of Confidential Information.

13. Nondisclosure. The Employee agrees that, except as Sabre expressly authorizes in writing, the Employee shall: (a) safeguard, using a high degree of care, all Confidential Information (defined above) the Employee received or receives during employment with Sabre; (b) use any Confidential Information the Employee receives for Sabre's sole benefit and for no other purpose whatsoever; (c) refrain from disclosing any Confidential Information to any third party; and, (d) refrain from disclosing the fact or existence of any discussion or any planned, contemplated, or potential Sabre business activity as Confidential Information.

The Employee also agrees, that the he will not, at any time during the course of employment or after the end of Employee's employment with Sabre for any reason, directly or indirectly use, disclose or disseminate to any other person, organization or entity or otherwise employ any Confidential Information. The Employee further agrees not to copy or transmit any Confidential Information without prior written authorization by Sabre (except as required for the Employee to perform the Employee's duties and responsibilities hereunder). This includes copying or transmitting Confidential Information via Personal Digital Assistants, mobile phones, external hard drives, USB "flash" drives, USB storage devices, FireWire storage devices, digital music players, digital tapes, floppy discs, CD's, DVD's, personal email accounts (including web-based email accounts such as Hotmail, Gmail, Yahoo), memory cards, Zip discs, and all other similar mediums which can be used to transmit electronic data.

The Employee further agrees that at the end of his employment, regardless of the reason, or any time upon request from Sabre, the Employee will return to Sabre any and all Confidential Information in the Employee's possession, regardless of form or media, together with an affirmation signed by the Employee and stating that all of Sabre's Confidential Information in the Employee's possession has been returned to Sabre and the employee has not duplicated or made copies of this material.

14. Non-Competition/Non-Solicitation.

(a) Employee understands that Sabre invests substantial time, money and other resources in developing and maintaining the confidential nature of its Confidential Information and in developing its customer and employee relationships, goodwill, and reputation. Accordingly, provided that Sabre timely complies with its obligations under Paragraph 5(a), Employee agrees that during employment with Sabre and continuing for a period ending on the date which is two (2) years after the end of Employee's employment with Sabre, for any reason or no reason, Employee shall not directly or indirectly, either individually or as a principal, partner, agent, employee, employer, consultant, stockholder, joint venturer, or investor, or as a director or officer of any corporation or association, or in any other manner or capacity whatsoever: (i) engage in, assist or have any active interest in a business located in the United States which develops, manufactures, markets and/or sells products or services competitive with those offered by Sabre on the date on which Employee's employment terminates; and (ii) solicit, sell, attempt to sell, or assist in the effort of anyone else who sells or attempts to sell, any products or services to any customers, clients or accounts of Sabre or its affiliates with which Employee had any contact or association, or about which Employee obtained Confidential Information, during the last twelve months of employment. The foregoing shall not prohibit Employee from owning securities in any publicly traded company, representing less than 1% of the outstanding securities of such company.

(b) Employee also understands that Sabre invests substantial time, money and other resources in hiring, educating and training employees and developing in its employee's skills and knowledge specific to Sabre and its business, and that Sabre has a legitimate interest in building and maintaining a cohesive workforce. Accordingly, provided that Sabre timely complies with its obligations under Paragraph 5(a), for a period of two (2) years following the end of Employee's employment with Sabre, regardless of the reason, Employee will not

hire, attempt to hire, solicit, or be involved in the recruitment of any individual who is an employee of Sabre at the end of Employee's employment with Sabre or was an employee of Sabre at any time during the one (1) year period preceding the end of Employee's employment with Sabre. Employee understands that this restriction is limited to those employees that Employee had any business-related contact with at Sabre or about whom Employee obtained Confidential Information (including, but not limited to, information regarding their skills and abilities, compensation, or performance).

15. Notification to New Employer. The Employee shall inform any prospective or future employer of any and all relevant restrictions contained in this Agreement and provide such employer with a copy of such restrictions prior to the commencement of that employment.

16. Judicial Modification. If, at the time of enforcement of Paragraphs 12, 13, and 14, a court holds that the restrictions stated herein are unreasonable under the circumstances then existing, the Employee and Sabre agree that the maximum period, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area so as to protect Sabre to the greatest extent possible under applicable law from improper competition. It is the parties' express desire that the court reform and revise the "invalid or unenforceable" provision, so as to render it valid and to enforce it as reformed and revised.

17. Return of Property. At end of Employee's employment, all Sabre property including, but not limited to, Sabre cell phones, pagers, security cards, keys, credit cards, desktop computers and any other computer hardware or software issued by Sabre to, or otherwise held by, the Employee shall be returned to Sabre.

Sabre recognizes that cell phone numbers are portable and the Employee shall have the right to transfer his cell phone number to a personal cell phone and plan within 72 hours of termination, with Sabre's assistance.

18. Assignment. The Employee may not assign this Agreement, except that the Employee may assign by will or the laws of descent and distribution the Employee's accrued rights to payment, and any assignment in violation of this Agreement will be void. Sabre may assign this Agreement to any of its subsidiaries or any of its controlled affiliates. This Agreement shall remain binding on the Employee and Sabre and their respective heirs, legal representatives successors and permitted assigns, including, without limitation successors by (i) the merger, acquisition or consolidation of Sabre with any other entity; (ii) the sale of all or substantially all of Sabre's assets; or (iii) the sale of a majority of the shares of the then outstanding stock of Sabre.

19. Remedies. The parties acknowledge that full compliance with the terms of this Agreement is necessary to protect Sabre's business and goodwill and that a breach of this Agreement will irreparably and continually harm Sabre, for which money damages may not be adequate. Consequently, the Employee acknowledges and understands that, in the event the Employee breaches or threatens to breach any of these covenants, Sabre will suffer irreparable harm, for which money damages alone will be an inadequate remedy. Thus, the Employee agrees that Sabre shall be entitled to a temporary, preliminary or permanent injunction without posting a bond in order to prevent the continuation of such harm, in addition to all other remedies available to Sabre. The Employee also agrees that, if the Employee breaches Paragraph 14, the Employee shall be bound by the restrictions in Paragraph 15, above, until a period of two (2) years have expired without a violation of such restrictions. Nothing in this Agreement, however, will be construed to prohibit Sabre from also pursuing any other remedy.

20. Governing Law. This Agreement shall be governed by, and construed in accordance with the laws of the State of Colorado without reference to its conflict of law provisions that would require the application of the law of any other jurisdiction and Employee consents to the exclusive personal jurisdiction of such courts.

21. Waiver. One party's waiver of a breach of any provision of this Agreement shall not operate or be construed as a continuing waiver or waiver of any other provision, obligation, right, or privilege. The provisions of this Agreement may be waived only with the prior written consent of Sabre and the Employee, and

no course of conduct or failure or delay in enforcing the provisions of this Agreement shall affect the validity, binding effect or enforceability of this Agreement or any provision hereof.

22. Amendment. This Agreement cannot be changed or modified orally and may only be supplemented, amended, or revised in a writing signed by all parties.

23. Severability. If any provision of this Agreement, or any portion of a provision of this Agreement, is determined invalid or unenforceable for any reason, and cannot be modified pursuant to Paragraph 16, the remainder of this Agreement shall remain in force and effect.

24. Termination. During the Non- Termination Period, Sabre may only terminate this Agreement for Cause. In the event the Employee voluntarily terminates employment, or Sabre terminates the Employee's employment for "Cause", the Employee shall not be entitled to any severance set forth in Paragraph 5.

Sabre may terminate Employee's employment with Cause by written notice of termination via certified mail, return receipt requested, at the address in Paragraph 26 of this Agreement. A termination with Cause shall be effective immediately.

25. Definition of "Cause" and "Good Reason".

(a) For purposes of this Agreement, "Cause" shall be defined as t the material failure by the Employee to observe Sabre written policies and/or written policies which are generally applicable to similarly situated employees of Sabre; willful misconduct by the Employee in the performance of the Employee's duties hereunder; insubordination; willful unauthorized disclosure or misuse of Confidential Information; a conviction of or a plea of guilty or nolo contendere by the Employee to any act of fraud, theft or dishonesty with respect to Sabre, or a conviction of a felony criminal act that would have a material and adverse impact on Sabre; the material breach by the Employee of this Agreement or any other material agreement or contract with Sabre; or the material, willful violation by Employee of any state or federal law relating to the workplace environment (including, without limitation, laws relating to sexual harassment or age, sex or other prohibited discrimination). "Cause" shall not include termination as a result of a job elimination or staff reduction, including any that might occur during a re-organization or restructuring.

(b) At the conclusion of year 2, "Cause" will also be expanded to include the material failure by the Employee to meet financial and performance criteria as established for the business segment that the Employee is directing

(c) For purposes of this Agreement, "Good Reason" shall be defined as the occurrence of any of the following without Employee's consent: (A) a materially reduction in Employee's duties; (B) Employee's annual base salary or annual bonus potential is reduced or the Company fails to pay any material amount of compensation when due; (; (D) Sabre relocates the Employee's principal place of business more than fifty (50) miles away from his current residence; or (E) Sabre materially breaches any material provision of this Agreement.

26. Notices. Any notice or other communication required or desired to be given in this Agreement shall be in writing and addressed to the parties, respectively, as follows:

Jonathon Fitzhugh

Sabre Industries, Inc.
Attn: Carey Ellinghaus, VP – Human Resources
8653 E. Highway 67
Alvarado, TX 76009-4012
(817) 852-1838

(817) 852-1703 (Fax)

27. Arbitration. With the exception of claims brought pursuant to Paragraphs 12, 13, and 14, the Employee and Sabre agree to resolve all claims, demands, causes of action, disputes, controversies or other matters in question ("Claims"), whether or not arising out of this Agreement or the Employee's service (or termination from service) with Sabre, whether arising in contract, tort or otherwise and whether provided by statute, equity or common law, that Sabre may have against the Employee or that the Employee may have against Sabre or its parents, Subsidiaries or Affiliates, or their respective officers, directors, employees or agents in their individual or professional capacity, shall be submitted to binding arbitration, if such Claim is not resolved by the mutual written agreement of the Employee and Sabre, or otherwise, within 30 days after notice of the dispute is first given. Claims covered by this paragraph include, without limitation, claims by the Employee for breach of this Agreement, the interpretation or application of this Agreement, wrongful termination, wage and hour claims, discrimination (based on age, race, sex, disability, national origin, sexual orientation, or any other factor), harassment and retaliation. Either party may, however, seek injunctive relief from a court of competent jurisdiction. Any arbitration shall be conducted in accordance with the Federal Arbitration Act ("FAA") and, to the extent an issue is not addressed by the FAA, with the then-current National Rules for the Resolution of Employment Disputes of the American Arbitration Association ("AAA") or such other rules of the AAA as are applicable to the claims asserted. If a party refuses to honor its obligations under this paragraph, the other party may compel arbitration in either federal or state court.

Sabre agrees to pay the costs of arbitration charged by AAA, other than filing fee and the Employee's attorney's fees and other expenses of arbitration incurred by the Employee. In the event the Employee is unable to pay the applicable filing fee for arbitration due to extreme hardship, the Employee may apply to AAA for deferral or reduction of the fees. AAA shall determine whether the Employee qualifies for financial hardship. To invoke the arbitration process, the Employee or Sabre must contact the American Arbitration Association, 100 N. Broadway, Ste. 1820, St. Louis, Missouri 63102, or the nearest regional office of AAA.

The arbitrator shall apply the substantive law of Colorado (excluding choice-of-law principles that might call for the application of some other jurisdiction's law) or federal law, or both as applicable to the claims asserted. In the event that arbitration is brought pursuant to any law or statute which provides for allocation of attorneys' fees and costs, the arbitrator shall have the authority to allocate attorneys' fees and costs pursuant to the applicable law or statute. The arbitrator shall have exclusive authority to resolve any dispute relating to the interpretation, applicability or enforceability or formation of this Agreement (including this paragraph), including any claim that all or part of the Agreement is void or voidable and any claim that an issue is not subject to arbitration. The results of arbitration will be binding and conclusive on the parties hereto. Any arbitrator's award or finding or any judgment or verdict thereon will be final and unappealable. All parties agree that venue for arbitration will be in Colorado, and that any arbitration commenced in any other venue will be transferred to Colorado upon the written request of any party to this Agreement. Any and all of the arbitrator's orders, decisions and awards may be enforceable in, and judgment upon any award rendered by the arbitrator may be confirmed and entered by any federal or state court having jurisdiction. All privileges under state and federal law, including attorney-client, work product and party communication privileges, shall be preserved and protected. The decision of the arbitrator will be binding on all parties. All proceedings conducted pursuant to this agreement to arbitrate, including any order, decision or award of the arbitrators, shall be kept confidential by all parties. **THE EMPLOYEE ACKNOWLEDGES THAT, BY SIGNING THIS AGREEMENT, THE EMPLOYEE IS WAIVING ANY RIGHT THAT THE EMPLOYEE MAY HAVE TO A JURY TRIAL OR A COURT TRIAL OF ANY CLAIM ALLEGED BY THE EMPLOYEE.**

28. Withholding. All payments made by Sabre under this Agreement may be reduced by any tax or other amounts required or permitted to be withheld by the Sabre under applicable law or regulation.

29. Section 409A of the Code.

(a) For purposes of this Agreement, "Section 409A" means Section 409A of the Internal Revenue Code

of 1986, as amended (the "Code"), and the Treasury Regulations promulgated thereunder (and such other Treasury or Internal Revenue Service guidance) as in effect from time to time. The parties intend that any amounts payable hereunder that could constitute "deferred compensation" within the meaning of Section 409A will be compliant with Section 409A or exempt from Section 409A. However, in light of the uncertainty as of the date hereof with respect to the proper application of Section 409A, the parties agree to negotiate in good faith to make amendments to this Agreement as the parties mutually agree, reasonably and in good faith, are necessary or desirable to avoid the possible imposition of taxes or penalties under Section 409A, while preserving any affected benefit or payment to the extent reasonably practicable without materially increasing the cost to Sabre. Notwithstanding the foregoing, the Employee shall be solely responsible and liable for the satisfaction of all taxes and penalties that may be imposed on or for the account of the Employee in connection with this Agreement (including any taxes and penalties under Section 409A of the Code), and neither Sabre nor any of its subsidiaries or affiliates shall have any obligation to indemnify or otherwise hold the Employee (or any beneficiary) harmless from any or all of such taxes or penalties.

(b) Notwithstanding anything in this Agreement to the contrary, the following special rule shall apply, if and to the extent required by Section 409A, in the event that (i) the Employee is deemed to be a "specified employee" within the meaning of Section 409A(a)(2)(B)(i), (ii) amounts or benefits under this Agreement or any other program, plan or arrangement of Sabre or a controlled group affiliate thereof are due or payable on account of "separation from service" within the meaning of Treasury Regulations Section 1.409A-1(h) and (iii) the Employee is employed by a public company or a controlled group affiliate thereof: no payments hereunder that are "deferred compensation" subject to Section 409A shall be made to the Employee prior to the date that is six (6) months after the date of the Employee's separation from service or, if earlier, the Employee's date of death; following any applicable six (6) month delay, all such delayed payments will be paid in a single lump sum on the earliest permissible payment date.

(c) Each payment made under this Agreement (including each separate installment payment in the case of a series of installment payments) shall be deemed to be a separate payment for purposes of Section 409A. Amounts payable under this Agreement shall be deemed not to be a "deferral of compensation" subject to Section 409A to the extent provided in the exceptions in Treasury Regulation §§ 1.409A-1(b)(4) ("short-term deferrals") and (b)(9) ("separation pay plans," including the exception under subparagraph (iii)) and other applicable provisions of Section 409A. For purposes of this Agreement, with respect to payments of any amounts that are considered to be "deferred compensation" subject to Section 409A, references to "termination of employment", "termination", or words and phrases of similar import, shall be deemed to refer to the Employee's "separation from service" as defined in Section 409A, and shall be interpreted and applied in a manner that is consistent with the requirements of Section 409A.

(d) Notwithstanding anything to the contrary in this Agreement, any payment or benefit under this Agreement or otherwise that is exempt from Section 409A pursuant to Treasury Regulation § 1.409A-1(b)(9)(v)(A) or (C) (relating to certain reimbursements and in-kind benefits) shall be paid or provided to the Employee only to the extent that the expenses are not incurred, or the benefits are not provided, beyond the last day of the second calendar year following the calendar year in which the Employee's "separation from service" occurs; and provided further that such expenses are reimbursed no later than the last day of the third calendar year following the calendar year in which the Employee's "separation from service" occurs. To the extent any indemnification payment, expense reimbursement, or the provision of any in-kind benefit is determined to be subject to Section 409A (and not exempt pursuant to the prior sentence or otherwise), the amount of any such indemnification payment or expenses eligible for reimbursement, or the provision of any in-kind benefit, in one calendar year shall not affect the indemnification payment or provision of in-kind benefits or expenses eligible for reimbursement in any other calendar year (except for any life-time or other aggregate limitation applicable to medical expenses), and in no event shall any indemnification payment or expenses be reimbursed after the last day of the calendar year following the calendar year in which the Employee incurred such indemnification payment or expenses, and in no event shall any right to indemnification payment or reimbursement or the provision of any in-kind benefit be subject to liquidation or exchange for another benefit.

30. Opportunity to Review. The Employee acknowledges that Sabre has encouraged and given the Employee the opportunity to thoroughly discuss all aspects of this Agreement with an attorney or other advisor before signing and that the Employee has thoroughly discussed or has alternatively elected to freely waive any further opportunities to thoroughly discuss this Agreement with an attorney or advisor.

31. Complete Agreement. This Agreement and those documents expressly referred to herein constitute the entire agreement among the parties and supersede any prior correspondence or documents evidencing negotiations between the parties, whether written or oral, and any and all understandings, agreements or representations by or among the parties, whether written or oral, that may have related in any way to the subject matter of this Agreement.

32. Counterparts. This Agreement may be executed in one or more counterparts (including via facsimile and electronic image scan (PDF), each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

Dated:_______________, 2015 JONATHON FITZHUGH

______________________________

Dated: _______________, 2015 SABRE INDUSTRIES, INC.

By ______________________________
Carey Ellinghaus

Its Vice President of Human Resources

4820-9771-6769, v. 1

**JONATHAN T. FITZHUGH**

[redacted]

**experience**

2013-Present **CFG SYSTEMS, INC. (D.B.A CONCEALFAB CORPORATION) COLORADO SPRINGS, CO**
**Chief Executive Officer**

- ConcealFab Corporation is the leading innovator in concealment and infrastructure solutions for commercial wireless 3G/4G, outdoor Distributed Antenna Systems (DAS), point-to-point microwave backhaul, and high-frequency SATCOM government applications. ConcealFab's capabilities include design engineering, fabrication, and integration. Clients include major wireless carriers, leading tier 1 system integrators, and all branches of the US Government.

- Major Accomplishments: Increased revenues 6x from 2013 to 2015; on track to quadruple revenues in 2016. Secured OEM/resale partnerships with industry leaders – Ericsson, Nokia, CommScope. Awarded a 5-year, $7M Prime Government Services contract. Successfully raised 4 investment rounds, totaling $3MM, including institutional capital. Achieved 'Approved Vendor' status at Verizon, AT&T, and Crown Castle. Top Secret Government clearance.

2010-2013 **MORGAN STANLEY** **NEW YORK, NY**
2011-2013 **Executive Director**: Head of Business Development and Strategy – Morgan Stanley Private Bank

- Managed a 10-person strategy, business development and analytics team; created strategic product development roadmaps for the division, developed compensation and deployment plans for 180 person sales team, and developed ideal target client profiles and sales campaign strategies.

2010-2011 **Executive Director:** Corporate Strategy

- Managed the turnaround of a mortgage fulfillment center within Morgan Stanley's Private Bank: developed and executed a 90 plan to re-organize operations, expand capacity, and offload select functions to a 3rd party provider. Increased throughput 3x in 4 weeks by restructuring incentive compensation, integrating contract employees, and streamlining internal supply chain.

- Developed firm's 5 year international/emerging market expansion strategy: built econometric model to estimate country-level market growth projections, interviewed Sr. product/region heads and MS economists to incorporate competitive and other qualitative variables, and created final presentation shown to CEO and Board of Directors.

2007-2009 **TISHMAN SPEYER** **NEW YORK, NY**
**Sr. Director**
Head of Corporate Finance and Strategy

- Led overhaul of global budgeting and expense tracking process: managed 10-person, multi-functional internal team and a 3rd party IT development firm. Drafted new corporate policies and procedures, defined new lines of accountability across all regions and functions, modified all back-end accounting systems, developed a business intelligence tool for enhanced reporting and analysis, built out a financial planning and analysis group.

EXHIBIT 30
tabbies
2
Fitzhugh 3/13/17

CONCEALFAB 003177

- Led the multi-million dollar buy-out of Tishman Speyer's strategic partner in India. Built financial model to support acquisition price, co-led the negotiation, reported interim and final results to the Tishman Speyer BoD.

2005-2007 **BOSTON CONSULTING GROUP** **NEW YORK, NY**

**Consultant**

Strategic advisor to senior management, primarily focused in the financial services industry.

- Re-designed end-to-end application development process for a major North American bank, reducing annual spend by ~10%.

- Developed market-entry strategy for a payment processing outsourcer; created product branding and marketing plans, designed new sales/support infrastructure, and architected a product development roadmap.

1998–2003 **THE BOEING COMPANY** **SEATTLE, WA**

2002–2003 **Associate,** *Corporate Ventures Group*

$300 million Corporate Incubator Fund aimed at commercializing Boeing's technology portfolio.

- Advised a strategic partnership with a civil engineering firm and a Boeing composite manufacturing facility; built pro-forma financial statements and supported presentations to prospective VC investors and strategic partners.

- Wrote the business plan for an environmental services start-up that launched its first project in August 2003; researched market trends, estimated addressable market size, and evaluated preliminary launch strategy.

- Helped structure and negotiate a licensing-acquisition deal between Boeing and a venture-backed software firm.

1998–2001 **Financial Analyst,** *Commercial Airplane Group*

Led a 12-person, multi-disciplined project team that designed and developed a global supply chain modeling tool to help administer a 10-year, $1.2 billion titanium procurement strategy.

**education** **HARVARD BUSINESS SCHOOL** **BOSTON, MA**

2003–2005 **Masters of Business Administration degree, June 2005.**

1994–1998 **UNIVERSITY OF PUGET SOUND** **TACOMA, WA**

**Bachelor of Science, with honors, in Economics. Minor in Mathematics. GPA: 3.6/4.0.**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-01793-CMA-KLM

---

VIDEOTAPED DEPOSITION OF JONATHAN TODD FITZHUGH
March 13, 2017

---

CONCEALFAB CORPORATION,

Plaintiff,

vs.

SABRE INDUSTRIES, INC., and

MIDWEST UNDERGROUND TECHNOLOGY, INC.,

Defendants.

---

PURSUANT TO NOTICE, the videotaped deposition JONATHAN TODD FITZHUGH, called for an examination by the Defendants herein, was taken at Silver & DeBoskey, P.C., 1801 York Street, Denver, Colorado 80206, commencing at 10:02 a.m. on March 13, 2017, before Shauna T. Dietel, a Registered Professional Reporter and Notary Public within Colorado.

APPEARANCES:

ANGELA D. DEVINE, ESQ.
Silver & DeBoskey, P.C.
1801 York Street
Denver, Colorado 80206
303-399-3000
devinea@s-d.com

For the Plaintiff

ELIZABETH M. LALLY, ESQ.
Goosmann Law Firm
410 5th Street
Sioux City, Iowa 51101
712-226-4000
LallyE@GoosmannLaw.com

For the Defendants

Also Present: Rodney Hudson, videographer

I N D E X


| EXAMINATION: | PAGE |
|---|---|
| By Ms. Lally | 6 |

| EXHIBITS: | | MARKED |
|---|---|---|
| 1 | Subpoena to Testify at a Deposition in a civil Action | 6 |
| 2 | Mr. Fitzhugh's resume | 6 |
| 3 | Amended Complaint | 34 |
| 4 | ConcealFab Corporation, Executive Employment Agreement | 35 |
| 5 | E-mail from Jon Fitzhugh to Doug Huff dated Sunday, December 21, 2014 | 37 |
| 6 | E-mail chain with attachment, Bates stamped CONCEALFAB 000045 to CONCEALFAB 000054 | 47 |
| 7 | E-mail from Jonathan Fitzhugh to Chris Odell and Duncan Stewart dated Thursday, January 8, 2015, with attachment, Bates stamped CONCEALFAB 001112 to CONCEALFAB 001121 | 62 |
| 8 | E-mail from Jonathan Fitzhugh to Doug Huff dated Thursday, January 8, 2015, with attachment, Bates stamped CONCEALFAB 001084 to CONCEALFAB 001093 | 65 |
| 9 | E-mail from Jonathan Fitzhugh to Doug Huff dated Thursday, January 8, 2015, with attachment, Bates stamped CONCEALFAB 001053 CONCEALFAB 001062 | 68 |
| 10 | E-mail from Jonathan Fitzhugh to Paul W. Hurcomb dated Thursday, January 8, 2015, with attachment, Bates stamped CONCEALFAB 001043 to cONCEALFAB 001052 | 71 |

| EXHIBITS: | | MARKED |
|---|---|---|
| 11 | E-mail from Doug Huff to Jonathan Fitzhugh dated Thursday, January 8, 2015, with attachment, Bates stamped CONCEALFAB 000055 to CONCEALFAB 000064 | 74 |
| 12 | E-mail from Doug Huff to Jonathan Fitzhugh dated Thursday, January 8, 2015, with attachment, Bates stamped CONCEALFAB 001063 to CONCEALFAB 001072 | 76 |
| 13 | E-mail from Jonathan Fitzhugh to Doug Huff dated Thursday, January 8, 2015, with attachment, Bates stamped CONCEALFAB 001073 to CONCEALFAB 001082 | 77 |
| 14 | E-mail from Doug Huff to Jonathan Fitzhugh dated Friday, January 9, 2015, with attachment, Bates stamped CONCEALFAB 001132 to CONCEALFAB 001141 | 78 |
| 15 | E-mail chain with attachment, Bates stamped CONCEALFAB 001122 to CONCEALFAB 001131 | 82 |
| 16 | E-mail from Jonathan Fitzhugh to Duncan Stewart and Chris Odell, dated Thursday, January 15, 2015, Bates stamped CONCEALFAB 001124 to 001151 | 84 |
| 17 | E-mail chain, Bates stamped CONCEALFAB 001640 | 91 |
| 18 | E-mail from Chris Odell to Jonathan Fitzhugh, dated Wednesday, January 7, 2015, Bates stamped CONCEALFAB 001041 | 93 |

P R O C E E D I N G S

THE VIDEOGRAPHER: We are on the record at 10:02 a.m. on March 13th, 2017, at 1801 York Street, Denver, Colorado.

We're here for the video deposition of Jonathan Fitzhugh in the matter of ConcealFab Corporation versus Sabre Industries, Inc., et al. In the United States District Court for the District of Colorado, Case Number 15CV01793-CMA-KLM.

The videographer is Rodney Hudson. The court reporter is Shauna Dietel with Mile High Court Reporting and Video.

Will counsel please state their appearances beginning with the plaintiff's counsel.

MS. DEVINE: Angela DeVine on behalf of plaintiff ConcealFab Corporation.

MS. LALLY: Oh, Elizabeth Lally on behalf of defendants Sabre Industries, Inc. and Midwest Underground Technology, Inc.

THE VIDEOGRAPHER: Will the reporter please swear in the witness.

JONATHAN TODD FITZHUGH,

having been sworn by the reporter, testified as follows:

MS. LALLY: Thank you.

This deposition is being taken pursuant to the Federal Rules of Civil Procedure and any other applicable rules of local procedure.

EXAMINATION

BY MS. LALLY:

**Q Will you please state your full name and spell it for the record.**

A Sure. Jonathan Todd Fitzhugh, J-O-N-A-T-H-A-N, T-O-D-D, F-I-T-Z-H-U-G-H.

**Q Thank you.**

**(Deposition Exhibit 1 was marked.)**

**Q (By Ms. Lally) You're here today pursuant to a subpoena that was issued to you. This is a copy of that subpoena.**

**Have you seen this before?**

A Yes.

**Q Okay. Pursuant to the subpoena, you gave us an updated copy of your resume; is that correct?**

A Yes.

(Deposition Exhibit 2 was marked.)

**Q (By Ms. Lally) Okay. Is this a copy of that resume?**

A Yes.

**Q Okay. Thank you.**

**Mr. Fitzhugh, do you understand that you have**

**been compelled to be here today and that this part of the examination is as a fact witness?**

A Yes.

**Q Were you provided with a witness fee for attending your deposition today?**

A I was told that I will be provided with one, yes.

**Q Okay.**

MS. DEVINE: It's in my office.

MS. LALLY: Okay.

MS. DEVINE: I haven't given it to him yet.

MS. LALLY: Okay. Okay. Well, we don't want to withhold your $74.11.

**Q (By Ms. Lally) Mr. Fitzhugh, have you ever given a deposition before?**

A I have not.

**Q Okay. So I'm sure your attorney prepared you for today, but basically I'm going to be asking you a series of questions. I'm going to do my best to keep the fact witness questions for the -- for the first portion of today and the expert questions, the Rule 30(b)(6) examination, questions this afternoon.**

A Okay.

**Q If you would like to ask me to repeat the question, that's fine. The court reporter can read it**

**back. It's important to make sure that you understand the question before you answer it.**

**Also, the court reporter cannot take down nods of your head or any other sort of nonverbal cues, so you'll need to give a verbal response.**

A Understood.

**Q We do -- we are being videotaped today, so that helps a little bit.**

**If you feel the need to take a break, please ask, and we'll try to wrap up that line of questioning and accommodate you.**

A Okay.

**Q This isn't supposed to be a painful process.**

**Did you speak with anyone today in preparation for this deposition?**

A Today? No.

**Q Sorry. Okay. That's very good.**

**Did you speak with anybody in preparation for today's deposition --**

A Yes.

**Q -- at any time?**

A I spoke with my counsel.

**Q Okay. Did you review any documents in preparation for today?**

A Yes.

**Q Okay. And were they documents that have been produced, to your knowledge, as part of litigation?**
A Yes.
**Q Okay. Did you review any documents that have not been produced, to your knowledge?**
A Sorry. The defin -- definition of "produced" is?
**Q So in production we give documents back and forth. Angie has asked us for documents, and we have produced them. They are marked Sabre at the bottom corner. And we have asked for documents, and she's produced them, and they've been marked ConcealFab in the bottom.**
A Got it.
**Q Do you recall looking at any records that didn't have a Bates stamp on it?**
A I -- not relevant to this case, no.
**Q Okay. Okay. So in preparation --**
A So no.
**Q Okay.**
A Sorry.
**Q Okay. So in preparation for today's examination, you do not recall reviewing any documents that have not been produced?**
A Correct.

**Q Okay. Some of the next questions are a little personal, but they are important too for laying your credibility as a witness.**
A Okay.
**Q Have you ever been convicted of a felony?**
A No.
**Q Have you ever been convicted of a crime of dishonesty?**
A No.
**Q What is your current address?**
A 31 Cherry Hills Farm Drive, Englewood, Colorado 80113.
**Q And that is your primary address?**
A Correct.
**Q For how long have you lived at this address?**
A Since June of 2014.
**Q Do you have any plans on moving at any time in the near future?**
A No.
**Q No. Okay. I should be able to contact you via your attorney --**
A Yes.
**Q -- is that correct?**
A Absolutely.
**Q Okay. Great.**

**I have handed you Exhibit Number 2, which is your resume --**

A Yes.

**Q -- and I'd like to start with talking a little bit about your educational background.**

A Okay.

**Q You attended undergraduate, and you have a degree from the University of -- is it Puget Sound?**

A Puget Sound.

**Q Okay. What is your degree in?**

A Mathematic -- or sorry.

Economics, with a minor in mathematics.

**Q Okay. And after that, you eventually pursued a master's degree; is that correct?**

A Correct.

**Q Or -- okay. And where do you have your master's degree from?**

A From Harvard.

**Q Is that an MBA?**

A Yes.

**Q Okay. And when did you receive that?**

A 2005.

**Q Okay. Was there a particular focus in your MBA program, or was it just --**

A No. They're general.

**Q Okay.**

A They don't do focuses at -- some -- some MBAs do; Harvard does not.

**Q Okay. Do you have any other sort of certifications? For example, a CPA?**

A I do not.

**Q Okay. Do you have any commercial industry designations?**

A I have a -- had a top secret clearance. I believe it's now rated secret, before it's -- gets back upgraded to top secret. But I have been top secret cleared.

**Q You have had in the past top secret clearance --**

A Yes.

**Q -- for the federal government?**

A Correct.

**Q And is that for -- for contracting on government jobs?**

A Yes.

**Q Okay. But you currently do not know if that top secret is current; it's just --**

A I'm currently secret. Until we -- a contract comes through that is rated top secret will I get back to top secret. So at current, I am secret, but I have been

rated as high as top secret.
**Q Okay. Are you currently employed?**
A Yes.
**Q And what is your -- who is your employer?**
A CFG Systems doing business as ConcealFab Corporation.
**Q Okay. What is your job title for ConcealFab?**
A Chief executive.
**Q And when did you come to work for ConcealFab?**
A In March of 2013.
**Q Have you always been the CEO?**
A Yes.
**Q Okay. How did you find out that ConcealFab was looking for a CEO?**
A I -- when I was at my prior job at Morgan Stanley, I hired a -- what could be deemed the equivalent of a finder, a business finder.
**Q A headhunter?**
A No. It's more like a search fund --
**Q Okay.**
A -- where I was looking to invest money and change geographies. I didn't have the time or resources to go search on my own.
So I found a guy who would go look for opportunities in the geographies that I was interested in

and the right kind of opportunity to invest in where the founder or current head of the business was willing to step aside in exchange for, you know, financial investment.

**Q Okay.**

A And he came upon ConcealFab as part of his search.

**Q Okay. And you don't know how he found ConcealFab?**

A I believe he attended some venture conferences in Colorado, and he eventually met Rick Denton --

**Q Okay.**

A -- who was on the board of directors and, oddly enough, is now back on the board of directors of ConcealFab.

**Q Okay. And so you -- why did you think that ConcealFab was a good fit for you?**

A It was an interesting opportunity in a growing market. It had a product; it had customers; it had revenue. It was willing to take the investment of the size I was willing to make and give me the amount of ownership that I was targeting, as well as, at the time, a founder who was willing to step aside and allow for change in management.

**Q Okay.**

A Plus, I wanted to move to Colorado.
**Q Okay. So to your knowledge, was ConcealFab actively looking for a new CEO at that time?**
A They were actively looking for investment.
**Q Okay.**
A My condition -- one of my conditions of investment was, I need to come in and oversee the company.
**Q Okay. What did you understand ConcealFab's immediate needs to be in terms of hiring a CEO?**
**When you came in and you were like, All right, I'm going to start this job, what did you think the immediate, I need to do this in the first 90 days?**
A Focus on commercial business. They were -- they had a fairly strong focus on government, and I personally feel government business to be inconsistent. And so I -- part of my --
**Q Inconsistent how? Like ebbs and flows?**
A Ebbs and flows, exactly. Choppy.
**Q Okay.**
A Whereas the commercial business seemed to have more of a growth story. So part of my pitch to the investors I brought into the deal was I would focus on the industry that I felt had more of a growth story to make them a return on investment.
**Q Who were the investors that you brought into**

**the deal?**

A Friends and family, initially.

**Q Okay. What about the commercial market made you think that there was growth opportunity there?**

A The -- well, the growth opportunity is really tied to the use of Smart Phones and the data intensity of those Smart Phones.

Based upon my limited knowledge of telecom, it seemed a reasonable bet that people were going to use Smart Phones more and more and that the data intense nature of those Smart Phones was only going to increase.

**Q You said you had limited knowledge of the telecom industry at the time you joined ConcealFab?**

A I did.

**Q And prior to that, you had been at Morgan Stanley?**

A Uh-huh.

**Q And you were head of business development and strategy at Morgan Stanley most recen -- you had multiple titles?**

A Yes. So I started out in corporate strategy. Did that --

**Q What were you strategizing?**

A What was I strategizing? International expansion opportunities. Let's see. So I -- it was sort

of a weird role because I was hired in by the COO, who also happened to have the head of strategies. So I sort of did a little bit for him and a little bit in strategy.

He was also the head of the private bank. So when the interest rates dropped precipitously in, I guess it was 2009, there was a massive refinancing boom that impacted the private bank. So he picked me up and dropped me into the private bank and said, Fix this.

So then I spent a year at the private bank. That's where I was the head of business development and strategy.

And then around the time that ceased, I -- or that had stabilized, all of these servicing -- mortgage servicing issues had cropped up by service organizations, so that started being a crisis --

**Q MERS?**

**What sort of issues were you facing?**

A They -- well, from a servicing perspective, just default rates. The fed was, as you know, on a massive hunt to find people who were, you know, cheating people.

So we owned a large servicing company, and they were under investigation. So he said, Hey, I need to pull you out of the private bank, put you back in strategy, and you need to help fix this problem to make sure that we're

not going to have any massive issues as a result from our servicing arm.

So I did that for a little bit, as well as focused on Dodd-Frank, Volcker. That's where I spent most of 2012, yes.

**Q So after you decided to transition to -- well, to just look for an opportunity and you took the ConcealFab job, what sort of skill set -- what were the skills that you -- that you thought were transferable?**

**Like, what -- what did you learn at Morgan Stanley that you thought, this is transferrable to this job; this is how I can help them?**

A Finance, general strategy.

**Q Uh-huh.**

A Sound business judgment.

**Q So you were looking to incorporate --**

A Money.

**Q -- business -- standard business procedures like GAAP accounting?**

A More high level.

**Q Okay.**

A I'm not an accountant by trade. I'm an economics major by trade. So it was more, where can we focus on growth opportunities to grow the top line, which companies of this size, that's what my impression is what

investors are looking for.
These guys had been fairly flat for the last several years, so I wanted to at least come in and start with a growth in top-line story, which would then translate into a growth in bottom-line story, but I had to start somewhere.
**Q Okay. So growth in top line is investment?**
A No. Growth in top line is revenue.
**Q Revenue. Okay.**
A Growth in bottom line is profit.
**Q Gross revenue?**
A Yes. Sales.
**Q Okay. Were you also looking to bring in other investors other than friends and family?**
A Eventually.
**Q Okay. What sort of investors were you looking for? Private equity --**
A Venture capital, private equity, strategic partners.
**Q Okay.**
A Whoever made the most sense. I needed to get in and find out what we needed before I knew.
**Q Right. And we were just talking at the very beginning, so . . .**
A Right.

**Q I do have one question. Well, this --**
A Probably more than one.
**Q About the top line.**
A Sure.
**Q Your resume says that you've increased revenue six times over from 2013 to 2015.**
A Uh-huh.
**Q Correct statement?**
**Is that top line? Is that --**
A Sales.
**Q Is that total revenue?**
**Sales. So that's not profit?**
A Correct.
**Q Okay. It also says that you've raised four investment rounds. How have you raised -- has it been stock sales?**
A Yes.
**Q Private equity investment? What are those -- what is comprised in those four?**
A So they're all some form of stock sale.
**Q Okay.**
A We did -- so the initial round, where I came in. I did a subsequent round with some of my New York friends and family. I did another --
**Q What year was that that you did -- could you**

**give me --**
A Oh, sure.
**Q -- general time frames for the first round, the second round.**
A So 2013 came in two rounds. There was a January 2013 investment. Then there was a March 2013 investment. Then there was a December 2013 investment. Then there was a November of 2014 --
**Q Okay.**
A -- investment.
**Q And they were all stock sales?**
A Correct.
**Q Okay. Had ConcealFab had a CEO prior to your joining?**
A Yes.
**Q And who was that?**
A That was the founder, Mike Slattery.
**Q Okay. And he actually held the title of CEO?**
A Correct.
**Q Okay. Had he been the CEO since the founding of the company?**
A Yes.
**Q Was that in '08? Do you know?**
A I believe it was middle of '07.
**Q Okay.**

A But give or take, yes.
**Q So we talked about your immediate responsibilities. What did you see your long-term goals to be, responsibilities with ConcealFab?**
A I mean, eventually create an exit opportunity for shareholders.
**Q Okay. Explain what an exit opportunity is to you is.**
A A sale.
**Q Could be a lot of things.**
A Sure.
**Q A sale?**
A A liquidation event where shareholders would make money, either through being bought by a private equity firm or a strategic partner.
**Q Okay. And that would increase share value?**
A Correct.
**Q Okay. You moved your family to Colorado as part of your employment with ConcealFab; is that correct?**
A Correct.
**Q And when did you begin your duties exactly with -- with ConcealFab?**
A March 1, I think, was my first official day.
**Q Okay. When you first started and you had the initial stock sale -- well, how did you go about**

**attempting to find people who would be interested in purchasing stock?**
A Well, it was mostly -- the initial was family.
**Q In January 2013.**
A Yeah. So it was family money.
**Q Okay. Same question for March 2013.**
A I added one to two more people with -- where -- actually the guy who found the company for me put money in, as well as one of my undergraduate friends also --
**Q Acquaintances. So --**
A No.
**Q Okay. No.**
**The March 2013 raise wasn't -- you didn't sell it to acquaintances?**
A Oh, sorry. If he's counted as acquaintance, yes. Well, because I said friends and family, so I was saying friend.
**Q Okay. Okay.**
A So one was the acquaintance who found it for me. Then I had a friend who also invested as well.
**Q Okay. Was the December 2013 raise to friends and family as well, or outside investors?**
A Mostly friends. So -- as well as some of the existing investors. So some of my New York colleagues put in in the December 2013 round.

**Q And some of the -- the investors were already there sort of upped their investment?**

A Correct.

**Q Okay. And November 2014 raise?**

A November 2014, again, was a -- a combination of all, but we did add one institutional investor; that was a venture capital group out of Colorado Springs.

**Q When you started at ConcealFab, who did the accounting for the company internally?**

A Internally, it was the founder's wife.

**Q Does she have an accounting background?**

A No. She was more of a bookkeeper. We had a third-party accounting firm who, at the end of our year, would prepare the taxes. And when I started, we began doing reviewing. Our auditors would do a review of the books, and I started in 2012 with a review.

**Q Okay. So you came in and hired auditors?**

**Before you said that they had people who prepared the taxes. That's not an audit?**

A Correct.

The people who did the taxes, I asked them to augment their responsibilities and do a review.

**Q Starting in -- with the 2012?**

A Starting with the 2012.

**Q Who was the accounting firm?**

A Biggs Kofford.
**Q Could you spell that?**
A B-I-G-G-S, K-O-F-F-O-R-D.
**Q Okay. So they audited the 2012 books?**
A They reviewed the 2012 books. Very -- sorry. I did not pay for a full-blown audit.
**Q Okay.**
A They did what's called a -- a review. So they give you a review letter.
**Q Right. That says this isn't an official audit and --**
A Uh-huh.
**Q -- and spells it all out?**
**Did they do an audit in 2013?**
A So I've never had an audit done.
**Q Never had the books and records of the company audited?**
A Not an official audit, no. I've had them reviewed.
**Q Okay. So have they reviewed the 2013 financials?**
A Yes.
**Q Did they review the 2014 financials?**
A No.
**Q Who reviewed the 2014 financials?**

A We have not had a third-party review of the 2014 financials yet.
**Q Okay. 2015?**
A Not yet.
**Q Have you closed your books yet for 2016?**
A Closing in.
**Q Okay.**
A We have not had them reviewed, if that's the next question you have.
**Q When did -- I'm sorry.**
**The founder's wife, her name is what?**
A Nancy.
**Q Nancy Slattery?**
A Uh-huh.
**Q When did Nancy Slattery stop doing the input of the accounting for the company?**
A She left the company around -- it was during our time with Sabre. I want to say it was either April or May of 2015.
**Q Who took over her responsibilities of the bookkeeping at that time?**
A We had a bookkeeper that she was a mentor or had been working with Nancy for the prior six or ten months. Her name is -- sorry.
**Q Ms. Clark?**

A Yes. Thank you.
**Q I can't remember her first name.**
A I know. That's why -- that's what I was --
**Q I think it's Amanda --**
A Mandy. Amanda. Because she goes by Mandy. Mandy Clark.
**Q Okay. And does Mandy Clark still do your books?**
A No.
**Q Who does the books?**
A I hired a CPA the end of 2015, beginning of 2016.
**Q Okay.**
A So now I have a more seasoned . . .
**Q And the CPA -- does the CPA work for ConcealFab?**
A Yes.
**Q Okay. And who's this person?**
A Her name is Julia Belmont, B-E-L-M-O-N-T.
**Q Thank you.**
**Okay. So until 2015 there was no actual CPA who worked for ConcealFab?**
A Not for ConcealFab.
**Q Did you modify the internal accounting in any way when you started?**

MS. DEVINE: Object to form.

**Q (By Ms. Lally) Okay. When you started with ConcealFab, did you make any changes to how the books and records were kept?**

A We -- we were very cash based, so it was very straight-forward in terms of every time an expense came in, we recognized that every time cash came in -- as an expense, every time cash came in.

We started -- the only major change that we have implemented is that we stopped counting deposits as revenue, which never really was a problem because they typically came in the same year as we delivered the product. But there was one year where it crossed over, and we had to reverse it out.

But I had the CPA at that time, so and she -- it's a very simple business, which is nice because it's easy to explain. So not a lot of change had to happen. We don't do a lot of sophisticated accounting.

**Q Are you on an accrual method now?**

A Yes.

**Q When did you move to accrual method?**

A I guess I would have to say when the CPA started, we -- we became a lot more disciplined about being accrual based.

**Q Do you believe that ConcealFab followed GAAP**

**method prior to your coming onboard, when you arrived?**
A No.
**Q Okay. When do you think that ConcealFab started following GAAP accounting?**
A When the CPA started becoming more involved.
**Q So that would be in 2015 or 2016?**
A Uh-huh.
**Q Okay. Do you know when you hired Julia Belmont?**
A I want to say it was like -- it was either December or January -- either Dec -- I think she started kind of part-time December of 2015 and then became full-time January of 2016, but I'd have to confirm the employment.
**Q Okay. Are you a shareholder of ConcealFab?**
A I am.
**Q How many shares of ConcealFab do you currently own?**
A So there's two types of stock: There's options and stock.
**Q Okay.**
A Do you care which, or do you want me to give you both?
**Q Let's talk about both.**
A Okay. So from pure stock, I want to say I'm

somewhere in the ballpark of 800,000 shares.

**Q How many total outstanding shares are there in the company of pure stock?**

A About 14 million.

**Q Okay.**

A And that's fully diluted stock plus options.

**Q Okay. That's -- the 14 million is fully diluted?**

A Correct.

**Q -- stock and options?**

**And then what about your options?**

A Options and warrants, I believe I'm somewhere in the ballpark of two million.

**Q Are any family members by blood shareholders of ConcealFab?**

A Yes.

**Q And who are those?**

A My father and my sister.

**Q And what's your sister's name?**

A Allison Murphy.

**Q Is your father William Fitzhugh?**

A Yes.

**Q How about by marriage? Are any of your family members by marriage stockholders in ConcealFab?**

A No. It's all done individually in my name.

**Q So your father-in-law, sister-in-law, none of them own stock in ConcealFab?**
A None of them.
**Q When did your father first come into ownership of ConcealFab stock?**
A In the January investment. January 2013 investment.
**Q And when did your sister first come into ownership of ConcealFab stock?**
A The same.
**Q Okay. Are you a creditor of ConcealFab?**
A Yes.
**Q How is the debt structured?**
A Right now it's a convertible debt note.
**Q When was that note issued?**
A I believe December of 2016.
**Q Okay. How much is the note for?**
A 500,000.
**Q Is that interest -- does that note bear interest?**
A Yes.
**Q What is the interest rate on that note?**
A 0.7 percent. The -- whatever was the federal minimum --
**Q Federal minimum?**

A Yes, the federal minimum.
**Q Is it tied to the fed rate?**
A Yes.
**Q So if the fed rate goes up, the interest rate goes up?**
A I would have to review the note, but I -- I think we said that it's this percent, which is the federal minimum rate. I think we said it's the federal rate that will float. So I think we just pegged it at whatever the rate was at the time.
**Q Does ConcealFab pay interest on that note?**
A We have not requested them to pay interest yet. It's rolling.
**Q So you've never been -- have you ever been paid the interest on the note?**
A No.
**Q Okay. Do you know what the current interest due is?**
A I do not.
**Q Is your father a creditor of ConcealFab?**
A Yes.
**Q Okay. How is that debt structured?**
A It was -- is structured as a short-term note.
**Q When was that debt issued? When was the note issued?**

A Middle of 2016.
**Q Okay. Does that note carry interest?**
A At a fixed interest.
**Q What is the fixed interest, if you know?**
A I believe he put in somewhere in the neighborhood of 35,000, and we told them we will pay him back either thirty-eight or 40,000, something to that effect.
**Q Okay. Has ConcealFab paid any interest on that note?**
A No.
**Q Okay. I'm sorry. Did you tell me the note value was 35,000, you believe?**
A Well, that's what me put in, and then we -- so -- the note --
**Q Without interest?**
A -- value is thirty-eight, or something to that effect.
**Q Is your sister a creditor of ConcealFab?**
A She is not.
MS. LALLY: Okay. Can we take a break for a moment?
MS. DEVINE: Sure.
MS. LALLY: Thank you.
Off the record.

THE VIDEOGRAPHER: We're off the record at 10:36 a.m.

(A recess was taken at 10:36 a.m. until 10:41 a.m.)

MS. LALLY: Back on the record.

THE VIDEOGRAPHER: We're back on the record at 10:41 a.m.

(Deposition Exhibit 3 was marked.)

**Q (By Ms. Lally) Okay. Mr. Fitzhugh, I'm going to hand you what's been marked as Exhibit 3. This is a copy of the Amended Complaint filed in the matter of ConcealFab Corporation versus Sabre Industries and Midwest Underground Technology, Inc.**

**Have you seen this record before?**

A I have.

**Q Okay. Did you help in the preparation of this?**

**Did you review it before it was filed?**

A I did.

**Q I'm sorry. I asked you a compound question.**

**Did you help in the preparation of this?**

A Yes.

**Q Did you review it before it was filed?**

A Yes.

**Q Okay. As part of this, you have brought claims individual to yourself for breach of employment**

**agreement --**

A Yes.

**Q -- is that correct?**

**Okay. And you have assigned the rights to any funds you received due to breach of employment agreement to ConcealFab; is that correct?**

A Correct.

**Q When did you assign those rights?**

A I assigned the right to the severance around the time the deal was consummated.

**Q The deal with Sabre?**

A The deal with Sabre.

**Q Okay.**

A Sorry.

And when we amended the complaint for the signing bonus, which I believe you were referring to, I assigned them at that point when we amend -- before we amended the complaint.

**Q Okay. You'll probably want to keep that handy. At some point we're going to go through it.**

A Okay.

(Deposition Exhibit 4 was marked.)

**Q (By Ms. Lally) I'm handing you what's been marked as Exhibit Number 4. This is the Executive Employment Agreement between ConcealFab Corporation and**

**Jonathan Fitzhugh dated the 15th of January 2013.**
**Could you please review the record; tell me if this looks like a complete and accurate copy.**
A Looks look it, yes.
**Q Okay. Do you recall producing this to Sabre as part of the due diligence related to the deal with Sabre?**
A I don't specifically recall, but it wouldn't surprise me if I did.
**Q Okay. Well, that's how I came across this document. You'll see it's not Bates stamped, which is why I asked you to confirm that it was an accurate copy.**
A Okay.
**Q Let's talk about your compensation --**
A Okay.
**Q -- when you started with ConcealFab.**
**Page Number 2, Compensation, 2013 salary. What was your salary for 2013 with ConcealFab?**
A One dollar, less applicable deductions and holdings.
**Q Were there applicable deductions and withholdings?**
A I don't believe so.
**Q Okay. So that to me says, I mean, you took a bit of a risk here, right? I mean, you were at, what, $400,000 with Morgan Stanley, all in?**

A Salary, yes.

**Q Yes. Okay. So not all in, just salary?**

A I'm sorry. Are you asking me my compensation at Morgan Stanley?

**Q Yeah.**

A It was higher than that.

**Q Okay.**

**(Deposition Exhibit 5 was marked.)**

**Q (By Ms. Lally) I'm going to hand you what I've marked as Exhibit 5. If you could please review the document. This appears to be an e-mail from you to Doug Huff titled, Subject, Fitzhugh employment terms for discussion when you get to the airport.**

A Uh-huh.

**Q Okay. Do you recall sending this e-mail?**

A Yes.

**Q Okay. And does this -- it says, My promised salary when I left Morgan Standry was four -- Morgan Stanley was $400,000 as an MD.**

A Correct.

**Q Okay.**

A But bonuses is typically --

**Q Well, that's all in. I consider bonuses all in. So what was your salary at Morgan Stanley?**

A Oh, you consider bonus as part of salary?

**Q No. I consider that all in. So what was your salary?**

A Okay. Yes. My salary when I left was 325, and I was about to be promoted to MD right before I left for ConcealFab, and MDs are a fixed 400,000.

**Q Okay. And so you gave that up and moved to Colorado and took a dollar salary for 2013; is that correct?**

A That's correct.

**Q Okay. And for 2014 and thereafter, what was your annual salary for ConcealFab?**

A It started out at 150,000 per year, and increased as company revenues increased.

**Q Okay. So it was tied to the gross revenue of the company, not profits?**

A Correct.

**Q Okay. And there was an incentive bonus as well; is that right?**

A Potentially.

**Q Okay. How would you come into the incentive bonus? Do you recall?**

A Sorry. Could you repeat --

**Q Do you recall how you would be able to achieve the incentive bonus?**

A Profitability.

**Q Okay. What were the profitability targets? Do you recall?**
A We had not defined them at the time. We left it open for the CEO and the board to decide.
**Q Okay. As part of this, you -- employment agreement with ConcealFab, you also took a seat on the company's board of directors; is that correct?**
A Correct.
**Q Okay. Was there a severance clause in this agreement with ConcealFab?**
A Yes.
**Q And did it cover termination for what would be deemed as good reason?**
A I would have to review.
**Q Okay.**
A Yes, it does.
**Q Who drafted this initially? Do you know?**
A My attorney and in negotiating with the company's attorneys and the founder.
**Q Okay. And the founder is Mr. Slattery?**
A Correct.
**Q Okay. I'd like to go back to Exhibit 5.**
**Was the -- was this e-mail meant to set out your initial starting negotiation for terms with Sabre?**
A This was the result of a discussion I'd had

with Pete Sandore at a dinner the prior night. So we had come up with --

**Q So on December 20th, 2014, you had dinner with Pete Sandore?**

A No. It was during the week. So December 20th would be a Saturday. So it was somewhere -- I believe it was early December when I had the dinner with Pete.

**Q Where --**

A I could get you the exact date.

In Denver.

**Q Okay. Do you know what restaurant you went to? Obviously one with paper napkins?**

A What's that?

**Q It must have had paper napkins, because you said, In spite of what Pete wrote on that napkin.**

A Yes.

**Q But you don't recall exactly where it was?**

A It was a tapis restaurant really nearby. I have not been back in a while, so I apologize. I can get you the name if you would like it.

**Q Okay. So you and Pete had dinner?**

A Yes.

**Q And you discussed your general employment terms at that dinner; is that correct?**

A That was one of the topics that we discussed,

yes.

**Q Okay. Fair enough.**

**That's the topic we're going to stick to for now.**

A Okay.

**Q And as a follow-up, you wrote this e-mail, is that correct, as a follow-up to the meeting?**

A Yes. I -- I'm trying to figure out what the specific -- I believe Doug sent me or discussed with me employment terms that were consistent with what Pete and I had discussed, which is, I believe, what necessitated me sending this e-mail.

**Q Okay. All right. What did you mean by, These are close and gets me close to whole? Whole is in quotes.**

A So if -- if you recall from the term sheet, Sabre was going to pay a fixed amount of money to extinguish certain company liabilities, one of those liabilities was not me.

And Sabre said, We will take care of that portion in your employment agreement, but we don't want to pay more than the X dollars that was spelled out in the term sheet.

**Q Okay.**

A So in order to get me whole, I had to forfeit money for the acquisition -- in the acquisition, and they

would -- I would recoup it through the employment agreement.

**Q Okay. As salary or what?**

A As a variety of things.

**Q Okay.**

A It looks like salary, a sign-on bonus, options.

**Q Okay. So all of this was to -- the "gets you close to whole," was to you -- what did you mean by "whole"? I'm just trying to understand that.**

A Well, I was going to take on increased responsibilities at Sabre. They wanted me to absorb their existing small cell and dash group, as well as they wanted to fold their government business under me.

So they were greatly expanding my responsibilities, and like I said, asking me to forfeit certain compensation -- or certain compensation through the term sheet --

**Q Okay.**

A -- acquisition.

**Q All right. Does get close to whole in any way refer to what your salary was at Morgan Stanley?**

**Were you trying to get back to that point of $406,000 or there around?**

A No. 406,000, just to be clear, that was the amount of preferred share dollars that they were asking me

to forfeit as a result of the -- that's what that preferred shares are, 406. Do you see --

**Q Oh, no. But I was talking about -- look down here.**

A Sorry.

**Q So when you say "close to whole" --**

A Sorry. I heard you say 406.

**Q That's okay. It -- it appears twice in -- oh, you're right. You're right. You're exactly right.**

**Let me rephrase the question.**

**When you talk about getting close to whole, is that discussing in any way your -- the difference in your salary from when you went to -- when you were at Morgan Stanley and you went to ConcealFab?**

A That was part -- part of the discussion had to do with me going from a small company where I had lots of equity incentive and power to a large company like Sabre.

So I was giving them some parallel of when I was -- my last job at a large job, which was Morgan Stanley. So that was part of it.

**Q How much -- how much is Morgan Stanley's revenue every year? Do you know?**

A That's a long time since I've had to think about that.

**Q Like when you left. Let's just focus on when**

**you left. Do you know what their annual revenue was that year?**
A I mean, greater than Sabre.
**Q Right.**
A If that's what you're getting at.
**Q Yes. That is exactly what I'm driving at.**
A Sure. Somewhere between eight and ten billion, I believe.
**Q Eight and ten billion with a B?**
A Billion with a B.
**Q Okay. And Sabre is -- what do you estimate at that time? 500 million, does that sound about right?**
MS. DEVINE: Objection. Foundation.
MS. LALLY: Okay. All right.
**Q (By Ms. Lally) You get my point.**
**So you wanted to increase your salary?**
A Yes.
**Q Okay. From a hundred and -- what did we say it was?**
A Fifty.
**Q 150,000 to 325,000; is that correct?**
A Yes.
**Q Okay. You wanted a performance bonus; is that correct?**
A Yes.

**Q Okay. And that performance bonus you wanted would be 50 percent? Explain to me what this is, what you're asking for here.**

A Well, again, this isn't necessarily my asking. This was a result of a discussion with Pete on what would be fair based upon the value I could bring to Sabre.

But in that context, 50 percent of my annual salary would be the -- have the potential for a performance-based bonus.

**Q Okay. And you asked if this was a target or a cap; is that correct?**

A Yes.

**Q Okay. And you wanted a sign-on bonus; is that correct?**

A Yes.

**Q Of $125,000?**

A Yes.

**Q Stock options? Could you explain what it -- what you were asking for here in terms of stock options?**

A So it looks like I was asking for 250,000 options in Sabre. Again, this is what Pete had written on this napkin. I'm just reading this. This amount -- sorry.

So what is your question.

**Q I'm asking you to explain to me what you're**

**looking for in stock options, and you said 250k in options in Sabre?**

A Correct.

**Q Okay. Because it doesn't -- it's not quite clear. It doesn't say 250k options in Sabre. Okay.**

A Well, Sabre would be awarding it, so I guess it's implied.

**Q You asked for a car allowance; is that correct?**

A Yes.

**Q Okay. And did you later put a number? Because this just says whatever is standard for my level. Did you later ask for a specific number for a car allowance?**

A I did.

**Q And what was that?**

A Doug told me it's around $700 a month, I believe.

**Q Okay. And other standard executive benefits. What did you mean by that?**

A Whatever other standard executive benefits Sabre typically offers its executives. I left it open because I didn't know.

**Q Okay. What happened to the napkin?**

A It was transformed into an employment agreement.

**Q Did you take the napkin with you after dinner?**

A Oh, it may have evaporated. I don't know if Pete took it with him.
**Q Okay. So --**
A But it -- sorry. It transformed into an -- I -- I don't have the napkin, no. But it translated into this e-mail that was then used to create the employment agreement that you, no doubt, have somewhere.
**Q Okay. So -- that's good. Thank you.**
A Uh-huh.
**Q I'm going to hand you what I'm going to mark as Exhibit Number 6.**
**(Deposition Exhibit 6 was marked.)**
**Q (By Ms. Lally) Okay. I'm handing you what I've marked as Exhibit Number 6. Could you please review. Let me know if this appears to be a true and accurate copy of the e-mail, as well as the attachment.**
A Okay. I've --
**Q Have you reviewed --**
A Do you want me to read the whole thing or what is --
**Q No. This is -- you can see by the Bates stamps that this was produced by you, at the very bottom. I mean, it should be sequential, CONCEALFAB 45 to CONCEALFAB 54.**
A Sure.

**Q Okay. Well, this e-mail purports -- or this appears to be an e-mail from Doug Huff to you dated January 7th, 2015. Is that your work e-mail address, jfitzhugh@ConcealFab.com?**
A It is.
**Q Okay. And this subject is Draft Employment Agreement?**
A Yep.
**Q Okay. To your knowledge, was this drafted by somebody at Sabre?**
A Yes.
**Q Initially?**
A Initially.
**Q Okay. And do you believe that this was the first draft that you received, just based on the date, January 7th, 2015?**
A I believe that's correct.
**Q Okay. So you had the dinner with Pete sometime around the week of December 20th?**
A No.
**Q No?**
A I believe my dinner with Pete was well before then. I can get you the exact date on my dinner with Pete, but I want to say it was December 1st.
**Q Oh, okay. So I'm sorry. Just referring back**

**to Exhibit Number 5.**
A Uh-huh.
**Q Okay. So there was some time between your dinner with Pete and the drafting of Exhibit Number 5 on your part?**
A It looks like that, yes.
**Q Okay. Perhaps a matter of a few weeks?**
A Correct.
**Q Okay. And you didn't take the napkin with you; is that correct?**
A I did not take the napkin with me.
**Q Okay. So this was just on your recollection of the meeting, is that correct, Exhibit Number 5?**
A I -- I'm guessing I probably wrote down the results of my meeting with Pete, that Pete wrote on a napkin, I probably wrote in a notebook somewhere.
**Q Okay.**
A So likely wasn't totally my mental snapshot of the napkin.
**Q Okay. Do you know where those written notes might be?**
A I mean, it's possible it's in this notebook in front of me, to be honest with you.
Nope. Sorry. The earliest date is June 2015. We had a chance.

**Q Thank you for looking.**
A You're welcome.
**Q Okay. So sometime, possibly almost a month after your meeting with Pete, we're not sure, this e-mail arrives. It's dated January 7th, 2015.**
**Is that the correct date?**
A Well, you're making the assumption there weren't conversations between then and now. But this is the e-mail that codified whatever conversations with Pete, post Pete happened.
**Q Okay. But I wasn't able to find any communications between your e-mail marked Exhibit Number 5 and this marked Exhibit Number 6. That's --**
A Correct.
**Q That's all.**
A Oh, I'm sorry. You're talking about between 5 and 6?
**Q Between 5 and 6 --**
A I'm sorry. I thought you meant between --
**Q -- I have no written record.**
A Right. Sorry. I thought you meant --
**Q Not between the dinner.**
A Not between the dinner.
**Q Between the dating of the e-mail that is Exhibit Number 5, which is December 21st, and this e-mail,**

**which is January 7th, I haven't found anything else in writing.**
A Okay.
**Q Do you believe that there were conversations that happened between December 21st and January 7th --**
A Oh, absolute --
**Q -- with somebody at Sabre regarding your employment agreement --**
A Oh, absolutely.
**Q Okay. Do you know who those discussions were with?**
A Doug Huff.
**Q Solely with Doug?**
A Doug -- Doug and I were -- 99 percent of the communication back and forth between ConcealFab and Sabre was between myself and Doug Huff.
**Q Okay. So do you recall having any written communications with Pete, for example, after your dinner regarding your -- up until this point, January 7th --**
A Not regarding my employment agreement.
**Q Okay. This initial draft, then, came from Sabre to you; is that correct?**
A Correct.
**Q Okay. Did you provide them a sample, for example, this is any employment agreement with ConcealFab?**

A No.
**Q Anything to base it off of?**
A No.
**Q No. Okay.**
**Do you agree that the proposed employment agreement was negotiated by multiple parties?**
A Yes. They sent me a draft of the employment agreement. We reviewed it internally, both as a board, as well as me personally, and went back and forth with them. Absolutely.
**Q Okay. So this was -- either your e-mail or this, the initial start point, you went back and forth with this document, right here, that's titled Employment Agreement --**
A Yes.
**Q -- is that correct?**
**Okay. So you said you negotiated. Who did you negotiate on behalf of, regarding the employment agreement only?**
A Both myself personally and ConcealFab.
**Q Okay. So you negotiated on behalf of ConcealFab in terms of this employment agreement?**
A Yes. Would you like me to explain?
**Q Uh-huh.**
A This was ConcealFab's -- my board said this was

a must have before they were willing to sign the term sheet, because the term sheet was an earnout, and this was their one safety -- the net to ensuring that earnout, was my employment agreement and the circumstances surrounding it. So until we finalized this --

**Q What in this agreement assured earnout?**

A The term sheet assured earnout. The term sheet was an earnout.

**Q Okay.**

A I'm saying this was their protection, was me, to make sure that ConcealFab shareholders received an earnout. Without me, they would have no one acting on their behalf.

**Q How does this agreement -- what in this draft agreement protects ConcealFab's interest in that way?**

A Well, it's got a large severance clause, for instance. And I'd have to check the exact language, but I believe their ability to fire me is limited, and that was actually one of the things -- that was the last thing to sort of go down, was all the reasons Sabre could have to fire me.

**Q Okay. And so ConcealFab's board, you believe, was concerned that you would get fired from Sabre and there would be nobody to protect their interest in the deal; is that correct?**

A Correct.
**Q Okay. Were you to maintain your seat on ConcealFab's board after this agreement was signed if -- after you went to work for Sabre, were you to continue to maintain your seat on ConcealFab's board?**
A I believe Sabre allowed me the right to continue working -- because ConcealFab went away as a result of the deal, and we changed the name of the leave-behind entity to CFG Systems, which was going to be a government contracting entity only.
But I -- they were saying on behalf of Sabre, because Sabre had to cut checks to the ConcealFab shareholders. They were saying who at Sabre is looking after us to make sure proper investment is being made, it's not being overly burdened by cost.
So they were very concerned about what my role would be at Sabre and the protections around that role, how that role could be changed.
I mean, there -- this was a heavily, heavily negotiated document, and they wouldn't sign the term sheet until that negotiation was complete.
**Q The board wouldn't sign?**
A Correct.
**Q Okay. But they ultimately did sign before this was signed -- before the employment agreement was signed;**

**isn't that correct?**
A Well, the employment agreement wasn't going to be assigned until I became a Conceal -- or a Sabre employee.
**Q Okay.**
A But we were done negotiating when we signed the term sheet. And --
**Q You were done negotiating -- in your mind, you were done negotiating the employment agreement when the term sheet was signed; is that correct?**
A We were represented by Sabre that this is the draft that they were comfortable with, and we agreed to it. We -- there was zero communication that there was more negotiation to be done.
**Q Okay. And so was there anybody else negotiating on behalf of ConcealFab with relate -- with -- as it relates to your employment agreement with Sabre?**
A I was the face of the negotiation, but everything -- I couldn't agree to anything until my board signed off.
**Q Okay. Did you see a conflict of interest in negotiating on behalf of yourself as well as the corporation?**
A Absolutely.
**Q Okay.**

A Which is why the board was very concerned about me not being unjustly enriched, because they had to go represent to ConcealFab shareholders that this was a fair agreement.

**Q Was this sent to the shareholders for approval?**

A No. The board acts on behalf of shareholders, and the board represented that they thought it was a fair agreement. We disclosed terms of the agreement. We disclosed that my compensation was going up.

**Q Okay. How did you disclose that? In a written document?**

A Yes.

**Q Issued to all shareholders?**

A Yes.

**Q Okay. Who drafted that document?**

A A combination of the board, and our attorney reviewed it.

**Q Your -- ConcealFab's attorney?**

A Corporate attorney, correct.

**Q Did you have an attorney help you with this draft of the agreement, you personally?**

A Yes. I had my personal attorney also review it.

**Q Okay. And was your personal attorney involved in the back-and-forth negotiations, the redlining of this**

**employment agreement?**
A Yes. When -- when I would get a draft from Sabre, I would have my personal attorney, as well as the board and the corporate attorney review.
**Q Okay. So you were represented by counsel with regard to the employment agreement negotiation; is that correct?**
A Yes.
**Q And the board -- and ConcealFab was represented by counsel with regard to the employment agreement negotiation; is that correct?**
A Correct.
**Q Okay. Who was the attorney that helped you with your -- who represented you individually?**
A His name is David Brown.
**Q David Brown. And what law firm is he with?**
A It's called BISLaw, B-I-S-L-A-W.
**Q Is that here in Denver?**
A Uh-huh.
**Q Okay. And who represented ConcealFab? Who was their attorney?**
A Sparks Wilson.
**Q Is that Ben Sparks? Ben Sparks?**
A Correct.
**Q Okay. Okay. Did Sabre ever sign an employment**

**agreement with you?**
A No.
**Q Okay. Could you turn to paragraph -- what's marked as Paragraph 1, effective date of this draft agreement.**
A Uh-huh.
**Q I'm going to read the second sentence in that paragraph: This agreement shall automatically terminate without any action on the part of any person and be void ab initio if the Stock Purchase Agreement is terminated in accordance with its terms, and neither Sabre nor any other person shall have any liability to employee under this agreement if the closing, as defined in the Stock Purchase Agreement does not occur.**
**That was a mouth full. Let's break it down.**
**Do you know what void ab -- ab initio means? It should in ab initio.**
A I do not know what void ab initio means.
**Q It's Latin for from the inception.**
A Okay.
**Q Do you know what Stock Purchase Agreement this is referring to?**
A I do not.
**Q Okay. Was the -- did -- did Sabre and ConcealFab anticipate a Stock Purchase Agreement wherein**

**Sabre would purchase the stock of ConcealFab in the future?**

A I mean, it's likely. My guess, it's referring to a document that would be drafted post the term sheet.

**Q Okay.**

A I'd have to review the term sheet to confirm this assumption.

**Q So there was never a Stock Purchase Agreement that was signed between Sabre and ConcealFab; is that correct?**

A Nothing that was labeled "Stock Purchase Agreement."

**Q Okay. Was there an Asset Purchase Agreement between them?**

A Again, I would want to look at the exact terms of the term sheet --

**Q Okay.**

A -- to understand what it was called.

**Q Okay. Have you ever negotiated an Asset Purchase Agreement as a professional?**

A Yes.

**Q Okay. So you know generally what an Asset Purchase Agreement is?**

A Yes.

**Q And what it looks like?**

A Generally.
**Q Okay. Let's see. And neither Sabre nor any other person shall have any liability to employee.**
**Who is employee? That is you.**
**Under this agreement if the closing as defined in the Stock Purchase Agreement does not occur.**
**Did any closing occur with regard to a Stock Purchase Agreement between Sabre and ConcealFab, ever?**
A Well, I would think that we had a closing because we signed an LOA.
**Q You signed an LOA. You did not sign a Stock Purchase Agreement; is that right?**
A Did not sign a Stock Purchase Agreement.
**Q And you're not sure if you ever signed an Asset Purchase Agreement; is that correct?**
A The only thing that was ever signed was an LOA.
**Q And --**
A Sorry. A term -- sorry. A term sheet and an LOA.
**Q And a nondisclosure agreement?**
A And a nondisclosure agreement. Sorry. I meant in terms of purchasing. So, yes, there were probably other documents. But I'm saying there was a term sheet for an acquisition and an -- and an LOA. Those were both executed. In addition to an NDA, you are correct.

**Q Okay. And neither Sabre, nor any other person, shall have any liability to employee under this agreement if the closing, as defined in the Stock Purchase Agreement, does not occur.**

**What does that mean to you?**

A That -- I guess exactly what it says. If a closing does not occur, that they would have no liability. I guess that's what it's --

**Q They being Sabre?**

A They being Sabre.

**Q To you?**

A Correct.

**Q Okay.**

A Obviously what's at issue is, did a closing happen.

**Q You did have a lawyer negotiate this on behalf of you?**

A Yes.

**Q Okay. So we said that this went through multiple drafts, right?**

A Correct.

**Q Okay. We're going to walk through them.**

MS. LALLY: Let's take a break before we do that. Let's go off the record.

Everybody might want to --

THE VIDEOGRAPHER: Sorry. We're off the record at 11:19 a.m.
(A recess was taken from 11:19 a.m. until 11:27 a.m.)
THE VIDEOGRAPHER: We're back on the record at 11:27 a.m.
(Deposition Exhibit 7 was marked.)
**Q (By Ms. Lally) Okay. I'm going to hand you what I've marked as Exhibit Number 7. Could you please take a look at this and let me know if it appears to be a true and accurate copy.**
A So far so good.
**Q Take your time. That's fine. This is also Bates stamped CONCEALFAB 1112 through 1121.**
A Right.
Looks good.
**Q Does this appear to be true and accurate.**
**Okay. This purports to be, anyway, an e-mail from you -- it doesn't have your e-mail address -- to Chris Odell and Duncan Stewart.**
**Who are they?**
A Board members --
**Q Okay.**
A Of ConcealFab.
**Q Of ConcealFab. Sent January 8th at -- 2015 at**

**9:49 a.m. Subject, Revised employment agreement. Attachments, Fitzhugh's employment agreement, January 8th, 2015. Then it says, Attached reflects conversations with Sabre, Doug.**

**Is that Doug Huff?**

A That is Doug Huff.

**Q Okay. My attorney -- that is Mr. Brown?**

A Yes.

**Q -- and Sparks. Is that a person or the law firm?**

A Probably both.

**Q Okay. Ben Sparks --**

A Yes.

**Q -- probably?**

**So your attorney would have been looking at the -- what I believe is Exhibit 6, for yourself, is that correct, watching out for your interest?**

A He -- yeah, he would have been looking at the employment agreement in general, my personal interest specifically.

**Q Yes. And Mr. Sparks would have been looking for ConcealFab's interest --**

A Correct.

**Q Good.**

**And if we look back at the attachment itself,**

**we'll see that this is an -- I guess it's not in color, but it would be what we would refer to generally as a redline; is that correct?**
A Yes.
**Q Okay. And so the -- the comments and the changes that are tracked in this document, would those have been made, at least in part, by Mr. Brown?**
A Yes.
**Q Okay. Do you think they also would have been made in part by Mr. Sparks?**
A It's conceivable.
**Q Okay. Is Mr. Odell also a lawyer?**
A No.
**Q Okay. Is Mr. Stewart a lawyer?**
A No.
**Q Okay. Could you look at Page 11113. We're going to look again at Paragraph 1, effective date.**
A Okay.
**Q Sentence Number 2. This agreement shall automatically terminate without any action on the part of any person and be void ab initio if the Stock Purchase Agreement is terminated in accordance with its terms, and neither Sabre nor any other person shall have any liability to employee under this agreement if the closing, as defined in the Stock Purchase Agreement does not occur.**

**Is that what that says?**
A Yes.
**Q Have any changes been made to Paragraph 1 from Exhibit 6 to Exhibit 7?**
A Does not appear so.
**Q Okay.**
**(Deposition Exhibit 8 was marked.)**
**Q (By Ms. Lally) I'm going to hand you what I've mark as Exhibit Number 8. Can you please take a look, and let me know if this appears to be a true and accurate copy of an e-mail and its attachment. It's marked CONCEALFAB 1084 to CONCEALFAB 1093.**
A Okay. Looks good.
**Q Looks good. Okay.**
**This is also an e-mail from you to Doug Huff?**
A Yep.
**Q And this is also dated -- Exhibit Number 7 and Exhibit Number 8 are both dated January 8th, 2015?**
A Okay.
**Q This says that it was sent at 11:23 a.m.; is that correct?**
A Yes.
**Q Okay. Subject, Revised agreement. Doug, attached is the term sheet and employment agreement that has been signed off by both the attorneys and the board.**

**Okay. So the board would be Mr. Odell and Mr. Stewart?**
A Correct.
**Q Was there anybody else on the board at that time for ConcealFab?**
A Just myself.
**Q Okay. So ConcealFab's board had three members at this time?**
A Correct.
**Q Okay. And then if we can look at Page 1085.**
A Okay.
**Q If you look at the bottom of this, right by Number 1, where the page is.**
A Yep.
**Q If you can see that.**
**Okay. There is a document number.**
**Do you see that?**
A I do.
**Q Okay. Does this document number, which is US1:8568936V2, match -- does the document number on Exhibit Number 8 match the document number on Exhibit Number 7?**
A Yes.
**Q Okay. And let's look at Paragraph 1. Do you see a change in Paragraph 1?**

A I do.
**Q Who -- who -- who made that change? Do you know?**
A I'm guessing it would have been our side, if I was supplying the document.
**Q Okay. "Our side," you mean somebody either --**
A ConcealFab.
**Q ConcealFab?**
A Somebody representing ConcealFab likely made that change.
**Q Okay.**
A Without -- I'm speculating.
**Q Okay. You don't recall making that change yourself?**
A Not at this point in time relative to that point in time.
**Q I understand.**
**Let's read Paragraph Number 1 --**
A Okay.
**Q -- Sentence Number 2: This agreement shall automatically terminate without any action on the part of any person and be void ab initio if the Asset Purchase Agreement is terminated in accordance with its terms, and neither Sabre, nor any other person, shall have any liability to the employee under this agreement if the**

**closing, as defined in the Stock Purchase Agreement, does not occur.**

**So somebody has changed this to say Asset Purchase Agreement; is that correct?**

A Yes.

**Q But they have not changed the "as defined in;" is that correct?**

A Correct.

**Q Okay. Again, do you know if there was ever a formal Asset Purchase Agreement between Sabre and ConcealFab?**

A I do not.

**Q Okay.**

**(Deposition Exhibit 9 was marked.)**

**Q (By Ms. Lally) I'm going to hand you what has been marked as Exhibit Number 9. If you could please take a look, and let me know if this appears to be a true and accurate copy. It's marked as CONCEALFAB 1053 through CONCEALFAB 1062.**

A Looks good.

**Q Okay. This appears to be, again, an e-mail from you to Doug Huff dated January 8th, again, 2015, at 2:04 p.m.**

**What is this talking about? Doug, please see the attached compromise. We can put the financial**

**performance, et cetera, language back into the definition of cause, but also add in the qualifier of due to employee's gross negligent.**

A Negligence. But, yes.

**Q I'm sorry. You're right. Due to the employee's gross negligence.**

A So your question is what was I referring to?

**Q Yeah.**

A They had a -- a trigger that could allow them to fire me for cause due to financial performance.

**Q Of -- of the combined entity?**

A Correct. Of the small cell entity operating within Sabre. And it just felt there were too many moving parts that could give them too much power to do that. So we were trying to negotiate that out. They pushed back.

And then it looks like we wanted to add employee gross neg -- like, if that poor financial performance was due to employee gross negligence, as opposed to the economy tanked and financial performance went down. So I think that was the specific that the e-mail was referring to.

**Q Okay. Did you have a problem with the severance being triggered -- being tied in any way to the financial performance of the new entity?**

A Well, it was -- you're saying why did I write

this e-mail? Did it have to do with severance?

**Q Well, I'm trying to understand if you had problems generally with the -- with the proposal that termination could happen as a result of financial performance of the new entity.**

A It was more financial performance -- because finan -- so just to be clear, financial performance was, we submit a budget, if I don't hit that budget or I'm off by a variance, they would define that as can fire for cause.

**Q Which would mean you would get no severance; is that right?**

A Well, it was more -- yes. Correct. They'd get no severance. So it would be less onerous for Sabre to fire me, and then ConcealFab would have no representative overseeing their earnout.

We were concerned that if we submit a budget and Armageddon happens, outside of anything that I had to do and I missed the budget, they could fire me. That was the concern.

So we said, It's -- this performance has to somehow tie into Jon's influence, not external factors.

**Q Okay. I'd like to turn to the first page of this draft employment agreement.**

A Uh-huh.

**Q Paragraph Number 1, Sentence Number 2: This agreement shall automatically terminate without any action on the part of any person and be void ab initio if the Asset Purchase Agreement is terminated in accordance with its terms, and neither Sabre, nor any other person, shall have any liability to employee under this agreement if the closing, as defined in the Stock Purchase Agreement, does not occur.**

**Have there been any changes to this sentence between the draft, which is Exhibit Number 8, and Exhibit Number 9?**

A No.

**Q Okay.**

A Oh, sorry.

**Q That's okay.**

**That's all.**

**(Deposition Exhibit 10 was marked.)**

**Q (By Ms. Lally) I'm going to hand you what I've marked as Exhibit Number 10. Could you please take a -- well, let me look at this.**

**Yes. Could you please take a look at this, and let me know if it appears to be a true and accurate copy of what has been marked as CONCEALFAB 1043 to CONCEALFAB 1052.**

A Looks good.

**Q This appears to be an e-mail from you to a Mr. Paul W. Hurcomb?**

A Uh-huh.

**Q Dated January 8th, 2015, at 2:09 p.m.**

**Who is Mr. Hurcomb?**

A He's the employment attorney at Sparks Wilson.

**Q Okay. So you were forwarding this to him as an attorney for ConcealFab?**

A I believe so.

**Q Okay. And do you think Mr. Hurcomb considered you as his client as the CEO of ConcealFab?**

A I think he --

MS. DEVINE: Objection. Foundation.

MS. LALLY: Okay.

MS. DEVINE: You can --

**Q (By Ms. Lally) Do you consider yourself Mr. Hurcomb's client as the CEO of ConcealFab?**

A I was not forwarding this to Mr. Hurcomb representing me personally, whereas he was acting on behalf of ConcealFab.

**Q Okay. So you were acting -- when you sent this e-mail, in your mind, you were acting as the CEO of ConcealFab; is that correct --**

A Oh, yes. Sorry. Yes.

**Q And in your mind, you were sending this to the**

**attorney for the company that you are the CEO of?**
A Correct.
**Q Okay. Why were you sending this to Mr. Hurcomb?**
A Because he was ConcealFab's attorney.
**Q Okay. Is he with Sparks Wilson?**
A Yes.
**Q Okay. There's no other communication in that e-mail, is there, though, other than the fact that you're sending him this employment agreement?**
A Doesn't appear to be.
**Q Okay. So Mr. Hurcomb was also involved in the negotiation of this agreement; is that correct?**
A Yes.
**Q Okay. And Mr. Hurcomb, in the negotiation of this agreement, represented ConcealFab's interest, you believed?**
A Correct.
**Q Okay. Turning to Paragraph 1.**
A Uh-huh.
**Q Have there been any changes made to Paragraph 1 from the time that Exhibit Number 9 was sent to the time that Exhibit Number 10 was sent?**
A Doesn't appear to be.
**Q Okay. Those are all the questions I have for**

**that.**

**Okay. What have I got here?**

**(Deposition Exhibit 11 was marked.)**

**Q (By Ms. Lally) This is Exhibit Number 11. This is marked CONCEALFAB 55 to CONCEALFAB 64. Could you please look and let me know if this appears to be a true and accurate copy of this record -- two records, actually, the e-mail and the attachment.**

A Looks good.

**Q Okay. Okay. If you look under the blacked out portion is where you'll see the original e-mail. This appears to be from Doug Huff?**

A Yes.

**Q To you --**

A Yes.

**Q -- is that correct?**

A Okay.

**Q Also dated January 8th, 2015 at 3:24 p.m.?**

A Uh-huh.

**Q Okay. It looks like you were primarily concerned -- he wanted to point your attention to Paragraphs Number 25 and Number 26.**

**Okay. If you compare this with Exhibit Number 10, Paragraph Number 25. It appears that Mr. Huff has, under 25 -- Paragraph 25-A, he struck out -- it used to**

**read, Employee's failure to meet -- for purposes -- let me start over.**

**For purposes of this agreement, cause shall be defined as employee's failure to meet financial and performance criteria as established for the business segment that employee is directing due to employee's gross negligence, semicolon, and it goes on.**

A Uh-huh.

**Q In Exhibit Number 11 --**

A Uh-huh.

**Q -- it says, For purposes of this agreement, cause shall be defined as employees's material failure to meet financial and performance criteria as established for the business segment that the employee is directing, and he has struck out "due to employee's gross negligence."**

A Yes.

**Q Okay. So this -- that line, due to employee's gross negligence, that was subject to negotiation between the parties?**

A (The witness nodded.)

**Q Okay. And it was important for you that, "due to employee's gross negligence," be included in this agreement; is that correct? Is that fair?**

A By me do you mean, me personally --

**Q You personally, was this important to you?**

**Yes.**

A I'd say it was more important to the board.

**Q Okay. If you could go back on Exhibit Number 11. I'm sorry if I've asked this question. We could look at the transcript. But do you see any changes in Paragraph 1 between Exhibit Number 10 and Exhibit Number 11?**

A I do not.

(Deposition Exhibit 12 was marked.)

**Q (By Ms. Lally) Okay. I'm going to hand you Exhibit Number 12. Could you please take a look at what's been marked as Exhibit Number 12, CONCEALFAB 1063 to CONCEALFAB 1072, and let me know if it appears to be a true and accurate copy.**

A Isn't this the same exhibit?

**Q Oh, my. The Bates stamp -- the timestamp I think is different, if you look at --**

A Huh-uh. It's --

**Q -- 324 --**

A -- 324 to three twenty --

MS. LALLY: Oh, I'm sorry. This is the same exhibit. This was a mistake on behalf of my paralegal. I'm going to strike Exhibit Number 12.

THE WITNESS: Okay.

MS. LALLY: Well, actually, I'll enter Exhibit

Number 12; we're just not going to question on it.

THE WITNESS: Okay.

MS. LALLY: So bummer. Sorry about that.

MS. DEVINE: I think actually you took the witness's copy --

MS. LALLY: All right. I'll give him a new one.

MS. DEVINE: And the court reporter gets kind of cranky when you do that.

MS. LALLY: Oh, does she?

THE WITNESS: Oh, I handed it back.

MS. LALLY: Yeah.

THE WITNESS: I apologize.

MS. LALLY: It's okay. There you go.

THE WITNESS: All right. Thank you.

MS. LALLY: Sure.

**Q (By Ms. Lally) All right. Now I'm really going to double-check it.**

**(Deposition Exhibit 13 was marked.)**

**Q (By Ms. Lally) Okay. Exhibit Number 13. Exhibit Number 13, CONCEALFAB 1073 to CONCEALFAB 1082. Could you please look and let me know if this appears to be a true and accurate copy of the e-mail, as well as the attachment that were produced.**

A Yep.

**Q Okay. Okay. Exhibit Number 13 looks to be an e-mail from you to Mr. Doug Huff?**
A Yep.
**Q Containing a draft employment agreement. And you said, So we are looking at the same thing when you call back.**
**Obviously that's probably because there were numerous copies going back and forth, and you wanted to make sure you were on the same page for a telephone call, is that --**
A I believe so.
**Q Okay.**
A Sounds reasonable.
**Q Okay. Could you please look at Page 1 of the draft employment agreement, Paragraph 1, and tell me if you notice any differences between Exhibit Number 11 and Exhibit Number 13.**
A I don't believe so.
(Deposition Exhibit 14 was marked.)
**Q (By Ms. Lally) Okay. Okay. I'm going to hand you what's been marked as Exhibit Number 14. This is CONCEALFAB 001132 to CONCEALFAB 001141.**
**Could you please look at the e-mail, as well as the attachment, and let me know if it appears to be a true and accurate copy of what was produced.**

A Yep. Looks good.
**Q Okay. If you look -- if you look between Exhibits Number 14 and Exhibit Number 13, though, you see the attachment has a different name?**
**Exhibit Number 13 the attachment is called Jon Fitzhugh Employment Agreement, Jan. 8, 2015, dash, JF330.**
**And if you look at Exhibit Number 15, the attachment says it's called Jon Fitzhugh Employment Agreement, January 8th, 2015, slash, DCH.**
A Okay.
**Q Do you recall having a telephone conversation with Doug Huff regarding the draft employment agreement on January 9th, 2015?**
A I don't recall the specific conversation, but it -- it's reasonable to assume we had it.
**Q Okay. Could you turn to Page 5 of the draft employment agreement, Paragraph 25.**
A Okay.
**Q If you'd compare Paragraph 25 of Exhibit Number 13 to Paragraph 25 of Exhibit Number 14.**
A You said Paragraph 5. Do you mean --
**Q 25.**
A -- 25?
**Q Page 5, Paragraph 25.**
A Got it.

**Q Sorry.**
A Got it.
**Q The definition of cause has again been -- and good reason -- has again been changed.**
**Do you see that?**
A I do.
**Q Okay. Looks like there's been additional editing; is that correct?**
A Yes.
**Q Okay. This sentence, Employee's failure to meet financial and performance criteria is established for the business segment that employee is directing. Due to employee's gross negligence has completely been struck out.**
A Uh-huh.
**Q Okay. Do you recall discussing that strike out with Mr. Huff?**
A This specific strike -- I mean, generally, yes. I mean, this is --
**Q The term. Do you recall -- I mean, you were obviously going back and forth on this, right? You're adding it; he's taking it out.**
**So this discussion that you had on January --**
A 9th.
**Q -- 9th, do you recall discussing that portion**

**of Paragraph 25-A?**
A Roughly.
**Q Okay. Can you tell me roughly what you remember?**
A We were basically trying to -- I -- well, I trying to figure out a way that it would be due to me. And as you can see, they went away from "gross negligence" to something -- reading it, me not abiding by written policies that a similarly-situated employee -- so they were trying to get more specific, I guess, if I was to read into what they've written -- on what actions would be required or that I would be subject to in order to sort of redefine "gross negligence," like what -- what does that mean. Because it -- that's how I -- so we basically trying to -- they didn't want "gross negligence." They wanted something softer.
**Q That's your recollection?**
A Yes.
**Q Okay. And by "softer," do you mean easier to terminate you for cause? Is that your under -- is that what you mean by that statement?**
A Yes.
**Q A standard lower than gross negligence, is that your understanding?**
A Yes.

**Q Okay. Could you turn to Paragraph 1.**
A Yep.
**Q Okay. Sentence number 2: This agreement shall automatically terminate without any action on the part of any person and be void ab initio if the Asset Purchase Agreement is terminated in accordance with its terms, and neither Sabre, nor any other person, shall have any liability to employee under this agreement if the closing, as defined in the Stock Purchase Agreement, does not occur.**
A Uh-huh.
**Q Have there been any changes to that sentence from para -- from what is marked as Exhibit Number 14 --**
A Nope.
**Q -- and Exhibit Number 13?**
A (The witness shook his head.)
**Q No. Okay.**
**(Deposition Exhibit 15 was marked.)**
**Q (By Ms. Lally) Okay. I'm handing you Exhibit Number 15. Exhibit Number 15, CONCEALFAB 1122 to CONCEALFAB 1130. This appears to be an e-mail and an attachment. Could you please look them over and let me know if they appear to be true and accurate copies that were produced.**
A Yes.

**Q Yes, they appear to be true and accurate copies of what was produced?**
A Yes.
**Q Okay. This appears to be an e-mail from you?**
A Uh-huh.
**Q To Chris Odell and Duncan Stewart?**
A Yes.
**Q Again, they were the two other board members of ConcealFab; is that correct?**
A Correct.
**Q Okay. And it looks like you have forwarded them the agreement that Doug Huff sent you earlier in the day; is that correct?**
A Correct.
**Q Okay. So why were you forwarding it to Chris Odell and Duncan Stewart?**
A For discussion.
**Q Okay. And you were forwarding it to them because they're board members of ConcealFab --**
A Correct.
**Q -- is that correct?**
A Uh-huh.
**Q Okay. It says, Will call you shortly.**
**Do you recall having a telephone conference with Chris Odell regarding this draft agreement on January**

**9th, 2015?**
A Give or take.
**Q And do you recall having a telephone conference with Duncan Steward on January 9th, 2015, regarding this agreement?**
A Give or take.
**Q Okay. Did you -- do you recall discussing with Mr. Odell the striking of the section in Paragraph 25 regarding removal for cause being defined as employee's gross negligence?**
A I don't specifically remember that conversation.
**Q Okay. Same question as to Mr. Duncan Stewart.**
A I don't specifically remember that discussion.
**Q Okay. Could you look at Paragraph Number 1 --**
A Yep.
**Q -- of the draft employment agreement, and just confirm there have been no changes between Exhibit Number 14 and Exhibit Number 15 with regard to that paragraph.**
A No changes.
**Q Okay. I'm short . . .**
**Last one. Exhibit Number 16.**
**(Deposition Exhibit 16 was marked.)**
A Shucks.
**Q (By Ms. Lally) Well, not the end.**

A Okay.
**Q Don't get your hopes up.**
**I'm handing you what has been marked as Exhibit Number 16, CONCEALFAB 1142 to CONCEALFAB 1151.**
A Uh-huh.
**Q Could you please review and let me know if that appears to be a true and accurate copy of the document that was produced.**
A Yes.
**Q Yes, it appears to be a true and accurate --**
A Yes, it appears to be a true and accurate copy.
**Q Okay. This looks like an e-mail from you to you Duncan Stewart and Chris Odell?**
A Uh-huh.
**Q It is dated January 15th, 2015?**
A Uh-huh.
**Q So there's been a period of time between Exhibit Number 15 and Exhibit Number 16; is that correct?**
A Yes.
**Q Okay. And it says, Documents to discuss, slash, approve at board meeting?**
A Yep.
**Q Okay. So you were going to have a board meeting on or around January 15th, 2015?**
A Correct.

**Q Okay. And this was one of the things you were going to discuss during that meeting?**
A Correct.
**Q Okay.**
A Looks like there were two attachments.
**Q A term sheet?**
A Yep.
**Q Okay. Dated -- well, we don't know.**
**And your employment agreement --**
A Uh-huh.
**Q -- which is attached?**
**Okay. There are no redlines on this draft agreement; is that correct?**
A Correct.
**Q Is that because you thought that this was the final draft, or do you remember?**
A Yes.
**Q I asked you a compound question.**
A That's all right. I --
**Q Did -- did you believe that this was the final draft of the employment agreement?**
A Yes.
**Q Okay. Could you look at Paragraph Number 1, please.**
A Uh-huh.

**Q All right. Paragraph Number 1, Sentence Number 2: This agreement shall be automatic -- shall -- this agreement shall automatically terminate without any action on the part of any person and be void ab initio if the Asset Purchase Agreement is terminated in accordance with its terms, and neither Sabre, nor any other person, shall have any liability to employee under this agreement if the closing, as defined in the Stock Purchase Agreement, does not occur.**

A Uh-huh.

**Q Do there seem to be any changes between Exhibit Number 15, Paragraph 1, and Exhibit Number 16, Paragraph 1?**

A No.

**Q I think that there are.**

**Has somebody accepted the change of Stock to Asset?**

A Oh, is that considered a change in your mind?

**Q Well, it's still redlined.**

A Okay.

**Q And now that word "stock" no longer appears as redlined.**

A Okay.

**Q Do you agree?**

A Yes.

**Q Okay. If we go to Paragraph 25-A.**

A Okay.

**Q For purposes of this agreement, cause shall be defined as -- typo -- T, the material failure by employee to observe Sabre's written policies and/or written policies which are generally applicable to similarly-situated employees of Sabre: Willful misconduct by the employee in the performance of employee's duties hereunder, insubordination, willful unauthorized disclosure and misuse of confidential information, a conviction or a plea of guilty or nolo contendere by the employee to any act of fraud, theft, or dishonesty with respect to Sabre, or a conviction of a felony criminal act which that would have a material or adverse impact on Sabre, a material breach by the employee with this disagreement or any other material agreement or the contract with Sabre or the material willful violation of employee of any state or federal law relating to the workplace environment, including, without limitations, laws relating to sexual harassment or age, sex or other prohibited discrimination.**

**Cause shall not include termination as a result of job elimination or staff reduction, including any that might occur during the reorganization -- during a reorganization or a restructuring.**

**So this has no reference to "gross negligence." Is that correct?**
A Correct.
THE VIDEOGRAPHER: Excuse me, Counsel, five minutes of recording time remaining.
**Q (By Ms. Lally) And this agreement was never signed by anybody at Sabre, to your knowledge, was it?**
A No.
**Q Okay. And Paragraph 1 had only one change in terms of the word "stock" being changed to "asset," as far as you can tell; is that correct?**
A Correct.
**Q Okay.**
MS. LALLY: All right. We're going to take a break and change the tape right now.
THE VIDEOGRAPHER: This is the end of Media Unit Number 1 in the deposition Jonathan Fitzhugh.
We're off the record at 12:08 p.m.
(A recess was taken from 12:08 p.m. until 12:17 p.m.)
THE VIDEOGRAPHER: This is the beginning of Media Unit 2 in the deposition of Jonathan Fitzhugh.
We're back on the record at 12:17 p.m.
MS. LALLY: Thank you.
**Q (By Ms. Lally) Do you know if Sabre has a drug**

**testing policy as part of its employment agreement?**
A They do.
**Q Okay. Did you take a drug test for Sabre?**
A I did.
**Q Okay. Do you recall when you took that, in around?**
A It was, I want to say, April.
**Q Around April of 2015?**
A Yes.
**Q Okay. When did you start working for Sabre --**
A On --
**Q -- or the new entity?**
A When -- the official signing date was mid-March.
**Q Okay.**
A When they started -- I believe that was the effective date when they started paying us.
**Q All right. So mid-March 2015?**
A Correct.
**Q And you believe you took a drug test in April --**
A Yes.
**Q Okay. -- of 2015?**
**Okay. Did you resign from the board of ConcealFab when you started working for Sabre?**

A No.

**Q Okay. Was there any discussion regarding whether or not you should resign from the board between you and Chris Odell, as far as you recall?**

A Not that I recall from the board.

**Q Okay.**

**(Deposition Exhibit 17 was marked.)**

**Q (By Ms. Lally) Okay. I'm going to hand you what I've marked as Exhibit Number 17, and I want you to take your time and read that, please.**

**This is CONCEALFAB 1640, Exhibit Number 17. Please review and see if it appears to be a true and accurate copy of this record.**

A Uh-huh.

**Q Okay. Does this appear to be true and accurate?**

A Yes.

**Q Okay. The bottom of this is an e-mail from what I believe is Chris Odell's e-mail address. We haven't examined him yet.**

A Right.

**Q Do you recognize that as an e-mail address that he uses?**

A Yes.

**Q Okay. To you, and it's entitled Consulting**

**Versus LOA?**

A Uh-huh.

**Q Becoming a Sabre employee for an interim period probably would probably mean appointing an interim CFC/CEO that would be responsible for negotiations with Sabre on an acquisition deal, and likely means you resigning from the board during this period. If you went the consulting route, I don't think either would be required.**

**Did you go the consulting route?**

A I did not.

**Q Okay. Did you appoint an interim CEO?**

A Yes.

**Q Who did you appoint?**

A Duncan Steward.

**Q Okay. And when did Duncan Stewart start being the interim CEO?**

A You and your dates. I believe in the March . . .

**Q March 2015?**

A March 2015. It could have been April when we finally got around to actually formally drafting it. But we had his informal consent in March. He knew it was coming.

**Q Okay. And you did not resign from the board; is that correct?**

A Correct.

**Q Okay. So during the negotiation of the LOA, were you on ConcealFab's board?**

A Yes.

**Q Okay. Did you negotiate the LOA on behalf of ConcealFab?**

A Yes.

**Q But you were a Sabre employee at that time?**

A No.

**Q No. This was before March of 2015?**

A Correct.

**Q Okay. All right. That's all.**

A Okay.

**Q I'm going to go back to the time when you were taking the employment agreement. I'm sorry I took these exhibits a little out of order. I hope it's okay.**

**(Deposition Exhibit 18 was marked.)**

**Q (By Ms. Lally) Exhibit Number 18. Could you please look and let me know if this appears to a true and accurate copy of what has been marked as Exhibit Number 18, CONCEALFAB 1041.**

A Okay.

**Q Okay. Does this appear to be a true and accurate copy of what was produced?**

A Yes.

**Q Okay. This looks to be, again, an e-mail from Mr. Odell to you --**

A Uh-huh.

**Q -- copying Duncan Stewart. And it says re: Forward draft employment agreement and it's January -- dated January 7th, 2015.**

**It says, Jon, this employment agreement allows Sabre to terminate you without cause -- this is, again, just his reading of it.**

A Yep.

**Q -- subject to severance or for cause which can be your failure to achieve the financial objections -- objectives set forth for the business, either of which puts the earnout to ConcealFab shareholders substantially at risk with you no longer responsible for the P&L.**

**What is the P&L?**

A Profit and loss.

**Q Okay. So why was your no longer being responsible for the P&L a risk for ConcealFab?**

**Do you know what he's thinking here?**

**Did you discuss this with him?**

**Let me ask that again. Did you discuss this e-mail with him?**

A Yes.

**Q Okay. Did you discuss this sentence in**

**particular, that ConcealFab shareholders would be at risk with you no longer responsible for the P&L?**

A Yes.

**Q Okay. What is your understanding of what that means?**

A The earnout was a percentage of profit defined as EBITDA, or earnings before interest and taxes. So he was concerned that if I wasn't overseeing the profit and loss, which ultimately generates EBITDA, that there could be a fox watching the henhouse.

Meaning, if wasn't me and if it was someone without ConcealFab's best interests in mind or aligned interests, that they would care less that that number, the EBITDA, was as high as possible. So they -- that is why they were so concerned about the employment agreement and it hopefully ensuring my permanence.

**Q Okay. Was -- Mr. Stewart was the acting CEO after you, though; is that correct?**

A Of CFG.

**Q Okay.**

A This is not talking about CFG.

**Q This is just talking about the new entity --**

A The profit and loss within Sabre.

**Q Okay.**

A That my employment agreement suggested I would

be the -- whatever the title was --
Q You just mean the profit and loss of the segment of the business, though, right?
A The segment of business within Sabre --
Q Within Sabre --
A -- for which ConcealFab shareholders would receive a percentage of the EBITDA.
Q Okay. So did Mr. Odell suggest that -- the addition of the gross misconduct language? Do you recall?
A It appears that he had influence on it.
Q Okay. Again, is Mr. Odell trained as an attorney in any way?
A No. He just plays one on TV. He -- I mean, he's been through -- he's very knowledgeable about mergers and acquisitions. You'll see when you speak with him.
Q Uh-huh. I don't have his resume yet, so --
A Okay.
Q -- it's hard to know.
A No. That's me volunteering it.
Q Okay. Okeydokey.
I'm sorry. I just . . .
A You're fine.
Q These are a little out of order.
MS. LALLY: That's everything I have for this portion for your fact witness --

MS. DEVINE: Okay.
MS. LALLY: -- deposition.
Would you like to resuscitate the witness in any way? No?
MS. DEVINE: Resuscitate?
MS. LALLY: That's what we call it in Illinois.
No?
MS. DEVINE: No, I don't need to resuscitate the witness.
MS. LALLY: Okay. How much time did we use up?
THE VIDEOGRAPHER: Total time?
MS. LALLY: Uh-huh.
THE VIDEOGRAPHER: One second. Two hours, seven minutes.
MS. LALLY: Okay. I'd like to reserve my four hours and 53 minutes that are left just in case I have to call this witness back.
MS. DEVINE: Okay.
MS. LALLY: In his individual capacity.
MS. DEVINE: I object to that.
MS. LALLY: Okay. Why?
Are you just placing it for the record?
Are you just putting an objection on the record?
MS. DEVINE: Yeah, just on the record.

MS. LALLY: Okay. Okay.

(A discussion was held off the record.)

THE REPORTER: Do we want to go off the record?

MS. LALLY: Yes, please, off the record.

THE VIDEOGRAPHER: Okay. We're off the record at 12:31 p.m.

(The deposition adjourned at 12:31 p.m. on the 13th day of March, 2017.)

AFFIDAVIT

I have read my deposition and it is true and accurate, except for changes or corrections now indicated by me on the Amendment sheet.

Amendment sheet attached ( )

No changes to testimony ( )

______________________________
JONATHAN TODD FITZHUGH

Subscribed and sworn to before me this date, __________________ 2017.

______________________________
My Commission expires:

______________________________
NOTARY PUBLIC

______________________________
STREET ADDRESS

______________________________
CITY, STATE, ZIP

Return to: MILE HIGH COURT REPORTING & VIDEO, INC.
14143 Denver West Parkway
Suite 100
Golden, Colorado 80401

CERTIFICATE

STATE OF COLORADO )
) ss.
COUNTY OF ADAMS )

I, SHAUNA T. DIETEL, Registered Professional Reporter, and Notary Public of the State of Colorado, certify that before the deposition the witness sworn by me to testify to the truth, and that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

I further certify that I am not related to, any party herein, nor their counsel, and have no interest in the result of this litigation.

__________________________________
Shauna T. Dietel, RPR
My commission expires 10/6/2017

March 30, 2017

ANGELA D. DEVINE, ESQ.
Silver & DeBoskey, P.C.
1801 York Street
Denver, Colorado 80206

RE: ConcealFab vs. Sabre Industries, Inc., et al.
Civil Action No. 15-cv-01793-CMA-KLM
Deposition of: JONATHAN TODD FITZHUGH
Taken: March 13, 2017

Dear Ms. DeVine,

Attached with your electronic copy of the above-referenced deposition is the signature page from the Court's original transcript.

In accordance with the Rule, please have the witness read and sign his or her testimony, then return the executed signature page and any amendment sheets used to us within 35 days of the date of this letter.

Sincerely,

MILE HIGH COURT REPORTING & VIDEO, INC.

Encl.

cc: Original transcript

Elizabeth M. Lally, Esq.

ELIZABETH M. LALLY, ESQ.
Goosmann Law Firm
1801 York Street
Denver, Colorado 80206

Re: ConcealFab vs. Sabre Industries, Inc., et al.
Civil Action No. 15-cv-01793-CMA-KLM
Deposition of: JONATHAN TODD FITZHUGH
Taken: March 13, 2017

Dear Ms. Lally:

The above-referenced original deposition is being filed with you on this date:______________________.

Pursuant to the governing Rules of Civil Procedure, the above-mentioned deposition is being filed:

____ signed, with no changes

____ signed, with changes, a copy of which is attached

____ unsigned, no changes

____ unsigned, with changes, a copy of which is attached

____ unsigned, pursuant to agreement of counsel that the deposition may be reviewed and signed at or before the time of trial

____ unsigned, our office having received notice that the case has settled

____ signature waived at the time of deposition

____ signature not required

MILE HIGH COURT REPORTING & VIDEO, INC.

cc: Original transcript

Angela D. DeVine, Esq.

**A**
**a.m**
1:23 5:3 34:2,3 34:4,7 62:2,3,4 62:6 63:1 65:20
**ab**
58:10,16,16,17 58:18 64:21 67:22 71:3 82:5 87:4
**abiding**
81:8
**ability**
53:18
**able**
10:20 38:23 50:11
**above-mentio...**
102:11
**above-referen...**
101:11 102:9
**absolute**
51:6
**absolutely**
10:24 51:9 52:10 55:24
**absorb**
42:11
**accepted**
87:16
**accommodate**
8:11
**accountant**
18:22
**accounting**
18:19 24:9,11 24:13,25 26:16 27:24 28:18 29:4
**accrual**
28:19,21,24
**accurate**
36:3,11 47:15 62:11,17 65:10 68:18 71:22 74:7 76:14 77:23 78:25 82:23 83:1 85:7,10,11 91:13,16 93:20 93:24 99:3
**achieve**
38:23 94:12
**acquaintance**
23:15,19
**acquaintances**
23:10,14
**acquisition**
41:25,25 42:19 60:24 92:6
**acquisitions**
96:15
**act**
88:12,13
**acting**
53:12 72:19,21 72:22 95:17
**action**
1:2 3:7 58:9 64:20 67:21 71:2 82:4 87:3 101:7 102:5
**actions**
81:11
**actively**
15:3,4
**acts**
56:6
**actual**
27:21
**ADAMS**
100:3
**add**
24:6 69:2,16
**added**
23:7
**adding**
80:22
**addition**
60:25 96:9
**additional**
80:7
**address**
10:10,13,15 48:3 62:19 91:19,22 99:17
**adjourned**
98:7
**adverse**
88:14
**AFFIDAVIT**
99:1
**afternoon**
7:22
**age**
88:20
**agree**
52:5 55:19 87:24
**agreed**
55:12
**agreement**
3:10 35:1,5,25 39:6,10 41:20 42:2 46:24 47:7 48:7 51:8 51:20,25 52:6 52:8,14,18,22 53:4,6,14,15 54:3,25 55:2,9 55:17 56:4,8,8 56:21 57:1,6 57:10 58:1,5,8 58:10,13,14,21 58:25 59:8,12 59:13,20,23 60:5,6,8,12,13 60:15,20,21 61:2,4 63:1,2 63:19 64:19,22 64:24,25 65:23 65:24 67:20,23 67:25 68:1,4 68:10 70:24 71:2,4,6,7 73:10,13,16 75:3,11,23 78:4,15 79:6,9 79:12,17 82:3 82:6,8,9 83:12 83:25 84:5,17 86:9,13,21 87:2,3,5,7,8 88:3,16 89:6 90:1 93:15 94:5,7 95:15 95:25 102:17
**airport**
37:13
**al**
5:7 101:6 102:4
**aligned**
95:12
**Allison**
30:20
**allow**
14:23 69:9
**allowance**
46:8,12
**allowed**
54:6
**allows**
94:7
**Amanda**
27:4,5
**amend**
35:17
**amended**
3:9 34:11 35:15 35:18
**amendment**
99:4,6 101:13
**amount**
14:21 41:16 42:25 45:22
**and/or**
88:5
**Angela**
2:2 5:15 101:3 102:25
**Angie**
9:9
**annual**
38:11 44:1 45:7
**answer**
8:2
**anticipate**
58:25
**anybody**
8:18 55:15 66:4 89:7
**anyway**
62:18
**apologize**
40:19 77:13
**appear**
62:17 65:5 73:11,24 82:23 83:1 91:15 93:23
**appearances**
2:1 5:13
**appears**
37:11 43:8 47:15 48:2 62:10 65:10 68:17,21 71:22 72:1 74:6,12 74:24 76:13 77:22 78:24 82:21 83:4 85:7,10,11 87:21 91:12 93:19 96:10
**applicable**
6:2 36:18,20 88:6
**appoint**
92:11,13
**appointing**
92:4
**approval**
56:5
**approve**

85:21
**April**
26:18 90:7,8,21 92:20
**arm**
18:2
**Armageddon**
70:18
**arrived**
29:1
**arrives**
50:5
**aside**
14:3,23
**asked**
9:9,11 24:21 34:19 36:11 45:10 46:8 76:4 86:18 100:7
**asking**
7:18 37:3 42:15 42:25 45:3,4 45:19,20,25
**asset**
59:13,19,22 60:14 67:22 68:3,10 71:4 82:5 87:5,17 89:10
**assign**
35:8
**assigned**
35:4,9,17 55:3
**assume**
79:15
**assumption**
50:7 59:7
**assured**
53:6,7
**attached**
63:3 65:24 68:25 86:11 99:6 101:10 102:13,16
**attachment**
3:13,16,19,21 3:24 4:3,5,8,10 4:12 47:16 63:25 65:11 74:8 77:24 78:24 79:4,5,8 82:22
**attachments**
63:2 86:5
**attempting**
23:1
**attended**
11:7 14:10
**attending**
7:5
**attention**
74:21
**attorney**
7:17 10:21 39:18 56:16,18 56:19,20,22,24 57:3,4,13,21 63:7,15 72:6,8 73:1,5 96:12
**attorneys**
39:19 65:25
**audit**
24:19 25:6,10 25:14,15,18
**audited**
25:4,17
**auditors**
24:15,17
**augment**
24:22
**automatic**
87:2
**automatically**
58:8 64:20 67:21 71:2 82:4 87:3
**awarding**
46:6

**B**

**B**
44:9,10
**B-E-L-M-O-...**
27:19
**B-I-G-G-S**
25:3
**B-I-S-L-A-W**
57:17
**back**
8:1 9:8 12:10,24 14:14 17:24 33:7 34:5,6 39:22 40:19 42:22 48:25 51:15 52:9,12 62:5 63:25 69:1,15 76:3 77:11 78:6,8 80:21 89:23 93:14 97:17
**back-and-forth**
56:25
**background**
11:5 24:11
**ballpark**
30:1,13
**bank**
17:4,7,8,9,24
**base**
52:2
**based**
16:8 28:5,24 45:6 48:15
**basically**
7:18 81:5,14
**Bates**
3:13,16,19,21 3:24 4:3,5,8,10 4:12,14,16,18 9:16 36:10 47:21 62:14 76:16
**bear**
31:19
**becoming**
29:5 92:3
**began**
24:14
**beginning**
5:14 19:24 27:11 89:21
**behalf**
5:15,17 52:18 52:21 53:13 54:11 55:16,22 56:6 61:16 72:20 76:22 93:5
**believe**
12:10 14:10 21:24 28:25 30:12 31:16 33:5,13 35:16 36:22 40:6 41:9,11 44:8 46:16 48:14,17 48:22 51:4 53:18,22 54:6 63:16 72:9 78:11,18 86:20 90:16,20 91:19 92:17
**believed**
73:17
**Belmont**
27:19 29:9
**Ben**
57:23,23 63:12
**benefits**
46:17,19
**best**
7:19 95:12
**bet**
16:9
**Biggs**
25:1
**billion**
44:7,9,10
**BISLaw**
57:17
**bit**
8:8 11:5 17:3,3 18:3 36:24
**blacked**
74:10
**blood**
30:14
**board**
14:13,14 39:4,7 52:8,25 53:22 54:3,5,22 55:19 56:1,6,7 56:16 57:4,9 62:22 65:25 66:1,4,7 76:2 83:8,19 85:21 85:23 90:24 91:3,5 92:7,24 93:3
**bonus**
35:16 37:25 38:17,21,24 42:6 44:23 45:1,9,13
**bonuses**
37:22,23
**bookkeeper**
24:12 26:22
**bookkeeping**
26:21
**books**
24:16 25:4,5,16 26:5 27:8,10 28:3
**boom**
17:6
**bottom**
9:10,13 19:10 47:22 66:12 91:18
**bottom-line**
19:5
**bought**
22:14

**breach** 34:25 35:5 88:15
**break** 8:9 33:21 58:15 61:23 89:15
**bring** 19:13 45:6
**brought** 15:22,25 34:24
**Brown** 57:15,16 63:7 64:7
**budget** 70:8,8,17,19
**bummer** 77:3
**burdened** 54:15
**business** 13:5,17 14:2 15:13,15,20 16:18 17:10 18:15,18,18 28:16 42:13 75:5,14 80:12 94:13 96:3,4

**C**

**C** 5:1
**call** 78:6,9 83:23 97:6,17
**called** 1:20 25:8 57:17 59:18 79:5,8
**cap** 45:11
**capacity** 97:19
**capital** 19:18 24:7
**car** 46:8,12
**care** 29:22 41:19 95:13
**carry** 33:2
**case** 5:8 9:17 97:16 102:19
**cash** 28:5,7,8
**cause** 69:2,10 70:10 75:3,12 80:3 81:20 84:9 88:3,22 94:8 94:11
**cc** 101:24 102:24
**ceased** 17:12
**cell** 42:12 69:12
**CEO** 13:11,14 15:3,9 21:13,18,20 39:4 72:11,17 72:22 73:1 92:11,16 95:17
**certain** 41:17 42:16,16
**CERTIFICATE** 100:1
**certifications** 12:5
**certify** 100:6,9
**cetera** 69:1
**CFC/CEO** 92:4
**CFG** 13:5 54:9 95:19 95:21
**chain** 3:13 4:12,16
**chance** 49:25
**change** 13:22 14:23 28:9,17 66:25 67:2,10,13 87:16,18 89:9 89:15
**changed** 54:8,18 68:3,6 80:4 89:10
**changes** 28:3 64:6 65:3 71:9 73:21 76:5 82:12 84:18,20 87:11 99:3,7 102:12 102:13,14,15
**cheating** 17:20
**check** 53:17
**checks** 54:12
**Cherry** 10:11
**Chief** 13:8
**Choppy** 15:18
**Chris** 3:15 4:14,17 62:20 83:6,15 83:25 85:13 91:4,19
**circumstances** 53:4
**City** 2:8 99:18
**civil** 1:2 3:7 6:2 101:7 102:5,10
**claims** 34:24
**Clark** 26:25 27:6,7
**clause** 39:9 53:16
**clear** 42:24 46:5 70:7
**clearance** 12:9,14
**cleared** 12:12
**client** 72:11,17
**close** 41:14,14 42:8 42:20 43:6,11
**closed** 26:5
**closing** 26:6 58:13 60:5 60:7,9 61:3,7 61:14 64:24 68:1 71:7 82:8 87:8
**codified** 50:9
**colleagues** 23:24
**color** 64:1
**Colorado** 1:1,22,25 2:3 5:4,8 10:11 14:11 15:1 22:18 24:7 38:7 99:22 100:2,6 101:5 102:2
**combination** 24:5 56:16
**combined** 69:11
**come** 13:9 15:7 19:3 31:4,8 38:20 40:2
**comes** 12:24
**comfortable** 55:12
**coming** 29:1 92:23
**commencing** 1:23
**comments** 64:5
**commercial** 12:7 15:13,20 16:3
**commission** 99:13 100:14
**communication** 51:15 55:13 73:8
**communicatio...** 50:12 51:18
**companies** 18:25
**company** 15:7 17:22 21:21 23:8 24:9 25:16 26:16,17 30:3 38:13,15 41:17 43:16,17 73:1
**company's** 39:7,19
**compare** 74:23 79:19
**compelled** 7:1
**compensation** 36:13,16 37:3 42:16,16 56:9
**complaint** 3:9 34:11 35:15 35:18
**complete** 36:3 54:21
**completely** 80:13
**compound**

34:19 86:18
**comprised** 20:19
**compromise** 68:25
**Conceal** 55:3
**ConcealFab** 1:6 3:10,13,14 3:16,17,19,19 3:21,22,24,24 4:3,3,5,6,8,8 4:10,11,12,12 4:15,16,18 5:6 5:16 9:12 13:5 13:7,9,13 14:6 14:9,15,17 15:2 16:13 18:8 21:13 22:4,19,22 24:8 27:16,22 27:23 28:3,25 29:3,15,17 30:15,24 31:2 31:5,9,11 32:11,20 33:9 33:19 34:12 35:6,25 36:15 36:17 38:5,11 39:6,10 43:14 47:23,23 51:15 51:25 52:20,22 53:11 54:7,12 55:16 56:3 57:9,20 58:25 59:1,9 60:8 62:14,24,25 65:11,12 66:5 67:7,8,9 68:11 68:18,19 70:15 71:23,23 72:8 72:11,17,20,23 74:5,5 76:12 76:13 77:21,21 78:22,22 82:20 82:21 83:9,19 85:4,4 90:25 91:11 93:6,21 94:14,19 95:1 96:6 101:6 102:4
**ConcealFab's** 15:8 52:25 53:15,22 54:3 54:5 56:18 63:22 66:7 73:5,16 93:3 95:12
**conceivable** 64:11
**concern** 70:20
**concerned** 53:23 54:16 56:1 70:17 74:21 95:8,15
**condition** 15:6
**conditions** 15:6
**conference** 83:24 84:3
**conferences** 14:10
**confidential** 88:10
**confirm** 29:13 36:11 59:6 84:18
**conflict** 55:21
**consent** 92:22
**consider** 37:23,25 38:1 72:16
**considered** 72:10 87:18
**consistent** 41:10
**consulting** 91:25 92:7,9
**consummated** 35:10
**contact** 10:20
**Containing** 78:4
**contendere** 88:11
**context** 45:7
**continue** 54:4,7
**contract** 12:23 88:17
**contracting** 12:18 54:10
**conversation** 79:11,14 84:12
**conversations** 50:8,9 51:4 63:3
**convertible** 31:14
**convicted** 10:5,7
**conviction** 88:11,13
**COO** 17:1
**copies** 78:8 82:23 83:1
**copy** 6:13,18,21 34:11 36:3,11 47:15 62:11 65:10 68:18 71:22 74:7 76:14 77:5,23 78:25 85:7,11 91:13 93:20,24 101:10 102:13 102:15
**copying** 94:4
**corner** 9:11
**corporate** 16:21 56:19 57:4
**corporation** 1:6 3:10 5:6,16 13:6 34:12 35:25 55:23
**correct** 6:18 9:25 10:14 10:23 11:14,15 12:17 20:8,13 21:12,19 22:17 22:19,20 24:3 24:20 30:9 35:3,6,7 37:20 38:8,9,16 39:7 39:8,21 40:24 41:7 44:21,24 45:11,14 46:3 46:8 48:17 49:8,10,13 50:6,14 51:22 51:23 52:16 53:25 54:1,23 55:1,10 56:19 57:7,11,12,24 59:10 60:15,25 61:12,21 63:17 63:23 64:3 65:21 66:3,9 68:4,7,8 69:12 70:13 72:23 73:2,13,18 74:16 75:23 80:8 83:9,10 83:13,14,20,21 85:18,25 86:3 86:13,14 89:2 89:3,11,12 90:19 92:25 93:1,11 95:18
**corrections** 99:3
**cost** 54:15
**counsel** 5:13,14 8:22 57:5,10 89:4 100:9 102:17
**counted** 23:15
**counting** 28:10
**COUNTY** 100:3
**court** 1:1 5:8,10,11 7:25 8:3 77:8 99:20 101:19 102:23
**Court's** 101:11
**cover** 39:12
**CPA** 12:5 27:11,15 27:15,21 28:15 28:22 29:5
**cranky** 77:9
**create** 22:5 47:6
**credibility** 10:3
**creditor** 31:11 32:20 33:19
**crime** 10:7
**criminal** 88:13
**crisis** 17:15
**criteria** 75:5,13 80:11
**cropped** 17:14
**crossed**

28:13
**cues**
8:4
**current**
10:10 12:22,25 14:2 32:17
**currently**
12:21,23 13:2 29:17
**customers**
14:19
**cut**
54:12

**D**

**D**
2:2 3:1 5:1 101:3 102:25
**dash**
42:12 79:6
**data**
16:6,10
**date**
40:9 48:15,23 49:24 50:6 58:4 64:17 90:13,17 99:12 101:14 102:9
**dated**
3:12,15,18,21 3:23 4:2,5,7,10 4:14,17 36:1 48:2 50:5 65:17,18 68:22 72:4 74:18 85:15 86:8 94:6
**dates**
92:17
**dating**
50:24
**David**
57:15,16
**day**
22:23 83:13
98:8
**days**
15:12 101:14
**DCH**
79:9
**deal**
15:22 16:1 35:10,11,12 36:6 53:25 54:8 92:6
**Dear**
101:9 102:8
**DeBoskey**
1:22 2:2 101:4
**debt**
31:13,14 32:22 32:24
**Dec**
29:11
**December**
3:12 21:7 23:21 23:25 29:11,12 31:16 40:3,5,7 48:19,24 50:25 51:5
**decide**
39:4
**decided**
18:6
**deductions**
36:18,20
**deemed**
13:16 39:13
**default**
17:19
**defendants**
1:15,21 2:10 5:18
**defin**
9:6
**define**
70:9
**defined**
39:3 58:13 60:5 61:3 64:25
68:1,6 71:7 75:4,12 82:9 84:9 87:8 88:4 95:6
**definition**
9:6 69:1 80:3
**degree**
11:8,10,14,17
**delivered**
28:12
**Denton**
14:11
**Denver**
1:22 2:3 5:4 40:10 57:18 99:21 101:5 102:2
**deposition**
1:4,20 3:6 5:5 6:1,11,20 7:5 7:15 8:15,19 34:8 35:22 37:8 47:12 62:7 65:7 68:14 71:17 74:3 76:9 77:19 78:19 82:18 84:23 89:17,22 91:7 93:17 97:2 98:7 99:2 100:6 101:7,11 102:5,9,11,17 102:20
**deposits**
28:10
**designations**
12:8
**development**
16:18 17:10
**DeVine**
2:2 5:15,15 7:9 7:11 28:1 33:23 44:13 72:13,15 77:4
77:8 97:1,5,8 97:18,20,25 101:3,9 102:25
**devinea@s-d....**
2:4
**Dietel**
1:24 5:11 100:5 100:13
**difference**
43:12
**differences**
78:16
**different**
76:17 79:4
**diligence**
36:6
**diluted**
30:6,8
**dinner**
40:1,3,7,21,24 46:25 48:18,22 48:23 49:4 50:22,23 51:18
**directing**
75:6,14 80:12
**directors**
14:13,14 39:7
**disagreement**
88:16
**disciplined**
28:23
**disclose**
56:10
**disclosed**
56:8,9
**disclosure**
88:10
**discrimination**
88:21
**discuss**
85:20 86:2 94:21,22,25
**discussed**
40:23,25 41:9 41:11
**discussing**
43:12 80:16,25 84:7
**discussion**
37:13 39:25 43:15 45:5 80:23 83:17 84:14 91:2 98:2
**discussions**
51:10
**dishonesty**
10:8 88:12
**District**
1:1,1 5:8,8
**document**
36:10 37:11 52:13 54:20 56:11,15 59:4 64:6 66:16,19 66:20,21 67:5 85:7
**documents**
8:23 9:1,4,8,9 9:11,23 60:23 85:20
**Dodd-Frank**
18:4
**doing**
13:5 24:15 26:15
**dollar**
36:18 38:7
**dollars**
41:21 42:25
**double-check**
77:18
**doubt**
47:7
**Doug**
3:11,18,20 4:2,4 4:7,9 37:11 41:9 46:15 48:2 51:12,13 51:14,14,16

63:4,5,6 65:15 65:23 68:22,24 74:12 78:2 79:12 83:12
**draft**
48:6,15 51:21 52:7 53:14 55:12 56:21 57:2 58:4 70:24 71:10 78:4,15 79:12 79:16 83:25 84:17 86:12,16 86:21 94:5
**drafted**
39:17 48:9 56:15 59:4
**drafting**
49:4 92:21
**drafts**
61:20
**Drive**
10:11
**driving**
44:6
**dropped**
17:5,7
**drug**
89:25 90:3,20
**due**
32:18 35:5 36:6 69:2,5,10,18 75:6,15,17,21 80:12 81:6
**Duncan**
3:15 4:13 62:20 83:6,16 84:4 84:13 85:13 92:14,15 94:4
**duties**
22:21 88:8

**E**

**E**
3:1 5:1,1
**e-mail**
3:11,13,15,18 3:20,23 4:2,4,7 4:9,12,13,16 4:17 37:11,15 39:23 41:6,12 47:6,16 48:1,2 48:3 50:4,9,12 50:24,25 52:11 62:18,19 65:11 65:15 68:21 69:21 70:1 72:1,22 73:9 74:8,11 77:23 78:2,23 82:21 83:4 85:12 91:18,19,22 94:1,23
**earlier**
83:12
**earliest**
49:24
**early**
40:7
**earnings**
95:7
**earnout**
53:2,3,6,7,8,12 70:16 94:14 95:6
**easier**
81:19
**easy**
28:17
**ebbs**
15:17,18
**EBITDA**
95:7,9,14 96:7
**economics**
11:12 18:23
**economy**
69:19
**editing**
80:8
**educational**
11:5
**effect**
33:8,18
**effective**
58:4 64:17 90:17
**eight**
44:7,9
**either**
22:14 26:18 29:10,11 33:7 52:11 67:6 92:8 94:13
**electronic**
101:10
**elimination**
88:23
**Elizabeth**
2:7 5:17 101:25 102:1
**employed**
13:2
**employee**
55:4 58:12 60:3 60:4 61:2 64:24 67:25 69:17,18 71:6 75:6,14 80:12 81:9 82:8 87:7 88:4,8,12,15 88:18 92:3 93:8
**employee's**
69:3,6 75:1,4,6 75:15,17,22 80:10,13 84:9 88:8
**employees**
88:7
**employees's**
75:12
**employer**
13:4
**employment**
3:10 22:19 29:14 34:25 35:5,25 37:12 39:5 40:23 41:10,20 42:1 46:23 47:6 48:6 51:8,20 51:25 52:5,7 52:13,18,22 53:4 54:25 55:2,9,17 57:1 57:6,10,25 63:1,2,19 65:24 70:24 72:6 73:10 78:4,15 79:6,8 79:12,17 84:17 86:9,21 90:1 93:15 94:5,7 95:15,25
**Encl**
101:22
**Englewood**
10:11
**enriched**
56:2
**ensuring**
53:3 95:16
**enter**
76:25
**entitled**
91:25
**entity**
54:9,10 69:11 69:12,24 70:5 90:12 95:22
**environment**
88:19
**equity**
19:17,18 20:18 22:15 43:17
**equivalent**
13:16
**Esq**
2:2,7 101:3,25 102:1,25
**established**
75:5,13 80:11
**estimate**
44:11
**et**
5:7 69:1 101:6 102:4
**evaporated**
47:1
**event**
22:13
**eventually**
11:13 14:11 19:15 22:5
**Everybody**
61:25
**exact**
40:9 48:23 53:17 59:15
**exactly**
15:18 22:21 40:17 43:9 44:6 61:6
**examination**
1:21 3:2 6:4 7:2 7:22 9:23
**examined**
91:20
**example**
12:5 51:18,25
**exchange**
14:3
**Excuse**
89:4
**executed**
60:25 101:13
**executive**
3:10 13:8 35:24 46:17,19
**executives**
46:20
**exhibit**
6:11,20 11:1 34:8,10 35:22 35:24 37:8,10

39:22 47:11,12 47:14 49:1,4 49:13 50:12,13 50:25 62:7,9 63:16 65:4,4,7 65:9,17,18 66:21,21 68:14 68:16 71:10,10 71:17,19 73:22 73:23 74:3,4 74:23 75:9 76:3,6,6,9,11 76:12,15,22,23 76:25 77:19,20 77:21 78:1,16 78:17,19,21 79:3,5,7,19,20 82:13,15,18,19 82:20 84:18,19 84:22,23 85:3 85:18,18 87:11 87:12 91:7,9 91:11 93:17,18 93:20
**exhibits** 3:5 4:1 79:3 93:16
**existing** 23:24 42:12
**exit** 22:5,7
**expanding** 42:14
**expansion** 16:25
**expense** 28:6,8
**expert** 7:21
**expires** 99:13 100:14
**explain** 22:7 28:17 45:2 45:18,25 52:23
**external** 70:22
**extinguish** 41:17

**F**

**F-I-T-Z-H-U-...** 6:9
**face** 55:18
**facing** 17:17
**fact** 7:2,20 73:9 96:25
**factors** 70:22
**failure** 75:1,4,12 80:10 88:4 94:12
**fair** 41:2 45:6 56:3,7 75:23
**fairly** 15:14 19:2
**family** 16:2 19:14 20:24 22:18 23:3,5,16,22 30:14,23
**far** 62:12 89:10 91:4
**Farm** 10:11
**father** 30:18,21 31:4 32:20
**father-in-law** 31:1
**fed** 17:19 32:2,4
**federal** 6:2 12:16 31:23 31:25 32:1,7,8 88:18
**fee** 7:4
**feel** 8:9 15:15
**felony** 10:5 88:13
**felt** 15:23 69:13
**Fifty** 44:20
**figure** 41:8 81:6
**filed** 34:11,17,22 102:9,11
**final** 86:16,20
**finalized** 53:5
**finally** 92:21
**finan** 70:7
**Finance** 18:13
**financial** 14:3 68:25 69:10,17,19,24 70:4,6,7 75:4 75:13 80:11 94:12
**financials** 25:21,23,25 26:2
**find** 13:13 17:20 19:22 23:1 50:11
**finder** 13:17,17
**fine** 7:25 62:13 96:22
**fire** 53:18,21 69:10 70:9,15,19
**fired** 53:23
**firm** 2:7 22:15 24:13 24:25 57:16 63:10 102:1
**first** 7:20 15:12 21:3 22:23,24 27:2 31:4,8 48:15 70:23
**fit** 14:17
**Fitzhugh** 1:4,20 3:11,15 3:18,20,23 4:2 4:4,7,9,13,17 5:6,22 6:8,25 7:14 30:21 34:9 36:1 37:12 79:6,8 89:17,22 99:9 101:7 102:5
**Fitzhugh's** 3:8 63:2
**five** 89:4
**fix** 17:8,25
**fixed** 33:3,4 38:5 41:16
**flat** 19:2
**float** 32:9
**flows** 15:17,18
**focus** 11:23 15:13,14 15:22 18:24 43:25
**focused** 18:4
**focuses** 12:2
**fold** 42:13
**follow-up** 41:6,7
**followed** 28:25
**following** 29:4
**follows** 5:24
**foregoing** 100:7
**forfeit** 41:24 42:15 43:1
**form** 20:20 28:1
**formal** 68:10
**formally** 92:21
**forth** 9:9 51:15 52:9 52:12 78:8 80:21 94:13
**Forward** 94:5
**forwarded** 83:11
**forwarding** 72:7,18 83:15 83:18
**found** 13:24 14:8 23:8 23:19 51:1
**Foundation** 44:13 72:13
**founder** 14:2,23 21:17 39:19,20
**founder's** 24:10 26:11
**founding**

21:20
**four**
20:14,19 37:18 97:15
**fox**
95:10
**frames**
21:3
**fraud**
88:12
**Friday**
4:10
**friend**
23:17,20
**friends**
16:2 19:14 20:24 23:9,16 23:21,23
**front**
49:23
**full**
6:6 58:15
**full-blown**
25:6
**full-time**
29:13
**fully**
30:6,7
**fund**
13:19
**funds**
35:5
**further**
100:9
**future**
10:18 59:2

G

**G**
5:1
**GAAP**
18:19 28:25 29:4
**general**
11:25 18:13 21:3 40:23 63:19
**generally**
59:22 60:1 64:2 70:3 80:18 88:6
**generates**
95:9
**geographies**
13:22,25
**getting**
43:11 44:5
**give**
8:5 9:8 14:21 21:1 22:1 25:9 29:22 69:14 77:6 84:2,6
**given**
7:11,15 100:7
**giving**
43:18
**go**
13:23,24 22:25 35:20 39:22 53:20 56:2 61:24 76:3 77:14 88:1 92:9 93:14 98:3
**goals**
22:3
**goes**
27:5 32:4,5 75:7
**going**
7:18,19 15:11 16:9,11 18:1 34:9 35:20 37:9 41:3,16 42:10 43:16 47:10,10 54:9 55:2 56:9 58:7 61:22 62:8 64:17 65:8 68:15 71:18 76:10,23 77:1 77:18 78:8,20 80:21 85:23 86:2 89:14 91:8 93:14
**Golden**
99:22
**good**
8:17 14:17 39:13 47:8 62:12,16 63:24 65:13,14 68:20 71:25 74:9 79:1 80:4
**Goosmann**
2:7 102:1
**governing**
102:10
**government**
12:16,19 15:14 15:15 42:13 54:10
**Great**
10:25
**greater**
44:3
**greatly**
42:14
**gross**
19:11 38:14 69:3,6,17,18 75:6,15,18,22 80:13 81:7,13 81:15,23 84:10 89:1 96:9
**group**
24:7 42:12
**grow**
18:24
**growing**
14:18
**growth**
15:21,23 16:4,5 18:24 19:4,5,7 19:8,10
**guess**
17:5 28:22 46:6 59:3 61:6,8 64:1 81:10
**guessing**
49:14 67:4
**guilty**
88:11
**guy**
13:24 23:8
**guys**
19:2

H

**hand**
34:10 37:9 47:10 62:8 65:8 68:15 71:18 76:10 78:20 91:8
**handed**
11:1 77:11
**handing**
35:23 47:13 82:19 85:3
**handy**
35:19
**happen**
28:17 61:15 70:4
**happened**
17:2 46:22 50:10 51:5
**happens**
70:18
**harassment**
88:20
**hard**
96:18
**Harvard**
11:18 12:3
**head**
8:4 14:2 16:18 17:2,4,10 82:16
**headhunter**
13:18
**heard**
43:7
**heavily**
54:19,19
**held**
21:18 98:2
**help**
17:25 18:12 34:16,20 56:20
**helped**
57:13
**helps**
8:8
**henhouse**
95:10
**hereunder**
88:9
**Hey**
17:23
**high**
5:11 13:1 18:20 95:14 99:20 101:19 102:23
**higher**
37:6
**Hills**
10:11
**hired**
13:16 17:1 24:17 27:11 29:8
**hiring**
15:9
**hit**
70:8
**holdings**
36:19
**honest**
49:23
**hope**
93:16
**hopefully**
95:16
**hopes**

85:2
**hours**
97:13,16
**Hudson**
2:12 5:10
**Huff**
3:11,18,20 4:2,4 4:7,9 37:12 48:2 51:12,16 63:5,6 65:15 68:22 74:12,24 78:2 79:12 80:17 83:12
**Huh-uh**
76:18
**hundred**
44:18
**hunt**
17:20
**Hurcomb**
3:23 72:2,5,10 72:18 73:4,12 73:15
**Hurcomb's**
72:17

**I**

**Illinois**
97:6
**immediate**
15:9,12 22:2
**impact**
88:14
**impacted**
17:7
**implemented**
28:10
**implied**
46:7
**important**
8:1 10:2 75:21 75:25 76:2
**impression**
18:25
**incentive**
38:17,20,24 43:17
**inception**
58:19
**include**
88:22
**included**
75:22
**including**
88:19,23
**inconsistent**
15:15,17
**incorporate**
18:16
**increase**
16:11 22:16 44:16
**increased**
20:5 38:13,13 42:10
**indicated**
99:3
**individual**
34:25 97:19
**individually**
30:25 57:14
**Industries**
1:12 5:7,18 34:12 101:6 102:4
**industry**
12:7 15:23 16:13
**influence**
70:22 96:10
**informal**
92:22
**information**
88:10
**initial**
20:22 22:25 23:3 39:24 51:21 52:12
**initially**
16:2 39:17
48:12,13
**initio**
58:10,16,17,18 64:21 67:22 71:3 82:5 87:4
**input**
26:15
**instance**
53:17
**institutional**
24:6
**insubordination**
88:9
**intense**
16:10
**intensity**
16:6
**interest**
17:5 31:19,20 31:22 32:4,11 32:12,15,17 33:2,3,4,9,16 53:15,24 55:21 63:17,19,22 73:16 95:7 100:9
**interested**
13:25 23:1
**interesting**
14:18
**interests**
95:12,13
**interim**
92:3,4,11,16
**internal**
27:24
**internally**
24:9,10 52:8
**International**
16:24
**invest**
13:21 14:1
**invested**
23:20
**investigation**
17:23
**investment**
14:4,20 15:4,7 15:24 19:7 20:15,18 21:6 21:7,7,10 24:2 31:6,7 54:14
**investor**
24:6
**investors**
15:22,25 19:1 19:14,16 23:22 23:24 24:1
**involved**
29:5 56:24 73:12
**Iowa**
2:8
**issue**
61:14
**issued**
6:13 31:15 32:24,25 56:13
**issues**
17:14,17 18:1

**J**

**J-O-N-A-T-H...**
6:8
**Jan**
79:6
**January**
3:16,18,21,23 4:2,5,7,10,14 4:17 21:6 23:4 29:11,13 31:6 31:6 36:1 48:3 48:16 50:5 51:1,5,19 62:25 63:2 65:18 68:22 72:4 74:18 79:9,13 80:23 83:25 84:4 85:15,24 94:5
94:6
**JF330**
79:6
**jfitzhugh@Co...**
48:4
**job**
13:7,15 15:11 18:8,12 43:19 43:19 88:23
**jobs**
12:19
**joined**
16:13
**joining**
21:14
**Jon**
3:11 79:5,8 94:7
**Jon's**
70:22
**Jonathan**
1:4,20 3:15,18 3:20,23 4:2,4,7 4:9,13,17 5:5 5:22 6:8 36:1 89:17,22 99:9 101:7 102:5
**judgment**
18:15
**Julia**
27:19 29:8
**June**
10:16 49:24

**K**

**K-O-F-F-O-R...**
25:3
**keep**
7:19 35:19
**kept**
28:4
**kind**
14:1 29:12 77:8
**knew**
19:22 92:22
**know**

12:21 14:3,8 17:19,20 21:23 27:3 29:8 32:17 33:4 39:17 40:11 43:22 44:1 46:21 47:1,15 49:20 51:10 58:16,18,21 59:22 62:10 65:10 67:3 68:9,17 71:22 74:6 76:13 77:22 78:24 82:23 85:6 86:8 89:25 93:19 94:20 96:18
**knowledge** 9:2,5 15:2 16:8 16:12 48:9 89:7
**knowledgeable** 96:14
**Kofford** 25:1

**L**

**labeled** 59:11
**Lally** 2:7 3:3 5:17,17 5:25 6:5,12,21 7:10,12,14 28:2 33:21,24 34:5,9 35:23 37:9 44:14,15 47:13 61:23 62:8 65:8 68:15 71:18 72:14,16 74:4 76:10,21,25 77:3,6,10,12 77:14,16,17,20 78:20 82:19 84:25 89:6,14 89:24,25 91:8 93:18 96:24 97:2,6,10,12 97:15,19,21 98:1,4 101:25 102:1,8
**LallyE@Goos...** 2:9
**language** 53:17 69:1 96:9
**large** 17:22 43:17,19 53:16
**Latin** 58:19
**law** 2:7 57:16 63:9 88:18 102:1
**laws** 88:20
**lawyer** 61:16 64:12,14
**laying** 10:2
**learn** 18:10
**leave-behind** 54:9
**left** 26:17 37:18 38:3,4 39:3 43:25 44:1 46:20 97:16
**let's** 16:25 29:24 36:13 43:25 58:15 60:2 61:23,24 66:24 67:18
**letter** 25:9 101:14
**level** 18:20 46:11
**liabilities** 41:17,18
**liability** 58:12 60:3 61:2 61:7 64:24 67:25 71:6 82:8 87:7
**limitations** 88:19
**limited** 16:8,12 53:18
**line** 8:10 18:24 19:7 19:8,10 20:3,9 75:17
**liquidation** 22:13
**litigation** 9:2 100:10
**little** 8:8 10:1 11:4 17:3,3 18:3 93:16 96:23
**lived** 10:15
**LOA** 60:10,11,16,19 60:24 92:1 93:2,5
**local** 6:3
**long** 10:15 43:23
**long-term** 22:3
**longer** 87:21 94:15,18 95:2
**look** 13:24 18:7 36:4 43:3 59:15 62:10 63:25 64:16,17 65:9 66:10,12,24 68:17 71:20,21 74:6,10 76:4 76:11,17 77:22 78:14,23 79:2 79:2,7 82:22 84:15 86:23 93:19
**looking** 9:15 13:14,21 15:3,4 18:16 19:1,13,16 46:1 50:1 54:13 63:15,18 63:21 78:5
**looks** 36:3,4 42:6 45:20 49:6 59:25 62:16 65:13,14 68:20 69:16 71:25 74:9,20 78:1 79:1 80:7 83:11 85:12 86:5 94:1
**loss** 94:17 95:9,23 96:2
**lot** 22:10 28:17,18 28:23
**lots** 43:16
**lower** 81:23

**M**

**M** 2:7 101:25 102:1
**maintain** 54:2,5
**major** 18:23 28:9
**making** 50:7 67:13
**management** 14:24
**Mandy** 27:5,5,6,7
**March** 1:4,23 5:3 13:10 21:6 22:23 23:6,13 92:18 92:19,20,22 93:10 98:8 101:1,8 102:6
**mark** 47:10 65:9
**marked** 3:5 4:1 6:11,20 9:10,12 34:8 34:10 35:22,24 37:8,10 47:12 47:14 50:12,13 58:4 62:7,9 65:7,11 68:14 68:16,18 71:17 71:19,23 74:3 74:5 76:9,12 77:19 78:19,21 82:13,18 84:23 85:3 91:7,9 93:17,20
**market** 14:19 16:3
**marriage** 30:23,24
**massive** 17:6,20 18:1
**master's** 11:14,17
**match** 66:20,21
**material** 75:12 88:4,14 88:15,16,17
**Mathematic** 11:11
**mathematics** 11:12
**matter** 5:6 34:11 49:7

**MBA**
11:19,23
**MBAs**
12:2
**MD**
37:19 38:4
**MDs**
38:5
**mean**
22:5 36:23,24 41:13 42:8 44:3 46:18 47:23 49:22 54:19 59:3 61:5 67:6 70:11 75:24 79:21 80:18,19 80:20 81:14,19 81:21 92:4 96:2,13
**Meaning**
95:11
**means**
58:16,18 92:6 95:5
**meant**
39:23 50:19,21 60:21
**Media**
89:16,22
**meet**
75:1,4,13 80:11
**meeting**
41:7 49:13,15 50:4 85:21,24 86:2
**members**
30:14,24 62:22 66:7 83:8,19
**mental**
49:18
**mentor**
26:22
**mergers**
96:14
**MERS**
17:16
**met**
14:11
**method**
28:19,21 29:1
**mid-March**
90:14,18
**middle**
21:24 33:1
**Midwest**
1:13 5:18 34:12
**Mike**
21:17
**Mile**
5:11 99:20 101:19 102:23
**million**
30:4,7,13 44:12
**mind**
55:8 72:22,25 87:18 95:12
**minimum**
31:24,25 32:1,8
**minor**
11:12
**minutes**
89:5 97:14,16
**misconduct**
88:7 96:9
**missed**
70:19
**mistake**
76:22
**misuse**
88:10
**modify**
27:24
**moment**
33:22
**money**
13:21 18:17 22:14 23:5,8 41:16,25
**month**
46:15 50:3
**months**
26:24
**Morgan**
13:15 16:15,19 18:10 36:25 37:4,18,18,24 42:21 43:13,19 43:21
**mortgage**
17:13
**mouth**
58:15
**move**
15:1 28:21
**moved**
22:18 38:6
**moving**
10:17 69:13
**multiple**
16:19 52:6 61:20
**Murphy**
30:20

**N**

**N**
3:1 5:1
**name**
6:6 26:11,24 27:2,19 30:19 30:25 40:20 54:8 57:15 79:4
**Nancy**
26:12,13,15,23
**napkin**
40:15 45:22 46:22,25 47:5 49:9,11,16,19
**napkins**
40:12,14
**nature**
16:11
**NDA**
60:25
**near**
10:18
**nearby**
40:18
**necessarily**
45:4
**necessitated**
41:11
**need**
8:5,9 15:7,12 17:23,25 97:8
**needed**
19:21,22
**needs**
15:9
**neg**
69:17
**negligence**
69:4,6,18 75:7 75:15,18,22 80:13 81:7,13 81:15,23 84:10 89:1
**negligent**
69:3
**negotiate**
52:18 61:16 69:15 93:5
**negotiated**
52:6,17,21 54:20 59:19
**negotiating**
39:18 55:6,8,9 55:16,22
**negotiation**
39:24 54:21 55:14,18 57:6 57:11 73:13,15 75:18 93:2
**negotiations**
56:25 92:5
**neighborhood**
33:6
**neither**
58:11 60:2 61:1 64:23 67:24 71:5 82:7 87:6
**net**
53:3
**never**
25:15,16 28:11 32:14 59:8 89:6
**new**
15:3 20:23 23:24 69:24 70:5 77:6 90:12 95:22
**nice**
28:16
**night**
40:1
**nodded**
75:20
**nods**
8:3
**nolo**
88:11
**nondisclosure**
60:20,21
**nonverbal**
8:4
**Nope**
49:24 82:14
**Notary**
1:24 99:15 100:5
**note**
31:14,15,17,19 31:22 32:6,11 32:15,23,24 33:2,10,12,15
**notebook**
49:16,22
**notes**
49:20
**notice**
1:19 78:16 102:19

**November**
21:8 24:4,5
**number**
5:8 11:1 35:24 36:16 46:10,12 47:11,14 49:1 49:4,13 50:12 50:13,25 62:9 64:19 65:9,17 65:18 66:13,16 66:19,20,21,21 66:22 67:18,20 68:16 71:1,1 71:10,11,19 73:22,23 74:4 74:22,22,23,24 75:9 76:3,6,6 76:11,12,23 77:1,20,21 78:1,16,17,21 79:3,3,5,7,19 79:20 82:3,13 82:15,20,20 84:15,18,19,22 85:4,18,18 86:23 87:1,1 87:12,12 89:17 91:9,11 93:18 93:20 95:13
**numerous**
78:8

**O**

**O**
5:1
**object**
28:1 97:20
**objection**
44:13 72:13 97:23
**objections**
94:12
**objectives**
94:13
**observe**
88:5
**obviously**
40:12 61:14 78:7 80:21
**occur**
58:14 60:6,7 61:4,7 64:25 68:2 71:8 82:10 87:9 88:24
**oddly**
14:13
**Odell**
3:15 4:14,17 62:20 64:12 66:1 83:6,16 83:25 84:8 85:13 91:4 94:2 96:8,11
**Odell's**
91:19
**offers**
46:20
**office**
7:9 102:19
**official**
22:23 25:10,18 90:13
**oh**
5:17 21:2 23:15 37:25 43:3,8 47:1 48:25 50:16 51:6,9 71:14 72:24 76:16,21 77:10 77:11 87:18
**okay**
6:17,21,24 7:8 7:10,12,12,17 7:23 8:12,17 8:23 9:1,4,18 9:18,20,22 10:1,4,20,25 11:6,10,13,16 11:21,23 12:1 12:4,7,21 13:2 13:7,13,20 14:5,8,12,16 14:25 15:2,5,8 15:19 16:3 18:21 19:7,9 19:13,16,20 20:14,21 21:9 21:13,18,20,25 22:7,16,18,24 23:6,12,18,18 23:21 24:4,17 25:4,7,20 26:3 26:7 27:7,13 27:18,21 28:2 29:3,8,15,21 29:25 30:5,7 31:11,17 32:17 32:22 33:2,9 33:12,21 34:9 34:16,24 35:4 35:13,19,21 36:5,9,12,14 36:23 37:2,7 37:15,17,21 38:3,6,10,14 38:17,20 39:1 39:5,9,15,20 39:22 40:11,21 41:2,5,13,23 42:3,5,7,18 43:8 44:11,14 44:18,23 45:1 45:10,13 46:4 46:5,10,17,22 47:3,8,13,17 48:1,6,9,14,18 48:25 49:3,7,9 49:12,17,20 50:3,11 51:3 51:10,17,21,24 52:4,11,17,21 53:9,22 54:2 54:24 55:5,15 55:21,25 56:10 56:15,24 57:5 57:13,20,25,25 58:3,20,24 59:5,13,17,19 59:22 60:2 61:1,13,19,22 62:8,18,23 63:7,12 64:5,9 64:12,14,16,18 65:6,13,14,19 65:23 66:1,7 66:10,11,16,19 66:24 67:6,11 67:13,19 68:9 68:13,21 69:22 70:23 71:13,15 72:7,10,14,21 73:3,6,8,12,15 73:19,25 74:2 74:10,10,17,20 74:23 75:17,21 76:3,10,24 77:2,14,20 78:1,1,12,14 78:20,20 79:2 79:10,16,18 80:7,10,16 81:3,19 82:1,3 82:17,19 83:4 83:11,15,18,23 84:7,13,15,21 85:1,12,20,23 86:1,4,8,12,23 87:20,23 88:1 88:2 89:9,13 90:3,5,10,15 90:23,24 91:2 91:6,8,15,18 91:25 92:11,15 92:24 93:2,5 93:12,13,16,22 93:23 94:1,18 94:25 95:4,17 95:20,24 96:8 96:11,17,20 97:1,10,15,18 97:21 98:1,1,5
**Okeydokey**
96:20
**onboard**
29:1
**onerous**
70:14
**open**
39:4 46:20
**operating**
69:12
**opportunities**
13:25 16:25 18:24
**opportunity**
14:1,18 16:4,5 18:7 22:5,7
**opposed**
69:19
**options**
29:19 30:6,10 30:11,12 42:6 45:18,19,21 46:1,1,5
**order**
41:24 81:12 93:16 96:23
**organizations**
17:14
**original**
74:11 101:11,24 102:9,24
**outside**
23:22 70:18
**outstanding**
30:2
**overly**
54:15
**oversee**
15:7
**overseeing**
70:16 95:8
**owned**
17:22

**ownership** 14:22 31:4,9

**P**

**P** 5:1
**P&L** 94:15,16,19 95:2
**P.C** 1:22 2:2 101:4
**p.m** 68:23 72:4 74:18 89:18,19 89:20,23 98:6 98:7
**page** 3:2 36:16 64:16 66:10,13 70:23 78:9,14 79:16 79:24 101:11 101:13
**paid** 32:14 33:9
**painful** 8:13
**paper** 40:12,14
**para** 82:13
**paragraph** 58:3,4,8 64:17 65:3 66:24,25 67:18 71:1 73:19,21 74:24 74:25 76:6 78:15 79:17,19 79:20,21,24 81:1 82:1 84:8 84:15,19 86:23 87:1,12,12 88:1 89:9
**Paragraphs** 74:22
**paralegal** 76:22
**parallel** 43:18
**Parkway** 99:21
**part** 7:1 9:2 14:6 15:16,21 22:19 34:24 36:6 37:25 39:5 43:15,15,20 49:5 58:9 64:7 64:10,20 67:21 71:3 82:4 87:4 90:1
**part-time** 29:12
**particular** 11:23 95:1
**parties** 52:6 75:19
**partner** 22:15
**partners** 19:19
**parts** 69:14
**party** 100:9
**Paul** 3:23 72:2
**pay** 25:6 32:11,12 33:6 41:16,21
**paying** 90:17
**pegged** 32:9
**people** 16:9 17:20,21 23:1,7 24:18 24:21
**percent** 31:23 32:7 45:2 45:7 51:14
**percentage** 95:6 96:7
**performance** 44:23 45:1 69:1 69:10,18,19,24 70:5,6,7,21 75:5,13 80:11 88:8
**performance-...** 45:9
**period** 85:17 92:3,7
**permanence** 95:16
**person** 27:18 58:9,12 60:3 61:1 63:9 64:21,23 67:22 67:24 71:3,5 82:5,7 87:4,6
**personal** 10:2 56:22,24 57:3 63:19
**personally** 15:15 52:9,20 56:21 72:19 75:24,25
**perspective** 17:18
**Pete** 40:1,4,7,15,21 41:10 45:5,21 47:2 48:18,22 48:24 49:4,15 49:15 50:4,9 50:10 51:18
**Phones** 16:6,7,10,11
**picked** 17:7
**pitch** 15:21
**placing** 97:22
**plaintiff** 1:8 2:5 5:16
**plaintiff's** 5:14
**plans** 10:17
**plays** 96:13
**plea** 88:11
**please** 5:13,20 6:6 8:9 36:2 37:10 47:14 62:9 65:9 68:16,24 71:19,21 74:6 76:11 77:22 78:14,23 82:22 85:6 86:24 91:10,12 93:19 98:4 101:12
**plus** 15:1 30:6
**point** 35:17,20 42:22 44:15 51:19 52:12 67:15,16 74:21
**policies** 81:9 88:5,6
**policy** 90:1
**poor** 69:17
**portion** 7:20 41:20 74:11 80:25 96:25
**possible** 49:22 95:14
**possibly** 50:3
**post** 50:10 59:4
**potential** 45:8
**Potentially** 38:19
**power** 43:17 69:14
**precipitously** 17:5
**preferred** 42:25 43:2
**preparation** 8:14,18,24 9:18 9:22 34:16,20
**prepare** 24:14
**prepared** 7:17 24:19
**Present** 2:12
**primarily** 74:20
**primary** 10:13
**prior** 13:15 16:15 21:13 26:23 29:1 40:1
**private** 17:4,7,8,9,24 19:17,18 20:18 22:14
**probably** 20:2 35:19 49:14,16 60:22 63:11,14 78:7 92:4,4
**problem** 17:25 28:11 69:22
**problems** 70:3
**procedure** 6:2,3 102:10
**procedures** 18:18
**proceedings** 100:7

**process** 8:13
**produced** 9:2,5,6,10,12,24 47:22 77:24 78:25 82:24 83:2 85:8 93:24
**producing** 36:5
**product** 14:19 28:13
**production** 9:8
**professional** 1:24 59:20 100:5
**profit** 19:10 20:12 94:17 95:6,8 95:23 96:2
**profitability** 38:25 39:1
**profits** 38:15
**program** 11:24
**prohibited** 88:21
**promised** 37:17
**promoted** 38:4
**proper** 54:14
**proposal** 70:3
**proposed** 52:5
**protect** 53:24
**protection** 53:10
**protections** 54:17
**protects** 53:15
**provide** 51:24
**provided** 7:4,6
**Public** 1:25 99:15 100:5
**Puget** 11:8,9
**pull** 17:23
**purchase** 58:10,13,21,25 59:1,8,11,13 59:20,23 60:6 60:8,12,13,15 61:3 64:21,25 67:22 68:1,4 68:10 71:4,7 82:5,9 87:5,8
**purchasing** 23:2 60:22
**pure** 29:25 30:3
**purports** 48:1 62:18
**purposes** 75:1,3,11 88:3
**pursuant** 1:19 6:1,12,17 102:10,17
**pursued** 11:13
**pushed** 69:15
**put** 17:24 23:8,24 33:5,14 46:10 68:25
**puts** 94:14
**putting** 97:23

**Q**

**qualifier** 69:2
**question** 7:25 8:2 20:1 23:6 26:9 34:19 43:10 45:24 69:7 76:4 77:1 84:13 86:18
**questioning** 8:10
**questions** 7:19,20,21,22 10:1 73:25 100:7
**quite** 46:4
**quotes** 41:14

**R**

**R** 5:1
**raise** 23:13,21 24:4
**raised** 20:14,15
**rate** 31:22 32:2,4,4,8 32:8,10
**rated** 12:10,24 13:1
**rates** 17:5,19
**read** 7:25 47:19 58:7 67:18 75:1 81:11 91:10 99:2 101:13
**reading** 45:22 81:8 94:9
**really** 16:5 28:11 40:18 77:17
**reason** 39:13 80:4
**reasonable** 16:9 78:13 79:15
**reasons** 53:20
**recall** 9:15,23 36:5,7 37:15 38:21,23 39:2 40:17 41:15 51:17 67:13 79:11,14 80:16,20,25 83:24 84:3,7 90:5 91:4,5 96:9
**receive** 11:21 96:7
**received** 35:5 48:15 53:11 102:19
**recen** 16:19
**recess** 34:3 62:3 89:19
**recognize** 91:22
**recognized** 28:7
**recollection** 49:12 81:17
**record** 5:2 6:7 33:25 34:1,5,6,14 36:2 50:20 61:24 62:1,5 74:7 89:18,23 91:13 97:22,24 97:25 98:2,3,4 98:5
**recording** 89:5
**records** 9:15 25:16 28:4 74:7
**recoup** 42:1
**redefine** 81:13
**redline** 64:3
**redlined** 87:19,22
**redlines** 86:12
**redlining** 56:25
**reduction** 88:23
**refer** 42:21 64:2
**reference** 89:1
**referring** 35:16 48:25 58:22 59:3 69:7,21
**refinancing** 17:6
**reflects** 63:3
**regard** 57:6,10 60:7 84:19
**regarding** 51:7,19,20 52:18 79:12 83:25 84:4,9 91:2
**Registered** 1:24 100:5
**relate** 55:16
**related** 36:6 100:9
**relates** 55:17
**relating** 88:18,20

**relative**
67:15
**relevant**
9:17
**remaining**
89:5
**remember**
27:2 81:4 84:11 84:14 86:16
**removal**
84:9
**reorganization**
88:24,25
**repeat**
7:24 38:22
**rephrase**
43:10
**reporter**
1:24 5:11,20,23 7:25 8:3 77:8 98:3 100:5
**Reporting**
5:11 99:20 101:19 102:23
**represent**
56:3
**representative**
70:15
**represented**
55:11 56:7 57:5 57:9,14,20 73:16
**representing**
67:9 72:19
**requested**
32:12
**required**
81:12 92:8 102:21
**reserve**
97:15
**resign**
90:24 91:3 92:24
**resigning**
92:6
**resources**
13:22
**respect**
88:13
**response**
8:5
**responsibilities**
22:3,4 24:22 26:20 42:11,15
**responsible**
92:5 94:15,19 95:2
**restaurant**
40:11,18
**restructuring**
88:25
**result**
18:1 39:25 43:1 45:5 54:8 70:4 88:22 100:10
**results**
49:15
**resume**
3:8 6:18,22 11:2 20:5 96:16
**resuscitate**
97:3,5,8
**return**
15:24 99:20 101:13
**revenue**
14:20 19:8,9,11 20:5,11 28:11 38:14 43:22 44:1
**revenues**
38:13
**reverse**
28:14
**review**
8:23 9:4 24:15 24:16,22 25:8 25:9,23 26:1 32:6 34:17,22 36:2 37:10 39:14 47:14 56:22 57:4 59:6 85:6 91:12
**reviewed**
25:5,19,20,25 26:8 47:18 52:8 56:17 102:17
**reviewing**
9:23 24:15
**Revised**
63:1 65:23
**Rick**
14:11
**right**
14:1 15:10 19:23,25 25:10 31:14 35:9 36:24 38:4,18 41:13 42:20 43:9,9,9 44:4 44:12,14 50:21 52:13 54:6 60:12 61:20 62:15 66:12 69:5 70:12 77:6,15,17 80:21 86:19 87:1 89:14,15 90:18 91:21 93:12 96:3
**rights**
35:4,8
**risk**
36:24 94:15,19 95:1
**Rodney**
2:12 5:10
**role**
17:1 54:16,17 54:18
**rolling**
32:13
**roughly**
81:2,3
**round**
20:22,23 21:3,4 23:25
**rounds**
20:15 21:5
**route**
92:8,9
**RPR**
100:13
**Rule**
7:21 101:12
**rules**
6:2,3 102:10

**S**

**S**
5:1
**Sabre**
1:12 5:7,18 9:10 26:18 34:12 35:11,12 36:5 36:6 39:24 41:16,19 42:11 43:17 44:3,11 45:6,21 46:2,5 46:6,20 48:10 51:7,15,22 53:20,23 54:4 54:6,11,12,13 54:17 55:3,11 55:17 57:3,25 58:11,24 59:1 59:9 60:2,8 61:1,9,10 63:4 64:23 67:24 68:10 69:13 70:14 71:5 82:7 87:6 88:7 88:13,15,17 89:7,25 90:3 90:10,25 92:3 92:5 93:8 94:8 95:23 96:4,5 101:6 102:4
**Sabre's**
88:5
**safety**
53:3
**salary**
36:16,17 37:1,2 37:18,24,25 38:2,3,7,11 42:3,6,21 43:13 44:16 45:8
**sale**
20:20 22:9,12 22:25
**sales**
19:12 20:10,12 20:16 21:11
**sample**
51:24
**Sandore**
40:1,4
**Saturday**
40:6
**saying**
23:17 53:10 54:11,13 60:23 69:25
**says**
20:5,14 25:10 36:23 37:17 46:11 61:6 63:3 65:1,20 75:11 79:8 83:23 85:20 94:4,7
**search**
13:19,23 14:7
**seasoned**
27:14
**seat**
39:6 54:2,5
**second**
21:4 58:7 97:13
**secret**

12:9,10,11,11 12:13,22,23,24 12:25,25 13:1
**section** 84:8
**see** 16:25 22:3 36:10 43:2 47:21 55:21 60:2 64:1 66:15,17,25 68:24 74:11 76:5 79:3 80:5 81:7 91:12 96:15
**seen** 6:15 34:14
**segment** 75:6,14 80:12 96:3,4
**sell** 23:13
**semicolon** 75:7
**sending** 37:15 41:12 72:25 73:3,10
**sense** 19:21
**sent** 41:9 52:7 56:5 62:25 65:20 72:21 73:22,23 83:12
**sentence** 58:7 64:19 67:20 71:1,9 80:10 82:3,12 87:1 94:25
**sequential** 47:23
**series** 7:19
**service** 17:14
**servicing** 17:13,14,18,22 18:2
**set** 18:8 39:23 94:13
**settled** 102:19
**seven** 97:14
**severance** 35:9 39:9 53:16 69:23 70:1,11 70:14 94:11
**sex** 88:20
**sexual** 88:20
**share** 22:16 42:25
**shareholder** 29:15
**shareholders** 22:6,13 30:14 53:11 54:13 56:3,5,6,13 94:14 95:1 96:6
**shares** 29:17 30:1,2 43:2
**Shauna** 1:23 5:11 100:5 100:13
**sheet** 41:15,22 42:17 53:2,2,7,7 54:20 55:7,10 59:4,6,16 60:18,23 65:24 86:6 99:4,6
**sheets** 101:13
**shook** 82:16
**short** 84:21
**short-term** 32:23
**shortly** 83:23
**Shucks** 84:24
**side** 67:4,6
**sign** 53:1 54:20,22 54:24 57:25 60:11,13 101:13
**sign-on** 42:6 45:13
**signature** 101:11,13 102:20,21
**signed** 54:3,25,25 55:6 55:10,20 59:9 60:10,11,14,16 65:25 89:7 102:12,13,17
**signing** 35:16 90:13
**Silver** 1:21 2:2 101:4
**similarly-situa...** 81:9 88:7
**simple** 28:16
**Sincerely** 101:16
**Sioux** 2:8
**sister** 30:18 31:8 33:19
**sister's** 30:19
**sister-in-law** 31:1
**six** 20:6 26:23
**size** 14:21 18:25
**skill** 18:8
**skills** 18:9
**slash** 79:9 85:21
**Slattery** 21:17 26:13,15 39:20
**small** 42:12 43:16 69:12
**Smart** 16:6,7,10,11
**snapshot** 49:18
**softer** 81:16,19
**Solely** 51:13
**somebody** 48:10 51:7 67:6 67:9 68:3 87:16
**sophisticated** 28:18
**sorry** 8:17 9:6,21 11:11 23:15 25:5 26:10,24 33:12 34:19 35:14 37:3 38:22 43:5,7 45:23 47:4 48:25 49:24 50:16,19,21 60:18,18,21 62:1 69:5 71:14 72:24 76:4,21 77:3 80:1 93:15 96:21
**sort** 8:4 12:4 16:25 17:2,17 18:8 19:16 24:2 53:20 81:12
**sound** 11:8,9 18:15 44:12
**Sounds** 78:13
**Sparks** 57:22,23,23 63:9,12,21 64:10 72:6 73:6
**speak** 8:14,18 96:15
**specific** 41:9 46:12 69:20 79:14 80:18 81:10
**specifically** 36:7 63:20 84:11,14
**speculating** 67:12
**spell** 6:6 25:2
**spelled** 41:21
**spells** 25:13
**spent** 17:9 18:4
**spite** 40:15
**spoke** 8:22
**Springs** 24:7
**ss** 100:3
**stabilized** 17:13

**staff**
88:23
**stamp**
9:16 76:16
**stamped**
3:13,16,19,21 3:24 4:3,5,8,10 4:12,14,16,18 36:10 62:14
**stamps**
47:21
**standard**
18:18 46:11,17 46:19 81:23
**Standry**
37:18
**Stanley**
13:16 16:16,19 18:11 36:25 37:4,19,24 42:21 43:14,20
**Stanley's**
43:21
**start**
11:4 15:11 19:3 19:6 52:12 75:2 90:10 92:15
**started**
16:21 17:15 22:24 24:8,14 24:16 27:25 28:2,9,23 29:4 29:5,11 36:15 38:12 90:16,17 90:25
**starting**
24:23,24 39:24
**state**
5:13 6:6 88:18 99:18 100:2,5
**statement**
20:8 81:21
**States**
1:1 5:7
**step**
14:3,23
**Steward**
84:4 92:14
**Stewart**
3:15 4:14 62:20 64:14 66:2 83:6,16 84:13 85:13 92:15 94:4 95:17
**stick**
41:3
**stock**
20:16,20 21:11 22:25 23:2 29:19,20,25 30:3,6,10 31:2 31:5,9 45:18 45:19 46:1 58:10,13,21,25 59:1,8,11 60:6 60:7,11,13 61:3 64:21,25 68:1 71:7 82:9 87:8,16,21 89:10
**stockholders**
30:24
**stop**
26:15
**stopped**
28:10
**story**
15:21,23 19:4,5
**straight-forwa...**
28:6
**strategic**
19:18 22:15
**strategies**
17:2
**strategizing**
16:23,24
**strategy**
16:19,21 17:3 17:11,24 18:13
**Street**
1:22 2:3,8 5:3 99:17 101:4 102:2
**strike**
76:23 80:16,18
**striking**
84:8
**strong**
15:14
**struck**
74:25 75:15 80:13
**structured**
31:13 32:22,23
**subject**
37:12 48:6 63:1 65:23 75:18 81:12 94:11
**submit**
70:8,17
**subpoena**
3:6 6:13,14,17
**Subscribed**
99:11
**subsequent**
20:23
**substantially**
94:14
**suggest**
96:8
**suggested**
95:25
**Suite**
99:21
**Sunday**
3:12
**supplying**
67:5
**supposed**
8:13
**sure**
6:8 7:17 8:1 17:25 20:4 21:2 22:11 33:23 44:7 47:25 50:4 53:11 54:14 60:14 77:16 78:9
**surprise**
36:8
**surrounding**
53:4
**swear**
5:21
**sworn**
5:23 99:11 100:6
**Systems**
13:5 54:9

**T**

**T**
1:24 88:4 100:5 100:13
**T-O-D-D**
6:9
**take**
8:3,9 14:20 22:1 33:21 41:19 42:10 46:25 49:9,11 61:23 62:10,13 65:9 68:16 71:19,21 76:11 84:2,6 89:14 90:3 91:10
**taken**
1:21 6:1 34:3 62:3 89:19 101:8 102:6
**talk**
29:24 36:13 43:11
**talked**
22:2
**talking**
11:4 19:23 43:3 50:16 68:24 95:21,22
**tanked**
69:19
**tape**
89:15
**tapis**
40:18
**target**
45:10
**targeting**
14:22
**targets**
39:1
**taxes**
24:14,19,21 95:7
**Technology**
1:13 5:19 34:13
**telecom**
16:8,13
**telephone**
78:9 79:11 83:24 84:3
**tell**
33:12 36:2 78:15 81:3 89:11
**ten**
26:23 44:7,9
**term**
41:15,22 42:17 53:1,2,7,7 54:20 55:7,10 59:4,6,16 60:18,18,23 65:24 80:20 86:6
**terminate**
58:8 64:20 67:21 71:2 81:20 82:4 87:3 94:8
**terminated**
58:10 64:22 67:23 71:4

82:6 87:5
**termination**
39:12 70:4 88:22
**terms**
15:9 28:6 37:12 39:24 40:23 41:10 45:19 52:22 56:8 58:11 59:15 60:22 64:22 67:23 71:5 82:6 87:6 89:10
**test**
90:3,20
**testified**
5:23
**testify**
3:6 100:6
**testimony**
99:7 100:7 101:13
**testing**
90:1
**Thank**
5:25 6:10,24 27:1,20 33:24 47:8 50:1 77:15 89:24
**theft**
88:12
**They'd**
70:13
**thing**
47:19 53:19 60:16 78:5
**things**
22:10 42:4 53:19 86:1
**think**
14:16 15:11 16:4 22:23 27:4 29:3,11 32:7,8,9 43:23 60:9 64:9 69:20 72:10,12 76:17 77:4 87:15 92:8
**thinking**
94:20
**third-party**
24:13 26:1
**thirty-eight**
33:7,17
**thought**
18:9,11 50:19 50:21 56:7 86:15
**three**
66:7 76:20
**Thursday**
3:16,18,21,23 4:2,5,7,14
**tie**
70:22
**tied**
16:6 32:2 38:14 69:23
**time**
8:21 10:17 13:22 14:22 15:3 16:13 17:12 21:3 26:18,21 28:6 28:7,8,15 32:10 35:10 39:3 43:23 44:12 49:3 62:13 66:5,8 67:15,16 73:22 73:22 85:17 89:5 91:10 93:8,14 97:10 97:11 102:18 102:20
**times**
20:6
**timestamp**
76:16
**title**
13:7 21:18 96:1
**titled**
37:12 52:13
**titles**
16:20
**today**
6:12 7:1,5,18,21 8:7,14,16,24
**today's**
8:19 9:22
**Todd**
1:4,20 5:22 6:8 99:9 101:7 102:5
**told**
7:6 33:6 46:15
**top**
12:9,11,11,13 12:22,24,25 13:1 18:24 19:7,8 20:3,9
**top-line**
19:4
**topic**
41:3
**topics**
40:25
**total**
20:11 30:2 97:11
**totally**
49:18
**tracked**
64:6
**trade**
18:22,23
**trained**
96:11
**transcript**
76:5 100:7 101:11,24 102:24
**transferable**
18:9
**transferrable**
18:11
**transformed**
46:23 47:4
**transition**
18:6
**translate**
19:5
**translated**
47:5
**trial**
102:18
**trigger**
69:9
**triggered**
69:23
**true**
47:15 62:11,17 65:10 68:17 71:22 74:6 76:14 77:23 78:24 82:23 83:1 85:7,10 85:11 91:12,15 93:19,23 99:2 100:7
**truth**
100:6
**try**
8:10
**trying**
41:8 42:9,22 69:15 70:2 81:5,6,10,15
**turn**
58:3 70:23 79:16 82:1
**Turning**
73:19
**TV**
96:13
**twenty**
76:20
**twice**
43:8
**two**
21:5 23:7 29:19 30:13 74:7 83:8 86:5 97:13
**types**
29:19
**typically**
28:12 37:22 46:20
**typo**
88:4

**U**

**Uh-huh**
16:17 18:14 20:7 25:12 26:14 29:7 37:14 47:9 49:2 52:24 57:19 58:6 70:25 72:3 73:20 74:19 75:8,10 80:15 82:11 83:5,22 85:5,14,16 86:10,25 87:10 91:14 92:2 94:3 96:16 97:12
**ultimately**
54:24 95:9
**unauthorized**
88:9
**undergraduate**
11:7 23:9
**Underground**
1:13 5:18 34:13
**understand**
6:25 8:1 15:8 42:9 59:18 67:17 70:2
**understanding**
81:24 95:4
**Understood**

8:6
**Unit**
89:17,22
**United**
1:1 5:7
**University**
11:8
**unjustly**
56:2
**unsigned**
102:14,15,17,19
**updated**
6:18
**upgraded**
12:11
**upped**
24:2
**US1:8568936V2**
66:20
**use**
16:6,9 97:10
**uses**
91:23

**V**

**value**
22:16 33:13,17 45:6
**variance**
70:9
**variety**
42:4
**venture**
14:10 19:18 24:7
**verbal**
8:5
**versus**
5:6 34:12 92:1
**video**
5:5,12 99:20 101:19 102:23
**videographer**
2:12 5:2,10,20 34:1,6 62:1,5 89:4,16,21 97:11,13 98:5
**videotaped**
1:4,19 8:7
**violation**
88:17
**void**
58:9,16,18 64:21 67:22 71:3 82:5 87:4
**Volcker**
18:4
**volunteering**
96:19
**vs**
1:10 101:6 102:4

**W**

**W**
3:23 72:2
**waived**
102:20
**walk**
61:22
**want**
7:12 26:18 29:10,22,25 35:19 41:20 47:19 48:24 59:15 61:25 81:15 90:7 91:9 98:3
**wanted**
15:1 19:3 42:11 42:12 44:16,23 45:1,13 69:16 74:21 78:8 81:16
**warrants**
30:12
**wasn't**
23:13 49:18 50:11 55:2 95:8,11
**watching**
63:17 95:10
**way**
27:25 42:20 43:12 53:15 69:23 81:6 96:12 97:4
**we'll**
8:10 64:1
**we're**
5:5 17:25 34:1,6 35:20 41:3 50:4 61:22 62:1,5 64:16 77:1 89:14,18 89:23 98:5
**Wednesday**
4:17
**week**
40:5 48:19
**weeks**
49:7
**weird**
17:1
**welcome**
50:2
**went**
40:11 43:13,14 52:9,12 54:4,7 61:19 69:20 81:7 92:7
**weren't**
50:8
**West**
99:21
**wife**
24:10 26:11
**willful**
88:7,9,17
**William**
30:21
**willing**
14:2,20,21,23 53:1
**Wilson**
57:22 72:6 73:6
**withhold**
7:13
**withholdings**
36:21
**witness**
5:21 7:2,4,20 10:3 75:20 76:24 77:2,11 77:13,15 82:16 96:25 97:3,9 97:17 100:6 101:12
**witness's**
77:5
**word**
87:21 89:10
**work**
13:9 27:15 48:3 54:4
**worked**
27:22
**working**
26:23 54:7 90:10,25
**workplace**
88:19
**wouldn't**
36:7 54:20,22
**wrap**
8:10
**write**
69:25
**writing**
51:2
**written**
45:21 49:20 50:20 51:17 56:10 81:8,11 88:5,5
**wrote**
40:15 41:6 49:14,15,16

**X**

**X**
3:1 41:21

**Y**

**yeah**
23:5 37:5 63:18 69:8 77:12 97:25
**year**
17:9 20:25 24:13 28:12,13 38:12 43:22 44:2
**years**
19:3
**Yep**
48:8 65:16 66:14 77:25 78:3 79:1 82:2 84:16 85:22 86:7 94:10
**York**
1:22 2:3 5:3 20:23 23:24 101:4 102:2

**Z**

**zero**
55:13
**ZIP**
99:18

**0**

**0.7**
31:23
**000045**
3:13
**000054**
3:14
**000055**
4:3
**000064**
4:3
**001041**
4:18
**001043**

3:24
**001052**
3:24
**001053**
3:21
**001062**
3:22
**001063**
4:5
**001072**
4:6
**001073**
4:8
**001082**
4:8
**001084**
3:19
**001093**
3:19
**001112**
3:16
**001121**
3:17
**001122**
4:12
**001124**
4:15
**001131**
4:12
**001132**
4:10 78:22
**001141**
4:11 78:22
**001151**
4:15
**001640**
4:16
**07**
21:24
**08**
21:23

**1**

**1**
3:6 6:11 22:23
58:4 64:17 65:3 66:13,24 66:25 67:18 71:1 73:19,21 76:6 78:14,15 82:1 84:15 86:23 87:1,12 87:13 89:9,17
**10**
3:23 71:17,19 73:23 74:24 76:6
**10/6/2017**
100:14
**10:02**
1:23 5:3
**10:36**
34:2,3
**10:41**
34:4,7
**100**
99:21
**1041**
93:21
**1043**
71:23
**1052**
71:24
**1053**
68:18
**1062**
68:19
**1063**
76:12
**1072**
76:13
**1073**
77:21
**1082**
77:21
**1084**
65:12
**1085**
66:10
**1093**
65:12
**11**
4:2 74:3,4 75:9 76:4,7 78:16
**11:19**
62:2,3
**11:23**
65:20
**11:27**
62:4,6
**11113**
64:16
**1112**
62:14
**1121**
62:14
**1122**
82:20
**1130**
82:21
**1142**
85:4
**1151**
85:4
**12**
4:4 76:9,11,12 76:23 77:1
**12:08**
89:18,19
**12:17**
89:20,23
**12:31**
98:6,7
**125,000**
45:16
**13**
1:4,23 4:7 77:19 77:20,21 78:1 78:17 79:3,5 79:20 82:15 101:8 102:6
**13th**
5:3 98:8
**14**
4:9 30:4,7 78:19 78:21 79:3,20 82:13 84:19
**14143**
99:21
**15**
4:12,14 79:7 82:18,20,20 84:19 85:18 87:12
**15-cv-01793-...**
1:2 101:7 102:5
**150,000**
38:12 44:21
**15CV01793-C...**
5:9
**15th**
36:1 85:15,24
**16**
4:13 84:22,23 85:4,18 87:12
**1640**
91:11
**17**
4:16 91:7,9,11
**18**
4:17 93:17,18 93:21
**1801**
1:22 2:3 5:3 101:4 102:2
**1st**
48:24

**2**

**2**
3:8 6:20 11:1 36:16 64:19 67:20 71:1 82:3 87:2 89:22
**2:04**
68:23
**2:09**
72:4
**2005**
11:22
**2009**
17:6
**2012**
18:5 24:16,23 24:24 25:4,5
**2013**
13:10 20:6 21:5 21:6,6,7 23:4,6 23:13,21,25 25:14,20 31:6 36:1,16,17 38:7
**2014**
3:12 10:16 21:8 24:4,5 25:23 25:25 26:2 38:10 40:3
**2015**
3:16,18,21,23 4:2,5,7,10,14 4:17 20:6 26:3 26:19 27:11,21 29:6,12 48:3 48:16 49:24 50:5 62:25 63:3 65:18 68:22 72:4 74:18 79:6,9 79:13 84:1,4 85:15,24 90:8 90:18,23 92:19 92:20 93:10 94:6
**2016**
26:5 27:12 29:6 29:13 31:16 33:1
**2017**
1:4,23 5:3 98:8 99:12 101:1,8 102:6
**20th**
40:3,5 48:19
**21**

3:12
**21st**
50:25 51:5
**25**
74:22,24,25 79:17,19,20,22 79:23,24 84:8
**25-A**
74:25 81:1 88:1
**250,000**
45:20
**250k**
46:1,5
**26**
74:22

**3**

**3**
3:9 34:8,10
**3:24**
74:18
**30**
101:1
**30(b)(6)**
7:21
**303-399-3000**
2:4
**31**
10:11
**324**
76:19,20
**325**
38:3
**325,000**
44:21
**34**
3:9
**35**
3:10 101:14
**35,000**
33:6,13
**37**
3:11

**4**

**4**
3:10 35:22,24
**40,000**
33:7
**400,000**
36:25 37:19 38:5
**406**
43:2,7
**406,000**
42:23,24
**410**
2:8
**45**
47:23
**47**
3:13

**5**

**5**
3:11 37:8,10 39:22 49:1,4 49:13 50:12,16 50:18,25 79:16 79:21,24
**50**
45:2,7
**500**
44:12
**500,000**
31:18
**51101**
2:8
**53**
97:16
**54**
47:24
**55**
74:5
**5th**
2:8

**6**

**6**
3:3,6,8,13 47:11 47:12,14 50:13 50:17,18 63:16 65:4
**62**
3:15
**64**
74:5
**65**
3:18
**68**
3:20

**7**

**7**
3:15 4:17 62:7,9 65:4,17 66:22
**700**
46:15
**71**
3:23
**712-226-4000**
2:9
**74**
4:2
**74.11**
7:13
**76**
4:4
**77**
4:7
**78**
4:9
**7th**
48:3,16 50:5 51:1,5,19 94:6

**8**

**8**
3:16,18,18,21 3:23 4:2,5,7 65:7,9,18 66:21 71:10 79:6
**800,000**
30:1
**80113**
10:12
**80206**
1:22 2:3 101:5 102:2
**80401**
99:22
**82**
4:12
**84**
4:13
**8th**
62:25 63:2 65:18 68:22 72:4 74:18 79:9

**9**

**9**
3:20 4:10 68:14 68:16 71:11 73:22
**9:49**
63:1
**90**
15:12
**91**
4:16
**93**
4:17
**99**
51:14
**9th**
79:13 80:24,25 84:1,4

# Mr. Fitzhugh’s Rule 30(b)(6) Examination

# Movant’s Appx., pp. 162-203

## FILED UNDER RESTRICTION

IN THE UNITED STATES DISTRICT COURT.
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-01793-CMA-KLM

---

30(b)(6) DEPOSITION OF CONCEALFAB CORPORATION
CHRIS L. ODELL
March 16, 2017

---

CONCEALFAB CORPORATION,

Plaintiff,

vs.

SABRE INDUSTRIES, INC., and

MIDWEST UNDERGROUND TECHNOLOGY, INC.,

Defendants.

---

PURSUANT TO NOTICE, the 30(b)(6) deposition of CONCEALFAB CORPORATION - CHRIS ODELL, called for an examination by the Defendants herein, was taken at Silver & DeBoskey, P.C., 1801 York Street, Denver, Colorado 80206, commencing at 9:56 a.m. on March 16, 2017, before Shauna T. Dietel, a Registered Professional Reporter and Notary Public within Colorado.

APPEARANCES:

ANGELA D. DEVINE, ESQ.
Silver & DeBoskey, P.C.
1801 York Street
Denver, Colorado 80206
303-399-3000
devinea@s-d.com

For the Plaintiff

ELIZABETH M. LALLY, ESQ.
Goosmann Law Firm
410 5th Street
Sioux City, Iowa 51101
712-226-4000
LallyE@GoosmannLaw.com

For the Defendants

Also Present: None

I N D E X


| EXAMINATION: | | PAGE |
|---|---|---|
| By Ms. Lally | | 5 |

| EXHIBITS: | | MARKED |
|---|---|---|
| 68 | Subpoena to Testify at a Deposition in a Civil Action | 5 |
| 69 | Minutes of the Board of Directors Meeting ConcealFab Corporation, January 15, 2015 | 26 |

| EXHIBITS PREVIOUSLY MARKED: | | MARKED |
|---|---|---|
| 6 | E-mail chain with attachment, Bates stamped CONCEALFAB 000045 to CONCEALFAB 000054 | 16 |
| 7 | E-mail from Jonathan Fitzhugh to Chris Odell and Duncan Stewart dated Thursday, January 8, 2015, with attachment, Bates stamped CONCEALFAB 001112 to CONCEALFAB 001121 | 16 |
| 8 | E-mail from Jonathan Fitzhugh to Doug Huff dated Thursday, January 8, 2015, with attachment, Bates stamped CONCEALFAB 001084 to CONCEALFAB 001093 | 24 |
| 9 | E-mail from Jonathan Fitzhugh to Doug Huff dated Thursday, January 8, 2015, with attachment, Bates stamped CONCEALFAB 001053 CONCEALFAB 001062 | 25 |
| 16 | E-mail from Jonathan Fitzhugh to Duncan Stewart and Chris Odell, dated Thursday, January 15, 2015, Bates stamped CONCEALFAB 001124 to 001151 | 26 |

| EXHIBITS PREVIOUSLY MARKED: | | MARKED |
|---|---|---|
| 17 | E-mail chain, Bates stamped CONCEALFAB 001640 | 31 |
| 18 | E-mail from Chris Odell to Jonathan Fitzhugh, dated Wednesday, January 7, 2015, Bates stamped CONCEALFAB 001041 | 15 |
| 25 | E-mail chain with Term Sheet attached Bates stamped CONCEALFAB000035 to CONCEALFAB000042 | 37 |
| 26 | Term Sheet, Bates stamped CONCEALFAB000178 to CONCEALFAB000184 | 48 |
| 29 | E-mail from Jon Fitzhugh to Doug Huff dated Monday, February 23, 2015 Bates Stamped CONCEALFAB000114 | 52 |
| 31 | Executed copy of LOA | 55 |
| 50 | Letter from Howard & Jensen, LLC, dated May 7, 2015 | 59 |
| 51 | Letter to ConcealFab Shareholders Bates stamped CONCEALFAB000237 and CONCEALFAB000238 | 58 |
| 60 | Frequently asked questions and answers for Proposed MUTI/ConcealFab Transaction | 62 |
| 61 | Secured Promissory Note | 65 |
| 62 | E-mail chain Bates stamped SABRE00058 through SABRE00062 | 66 |

PROCEEDINGS

CHRIS L. ODELL,

having been sworn by the reporter, testified as follows:

MS. LALLY: Okay. We're here today to take the Rule 30(b)(6) examination of Mr. Christopher Odell in the matter of ConcealFab Corporation versus Sabre Industries, Inc. and Midwest Underground Technology, Inc., currently pending in the United States District Court for the District of Colorado

Present for the defendants, Sabre Industry, Inc. and Midwest Underground Technology, Inc. is Elizabeth Marie Lally. Present for the plaintiff, ConcealFab, is Angela DeVine.

EXAMINATION

BY MS. LALLY:

**Q Will the witness please state his name and spell it for the record.**

A Chris Odell, C-H-R-I-S, O-D-E-L-L, small d, no apostrophe.

MS. LALLY: This deposition is being taken pursuant to a subpoena to testify in a civil action.

I am marking this as Exhibit Number 68 and handing it to the witness.

(Deposition Exhibit 68 was marked.)

**Q (By Ms. Lally) Sir, have you seen this document before?**
A It looks familiar.
**Q Have you had a chance to review what was attached to the subpoena as Exhibit A?**
A Yes, I have.
**Q Did you receive your witness fee for being a Rule 30(b)(6) examinee today?**
A I did.
**Q Have you ever given a Rule 30(b)(6) examination before?**
A I have not.
**Q It's substantially the same as the deposition you've just given. Same rules apply. Please use verbal answers. Don't nod your head. Tell us if you need a break.**
**Ask for clarification if you don't understand. The -- I can restate it. The court reporter can read the question back. If I hand you a document, take your time to review it.**
**Have you ever -- did you speak with anyone in preparation for today's 30(b)(6) examination?**
A I did.
**Q Okay. Did you speak with an attorney?**
A I did.

**Q Did you speak with anyone other than an attorney?**

A I did.

**Q And who did you speak with?**

A I spoke with Jonathan Fitzhugh, Rick Denton, and Duncan Stewart.

**Q Okay. Did you review any documents in preparation for today's 30(b)(6) examination?**

A I did.

**Q Generally, what documents did you review, categories?**

A Documents related to the anticipated transaction with Sabre and a couple of corporate documents, governance documents. I think there was -- I did review the board report from the Special Litigation Committee also.

**Q Okay. Have you ever been convicted of a felony?**

A I have not.

**Q Have you ever been convicted of a crime of dishonesty?**

A I have not.

**Q Can you please state your current address for the record.**

A 1985 Craig, C-R-A-I-G, Drive, Colorado Springs,

80921.
**Q Mr. Odell, you are currently on the ConcealFab board; is that correct?**
A That's correct.
**Q And you have been on the ConcealFab board twice; is that right?**
A That's correct.
**Q So you started with the ConcealFab board in around 2008; is that correct?**
A I believe that's correct, yes.
**Q Okay. And then you left the ConcealFab board in 2011 sometime; is that right?**
A I'm a little fuzzy on the actual year, but I believe that's the approximate time frame.
**Q Okay. And sometime around the end of 2014 or 2013, you rejoined the board?**
A End of 2014.
**Q Okay. And have you served continually on the board since then?**
A I have.
**Q Okay. Did there come a time when -- well, let me just rephrase.**
**Mr. Mike Slattery, is he the founder of ConcealFab?**
A He is.

**Q Okay. And did there come a time when the powers that be at the company and Mr. Slattery thought that he should transition his role from being an active employee of ConcealFab to something else?**

MS. DEVINE: Objection. Foundation.

You can answer if you know.

MS. LALLY: I'll withdraw the question. I'm going to start over on this point.

**Q (By Ms. Lally) Is Mr. Slattery currently an employee of ConcealFab?**

A He is not.

**Q When did Mr. Slattery cease being an employee of ConcealFab, if you know?**

A I believe it was coincident with the closing of the equity round, which would have been end of November, December of 2014.

**Q Okay. And did Mr. Slattery, then, take on the role of a consultant with ConcealFab?**

A My understanding is he was a -- yeah, he had a consulting contract.

**Q Okay. Did you help in any way to help negotiate the consulting agreement between Mike Slattery and ConcealFab?**

A I did not. I reviewed it, but I didn't -- I didn't negotiate anything.

**Q Okay. So you didn't redline it or make any -- any sort of comments?**

A I most certainly could have redlined it. That would have been reviewing. I remember -- let's see.

It would have been prior to joining the board, but as part of due diligence for closing, reviewing numerous documents, because there were lots of things contemplated to occur, one of them being Mike Slattery transitioning to be a consultant and also becoming a member of the Investor Rights Agreement, that was a material fact for the new investors coming in.

**Q Okay. How was the Investor Rights Agreement a material fact for new investors coming in?**

A The Investor Rights Agreement was revised, and I don't know all of the revisions, but one of the key elements was that as a member of the Investor Rights Agreement, you were subject to the majority vote of the shareholders.

**Q Okay. And that was the First Amended and Restated Rights Agreement? Is that the -- do you know the technical name of it?**

A That would sound like it. It was -- it was -- what's important is the date of it, which would have happened -- should have been dated around that November 2014 time frame.

**Q Okay.**
A Because there may have been subsequent ones.
**Q Okay. When did you first hear that there was the possibility of a synergy opportunity between Sabre and ConcealFab?**
A It would have been in the fall of 2014. The -- yeah, the fall of 2014.
**Q Do you recall the circumstances behind how you heard about it?**
A It was a key fact and consideration for the new investors coming in.
**Q Oh, okay. So were you one of those new investors who were coming in? Were you putting in new money?**
A I did.
**Q Okay. So at least as far as you're concerned, in your mind, it was a key fact? Is that what you're saying?**
A Yes.
**Q Okay. And you understand -- understand that it was important to other investors as well; is that correct?**
A Yes.
**Q Okay. Why was it important to you?**
A The catalyst for the company raising money is that it was out of money and needed to bridge to what was

believed to be an acquisition by Sabre.
And so it was important, both in terms of how the actual investment got constructed, as well as trying to understand what the goal of the company was, trying to -- what they were trying to accomplish, and was there -- was there enough time to do what the company wanted, given the -- the -- the ability to continue was in question for the company.
**Q Okay. So ConcealFab was having financial difficulties in November of 2014? Is that your statement? A correct summary of what you testified?**
A I don't know that I used "difficulties," but that might be a good word, yeah.
**Q All right. I think you may have said they were out of money.**
**Did you know if the company was unable to pay its debts as they became due in November of 2014?**
A I would say it was tenuous.
**Q Okay.**
A I wasn't a part of the company at that point in time, but I understood that things were pretty tenuous.
**Q Okay. And as an investor, you saw this November 2014 capital raise as being, what, a bridge loan?**
A It wasn't a bridge loan.
**Q Okay. What was it?**

A It was a preferred equity investment.
**Q Okay. So you would get preferred stock back?**
A Correct.
**Q And you understood this money to be needed to get ConcealFab through the negotiation period with Sabre? Is that a correct summary?**
A Roughly, yes.
**Q Okay.**
A I mean, there wasn't a -- at least when I was doing due diligence, there wasn't a specific timeline. It was contemplated that by the end of the year, the deal might be done and there was funding to go longer than that, but not a whole lot longer than that.
**Q Okay. Was a presentation made to potential investors regarding the hoped for -- you said purchase by ConcealFab. But was there some sort of presentation made to investors concerning the potential synergy with Sabre?**
A I don't recall that. I remember -- I don't remember a presentation. I remember at the time there were a number -- this -- that all predated me -- but there were discussions with various people at different times, but Sabre seemed to be the most likely, is what was represented, suitor to acquire ConcealFab.
There's lots of due diligence materials. There may have been a presentation, as you call it. I don't

recall. When I think of presentation, I think of PowerPoint, and I don't know if there was one there or not.

**Q Okay.**

A I don't recall.

**Q Okay. Okay. Did you at some point help Mr. Fitzhugh -- strike that.**

**As part of the deal with Sabre, there's a draft employment agreement that went back and forth between the parties multiple times.**

**Do you know what I'm referring to?**

A You're speaking about the employment agreement for Jon Fitzhugh?

**Q Yes.**

A Yes.

**Q And did you help with various drafts of that employment agreement?**

A Yes.

**Q Okay. In what capacity did you help?**

**Were you there on behalf of ConcealFab, or were you -- did you see yourself as representing ConcealFab in that negotiation, or Mr. Fitzhugh?**

A Primarily ConcealFab, although I recall giving feedback to him personally.

**Q Okay. Did you see a conflict of interest in**

**wearing both hats?**

A No.

**Q Why not?**

A I think my feedback to him personally was he should have an attorney representing him.

**Q Okay. So with the exception of telling him he should get an attorney to represent him individually, in your mind, you were representing ConcealFab in that negotiation; is that correct?**

A Yes. That was my mind set.

**Q Okay. Could you please turn the Exhibit Number 18 in the binder right there.**

A All right. Okay.

**Q Could you review and let me know if you've seen this record before.**

A Yes.

**Q Okay. This appears to be an e-mail from you to Mr. Fitzhugh, copying Duncan Stewart, regarding a draft employment agreement dated January 7th, 2015; is that correct?**

A Correct.

**Q Is that your e-mail account?**

A It is my account.

**Q Okay. This says -- is referring to a draft employment agreement, and so I'm going to ask you to also**

**-- you might want to remove it from that binder -- and go the Exhibit Number 7.**

A All right. Just one page?

**Q Uh-huh. And then go to Exhibit Number 7.**

A Remove this or just leave it?

**Q Just leave that one in there.**

A Okay. All right.

**Q So you had -- if you look at the e-mail, it appears that you've actually read the employment agreement that was attached to here. And --**

A Are you referring to the --

**Q If you --**

A -- Exhibit 7 or --

**Q -- look at Exhibit Number 18.**

A Okay. Sorry.

**Q I've directed you to the wrong draft. It's going to -- could you look at Exhibit Number 6.**

**So Exhibit Number 6, if you look a little further down the page.**

**All right?**

A Okay.

**Q It's from Doug Huff to Jon Fitzhugh, and it attaches a draft employment agreement, and the draft employment agreement is actually attached to here -- to Exhibit 6. And that's -- the e-mail that goes with**

**Exhibit 6 is dated Wednesday, January 7th, 2015. The same day as your e-mail on Exhibit Number 18.**
**Do you agree that those are the same day?**
A January 7th, 2015?
**Q Yeah. Sorry.**
A I -- I agree.
**Q Okay. Could you turn to -- it's marked CONCEALFAB51 there at the bottom of the exhibit, the bottom of Exhibit 6.**
**Okay?**
A Also Page 5?
**Q Also Page 5 of the agreement.**
A Okay.
**Q Could you look at Paragraph 25, definition for "cause." I'll give you some time to read that.**
A Okay.
**Q All right. On the third line of that paragraph it says, Failure to meet financial and performance criteria as established for the business segment, the business -- sorry -- established for the business segment that the employee is directing, will be cause -- termination for cause.**
**Do you see that?**
A I do.
**Q Okay. And then if we look at your e-mail,**

**which is Exhibit Number 18, it says, Jon, this employment agreement allows Sabre to terminate you without cause subject to severance for a cause which can be your failure to achieve the financial objectives set for the business, either of which puts the earnout of ConcealFab shareholders substantially at risk with you no longer responsible for the P&L.**

**I would just like you to tell me what sparked this e-mail and your concern that the earnout for shareholders would be at risk with Mr. Fitzhugh no longer responsible for the P&L.**

A Ask me -- sorry. Ask me again. I was rereading the sentence.

**Q Okay. That's fine.**

**So you seemed to be at risk -- you seemed to be concerned about the ConcealFab shareholder earnout; is that --**

A Absolutely.

**Q Okay. And you tie that, in part, at least to Mr. Fitzhugh not being responsible for the P&L anymore?**

A Correct.

**Q All right. So tell me in depth -- more in depth what your concern was. Why his not being responsible for the P&L concerned you with respect to shareholder earnout.**

A The proposed transaction with Sabre was structured in a way that the majority of any value to be realized by the shareholders was at risk earned over time, subject to bunch of different formulas on EBITDA and that being tied to the performance of the business going forward.

In my experience, those kind of deals have a great deal of risk associated with them, not the -- not the least of which is who's responsible for the business.

What was contemplated in that deal from the get-go was that Jon Fitzhugh would become the head of that business and be responsible for driving it.

He happened to be, if not the largest, one of the largest ConcealFab shareholders, so in that respect, interests were aligned with all the shareholders of ConcealFab. But if --

**Q Meaning he wouldn't do anything to hurt his own interest?**

**I mean, he was a shareholder, so to the effect shareholders were affected by these things that we're talking about, like EBITDA, and what the definitions were in the term sheet, he was similarly affected; is that correct?**

A Yeah. Yeah.

So the -- the challenge from a shareholder

perspective is, how do you make sure that the guy who you want running the business, that your potential returns are tied to, is going to continue to be in that job and performing to be successful, because otherwise, as a shareholder, your -- your likelihood of getting anything is diminished.

So I had actually expressed concern at the very beginning about that sort of a structure, having done deals like that in the past, and just know that even with the best of intentions, they're a challenge to manage.

But wanted to be very certain that the shareholders were as protected as possible with regard to Jon being the one that would drive the business going forward.

So from that standpoint, making sure that he couldn't be taken out and somebody else put in, reorganized, have his scope changed, have the whole -- incented (sic) differently, a whole host of things were in my area of concern that I was giving feedback on.

**Q Okay. And you were concerned about the fact that termination could be for failure to achieve financial objectives set for the business?**

A Yeah. I found that to be a highly unusual and onerous proposed reason for cause. There are enumerable risks in a business, especially a start-up business. You

compound that with combining businesses, and to be told that you can be fired to not meet some financial objective that you may or may not have been the one to set seemed like an inordinate risk for the shareholders to take on, as least as much as we could influence it through the employment agreement.

**Q Your e-mail goes on. So in my mind, we are back to needing to put some kind of trigger or protection on earnout into the term sheet if you are terminated for anything other than gross misconduct.**

**What kind of trigger protection do you know that you had in mind there?**

A We had had previous discussions, and they had been rejected, around minimums if he was to no longer be in control. So it would be a -- a cash transaction to the shareholders. I don't recall exactly what the numbers were, but there were discussions around, like, a ten million dollar minimum.

Or -- the point being, if we're going to go into an earnout, and for whatever reason Jon Fitzhugh is not part of the equation for anything other than gross misconduct, that Sabre would have the right to do that if they felt like it was the right -- the right thing to do, but there would be an immediate payment to the shareholders of ConcealFab, because they had put their

faith in Jon Fitzhugh being the one to drive the business going forward, and Sabre had elected to take him out.

**Q So if we look at Exhibit 7.**

A Okay.

**Q So we're going to move forward in time. Look on 7, and look on Page 5 of the draft employment agreement, which is CONCEALFAB1117 at the bottom.**

A Got it.

**Q We're going to look at the same paragraph we just looked at. There are a lot of differences here. I'll give you minute, and you can compare them, if you need.**

**For one thing the --**

A You said --

**Q If you look at Paragraph 25-A.**

A Okay.

**Q Well, if you look at Paragraph 25, you'll see that the definition of "cause" has had "good reason" added to it. Definition of "cause" and "good reason."**

A Uh-huh.

**Q And then the failure to meet financial and performance criteria as established for the business segment that the employee is directing has been strucken -- has been stricken completely.**

A Okay.

**Q Do you see that?**
A I'm looking. Sorry.
Yes, I see that.
**Q And so that -- that is in line with what you were suggesting, at least. It doesn't say anything about gross negligence, but this section has been taken out concerning financial performance.**
**Do you agree?**
A Uh-huh. Sorry. Yes.
**Q And then 25-B has been added, which defines "good reason." I'll give you a minute to read that.**
**And the reason I'm pointing you to that is "good reason" lists some of the things that you just mentioned: Reduction in employees duties?**
A Correct.
**Q Okay. Did you draft this, do you recall, Paragraph 25-B?**
A It's quite possible. Some of the language I could see myself writing. 50 miles away, I don't know what would have been on my radar screen, so I doubt that I was the sole author, if I authored any of this, but . . .
**Q Does this seem to take into account some of the advice or comments that you've made in Exhibit Number 18?**
A Yes.
**Q Okay. That's fine. You're not sure if you**

**drafted Exhibit Number 25-B? Let's just be clear.**

MS. DEVINE: Paragraph 25?

**Q (By Ms. Lally) Paragraph 25-B, you're not -- you can't be sure that you drafted that?**

A No. I -- I usually do things under revision control for any document that I edit. So I would assume if I had either drafted it or edited it, there would be some kind of a trail. It's just a practice of mine.

**Q Okay. Could you turn to Exhibit 8, please. You're not on this e-mail chain.**

A Okay.

**Q I just want to ask you if you agree with a statement in here. In this Mr. Doug Huff writes, There were several changes to the employment agreement which should be discussed, but at least at this point, my side is comfortable that it is non-terminable, at least during the earnout period.**

**Do you recall discussing if it was important to the board that the agreement be non-terminable during a certain point in time?**

A I don't think we would have used that term, but I would say the concept was clearly a point of concern for the board, for the reasons that I mentioned, which was we're not going to make the shareholders return at risk over time unless we're comfortable that you are driving

the business.

**Q "You" being Mr. Fitzhugh?**

A Correct.

**Q Okay.**

A So I suppose some of the clauses in there might be generally described as non-terminable. This is from Doug Huff, but this wouldn't have been my terms, because we clearly said that there were other reasons you could be terminated.

**Q All right. Fair enough.**

**If you turn to Exhibit Number 9. This is from Jon Fitzhugh to Doug Huff, and if you look at what's Bates stamped CONCEALFAB1058, it's going to be Paragraph 25 of the draft employment agreement.**

**If you look at 25-A, it now has the line back, and now is another line concerning financial performance. And it says, Employee's failure to meet financial and performance criteria as established for the business segment that employee's directing due to employee's gross negligence.**

**So we've got the section back in there with gross negligence, and I'm wondering if you think that this was as a result of discussions with the board to put in the qualifier "due to employee's gross negligence."**

A Is -- is this a later version than the one --

**Q It is. It is, yeah, which I can show you.**
A That's fine. I just --
**Q They go in chronological order.**
A Okay. Ask me the question again.
**Q Okay. So you can see where the section has been put in, but they've put "due to employee's gross negligence"?**
A Correct.
**Q And I'm wondering if the addition of "gross negligence" was a result of the discussions with the board, because your e-mail, Number 18, talks about "gross misconduct."**
A I don't think that was the reason. My recollection is Sabre had concerns about striking it altogether, and our primary concern is, we don't know who sets the numbers. There's all kind of variance in business.
You can't be held to a strict number, but we would have be willing to agree that if gross misconduct was the cause for missing the financial, that that was okay.
**Q Could you turn to Exhibit 16.**
**Okay. You are on this e-mail.**
A Uh-huh.
**Q And it's an e-mail from Jon Fitzhugh to Duncan**

**Stewart and Chris Odell dated January 15th, 2015, and it says, Documents to discuss and approve at the board meeting, and it has an attachment.**

**Was there a board meeting on or around January 15th, 2015, to discuss what is attached, the proposed employment agreement?**

**And I'll give you time to look at it and think about it.**

A I'm certain we discussed it, because it was late and what we had been expecting it. I don't know that -- I don't know the date of the board meeting, but . . .

**Q Okay.**

MS. LALLY: Let's go off the record for one minute.

(A discussion was held of the record.)

MS. LALLY: Back on.

I'm going to mark Exhibit Number 69, Minutes of the Board of Directors of ConcealFab Corporation, January 15th, 2015.

(Deposition Exhibit 69 was marked.)

A So we did have it.

**Q (By Ms. Lally) And I'm going to let you review the record to refresh your recollection.**

A Okay.

**Q Okay. So if you look at this, most of this**

**just talks about the term sheet and the agreement between the parties in the term sheet.**
**Do you recall if you also discussed this employment agreement?**
A Not specifically, but I would have -- given the contemporaneousness of this and the forwarding, I would be surprised if we didn't.
**Q Okay. That's fine. I just -- I -- it's not memorialized --**
A Okay.
**Q -- and - -and I'm curious if you actually discussed it.**
A It was a topic of concern, so as I said, I would be surprised if we didn't.
**Q Okay. And this was a telephonic board meeting; is that right?**
A Most were just because we were in different places most of the time.
**Q Okay. Okay. If we look at what is the -- the attachment on Exhibit Number 16, do you believe this is the copy of the employment agreement that would have been discussed at that meeting?**
**At least you'll see that there's no redlines.**
A Okay.
**Q And if you look at Page Number 5 of the draft**

**employment agreement -- Page 11 --**

A Got it.

**Q And you look at 25-B. And it says, At the conclusion of your two, cause will also be expanded to include the material failure of employee to meet financial performance criteria established by the business segment that the employee is directing.**

**Does that represent a compromise between the board's concerns and what Sabre was wanting to put in here? Is that your understanding?**

A I remember it continued to be a sticking point. I'm looking back at the first paragraph to see if it still says gross misconduct -- willful misconduct in performance of duties.

So, yes, I think it was a sticking point for Sabre wanting to have the ability to change the head of the business if wasn't performing the way they wanted, and that was the compromise.

**Q We're going to turn back to that Paragraph 1 of the employment agreement now.**

A Same exhibit?

**Q Uh-huh.**

**This talks about the effective date. But if you look at Sentence 2, it says, The agreement shall automatically terminate without any action on the part of**

**any person and be void ab initio if the Asset Purchase Agreement is terminated in accordance with its terms, and neither Sabre, nor any other person, shall have any liability to employee under this agreement if the closing, as defined in the Stock Purchase Agreement, has not occurred.**

**Do you see that?**

A I do see that.

**Q Okay. So this is a little confusing. It references an Asset Purchase Agreement and a Stock Purchase Agreement.**

**Do you see that?**

A Yes.

**Q Okay. Did an Asset Purchase Agreement ever come to fruition between Sabre and ConcealFab?**

A Not to my knowledge.

**Q Okay. Did a Stock Purchase Agreement ever come to fruition between Sabre and ConcealFab?**

A Pretty certain not. I don't know -- that seems to be an error, but as far as I knew, there was only ever an asset purchase contemplated.

**Q Did the board ever discuss this paragraph, as far as your recollection?**

A I don't remember.

**Q Okay.**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-01793-CMA-KLM

---

30(b)(6) DEPOSITION OF CONCEALFAB CORPORATION
DUNCAN H. STEWART
March 14, 2017

---

CONCEALFAB CORPORATION,

Plaintiff,

vs.

SABRE INDUSTRIES, INC., and

MIDWEST UNDERGROUND TECHNOLOGY, INC.,

Defendants.

---

PURSUANT TO NOTICE, the 30(b)(6) deposition of CONCEALFAB CORPORATION - DUNCAN H. STEWART, called for an examination by the Defendants herein, was taken at Silver & DeBoskey, P.C., 1801 York Street, Denver, Colorado 80206, commencing at 9:44 a.m. on March 14, 2017, before Shauna T. Dietel, a Registered Professional Reporter and Notary Public within Colorado.

APPEARANCES:

ANGELA D. DEVINE, ESQ.
Silver & DeBoskey, P.C.
1801 York Street
Denver, Colorado 80206
303-399-3000
devinea@s-d.com

For the Plaintiff

ELIZABETH M. LALLY, ESQ.
Goosmann Law Firm
410 5th Street
Sioux City, Iowa 51101
712-226-4000
LallyE@GoosmannLaw.com

For the Defendants

Also Present: None

# I N D E X


| EXAMINATION: | | PAGE |
|---|---|---|
| By Ms. Lally | | 4 |

| EXHIBITS: | | MARKED |
|---|---|---|
| 57 | Subpoena to Testify at a Deposition in a Civil Action | 4 |
| 58 | Consulting Agreement between ConcealFab, and Mr. Michael Slattery | 16 |
| 59 | Action by Written Consent of the Shareholders of ConcealFab Corporation | 35 |
| 60 | Frequently asked questions and answers for Proposed MUTI/ConcealFab Transaction | 37 |
| 61 | Secured Promissory Note | 68 |
| 62 | E-mail chain Bates stamped SABRE00058 through SABRE00062 | 70 |

| EXHIBITS PREVIOUSLY MARKED: | | MARKED |
|---|---|---|
| 18 | E-mail from Chris Odell to Jonathan Fitzhugh, dated Wednesday, January 7, 2015, Bates stamped CONCEALFAB 001041 | 59 |
| 21 | E-mail chain Bates stamped CONCEALFAB000287 through CONCEALFAB000289 | 12 |
| 22 | Answer to Complaint and Jury Demand, and Counterclaims | 19 |
| 26 | E-mail with term sheet attached | 24 |
| 31 | Executed copy of LOA | 48 |
| 50 | Letter from Howard & Jensen, LLC, dated May 7, 2015 | 62 |
| 51 | Letter to ConcealFab Shareholders Bates stamped CONCEALFAB000237 and CONCEALFAB000238 | 37 |

PROCEEDINGS

DUNCAN H. STEWART,

having been sworn by the reporter, testified as follows:

MS. LALLY: Okay. Thank you.

We are on the record in the matter of ConcealFab Corporation versus Sabre Industries, Inc., and Midwest Underground Technology, Inc., currently pending in the United States District Court for the District of the Colorado, Case Number 1:15-cv-01793.

Present are the attorney for the defendants, Sabre Industries and Midwest Underground Technology, represented by Elizabeth Lally, and attorney for the plaintiff, ConcealFab, Ms. Angela DeVine.

The witness is Mr. Duncan Fitz -- no, I'm sorry -- Mr. Duncan Stewart, and this is a 30(b)(6) examination.

EXAMINATION

BY MS. LALLY:

**Q Sir, do you understand that you have been compelled to be here today?**

A Yes.

**Q Okay. And I'm going to mark Exhibit Number 57 and hand it to you.**

**(Deposition Exhibit 57 was marked.)**

**Q (By Ms. Lally) This is the Subpoena to Testify in a Civil Action as a 30(b)(6) witness.**
**Have you seen that document before?**
A Yes.
**Q Okay. Have you reviewed what is attached to this document as Exhibit A?**
A Yes, I believe so.
**Q Okay. Could you please state your name and spell it for the record.**
A Duncan Stewart, D-U-N-C-A-N, S-T-E-W-A-R-T.
**Q All right. Have you ever given a 30(b)(6) examination before?**
A No.
**Q Okay. Have you been provided with your witness fee for attending today?**
A Yes.
**Q Have you ever been convicted of a felony?**
A No.
**Q Have you ever been convicted of a crime of dishonesty?**
A No.
**Q Okay. What is your primary address?**
A 1015 Dolan Drive, Monument, Colorado 80132.
**Q Okay. For how long have you been on -- when did you first join ConcealFab's board?**

A Shortly after it was formed in 2007.

**Q And you served on the board for how long, initially?**

A Initially, for about six years or so.

**Q Until around January 2013?**

A Yes.

**Q And then you rejoined the board; is that correct?**

A Yes. About three or four years ago.

**Q Did there come a time when Mr. Slattery's position with ConcealFab was going to transition?**

A Yes.

**Q And he was going to go from being an employee of ConcealFab to being something else?**

A Yes.

**Q And whose idea was that, that he transition his position?**

A Probably mutual between he, Jon Fitzhugh, and I.

**Q Okay. Wait. So was Jon Fitzhugh -- was it discussed that he should transition from being an employee to being something else prior to Mr. Fitzhugh joining the company in January of 2013?**

A No.

**Q No, it was not?**

A Not from going from an employee to something else, no.

**Q Okay. When did those discussions start?**

A After Jon had been there for a while. I can't remember -- recall how long.

**Q Okay. Why was it -- why did this discussion come about, that Mr. Slattery should transition from being an employee to being something else with the company?**

THE WITNESS: I need to talk to you privately.

MS. DEVINE: You have to answer the question.

THE WITNESS: Well, I just don't know if I'm allowed to say certain things for HR rules.

MS. DEVINE: I think it's fine.

THE WITNESS: Okay.

MS. DEVINE: To the extent that anything that you -- your answer has to do with advice from counsel, don't reveal that. But otherwise, HR --

THE WITNESS: Some of it does, so I don't know what I'm going to say.

A There were multiple reasons why we thought it -- everybody thought it would be best for him to transition from an employee to a consultant.

Primarily, he -- you know, he was using -- legally using marijuana in the state of Colorado, but we were a federal contractor, so he could not have fiduciary

responsibilities in the company doing that.

So under -- with advice of counsel, we decided that he needed to transition out of the board, out of an officer role, out of any managerial control.

**Q (By Ms. Lally) Couldn't you simply ask Mr. Slattery to stop using marijuana?**

A Yes. Many times.

**Q When did you first ask Mr. Slattery to stop using marijuana?**

A I don't know exactly. I mean, it was relatively soon after I joined the board -- rejoined the board.

**Q Okay. In 2013?**

A Yeah, somewhere around that time frame.

**Q Okay. How did it come to the board's attention that Mr. Slattery was using marijuana?**

A He didn't hide it.

**Q Okay. Did the board believe that he was using marijuana or under the influence of marijuana at work?**

A Yes.

**Q Okay. And did the board believe that this jeopardized their ability to get contracts with the federal government?**

A Yes.

**Q Okay. However, if Mr. Slattery was a**

**consultant, this wouldn't impact federal contracting?**
A Correct.
**Q Okay. When did negotiations, then, begin in earnest with Mr. Slattery to transition from being an employee to being a consultant?**
A I don't remember the exact time frame. It was probably within six months of me rejoining the board.
**Q Maybe mid-2013?**
A That sounds about right.
**Q Okay. When did you first hear that there was this potential, I guess, synergy opportunity with Sabre?**
A I want to say there was some early discussions in 2013.
**Q Did anything come of those initial discussions?**
A You know, Jon had -- Jon Fitzhugh would bring it up in casual conversations with the -- you know, the board members and officers that it sounded like there was a potential to do work together and maybe -- maybe even join -- I mean, join together and do a transaction together. It was very early discussions, though.
**Q Okay. When you -- when the board brought on Mr. Fitzhugh, did they envision one of his responsibilities being raising capital?**
A Yes.
**Q Okay. And how did they envision him raising**

**capital?**
A Well, he brought capital with him on day one, so that was --
**Q Okay.**
A That was one of the conditions of his employment, was to help do that. If he wanted the salary that he wanted, he needed to raise capital from day one.
So he, his dad, and I think a few other friends put money in on practically day one. And then that was actually enough capital to sustain the company for quite a while. And I believe maybe 18 to 24 months later, we needed more capital to put in, so we started talking about that at that time.
**Q Did you envision him looking for, I guess, business synergy opportunities, going out and trying to find other companies to pair with?**
A Not necessarily. I mean, we -- part of his job is to always look for teaming opportunities to work together --
**Q Ok. That's a good way --**
A That's different than, you know, a formal combination of companies.
**Q Okay.**
A But we didn't charge him with going out and finding a combination opportunity, a merger and

acquisition opportunity.
**Q Okay. So he first came to you and sort of told you there's this possibility of working with Sabre in early 2013?**
A Right.
**Q And then it fell off the table, or nothing happened with that or --**
A Well, you know, it took awhile. I seem to recall many months going by of that. And then I think eventually the first thing we did was team with them on the Hill Air Force Base proposal.
**Q Okay. And who did you work with?**
**Who -- do you know they worked with on that, who the point was with Sabre Government?**
A Well, I mean, originally he talked to the CEO, which is Tim San -- I can't remember.
**Q I'm sorry?**
A I'm kind of -- I'm just thinking out loud here. The original talks were with the CEO. Eventually, I think it was with Doug Huff.
**Q But I was talking about the Hill Air Force Base proposal.**
A I think it was Doug, but I can't recall that.
**Q Okay. That's fine.**
**All right. Could you look at what's been**

**marked as Exhibit Number 21?**
A Is that labeled here 21?
**Q Yeah.**
A Okay.
**Q Okay. And Exhibit 21 appears to be an e-mail from Mr. Fitzhugh to Mike and Tim Slattery, as well as to yourself.**
**Is that your e-mail address, dhstewart@ --**
A Yes.
**Q Or it was at the time --**
A Yes.
**Q -- your e-mail?**
**Dated September 26th, 2014. It looks like the parties are talking about -- if you could read this, please, and let me know -- ConcealFab agreement, do you know what the agreement is that they're discussing here?**
A Okay. Give me a second.
**Q Sure.**
A Yeah, this looks like -- this was regarding his contracting agreement.
**Q His --**
A Independent contracting agreement.
**Q Who is "his"?**
A Mike Slattery.
**Q Okay. In this, Mr. Fitzhugh states that he was**

**invited to Atlanta this Thursday -- Wednesday/Thursday to meet with Sabre executives, to hear their proposal for a potential investment partnership. And then he writes, Would be ideal to have this resolved so they don't find a reason to walk away.**

A Yes.

**Q Did you have discussions with Mr. Fitzhugh about this meeting that was going to happen in Atlanta before it happened?**

A I don't recall.

**Q Okay. Do you know why he wanted to resolve this issue with Mr. Slattery, why he felt Sabre might walk away from the deal without it being resolved?**

A I mean, any unresolved founder issues would cause anybody to hesitate.

**Q Okay. So just, general, we need to -- did you have any discussions with Mr. Fitzhugh specifically on that point, about resolving this?**

A I don't recall if I did at this time, but I know I did as part of this deal. At some point before we made the deal with him, I said -- you know, I told him that Mike Slattery needs to be under an agreement with us or it's going to -- it could impact any deal.

**Q Any deal?**

A What's that?

**Q Why did you feel like it could impact any deal?**
A The same reason I said, that any company trying to acquire or team -- significantly team with another company would be concerned about a founder with an unresolved issue.
**Q Okay.**
A Especially one of -- as big a shareholder as he was.
**Q He was a majority shareholder at -- at that time?**
A I don't remember the timing, because he lost some of his shares to his brother. At some point, Jon become the largest shareholder. I just don't remember when it happened.
**Q You mean Tim?**
A Or yeah, sorry, Tim. Tim's probably larger than Jon. Those are the three top. It moves around a lot -- it did move around a lot in those years.
**Q So Tim Slattery is copied on this as well, and he is Mike Slattery's brother?**
A Uh-huh. Yes.
**Q Was he part of this bridge loan in 2014 to get you through to the Sabre negotiations, Tim Slattery?**
A I believe so.
**Q Okay. Do you know how much money Tim Slattery**

**put in --**
A No.
**Q -- as part of that loan?**
A I can't recall.
**Q Okay. Let's move further down and talk about what Mr. Slattery has to say in this e-mail. There's an e-mail in this chain from Mr. Slattery to Tim Slattery, copying yourself and Mr. Fitzhugh, in which he says that, There are some pretty big gaps and legal problems at CFAB.**
**Do you know to what Mr. -- in your mind, when you got that e-mail, what did you think Mr. Slattery was referring to in terms of big gaps and legal problems?**
A I don't recall. It's been a while. I mean, I know he had some, and we brought them up openly, and I never agreed with --
**Q If you addressed them, would that be in the board minutes?**
A Some of them might be in board minutes, but informal conversations.
**Q Okay. And what were -- you don't recall any specific legal problems that you discussed that he might be referring to?**
A I don't remember the exact details, but he had a problem with two of the -- I want to say board members that Jon brought on. That's all I recall about that.

**Q Okay. Is Tim Slattery a board member?**

A No.

**Q Has he ever been?**

A Yes. I don't recall what the dates were. I'm pretty sure that he came -- I'm pretty sure that he was. I don't recall exactly the dates.

**Q Okay. Do you recall if this was the first time Mr. Mike Slattery threatened legal action against ConcealFab to you?**

A I don't recall when he initially threatened anything.

MS. LALLY: Can we go off the record for a minute?

(A recess was taken from 10:03 a.m. until 10:05 a.m.)

MS. LALLY: Back on the record.

We're back on the record now, and I'm marking Exhibit Number 58.

(Deposition Exhibit 58 was marked.)

MS. LALLY: Exhibit Number 58 is the -- I'm handing it to the witness -- ConcealFab Corporation Consulting Agreement between the company, ConcealFab, and Mr. Michael Slattery.

I have written "confidential" on the first page of witness' copy of Exhibit Number 58. And this exhibit

is confidential pursuant to the protective order signed by the parties.

**Q (By Ms. Lally) Have you ever seen this document before?**

A Yes.

**Q Did you help in the drafting of this document?**

A Yes.

**Q What sort of insights did you provide in terms of drafting of this document?**

A Made sure that the terms were consistent with what we had talked about verbally.

**Q Okay. So you reviewed it to just make sure that it met with the parties' oral agreement?**

A Yes.

**Q Okay. And do you know when this document was officially executed?**

**If you look at -- it's not notarized, and the signatures are not dated.**

A Well, I mean, it appears from the opening paragraph that it was executed in November of 2014.

**Q Do you have any reason to believe that's not correct?**

A No.

**Q Okay. Could you turn to Page 4.**

A I'm there.

**Q Yeah. It's marked as Page 4 of 5. You're there. I'm sorry.**
**Term -- term and termination?**
A Okay.
**Q It says that is this agreement commenced and will continue until December 31, 2015, unless terminated earlier, as provided.**
**Is this agreement still in force, or it's ended? It's past December.**
A It's ended, uh-huh.
**Q Okay. It says in 6(b), Company may terminate this agreement, in part, for material breach as defined in section (e).**
A Yes.
**Q If we turn to the next page, "Material Breach" is defined, Page 5. And one of the little subheadings, (iii), says, Willful misconduct that violates law and causes material harm to the company.**
A Correct.
**Q Okay. Did the company ever tell Mr. Slattery that he was in material breach of this agreement?**
A I believe so.
**Q Okay. This provides for written notice that the company may terminate -- on Page 4, 6(e). The company may terminate this agreement upon a material breach, as**

**defined below, I believe which we said includes willful misconduct that violates law and causes harm, by consultant upon giving ten days' prior written notice, and such material breach is not cured during such ten-day period.**

**Did you ever send a notice letter like that?**

A Did I? No.

**Q Did the company ever send a notice letter like that?**

A I believe so. It's been a while. I don't recall.

**Q Okay. You believe you've seen one?**

A I believe that there was a formal termination provided to him.

**Q Do you know what the cause was?**

A I don't recall exactly, but I think it had -- no, I don't recall exactly. It's been too long.

**Q Okay.**

A I'd probably misspeak.

**Q Did there come a time when Mr. Slattery sued the company?**

A Yes.

**Q If you could please turn to Exhibit Number 22 in that binder.**

**Have you seen this document before? This says,**

**Answers to Complaint and Jury Demand and Counterclaims Filed in District Court in El Paso County in the State of Colorado.**

A Yes.

**Q Okay. Are you a named defendant in this action?**

A Yes.

**Q And who is the plaintiff?**

A Michael Slattery.

**Q Did you review this answer to the complaint before it was filed?**

A I don't recall. I believe so.

**Q Okay. If you could turn to Page 9. When you signed this consulting agreement in 2014 -- or when Mr. Slattery was -- you were negotiating it, did you believe that Mr. Slattery was still using marijuana?**

A When?

**Q When you -- when this was signed, November --**

A Yes, I believed he was. Yes.

**Q Okay.**

A In fact, he stated such, so . . .

**Q All right. If you look at Page 9 of Exhibit Number 22, it says, On or about January 7th, 2015, ConcealFab Corporation gave Mr. Slattery written notice that his habit of being under the influence of marijuana**

**at work violated federal law. It's a federal drug-free workplace and could cause material harm to ConcealFab.**
**Does that refresh your recollection?**
A Yes. Uh-huh.
**Q Okay. Did Michael Slattery still work for ConcealFab?**
A No.
**Q When was his last day as a -- I'm sorry. When was his last day as an employee, if you know?**
A I believe it would have been about the time of the consulting agreement, around November of 2014.
**Q And when was his last day as a consultant at ConcealFab?**
A It would have been around the time we gave him notice, January 2015.
**Q Okay. So he stopped consulting for the company around January of 2015?**
A Yes.
**Q Okay. If you look back at Exhibit Number 58, which is his consulting agreement, Exhibit 4 -- or Page 4 of that exhibit -- I'm sorry -- under termination again, if we go down to (f), it says, Upon termination by the company for material breach, then the following shall be paid to the consultant. And it references Exhibit A, Section 2(a), cash compensation prorated for any partial**

**month through the effective date of termination.**

**Okay. So you believe that Mr. Slattery was terminated sometime around January 7th of 2015. Ten days past that, so he would have been terminated no sooner than January 17th, I'm assuming.**

**Do you agree?**

A Actually, I'm not sure about the dates.

**Q Okay.**

A I'm trying to get the dates straight in my head now.

**Q I understand.**

**If you want to look through the complaint, maybe somewhere around Page 9. I'm just trying to remember -- I'm trying to pin down when he was officially terminated.**

A Terminated as a consultant?

**Q As a consultant.**

MS. DEVINE: This topic is outside the scope of the 30(b)(6) notice, so Mr. Stewart has not prepared or been prepared on this topic.

MS. LALLY: I'm sorry, I thought one of the topics, and I will refresh, was the negotiation of the consulting agreement.

MS. DEVINE: Right. But the termination of the consulting agreement is not a topic.

MS. LALLY: Okay. Well, including your obligations to Michael Slattery under the agreement --

MS. DEVINE: Right. That's --

MS. LALLY: -- pay is one of their obligations under the agreement.

MS. DEVINE: Right. And those aren't the questions you're asking.

MS. LALLY: I'm trying to find out when he was terminated so I can find out when these obligations concerning cash compensation were prorated, took effect.

MS. DEVINE: Okay. He was terminated in the summer of 2015.

MS. LALLY: Thank you.

A If I can clarify, I thought -- I thought this was our note, but it was his note, so I misspoke about termination in January.

**Q (By Ms. Lally) Okay.**

A This was his claim, that he was terminated in January, so that's my mistake. I thought I was relying on our notes.

**Q Is it your recollection, then, that he was terminated in the summer of 2015, Mr. Slattery?**

A I don't recall specific timing of that.

**Q Okay. That's fine.**

A I mean, if you have a document, I'll be happy

to look at it.

**Q That's fine.**

**Was ConcealFab represented by counsel with regards to the negotiation of Document 58, the consulting agreement, by Mr. Slattery?**

A Were -- were they represented by counsel to prepare this? Yes.

**Q And was that Ben Sparks?**

A Sparks Willson. I don't remember if it was exactly Ben Sparks.

**Q Okay. At some point, ConcealFab and Sabre decided to enter into a term sheet regarding possible --**

A Combination --

**Q -- combination of the businesses, right.**

**Do you recall when the board first started discussing the terms of the term sheet?**

A Let's see. The term sheet was, I want to say, late 2014.

**Q Okay. And did you help negotiate -- I'm going to give you the term sheet. If you could turn to Exhibit Number 26.**

A Okay.

**Q Just review it. Does that look like a true and accurate copy of the term sheet that the parties signed?**

A Yes, it appears to be.

**Q So this document is dated February 3rd, 2015; is that correct?**

A Yes.

**Q Okay. And you believe that you started discussing and negotiating the term sheet in late 2014; is that correct?**

A I think so.

**Q Okay. Who else helped negotiate this on behalf of ConcealFab?**

A Chris Odell.

**Q Was Mr. Fitzhugh also negotiating --**

A Yes.

**Q -- on behalf of ConcealFab?**

**And how did you generally, usually, get the term sheet negotiations? Were they e-mailed to you?**

A Yes.

**Q And did they usually come from Mr. Fitzhugh?**

A Yes.

**Q Okay. And did you yourself have any communications with anybody at Sabre directly concerning the negotiation of the term sheet?**

A Without anybody else?

**Q Right, just -- like, just you.**

A Did I ever talk to anybody at Sabre alone? No. The only time I ever talked to them was either with Jon

and/or Chris Odell.

**Q Okay. All right. Did you believe, as a board member and a shareholder of the corporation, that this term sheet was in the best interest of the company?**

A Yes.

**Q Okay. Why? I'm sure you had a lot of reasons. I want to hear all of them.**

A We did our research on Sabre. Seemed like a good company. It was fairly large and had a lot of resources. That was the one thing that this company was lacking to exploit its potential.

They seemed to want to grow together. And they had enough experience in this industry to make us believe that they could be helpful in ways other than just finances.

**Q Like what?**

A They had done business in this industry, small cell industry.

**Q So what were the benefits of it?**

A The benefits of?

**Q The benefits were just they knew the industry?**

A Yeah, they knew the industry. They knew the customers, they knew -- you know, it appeared they knew where the industry was going, where the growth opportunities were.

**Q Okay. Any other reasons?**
A Any other reasons for why I thought it was a good term sheet?
**Q No. Just that it was in the best interest --**
A Best interest of the company?
**Q Yeah.**
A Well, the company needed finances, and they had plenty of those. Yeah.
**Q Company -- why did the company need finances? Are you talking about capital?**
A Yes. Yeah. The company definitely needed -- it had always needed capital. I mean, this is -- they've invested heavily in research and development to develop their product lines.
So we have, you know, invested a lot of money in this company over time, and Sabre appeared to be a company that could help us exploit all those investments.
**Q Were there any negatives that you saw to signing this term sheet?**
A Yeah. I mean, it was -- it was not a standard term sheet. We would have liked to have seen a simpler deal. We proposed verbally, and I think probably through some e-mails, a much simpler deal.
I don't think any company that's, you know, potentially going to be acquired ever wants to do an

earnout because it's an unknown payment.
**Q You mean an earnout on -- an earnout on royalties; is that --**
A Well, there's an earnout as in they're not just going to bring cash on day one, you know, and buy the company outright. There was a proposed --
**Q This was not an Asset Purchase Agreement?**
A This -- this was an Asset Purchase Agreement.
**Q You think this was? Okay. Does it say Asset Purchase Agreement?**
A Yeah, purchase of all the noncash assets.
**Q Okay.**
A 1(a).
**Q Term sheet, 1(a). All right.**
**But it was contingent upon things, right? It wasn't just, like, we're going to come in and buy your assets right now?**
A Right. It was an earnout.
**Q Ok. And so from your perspective, that was not preferred?**
A I have never heard of any company potentially going to get acquired that likes an earnout.
**Q Okay. Anything else?**
A Anything I didn't like? Is that what you're asking?

**Q Uh-huh.**
A Um --
**Q Well, I asked what you thought was in the best interest of the company in terms of this agreement, and yeah, I want to know what you thought was -- what you had problems with. So part of it was an earnout. Anything else?**
A We were always concerned that they were not putting enough cash in up front, so that was a big part of the negotiations, is actually how much cash was going to go up front.
So they obviously wanted to offer the least; we wanted more, because we thought it would be healthier for the company. But at the end, that's the most they would offer, and that's the best deal we thought we could get, so we thought it was acceptable.
**Q Okay. Did you think that -- the initial infusion was $160,000; is that correct?**
A Yes.
**Q This envisions an eventual payout of 1.2 million for certain things --**
A Well --
**Q -- is that correct?**
A Well, the 160 is not part of this agreement, though.

**Q Right.**
A So I'm not sure what you're asking.
**Q Ok. So this says 1.2 million for the following. Okay? And this is, like, in the future. Is that the number that you thought wasn't enough?**
A Well, we thought it was acceptable eventually, because it was the most they were willing to offer and it was the deal that we could get done. But I always --
**Q Did you consider --**
A -- we always thought it --
**Q -- just walking away?**
A Sure. Absolutely.
**Q Okay. Going and finding other investors?**
A Sure.
**Q Was the company's --**
A But we were under exclusivity with them at that point, so we couldn't.
**Q Okay. And you believe that the company would have survived financially had you said, We're just going to wait for the exclusivity to run out and go to other deals?**
A Well, that's speculative. I have no idea. I mean, the company needed cash, and it had to raise cash externally to keep -- continue.
**Q When -- this talks about ConcealFab**

**Corporation's using 1.2 million as follows, extinguish $843,750 liquidation preference on preferred stock.**

**Does that include your stock?**

A Yes.

**Q Okay. Fund employee obligations until the $250,000. What's that referring to?**

A The Slattery --

**Q Slattery?**

A -- buyout.

**Q Slattery wasn't an employee at the time, was he?**

A Yeah, I think that they just misspoke there.

**Q Okay.**

A I mean, that -- that line was clearly only meant for the buyout of Mike Slattery.

**Q Okay. And it talks about extinguishing the commercial loan --**

A Yes.

**Q -- of a 100,000, and the remaining 200,000 of private debt will be extinguished and paid back through a royalty agreement on awarding contracts to CFG Systems.**

**What is that private debt that it's talking about extinguishing?**

A Debt from, you know, investors, private individuals. I think most of it was Tim Slattery, a

couple other people, I think.

**Q All interested shareholders and option holders must vote, per ConcealFab Corporation's bylaws, to approve this transaction, specifically noting that any economic consideration above and beyond the 1.2 million is solely -- solely in future earnouts.**

**Did the company send this term sheet as it is to the shareholders for vote?**

A No, because that would not be a typical -- you would not typically disclose this much detail to shareholders. I believe we sent out a summary of all the key terms for them to vote on.

**Q Why wouldn't it be normal to send something like this out to shareholders?**

A That's not typical, for a merger and acquisition, to give this much detail to shareholders. There's, you know, too much company confidential information here that shareholders would not typically be given.

**Q Most of your shareholders are insiders of the corporation, right?**

A No, that's not true.

**Q That's not true. Okay.**

**So what is the confidential information in here that shouldn't be given to shareholders?**

A I don't know. I mean, I would -- I would probably have to get advice of counsel on that, but --
**Q Were you part of the decision to not send this as it is to the shareholders?**
A Yes.
**Q Okay. And you based that decision on what?**
A Primarily, if I recall, Chris Odell's advice. He has more experience in this area than we do.
**Q Okay. So he made an argument for not sending the whole thing and you agreed with it? That's your recollection?**
A I believe he might have made the initial suggestion. The attorneys helped us draft the appropriate language.
**Q Okay. The attorneys at Sparks Willson?**
A Yes.
**Q Okay. It goes on to say, Full releases will be provided by each shareholder an option holder.**
**Did you get full releases from each shareholder?**
A I don't recall.
**Q Did you get full releases from each option holder?**
A I don't recall.
**Q So this was -- if you turn to the page marked**

**183 on the bottom, ConcealFab 183 -- well, I guess it starts at 182. You can see Paragraph 8, exclusivity, and then it's just adding on --**

A Yep.

**Q -- right?**

**Okay. So for a period of 60 days post the execution of this agreement, an exclusivity period will begin to allow for MUTI and CF to formulate an agreement acceptable to both parties.**

**Okay. So to formulate -- you said that this is an Asset Purchase Agreement, so what were they formulating?**

A The purchase agreement. This is just a term sheet.

**Q Okay.**

A Term sheets are just outlines, summaries of --

**Q Okay.**

A -- eventual final --

**Q I'm sorry. I misunderstood your prior testimony.**

**You -- you agree that this is not an Asset Purchase Agreement?**

A This is not an Asset Purchase Agreement. It's a term sheet towards an Asset Purchase Agreement.

**Q Thank you. I wanted to clarify that point.**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-01793-CMA-KLM

CONCEALFAB CORPORATION, a Colorado corporation,

Plaintiff,

v.

SABRE INDUSTRIES, INC., a Delaware corporation, and MIDWEST UNDERGROUND TECHNOLOGY, INC., an Illinois corporation,

Defendants.

**AFFIDAVIT OF CLAY MCGEE IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

I, Clay McGee ("Affiant") being first duly sworn, deposes and says that Affiant has personal knowledge of and is competent to testify to the following facts:

1. Affiant is the Vice-President of Finance for Sabre Industries, Inc.

2. During the pendency of the LOA, from approximately March 12, 2015, to June 5, 2015, Sabre paid the following working capital and other expenses on behalf of ConcealFab or former ConcealFab employees in an amount not less than $608,966.69 including:

a) An initial deposit of prepaid licensing fees / capital infusion of $160,000.00;
b) Payroll from March 31, 2015 to June 5, 2015 of $232,329.30;
c) Employment taxes of $21,576.77;
d) Payroll benefits of $26,693.29;
e) ConcealFab accounts payable totaling $67,634.47;
f) ConcealFab liabilities incurred $71,778.26;
g) Payments of Jonathan Fitzhugh's Credit Card bills: $4,954.61; and
h) Payments to Founder, Slattery, $24,000.00.

3. During the pendency of the LOA, from approximately March 12, 2015, to June 5, 2015, Sabre also booked $96,899.47 in unpaid receivables related to former ConcealFab.

I affirm, under the penalties for perjury, that the foregoing representations are true.

Dated this 26th day of April, 2017.

Clay McGee

## Cash Flow Forecast - CF

[redacted]

### Incremental Cash Flow Requirements - FYE 4.30.16 and inception through 4.30.16

| | CFG | EPG | | |
|---|---|---|---|---|
| [redacted] | | - | - [redacted] | - |
| Founder take out | 60.00 | | | 60.00 |

[redacted]

Founder take out is $12K / month. If take out in March the payment is $120K and remaining due based on closing of deals he has quoted. Paid when cash collected. Jon to provide estimate and timing. CAN SPREAD

[redacted]

EXHIBIT 5D
tabbies
45 3-13-17
Fitzhugh 30(b)(6)

SABRE000362

# Correspondence regarding manufacturing for ConcealFab

# Movant's Appx. P. 271-272

## FILED UNDER RESTRICTION

# Correspondence regarding a site visit to ConcealFab

# Movant’s Appx. P. 273-276

## FILED UNDER RESTRICTION

# Mr. Fitzhugh’s Rule 30(b)(6) Examination

# Movant’s Appx., pp. 277-282

## FILED UNDER RESTRICTION