**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-01793-CMA-KLM

CONCEALFAB CORPORATION, a Colorado corporation,

Plaintiff,

v.

SABRE INDUSTRIES, INC., a Delaware corporation, and MIDWEST UNDERGROUND TECHNOLOGY, INC., an Illinois corporation,

Defendants.

---

**DEFENDANTS' RESPONSE TO PLAINITFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56**

---

Defendants, Sabre Industries, Inc. ("Sabre") and Midwest Underground Technology, Inc., (collectively, "Defendants" or "Sabre") by counsel, in support of their Response to Plaintiff's Motion for Partial Summary Judgment pursuant to Fed. R. Civ. P. 56 and CMA Civil Practice Standard 7.1E, respectfully state as follows:

## INTRODUCTION

Sabre and ConcealFab Corp. ("ConcealFab") (collectively, the "Parties") each participate in segments of the telecom market. On February 3, 2015, the Parties executed a Term Sheet outlining the key categories and terms from which a definitive agreement to combine the two businesses could be developed. They then negotiated and signed a Licensing Operating Agreement ("LOA") to permit the Parties to operate jointly until due

diligence was complete. The Parties operated jointly from March 13, 2015, until June 3, 2015, when Sabre terminated the LOA.

**UNDISPUTED FACTS RELEVANT TO SABRE'S FRAUDULENT INDUCEMENT CLIAM**

1. Mr. Michael Slattery ("Slattery") founded ConcealFab. (Resp't Appx., pp. 17-18, Fitzhugh R. 30(b)(6), pp. 23:25; 24:1-3).

2. In March 2013, Mr. Jonathan Fitzhugh ("Fitzhugh") replaced Slattery as the CEO of ConcealFab. (Resp't Appx., pp. 17-18, Fitzhugh R. 30(b)(6), pp. 23:25; 24:1-3).

3. In September 2014, Fitzhugh met with Sabre executives to discuss a potential strategic alliance or joining of the businesses. (Resp't Appx., p. 19, Fitzhugh R. 30(b)(6) p. 25:16-17).

4. Slattery ceased to be an employee of ConcealFab in November of 2014. (Resp't Appx., p. 8, CF Ans. & Countercl., ¶ 2).

5. Slattery and ConcealFab executed a Separation Agreement and General Release and Consulting Agreement ("Consulting Agreement") on November 18, 2014. (Resp't Appx., p. 8, CF Ans. & Countercl., ¶ 2).

6. On February 3, 2015, ConcealFab and Sabre executed a Term Sheet outlining the key categories and terms from which a definitive agreement to combine the two businesses would be developed. (Dkt., 70, ¶ 13; Dkt. 71, ¶ 13).

7. On March 13, 2015, the Parties executed the LOA. (Dkt., 70, ¶23; Dkt. 71, ¶ 23).

8. Pursuant to the LOA, Sabre paid $24,000 toward ConcealFab's obligations to Slattery under the Consulting Agreement. (Movant's Appx., p. 9, LOA ¶ 3(b)(ii); Resp't Appx., p. 41, McGee Aff.).

## ARGUMENT

### I. CONCEALFAB'S REQUEST FOR DECLARATORY JUDGMENT AS TO SABRE'S UCC LIEN IS MOOT

ConcealFab has asked this Court for a declaratory judgment pursuant to 28 U.S.C. § 2201 that the lien filed by Sabre is invalid pursuant to the Uniform Commercial Code ("UCC"). Sabre has filed a UCC Termination with the Colorado Secretary of State as to its previously filed lien. Accordingly, there is no need for the Court to render an opinion or judgement as to this request. (Resp't Appx., pp. 49-52, UCC Termination).

### II. SABRE'S FRAUDULENT INDUCEMENT CLAIM IS NOT SUBJECT TO SUMMARY JUDGEMENT DUE TO TRIABLE ISSUES OF MATERIAL FACT

A clear issue of material fact exists as to the *extent* of the misrepresentations ConcealFab made to induce Sabre to enter into the Term Sheet and the LOA, and, later to perform under the LOA. Accordingly, Sabre's fraudulent inducement counterclaim should not be dismissed as a matter of law.

#### A. Elements of Fraudulent Inducement Counterclaim & Burden of Proof

Under Colorado law, the elements of a claim for fraudulent inducement are: (1) the plaintiff's misrepresentation of a material fact; (2) the defendant's justifiable reliance on that misrepresentation; and (3) such reliance resulting in damage to the defendant. *Kirzhner v. Silverstein*, 2011 WL 4382650, at *9 (D. Colo. 2011). Sabre must prove each element of its claim by a preponderance of the evidence. *See* CJI-Civil 19:1.

### B. Ample Evidence Supports a Finding That ConcealFab Made Material Misrepresentations of Past and Present Facts to Induce Sabre to Enter the LOA

A party claiming fraudulent inducement must show that the opposing party made a false representation of a past or present fact. *Mosher v. Long Beach Mortgage Co.*, 2014 WL 287441, at *3 (D. Colo. 2014). Sabre alleges that ConcealFab fraudulently induced it to enter the LOA based on ConcealFab's "misrepresentations of material fact…*including, but not limited to"* misrepresentations concerning ConcealFab's significant and lucrative upcoming purchase orders. (Ans. & Countercl., ¶¶ 14, 15, 21, 22, 57 [Dkt. 68]). (Emphasis added). This emphasis is important because Rule 30(b)(6) examinations, taken in in mid-March 2017 (just prior to the close of discovery in this matter) revealed that ConcealFab did make misrepresentations pf past and present facts to induce Sabre to enter into the Term Sheet and the LOA as well as to perform under the LOA.[1]

#### 1. The Evidence Supports a Finding That ConcealFab Misrepresented Past and Present Facts Concerning the Lifetime Value of the Hill AFB Contract

Sabre alleges, in part, that ConcealFab fraudulently induced it to enter the LOA based on ConcealFab's having significant and lucrative upcoming purchase orders including a contract to provide engineering services to Hill Air Force Base in Utah ("Hill AFB"). (Am. Compl., ¶¶ 14, 15, 21, 22, 57 [Dkt. 68]). ConcealFab admits, for the purpose of its Motion, that it made representations regarding its anticipated future contracts and revenue to Sabre before the Parties executed the LOA. (Pl.'s Mt. Partial Summary

[1] Sabre intends to seek leave of the Court to amend its counterclaims to comport with this recently discovered evidence.

Judgment, p. 9 [Dkt. 94]). Regardless, ConcealFab argues that Sabre cannot establish ConcealFab's fraud as to its representations, including those regarding the Hill AFB contract, because these representations were *forward* looking, and, therefore, were not false representations of a *past or present fact. See Mosher*, 2014 WL 287441, at *3. Putting semantics aside, ConcealFab did make misrepresentations of present facts to Sabre concerning the lifetime value of the Hill AFB contract.

Pursuant to Exhibit "A" of the Term Sheet, ConcealFab placed a potential lifetime value of $21 Million on the Hill AFB contract. (Movant's Appx., p. 12). After the Term Sheet was signed, but prior to the signing of the LOA, ConcealFab informed Sabre that it had lost the Hill AFB contract. (Movant's Appx., p. 37). ConcealFab also informed Sabre that it was going to Appeal the decision, and ConcealFab did file an Appeal. (Resp't Appx., 48, SABRE000051).

It wasn't until May 10, 2015, however, that Fitzhugh informed Sabre executives and management that the true lifetime value of the Hill AFB contract, should the Appeal be successful, wasn't $21 Million but, rather, was only $7.9 Million. Specifically, Fitzhugh wrote: "Regarding the opportunity size - the RFP was initially released with a $7.9M 'estimated value', when our Contracting Officer spoke with the Contracting officer at Hill, they indicated that $7.9 was just the Hill portion of the RFP and that multiple other (non-Hill) customers were tee'd up to flow work through this contract, hence the reason we upped the projected value of this contract in the budget/forecast." (Resp't Appx., p. 48, SABRE000051).

Fitzhugh knew all along that the true value of the Hill AFB contract was, at most, $7.9 Million. (Resp't Appx., pp. 37-38, Fitzhugh R. 30(b)(6), pp.134:6-25; 135:1-12).

Regardless, Fitzhugh testified that he did not inform any Sabre representatives in charge of the negotiation of the Term Sheet and the LOA that the value of the contract was $7.9 Million while the negotiations were ongoing. (Resp't Appx., pp. 34-36, Fitzhugh R. 30(b)(6), pp..130:13-25; 131-132). Nor did he inform any of the members of the Sabre / ConcealFab team that the that the lifetime value of the contract was $7.9 Million until May 10, 2015—*two months after the LOA was signed*. *Id*.

The scope of ConcealFab's misrepresentation, which continued for months after the Parties signed the LOA, is beyond mere "puffery" as to future profitability. ConcealFab inflated the value of the Hill AFB contract by almost three (3) times the Government's lifetime value assigned to the contract. At some point, a representation as to the value of something, made to induce another party into action, crosses the line from "puffery" into fraud. This is exactly what happened here. The relevant facts are: (1) the Hill AFB was given a lifetime value of $7.9 Million by the Government office in charge of bidding on the contract; and (2) in spite of knowing this, ConcealFab continually represented to Sabre that the opportunity size of the project was $21 Million, during the negotiation of the Term Sheet and the LOA and while the Parties were working together.

### 2. ConcealFab Misrepresented the Nature of Slattery's Departure and Its Obligations to Slattery Under the "Consulting Agreement"

Discovery has provided Sabre with ample evidence that ConcealFab's CEO, Mr. Fitzhugh, misrepresented past and present facts to Sabre concerning Slattery's departure and the nature of ConcealFab's obligations to Slattery under the "Consulting Agreement."

In November 2014, Mr. Slattery ceased to be an employee of ConcealFab, and on November 18, 2014, ConcealFab and Slattery executed a Consulting Agreement. (Resp't

Appx., p. 8, CF Ans. & Countercl., ¶ 2). Pursuant to the LOA, Sabre paid $24,000 toward ConcealFab's obligations to Slattery under the Consulting Agreement. (Movant's Appx., p. 9, LOA ¶3(b)(ii); Resp't Appx., p. 41, McGee Aff.). What Sabre did not know while it was negotiating the Term Sheet and the LOA, and, later, while it was making payments towards Slattery's "Consulting Agreement," was the true nature of the agreement and the payments.

In late September 2014, Fitzhugh wrote to Slattery, his brother Tim Slattery, and ConcealFab Board member, Duncan Stewart, "I was invited to Atlanta this Wed / Thurs to meet with Sabre Executive Mgt. to hear their proposal for a potential investment / partnership. Would be ideal to have this resolved so they don't find a reason to walk away." (Resp't Appx., p. 43, CONCEALFAB 000287). This meeting then took place between Fitzhugh and Sabre executives. (Resp't Appx., p. 19, Fitzhugh R. 30(b)(6), p. 25:16-17). During his examination, Fitzhugh testified as to the meaning of this words.

> Q. What did you want to have resolved?
>
> A. Not having Mike be an employee of the company.
>
> Q. Why did you think there would be a reason for Sabre to walk away if that was not resolved?
>
> A. Mike is a challenge to work with, and the more we could have him on a non-executive, non-board role, the better.

(Resp't Appx., p. 20, Fitzhugh R. 30(b)(6), p. 26:15-26).

In the background, and unknown to Sabre at the time, on January 7, 2015, ConcealFab gave Slattery written notice that his habit of being under the influence of marijuana at work violated federal law, its federal drug-free workplace policy, and could cause material harm to ConcealFab. (Resp't Appx., p. 9, CF Ans. & Countercl., ¶¶ 8, 9;

Resp't Appx., pp. 21-22, Fitzhugh R. 30(b)(6), pp.28:11-25; 29:1-25). Fitzhugh testified that at the time he was negotiating with Sabre he was aware of these facts concerning Slattery, and that he did not disclose this information to Sabre for fear that Sabre would not enter into an agreement with ConcealFab if it knew the truth.

> Q. At the time that we were talking about, where you had this meeting in Atlanta on September 26, 2014, did you know that Mr. Slattery was a habitual user of marijuana?
>
> A. I did.
>
> Q. …And was that part of the reason why you wanted to transition him from being an executive of ConcealFab to being a -- what was the word --- consultant?
>
> ****
>
> A. Yes. We were -- two reasons: One was to Sabre. The other was we were under review for getting a facility clearance, and as that is a federal law, state law -- it supersedes state law, so we had to abide by the federal drug-free act, so we couldn't have a known violator of that act be under our employ. So we had a couple of reasons to cleave him.

(Resp't Appx., p. 23, Fitzhugh R. 30(b)(6), pp.30:4-21).

As part of the Term Sheet, and later the LOA, ConcealFab negotiated payments related to Slattery's "Consulting Agreement." Specifically, Section 1(a)(iii) of the Term Sheet provides that Sabre will provide "~$250,000" to "fund employee obligations." (Movant's Appx., p. 6, Term Sheet). The Term Sheet was not executed until February 3, 2017, by which time Slattery was no longer an employee of ConcealFab; these funds, however, were to be used to extinguish ConcealFab's obligations to Slattery under the "Consulting Agreement." (Resp't Appx., pp. 28-31, Fitzhugh R. 30(b)(6), pp. 89:12-25; 90:1-7; 91:14-25).

The LOA states, in part, "Employee / Contractor buyout in March in the amount of $120K. This will be funded through a prepayment / deposit fee licensing fee." (Movant's Appx., p. 14, LOA, ¶3(b)(ii)(1)). Sabre proposed and ConcealFab agreed to accept the Slattery buyout in monthly payments. (Resp't Appx., p. 46, SABRE000362 [Redacted]; Resp't Appx., pp. 31-33, 39-40, Fitzhugh R. 30(b)(6), pp. 93:22-25; 94-95:1-20; 173-174).

Fitzhugh's Rule 30(b)(6) testimony established that ConcealFab misrepresented to Sabre the nature these payments during the negotiations of the Term Sheet, the LOA, and during the time the Parties were working together:

> Q. …So you were asking Sabre to -- to fund the deal that you had to remove this man for his habitual drug use?
>
> A. Correct.

(Resp't Appx., p. 26, Fitzhugh R. 30(b)(6), p. 41:8-14).

Fitzhugh's testimony also shows that ConcealFab actively attempted to keep this information from Sabre to induce Sabre to enter into the deal.

> Q. Okay. When did you inform [Sabre] that Mr. Slattery was being removed from his role as an executive in part because of his habitual drug use?
>
> A. I don't know that we ever said it was because of his drug use. I think that would be a -- it was suspicion. We never actually formally tested him, so we more just removed him.

(Resp't Appx., pp. 23-24, Fitzhugh R. 30(b)(6), pp.30:22-25; 31:1-3).

> Q. You were concerned that Sabre would walk away from the deal if Mr. Slattery was still there, though?
>
> A. …I would have to look at the exact context, but it could have been because we -- he was putting our cleared facility status at risk, and we had several opportunities [involving] that. So, yes, that in several capacities, he could jeopardize the deal with Sabre – he could have jeopardized the deal with Sabre.

(Resp't Appx., p. 25, Fitzhugh R.30(b)(6), p. 32:7-15).

During the pendency of the LOA, Sabre paid $24,000 toward ConcealFab's obligations to Slattery under the Consulting Agreement (Resp't Appx., p 41, McGee Aff.). Without Sabre's infusion of funds, ConcealFab did not have the ability to pay its obligations to Slattery under the Consulting Agreement. Accordingly, ConcealFab had every reason to make sure that Sabre didn't back out. Specifically, Fitzhugh testified:

> Q. …And so this $250,000 was related to that agreement that you reached with Mr. Slattery to remove him from being an employee of ConcealFab?
>
> A. Correct. I wanted to make sure it was funded.
>
> Q. But not by ConcealFab. Funded by Sabre?
>
> A. Well, paid for. Because he wasn't coming over as part of the deal. He -- his agreement was tied to CFG[2]
>
> ****
>
> Q. Did CFG not have capital to pay him?
>
> A. It did not.

(Resp't Appx., p. 26, Fitzhugh R.30(b)(6), p.42:4-14).

## CONCLUSION

WHEREFORE, Defendants, Sabre Industries, Inc., and Midwest Underground Technology, Inc., respectfully request an Order Denying Plaintiff's Partial Summary Judgment as to Sabre's Counterclaim for Fraudulent Inducement.

[2] ConcealFab's legal name is CFG Systems, which does business as ConcealFab.

Dated May 18, 2017

**GOOSMANN LAW FIRM, PLC**

By: /s/ Elizabeth M. Lally
Elizabeth M. Lally, AT0013010
Jeana L. Goosmann, AT0002984
410 5th Street
Sioux City, IA 51101
Phone: 712-226-4000
Fax: 712-2244517
lallye@goosmannlaw.com
goosmannj@goosmannlaw.com
**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify on May 18, 2017, a true and correct copy of the foregoing was filed and served electronically upon the following:

Angela DeVine
Silver & DeBoskey, P.C.
1801 York Street
Denver, CO 80206
DevineA@s-d.com

*s/ Chasity Raub-Medina*
Chasity Raub-Medina