# RESPONDENT'S APPENDIX

## p. 1 - 52

| | |
|---|---|
| DISTRICT COURT, EL PASO COUNTY, STATE OF COLORADO<br>Court Address: 270 S. Tejon Street<br>Colorado Springs, Colorado 80903 | |
| **Plaintiff:** MICHAEL SLATTERY,<br><br>v.<br><br>**Defendants:** CONCEALFAB CORPORATION, JONATHAN FITZHUGH, DUNCAN STEWART, AND CHRIS ODELL. | COURT USE ONLY |
| ATTORNEYS FOR DEFENDANTS:<br>Thomas M. Haskins III (#17651)<br>Angela D. DeVine (#35966)<br>Silver & DeBoskey, A Professional Corporation<br>1801 York Street<br>Denver, Colorado 80206<br>(303) 399-3000<br>haskinst@s-d.com<br>devinea@s-d.com | Case No.: 2015CV31900<br><br>Division |
| **ANSWER TO COMPLAINT AND JURY DEMAND, AND COUNTERCLAIMS** | |

Defendants ConcealFab Corporation, Jonathan Fitzhugh, Duncan Stewart and Chris Odell, by their counsel, Silver & DeBoskey, A Professional Corporation, respectfully submit this Answer to Plaintiff's Verified Complaint and Jury Demand ("Complaint"):

## ANSWER

### Parties

1. Defendants admit the allegations contained in paragraph 1 of the Complaint.

2. With respect to the allegations contained in paragraph 2 of the Complaint, Defendants admit ConcealFab Corporation is a Colorado corporation with a principal place of

EXHIBIT 22 3/13/17 Fitzhugh 30(b)(6)

CONCEALFAB 003191

business at 3275 Fillmore Ridge Heights, Colorado Springs, Colorado 80907. Defendants deny the remaining allegations contained in paragraph 2 of the Complaint.

3. Defendants admit the allegations contained in paragraph 3 of the Complaint.

4. Defendants admit the allegations contained in paragraph 4 of the Complaint.

5. Defendants admit the allegations contained in paragraph 5 of the Complaint.

**Jurisdiction and Venue**

6. Defendants admit the allegations contained in paragraph 6 of the Complaint.

7. Defendants admit the allegations contained in paragraph 7 of the Complaint.

8. Defendants admit the allegations contained in paragraph 8 of the Complaint.

9. Defendants admit the allegations contained in paragraph 9 of the Complaint.

10. Defendants admit the allegations contained in paragraph 10 of the Complaint.

11. With respect to the allegations contained in paragraph 11 of the Complaint, Defendants admit venue is properly before this Court because ConcealFab Corporation's principal place of business is in El Paso County, Colorado. Defendants deny the remaining allegations contained in paragraph 11 of the Complaint.

**General Allegations**

12. Defendants admit the allegations contained in paragraph 12 of the Complaint.

13. Defendants admit the allegations contained in paragraph 13 of the Complaint.

14. With respect to the allegations contained in paragraph 14 of the Complaint, Defendants admit that ConcealFab Corporation's intellectual property provides a competitive advantage, but deny that it is the only competitive advantage or even the primary competitive advantage. Defendants deny the remaining allegations contained in paragraph 14 of the Complaint.

15. Defendants admit the allegations contained in paragraph 15 of the Complaint.

16. With respect to the allegations contained in paragraph 16 of the Complaint, Defendants admit that Mr. Fitzhugh replaced Mr. Slattery as CEO of ConcealFab Corporation in March of 2013. Defendants deny the remaining allegations contained in paragraph 16 of the Complaint.

17. Defendants admit the allegations contained in paragraph 17 of the Complaint.

18. Defendants admit the allegations contained in paragraph 18 of the Complaint.

19. Defendants admit the allegations contained in paragraph 19 of the Complaint.

20. With respect to the allegations contained in paragraph 20 of the Complaint, Defendants admit that Mr. Slattery ceased to be an employee of ConcealFab Corporation in November of 2014, and that Mr. Slattery and ConcealFab Corporation executed a Separation Agreement and General Release and Consulting Agreement on November 18, 2014. Defendants state that the terms of the Separation Agreement and General Release and Consulting Agreement speak for themselves, and deny Mr. Slattery's characterization of the agreements and all allegations contrary to their terms. Defendants deny the remaining allegations contained in paragraph 20 of the Complaint.

21. With respect to the allegations contained in paragraph 21 of the Complaint, Defendants state that the terms of the Consulting Agreement speak for themselves, and deny Mr. Slattery's characterization of the Consulting Agreement and all allegations contrary to its terms. Defendants deny the remaining allegations contained in paragraph 21 of the Complaint.

22. Defendants deny the allegations contained in paragraph 22 of the Complaint.

23. With respect to the allegations contained in paragraph 23 of the Complaint, Defendants admit that Mr. Fitzhugh, on behalf of ConcealFab Corporation, signed a Term Sheet with Midwest Underground Technology, Inc. on March 9, 2015. Defendants deny the remaining allegations contained in paragraph 23 of the Complaint.

24. Defendants admit the allegations contained in paragraph 24 of the Complaint.

25. With respect to the allegations contained in paragraph 25 of the Complaint, Defendants admit that Mr. Fitzhugh sent a letter to ConcealFab Corporation shareholders on March 10, 2015. Defendants state that the letter speaks for itself, and deny Mr. Slattery's characterization of the letter and all allegations contrary to its content. Defendants deny the remaining allegations contained in paragraph 25 of the Complaint.

26. With respect to the allegations contained in paragraph 26 of the Complaint, Defendants state that the letter speaks for itself, and deny Mr. Slattery's characterization of the letter and all allegations contrary to its content. Defendants deny the remaining allegations contained in paragraph 26 of the Complaint.

27. With respect to the allegations contained in paragraph 27 of the Complaint, Defendants state that the letter speaks for itself, and deny Mr. Slattery's characterization of the

letter and all allegations contrary to its content. Defendants deny the remaining allegations contained in paragraph 27 of the Complaint.

28. With respect to the allegations contained in paragraph 28 of the Complaint, Defendants admit that the March 10, 2015 letter enclosed a written consent. Defendants state that the written consent speaks for itself, and deny Mr. Slattery's characterization of the consent and all allegations contrary to its content. Defendants deny the remaining allegations contained in paragraph 28 of the Complaint.

29. Defendants admit the allegations contained in paragraph 29 of the Complaint.

30. With respect to the allegations contained in paragraph 30 of the Complaint, Defendants admit that the majority of common stock shareholders approved the Term Sheet. Defendants deny the remaining allegations contained in paragraph 30 of the Complaint.

31. With respect to the allegations contained in paragraph 31 of the Complaint, Defendants admit that Mr. Fitzhugh sent Mr. Slattery and others a notice dated April 11, 2015. Defendants state that the notice speaks for itself, and deny Mr. Slattery's characterization of the notice and all allegations contrary to its content. Defendants deny the remaining allegations contained in paragraph 31 of the Complaint.

32. With respect to the allegations contained in paragraph 32 of the Complaint, Defendants admit that Mr. Fitzhugh sent a document entitled "Frequently Asked Questions & Answers for Proposed MUTI/ConcealFab Transaction" to all ConcealFab Corporation shareholders on April 11, 2015. Defendants state that the document speaks for itself, and deny Mr. Slattery's characterization of the document and all allegations contrary to its content. Defendants deny the remaining allegations contained in paragraph 32 of the Complaint.

33. Defendants deny the allegations contained in paragraph 33 of the Complaint.

34. With respect to the allegations contained in paragraph 34 of the Complaint, Defendants admit that all ConcealFab Corporation employees became employees of Sabre. Defendants deny the remaining allegations of paragraph 34 of the Complaint.

35. Defendants deny the allegations contained in paragraph 35 of the Complaint.

36. Defendants deny the allegations contained in paragraph 36 of the Complaint.

37. With respect to the allegations contained in paragraph 37 of the Complaint, Defendants admit that individuals with a concealfab.com e-mail account added "ConcealFab Corporation—a Division of Sabre Industries" to their signature blocks. Defendants deny the remaining allegations contained in paragraph 37 of the Complaint.

38. Defendants deny the allegations contained in paragraph 38 of the Complaint.

39. Defendants admit the allegations contained in paragraph 39 of the Complaint.

40. Defendants admit the allegations contained in paragraph 40 of the Complaint.

41. Defendants deny the allegations contained in paragraph 41 of the Complaint.

42. Defendants admit the allegations contained in paragraph 42 of the Complaint.

43. With respect to the allegations contained in paragraph 43 of the Complaint, Defendants admit that ConcealFab Corporation gave Mr. Slattery certain financial statements, board meeting minutes and the Term Sheet on May 4, 2015. Defendants deny the remaining allegations contained in paragraph 43 of the Complaint.

44. Defendants deny the allegations contained in paragraph 44 of the Complaint.

45. Defendants deny the allegations contained in paragraph 45 of the Complaint.

46. With respect to the allegations contained in paragraph 46 of the Complaint, Defendants admit that Mr. Slattery sent a demand letter to the board on May 7, 2015. Defendants state that the demand letter speaks for itself, and deny Mr. Slattery's characterization of the demand letter and all allegations contrary to its content. Defendants deny the remaining allegations contained in paragraph 46 of the Complaint.

47. Defendants deny the allegations contained in paragraph 47 of the Complaint.

48. With respect to the allegations contained in paragraph 48 of the Complaint, Defendants admit that ConcealFab Corporation provided a written response to Mr. Slattery's demand letter on May 13, 2015. Defendants state that the written response speaks for itself, and deny Mr. Slattery's characterization of the response and all allegations contrary to its content. Defendants deny the remaining allegations contained in paragraph 48 of the Complaint

49. With respect to the allegations contained in paragraph 49 of the Complaint, Defendants admit that Sabre informed ConcealFab Corporation that it intended to terminate the Term Sheet on May 26, 2015. Defendants deny the remaining allegations contained in paragraph 49 of the Complaint.

50. With respect to the allegations contained in paragraph 50 of the Complaint, Defendants admit that Ric Denton joined the board and was appointed the sole member of a special litigation committee on June 1, 2015. Defendants further admit that Mr. Denton is a common shareholder, a preferred shareholder and an option holder. Defendants deny the remaining allegations contained in paragraph 50 of the Complaint.

51. Defendants deny the allegations contained in paragraph 51 of the Complaint.

52. Defendants admit the allegations contained in paragraph 52 of the Complaint.

53. With respect to the allegations contained in paragraph 53 of the Complaint, Defendants state that the special litigation committee report speaks for itself, and deny Mr. Slattery's characterization of the report and all allegations contrary to its content. Defendants deny the remaining allegations contained in paragraph 53 of the Complaint.

54. With respect to the allegations contained in paragraph 54 of the Complaint, Defendants state that the special litigation committee report speaks for itself, and deny Mr. Slattery's characterization of the report and all allegations contrary to its content. Defendants deny the remaining allegations contained in paragraph 54 of the Complaint.

55. With respect to the allegations contained in paragraph 55 of the Complaint, Defendants state that the special litigation committee report speaks for itself, and deny Mr. Slattery's characterization of the report and all allegations contrary to its content. Defendants deny the remaining allegations contained in paragraph 55 of the Complaint.

56. With respect to the allegations contained in paragraph 56 of the Complaint, Defendants state that the special litigation committee report speaks for itself, and deny Mr. Slattery's characterization of the report and all allegations contrary to its content. Defendants deny the remaining allegations contained in paragraph 56 of the Complaint.

**First Claim for Relief**
**(Breach of Contract)**

57. Defendants incorporate by reference their responses set forth in paragraphs 1 through 56 above.

58. Defendants admit the allegations contained in paragraph 58 of the Complaint.

59. Defendants deny the allegations contained in paragraph 59 of the Complaint.

60. Defendants deny the allegations contained in paragraph 60 of the Complaint.

61. Defendants deny the allegations contained in paragraph 61 of the Complaint.

62. Defendants deny the allegations contained in paragraph 62 of the Complaint.

**Second Claim for Relief**
**(Derivative Shareholder Action—C.R.S. § 7-107-402)**

63. Defendants incorporate by reference their responses set forth in paragraphs 1 through 62 above.

64. Defendants deny the allegations contained in paragraph 64 of the Complaint.

65. Defendants deny the allegations contained in paragraph 65 of the Complaint.

66. Defendants deny the allegations contained in paragraph 66 of the Complaint.

67. Defendants deny the allegations contained in paragraph 67 of the Complaint.

68. Defendants deny the allegations contained in paragraph 68 of the Complaint.

69. Defendants deny the allegations contained in paragraph 69 of the Complaint.

70. Defendants deny all allegations contained in the Complaint that were not specifically admitted.

## AFFIRMATIVE DEFENSES

1. Plaintiff's Complaint fails to state claims upon which relief may be granted.

2. Plaintiff's claims are barred because of his failure to satisfy one or more conditions precedent.

3. Plaintiff's claims are barred by the doctrines of waiver, estoppel and laches.

4. Plaintiff's claims are barred by the doctrine of accord and satisfaction.

5. Plaintiff's claims are barred by his own prior breach of contract.

6. Plaintiff's claims are barred because he did not make a good faith effort to obtain the action he desired from the Defendants prior to filing suit.

7. Plaintiff's claims are barred because he does not fairly and adequately represent the interests of ConcealFab Corporation's common shareholders.

8. Plaintiff's claims are barred by the business judgment rule.

9. Defendants are entitled to an award of costs and attorneys' fees pursuant to C.R.S. § 7-107-402(2).

10. Defendants complied with all statutory and common-law duties to Plaintiff, if any.

11. Plaintiff's claims are barred by the terms of his First Amended and Restated Investor Rights Agreement.

12. Plaintiff's claims are barred because he lacks standing.

13. Plaintiff's claims are barred by his failure to mitigate his damages, if any.

14. Plaintiff's claims are barred by his unclean hands.

15. Plaintiff's claims may be subject to, limited by, and/or barred by the economic loss rule.

16. To the extent that discovery, the parties' continuing investigations, and/or trial preparation reveal the existence of any other affirmative defenses, Defendants reserve their right to assert such additional affirmative defenses.

## COUNTERCLAIMS

Defendant ConcealFab Corporation, for its Counterclaims against Plaintiff, alleges as follows:

### Parties, Jurisdiction and Venue

1. ConcealFab Corporation incorporates the allegations contained in paragraphs 1 through 11 and paragraph 19 of the Complaint herein.

### General Allegations

2. On November 18, 2014, Mr. Slattery executed a Consulting Agreement with ConcealFab Corporation.

3. Exhibit A to the Consulting Agreement requires Mr. Slattery, among other things, to "[d]iligently and actively promote the sales of all products of the Company and use reasonable efforts to maximize orders for the products of the Company by all lawful and proper means. . ."

4. Section 6(b) of the Consulting Agreement permits ConcealFab Corporation to "terminate this Agreement for convenience or for Material Breach" by Mr. Slattery.

5. Section 6(i) of the Consulting Agreement defines "Material Breach" as, among other things, "willful conduct that violates law and causes material harm to the Company."

6. Also on November 18, 2014, Mr. Slattery executed a First Amended and Restated Investor Rights Agreement ("Investor Agreement") with ConcealFab Corporation.

7. Section 2(a) of the Investor Agreement provides:

> Change of Control. If the Board of Directors and Shareholders holding shares sufficient to approve a transaction constituting a Change of Control transaction

under Colorado law and the Articles of Incorporation then in effect (the "Requisite Holders") (such transaction to be referred to as an "Approved Sale"), all Shareholders shall, in their respective capacities, consent to, and vote all of their shares in favor of, and raise no objections against, the Approved Sale, and if the Approved Sale is structured as (i) a merger or consolidation of the Company or a sale of all or substantially all of the Company's assets, each Shareholder shall waive any dissenters' rights, appraisal rights or similar rights in connection with such merger, consolidation or asset sale, or (ii) a sale of shares of capital stock of the Company, each Shareholder shall agree to sell all of such Shareholder's Shares on the terms and conditions approved by the Requisite Holders and the Board; provided, that in an Approved Sale, each Shareholder receives the same total consideration and benefits per Share of the respective class held by it as each other holder of a Share of a respective class receives.

8. On or about January 7, 2015, ConcealFab Corporation gave Mr. Slattery written notice that his habit of being under the influence of marijuana at work violated federal law, its federal drug-free workplace policy, and could cause material harm to ConcealFab Corporation.

9. Upon information and belief, Mr. Slattery continued to work for ConcealFab Corporation while under the influence of marijuana.

10. On March 9, 2015, ConcealFab Corporation and Midwest Underground Technology, Inc. ("MUTI") executed a Term Sheet in which the parties proposed "to combine the organizations to facilitate a strategic relationship, acquisition and investment by MUTI of" ConcealFab Corporation ("MUTI transaction").

11. The MUTI Term Sheet outlined the key categories and terms for which the basis of a definitive agreement would be developed.

12. The ConcealFab Corporation Board of Directors approved the MUTI transaction on or about March 9, 2015.

13. A majority of the ConcealFab Corporation common stock shareholders approved the MUTI transaction on or about March 11, 2015.

14. There was a reasonable likelihood or probability that the MUTI Term Sheet would result in a formal agreement. ConcealFab Corporation and MUTI began to perform some of the items on the Term Sheet, and all ConcealFab Corporation employees ceased to be employees of that company and became employees of MUTI.

15. Mr. Slattery claimed that the MUTI transaction was a Change of Control.

16. Mr. Slattery did not vote his shares in favor of, and raised objections against the MUTI transaction.

17. By letter dated May 7, 2015, Mr. Slattery accused the ConcealFab Board of Directors of breaching their fiduciary duties to the company by agreeing to the MUTI Term Sheet and pursing the MUTI transaction.

18. On May 9, 2015, ConcealFab Corporation disclosed Mr. Slattery's May 7, 2015 letter to MUTI.

19. On May 11, 2015, the ConcealFab Corporation Board of Directors, the MUTI executive team and their respective attorneys met to discuss Mr. Slattery's letter and its allegations. The MUTI representatives expressed concern about the letter and the risk its allegations posed to MUTI.

20. On May 26, 2015, MUTI informed ConcealFab Corporation that it perceived too much risk in proceeding with the MUTI transaction in light of Mr. Slattery's May 7, 2015 letter, and that it intended to terminate all employees and the Term Sheet.

21. MUTI terminated the Term Sheet by letter dated June 3, 2015.

22. No formal agreement was entered into by ConcealFab and MUTI.

23. On or about June 21, 2015, ConcealFab Corporation banned Mr. Slattery from its facility after receiving reports that he had harassed and intimidated ConcealFab Corporation employees.

**First Counterclaim for Relief**
**(Breach of Contract)**

24. Defendant ConcealFab Corporation incorporates herein the allegations contained in paragraphs 1 through 23 of its Counterclaims.

25. Mr. Slattery agreed in the Investor Agreement that he would consent to, and vote all of his shares in favor of, and raise no objections against an Approved Sale.

26. Mr. Slattery breached the Investor Agreement.

27. Mr. Slattery's breach of the Investor Agreement has caused ConcealFab Corporation to incur damages in an amount to be proven at trial, plus interest, attorneys' fees and costs.

## Second Counterclaim for Relief
## (Tortious Interference with Prospective Business Relations)

28. Defendant ConcealFab Corporation incorporates herein the allegations contained in paragraphs 1 through 27 of its Counterclaims.

29. Mr. Slattery intentionally and improperly interfered with ConcealFab Corporation's prospective contractual relation with MUTI.

30. Mr. Slattery caused MUTI to terminate the Term Sheet.

31. Mr. Slattery caused MUTI not to enter into a formal agreement with ConcealFab.

32. Mr. Slattery's interference has caused ConcealFab Corporation to incur damages in an amount to be proven at trial, plus interest, attorneys' fees and costs.

## Third Counterclaim for Relief
## (Declaratory Judgment)

33. Defendant ConcealFab Corporation incorporates herein the allegations contained in paragraphs 1 through 32 of its Counterclaims.

34. Pursuant to C.R.C.P. 57 and C.R.S. § 13-51-106, any person interested under a written instrument or contract may have determined any question of construction or validity arising under such written instrument or contract and obtain a declaration of rights, status or other legal relations under the contract.

35. ConcealFab Corporation is a person interested under the Consulting Agreement.

36. There is an actual case or controversy between ConcealFab Corporation and Mr. Slattery concerning whether Mr. Slattery has materially breached the Consulting Agreement.

37. ConcealFab Corporation seeks a declaratory judgment that Mr. Slattery materially breached the Consulting Agreement.

38. The Court's issuance of declaratory judgment in this case will terminate the uncertainty or controversy giving rise to these proceedings.

WHEREFORE, having fully answered, Defendants ConcealFab Corporation, Jonathan Fitzhugh, Duncan Stewart and Chris Odell respectfully request that the Court dismiss Plaintiff's Verified Complaint and Jury Demand with prejudice, and that Plaintiff take nothing; that judgment for damages be entered in favor of Defendant ConcealFab Corporation and against Plaintiff Michael Slattery; that the Court declare Plaintiff Michael Slattery in Material Breach of

the Consulting Agreement; and that Defendants be awarded their costs, expenses, and attorneys' fees and such other and further relief as the Court deems just and proper.

Dated this 27th day of July, 2015.

Respectfully submitted,

SILVER & DEBOSKEY,
A Professional Corporation

By: /s/Angela D. DeVine
Thomas M. Haskins III
Angela D. DeVine

ATTORNEYS FOR DEFENDANTS

Defendants' Addresses:

ConcealFab Corporation
3275 Fillmore Ridge Heights
Colorado Springs, CO 80907

Jonathan Fitzhugh
31 Cherry Hills Farm Drive
Englewood, CO 80113

Duncan Stewart
1015 Dolan Drive
Monument, CO 80132

Chris Odell
1985 Craig Drive
Colorado Springs, CO 80921

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2015, the foregoing **ANSWER TO COMPLAINT AND JURY DEMAND, AND COUNTERCLAIMS** was filed via ICCES, which will send notification of such filing to the following:

Erin M. Jensen, Esq.
Howard & Jensen LLC
444 East Pikes Peak Ave., STE 200
Colorado Springs, CO 80903

*/s/Linda Andolsek*
Linda Andolsek

F99237

Transcript of the 30(b)(6) Deposition of:
**ConcealFab through Jonathan Fitzhugh**

Date: **March 13, 2017**

ConcealFab Corporation v. Sabre Industries and Midwest Underground Technology

Civil No. 15-cv-01793-CMA-KLM

Mile High
Court Reporting & Video, Inc.

14143 Denver West Parkway, Suite 100 • Golden, Colorado 80401
(303) 202-0210 • contact@milehighreporting.com
www.milehighreporting.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-01793-CMA-KLM

---

30(b)(6) VIDEOTAPED DEPOSITION OF ConcealFab Corporation
JONATHAN TODD FITZHUGH
March 13, 2017

---

CONCEALFAB CORPORATION,

Plaintiff,

vs.

SABRE INDUSTRIES, INC., and

MIDWEST UNDERGROUND TECHNOLOGY, INC.,

Defendants.

---

PURSUANT TO NOTICE, the 30(b)(6) videotaped deposition of CONCEALFAB CORPORATION - JONATHAN TODD FITZHUGH, called for an examination by the Defendants herein, was taken at Silver & DeBoskey, P.C., 1801 York Street, Denver, Colorado 80206, commencing at 1:38 p.m. on March 13, 2017, before Shauna T. Dietel, a Registered Professional Reporter and Notary Public within Colorado.

APPEARANCES:

ANGELA D. DEVINE, ESQ.
Silver & DeBoskey, P.C.
1801 York Street
Denver, Colorado 80206
303-399-3000
devinea@s-d.com

For the Plaintiff

ELIZABETH M. Lally, ESQ.
Goosmann Law Firm
410 5th Street
Sioux City, Iowa 51101
712-226-4000
LallyE@GoosmannLaw.com

For the Defendants

Also Present: None

**(Depositions Exhibit 21 was marked.)**
**Q (By Ms. Lally) I'm going to hand you what is being marked as Exhibit Number 21.**
A Okay.
**Q This is CONCEALFAB278 to 2- -- I'm sorry, 287 to 289. Please take a look at it, and let me know if it appears to be a true and accurate copy.**
**MS. Lally: Thank you.**
A Appears accurate.
**Q (By Ms. Lally) Okay. So at the top here, this is a sort of an e-mail string --**
A Uh-huh.
**Q -- right? Which was unfortunate that you get those, but you do.**
**And at the very top, this appears to be an e-mail from you to Mike Slattery and Tim Slattery, dated September 26, 2014.**
A Uh-huh.
**Q ConcealFab agreement. It looks like it's copied to, perhaps, Duncan Stewart. I don't know whose e-mail address that is, but it says --**
A That is --
**Q -- D. Stewart.**
A That is Duncan.
**Q Okay. Who is Mike Slattery?**

A Mike Slattery was the original founder of ConcealFab and the CEO up until the time that I became CEO.

**Q Okay. What was his position with the company at this time, September 26, 2014?**

A He was a board member, and I believe his technical title was executive vice president of business development or sales and marketing, something like that.

**Q So he was a board member at this time?**

A Yes.

**Q But he was not a board member when you were hired, or was he?**

A He was.

**Q He was. I'm sorry.**

**And who's Tim Slattery?**

A Tim is Mike's brother.

**Q Okay. Is Tim also on the board of ConcealFab, or has --**

A He was. He was not at the time of this e-mail.

**Q Okay. So at some point he was on the board?**

A Correct.

**Q But not at the time of this e-mail?**

A Correct.

**Q Okay. When did Mike stop being part of the board? Do you recall?**

A Yes. It was part of our November 2014 investment round.

**Q Okay. We'll go back to that.**

**What -- you said, Perhaps we can meet this week to finalize? What are you talking about finalizing?**

A We were talking about putting Mike on a consulting agreement so that he would no longer be an employee.

**Q Okay. And it says in this e-mail, I was invited to Atlanta this Wednesday, Thursday to meet with Sabre executive management --**

A Yes.

**Q -- in short form -- to hear their proposal for a potential investment partnership.**

**Did that meeting happen?**

A Yes.

**Q Okay. And do you recall who was at that meeting?**

A Yes. It was Doug Huff, Patrick Cochran, Lou Olson, and I believe Tom Chikowski (phonetic).

**Q Okay. Did you make any sort of formal proposal or presentation at this meeting?**

A I -- I made a presentation. We were -- yes, I made a presentation.

**Q Was that that PowerPoint presentation or . . .**

A Sure.
**Q Did you have written materials --**
A Yes.
**Q -- for that presentation --**
A Yes.
**Q -- that you passed out?**
A Yes.
**Q Okay. Were those substantially different from the materials that you presented in January of 2014?**
A They were. We started discussing more detailed things.
**Q Okay. Did Sabre make any sort of formal presentation at this meeting, if you recall?**
A They did not.
**Q Okay. The last sentence of this e-mail is, Would be ideal to have this resolved so they don't find a reason to walk away.**
A That's true.
**Q What did you want to have resolved?**
A Not having Mike be an employee of the company.
**Q Okay. Why did you think there would be a reason for Sabre to walk away if that was not resolved?**
A Mike is a challenge to work with, and the more we could have him on a non-executive, non-board role, the better.

pretty clear that the investment round that was happening in November was critical to getting him sidelined.

**Q Okay. We'll talk later about that.**

A Okay.

**Q I'm handing you what's been marked as Exhibit Number 21.**

MS. DEVINE: I think we have two 21s.

MS. Lally: Oh, gee whiz. Thank you. Not a problem. I can fix it.

(Deposition Exhibit 22 was marked.)

**Q (By Ms. Lally) I'm handing you what's been marked as Exhibit Number 22. Could you -- and there is a Bates number on this, CONCEALFAB3191 to CONCEALFAB3203.**

**Can you take a look and let me know if this appears to be true and accurate.**

**MS. Lally: Thank you for keeping me on track.**

A Yes, it is --

**Q (By Ms. Lally) What is this --**

A -- accurate.

**Q -- exhibit?**

A This is a lawsuit from Michael Slattery against ConcealFab Corporation and each of the directors.

**Q Specifically, is this an Answer to a Complaint and Jury Demand and Counterclaim?**

A Yes.

**Q And this answer is on behalf of defendants ConcealFab Corporation, Jonathan Fitzhugh, Duncan Stewart and Chris Odell; is that correct?**
A Correct.
**Q Okay. Did you help prepare this answer to the complaint and counterclaim?**
A Yes.
**Q Okay. And did you review this before it was filed?**
A Yes.
**Q Okay.**
MS. LALLY: Oh, man. I'm sorry. My computer went to sleep.
**Q (By Ms. Lally) Okay. I have the paragraph marked just a little out of order here.**
MS. LALLY: And my computer's asleep. If could give me a moment.
**Q (By Ms. Lally) Okay. If you would turn to Page 9.**
A Okay.
**Q Okay. And Paragraph 9 says, On or about January 7th, 2015, ConcealFab Corporation gave Mr. Slattery written notice that his habit of being under the influence of marijuana at work violated federal law, the federal drug-free workplace policy, and could cause**

**material harm to ConcealFab Corporation.**
**Is that what that says?**
A It is.
**Q Okay. At the time that we were talking about where you had this meeting in Atlanta on September 26, 2014, did you know that Mr. Slattery was a habitual user of marijuana?**
A I did.
**Q Okay. And was that part of the reason why you wanted to transition him from being an executive of ConcealFab to being a -- what was the word -- not contractor --**
A A consultant?
**Q -- consultant?**
A Yes. We were -- two reasons: One was to Sabre. The other was we were under review for getting a facility clearance, and as that is a federal law, state law -- it supersedes state law, so we had to abide by the federal drug-free act, so we couldn't have a known violator of that act be under our employ. So we had a couple of reasons to cleave him.
**Q Okay. When did you inform ConcealFab that Mr. Slattery was being removed from his role as an executive in part because of his habitual drug use?**
A I don't know that we ever said it was because

of his drug use. I think that would be a -- it was a suspicion. We never actually formally tested him, so we more just removed him.

But it was in part of the November investment round. Everyone was aware that he was being removed in his capacity as both a board member and -- that was part of the package deal --

**Q When you say "everyone," you mean everyone at ConcealFab --**

A Correct.

**Q -- or everybody who was going to be an investor in ConcealFab; is that correct?**

A Everyone who was both a shareholder and looking to participate in the November investment round.

**Q Okay. So everyone does not include Sabre?**

A I do not recall the exact conversations I had with Sabre at the time. But they had no formal communication as a -- as part of my November investment round.

**Q Okay. Did you mention to ConcealFab at any time during the meeting in Atlanta that Mr. Slattery's role was being transitioned?**

A Do you mean Sabre?

**Q I'm sorry.**

**Did you mention to anybody at Sabre during the**

**meeting in Atlanta that Mr. Slattery's role was being transitioned?**
A No.
**Q Okay. And yet it apparently weighed heavy on your mind; is that correct?**
A It was one of the things on my mind.
**Q Okay. You were concerned that Sabre would walk away from the deal if Mr. Slattery was still there, though?**
A I -- I would have to look at the exact context, but it could have been because we -- he was putting our cleared facility status at risk, and we had several opportunities revolving that. So, yes, that in several capacities, he could jeopardize the deal with Sabre -- he could have jeopardized the deal with Sabre.
**Q Okay. Let's just go further down on Exhibit Number 21.**
A Okay.
**Q It appears to be --**
A 21 or 22?
**Q 21, the e-mail.**
A Oh, got it.
**Q If we go further down, it looks like there's an e-mail from Mike Slattery, dated September 26th, to Tim Slattery, copying you.**

**Q Okay. So that relates back to the November 2014 round?**
A (The deponent nodded.)
**Q Not including Fitzhugh's portion?**
A Correct.
**Q Okay. Was that your portion or your dad's?**
A Both.
**Q Okay. Fund founder severance of -- tilde, which means approximately -- $250,000?**
A Yep.
**Q Okay. So you were asking Sabre to -- to fund the deal that you had to remove this man for his habitual drug use?**
A Correct.
MS. DEVINE: Object to form.
**Q (By Ms. Lally) So part of the reason that Mr. Slattery was transitioned from being an employee of ConcealFab to being a consultant was because you believed that he was a habitual drug user; is that correct?**
A He used -- well, he used drugs enough that it was a problem.
**Q Okay. Whether or not it was habitual we'll table. He was a drug user?**
A Yes.
**Q And --**

A Mar -- he had a prescription to medical marijuana, I believe, which, regardless, for federal law, doesn't matter.

**Q Okay. And so this 250,000 was related to that agreement that you reached with Mr. Slattery to remove him from being an employee of ConcealFab?**

A Correct. I wanted to make sure it was funded.

**Q But not by ConcealFab. Funded by Sabre?**

A Well, paid for. Because he wasn't coming over as part of the deal. He -- his agreement was tied to CFG.

**Q Okay.**

A So --

**Q Did CFG not have capital to pay him?**

A It did not.

**Q Okay. Extinguish, tilde -- again, approximately -- $100,000 of existing SMB commercial loan --**

A Yep.

**Q -- through Vectra Bank?**

A Vectra (pronouncing).

**Q Vectra. Sorry.**

A That's all right.

**Q So you had a -- ConcealFab had a commercial loan through Vectra Bank; is that correct?**

A Correct.

**Q So were you negotiating with ConcealFab or yourself with respect to that point?**
A I guess technically in that, I was negotiating on my behalf.
**Q Fund employee obligations of tilde $250,000. If this -- is this your comment in bold? If this is funded through prepaid royalties as actual amounts owed, it could apply this to debt/other obligations described above.**
**Is that your comment?**
A Yes.
**Q So you -- what did you envision here with that change, the 250,000 being prefunded, or just given to you prepaid so that you could apply it to other obligations?**
A This was -- so Sabre was going to put capital into CFG Systems, which was the left-behind entity, of which -- I mean, this employee -- this is specifically talking about the founder severance. I was trying to figure out how we could get rid of the founder quickly.
**Q But it doesn't say founder severance, does it?**
A This specific line does not.
**Q No. This says fund employee obligations, doesn't it?**
A Yes.
**Q Okay. And Mr. Slattery was not an employee at**

**ConcealFab at this time, was he?**
A Correct. But I sent an e-mail to Doug, clearly saying could we change it to say this because of optics. But whatever. Go ahead.
**Q Okay. All right. Okay. So you wanted to get rid of him sooner, Slattery?**
A Always. Not soon enough.
**Q All right. So you wanted it prefunded so that you could just extinguish whatever liabilities ConcealFab had to him?**
A Well, Sabre was already going to submit prepaid royalties -- they were going to put money in and call it prepaid royalties that were to be paid back. I'm trying to -- my wording was not as good as it could have been. That's why I'm trying to re-read this.
Oh, okay. I understand. So we estimated, based upon Mike's 120,000 of fees and projected commissions, that it was going to be around 250,000. So I believe what I was asking here was if that all comes in and Mike's actuals are -- for the commission portion were less, I could apply it against other obligations, such as the debt -- that private debt note that remained on our books. It appears that's what I was angling at. Because Doug and I were doing lots of projections on Mike's commissions and what they might equal.

**Q And the private debt note, at least 200,000 of that was owed to Tim Slattery; is that right?**
A No.
**Q Or 100,000?**
A 100,000.
**Q Okay. Okay. So let's look at Paragraph 3(b)(11) -- nope, Paragraph 3(b)(ii).**
A Yep.
**Q And then little one. So it says, Employee obligations up till the 250 will be funded as follows: Employee buyout in March in the amount of 120K.**
**What's that referring to?**
A I'm sorry?
**Q What's that referring to, employee buyout in March in the amount of 120K?**
A So I know it says employee, but Mike Slattery had ten months remaining on his contract at 12,000 per month. So we could buy out those ten months at 12,000 per month, which equals 120K, to get rid of his -- just the fee portion, not his commission portion. As you'll notice, (ii), Number 2, started talking about his commissions.
**Q Okay. So your understanding is that had to do with Mike Slattery?**
A Absolutely had 100 percent to do with Mike

A Looks good.
**Q (By Ms. Lally) Okay. So eventually after some back and forth, the parties fully executed the LOA; is that correct?**
A Correct.
**Q Okay. And this is dated March 9th, 2015; is that correct?**
A Yes.
**Q Okay. So let's look at Paragraph 3(a). The term sheet provides for the purchase price of 1.2 million that will be used as follows: Extinguish the liquidation preference on preferred stock, not including Fitzhugh's portion.**
**So that didn't change?**
A Correct. I was unsuccessful in my negotiation.
**Q Fund employee obligations until the 250?**
A Uh-huh.
**Q Extinguish 100K of existing commercial loans?**
A Uh-huh.
**Q Under the LO -- temporary LOA structure, these amounts will be handled as outlined above.**
**So when we get to employee obligations, it spells out employee/contractor buyout in March in the amount of 120K; is that right?**
A Yes.

**Q Okay. This will be funded through a prepayment/deposit license fee. But that didn't actually happen, did it, not through a prepayment?**

A I'm sorry?

**Q Did -- that wasn't paid through a prepayment, was it?**

A No.

**Q No. How was it paid?**

A Well, they paid two payments of -- or it could have been one payment -- they paid a total of 24,000 against this obligation.

**Q So they paid the monthly obligations of 12,000 for a time?**

A For a time.

**Q Okay.**

A They paid two of the three monthly obligations.

**Q Okay. But you accepted those monthly payments?**

A Oh, I accepted the cash, absolutely.

**Q Okay. So you didn't say, when they sent you the first $12,000, Hey, guys, you're supposed to pay me 120K?**

A Did I complain about the amounts that Sabre was paying? Absolutely. Because they were late. We had a big meeting, and Tony and I had a knock-down, drag-out e-mail fight. He finally sent it to Pete. And then we

had a -- because they were late and it was causing tension with Mike. They finally, in, I think early May, had a meeting, and they finally funded those obligations.

**Q Okay. Monthly?**

A Correct, two of the monthly obligations.

**Q And you accepted those payments?**

A Absolutely.

**Q Okay. Did you see that as modifying the term of this portion of the LOA by accepting the monthly payments?**

MS. DEVINE: Objection. Foundation. Calls for a legal conclusion.

**Q (By Ms. Lally) You can answer.**

A But I don't have to answer?

MS. DEVINE: No, you do have to answer.

THE WITNESS: Oh, sorry.

A Did I see it as a modification? It's hard to answer because Sabre didn't do a lot of the things in here, so I guess I was just happy for them to do something in -- in the spirit of this agreement. So I accepted it.

**Q (By Ms. Lally) Okay. Let's go to -- and I'm sorry. We're going to take these a little out of order, but let's go to paragraph -- well, the last page of this, page 200, four additional provisions.**

A Yep.

**Q Okay. I'd like to look at Number 2, update on this CFG project and timing on any work. You have written in here, The Hill AFB project is still in the appeal stage.**

**So it was in appeal at this time?**

A But it looked like it says it was in DC, so it had been -- they appealed to the DC office, according to this.

**Q Okay. All right. So this is their appeal. You had won --**

A We had already gotten the regional affirmation that they were not small.

**Q Regarding the opportunity size, the RFP was initially released with a 7.9 million estimated value.**

A Uh-huh.

**Q Okay. Do you know if you actually put in writing before this to anybody at Sabre that the initial RFP was 7.9?**

A You really need to read the rest of the sentence.

**Q Okay. I was just asking about the first half of the sentence, so --**

A I know, but so -- no, I clustered both the first half and second half of the sentence whenever I represented this, it appears.

**Q Okay. Do you know if you put to anybody in writing at Sabre, in any way, prior to this e-mail that the RFP was initially released with a $7.9 million estimated value?**

A I'm confident I could find communication from our contracting officer to the Sabre Government Systems group, Doug Henry, that when it was shared, that that estimated value was in there.

**Q But you didn't negotiate the LOA with Doug Henry, did you? You negotiated --**

A No, but that wasn't your question. Your question was did I ever supply a number to anyone at Sabre regarding 7.9 million.

**Q Okay. And you believe you would have supplied it to Doug Henry?**

A I believe that I can find an e-mail, because we would have shared with him the RFP. They had -- would have obtained it somehow, and that number would probably be in there.

**Q Okay. Do you know if you ever shared that number with Doug Huff?**

A I don't know that I ever shared 7.9 with Doug Huff.

**Q Okay. Do you know if you ever shared that number with Tony Sabatino, 7.9?**

A No. During -- Tony Sabatino was irrelevant to the LOA and term sheet.

**Q Okay. Wasn't Doug Henry irrelevant to the LOA and the term sheet, then, by that? Did he -- was he involved in negotiation?**

A No. I'm saying I had no reason to interact with Tony Sabatino, because he was neither the government partner nor interacting as -- with the term sheet and LOA.

**Q Okay. How about Tim Rossetti? Did you ever tell him that the initial release for the RFP was 7.9 million estimated value, until this e-mail?**

A Did I directly have a conversation with Tim Rossetti? No.

**Q Did you ever -- okay.**

**How about any communication, either in writing or orally, to Pete Sandore regarding the $7.9 million estimated value of the RFP?**

A No.

**Q Okay. Was Doug Henry involved in the negotiation of the term sheet?**

A No.

**Q Okay. Was he involved in the negotiation of the LOA?**

A No.

**Q Okay. Okay. Let's go through the next part of**

RFP, and then at some point, mid-2014 -- mid- to late 2014 -- government people rotate all the time. So Lance Hardman became the contracting officer, and the old guy went on to another role somewhere in the government.

**Q Okay. All right. So Mr. Byrd then relayed this conversation with some unnamed contracting officer to you?**

A Well, he has a name. I just don't have it on me right now.

**Q Right, unnamed. Unnamed at this moment.**

A Okay.

**Q Okay. All right. I'm -- what did Mr. Byrd say to you?**

A Exactly what was reflected here.

**Q Okay. And somehow you came up with $21 million?**

A In collaboration with Mr. Byrd, yes.

**Q And reliance, in part, on his conversations with unknown people?**

A Did you say "unknown" or "unnamed"?

**Q Unnamed.**

A Okay. Unnamed, yes.

**Q All right. So you've been working this contract now for a year?**

A At this point --

**Q No, now, as in this moment.**
A Oh, yes.
**Q Okay. Have there been other -- multiple other non-Hill customers that have work flowing through the contract?**
A Not yet.
**Q All right. Hence the reason we upped the projected value of this contract in the budget forecast. Okay.**
A Uh-huh.
**Q But having worked this contract for a year, no work has come outside of the AFB Hill portion?**
A Correct.
**Q Okay. What did I mark that as, exhibit number what?**
A 35.
**Q 35?**
A Yep.
MS. LALLY: Does yours say 35?
MS. DEVINE: I have 35, yes.
**Q (By Ms. Lally) Okay.**
**(Deposition Exhibit 36 was marked.)**
**Q (By Ms. Lally) I'm going to hand you Exhibit Number 36.**
A Okay.

**(Deposition Exhibit 45 was marked.)**

**Q (By Ms. Lally) Okay. This is going to harken back to an exhibit we've already looked at. This is Exhibit Number 45. It's a cash flow forecast for ConcealFab, and there's these little, like, blue boxes.**

MS. LALLY: Thank you.

**Q (By Ms. Lally) I believe that these blue boxes were written by Mr. Huff.**

**Do you know?**

A At least one of them, because it refers to me in the third person, which I don't typically do.

**Q That's the one I want to talk about.**

A Okay.

**Q So this talks about the founder takeout is 12K a month. That's the payment to Mr. Slattery pursuant to his agreement to leave the company; is that right?**

A Right, to his consulting agreement, which expired end of calendar 2015.

**Q Okay. Do you see where it says, Jon to provide estimate, and timing can spread?**

A Uh-huh.

**Q Okay. Did this mean that we could -- I mean envision spreading it out, the 12K, on a monthly basis?**

A Yes.

**Q Did you have a discussion with Doug about that?**

A Yes.
**Q Okay. Do you know when you had that discussion with Doug?**
A Sometime before the LOA was signed.
**Q Okay. Because we discussed how, as drafted, it looks like it will be a one-sum payment, 100, then 200, whatever.**
A Right -- well, at least all that cash had to be paid at some point. Right.
**Q Right. But this envisioned spreading it out?**
A Uh-huh.
**Q And that is, in fact, what happened, is it not?**
A Well, for two payments it was spread out, yes.
**Q During the time that the LOA was in place, it was spread out --**
A Yes.
**Q -- is that right?**
**Okay. That was the only reason to look at this record.**
A Okay.
**Q Although I think I marked it as 44 and it's 45.**
A No, you marked it as 45.
**Q Perfect.**
MS. LALLY: Did I mark yours as 45, Angela?
MS. DEVINE: No, but I just --

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-01793-CMA-KLM

CONCEALFAB CORPORATION, a Colorado corporation,

Plaintiff,

v.

SABRE INDUSTRIES, INC., a Delaware corporation, and MIDWEST UNDERGROUND TECHNOLOGY, INC., an Illinois corporation,

Defendants.

**AFFIDAVIT OF CLAY MCGEE IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

I, Clay McGee ("Affiant") being first duly sworn, deposes and says that Affiant has personal knowledge of and is competent to testify to the following facts:

1. Affiant is the Vice-President of Finance for Sabre Industries, Inc.

2. During the pendency of the LOA, from approximately March 12, 2015, to June 5, 2015, Sabre paid the following working capital and other expenses on behalf of ConcealFab or former ConcealFab employees in an amount not less than $608,966.69 including:

a) An initial deposit of prepaid licensing fees / capital infusion of $160,000.00;
b) Payroll from March 31, 2015 to June 5, 2015 of $232,329.30;
c) Employment taxes of $21,576.77;
d) Payroll benefits of $26,693.29;
e) ConcealFab accounts payable totaling $67,634.47;
f) ConcealFab liabilities incurred $71,778.26;
g) Payments of Jonathan Fitzhugh's Credit Card bills: $4,954.61; and
h) Payments to Founder, Slattery, $24,000.00.

3. During the pendency of the LOA, from approximately March 12, 2015, to June 5, 2015, Sabre also booked $96,899.47 in unpaid receivables related to former ConcealFab.

I affirm, under the penalties for perjury, that the foregoing representations are true.

Dated this 20th day of April, 2017.

Clay McGee

## Vicki E. Pennington

**From:** Jonathan Fitzhugh
**Sent:** Friday, September 26, 2014 11:20 AM
**To:** Mike Slattery; Tim Slattery
**Cc:** dhstewart@grantdentaltech.com
**Subject:** RE: ConcealFab agreement

I'm assuming Duncan is on Reserve Duty again today. Perhaps we can meet this weekend to finalize?

I was invited to Atlanta this Wed/Thurs to meet with Sabre Executive Mgt. to hear their proposal for a potential investment/partnership. Would be ideal to have this resolved so they don't find a reason to walk away.

**From:** Mike Slattery
**Sent:** Friday, September 26, 2014 10:06 AM
**To:** Tim Slattery
**Cc:** Jon Fitzhugh; dhstewart@grantdentaltech.com
**Subject:** Re: ConcealFab agreement

I disagree on what is reasonable then. I will no longer have any type if control except as largest shareholder. And there actually some pretty big gaps and legal problems at CFAB. My proposal is for me to ignore them and cross my fingers, put some cash in my account. Otherwise they are going to be addressed openly with every shareholder and fixed with legal action.

We have not yet had any more discussions on what is or what is not reasonable in my proposal. This discussion can continue today thru end of month.

Mike Slattery

On Sep 26, 2014, at 9:53 AM, "Tim Slattery" <tslattery@comcast.net> wrote:

> Mike:
>
> I reviewed both your proposal and Jon's counter back you. Side by side. As a shareholder, I would not automatically agree to your demands, either. Most points on the counter are reasonable. Some could be adjusted. But if you refuse to discuss anything on it, until you file lawsuit, than it is pointless for me to make an effort to help.
>
> Later,
>
> Timothy E. Slattery
> Cell 303-356-2284
> Ranch (303) 823-6927
> Denver Home (303) 783-2290
>
> On Sep 26, 2014, at 9:40 AM, Mike Slattery <mslattery@concealfab.com> wrote:



EXHIBIT 5D
21 3/13/17
Fitzhugh 30(b)(6)

CONCEALFAB 000287

My proposal from August (almost two months ago) is fair, the counter and therefor delay was his choice. I made the effort to clean things up when asked. CA and IRA extinguish requirement should treated as one agreement, easy to finalize, Board can approve.

Ready to sign my proposal, keep things moving.

Mike Slattery

On Sep 26, 2014, at 8:49 AM, "Timothy E Slattery" <tslattery@comcast.net> wrote:

> Mike:
>
> My view is that you and John should discuss and approve, with your signatures, this outline for a contract now. You continue to push this off and then blame Jon for delaying. From the tone of the emails that you just forwarded to me last night it appears that you want to send a demand letter to Jon and start a lawsuit, just to show that you can, more than you want to resolve this, get paid and move on with business.
>
> And there appears to be much business to be had.
>
> Timothy E. Slattery
> cell: (303) 356-2284
> Ranch (303) 823-6927
> Denver Home (303) 783-2290
>
> On Sep 26, 2014, at 8:29 AM, Jon Fitzhugh <jfitzhugh@concealfab.com> wrote:
>
>> Tim asked me to forward him the proposal/counter-proposal email(s) last night.
>>
>> Given the short timeline here, perhaps we could focus on the IRA to pave the way for new investment and then the Independent Contractor agreement since that seems to be what keeps stalling everything.
>>
>> **From:** Mike Slattery
>> **Sent:** Friday, September 26, 2014 10:27 AM
>> **To:** Tim; dhstewart@grantdentaltech.com; Jon Fitzhugh
>> **Subject:** Re: ConcealFab agreement
>>
>> Not sure what you saw. Attached is my proposal from August 7th. Yes, this is what I need. After seeing the counter proposal from Jon I proposed we wait until after Sept 30th to discuss again.

**From:** Tim Slattery <tslattery@comcast.net>
**Date:** Friday, September 26, 2014 at 7:00 AM
**To:** Duncan Stewart <dhstewart@grantdentaltech.com>, Mike Slattery <mslattery@concealfab.com>, Jon Fitzhugh <jfitzhugh@concealfab.com>
**Subject:** ConcealFab agreement

Mike:

I have reviewed your string of emails and the proposed and counter proposed draft details of a consulting agreement (my read "Independent Contractor") between you and ConcealFab.

Isn't this what you wanted? One detail that I see missing is the dissolution of the Investor Shareholder Rights Agreement, if this agreement, in any way, might cause Investors to hesitate. Seems to me that creating the clearest path possible for Investors would be a top priority.

Let's discuss this morning.

Timothy Slattery
Cell (303) 356-2284
Ranch (303) 823-6927
Denver Home (303) 783-2290

## Cash Flow Forecast - CF

[redacted]

### Incremental Cash Flow Requirements - FYE 4.30.16 and Inception through 4.30.16

| | CFG | EPG | | |
|---|---|---|---|---|
| [redacted] | | - | - | - |
| Founder take out | 60.00 | | [redacted] | 60.00 |

Founder take out is $12K / month. If take out in March the payment is $120K and remaining due based on closing of deals he has quoted. Paid when cash collected. Jon to provide estimate and timing. CAN SPREAD

[redacted]

EXHIBIT SD
tabbies
45 3-13-17
Fitzhugh 30(b)(6)

SABRE000362

|  |  |
| --- | --- |
| **From:** | Jon Fitzhugh <jfitzhugh@concealfab.com> |
| **Sent:** | Tuesday, May 12, 2015 10:58 PM |
| **To:** | Tony Sabatino; Pete Sandore; Thomas L. Jagielski; Timothy Rossetti; Clay McGee; Patrick Cochran (pcochran@mutionline.com) |
| **Subject:** | RE: Update on current projects. |

Tony,

Most of these projects are WIP in Engineering, with completion dates of mid/late next week.

We are trying to get sections completed (e.g., the radio section) to get on order early to expedite as items #3 and #4 were request as quick turn projects. Once full sections are through engineering we are sending them to Tom's team, e.g., the SVP radio section which they have bids out for to compare pricing.

The resources required, high level, are continued focus from engineering and single radio-section prototypes to send to each of ALU and Ericsson for validation testing of thermal dissipation.

Thanks.

**From:** Tony Sabatino [mailto:tsabatino@sabreindustries.com]
**Sent:** Tuesday, May 12, 2015 3:17 PM
**To:** Jon Fitzhugh; Pete Sandore; Thomas L. Jagielski; Timothy Rossetti; Clay McGee; Patrick Cochran (pcochran@mutionline.com)
**Subject:** RE: Update on current projects.

John as a follow up below.

Has Tom been given (Tom please confirm) all the pricing, drawings and needs for the below projects.

Also what additional resources need to be expended on each of the projects below to bring them to market and a final product.

Thanks

**From:** Jon Fitzhugh [mailto:jfitzhugh@concealfab.com]
**Sent:** Sunday, May 10, 2015 11:33 PM
**To:** Tony Sabatino; Pete Sandore; Thomas L. Jagielski; Timothy Rossetti; Clay McGee; Patrick Cochran (pcochran@mutionline.com)
**Subject:** RE: Update on current projects.

Sure thing, see below in red.

**From:** Tony Sabatino [mailto:tsabatino@sabreindustries.com]
**Sent:** Sunday, May 10, 2015 9:38 PM
**To:** Jon Fitzhugh; Pete Sandore; Thomas L. Jagielski; Timothy Rossetti; Clay McGee; Patrick Cochran (pcochran@mutionline.com)
**Subject:** Update on current projects.

EXHIBIT SD
tabbies
35 3/13/17
Fitzhugh 30(b)(6)



SABRE000050

Jon

Need to understand the current status of a few projects.

1 – SVP – We need the drawings and details for this project shared with Tom and his team Monday. Please set up the meeting and get this going on. I will confirm, but I believe we have supplied Tom and team with drawings for the radio section of this pole so they can cost it out in Bossier. The power section design had to be tweaked due to a late change by the city of Santa Clara, requiring us to swap out most of the power equipment they told us to provision for. Once the power section is completed (targeting the end of this week), we will distribute those drawings to Tom and team as well. As of Friday, DGP is looking to get the power equipment locked down for budgetary purposes so they can begin the ordering process in the next week, so I was told by Epic Marketing. Will set up a meeting with Tom and team Monday to confirm they received the initial drawings and to put together a plan to manufacture these poles.

2 - Update on the CFG project and timing on any work . I need you and Doug Henry to be clear on what this opportunity is with this project. The Hill AFB project is still in the appeal stage with the SBA in DC. We received word that it may get delayed one more week, to May 21, but that isn't official yet. Regarding the opportunity size – the RFP was initially released with a $7.9M 'estimated value', when our Contracting Officer spoke with the Contracting officer at Hill, they indicated that $7.9 was just the Hill portion of the RFP and that multiple other (non-Hill) customers were tee'd up to flow work through this contract, hence the reason we upped the projected value of this contract in the budget/forecast.

3 - Design costing and specifics on the current Ericsson PO's that have been awarded to Sabre. Not sure exactly what you mean by "design costing and specifics", so let me know if I miss anything in my answer, but we have a 5 pole order from FiberTech for $80k to deploy poles in VZW Indiana. The design is attached to this email. Preliminary cost estimates are around 7k per pole at these low quantities, they want these poles delivered ASAP and the engineering team is moving full steam to complete the drawings.

4 - Current quotes and awards for ALU specific to the current projects. We were awarded a 5 pole order from Cincinnati Bell on Friday, totaling $87k. CinBell estimates orders of 5-10 poles per month starting in July/August through the end of the year. The rest of the ALU work is in the ramp up phase – we've had several joint kick-off calls with VZW regions including: New England, Baltimore/DC, Utah. The Utah work should spill over into the rest of the MTN region and ALU also wanted to set up a call with the NY Metro region in the near future. Other than Utah, most of the other regions are still in the requirement-gather phase as they are still negotiating Master Lease Agreements with their local utilities/municipalities.

Let me know if you need anything further.

Thanks in advance for getting this data in hand.

T

# UCC Financing Statement Amendment

## Initial Financing Statement

File #: 20152048631 File Date: 05/27/2015 01:24:44 PM Filing office: Secretary of State

This amendment is a termination.

**Authorizing Party (Secured Party): (Organization)**

Name: Sabre Industries Telecom Services
Address1: 8653 E. Highway 67
Address2:
City: Alvarado State: CO ZIP/Postal Code: 76009
Province: Country: United States

Attachment #: 1

# UCC Financing Statement Amendment

File name: UCC3.pdf

Uploaded: 05/18/2017 10:49:47 AM

[redacted]

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Eric Letsche
Vice President and Corporate Controller
Sabre Industries, Inc.
7101 South Bridge Dr.
Sioux City, IA 51111

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1a. INITIAL FINANCING STATEMENT FILE #
20152048631

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

2. ☑ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.
☐ DELETE name: Give record name to be deleted in item 6a or 6b.
☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 7d. SEE INSTRUCTIONS Not Applicable / ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | ☐ NONE |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.
Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME Sabre Industries, Inc. | | | |
|---|---|---|---|
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

10. OPTIONAL FILER REFERENCE DATA

**FILING OFFICE COPY** — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

## Instructions for UCC Financing Statement Amendment (Form UCC3)

Please type or laser-print this form. Be sure it is completely legible. Read all Instructions, especially Instruction 1a; correct file number of initial financing statement is crucial. Follow Instructions completely.

Fill in form very carefully; mistakes may have important legal consequences. If you have questions, consult your attorney. Filing office cannot give legal advice.

Do not insert anything in the open space in the upper portion of this form; it is reserved for filing office use.

An Amendment may relate to only one financing statement. Do not enter more than one file number in item 1a.

When properly completed, send Filing Office Copy, with required fee, to filing office. If you want an acknowledgment, complete item B and, if filing in a filing office that returns an acknowledgment copy furnished by filer, you may also send Acknowledgment Copy, otherwise detach. Always detach Debtor and Secured Party Copies.

If you need to use attachments, you are encouraged to use either Amendment Addendum (Form UCC3Ad) or Amendment Additional Party (Form UCC3AP).

Always complete items 1a and 9.

A. To assist filing offices that might wish to communicate with filer, filer may provide information in item A. This item is optional.

B. Complete item B if you want an acknowledgment sent to you. If filing in a filing office that returns an acknowledgment copy furnished by filer, present simultaneously with this form a carbon or other copy of this form for use as an acknowledgment copy.

1a. **File number:** Enter file number of initial financing statement to which this Amendment relates. Enter only one file number. In some states, the file number is not unique; in those states, also enter in item 1a, after the file number, the date that the initial financing statement was filed.

1b. Only if this Amendment is to be filed or recorded in the real estate records, check box 1b and also, in item 13 of Amendment Addendum, enter Debtor's name, in proper format exactly identical to the format of item 1 of financing statement, and name of record owner if Debtor does not have a record interest.

*Note:* Show purpose of this Amendment by checking box 2, 3, 4, 5 (in item 5 you must check two boxes) or 8; also complete items 6, 7 and/or 8 as appropriate. Filer may use this Amendment form to simultaneously accomplish both data changes (items 4, 5, and/or 8) and a Continuation (item 3), although in some states filer may have to pay a separate fee for each purpose.

2. To terminate the effectiveness of the identified financing statement with respect to security interest(s) of authorizing Secured Party, check box 2. See Instruction 9 below.

3. To continue the effectiveness of the identified financing statement with respect to security interest(s) of authorizing Secured Party, check box 3. See Instruction 9 below.

4. To assign (i) all of assignor's interest under the identified financing statement, or (ii) a partial interest in the security interest covered by the identified financing statement, or (iii) assignor's full interest in some (but not all) of the collateral covered by the identified financing statement: Check box in item 4 and enter name of assignee in item 7a if assignee is an organization, or in item 7b, formatted as indicated, if assignee is an individual. Complete 7a or 7b, but not both. Also enter assignee's address in item 7c. Also enter name of assignor in item 9. If partial Assignment affects only some (but not all) of the collateral covered by the identified financing statement, filer may check appropriate box in item 8 and indicate affected collateral in item 8.

5,6,7. To change the name of a party: Check box in item 5 to indicate whether this Amendment amends information relating to a Debtor or a Secured Party; also check box in item 5 to indicate that this is a name change; also enter name of affected party (current record name) in item 6a or 6b as appropriate; and enter new name (7a or 7b). If the new name refers to a Debtor complete (7c); also complete 7e-7g if 7a was completed.

5,6,7. To change the address of a party: Check box in item 5 to indicate whether this Amendment amends information relating to a Debtor or a Secured Party; also check box in item 5 to indicate that this is an address change; also enter name of affected party (current record name) in item 6a or 6b as appropriate; and enter new address (7c) in item 7.

5,6,7. To change the name and address of a party: Check box in item 5 to indicate whether this Amendment amends information relating to a Debtor or a Secured Party; also check box in item 5 to indicate that this is a name/address change; also enter name of affected party (current record name) in items 6a or 6b as appropriate; and enter the new name (7a or 7b). If the new name refers to a Debtor complete item 7c; also complete 7e-7g if 7a was completed.

5,6. To delete a party: Check box in item 5 to indicate whether deleting a Debtor or a Secured Party; also check box in item 5 to indicate that this is a deletion of a party; and also enter name (6a or 6b) of deleted party in item 6.

5,7. To add a party: Check box in item 5 to indicate whether adding a Debtor or Secured Party; also check box in item 5 to indicate that this is an addition of a party and enter the new name (7a or 7b). If the new name refers to a Debtor complete item 7c; also complete 7e-7g if 7a was completed. To include further additional Debtors or Secured Parties, attach Amendment Additional Party (Form UCC3AP), using correct name format.

*Note*: The preferred method for filing against a new Debtor (an individual or organization not previously of record as a Debtor under this file number) is to file a new Financing Statement (UCC1) and not an Amendment (UCC3).

7d. Reserved for Financing Statement Amendments to be filed in North Dakota or South Dakota only. If this Financing Statement Amendment is to be filed in North Dakota or South Dakota, the Debtor's taxpayer identification number (tax ID#) — social security number or employer identification number must be placed in this box.

8. Collateral change. To change the collateral covered by the identified financing statement, describe the change in item 8. This may be accomplished either by describing the collateral to be added or deleted, or by setting forth in full the collateral description as it is to be effective after the filing of this Amendment, indicating clearly the method chosen (check the appropriate box). If the space in item 8 is insufficient, use item 13 of Amendment Addendum (Form UCC3Ad). A partial release of collateral is a deletion. If, due to a full release of all collateral, filer no longer claims a security interest under the identified financing statement, check box 2 (Termination) and not box 8 (Collateral Change). If a partial assignment consists of the assignment of some (but not all) of the collateral covered by the identified financing statement, filer may indicate the assigned collateral in item 8, check the appropriate box in item 8, and also comply with instruction 4 above.

9. Always enter name of party of record authorizing this Amendment; in most cases, this will be a Secured Party of record. If more than one authorizing Secured Party, give additional name(s), properly formatted, in item 13 of Amendment Addendum (Form UCC3Ad). If the indicated financing statement refers to the parties as lessee and lessor, or consignee and consignor, or seller and buyer, instead of Debtor and Secured Party, references in this Amendment shall be deemed likewise so to refer to the parties. If this is an assignment, enter assignor's name. If this is an Amendment authorized by a Debtor that adds collateral or adds a Debtor, or if this is a Termination authorized by a Debtor, check the box in item 9 and enter the name, properly formatted, of the Debtor authorizing this Amendment, and, if this Amendment or Termination is to be filed or recorded in the real estate records, also enter, in item 13 of Amendment Addendum, name of Secured Party of record.

10. This item is optional and is for filer's use only. For filer's convenience of reference, filer may enter in item 10 any identifying information (e.g., Secured Party's loan number, law firm file number, Debtor's name or other identification, state in which form is being filed, etc.) that filer may find useful.