IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:15-cv-01793-CMA-KLM

CONCEALFAB CORPORATION, a Colorado corporation,

Plaintiff,

v.

SABRE INDUSTRIES, INC., a Delaware corporation, and MIDWEST UNDERGROUND TECHNOLOGY, INC., an Illinois corporation,

Defendants.

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT PURSUANT TO FED.R.CIV.P. 56**

---

Plaintiff ConcealFab Corporation ("ConcealFab"), by its attorneys at Silver & DeBoskey, A Professional Corporation, respectfully submits its Response in Opposition to Defendants' Motion for Partial Summary Judgment Pursuant to Fed.R.Civ.P. 56 [Dkt 97] ("Motion") as follows:

## I. INTRODUCTION

Defendants Sabre Industries, Inc. and Midwest Underground Technology, Inc. (collectively "Sabre") ask this Court to dismiss nine of the eleven claims ConcealFab asserts in this civil action, and provide unsubstantiated recitations of facts or contradict every position they have taken in this lawsuit until now in support of that request. In actuality, there is evidence where Sabre says there is none, and there are admissions that undermine its version of events. Accordingly, ConcealFab respectfully requests that this Court deny the Motion in its entirety.

## II. STANDARD OF REVIEW

A party seeking summary judgment always bears the initial responsibility of informing the

court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Thus, it is not the party opposing summary judgment that has the burden of justifying its claim; the movant must first establish the lack of merit. *See Alpine Bank v. Hubbell*, 555 F.3d 1097, 1110 (10th Cir. 2009). Sabre repeatedly fails to meet its burden by citing to its own unverified allegations as undisputed facts without identifying a corresponding admission from ConcealFab,[1] making affirmative statements without reference to any evidence in the record whatsoever,[2] and arguing that some—but not all—factual bases for a claim are deficient such that this Court could not dismiss the claim in its entirety even if Sabre is correct.[3]

## III. ARGUMENT

### A. ConcealFab's Breach of Contract Claims Regarding the Employment Agreement are Neither Subject to Arbitration Nor Fail for Lack of Evidence that Agreement Existed

#### 1. <u>Burden of Proof and Elements of Breach of Employment Agreement</u>

Sabre identifies just the first element of a breach of contract claim under Colorado law—the existence of a contract—but correctly states that ConcealFab bears the burden of proof with respect to that element.[4] *See* Dkt 97, Arg Sec B(1)(b); *Western Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).

---

[1] *See, e.g.,* Dkt 97, Statement of Undisputed Facts ("Facts"), ¶¶ 3 & 13.

[2] *See, e.g.,* Dkt 97, Argument ("Arg") Sec C(2) (Sabre "properly" terminated LOA); I(2) (ConcealFab's customer information ascertainable from public sources and pricing information obtainable from sources other than ConcealFab).

[3] *See* Sec III(C)(1) below.

[4] Because Sabre does not contend ConcealFab cannot prove the other elements of the claim in its Motion, ConcealFab does not discuss those elements in this Response. *See Alpine Bank*, 555 F.3d at 1110 (non-movant does not have burden of justifying claim; movant must establish lack of merit).

2. <u>Disputed Material Facts Supporting Existence of Employment Agreement</u>

a. The parties exchanged multiple drafts of an Employment Agreement for Jonathan Fitzhugh between January 7 and 15, 2015.[5] *See* ConcealFab Response Appendix ("RS Appx"), p 2—Affidavit of Jonathan Fitzhugh ("Fitzhugh Aff"), ¶ 4.

b. The parties concluded their negotiations regarding the terms of that Employment Agreement before the Term Sheet was signed on February 3, 2015. *See* RS Appx, p 2—Fitzhugh Aff, ¶ 5.

c. Finalization of the Employment Agreement was a condition precedent to the ConcealFab Board of Directors accepting the Term Sheet. *See* RS Appx, p 3—Fitzhugh Aff, ¶ 7; p 8—January 3, 2015 email.[6]

d. The Term Sheet contemplated that the parties would reach a definitive agreement within 75 days. *See* RS Appx, p 14—Term Sheet, ¶ 9.

e. Shortly after executing the Term Sheet, however, the parties agreed to restructure their deal as a Licensing Operating Agreement ("LOA") that would permit the parties to operate jointly for a period of at least six months and perhaps as long as a year before the merger would be finalized. *See* RS Appx, 3—Fitzhugh Aff, ¶¶ 9 & 10; p 16—LOA, ¶ 1(a) & (c).

f. Execution of the Employment Agreement was a condition precedent to the ConcealFab Board of Directors accepting the LOA. *See* RS Appx, p 3—Fitzhugh Aff, ¶ 12.

g. The LOA expressly provided, "In the event the LOA is terminated at any time...Jon Fitzhugh's employment agreement shall terminate as 'resignation for good reason' in the event of termination of the LOA." *See* RS Appx, p 19— LOA, ¶ 4(e)(ii).

h. Under the Employment Agreement, resignation for good reason entitled Mr. Fitzhugh to a severance payment equal to his annual salary of $300,000. *See* Sabre Appx, p 28— Employment Agreement, ¶ 5(a).

i. Mr. Fitzhugh assigned his right to collect the severance payment in the event the LOA was terminated to ConcealFab, and informed ConcealFab

---

[5] Sabre cites an allegation regarding delivery of a final version of the Employment Agreement on February 3, 2015, and its own **denial** of that allegation, in support of the "undisputed fact" that "Sabre and [Mr.] Fitzhugh began the process of negotiating a written Employment Agreement" on February 3, 2015. *See* Dkt 97, Facts, ¶ 5. The exhibits Sabre includes in its appendix further contradict this "undisputed fact." *See, e.g.*, Movant's Appendix ("Sabre Appx"), pp 27-36 (January 15, 2015 email with "Jonathan Fitzhugh's Employment Agreement" attachment). The January 15, 2015 version of the Employment Agreement was the final version accepted by all parties. *See* RS Appx, pp 2-3—Fitzhugh Aff, ¶ 5.

[6] The January 3, 2015 email labeled CONCEALFAB 002125 is genuine. *See* RS Appx, p 3—Fitzhugh Aff, ¶ 7.

shareholders of as much when they were asked to vote in favor of the LOA. *See* RS Appx, p 3—Fitzhugh Aff, ¶ 13.

j. After the LOA was executed, Sabre repeatedly led Mr. Fitzhugh to believe that it would execute the Employment Agreement. *See* RS Appx, p 4—Fitzhugh Aff, ¶¶ 15-21.

k. Mr. Fitzhugh performed according to the Employment Agreement by resigning his employment with ConcealFab and accepting employment with Sabre as its Executive Vice President of the DAS and Small Cell Product Segment. *See* RS Appx, p 4—Fitzhugh Aff, ¶¶ 15 & 20; p 13—Term Sheet, ¶ 4(a)(ii); *see also* Sabre Appx, p 28—Employment Agreement, ¶ 3.

l. Sabre performed according to the Employment Agreement by employing Mr. Fitzhugh as its Executive Vice President of the DAS and Small Cell Product Segment and paying him the salary identified in the agreement. *See* RS Appx, p 4—Fitzhugh Aff, ¶¶ 15, 20 & 21; *see also* Sabre Appx, p 28—Employment Agreement, ¶¶ 3 & 4.

3. Sabre Has Waived Any Right to Arbitrate Claims Arising from the Employment Agreement

Sabre first contends this Court should dismiss all claims related to the Employment Agreement[7] because it contained an arbitration provision that deprives this Court of subject matter jurisdiction. *See* Dkt 97, Arg Sec B(1)(a) & B(3). But the authority Sabre cites for the position that an arbitration clause is not a mere venue clause that can be waived did not even involve an arbitration agreement. *See, e.g., Laughlin v. Kmart Corp.*, 50 F.3d 871, 873 (10th Cir. 1995) (amount in controversy requirement to confer diversity subject matter jurisdiction could not be waived). In actuality, an arbitration clause is just a contract clause that can be waived by either party. Under both Colorado law and federal law, therefore, a party may waive its right to compel arbitration. *See L & W Innovations, LLC v. Linli Constr., Inc.*, Civil Action No. 07-cv-00563-CBS-MJW, 2009 WL 2400965, at *4 (D. Colo. Aug. 5, 2009).

Colorado law sets forth a six-factor test to determine whether a party has waived its right to invoke an arbitration clause: (1) whether the party has actually participated in the lawsuit or

---

[7] These claims are ConcealFab's First and Eleventh Claims for Relief. *See* Amended Complaint [Dkt 68], ¶¶ 56(c) & 103-108.

taken other action inconsistent with its rights; (2) whether litigation has substantially progressed by the time the intention to arbitrate was communicated by the party moving to dismiss; (3) whether there has been a long delay in seeking a stay and whether the party filed counterclaims without asking for a stay; (4) whether a request to compel arbitration was initiated close to trial; (5) whether the party seeking arbitration has taken unfair advantage of discovery proceedings which would not have been available in arbitration; and (6) whether the other party was affected, misled or prejudiced by the delay. *Id.* at *5 (citing *City and County of Denver v. District Court*, 939 P.2d 1353, 1369 (Colo. 1997)). Sabre's conduct demonstrates waiver under every one of these factors.

ConcealFab included allegations regarding the Employment Agreement in its August 19, 2015 Complaint and in support of its breach of contract claim. *See* Complaint [Dkt 1], ¶¶ 11, 24, 39 & 55(c). Sabre moved to dismiss that claim, but **not** on the basis that any claim regarding the Employment Agreement must be arbitrated. *See* Motion to Dismiss [Dkt 26], Arg Sec II. ConcealFab later sought leave to add an additional claim regarding the Employment Agreement. *See* Plaintiff's Motion for Leave to Amend Complaint [Dkt 45]. Sabre opposed the amendment, but again, **not** because of the existence of an arbitration clause. *See* Defendants' Opposition to Plaintiff's Motion for Leave to Amend Complaint [Dkt 50]. The Court granted leave to amend, *see* Order Granting Motion to Amend Complaint and Motion for Partial Stay of Discovery [Dkt. 67], but Sabre did not file another motion to dismiss or stay on the basis of the arbitration clause. Rather, Sabre answered and asserted counterclaims.[8] *See* Answer to Amended Complaint and Counterclaims [Dkt. 70]. Thus, Sabre's contention that all claims regarding the Employment Agreement must be arbitrated comes either 21 or 13 months after such claims were asserted. Moreover, discovery closed nearly a month before Sabre first

[8] Sabre also stipulated that this Court had subject matter jurisdiction in two separate Scheduling Orders. *See* Scheduling Order [Dkt 34], Sec 2; Revised Scheduling Order [Dkt. 77], Sec 2.

complained that the claim must be arbitrated, *see* Dkt 77, *compare* Sec 9(b) *with* Sec 9(c), and after Sabre propounded written discovery requests, conducted a Fed.R.Civ.P. 30(b)(6) deposition of ConcealFab,[9] and individual depositions of four of its board members. Finally, Sabre raises this issue for the first time just four months before the final pretrial conference at which trial will be set. *See* Dkt 77, Sec 10(b). This Court should deny the Motion to the extent it seeks dismissal of any claim regarding the Employment Agreement on the basis of an arbitration clause.

4. There is Evidence that the Employment Agreement Existed

Sabre distorts the timeline of events and ignores the LOA altogether to next argue that the Employment Agreement never existed because the merger contemplated by the Term Sheet was never finalized. *See* Dkt 97, Arg Sec B(1)(b). Perhaps the most serious distortion is the contested representation that the parties **began** negotiating the Employment Agreement **after** the Term Sheet was executed. *See* Dkt 97, Facts, ¶¶ 4 & 5. Sabre fails to establish this fact as undisputed, and the exhibits in its own appendix contradict it.[10] But Sabre makes this claim to infer—perhaps with the intention of directly stating in its Reply—that the parties agreed to the "void *ab initio*" language even as they abandoned their plans to move forward with an asset or stock purchase agreement. That is simply not what happened, and the true timeline of events creates a genuine issue of material fact for trial.

The parties negotiated the Employment Agreement in connection with the Term Sheet, which contemplated a closing within 75 days and Mr. Fitzhugh becoming a Sabre employee only after that occurred. *See* Sec III(A)(2)(d)&(e) above; RS Appx, p 3—Fitzhugh Aff, ¶ 11. The

[9] The Fed.R.Civ.P. 30(b)(6) deposition included "The negotiation of any draft employment agreement between Sabre and Jonathan Fitzhugh," and "The negotiation and substance of the Employment Agreement." *See* RS Appx, p 24—Exhibit A to Subpoena to Testify at Deposition, Topic Nos. 9 & 10.

[10] *See* footnote 5 above.

void *ab initio* provision upon which Sabre relies makes sense under those circumstances. But not long after executing the Term Sheet, the parties restructured their deal as the LOA, under which Mr. Fitzhugh became a Sabre employee immediately. The LOA reflected this change in circumstances by expressly referencing the Employment Agreement and providing that termination of the LOA triggered rights under it. *See* Sec III(A)(2)(g) above; RS Appx, p 3—Fitzhugh Aff, ¶¶ 12 & 13. And, contrary to Sabre's contention that the Employment Agreement never existed, both parties performed according to its key terms, and Sabre repeatedly indicated that its execution was imminent.[11] *See* Sec III(a)(2)(j)-(l) above. The change in circumstances following negotiation of the Employment Agreement, the express reference to, and coordination between it and the LOA, and the parties' performance of the agreement, create a genuine issue of material fact for trial regarding whether the Employment Agreement existed despite a final asset or stock purchase agreement never occurring.

## B. ConcealFab's Breach of Contract Claim Regarding the NDA is Supported by Evidence that Sabre Used Its Confidential Information

### 1. <u>Burden of Proof and Elements of Breach of NDA</u>

Sabre properly identifies the elements of a breach of contract claim under Iowa law,[12] but argues ConcealFab cannot prove just one of those elements—breach of the contract.**[13]** *See* Dkt 97, Arg Sec (B)(2).

---

[11] Sabre initially makes much of the fact that it never executed the Employment Agreement, but ultimately concedes that common law contract principles allow for the formation of contracts without the signatures of the parties bound by them. *See* Dkt 97, Arg Sec B(1)(b) (citing *Bourret v. Aspect Management Corp*, Civil Action No. 1-cv-3320-RPM, 2013 WL 6073637 (D. Colo. Nov. 19, 2013)).

[12] The distinction between Iowa and Colorado law regarding the elements of a breach of contract claim is one without a difference. *See* Dkt 97, Arg Sec A; *also compare Iowa Mortgage Center, LLC v. Baccam*, 841 N.W. 2d 107, 110-111 (Iowa 2013) (elements of claim under Iowa law), *with Western Distrib.*, 841 P.2d at 1058 (elements of claim under Colorado law).

[13] Again, because Sabre does not contend ConcealFab cannot prove the other elements of the claim in its Motion, ConcealFab does not discuss those elements in this Response.

2. Disputed Material Facts Supporting Breach of NDA

a. The NDA defined "Confidential Information" to include "past, present, and future business affairs such as...customer and/or supplier information…"[14] *See* Sabre Appx, p 1, Sec 1(a).

b. The NDA required the parties to "use such Confidential Information only for the purposes of evaluating and engaging in discussion concerning a potential business relationship between the Parties..." *See* Sabre Appx, p 2, Sec 3(a).

c. The NDA required the party receiving Confidential Information to immediately report to the disclosing party "any attempt by the Receiving Party's Representatives to use or disclose any portion of the Confidential Information without authorization from the Disclosing Party, and shall cooperate with the Disclosing Party in every reasonable way to help the Disclosing Party regain possession of the Confidential Information and prevent its further unauthorized use." *See* Sabre Appx, p 2, Sec 3(e).

3. There is Evidence that Sabre Breached the NDA By Using ConcealFab's Confidential Information

Sabre contends that it did not breach the NDA by targeting key accounts for which ConcealFab had significant customer penetration, contacting ConcealFab vendors and representatives, and contacting existing and prospective ConcealFab customers because Sabre did not disclose any confidential information to those customers, vendors and representatives. *See* Dkt 97, Arg Sec B(2). However, the NDA did not merely prohibit Sabre from **disclosing** ConcealFab's confidential information to third parties; it also prohibited Sabre from **using** that information for any purpose other than "evaluating and engaging in discussion concerning a potential business relationship between the parties." *See* Sec III(B)(2)(b)&(c) above. That confidential information included past, present and future customer and supplier information. *See* Sec III(B)(2)(a) above. Sabre does not dispute that after the LOA was terminated and there was no longer any potential business relationship with the parties, it used ConcealFab's customer and supplier information to target key customer accounts, and contacted vendors, and

[14] The NDA labeled CONCEALFAB 000185-189 is genuine. *See* RS Appx, p 6—Fitzhugh Aff, ¶ 36.

existing and prospective customers. The use of ConcealFab's confidential information in such a manner creates a disputed issue of material fact for trial regarding whether Sabre breached the NDA.

**C. Ambiguity and Disputed Issues of Material Fact Preclude Summary Judgment Regarding ConcealFab's Breach of Contract Claim Regarding the LOA**

1. <u>Burden and Elements of Breach of LOA</u>

Sabre correctly identifies the burden and elements of a breach of contract claim under Colorado law. But ConcealFab identified at least four ways in which Sabre breached the LOA in its Complaint, and Sabre disputes the evidentiary support for only two of those bases. *Compare* Dkt 68, ¶¶ 56(a)-(d), *with* Dkt 97, Arg Sec B(3). Thus, even if Sabre is correct about those two breaches, its failure to make any showing regarding the absence of a genuine issue of material fact regarding the other two prevents this Court from dismissing the entire claim on summary judgment. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-671 (10th Cir. 1998) (burden is on the movant to show the absence of a genuine issue of material fact).

2. <u>Disputed Material Facts Supporting Breach of LOA</u>

a. The LOA required Sabre to pay $120,000 for an "Employee/Contractor" buyout in March 2015. *See* RS Appx, p 5—Fitzhugh Aff, ¶ 27; p 17—LOA, ¶ 3(b)(ii)(1).

b. The LOA elsewhere provided that the $120,000 for the "Employee/Contractor" buyout would be paid "with scheduled payment amounts to be determined." *See* RS Appx, p 18—LOA, ¶ 3(c)(vii)(1).

c. Sabre did not make a lump sum payment of $120,000 toward the Employee/Contractor obligation in March 2015. *See* RS Appx, p 5—Fitzhugh Aff, ¶ 27.

d. Sabre did not pay the March 2015 payment due to the Employee/Contractor until May 5, 2015. *See* RS Appx, p 37—Defendants' Responses and Objections to Plaintiff's Third Set of Written Discovery Requests to Defendants ("3rd Responses"), Response to Request for Admission No. 5.

e. Sabre did not pay the April 2015 payment due to the Employee/Contractor until May 5, 2015. *See* RS Appx, p 37—3rd Responses, Response to Request for Admission No. 6.

f. Sabre never paid the May 2015 payment due to the Employee/Contractor. *See* Dkt 68, ¶ 33; Dkt 70, Answer ¶ 33.

3. <u>There is Evidence that Sabre Breached the LOA Under Either One of Two Possible Interpretations of the Agreement</u>

Sabre asks this Court to dismiss the breach of LOA claim because ConcealFab cannot prove that Sabre failed to make certain "Employee/Contractor" payments due under the LOA. *See* Dkt 97, Arg Sec B(3). However, the LOA ambiguously required both a lump sum payment of $120,000 in March 2015 and permitted Sabre to pay this sum according to a schedule. *See* Sec III(C)(2)(a)&(b) above. Under Colorado law, a contract is ambiguous if it is fairly susceptible to more than one interpretation. *See Stroh Ranch Development, LLC v. Cherry Creek South Metro Dist. No. 2*, 935 F. Supp.2d 1052, 1060 (D. Colo. 2013). Where, as here, a contract is ambiguous, the meaning of its terms are generally an issue of fact to be determined in the same manner as other factual disputes, *i.e.,* not by summary judgment. *See id.* at 1055.

Even assuming the LOA is unambiguous regarding the Employee/Contractor payment, factual issues prevent this Court from entering summary judgment in favor of Sabre. If the LOA required one lump-sum payment of $120,000 to satisfy the Employee/Contractor obligation in March 2015, it is undisputed that Sabre did not pay that sum in March 2015 or at any other time. *See* Sec III(C)(2)(c) above. If, as Sabre contends, the parties agreed that the "Employee/Contractor' payments would be paid at a monthly rate of $12,000, evidence still exists that Sabre breached the LOA. It is undisputed that Sabre did not timely make the March or April 2015 payments, and failed to make any payment whatsoever in May 2015, even though the LOA was terminated more than a month later, on June 3, 2015. *See* Sec III(C)(2)(d)-(f) above; Dkt 97, Facts, ¶ 13. Thus, even if the payment provisions are unambiguous and Sabre's

interpretation of the LOA is correct, a genuine issue of material fact remains regarding whether Sabre breached those provisions when it failed to make timely payments in March and April 2015 and made no payment whatsoever in May 2015.[15]

**D. Genuine Issues of Material Fact Bar Summary Judgment Regarding Sabre's Counterclaim for Breach of the LOA**

1. Burden and Elements of Breach of LOA Counterclaim

Sabre properly identifies its burden of proof and the elements of its counterclaim for breach of the LOA. *See* Dkt 97, Arg Sec (B)(4).

2. Disputed Material Facts Supporting No Breach of LOA

a. The LOA required Mr. Fitzhugh and certain other ConcealFab employees to be terminated by ConcealFab and become Sabre Employees, and expressly stated, "ConcealFab is responsible for any and all liabilities of these employees **prior to** the Sabre hire date." *See* RS Appx, p 16—LOA, ¶ 2(1)(I)(1)-(2) (emphasis added).

b. The LOA stated, "Sabre will provide the working capital to the new EPG segment within Sabre…To be clear, no current [Accounts Receivable] or [Accounts Payable] of ConcealFab will move over to the new Sabre EPG segment…" *See* RS Appx, p 18—LOA, ¶ 3(c)(iv) & (iv)(1).

c. The LOA provided, "All new business purchase orders…received post the execution of this LOA will run through the Sabre EPG segment." *See* RS Appx, p 18—LOA, ¶ 3(c)(v). The LOA further stated, "If the LOA is terminated for any reason, orders that have been received prior to termination will be continued to be paid as per the terms of the LOA…" *See* RS Appx, p 19—LOA, ¶ 4(b). Pursuant to these provisions, Sabre received and retained all $1,201,622.48 of the proceeds from those purchase orders. *See* RS Appx, pp 34-35—3rd Responses, Response to Interrogatory No. 8; pp 41-43, SABRE 2324-2326.

d. Under a section of the LOA discussing employee obligations of up to $250,000, the LOA provided, "If for some reason the LOA is terminated, the amounts paid related to these Employee/Contractor obligations would revert to a 1-year note due Sabre guaranteed by all IP at a rate equivalent to their incremental borrowing rate, to be defined by the formal execution of this agreement." *See* RS Appx, p 17—LOA, ¶ 3(b)(ii)(4).

[15] With respect to Sabre's arguments regarding breach of the LOA provisions incorporating the Employment Agreement, *see* Sec III(A)(3) & (4) above.

e. Sabre paid just $24,000 of this possible $250,000 obligation before it terminated the LOA. *See* Dkt 68, ¶ 33; Dkt 70, Answer ¶ 33.

f. Under a section of the LOA discussing pre-payments and deposit licensing fees in the amount of $160,000, the LOA provided, "Pre-payments/deposit licensing fees shall be repaid by [ConcealFab] to Sabre or offset against licensing fees earned and due to [ConcealFab] from Sabre. In the event the LOA is terminated without an acquisition and the licensing fees due [ConcealFab] from Sabre are not sufficient to offset balances due to Sabre from [ConcealFab], then the balance due will revert to the form of a 1-year note at Sabre's incremental borrowing rate payable in monthly installments, with the rate to be determined at the formal execution of the LOA. This note will be guaranteed by a security interest in the IP of ConcealFab." *See* RS Appx, p 18—LOA, ¶ 3(c)(2).

g. Sabre paid the $160,000 pre-payments and deposit licensing fees to ConcealFab on or about March 16, 2015. *See* RS Appx, p 4—Fitzhugh Aff, ¶ 28.

h. On May 28, 2015, Sabre delivered a draft promissory note to ConcealFab.[16] *See* Dkt 70, Counterclaim ¶ 47; Dkt 71, ¶ 47.

i. The draft promissory note required ConcealFab to repay Sabre a total of $621,559.30. *See* RS Appx, p 45—Promissory Note.

j. The draft promissory note required ConcealFab to repay the $257,026.10 in wages Sabre had paid to its own employees during the pendency of the LOA, plus another $4,000 it intended to pay on June 5, 2015. *See* RS Appx, p 44—May 28, 2015 email.

k. The draft promissory note required ConcealFab to repay $27,310.60 in wages to its own employees that Sabre had yet to pay and, in fact, never did pay. *See* RS Appx, p 44—May 28, 2015 email; pp 37-38—3rd Responses, Response to Request for Admission No. 7.

l. The draft promissory note required ConcealFab to repay $50,990.99 in paid accounts payable for amounts Sabre had paid to ConcealFab vendors that submitted invoices during the pendency of the LOA. *See* RS Appx, p 44—May 28, 2015 email.

m. The draft promissory note required ConcealFab to repay $60,326.53 in unpaid accounts payable, an amount Sabre had not yet paid and, in fact, has never paid to ConcealFab vendors that submitted invoices during the pendency of the LOA. *See* RS Appx, p 44—May 28, 2015 email; p 38—3rd Responses, Response to Request for Admission No. 9 ("The AP

[16] The May 28, 2015 email and attached Secured Promissory Note labeled CONCEALFAB 002064-2073 are genuine. *See* RS Appx, p 5—Fitzhugh Aff, ¶ 30.

Aging for CF vendors that **remains unpaid** totals...") (emphasis added).

n. ConcealFab eventually paid more than $60,326.53 to vendors after Sabre failed and refused to pay them. *See* RS Appx, p 5—Fitzhugh Aff, ¶ 31.

o. The draft promissory note required ConcealFab to repay $4,954.61 in charges posted to Mr. Fitzhugh's corporate credit card while he was a Sabre employee. *See* RS Appx, p 44—May 28, 2015 email.

p. The draft promissory note required ConcealFab to repay $3,803.62 for a customer reception. *See* RS Appx, p 44—May 28, 2015 email.

q. The draft promissory note gave Sabre a security interest in all of ConcealFab's accounts, chattel paper, deposit accounts, documents, equipment, general intangibles, instruments, intellectual property and IP licenses, inventory, investment property, letter-of-credit rights, fixtures, pledged investments, receivables, books and records pertaining to the collateral, goods and other personal property, all proceeds and all supporting obligations. *See* RS Appx, pp 46-47—Promissory Note, Sec 4(a)(a)-(o).

3. <u>ConcealFab Had No Contractual Obligation to Sign a Promissory Note for Amounts it Never Agreed to Repay and Claiming a Security Interest in Nearly All of its Assets</u>

Sabre asks this Court to enter summary judgment in its favor on its counterclaim for breach of the LOA because ConcealFab refused to execute the promissory note Sabre presented to it on May 28, 2015. *See* Dkt 97, Arg Sec B(4). The first element of a breach of contract claim is the existence of a contract, *see Western Distrib.*, 841 P.2d at 1058, and the LOA nowhere required ConcealFab to execute a promissory note upon demand. *See* RS Appx, pp 16-19—LOA. ConcealFab could not breach a contract requirement that does not exist. But even assuming ConcealFab had an obligation to execute a promissory note, ConcealFab did not breach the LOA by refusing to execute a note that included amounts it had no obligation to repay and which claimed a security interest in far more than its intellectual property.

The promissory note Sabre sent ConcealFab on May 28, 2015 required ConcealFab to pay $621,559.30 to Sabre. *See* Sec III(D)(2)(i) above. Sabre concedes in its Motion that at least some of that figure was not actually due from ConcealFab to Sabre to the extent it now claims to

have only paid $608,966.69 to and on behalf of ConcealFab during the pendency of the LOA. *See* Dkt 97, Arg Sec B(4). Sabre previously admitted that other amounts in its promissory note were, and never have been incurred by Sabre. *See* Sec III(D)(2)(k)&(m) above. These concessions alone establish that ConcealFab was not in the wrong when it refused to sign the note.

There are other facts preventing a finding that ConcealFab breached the LOA by refusing to sign the promissory note. The LOA required ConcealFab to pay back only two categories of expenses in the event it was terminated: (1) the amounts Sabre paid toward the "Employee/Contractor" obligation, which ultimately totaled only $24,000; and (2) the pre-payments and deposit licensing fees in the amount of $160,000. *See* Sec III(D)(2)(d)&(f) above. Nonetheless, Sabre argued at the time of the promissory note and now in its Motion that ConcealFab must repay the wages and benefits Sabre paid ConcealFab personnel while they were Sabre employees. The LOA does not require ConcealFab to repay these amounts, and Colorado law does not otherwise require ConcealFab to pay Sabre's employees. *See* C.R.S. § 8-4-103 (employer is required to pay wages of its employees). Indeed, the only sums the LOA required ConcealFab to pay were "any and all liabilities of these employees **prior to** the Sabre hire date." *See* Sec III(D)(2)(a) above. ConcealFab did not breach the LOA by refusing to repay wages and benefits Sabre was legally obligated to pay during the pendency of the LOA. ConcealFab similarly did not breach the LOA by refusing to repay vendor invoices that were submitted to Sabre, the balance on a corporate credit card or the costs of a customer reception. The LOA expressly required Sabre to provide working capital during the pendency of the LOA, and nowhere required ConcealFab to repay that capital if the LOA was terminated. *See* Sec III(D)(2)(b) above. ConcealFab was responsible only for accounts receivable and payable on its books before the LOA. *See id.*

The reason the LOA did not require ConcealFab to repay many of the sums Sabre included in its promissory note is clear: Sabre was allowed to keep the proceeds from all purchase orders submitted during the pendency of the LOA. *See* Sec III(D)(2)(c) above. As a result, Sabre paid $357,332.23 to employees and in working capital, but retained more than $1.2 million in proceeds from purchase orders received during the LOA. *See* Sec III(D)(2)(c), (j) & (l) above.

Finally, ConcealFab did not breach the LOA by refusing to execute a promissory note because the LOA entitled Sabre to a security interest only in ConcealFab's intellectual property. *See* Sec III(D)(2)(d)&(f) above. However, the promissory note Sabre demanded ConcealFab sign also gave it a security interest in 17 other types of assets. *See* Sec III(D)(2)(q) above. ConcealFab had no obligation to give Sabre a security interest in those assets and, as a result, did not breach the LOA by refusing to do so. All of these facts, at minimum, create a genuine issue of material fact for trial regarding whether ConcealFab breached the LOA when it did not execute the promissory note Sabre sent on May 28, 2015.

### E. The Undisputed Facts Establish that Sabre Performed Inconsistent with the Parties' Expectations in Breach of the Implied Covenant of Good Faith and Fair Dealing

#### 1. <u>Burden and Elements of Breach of Implied Covenant of Good Faith and Fair Dealing</u>

A party asserting breach of the implied duty of good faith and fair dealing implied into every contract under Colorado law must prove the elements of a breach of contract claim: (1) the existence of a contract; (2) performance by the plaintiff or that performance was excused; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff. *See Bolsa Res., Inc. v. AGG Res., Inc.*, Civil Action No. 11-cv-01293-MSK-KMT, 2011 WL 6370409, at *3 (D. Colo. Dec. 20, 2011) (citing *Western Distrib.*, 841 P.3d at 1057). Additionally, with respect to the third element, plaintiff must identify a specific contract term that

allowed for discretion on the part of the defendant and present evidence that the defendant failed to perform consistent with the parties' reasonable expectations. *See id.* Sabre argues only that ConcealFab cannot prove the third element of this claim.[17]

2. <u>Disputed Material Facts Supporting Breach of Implied Covenant of Good Faith and Fair Dealing</u>

a. The LOA provided that the $120,000 for the "Employee/Contractor" buyout would be paid "with scheduled payment amounts to be determined." *See* RS Appx, p 18—LOA, ¶ 3(c)(vii)(1).

b. Sabre did not pay the March 2015 payment due to the Employee/Contractor until May 5, 2015. *See* RS Appx, p 37—3rd Responses, Response to Request for Admission No. 5.

c. Sabre did not pay the April 2015 payment due to the Employee/Contractor until May 5, 2015. *See* RS Appx, p 37—3rd Responses, Response to Request for Admission No. 6.

d. Sabre never paid the May 2015 payment due to the Employee/Contractor. *See* Dkt 68, ¶ 33; Dkt 70, Answer ¶ 33.

3. <u>There is Evidence Sabre Breached the Implied Covenant of Good Faith and Fair Dealing When it Failed to Timely Make Discretionary Payments Under Even its Own Interpretation of the LOA</u>

Sabre concedes in its Motion that it had discretion to pay $120,000 earmarked for an "Employee/Contractor buyout" through "scheduled payment amounts to be determined." *See* Dkt 97, Arg Sec (B)(1). It also suggests the parties' reasonable expectations were that the $120,000 would be paid in monthly installments of $12,000 each. *Id.* But it is undisputed that Sabre did not timely make the March or April 2015 payments, and failed to make any payment whatsoever in May 2015, even though the LOA was terminated more than a month later, on June 3, 2015. *See* Sec III(E)(2)(b)-(d) above; Dkt 97, Facts, ¶ 13. Thus, a genuine issue of material fact exists regarding whether Sabre breached its implied duty of good faith and faith

[17] Because Sabre does not contend ConcealFab cannot prove the other elements of the claim in its Motion, ConcealFab does not discuss those elements in this Response. *See Alpine Bank*, 555 F.3d at 1110 (non-movant does not have burden of justifying claim; movant must establish lack of merit).

dealing by failing to make timely payments in March and April 2015 and making no payment whatsoever in May 2015, contrary to the parties' expectations.

**F. ConcealFab's Breach of Fiduciary Duty and of the Implied Covenant of Good Faith and Fair Dealing Claims are Not Barred by the Economic Loss Rule**

1. Burden and Elements of Claims

Sabre seeks the dismissal of ConcealFab's claims for breach of fiduciary duty and breach of implied covenant of good faith and fair dealing not on the basis that ConcealFab cannot meet its burden to prove the elements of those claims, but because the claims in their entirety are barred as a matter of law by the economic loss rule.

2. Disputed Material Facts Preventing Application of Economic Loss Rule

a. Sabre contends the LOA is not a binding and enforceable contract. *See* Dkt 70, Answer ¶ 14 ("Defendants further state that the LOA is not a binding and enforceable contract"), ¶¶ 17-25 ("Defendants deny that the LOA was ever a binding an enforceable contract"), ¶ 29 ("Defendants deny that ConcealFab ever entered into the LOA"), ¶ 33 ("Defendants learned in May 2015 that ConcealFab did not properly enter into the LOA"), ¶ 63 ("The LOA was not a valid contract because ConcealFab did not properly accept the terms of the LOA"), ¶ 78 ("The LOA was never properly executed and thus is not a valid contract"); *see also* Dkt 34, Sec 3(b) ("Defendants dispute Plaintiff's claim that the parties entered into a valid LOA"), Dkt 77 Sec 3(b) (Defendants "affirmatively assert that Plaintiff's claims related to the LOA...are barred in whole due to the failure by Plaintiff's [sic] to establish the existence of a valid and enforceable contract").

3. Sabre Cannot Seek Dismissal of Claims Pursuant to the Economic Loss Rule While it Continues to Dispute the Existence of a Contract

The economic loss rule provides that a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such breach absent an independent duty of care under tort law. *See Registry Systems International, Ltd. v. Hamm*, Civil Action No. 08-cv-00495-PAB-MJW, 2010 WL 326327, at *10 (D. Colo. Jan. 20, 2010) (citing *Town of Alma v. Azco Constr., Inc.*, 10 P.3d 1256, 1264 (Colo. 2000)). A contractual duty is a predicate to application of the rule. *See Rhino Fund, L.L.P. v. Hutchins*,

215 P.3d 1186, 1194 (Colo. App. 2008) (the "economic loss rule applies where the plaintiff has an enforceable contractual remedy against the person or entity sought to be charged with liability"). But the first and only time Sabre has ever claimed the LOA was a valid contract was in its Motion, and in support, cited only ConcealFab's allegation of that fact in its Amended Complaint. *See* Dkt 97, Arg Sec (B)(4) (citing "Am. Compl., p. 6, ¶ 26"). Where, as here, the defendants argue that the contract containing the duty in question is unenforceable, summary judgment regarding a tort claim based on the economic loss rule is not appropriate. *See Registry Systems*, 2010 WL 326327 at *11.

4. Breach of the Implied Covenant of Good Faith and Fair Dealing is Not a Tort Claim Barred by the Economic Loss Rule

Sabre also argues that ConcealFab's claim for breach of the implied covenant of good faith and fair dealing is barred by the economic loss rule. However, breach of the implied covenant of good faith and fair dealing is not a tort claim. Rather, breach of this implied covenant is a contract claim that bars overlapping tort claims under the economic loss rule; it is not itself a claim that is barred by that rule. *See Top Rail Ranch Estates LLC v. Walker*, 327 P.3d 321, 329 (Colo. App. 2014) (citing *Jorgenson v. Colorado Rural Props, LLC*, 226 P.3d 1255, 1259 n 3 (Colo. App. 2010), and *Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282, 293-294 (Colo. App. 2009)). Sabre itself admits that breach of the implied covenant of good faith and fair dealing is a breach of contract claim elsewhere in its Motion. *See* Dkt 97, Arg Sec C (quoting *City of Golden v. Parker*, 138 P.3d 285, 292 (Colo. 2006) ("A violation of the duty of good faith and fair dealing gives rise to a claim for breach of contract")). Its contradictory contention that the claim is also a tort barred by the economic loss rule should be denied.

## G. Evidence Exists to Prevent Summary Judgment on ConcealFab's Tortious Interference with Existing and Prospective Business Relations Claims

### 1. Burden and Elements of Tortious Interference with Contractual and Prospective Contractual Relationships

Tortious interference with a contract requires the plaintiff to prove by a preponderance of the evidence that (1) the plaintiff have a contract with another party, (2) the defendant knew or should have known of such contract's existence, (3) the defendant intentionally induced the other party to the contract not to perform the contract with the plaintiff, and (4) the defendant's actions caused plaintiff to incur damages. *Telluride Real Estate Co. v. Penthouse Affiliates, LLC*, 996 P.2d 151, 155 (Colo. App. 2000) (citing *Memorial Gardens, Inc. v. Olympian Sales & Management Consultants, Inc.*, 690 P.2d 207 (Colo. 1984)). To prove tortious interference with a prospective contractual relationship, it is not necessary to prove an underlying contract; rather, it is sufficient to show intentional and improper interference preventing formation of a contract. *Dolton v. Capital Federal Savings & Loan Assoc.*, 642 P.2d 21, 23 (Colo. App. 1981).

### 2. Disputed Material Facts Supporting Tortious Interference Claims

a. Cincinnati Bell was a customer of ConcealFab before ConcealFab executed either the Term Sheet or the LOA. In 2014 alone, ConcealFab sold approximately $60,000 in products to Cincinnati Bell. *See* RS Appx, p 56—30(b)(6) deposition of J. Fitzhugh, 222:3-5.

b. Cincinnati Bell purchased between $80,000 and $90,000 in ConcealFab products during the pendency of the LOA.[18] *See* RS Appx, p 56—30(b)(6) deposition of J. Fitzhugh, 222:6-13. Pursuant to the LOA, those purchase orders were run through the Sabre EPG segment. *See* RS Appx, p 18—LOA, ¶ 3(c)(v); p 5—Fitzhugh Aff, ¶ 34.

c. Sabre, by contrast, did not have a pre-existing relationship with Cincinnati Bell. *See* RS Appx, p 59—Defendants' Responses and Objections to Plaintiff's Second Set of Written Discovery Requests ("2nd Responses"), Response to Interrogatory No. 2 (did not have communications with Cincinnati Bell before October 2, 2015).

[18] Sabre's internal documents show the purchase order(s) from Cincinnati Bell during the pendency of the LOA totaled at least $122,500. *See* RS Appx, pp 41-43—SABRE 2324-2325.

d. On February 5, 2016, Cincinnati Bell informed ConcealFab that it was preparing to execute an order to purchase antenna bracket hardware from ConcealFab.[19] *See* RS Appx, p 5—Fitzhugh Aff, ¶ 34; p 64—February 5, 2016 email.

e. On or about February 18, 2016, Cincinnati Bell faxed a purchase order to ConcealFab that did not include the prices ConcealFab previously quoted.[20] *See* RS Appx, p 5—Fitzhugh Aff, ¶ 35; *compare* RS Appx, p 66—Purchase Order, *with* RS Appx, p 64—February 5, 2016 email.

f. When ConcealFab asked about the pricing discrepancy, Cincinnati Bell faxed a Quote from Sabre to ConcealFab.[21] The prices in the Quote were exactly $10 less per unit than what ConcealFab traditionally sold one component for, exactly $15 less per unit for another component, and exactly $35 less per unit for the third component. *See* RS Appx, p 5—Fitzhugh Aff, ¶¶ 34 &35; *compare* RS Appx, p 64—February 5, 2016 email with RS Appx, p 65—Quote.

g. ConcealFab did not receive the $35,950 in revenue Cincinnati Bell indicated would be forthcoming in its email of February 5, 2016. *See* RS Appx, p 5—Fitzhugh Aff, ¶ 34.

h. ConcealFab has not received any other purchase orders from Cincinnati Bell since Sabre terminated the LOA. *See* RS Appx, p 55—30(b)(6) deposition of J. Fitzhugh, 221:2-7.

i. The LOA stated, "If for some reason the LOA is terminated, the amounts paid...would revert to a 1-year note due Sabre guaranteed by all IP..." *See* RS Appx, pp 17 & 18—LOA, ¶¶ 3(b)(ii)(4) & ¶ 3(c)(2).

j. On May 27, 2015, Sabre recorded a UCC-1 Financing Statement ("UCC Lien") with the Colorado Secretary of State claiming a security interest in all of ConcealFab's intellectual property. *See* Dkt 68, ¶ 36; Dkt 70, Answer ¶ 36 & Counterclaim ¶ 50; Plaintiff's Answer to Defendants' Counterclaims [Dkt 71], ¶ 50.

k. On May 28, 2015, Sabre delivered a draft promissory note to ConcealFab. *See* Dkt 70, Counterclaim ¶ 47; Dkt 71, ¶ 47.

l. ConcealFab did not sign the draft promissory note. *See* Dkt 70, Counterclaim ¶ 48; Dkt 71, ¶ 48.

---

[19] The February 5, 2016 email labeled CONCEALFAB 000277-278 is genuine. *See* RS Appx, p 5—Fitzhugh Aff, ¶ 35.

[20] The Purchase Order labeled CONCEALFAB 000274 is genuine. *See* RS Appx, p 5—Fitzhugh Aff, ¶ 35.

[21] The Quote labeled CONCEALFAB 000276 is genuine. *See* RS Appx, p 5—Fitzhugh Aff, ¶ 35.

m. Defendants terminated the LOA on June 3, 2015. *See* Dkt 68, ¶ 37; Dkt 70, Answer ¶ 37 & Counterclaim ¶ 49; Dkt 71, ¶ 49.

n. Despite demand, Sabre has refused to terminate its UCC Lien. *See* Dkt 68, ¶ 44; Dkt 70, Answer ¶ 44.

o. The UCC Lien has prevented ConcealFab from obtaining favorable financing terms on several occasions. *See* RS Appx, p 5—Fitzhugh Aff, ¶¶ 32 & 33.

3. <u>Evidence That ConcealFab Lost a Long-Term Customer and Could not Obtain Financing Prevents Summary Judgment Regarding its Tortious Interference with Existing and Prospective Business Relations Claims</u>

Sabre contends that both claims for tortious interference should be dismissed because there is no evidence that it acted intentionally or improperly, or that ConcealFab sustained any damages even if it did. *See* Dkt 97, Arg Sec E & F. In actuality, there is evidence that Sabre used information it learned about a pre-existing ConcealFab customer to lure that customer away, and that its invalid UCC Lien prevented ConcealFab from obtaining financing for nearly two years. This evidence prevents summary judgment regarding either claim.

It is undisputed that ConcealFab had a pre-LOA relationship with a customer called Cincinnati Bell, and that Sabre had never communicated with Cincinnati Bell prior to the LOA. *See* Sec III(G)(2)(a) above. It is also undisputed that Cincinnati Bell purchased ConcealFab products during the pendency of the LOA, and that Sabre learned both the identity of Cincinnati Bell as a ConcealFab customer and the prices ConcealFab charged Cincinnati Bell when that purchase order was processed through the Sabre EPG unit. *See* Sec III(G)(2)(b) above. Following termination of the LOA, Cincinnati Bell ceased being a ConcealFab customer and became a Sabre customer. *See* Sec III(G)(2)(h) above. These facts demonstrate that ConcealFab lost both an existing and prospective customer relationship. As a result of that lost relationship, ConcealFab has sustained at least $35,950 in damages. *See* Sec III(G)(2)(g) above.

Moreover, there is evidence that Sabre caused this loss of relationship through intentional and improper conduct. Specifically, Sabre acquired knowledge regarding the identity of Cincinnati Bell and the prices ConcealFab charged its long-time customer during the pendency of the LOA. *See* Sec III(G)(2)(b) above. As a competitor of ConcealFab, Sabre would have no other means of acquiring that information, particularly because it had never communicated with Cincinnati Bell. *See* Sec III(G)(2)(c) above. After Sabre terminated the LOA, and when it and ConcealFab were competitors in the same marketplace, Sabre used what it had learned during the parties' period of cooperation to undercut ConcealFab, and take for itself a purchase order that Cincinnati Bell previously indicated would be placed with ConcealFab. *See* Sec III(G)(2)(d)-(g) above. These actions were improper because Sabre used information it learned during a period of cooperation to openly compete with a competitor for a customer with whom it had no prior relationship. The LOA also did not permit Sabre to compete in this manner after it was terminated. *See* RS Appx, p 19—LOA, ¶ 4(e)(iii). And these actions were intentional because quoting prices that were exactly $10, $15 and $35 less than what ConcealFab charged Cincinnati Bell is too precise to be an accident.

Evidence regarding the UCC Lien is yet more proof that Sabre tortiously interfered with ConcealFab's business prospects. Sabre recorded its UCC Lien when the undisputed facts establish it did not have an authenticated security agreement, as required by the Colorado Uniform Commercial Code. *See* Plaintiff's Motion for Partial Summary Judgment [Dkt 94], Sec III. Even Sabre appears to concede in its Motion that its UCC Lien was invalid. *See* Dkt 97, Arg Sec E ("While Sabre's UCC-1 may have been deemed invalid…"); Arg Sec F ("While Sabre's UCC-1 was deemed invalid…"). Recording the invalid UCC Lien was an improper act, which Sabre compounded by refusing to terminate the UCC Lien upon demand by ConcealFab. *See* Sec III(G)(2)(n) above; *see also* C.R.S. § 4-9-513(c)(4) (within 20 days after a secured party

receives an authenticated demand from a debtor, a secured party shall file a termination statement if the debtor did not authorize the filing of the initial financing statement). Sabre knew or should have known that the existence of its UCC Lien would interfere with ConcealFab's business prospects because the Uniform Commercial Code expressly identifies "loss resulting from the debtor's inability to obtain, or increased costs of, alternative financing" as a consequence of a wrongfully recorded lien. *See* C.R.S. § 4-9-625(b); *Western Energy Resources, Inc. v. Keystone*, Civil Action No. 07-cv-02684-RPM, 2009 WL 12265 at *7 (D. Colo. Jn. 16, 2009) (everyone is deemed to have constructive knowledge of statutes). ConcealFab, in fact, was unable to obtain financing on numerous occasions because of the UCC Lien. *See* Sec III(G)(2)(o) above. Finally, ConcealFab was damaged by its inability to obtain financing because of the UCC Lien. *See id*; *see also* C.R.S. § 4-9-625(e)(4) (person named as a debtor in a wrongfully recorded UCC-1 Financing Statement is entitled to at least $500 in damages). Thus, there is evidence both that Sabre acted intentionally and improperly, and that ConcealFab sustained damages as a result.

### H. Evidence that Sabre Never Intended to Perform the Employment Agreement or LOA Precludes Summary Judgment Regarding ConcealFab's Fraudulent Inducement Claim

1. <u>Burden and Elements of Fraudulent Inducement</u>

Under Colorado law, a plaintiff asserting a fraudulent inducement claim must prove: (1) the defendant's misrepresentation of a material fact; (2) the plaintiff's justifiable reliance on that misrepresentation; and (3) such reliance resulting in damage to the plaintiff. *See Kirzhner v. Silverstein*, Civil Action No. 09-cv-02858-CMA-BNB, 2011 WL 4382560, at *9 (D. Colo. Sept. 20, 2011) (citing *J.A. Walker Co., Inc. v. Cambria Corp.*, 159 P.3d 126, 132 (Colo. 2007)). Sabre does not identify which elements of this claim allegedly fail for lack of evidentiary support. Instead, Sabre appears to ask this Court to generally make an affirmative factual determination

that its actions are "not the actions of a party committing fraud." *See* Dkt 97, Arg Sec G(1); *see also* Dkt 97, Arg Sec G(2) ("ConcealFab has no evidence to prove a fraud claim and the evidence before the Court proves the opposite"); Arg Sec G(3) ("All of the above show that Sabre cannot be held liable for fraud in the inducement").[22] The issue of a party's intent is typically a question of fact and is not an appropriate issue for summary disposition. *See Burman v. Richmond Homes*, 821 P.2d 913, 920 (Colo. App. 1991).

2. Disputed Material Facts Supporting Fraudulent Inducement

a. The parties exchanged multiple drafts of an Employment Agreement for Jonathan Fitzhugh between January 7 and 15, 2015. *See* RS Appx, p 2—Fitzhugh Aff, ¶ 4.

b. The parties concluded their negotiations regarding the terms of that Employment Agreement before the Term Sheet was signed on February 3, 2015. *See* RS Appx, p 2—Fitzhugh Aff, ¶ 5.

c. On February 14, 2015, Sabre told ConcealFab that it wanted to restructure the parties' deal as an LOA. *See* RS Appx, p 3—Fitzhugh Aff, ¶ 9.

d. Sabre told Mr. Fitzhugh on or about April 1, 2015 that it did not intend to execute the Employment Agreement. *See* RS Appx, p 4—Fitzhugh Aff, ¶ 22.

e. On April 21, 2015, Sabre denied ever seeing the Employment Agreement. *See* RS Appx, p 5—Fitzhugh Aff, ¶ 25.

f. Sabre never executed the Employment Agreement. *See* Dkt 68, ¶ 30; Dkt 70, Answer ¶ 30.

g. Sabre has asserted throughout this litigation that there was no enforceable Employment Agreement. *See* Motion to Dismiss [Dkt 26], p. 5 ("Fitzhugh and Sabre, however, could not agree to final terms of an employment agreement, hence neither side ever executed the Draft Employment Agreement"); Dkt 34, Sec 3(b) ("Defendants dispute Plaintiff's claim that the parties entered into a valid…Employment agreement and have moved to dismiss"); Dkt 70, Answer ¶ 11 ("an agreement between the parties was never reached and no written

[22] Because Sabre focuses only on evidence of its intent in its Motion, ConcealFab does not address the other elements of the claim here. *See Alpine Bank*, 555 F.3d at 1110 (non-movant does not have burden of justifying claim; movant must establish lack of merit).

employment agreement was ever executed"); ¶ 24 ("Defendants further deny that there was ever a binding and enforceable employment agreement"); ¶ 49 ("Defendants never entered into an employment agreement"); ¶ 110 ("The Amended Complaint fails to state a claim for breach of an employment agreement because no agreement was ever entered into between the Defendants and Jonathan Fitzhugh"); Counterclaim ¶ 36 ("Sabre and Mr. Fitzhugh never executed nor agreed to the terms of that draft [employment] agreement"); Dkt 77, Sec 3(b) (Defendants "deny the allegations in Plaintiff's Amended Complaint and affirmatively assert that Plaintiff's claims related to the…Employment Agreement are barred in whole due to failure by Plaintiff's [sic] to establish the existence of a valid and enforceable contract").

h. Sabre asserts in its Motion that the Employment Agreement never existed. *See* Dkt 97, Arg Sec B(1)(b).

i. In the event the LOA was terminated, the LOA required ConcealFab to give Sabre "most favored nation" status, a 20 percent discount on pricing, and the right to market and sell certain of its established, proprietary products. *See* RS Appx, p 19—LOA ¶ 4(e)(iii)(1). This term was at variance with the Term Sheet, which gave Sabre no rights regarding ConcealFab's concealed shelters or back lobe suppressors in the event a definitive agreement to combine the two businesses was not consummated. *See* RS Appx, pp 9-15—Term Sheet.

j. In the event the LOA was terminated, the LOA gave Sabre the unrestricted right to use whatever it learned regarding ConcealFab's equipment-concealing streetlight pole capabilities during the pendency of the LOA. *See* RS Appx, p 19—LOA ¶ 4(e)(iii)(4). This term was at variance with the Term Sheet, which gave Sabre no rights regarding ConcealFab's pole capabilities in the event a definitive agreement to combine the two businesses was not consummated. *See* RS Appx, pp 9-15—Term Sheet.

k. The LOA required Sabre to pay $160,000 to ConcealFab on March 13, 2015. *See* RS Appx, p 18—LOA, ¶ 3(c)(vii)(1).

l. Sabre chose to pay the $160,000 to ConcealFab three days later, for reasons that eluded even its own employees. *See* RS Appx, p 5—Fitzhugh Aff, ¶ 28; p 67—March 13, 2016 email.

m. The LOA provided that the $120,000 for an "Employee/Contractor" buyout would be paid "with scheduled payment amounts to be determined." *See* RS Appx, p 18—LOA, ¶ 3(c)(vii)(1).

n. Sabre did not pay the March 2015 payment due to the Employee/Contractor until May 5, 2015. *See* RS Appx, p 37—3rd Responses, Response to Request for Admission No. 5.

o. Sabre did not pay the April 2015 payment due to the Employee/Contractor until May 5, 2015. *See* RS Appx, p 37—3rd Responses, Response to Request for Admission No. 6.

p. Sabre never paid the May 2015 payment due to the Employee/Contractor. *See* Dkt 68, ¶ 33; Dkt 70, Answer ¶ 33.

3. <u>Evidence that Sabre Failed to Sign the Employment Agreement and Perform the LOA is Evidence of its Intent to Fraudulently Induce ConcealFab</u>

Sabre first seeks dismissal of the fraudulent inducement claim on the basis that the record is devoid of evidence that Sabre did not intend to execute the Employment Agreement at the time the parties negotiated the LOA, and points to the many drafts of that agreement as affirmative proof of its good intentions. *See* Dkt 97, Arg Sec G(1). Again, Sabre distorts the timeline of events to the extent it suggests the parties negotiated the Employment Agreement after the Term Sheet was executed on February 3, 2015. *See* Sec III(A)(4) above. The fact that the parties exchanged multiple drafts of the Employment Agreement before the Term Sheet was signed, and before any discussion of an LOA, has no evidentiary bearing on Sabre's intention to execute the Employment Agreement in connection with the LOA. Even if it did, that evidence is contradicted by (1) the undisputed fact that Sabre never did execute the Employment Agreement, (2) its statement to ConcealFab on April 1, 2015 that it did not believe it had any obligation to execute the Employment Agreement, (3) its denial of ever having seen the Employment Agreement on April 21, 2015, and (4) its repeated assertions in this case that there never was an Employment Agreement. *See* Sec III(H)(2)(d)-(h) above. This evidence creates a genuine issue of fact for trial regarding whether Sabre ever intended to execute the Employment Agreement when the parties signed the LOA.

Sabre also claims there is no evidence that it entered the LOA with an intention not to perform because it did perform some terms of the LOA. *See* Dkt 97, Arg Sec G(2) & (3). But its intention not to perform can be inferred from the fact that Sabre negotiated to acquire favorable

rights in the event it terminated the LOA. *See* Sec III(H)(2)(i)&(j) above. "Fraud or the existence of a fraudulent scheme is seldom susceptible to proof solely by direct evidence and in nearly every such case, direct and circumstantial evidence together with the inferences to be drawn therefrom must be relied upon for proof." *Beck v. U.S.*, 305 F.2d 595, 598 (10th Cir. 1962). Sabre's intention not to perform is also evidenced by its repeatedly delayed performance of the LOA, without any justification or excuse. *See* Sec III(H)(2)(k)-(p) above.

## I. ConcealFab's Misappropriation of Trade Secrets Claim is Neither Subject to Dismissal for Lack of Subject Matter Jurisdiction Nor Lack of Evidence

### 1. Burden and Elements of Misappropriation of Trade Secret

Sabre properly identifies the burden and elements of a misappropriation of trade secret claim under Colorado law. *See* Dkt 97, Arg Sec I(2).

### 2. Disputed Material Facts Supporting Misappropriation

a. The NDA defined "Confidential Information" to include "past, present, and future business affairs such as...customer and/or supplier information…" *See* Sabre Appx, p 1, Sec 1(a). This definition further included tools, methods, techniques and designs. *See* Sabre Appx, p 1, Sec 1(b).

b. The NDA required the parties to "use such Confidential Information only for the purposes of evaluating and engaging in discussion concerning a potential business relationship between the Parties..." *See* Sabre Appx, p 2, Sec 3(a).

c. The NDA required the party receiving Confidential Information to immediately report to the disclosing party "any attempt by the Receiving Party's Representatives to use or disclose any portion of the Confidential Information without authorization from the Disclosing Party, and shall cooperate with the Disclosing Party in every reasonable way to help the Disclosing Party regain possession of the Confidential Information and prevent its further unauthorized use." *See* Sabre Appx, p 2, Sec 3(e).

d. Sabre contends the LOA is not a binding and enforceable contract. *See* Dkt 70, Answer ¶ 14 ("Defendants further state that the LOA is not a binding and enforceable contract"), ¶¶ 17-25 ("Defendants deny that the LOA was ever a binding an enforceable contract"), ¶ 29 ("Defendants deny that ConcealFab ever entered into the LOA"), ¶ 33 ("Defendants learned in May 2015 that ConcealFab did not properly enter into the LOA"), ¶ 63 ("The LOA was not a valid contract because ConcealFab did

not properly accept the terms of the LOA"), ¶ 78 ("The LOA was never properly executed and thus is not a valid contract"); *see also* Dkt 34, Sec 3(b) ("Defendants dispute Plaintiff's claim that the parties entered into a valid LOA"), Dkt 77 Sec 3(b) (Defendants "affirmatively assert that Plaintiff's claims related to the LOA ... are barred in whole due to the failure by Plaintiff's [sic] to establish the existence of a valid and enforceable contract").

e. Cincinnati Bell was a customer of ConcealFab before ConcealFab executed either the Term Sheet or the LOA. *See* RS Appx, p 56—30(b)(6) deposition of J. Fitzhugh, 222:3-5; p 5—Fitzhugh Aff, ¶ 34.

f. Sabre, by contrast, did not have a pre-existing relationship with Cincinnati Bell. *See* RS Appx, p 59—2nd Responses, Response to Interrogatory No. 2 (did not have communications with Cincinnati Bell before October 2, 2015).

g. Cincinnati Bell purchased at least $90,000 in ConcealFab products during the pendency of the LOA.[23] *See* RS Appx, p 56—30(b)(6) deposition of J. Fitzhugh, 222:6-13. Pursuant to the LOA, those purchase orders were run through the Sabre EPG segment. *See* RS Appx, p 18—LOA, ¶ 3(c)(v); p 5—Fitzhugh Aff, ¶ 34.

h. On February 5, 2016, Cincinnati Bell informed ConcealFab that it was preparing to execute an order to purchase antenna bracket hardware from ConcealFab. *See* RS Appx, p 5—Fitzhugh Aff, ¶ 34; p 64—February 5, 2016 email.

i. On or about February 18, 2016, Cincinnati Bell faxed a purchase order to ConcealFab that did not include the prices ConcealFab previously quoted. *See* RS Appx, p 5—Fitzhugh Aff, ¶ 35; *compare* RS Appx, p 66—Purchase Order, *with* RS Appx, p 64—February 5, 2016 email.

j. When ConcealFab asked about the pricing discrepancy, Cincinnati Bell faxed a Quote from Sabre to ConcealFab. The prices in the Quote were exactly $10 less per unit than what ConcealFab traditionally sold one component for, exactly $15 less per unit for another component, and exactly $35 less per unit for the third component. *See* RS Appx, p 5—Fitzhugh Aff, ¶¶ 34 & 35; *compare* RS Appx, p 64—February 5, 2016 email with RS Appx, p 65—Quote.

---

[23] Sabre's internal documents show the purchase order(s) from Cincinnati Bell during the pendency of the LOA totaled at least $122,500. *See* RS Appx, p 41-43—SABRE 2324-2325.

3. <u>This Court has Subject Matter Jurisdiction to Hear Misappropriation Claim</u>

Sabre confuses the concepts of subject matter jurisdiction and choice of law, and conflates breach of contract with statutory claims, to argue without any citation to authority that this Court cannot hear ConcealFab's misappropriation of trade secrets claim. *See* Dkt 97, Arg Sec I(1). But choice of law is not the same as subject matter jurisdiction, the source of which in this case is 18 U.S.C. § 1332 because there is diversity of citizenship and the required amount in controversy.[24] A choice of law provision does not deprive this Court of subject matter jurisdiction to hear a claim under Iowa law. *See, e.g., Keefner v. U.S. Fire Ins. Co.*, Civil Action No. 90-A-486, 1991 WL 2233, at *5 (D. Colo. Jan. 7, 1991) (applying Colorado choice of law rules to determine whether Colorado or Iowa law applied to interpretation of insurance contract). Moreover, the mere fact that a contract is to be construed under Iowa law does not does not prevent a party from pursuing a separate claim under Colorado statute. The NDA itself does not prohibit a claim under the Colorado Uniform Trade Secrets Act, and Sabre fails to cite to any authority supporting its muddled contention.

4. <u>The NDA Both Defines the Trade Secrets Misappropriated and Makes Sabre's Use of the Improper</u>

Regarding the substance of the misappropriation claim, Sabre contends ConcealFab cannot show that its design and fabrication methods, key accounts, customer lists, contractual relationships and pricing information are trade secrets under the Colorado Uniform Trade Secrets Act. *See* Dkt 97, Arg Sec I(2). But what constitutes a trade secret is a question of fact. *Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 521 (Colo. App. 2011); *see also Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003) (trade secret status is a question of fact). Moreover, "trade secret" is defined broadly to include all or part of virtually any information that is of value, whether it be in the nature of scientific, technical, business, financial or professional

[24] *See* footnote 8 above.

information, so long as the owner has taken measures to prevent it from becoming available beyond those to whom it has given limited access. *Gognat v. Ellsworth*, 259 P.3d 497, 501 (Colo. 2011) (citing C.R.S. § 7-74-102(4)). ConcealFab took measures to prevent its design and fabrication methods, key accounts, customer lists, contractual relationships and pricing information from becoming publicly available by entering into an NDA with Sabre that specifically identified those categories of information as confidential, and prohibited their unauthorized use. *See* Sec III(I)(2)(a)-(c) above.

Sabre nonetheless contends that information regarding ConcealFab's pole production methods cannot constitute a trade secret because the LOA expressly provided that the parties could "compete on this product line with no restrictions" after the LOA was terminated. However, Sabre has repeatedly denied that the LOA was a valid contract. *See* Sec III(I)(2)(d) above. Its contradictory assertion now that the LOA entitles it to use information otherwise identified as confidential under the NDA creates a genuine issue of fact for trial. Sabre also asserts without any citation to any evidence of any kind that the identity of ConcealFab's key accounts, customer lists, contractual relationships and pricing information are "ascertainable from public sources," or at least known to Sabre as a competitor of ConcealFab in the same marketplace. But there is no evidence that Sabre knew Cincinnati Bell was a ConcealFab customer before the NDA or LOA. This lack of evidence is contradicted by evidence that Sabre had no communications with Cincinnati Bell before either the NDA or the LOA, had an opportunity to learn about both its existence and the prices ConcealFab charged it during the pendency of the LOA, and was not permitted under either the NDA or the LOA to use what it learned about Cincinnati Bell to compete for its business. *See* Sec III(I)(2)(b), & (e)-(g) above; RS Appx, p 19—LOA, ¶ 4(e)(iii).

Finally, Sabre argues that its use of any ConcealFab design and fabrication methods, key accounts, customer lists, contractual relationships and pricing information did not constitute misappropriation because it did not acquire the information via improper means. To the contrary, Sabre obtained and then used the information for purposes other than those specifically permitted by the NDA. In other words, Sabre breached its duty to maintain secrecy.

WHEREFORE, for the reasons stated herein, Plaintiff ConcealFab Corporation respectfully requests that this Court enter an Order denying Defendants' Motion for Partial Summary Judgment in its entirety.

Dated: May 19, 2017.

Respectfully submitted,

*s/Angela D. DeVine*
Thomas M. Haskins III
Martin D. Beier
Angela D. DeVine
SILVER & DEBOSKEY, P.C.
1801 York Street
Denver, CO 80206
Phone: (303) 399-3000
FAX: (303) 399-2650
haskinst@s-d.com
beierm@s-d.com
devinea@s-d.com

ATTORNEYS FOR PLAINTIFF

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on May 19, 2017 a true and correct copy of **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT PURSUANT TO FED.R.CIV.P. 56** was served via email to the following:

Jeana L. Goosmann
Elizabeth Lally
Goosmann Law Firm, PLC
410 5th Street
Sioux City, IA 51101

*s/Chris Allen*

GC9632