# APPENDIX

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:15-cv-01793-CMA-KLM

CONCEALFAB CORPORATION, a Colorado corporation,

Plaintiff,

v.

SABRE INDUSTRIES, INC., a Delaware corporation, and MIDWEST UNDERGROUND TECHNOLOGY, INC., an Illinois corporation,

Defendants.

---

**AFFIDAVIT OF JONATHAN FITZHUGH**

---

Affiant, Jonathan Fitzhugh, being first duly sworn upon his oath, deposes and states as follows:

1. I am over the age of 18 and am qualified to make the statements contained in this affidavit.

2. I am the Chief Executive Officer of ConcealFab Corporation ("ConcealFab").

3. ConcealFab and Midwest Underground Technology, Inc./Sabre Industries, Inc. (collectively "Sabre") began formal discussions in 2014 to combine their two businesses. In connection with that combination, the parties contemplated that I would resign from ConcealFab and become a Sabre employee. My position at Sabre would be Executive Vice President - DAS and Small Cell Product Segment.

4. As ConcealFab and Sabre negotiated the Term Sheet, Sabre and I also negotiated my Employment Agreement. Sabre provided a draft of an Employment Agreement on January 7, 2015. Over the next eight days, Sabre and I exchanged multiple drafts of the Employment Agreement until Sabre, the ConcealFab Board of Directors, and I were all in agreement.

5. Sabre and I concluded our negotiations regarding my Employment Agreement no later than January 15, 2015. On that date, I presented the final version of the Employment Agreement to the ConcealFab Board of Directors for its review and approval. The email and attachment labeled CONCEALFAB 001142-1151 and found at

pages 27 to 36 of Sabre's Appendix to its Motion are a true and accurate copy of the final Employment Agreement I presented to the ConcealFab Board of Directors on January 15, 2015.

6. The ConcealFab Board of Directors approved the Employment Agreement on or about January 15, 2015.

7. The ConcealFab Board of Directors would not approve the Term Sheet without first seeing, understanding and approving the final negotiated version of the Employment Agreement. I informed Sabre of this condition during our negotiations, including in an email dated January 3, 2015. The email labeled CONCEALFAB 002125 is a true and accurate copy of the email I sent to Douglas Huff on that date.

8. ConcealFab and Sabre signed the Term Sheet on February 3, 2015.

9. On February 14, 2015, Sabre told ConcealFab that it wanted to restructure the parties' deal to include an interim operating agreement referred to as a Licensing Operating Agreement ("LOA") prior to finalizing and executing the asset purchase agreement contemplated by the Term Sheet.

10. After approximately a month of back and forth negotiations, the parties agreed to the terms of the LOA.

11. The LOA differed from the Term Sheet in several respects. One of the differences between the Term Sheet and the LOA was the timing of my resignation from ConcealFab and acceptance of employment with Sabre. Under the Term Sheet, that event was supposed to occur after the asset purchase agreement was executed. Under the LOA, that event was to occur immediately.

12. In order to protect ConcealFab's interests under the LOA, especially if the LOA was terminated, ConcealFab incorporated the terms of my Employment Agreement into the LOA, and in particular negotiated that termination of the LOA would also constitute termination of the Employment Agreement as "resignation for good reason." The ConcealFab Board of Directors would not approve the LOA without these terms.

13. Under the Employment Agreement, "resignation for good reason" entitled me to a severance equal to my annual salary of $300,000. I agreed to assign that severance payment to ConcealFab, so that it, not me, would receive the $300,000 severance in the event Sabre terminated the LOA. This money was meant to help ConcealFab re-establish operations, fund any immediate obligations, and buy it some time to identify other sources of longer-term capital. The ConcealFab Board of Directors informed ConcealFab shareholders of my assignment of the severance to the company when we asked them to vote regarding the LOA.

14. I almost exclusively negotiated the terms of the Term Sheet, Employment Agreement and LOA with Douglas Huff, the President of Sabre Telecom. On or about, March 12, 2015, I learned that Mr. Huff intended to leave Sabre. Mr. Huff, in fact, left Sabre shortly thereafter.

15. ConcealFab and Sabre signed the LOA by March 13, 2015, and I became an employee of Sabre on or about March 16, 2015. Sabre had not yet signed my Employment Agreement, but repeatedly led me to believe that it would.

16. Specifically, on March 17, 2015, Carey Ellinghaus, Sabre's Vice President of Human Resources, told me that he had exchanged emails with Mr. Huff regarding the status of my Employment Agreement, and hoped to speak with him one on one the next morning.

17. On March 22, 2015, Leslie Myers, another employee in the Sabre human resources department, told me that Mr. Ellinghaus was still following up regarding my Employment Agreement.

18. On March 23, 2015, Ms. Myers sent me an email with everyone's new Sabre job titles. The email incorrectly identified me as "EVP – Engineered Products Group." I informed her that my Employment Agreement said my title would be Executive Vice President - DAS and Small Cell Product Segment.

19. On March 25, 2015, Ms. Myers told me that Mr. Ellinghaus was still working on the Employment Agreement and hoped to have something to me later that day.

20. On March 27, 2015, my Sabre job title was changed to Executive Vice President of the Engineered Product Group, DAS, Small Cells, & Government.

21. Sabre paid me a salary equal to the $300,000 annual salary identified in my Employment Agreement.

22. On April 1, 2015, Pete Sandore, Chief Executive Officer of Sabre, told me in a face-to-face meeting that he did not intend to sign the Employment Agreement until after the acquisition was finalized pursuant to the Term Sheet. I told Mr. Sandore that his position was contrary to the LOA and the deal that I had negotiated with Mr. Huff.

23. Neither my salary nor my job title changed after my April 1, 2015 meeting with Mr. Sandore.

24. On April 11, 2015, the ConcealFab Board of Directors confirmed to ConcealFab shareholders, "Mr. Fitzhugh's employment contract would also provide Mr.

Fitzhugh with a severance payment of one year's base compensation, should his employment be terminated. Should [Sabre] elect not to consummate the acquisition of ConcealFab for any reason, Mr. Fitzhugh's employment with [Sabre] will terminate . . . In addition, upon the termination of the proposed acquisition for any reason, Mr. Fitzhugh's . . . severance payment would be assigned to ConcealFab. . ."

25. On April 21, 2015, I emailed a copy of the January 15, 2015 Employment Agreement to Tony Sabatino, President of Sabre's Telecom Segment (and Mr. Huff's successor). Mr. Sabatino said he had never before seen the Employment Agreement.

26. Sabre terminated the LOA on June 3, 2015. Sabre said it had no obligation to pay the severance due under the Employment Agreement and LOA because it never signed the Employment Agreement. Sabre never paid the $125,000 signing bonus required by the Employment Agreement for this same reason.

27. The LOA also required Sabre to pay $120,000 for an "Employee/Contractor" buyout in March 2015. The "Employee/Contractor" in question was Michael Slattery, the founder of ConcealFab who left the ConcealFab Board of Directors and ceased being an employee of ConcealFab in November, 2014 under an agreement that required ConcealFab to make certain payments to Mr. Slattery. Sabre did not make a lump sum payment of $120,000 toward the "Employee/Contractor" obligation in March 2015.

28. Sabre paid $160,000 in pre-payments and deposit licensing fees to ConcealFab on or about March 16, 2015.

29. On May 28, 2015, Tim Rossetti, the Chief Financial Officer and Executive Vice President of Sabre, sent me an email with a promissory note attached to it at 7:16 p.m MST. Mr. Rossetti informed me that ConcealFab needed to sign the promissory note by 12 p.m. EST (or 10 a.m. MST) on May 28, 2015. Because that deadline had already passed by the time Mr. Rossetti sent his email to me, I believed he meant to say that the promissory note needed to be signed before 10 a.m. MST the next day, May 29, 2015.

30. The email and attached Secured Promissory Note labeled CONCEALFAB 002064-2073 is a true and accurate copy of the email and note I received from Mr. Rossetti on May 28, 2015.

31. The LOA required Sabre to pay invoices that were submitted to it during the pendency of the LOA. Sabre did not pay at least $60,326.53 to ConcealFab vendors that had submitted invoices to Sabre for payment during the pendency of the LOA. ConcealFab ultimately paid those vendor invoices itself, plus interest and late fees, so that ConcealFab could continue to operate its business.

32. On July 20, 2015, ConcealFab discovered the existence of the UCC-1 Financing Statement when it attempted to secure financing against its accounts receivable. As a result of the UCC-1 Financing Statement, ConcealFab received a less favorable loan term than it was initially quoted. Specifically, FastAR revised its loan-to-value ratio from 80 percent of ConcealFab's outstanding receivables to 60 percent of ConcealFab's outstanding receivables, which reduced ConcealFab's borrowing capacity by several hundred thousand dollars without reducing the cost. Additionally, on July 1, 2016, as a result of the UCC-1 Financing Statement, StarFunding requested that ConcealFab front a $10,000 fee for a third party attorney to investigate the lien, and requested that a 10 percent "reserve" fee be held back from proceeds otherwise due to ConcealFab as additional risk mitigation for the lender.

33. The dispute with Sabre regarding the UCC-1 Financing Statement also prevented ConcealFab from obtaining non-traditional financing with two equity investors in October and November of 2016. Those lost investments were each for $3 million or more.

34. In February 2016, Cincinnati Bell, a long-time customer of ConcealFab, was prepared to purchase ConcealFab's unique bracket mounting system for $35,950, which it had purchased multiple times prior. Ultimately, however, Cincinnati Bell purchased a substantially similar system from Sabre, which sold the system for exactly $10 less per unit than ConcealFab sells a certain component, exactly $15 less per unit for another component, and exactly $35 less per unit for the third component. Sabre learned all the mechanical, drawing and pricing details of ConcealFab's antenna mounting system during the pendency of the LOA.

35. The email labeled CONCEALFAB 000277-278 is a true and accurate copy of the emails between ConcealFab and Cincinnati Bell on February 5, 2016 regarding purchase of the bracket mounting system. The Purchase Order labeled CONCEALFAB 000274 is a true and accurate copy of the Purchase Order that Cincinnati Bell mistakenly faxed to ConcealFab on or about February 18, 2016. ConcealFab contacted Cincinnati Bell about the incorrect prices in the Purchase Order, and Cincinnati Bell faxed ConcealFab a Quote. The Quote labeled CONCEALFAB 000276 is a true and accurate copy of the Sabre quote that ConcealFab received sometime after February 5, 2016. Upon receipt of that Quote, I realized that Cincinnati Bell was trying to purchase the bracket mounting system from Sabre but had faxed the Purchase Order to ConcealFab.

36. The Mutual Non-Disclosure Agreement labeled CONCEALFAB 000185-189 and found at pages 1 to 5 of Sabre's Appendix to its Motion is a true and accurate copy of the Mutual Non-Disclosure Agreement between Sabre and ConcealFab.

Further Affiant sayeth naught.

Jonathan Fitzhugh

STATE OF COLORADO )
) ss:
COUNTY OF DENVER )

This Affidavit is subscribed and sworn to before me this 18th day of May 2017 by Jonathan Fitzhugh.

CAROL J. CHRISTMAN
Notary Public
State of Colorado
Notary ID # 19994004074
My Commission Expires 10-26-2020

Notary Public
My Commission Expires: 10/26/2020

## Vicki E. Pennington

**From:** Jonathan Fitzhugh
**Sent:** Saturday, January 3, 2015 11:44 AM
**To:** Doug Huff
**Subject:** RE: Term sheet...

Doug,

FYI, I'm having a call with the Board at 4pm EST today to discuss. One thing I know I anchored them around was the promise to get to review the Employment Agreement prior to signing the Term Sheet, as that was something you and I agreed to, not sure if I can move them off of that expectation.

---

**From:** Doug Huff [mailto:dhuff@sabreindustries.com]
**Sent:** Saturday, January 03, 2015 9:09 AM
**To:** Jon Fitzhugh
**Subject:** Term sheet...

Jon,

Are you prepared to sign the term sheet last draft ?

Pete would like to get that for his conversation with Bob on Monday.

Dch

Confidential

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

Tel 217-819-3040
Fax 217-819-3041

Sabre Industries Telecom Services

To: Jon Fitzhugh

From: Doug Huff

Re: Term Sheet

Date: February 3rd, 2015

## TERM SHEET

The parties Midwest Underground Technology Inc (MUTI) and Conceal Fab (CF) are entities that each participate in the Small Cell, DAS, and oDAS segments of the telecom market. (MUTI and Sabre may be used interchangeably in this agreement) Each organization has product lines, customer relationships, and intellectual property that position themselves in leadership positions in this space.

- MUTI brings the following: manufacturing capability, engineering expertise as it relates to power, battery-back up, and radio enclosures (including thermal dissipation, NEMA/GR487 compliance, etc.), backed by a large and credible parent organization, Sabre, and customer credibility with key accounts such as CCI, AT&T, VzW, Sprint, and others.
- CF brings the following: RF expertise as it relates to antenna concealment, PIM mitigation, and RF interference mitigation, engineering expertise as it relates to sound suppression, electrical integration, and total system integration. In addition, CF has significant customer penetration at key accounts including CCI, Verizon, and AT&T; plus an established marketing/sales footprint with several leading Manufacturing Reps, National Distributors, and OEM partners. CF is working in both the commercial and government markets and an important aspect of the government market is maintaining small business status at this time as CF works to be an approved secure facility with appropriate clearances.

The market is forecasted to grow significantly as the carriers continue to plan to invest at meaningful levels in the Small Cell, DAS, and oDAS segments to complement their macro networks over the coming years. The combined organization would have the opportunity to be in a market leadership position as compared to others currently in this space.

Each organization believes that combined efforts in developing products for the Small Cell, DAS, and oDAS, markets will result in significant market penetration and adoption by our customers in a relatively short period of time of the products that will be designed and produced. It will also optimize capital outlays, and marketing and sales efforts, as the parties combine their core competencies to develop world class product lines.

To capitalize on each party's strengths, maximize market penetration, and optimize capital / investment outlays, MUTI and CF have been in discussions to set a plan in place to combine the organizations to facilitate a strategic relationship, acquisition, and investment by MUTI of CF. This term sheet outlines the key categories and terms for which the basis of a definitive agreement will be developed.

Confidential

MUTI
Sabre Industries Telecom Services

**2626 Midwest Court Champaign, IL 61822**
**www.mutionline.com**

**Tel 217-819-3040**
**Fax 217-819-3041**

---

Outline of Key Terms and Basic Outline to support development of definitive agreement:

1. MUTI to pay $1.2M that will yield the following
   a. Purchase of all the non-cash assets of ConcealFab Corporation (including but not exclusive to all IP, processes, designs, etc.). These assets will be setup in a new Sabre entity within our products group and will manage all commercial and governmental products and complementary services that are awarded. The current and remaining entity post this asset acquisition will change its name to 'CFG Systems', whose primary function is Government Contracting of Engineering Services and Products.
      i. CFG Systems will be licensed to utilize the IP, designs, processes, etc that will support the business needs of the remaining governmental contracting entity, assuming this arrangement doesn't compromise the validity of CFG Systems as a cleared, small business contracting entity.
      ii. MUTI entity will utilize the name "ConcealFab Commercial Products" as consideration of the transaction
      iii. ConcealFab Corporation to use $1.2M as follows:
         1. Extinguish $843,750 liquidation preference on Preferred stock (not including Fitzhugh's portion)
         2. Fund employee obligations of ~$250,000
         3. Extinguish ~100k of existing SMB Commercial Loan through Vectra Bank
         4. The remaining $200k of private debt will be extinguished and paid back through a royalty agreement on all awarded contracts through CFG Systems based upon Sales generated by the CFG systems entity, until it reaches $230k in royalties in year 1, if it takes more than 1 year, the balance owed grows by ~7k/quarter until the full balance is extinguished.
      iv. All existing shareholders and option holders must vote (per ConcealFab Corporation's bylaws) to approve this transaction, specifically noting that any economic consideration above and beyond the $1.2M will be solely from future earn outs.
         1. Full releases will be provided by each shareholder and option holder

   b. CFG Systems – Will remain as noted in 1(a) as an independent contracting entity utilized for the Governmental engineering, services and product resale business for both legacy ConcealFab government products and MUTI government products as managed by the new MUTI entity and with consideration to the maintenance of its small business and cleared facility status.
      i. All options in the remaining CFG systems entity will be eliminated or converted to common stock
      ii. MUTI will receive a 45% fully diluted stake in CFG Systems as part of the executed transaction.
      iii. Government products and services not requiring small business or cleared facility status or benefiting from CFG Systems' past performance will run through the MUTI – Sabre / 180 organization
      iv. MUTI will provide working capital to CFG Systems to fund the operation of CFG systems
         1. Sabre to create or provide working capital at an amount to be determined, at Sabre's incremental cost of capital
         2. This working capital to be utilized to extinguish any remaining net working capital liabilities (net of any current portion of debt) plus working capital required for growth.

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

Tel 217-819-3040
Fax 217-819-3041

Sabre Industries Telecom Services

3. There will be no distributions from CFG Systems to shareholders until a point where any debt balance or working capital investment has been fully extinguished.

v. CFG Systems will provide MUTI with the exclusive right to provide and meet all product, service, and consulting needs when they are able to provide such items at competitive rates and prices as defined in 2(b)(i).

vi. The agreement will provide for a MUTI option to buy out the remaining 55% equity of CFG Systems at a 5x multiple of 55% of the total EBITDA at the 3 year anniversary, which will coinside with the end of MUTI's fiscal year, or on a trailing 12 month basis at each MUTI fiscal yearend interval thereafter less any outstanding working capital or debt that had been provided. At any time prior to year 3, MUTI will have the right of first refusal on any offer to purchase CFG Systems.

2. Earn-out
   a. For the 4 fiscal years ending in April beginning with FYE 4/16, ConcealFab shareholders of record as of closing and in accordance with their share ownership (will have the ability to earn additional payouts in accordance with the following schedule):
      i. 20% of the EBITDA generated by the commercial combined product lines of Conceal Fab and the current MUTI - Sabre / 180 line servicing the small cell, DAS, and oDAS markets, parties will develop a list of products, both existing and to-be-developed that will be included as part of the earn out
      ii. 25% of the EBITDA generated by the combined governmental combined product lines of Conceal Fab and the current MUTI – Sabre / 180 line servicing the small cell, DAS, and oDAS markets, parties will develop a list of products, both existing and to-be-developed that will be included as part of the earn out.
      iii. The list will include, but is not limited to integrated small cell poles where radios are housed inside the poles, back lobe suppressors, oDAS pole tops, RF Transparent Shelters and other products within the product lines of ConcealFab and Sabre / 180.
      iv. All new products not on the list will be reviewed and if approved by the President of the Sabre Telecom Group, will be inserted into the suite of products for qualification and inclusion in the earn-out calculation. Sabre covenants that it will not create or sell products that compete with ConceaFab/180 products and exclude them from the earn-out.
      v. Product line is defined strictly as "manufactured products" for purposes of the earn-out and do not include any installation/maintenance services (but does include Engineering Services that are sold in conjunction with the ConcealFab/180 products within the P&L), consulting, or other contributions unless explicitly agreed to in writing (such as potentially EBITDA generated by non-manufactured products that are only available through the small business or cleared facility status of CFG Systems).
      vi. At the completion of the final term of the earn-out, any revenue and attached EBITDA for orders that were received prior to the final earn-out term will count towards the final earn-out calculation as long as these orders are delivered and invoiced within 60 days of the final term end and EBITDA from these revenues will be calculated using the prior 6 month average EBITDA margin of the P&L.

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

Tel 217-819-3040
Fax 217-819-3041

Sabre Industries Telecom Services

b. A separate financial segment/ P&L will be established that will account for all product sales, manufacturing, associated direct, indirect, and G & A expenses (as per the explicitly defined EBITDA allowable expenses defined below) that will facilitate proper financial reporting for the product group as identified.
   i. Manufacturing will be provided from the Sabre Telecom Group at quoted transfer pricing levels at market competitive rates, which will be determined as being within 12.5% of the average of at least 2 reputable manufacturers when/if a dispute arises over the reasonability of Sabre Telecom Group's quoted transfer prices.

c. Financial statements will be in line with GAAP accounting and the EBITDA calculation will be a defined term within the formal agreement.

d. EBITDA is defined as follows:
   i. "**EBITDA**" means, with respect to any Earn-out Period, net income, plus (without duplication and to the extent reflected as an expense, charge or other deduction in the calculation of such net income), interest expense, income taxes, depreciation and amortization of the Company for such period, with each of the foregoing components being determined in accordance with GAAP consistently applied.
   ii. Direct corporate costs attributable to the business will be allocated to the business (such as insurance) and any indirect cost allocation will be structured between the parties prior to executing a formal purchase agreement.

3. Other financial items
   a. Additional terms supporting MUTI 45% share issuance in CFG Systems
      i. There will be no further issuance of options or alteration to the capital structure without the written approval of MUTI and ConcealFab shareholders of record

   b. MUTI and ConcealFab Corporation to be fully aligned on shareholder agreements, commitments, and capital / corporate structure prior to closing.

   c. Change of control of MUTI or Sabre
      i. The agreement will provide for continued consideration of the earn-out opportunity as outlined in this term sheet.
      ii. The successor will provide a process that maintains the performance / earn-out opportunity for ConcealFab shareholders in accordance with the intent of this agreement. The successor may also provide a buy-out option at their discretion that would be subject to ConcealFab shareholder majority approval.

   d. Minimum / Floor
      i. No floor or minimum to be established. Future earn-out opportunities will be solely based on performance of the segment. It is the full intention of MUTI to invest in this business to support the economic growth opportunities afforded by this business line. The required investment level will be determined and approved through Sabre's standard business planning process.

4. Employees & Leadership
   a. MUTI

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

Tel 217-819-3040
Fax 217-819-3041

Sabre Industries Telecom Services

---

i. Jon Fitzhugh will resign from ConcealFab and join MUTI and will be responsible for the Small Cell / DAS / Government products business. Jon will maintain an oversight role with the CFG Systems. An agreed upon employee base will transition to MUTI and accept employment packages (including non-compete language) and become key team members developing this combined product segment.

ii. Jon Fitzhugh will be the Executive VP of Engineered products serving the Small Cell / oDAS / DAS segment responsible for P & L, business development, marketing, sales, and liason with manufacturing entities.

iii. Jon Fitzhugh's liquidation preference in the Preferred Stock will not be taken out of the $1.2M purchase price, rather it will be covered as part of his MUTI employment package.

b. CFG Systems – all employee, board, etc. provisions contemplated below are subject to due diligence to be performed to determine whether they violate affiliation concerns, which both parties agree is meant to be avoided

i. An agreed number of employees and a designated leader will remain with the government segment operating entity under small business and cleared facility clearance provisions to facilitate opportunities currently under review in this segment.

ii. Board seats

1. CF board to expand to 5 with MUTI appointing 2 members and CF appointing 3 members with Jon Fitzhugh occupying one of the 3 CF board seats made available.

iii. Mentor / Protégé program application through the DHS has been prepared and submitted to mitigate affiliation concerns

5. Current Opportunities

a. The organizations currently agree that there are opportunities that are in demand of immediate action and will begin collaborating on integrating each other's product into the respective sales channels for specifically agreed to opportunities including Verizon, CCI, Ericsson and others upon the execution of this term sheet.

b. Within 10 days from the execution of this agreement, the parties will establish an interim plan / agreement that will allow for combined efforts in the marketing, business development, customer relationships, and manufacturing areas. This will include the identification of the responsibilities of each organization and the economic arrangement associated with these specific opportunities.

6. Non-Binding

a. This agreement is non-binding on either party and establishes only the intent of the organizations to work diligently to develop a formal agreement around the basics of the key points as outlined in this term sheet.

b. In case a deal does not consummate, the parties agree not to solicit or hire key employees

7. Due diligence

a. Subject to customary and typical due diligence including customer, distribution, and manufacturing relationships, IP, process review, and financials.

8. Exclusivity

a. For a period of 60 days post the execution of this agreement, an exclusivity period will begin to allow for MUTI and CF to formulate an agreement acceptable for both parties. During this time, CF will not solicit,

MUTI
Sabre Industries Telecom Services

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

Tel 217-819-3040
Fax 217-819-3041

receive, share documents, or take any other action that would be in conflict with the goal of developing a formal agreement as so noted above.

9. Closing target
   a. Closing to be targeted for a maximum of 75 days post the execution of this term sheet and all efforts will be put forth to reduce this time frame to a 60 days.

Agreed to this 3rd day of February 2015

Jonathan Fitzhugh
Fab

Peter J. Sandore, CEO Conceal
Sabre Industries, Inc.

Confidential

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

Tel 217-819-3040
Fax 217-819-3041

MUTI
Sabre Industries Telecom Services

## Addendum A

- Base & Upside Case

| Opportunity | Potential Lifetime Value | Base Case ($k) | | Upside Case ($k) | | Comments |
|---|---|---|---|---|---|---|
| | | FY 2016 Rev. | FY 2016 EBITDA | FY 2016 Rev. | FY 2016 EBITDA | |
| **CFG Systems** | | | | | | |
| Hill AFB | $21M | 2,000 | 400 | 6,000 | 1,400 | Engineering Services only, blended EBITDA between pass through opportunities (3% mark up) and in- |
| Air Force Space Command (L3 Prime) | $0.3M | 75 | 25 | 150 | 50 | Engineering Design work and contracting |
| GDAIS Warthog | $3.5M | 120 | 40 | 240 | 80 | Engineering/Design Services and contracting |
| Shelter Expeditionary Defense System | $1.2M | 120 | 40 | 240 | 80 | Engineering design work and contracting |
| **Total CFG Systems** | **$26M** | **2,315** | **505** | **6,630** | **1,610** | |
| **CF/Sabre Government** | | | | | | |
| Air Force Space Command (L3 Prime) | $1.5M | 750 | 400 | 750 | 400 | Shelter production |
| GDAIS Warthog | $32M | 800 | 300 | 1,600 | 800 | Prototype and Shelter Production |
| Shelter Expeditionary Defense System | $11M | 800 | 200 | 1,600 | 800 | Production of Reinforced Wall Systems |
| **Total CF/Sabre Government** | **$44.5M** | **2,350** | **900** | **3,950** | **2,000** | |
| **CF Commercial (w/o 180)** | | | | | | |
| Crown Castle | | 400 | 80 | 1,300 | 260 | Primarily SouthEast and CA |
| JMA/CSS | | 250 | 50 | 1,000 | 200 | Nationwide (OEM agreement) |
| AT&T | | 350 | 70 | 900 | 180 | Primarily NorCal |
| FiberTech | | 75 | 15 | 500 | 100 | Multiple mid-west regions |
| Verizon | | 400 | 80 | 1,200 | 240 | Multiple Verizon Regions (incl., PA, OR, NY) |
| Ericsson | | 200 | 40 | 1,000 | 200 | Nationwide (OEM opportunity) |
| CommScope | | 500 | 100 | 1,100 | 220 | Nationwide (OEM opportunity) |
| **Total CF Comm** | | **2,175** | **435** | **7,000** | **1,400** | |
| **Total CF Opportunities** | | **6,840** | **1,840** | **17,580** | **5,010** | |

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

Tel 217-819-3040
Fax 217-819-3041

Sabre Industries Telecom Services

In support of Item #5 in the Term Sheet, the parties agree to amend the term sheet with the following adjustments to facilitate an accelerated ability to execute business opportunities and to support the working capital requirements of the business.

The term sheet and the LOA below are inclusive of all Sabre Telecom entities and may pertain to Sabre, MUTI, or Cellxion as the Sabre Telecom Group fully considers which entity under it's umbrella will control and account for the new reporting segment, licensing agreement, and acquisition being contemplated. The exclusivity period will be extended for an additional 30 days from the date provided in the term sheet, and upon execution of the LOA, the exclusivity time frame will be extended through the time frame in which the LOA is active and operating.

The intent is that all significant terms of the executed term-sheet will remain in place with an interim plan set to govern the relationship through a "Licensing Agreement" as outlined below. The intent is to provide the business the ability to respond timely to business needs, integrate the business approach, recognize synergies, and facilitate the closing of the transaction within the time constraints set as per the timing noted below or sooner.

***Interim Plan / Licensing Operating Agreement (LOA):***

1. Timing / Term
   a. The term of this LOA will begin upon execution and the initial term will be from execution through 8.30.15.
   b. Sabre will be provided the sole exclusive right to effectuate the acquisition at any time during the term of the LOA at the terms outlined in the Term Sheet as adjusted only by any alteration noted in this LOA.
   c. At the conclusion of the initial term, Sabre will have the exclusive right to complete the acquisition as per the terms of the term sheet, extend the LOA for an additional -6month term, or terminate the LOA.
   d. If Sabre elects to extend the LOA with this 6 month renewal feature, at the conclusion of this renewal, Sabre must either complete the acquisition or terminate the LOA unless both parties agree to continue with the LOA or a new structured arrangement.
   e. Conceal Fab & Sabre agree that if ConcealFab reaches $4.5MM (50% of ConcealFab Standalone plus Synergies) in booked or recognized business (priced to provide a 20% EBITDA margin related to the Sabre Fiscal Year ending 4/16) and has positive EBITDA by the August decision date,or $7.65MMMM (85% of ConcealFab Standalone plus Synergies) in booked or recognized business (priced to provide a 20% EBITDA margin related to the Sabre Fiscal Year ending 4/16) and has delivered $1M of positive EBITDA by the February decision date.( during the term as noted will trigger the acquisition at the latest of the completion of the current term according to the terms of the term sheet as adjusted by this LOA. Booked business is defined as the receipt of formal purchase orders

2. Operation of LOA
   a. Sabre will set up a financial reporting segment under their engineered product group that would capture all financial related results associated with the term sheet as outlined and agreed in the term sheet.
      i. Employees
         1. Jon Fitzhugh and agreed upon employees will be terminated from CF as of an agreed upon date (targeted for 3/9/15) and these employees will go through the typical Sabre onboarding process.
         2. CF is responsible for any and all liabilities of these employees prior to the Sabre hire date.

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

Tel 217-819-3040
Fax 217-819-3041

Sabre Industries Telecom Services

---

ii. In addition to his Sabre EPG responsibilities, Jon Fitzhugh will be provided a waiver to allow him the ability to operationally manage the CFG business and the employees left within the remaining entity via the mentor / protégé agreement that has been approved between CF and Sabre by the Government.
iii. All commercial and non-small business / non-cleared facility work and opportunities will be marketed, closed, operated, and all financial transactions will run through this new Sabre reporting segment.
iv. Any Sabre products requiring small business or a cleared facility status will be run through the CFG P&L, when possible
v. Any orders post execution of this agreement not dependent on CFG's small business or cleared facility status will be run through the new Sabre reporting segment.

The current CF company will be renamed CFG as noted in the term sheet and operate as indicated in the term sheet (Item 1b) with the exception of Sabre's 45% fully diluted stake, which will not be executed until the purchase transaction is completed.

3. Financial and investment considerations
   a. The term sheet provides for a purchase price of $1.2M that would be used as follows
      i. Extinguish $843,750 liquidation preference on Preferred stock (not including Fitzhugh's portion)
      ii. Fund employee obligations of ~$250,000
      iii. Extinguish ~$100k of existing SMB Commercial Loan through Vectra Bank
   b. Under the temporary LOA structure these amounts will be handled as outlined below:
      i. The $843,750 liquidation preference on Preferred stock would not be funded and will be addressed as per the term sheet at time of acquisition.
         1. It is understood that if the LOA is extended for an additional renewal of 6 months that this preference would increase by 25% to approximately $1.1M as of Nov 1, 2015
         2. If Sabre elects to execute the renewal term, this ~$210K of increased preference on Preferred stock would be either additional purchase price at acquisition or would revert to a break-up fee if Sabre would elect to terminate the LOA during or at the conclusion of the renewal term.
         3. Any break-up fee would be able to be offset against any funds due Sabre from CFG
      ii. The employee obligations of ~$250K will be funded as follows
         1. Employee/Contractor buyout in March in the amount of $120K. This will be funded through a prepayment / deposit fee licensing fee.
         2. Commissions as earned monthly during the term of the LOA in accordance with the employee's agreement. This amount is expected to be less than 90K, but will be calculated as per the commissions as outlined in the consulting agreement.
         3. The amounts paid during the time of the LOA (March payment and any commission payments) will be deducted from the $250K (payments may not exceed $250K) at closing that is scheduled as per the term sheet, which is the maximum that can be credited against the $1.2MM purchase price.
         4. If for some reason the LOA is terminated, the amounts paid related to these employee / contractor obligations would revert to a 1-year note due Sabre guaranteed by all IP at a rate equivalent to their incremental borrowing rate, to be defined by the formal execution of this agreement. however, Sabre would first have the right of offset for any monies due to CFG from Sabre.
      iii. The ~$100K of existing SMB Commercial Loan will be continued to be paid through CFG and the change in the amount due at closing will be adjusted off of the $1.2M purchase price based on the then current balance.

Sabre Industries Telecom Services

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

Tel 217-819-3040
Fax 217-819-3041

---

- iv. The remaining $200K of private debt will be remain in place until Sabre completes the acquisition, after which time it will be converted as outlined in the Term Sheet. As with the prepaid licensing fees, at no time will CFG make any distributions to shareholders until this debt is extinguished either through the cash flow generation of the CFG entity or the licensing fees received from Sabre as outlined in this agreement.

c. Provisions of LOA

- i. Conceal Fab will provide to Sabre an exclusive use of all IP, including processes, designs and systems, etc. that are currently held by CF. New products, designs, and engineered products will be developed within the Sabre EPG to support our customers.
- ii. "Conceal Fab Commercial Products" will be made available for utilization as a trade name by Sabre
- iii. All business development efforts with the exception of those outlined for CFG will be completed through the new Sabre EPG.
- iv. Sabre will provide the working capital to the new EPG segment within Sabre
  1. To be clear, no current A/R or A/P of CF will move over to the new Sabre EPG segment that will be set up.
- v. All new business purchase orders, not dependent on CFG's small business or cleared facility received post the execution of this LOA will run through the Sabre EPG segment.
- vi. Any Sabre products requiring small business or a cleared facility status will be run through the CFG P&L, when possible
- vii. Sabre will provide working capital at an amount to be determined to CFG at Sabre's incremental cost of capital (method of funding to be determined as noted below-+--)
  1. Sabre will pre-pay / deposit licensing fees to CFG at an amount to be agreed upon at the execution of and during the duration of this LOA. This amount must be repaid to Sabre prior to any distributions to CFG shareholders. This includes an immediate infusion of cash to ConcealFab in the amount of $160k on March 13th to be utilized as source of funds to pay current A/P as per listing received 3/11/15 and as per agreement, 2015 and an additional $120K (with scheduled payment amounts to be determined) for the Employee/Contractor which must be utilized to effectuate a buyout of the current consulting agreement.
  2. The pre-payment of licensing fees / deposit may be increased upon mutual agreement during the term of the LOA.

Pre-payments / deposit licensing fees shall be repaid by CFG to Sabre or offset against licensing fees earned and due to CFG from Sabre. In the event the LOA is terminated without an acquisition and the licensing fees due CFG from Sabre are not sufficient to offset balances due to Sabre from CFG, then the balance due will revert to the form of a 1-year note at Sabre's incremental borrowing rate payable in monthly installments, with the rate to be determined at the formal execution of the LOA. This note will be guaranteed by a security interest in the IP of Conceal Fab. The security interest may be executed upon after 60 days of non-payment of the monthly installment payments at Sabre's discretion.

d. Licensing Fees

- i. Sabre will accrue licensing fees due CFG at the rates and per the calculations outlined in section 2 (i – v) of the term sheet as generated by the Sabre entity.
- ii. Licensing fees will be accrued by CFG and due Sabre at the rate of 45% of the EBITDA generated by the CFG entity.
- iii. These amounts will be paid within 60 days of the final term of the LOA or acquisition whichever is sooner as calculated by generally accepted accounting principles.
- iv. Sabre will retain the right to offset funds due to CFG for any amounts that may be owed from CFG to Sabre (to include but not limited to pre-paid licensing fees, and the elimination of employee obligations as outlined in 3(b)(ii).

MUTI
Sabre Industries Telecom Services

2626 Midwest Court Champaign, IL 61822
www.mutionline.com

Tel 217-819-3040
Fax 217-819-3041

4. Additional provisions
   a. All existing shareholders and option holders must vote (per Conceal Fab Corporation's By-Laws) to approve this LOA structure in accordance with Conceal Fab's corporate governance documents.
      i. The shareholders have evaluated, understand, and acknowledge all risk elements associated with this LOA structure and agreement and acknowledge that non-performance in achieving the forecasts as set forth may negatively impact their equity and holdings in CF.
   b. If the LOA is terminated for any reason, orders that have been received prior to termination will be continued to be paid as per the terms of the LOA for the duration (both from a Sabre and CF perspective)
   c. All 3rd party costs associated with drafting and executing the Interim LOA agreement will be the sole responsibility of Sabre, any 3rd party costs up to $10K borne by CFG will be reimbursed by Sabre upon the execution of the LOA.
   d. Jon Fitzhugh will also be provided a waiver to allow him to continue to negotiate in good faith the purchase and sale agreement on behalf of Conceal Fab
   e. In the event the LOA is terminated at any time....
      i. The employees may be terminated / released by Sabre and able to return to CFG at their discretion
      ii. Jon Fitzhugh's employment agreement shall terminate as "resignation for good reason" in the event of termination of the LOA.
      iii. Licensing rights
         1. Licensing rights originally provided as of the date of execution of this LOA to Sabre for the concealed shelters and back lobe suppressors will be discontinued and all rights shall be the exclusive property of CF thereafter. Sabre will be provided "most favored nation" status on these products and will be offered pricing at a 20% discount off of list / market pricing and the right to market and sell these products as manufactured by CF
         2. Sabre will retain the exclusive IP rights to their radio cages and shroud portfolio as outlined in Exhibit A. CF will be offered pricing at a 10% discount off of list / market pricing and the right to market and sell these products as manufactured by Sabre.
         3. Any IP developed by the new Sabre EPG segment (excluding further improvements in the concealed shelters and back lobe suppressors) will be the property of Sabre. CF will be provided a pricing discount to be determined based on the gross margins of the newly developed products and afforded the ability to market and sell these products.
         4. The organizations agree that each have specific pole capabilities and designs that will be shared and that upon the termination of the LOA, will compete on this product line with no restrictions.

Agreed to this 9th day of March, 2016

Jonathan Fitzhugh
Conceal Fab

Peter J. Sandore, CEO
Sabre Industries, Inc.

# UNITED STATES DISTRICT COURT

for the

District of Colorado

| | |
|---|---|
| CONCEALFAB CORPORATION<br>*Plaintiff*<br>v.<br>SABRE INDUSTRIES, INC., and<br>MIDWEST UNDERGROUND TECHNOLOGY, INC<br>*Defendant* | Civil Action No. 15-cv-01793-CMA-KLM<br><br>Amended |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: CONCEALFAB CORPORATION

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:
ConcealFab Corporation C/O Mr. Jonathan Fitzhugh, see Rule 30(b)(6) Designation for relevant examination subjects, attached hereto a as Ex "A".

| Place: Silver & DeBoskey, The Smith Mansion, 1801 York St Denver, Colorado 80206 | Date and Time: 03/13/2017 3:00 pm |
|---|---|

The deposition will be recorded by this method: Stenography and Videography

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:
See Rider, attached hereto as Exhibit "B."

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 03-01-2017

*CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*

OR

EM Lally
*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Sabre Industries & Midwest Underground Techonology Inc., who issues or requests this subpoena, are:
Elizabeth M. Lally, Goosmann Law Firm, 410 5th St., Sioux City, IA,51101; LallyE@goosmannlaw.com; 712-226-4000

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 15-cv-01793-CMA-KLM

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* ____________________

on *(date)* ____________ .

☑ I served the subpoena by delivering a copy to the named individual as follows: Angela D. DeVine, Attorney, Silver & DeBoskey, The Smith Mansion, 1801 York St Denver, Colorado 80206 via email and USPS on *(date)* ____________ ; or

☐ I returned the subpoena unexecuted because: ____________________

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ 74.77 . (previously tendered)

My fees are $ ________ for travel and $ ________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: 03/01/2017

____________________
*Server's signature*

Elizabeth M. Lally, Attorney
*Printed name and title*

Goosmann Law Firm
410 5th St.
Sioux City, IA,51101
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***

(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

Angela D. DeVine
Direct: 303.953.3773
Email : DeVineA@s-d.com

January 17, 2017

Via Email

Alan D. Schindler
Jeffrey S. Pagliuca
Laura Menninger
Haddon Morgan and Foreman PC
150 East 10th Avenue
Denver, CO 80203

Re: *Concealfab Corporation v. Sabre Industries, Inc., et al.*, United States District Court Civil Action No. 1:15-cv-01793-CMA-KLM

Dear Counsel:

I am writing in response to your request to take a Fed.R.Civ.P. 30(b)(6) deposition of ConcealFab Corporation, which will designate the following witnesses to testify regarding the following topics in your draft Notice of Fed.R.Civ.P. 30(b)(6) Deposition:

| Topic No. | Topic | Deponent |
|---|---|---|
| 1 | Discussions between Sabre and You in or around July 2014, whether formal or informal, concerning the exploration of a potential strategic alliance between the two companies | Jonathan Fitzhugh |
| 2 | The negotiation of the NDA between You and Sabre, and the substance of the final executed NDA | Jonathan Fitzhugh |
| 3 | The negotiation of the Term Sheet, and the substance of the final executed Term Sheet, including but not limited to information contained in Addendum A to the Term Sheet | Jonathan Fitzhugh, Chris Odell and Duncan Stewart |
| 4 | Your negotiations with Hill AFB in 2014 and 2015 | Jonathan Fitzhugh |

SILVER & DEBOSKEY
A PROFESSIONAL CORPORATION



| Topic No. | Topic | Deponent |
|---|---|---|
| 5 | The negotiation of the LOA, including all drafts of the LOA and the substance of the final, signed LOA | Jonathan Fitzhugh, Chris Odell and Duncan Stewart |
| 6 | The substance of Your corporate governance documents, including the First Amended and Restated Investor Rights Agreement and particularly any provision of its governance documents relating to the approval process for a Change of Control Transaction and non-Change of Control Transaction | Jonathan Fitzhugh, Chris Odell and Duncan Stewart |
| 7 | Your financial condition in 2014 and 2015, including Your profitability; available cash on hand; expenses/costs; revenue; and solvency | Jonathan Fitzhugh and Ric Denton |
| 8 | Any ConcealFab shareholder vote concerning the LOA or Term Sheet | Jonathan Fitzhugh |
| 9 | The negotiation of any draft employment agreement between Sabre and Jonathan Fitzhugh | Jonathan Fitzhugh, Chris Odell and Duncan Stewart |
| 10 | The negotiation and substance of the Employment Agreement | Jonathan Fitzhugh |
| 11 | The substance of the Consulting Agreement between Michael Slattery and You, including Your obligations to Michael Slattery under that agreement | Jonathan Fitzhugh, Chris Odell and Duncan Stewart |
| 12 | The events and circumstances surrounding the termination of the LOA | Jonathan Fitzhugh, Chris Odell and Duncan Stewart |
| 13 | Any statement or representation by You to Cincinnati Bell or any other customer in the DAS or oDAS market concerning Sabre and any products sold and/or marketed by Sabre after the termination of the LOA | Jonathan Fitzhugh |

SILVER & DEBOSKEY
A PROFESSIONAL CORPORATION



| Topic No. | Topic | Deponent |
|---|---|---|
| 14 | The substance of and circumstances surrounding the letter from Mr. Slattery to You, dated May 7, 2015 concerning alleged breaches of fiduciary duty by the ConcealFab board of directors | Jonathan Fitzhugh, Chris Odell, Duncan Stewart and Ric Denton |
| 15 | The negotiation of any promissory note following the termination of the LOA | Jonathan Fitzhugh, Chris Odell and Duncan Stewart |
| 16 | Your decision not to provide a promissory note in favor of Sabre following the termination of the LOA | Jonathan Fitzhugh, Chris Odell and Duncan Stewart |
| 17 | The factual basis for Your allegations in the Amended Complaint, including but not limited to Your allegations concerning Sabre's fulfillment | Jonathan Fitzhugh |
| 18 | Any alleged damage to You as a result of the UCC-1 Financing Statement filed by Sabre | Jonathan Fitzhugh |
| 19 | Information concerning a lawsuit filed by Mr. Slattery against You alleging breach of Mr. Slattery's Consulting Agreement, including the nature and resolution of the lawsuit, to the extent such information is not protected by any confidentiality agreement or other protection | Jonathan Fitzhugh, Chris Odell, Duncan Stewart and Ric Denton |
| 20 | The factual basis for Your denials of allegations in Sabre's counterclaims | Jonathan Fitzhugh |
| 21 | The factual basis for Your affirmative defenses | Jonathan Fitzhugh |
| 30 | The factual basis for Your affirmative defenses | Jonathan Fitzhugh |
| 31 | Your efforts to collect and produce documents, electronically-stored information, and other tangible things in connection with this lawsuit | Jonathan Fitzhugh |

| Topic No. | Topic | Deponent |
|---|---|---|
| 32 | The terms, nature and extent of Your document-retention policies, if any, from January 1, 2015 to the present | Jonathan Fitzhugh |
| 34 | Communications between You and any third party regarding Sabre | Jonathan Fitzhugh |
| 35 | Communications between You and any third party regarding, referencing or related to the terms and conditions of any contracts between You and Sabre | Jonathan Fitzhugh |

No witnesses have been designated in response to Topics 22, 23, 24, 25, 26, 27, 28, 29 or 33 of your draft Notice of Fed.R.Civ.P. 30(b)(6) Deposition for the reasons stated in my January 10, 2017 correspondence.

All of the above-witnesses are generally available beginning January 31, 2017 and into the week of February 6, 2017, as are counsel for ConcealFab.

Sincerely,

Angela D. DeVine

ADD/ejc

cc: ConcealFab Corporation

# RIDER

1. Any and all records reviewed in preparation for your examination that have not been previously produced by the parties in discovery and that are not subject to attorney-client or other privilege.

2. Any and all records produced by ConcealFab to Sabre in support of the Term Sheet and LOA at issues in this case, that are not subject to attorney-client or other privilege and have not previously produced by the parties in discovery, including, but not limited to, ConcealFab's financial forecasts, financial statements, balance sheets, interim financial forecasts, accounts payable, and accounts receivable information.

**Exhibit "B"**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-01793-CMA-KLM

CONCEALFAB CORPORATION, a Colorado corporation,

Plaintiff

v.

SABRE INDUSTRIES, INC., a Delaware corporation, and
MIDWEST UNDERGROUND TECHNOLOGY, INC., an
Illinois corporation

Defendants

---

**DEFENDANTS SABRE INDUSTRIES, INC. AND MIDWEST UNDERGROUND TECHNOLOGY, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S THIRD SET OF WRITTEN DISCOVERY REQUESTS TO DEFENDANTS**

---

Defendants Sabre Industries, Inc. ("Sabre") and Midwest Underground Technology, Inc. ("MUTI", and together with Sabre, "Sabre"), through undersigned counsel, hereby respond and object to Plaintiff's Third Set of Written Discovery Requests to Defendants (the "Requests").

**GENERAL OBJECTIONS**

1. Sabre objects to the Requests to the extent they attempt to impose any requirement or discovery obligation greater than or different from those under the Federal Rules of Civil Procedure, the local rules of this Court or any Orders of the Court.

2. Sabre objects to the Requests to the extent they seek documents or information protected by the attorney/client privilege, the work-product doctrine, Rule 408 of the Federal Rules of Evidence or any other applicable privilege.

3. Sabre objects to the Requests to the extent they seek documents or information outside of Sabre's possession custody or control.

4. Sabre objects to the Requests to the extent they seek information which is not relevant to the claims or defenses of any party and not proportional to the needs of the case, considering the factors set forth in the F.R.C.P. 26(b).

5. Sabre objects to the Requests to the extent they are overly broad, unduly burdensome and/or propounded for the improper purpose of annoying, embarrassing, or harassing Sabre.

6. Sabre objects to the Requests to the extent they are vague and ambiguous.

7. Sabre objects to the Requests to the extent they seek confidential or proprietary information. Sabre will produce such information pursuant to the Modified Stipulated Protective Order dated May 6, 2016 (Dkt. # 55).

8. Sabre incorporates by reference every general objection set forth above into each specific response set forth below. A specific response may repeat a General Objection for emphasis or for some other reason. The failure to include any General Objection in any specific response does not waive any General Objection to that request.

9. Sabre's response is made to the best of Sabre's present knowledge, information and belief. Sabre, through its attorneys of record, have not completed investigation of the facts relating to this case, have not completed discovery in this action, and have not completed preparation for trial. Defendants' responses to Plaintiff's requests are based on information currently known to them and are given without waiving Defendants' right to use evidence of any subsequently discovered or identified facts, documents or communications.

10. Sabre reserves the right to supplement this Response in accordance with Fed. R. Civ. P. 26(e).

**OBJECTIONS AND RESPONSES TO PLAINTIFF'S INTERROGATORIES**

**INTERROGATORY No. 1:** With respect to the allegation in paragraph 25 of your Counterclaims that "ConcealFab represented to Sabre that all of ConcealFab's existing shareholders and option holders would need to vote to approve the LOA structure in accordance with ConcealFab's corporate governance documents":

a. state when the representation occurred;
b. state how the representation was made;
c. identify all persons who made the representation; and
d. identify all persons who heard or received the representation.

**RESPONSE:**

a. The representation was first made on or about February 24, 2015.

b. On or about February 24, 2015 Jon Fitzhugh sent an email in which he stated: "As discussed, ConcealFab is not in a position to continue waiting for progress to occur and given several of the provisions of the LOA that will likely require significant 'back and forth' negotiations, *in addition to the requirement for all ConcealFab Shareholders and Option holders to vote in favor of the LOA*, we are likely 2-3 weeks from signing a deal and receiving funding. *See* CONCEALFAB 001795-CONCEALFAB 001796 (emphasis added).

In addition, as of February 26, 2015, all drafts of the LOA that were exchanged between ConcealFab and Sabre contained a provision that stated in sum and substance: "All existing shareholders and option holders must vote (per ConcealFab Corporation's By-Laws) to approve this LOA structure in accordance with ConcealFab's corporate governance documents." *See* CONCEALFAB 001802-001812.

c. Jonathan Fitzhugh, Chris Odell, Duncan Stewart.

d. Douglas Huff
805 Foxhollow Run
Milton, GA 30004
Tel: (678) 592-6860

**Interrogatory No. 2:** If you contend the LOA provided that the amounts paid by Sabre to ConcealFab employee/contractor obligations would revert to a 1-year note due Sabre guaranteed by all the intellectual property of ConcealFab at a rate equal to Sabre's incremental borrowing rate upon termination of the LOA, state all facts upon which you base your contention, identify all documents which support your contention, and identify all persons with knowledge of those facts or documents.

**RESPONSE:** Section 3(b)(ii)(4) of the final LOA states:

"If for some reason the LOA is terminated, the amounts paid related to these employee/contractor obligations would revert to a 1-year note due Sabre guaranteed by all IP at a rate equivalent to their incremental borrowing rate, to be defined by the formal execution of this agreement." *See* e.g. CONCEALFAB 002036 - 002046.

Anyone who has read the final LOA has knowledge of these facts, including but not limited to, Douglas Huff, Tony Sabatino, Jonathan Fitzhugh, Chris Odell and Duncan Stewart.

**Interrogatory No. 3:** With respect to the allegation in paragraph 57(a) of your Counterclaims that ConcealFab misrepresented that it "had significant and lucrative pending or upcoming purchase orders that were going to provide significant revenue to ConcealFab in 2015 and 2016":

a. state when the representation occurred;

b. state how the representation was made;
c. identify all persons who made the representation;
d. identify all persons who heard or received the representation; and
e. describe all the ways in which the representation was false.

**RESPONSE:**

a. The misrepresentation referenced in paragraph 57(a) of Sabre's Counterclaims was made by ConcealFab on several occasions from at least February 15, 2015 to April, 2015.

b. The misrepresentation referenced in paragraph 57(a) of the Counterclaims was made both via email and orally through conversations between primarily Jonathan Fitzhugh and Douglas Huff. Specific examples, include:

- CONCEALFAB 001675 - CONCEALFAB 001679; February 17, 2015, Email from Fitzhugh to Patrick Cochran and Doug Huff containing ConcealFab Revenue Forecast; ConcealFab Base Case/Upside Case provided to Sabre from Fitzhugh.

- CONCEALFAB 001677; February 17, 2015, ConcealFab Revenue Forecast from Fitzhugh to Patrick Cochran and Doug Huff contains multiple forward looking statements, "(Hill Airforce Base) Expected award in March, at the latest;" "(L3 Communication) Multiple shelter award in March/April;" "(SVP) Modest forecast, 200-400 poles possible."

- CONCEALFAB 001687; February 17, 2015, Email from Fitzhugh sent a document entitled "ConcealFab Sales Pipeline" that listed ConcealFab's commercial and government contracts and the timing and size of revenue generation. *See* e.g. CONCEALFAB 001687.

- CONCEALFAB 001787; February 20, 2015, Email from Fitzhugh to Huff/Fitzhugh attached revenue forecasts and stated: "Truth be told, I think his commission payout will be a lot higher because a lot more deals than I anticipated are starting to hit. We believe another 300K of unforecasted revenue will hit in mid/late March for a shelter."

- CONCEALFAB 000201-CONCEALFAB 000203: April 21, 2015, Email from Fitzhugh to Huff and Tony Sabatino: "May/June/July/August of the attached spreadsheet forecasts ~$1.8M of revenue in aggregate. The SVP deal alone covers that revenue forecast, while the Ericsson/JMA/CommScope partnership have an opportunity to ramp up and help supply the growth we expect later in the year, in addition to the follow-on order expected from SVP. The fact that AFB Hill is again in play is pure upside if it happens...I know I have the pipeline to support the attached forecast which supported the term sheet and my expense level."

c. Jonathan Fitzhugh

d. Douglas Huff
805 Foxhollow Run
Milton, GA 30004
Tel: (678) 592-6860

Tony Sabatino
Sabre Industries, Inc.,
8653 East Highway 67,
Alvarado, TX 76009
Tel: (817) 852-1700

e. This representation was false because ConcealFab did not actually have significant and lucrative pending or purchase orders that provided significant revenue to ConcealFab in 2015.

**Interrogatory No. 4:** With respect to the allegation in paragraph 57(c) of your Counterclaims that ConcealFab misrepresented that it "had considerable existing purchase orders that would inject considerable revenue in 2015":

a. state when the representation occurred;
b. state how the representation was made;
c. identify all persons who made the representation;
d. identify all persons who heard or received the representation; and
e. describe all the ways in which the representation was false.

**RESPONSE:**

a. The misrepresentation referenced in paragraph 57(c) of the Counterclaims was made by ConcealFab on several occasions and in several fashions during the period from at least February 15, 2015 to April, 2015.

b. The misrepresentation referenced in paragraph 57(c) of the Counterclaims was made both via email and orally through conversations between primarily Jonathan Fitzhugh and Douglas Huff. Specific examples, include:

- CONCEALFAB 001687; February 17, 2015, Email from Fitzhugh sent a document entitled "ConcealFab Sales Pipeline" that listed ConcealFab's commercial and government contracts and the timing and size of revenue generation. *See* e.g. CONCEALFAB 001687.

c. Jonathan Fitzhugh

d. Douglas Huff
805 Foxhollow Run

Milton, GA 30004
Tel: (678) 592-6860

e. This representation was false because ConcealFab did not in fact have considerable existing purchase orders that injected considerable revenue in 2015.

**Interrogatory No. 5:** With respect to the allegation in paragraph 68 of your Counterclaims that "ConcealFab has and continues to make false statements harmful to Sabre by telling key accounts that Sabre is improperly using ConcealFab intellectual property":

a. state when the statements occurred;
b. state how the statements were made;
c. identify all persons who made the statements;
d. identify all persons who heard or received the statements; and
e. describe all the ways in which the statements are false.

**RESPONSE:** Sabre objects to Interrogatory No. 5 on the grounds that it seeks information outside of Sabre's possession custody or control. Sabre is not aware of the specifics as to when, how, by whom and to whom the statements referenced in paragraph 68 of the Counterclaims were made. Subject to and without waiving this objection, by way of example, on February 22, 2016, Scott Gay, a Sabre employee, received a phone call from Keith Galey at Cincinnati Bell, during which Mr. Galey stated that he had received a call from Mr. Fitzhugh in which Mr. Fitzhugh told Mr. Galey that Sabre had no right to fabricate and sell certain products because the intellectual property for those products belongs to ConcealFab. Upon information and belief, Mr. Fitzhugh made similar remarks to other key Sabre accounts.

**Interrogatory No. 6:** State all facts upon which you base the allegation in paragraph 79(d) of the Counterclaims that ConcealFab has refused "to acknowledge that post-termination of the LOA, Sabre has the right to retain the property rights of Intellectual Property developed by the new Sabre EPG segment."

**RESPONSE:** Section 4(e)(iii)(3) of the LOA states in relevant part: "Any IP developed by the new Sabre EPG segment (excluding further improvements in the concealed shelters and back lobe suppressors) will be property of Sabre." Sabre bases the allegation in paragraph 79(d) of the Counterclaims on the fact that post-termination of the LOA, ConcealFab has represented to Sabre customers and potential customers that Sabre does not have the right to produce and/or market products that contain intellectual property developed by the Sabre EPG segment. Sabre reserves the right to supplement this response in the event it learns of additional information for which to base this allegation during the discovery period.

**Interrogatory No. 7:** Identify all intellectual property rights developed by the Sabre EPG segment between March 13, 2015 and June 3, 2015.

**RESPONSE**: Prior to and during the time period between March 13, 2015 and June 3, 2015, Sabre developed and continued to develop multiple engineered products supporting the same, shared market space as ConcealFab; Sabre Product identification of these units are as follows, and which are identified in more detail on SABRE002296:

SmartStack™ full family of integrated round pole solutions to house Remote Radios, power solutions (rectifiers and BBU controllers), Batteries and additional equipment e.g. fiber splice tray's, passive components (hybrid combiners, splitters) and lightning arrestors etc.

SmartStack Cubic™ full family of integrated square/rectangle pole solutions to house Remote Radios, power solutions (rectifiers and BBU controllers), Batteries and additional equipment e.g. fiber splice tray's, passive components (hybrid combiners, splitters) and lightning arrestors etc.

Radio Cages single or multiple remote radio housing for pole mounted solutions, shroud like unit with high thermal capacity due to extensive grated opening in structure for ventilation. Also houses additional equipment including but not limited to, Power Supply Unit, Passive components (Combiners, Splitters). Supporting multiple OEM radio equipment including but not limited to TE, Samsung, Ericsson, ALU.

Shrouds fully family of remote radio & power cabinet shrouds that can be pole mounted, pedestal mounted and or as ground furniture. Units are typical NEMA style enclosures included but not limited to 3R, 4R etc. Housing multiple equipment including but not limited to Remote Radios, power solutions (rectifiers and BBU controllers), Batteries and additional equipment e.g. fiber splice tray's, passive components (hybrid combiners, splitters) and lightning arrestors etc.

Sabre reserves the right to supplement this response in the event it learns of additional information.

**Interrogatory No. 8:** Identify all purchase orders received by the Sabre EPG segment between March 13, 2015 and June 3, 2015, and for each:

a. identify the customer;
b. identify the product(s), good(s) and/or service(s) purchased;
c. state the amount of money received by the Sabre EPG segment and/or you pursuant to the purchase order;
d. state the amount of money retained by the Sabre EPG segment and/or you; and
e. state the amount of money paid to ConcealFab.

**RESPONSE:** Sabre directs the plaintiff to SABRE002324-SABRE002326 – EPG Orders – 3/13/15 through 6/3/15 and related Purchase Orders SABRE 002297-SABRE002323 produced contemporaneously herein.

a. See SABRE002324-SABRE002326; SABRE002297-SABRE002323;
b. See SABRE002324-SABRE002326; SABRE002297-SABRE002323;
c. All funds were retained by the Sabre EPG segment;
d. No funds were paid to ConcealFab.

Interrogatory No. 9: Identify all invoices received by the Sabre EPG segment between March 13, 2015 and June 3, 2015, and for each:

a. identify the contractor or supplier submitting the invoice for payment;
b. identify the amount of the invoice;
c. state the amount of money paid by the Sabre EPG segment and/or you.

**RESPONSE:** Sabre directs the plaintiff to SABRE002324-SABRE002326 – EPG Orders – 3/13/15 through 6/3/15 and SABRE002327-SABRE002345, produced contemporaneously herein. Sabre reserves the right to supplement this response.

Interrogatory No. 10: For each response to the Requests for Admission below that is not an unqualified admission, state all facts and identify all documents upon which you based your qualified admission or denial.

**RESPONSE:** Sabre objects to this Request on the grounds that it constitutes nine separate and distinct interrogatories. Without waiving its General and Specific Objections, Sabre responds that for each response to the Requests for Admission below that is not an unqualified admission, Sabre directs ConcealFab to the facts and documents specifically identified in each Response.

## OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS FOR PRODUCTION

Document Request No. 1: For each response to the Requests for Admission below that is not an unqualified admission, produce all documents and other tangible things that support your qualified admission or denial.

**RESPONSE:** Sabre objects to this Request on the grounds that it constitutes nine separate and distinct requests for production.

**Document Request No. 2**: Produce all documents that were reviewed, referred to, or relied upon in the preparation of your responses to the above Interrogatories and below Requests for Admission.

**RESPONSE:** Sabre directs ConcealFab to the documents previously produced by the parties to this litigation, the documents specifically identified by Bates number in Sabre's Responses, and the documents listed below and produced contemporaneously herein:

- Sabre Payroll Distributions to ConcealFab, March 12, 2015 to June 15, 2105, Summary; SABRE002346-SABRE002347;
- ConcealFab Aging Summary, SABRE002348;
- ConcealFab Aging Detail, SABRE002349-002364;
- Summary of PO to SABRE002324-SABRE002326 – EPG Orders – 3/13/15 through 6/3/15;
- Purchase Orders for Sabre EPG, SABRE 002297-SABRE002323; and
- Invoices related to Sabre EPG, SABRE002327-SABRE002345.

## OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS FOR ADMISSION

**Request for Admission No. 1**: Admit you were informed that ConcealFab was not awarded the Hill Air Force Base contract no later than March 6, 2015. *See* document previously produced and labeled SABRE000309.

**RESPONSE:** Sabre admits that it received the document previously produced and labeled SABRE000309. Sabre admits that on or around March 6, 2015, Doug Huff was purportedly informed by Fitzhugh that "a small company called 'SIE'" was going to be awarded the Hill AFB contract, but Sabre further states that on or before April 21, 2105, Sabre was told by Fitzhugh that the Hill AFB contact was "again in play." CONCEALFAB000201-CONCEALFAB000202.

**Request for Admission No. 2:** Admit you were informed that ConcealFab "received an affirmative vote from a majority [of] both its Preferred class standalone and the Common plus Preferred classes combined" no later than March 12, 2015. *See* document previously produced and labeled SABRE000406.

**RESPONSE:** Admit.

**Request for Admission No. 3**: Admit you were never informed that ConcealFab received unanimous shareholder approval of the LOA.

**RESPONSE:** Deny. ConcealFab executed the LOA on or about March 13, 2015 and in so doing, ConcealFab represented that it received unanimous shareholder approval of the LOA pursuant to Section 4(a) therein.

**Request for Admission No. 4**: Admit that you prepared the Employment Agreement.

**RESPONSE:** Deny. Jonathan Fitzhugh, Chris O'Dell, Duncan Stewart of ConcealFab and Douglas Huff and Carey Ellinghaus of Sabre exchanged various drafts of the Employment Agreement starting on or around January 7, 2015 (see CONCEALFAB000045-000046; CONCEALFAB000047-CONCEALFAB000054) until at least January 15, 2015, (CONCEALFAB001142; CONCEALFAB001143-CONCEALFAB001151) which the Employment Agreement was never finalized or fully executed by the parties. Various drafts of the Employment Agreement are contained in ConcealFab's document production to date; including:

- CONCEALFAB 000045-000046; CONCEALFAB 000047-CONCEALFAB 000054;
- CONCEALFAB 001043; CONCEALFAB 001044-CONCEALFAB 001052;
- CONCEALFAB 001053; CONCEALFAB 001054-CONCEALFAB 001062;
- CONCEALFAB 001063; CONCEALFAB 001064-CONCEALFAB 001072;
- CONCEALFAB 001073; CONCEALFAB 001074-CONCEALFAB 001082
- CONCEALFAB 001084; CONCEALFAB 001085-CONCEALFAB 001093;
- CONCEALFAB 001102; CONCEALFAB 001103-CONCEALFAB 001111;
- CONCEALFAB 001112; CONCEALFAB 001113-CONCEALFAB 001121;
- CONCEALFAB 001122; CONCEALFAB 001123-CONCEALFAB 001131;
- CONCEALFAB 001132; CONCEALFAB 001133-CONCEALFAB 001141;
- CONCEALFAB 001142; CONCEALFAB 001143-CONCEALFAB 001151.

**Request for Admission No. 5**: Admit that you did not pay the March 2015 Founders Payment until May 5, 2015. *See* document previously produced and labeled SABRE000511.

**RESPONSE:** Admit.

**Request for Admission No. 6**: Admit that you did not pay the April 2016 Founders Payment until May 5, 2015. *See* document previously produced and labeled SABRE000511.

**RESPONSE:** Admit.

**Request for Admission No. 7**: Admit that you never paid the $27,310.60 described as "CF Payroll 6/1/2015-6/7/2015 estimated" on the document previously produced and labeled SABRE000689.

**RESPONSE:** Admit.

**Request for Admission No. 8:** Admit that you never paid the $4,000.00 described as "CF Hourly Payroll for Week Ending 5/31/15, To Be Paid June 5," on the document previously produced and labeled SABRE000689.

**RESPONSE:** Deny. Sabre paid the hourly payroll for week ending 5/31/15 and payable 6/5/15; the amount paid was $4,307.40, of which $1,389.40 was payout of PTO upon termination. See CF Payroll Distribution March 15, 2015 to June 15, 2016, SABRE002346-SABRE002347 produced contemporaneously herein.

**Request for Admission No. 9:** Admit that you never paid the $60,326.53 described as "AP Unpaid (March through May 31)" on the document previously produced and labeled SABRE000689.

**RESPONSE:** Deny. The AP Aging for CF vendors that remains unpaid totals $66,897.54, see updated AP Aging Summary, and AP Aging Detail, SABRE002348-SABRE002364 produced contemporaneously herein.

Dated: February 21, 2017.

**GOOSMANN LAW FIRM, PLC**

By: s/ Elizabeth M. Lally

Elizabeth M. Lally, AT0013010
410 5th Street
Sioux City, IA 51101
Phone: 712-226-4000
Fax: 712-2244517
lallye@goosmannlaw.com
**ATTORNEY FOR DEFENDANTS SABRE INDUSTRIES, INC. AND MIDWEST UNDERGROUND TECHNOLOGY, INC.**

## VERIFICATION

I, Stanley Clayton McGee, Jr., under penalties of perjury hereby state:

That I am the Vice President of Finance Sabre Industries, Inc.'s herein; and that I have read the above and foregoing Sabre Industries, Inc.'s Responses And Objections To Plaintiff's Third Set Of Written Discovery Requests To Defendants and know the contents thereof, and that the statements and allegations therein contained are true and correct to my best knowledge, except as to the statements and allegations stated upon information and belief, which I believe to be true to the best of my knowledge.

______________________________
Stanley Clayton McGee, Jr.

## CERTIFICATE OF SERVICE

I certify that on February 21, 2017, I served the above Responses and Objections to Plaintiff's Third Set of Written Discovery via email to:

Angela D. DeVine
SILVER AND DEBOSKEY, P.C.
1801 York Street
Denver, CO 80206
devinea@s-d.com

*s/ Chasity Raub-Medina*
Chasity Raub-Medina

**EPG ORDERS - 3/13/15 THRU 6/3/15**

| Invoice # | Customer | PO FROM | PO # |
|---|---|---|---|
| 0000092682 | CINCINNATI BELL | CINCINNATI BELL | 314991 |
| | AERO | AERO | 060318 |
| 000090585 | CLINTION-NEVADA | CLINTION-NEVADA | 28775BY |
| 0000090967/94846 | CROWN | CROWN | 774343 |
| 0000090968 | CROWN | CROWN | 772887 |
| | CROWN | CROWN | 774808 |
| | CROWN | CROWN | 777613 |
| | CROWN | CROWN | 781753 |
| | CROWN | CROWN | 781754 |
| 0000090966 | CROWN | CROWN | 784239 |
| | CROWN | CROWN | 786807 |
| 0000090965 | CROWN | CROWN | 792563 |
| 0000091613 | CROWN | CROWN | 792590 |
| 0000091355/91606 | CTS | CTS | WI45991 |
| 0000090969 | WESTELL | WESTELL | 472596 |

| Description | PO UNDER | Inv Date | Order $ | Tax | Freight | Goods |
|---|---|---|---|---|---|---|
| 18" OCTAGONAL BASE INTEGR POLES | SABRE | 12/15/2015 | 122,500.00 | | 2,581.00 | 122,500.00 |
| 180b04-/_000d | MUTI | | 7,632.50 | | | |
| ION B MODULAR BOX | MUTI | 5/31/2015 | 19,600.00 | | | 19,600.00 |
| 3XML BASIC SHROUD | MUTI | 6/30/2015 | 1,222,170.30 | 50,918.40 | 22,118.96 | 848,640.00 |
| ION B MODULAR BOX | MUTI | 6/30/2015 | 3,200.00 | 224.00 | | 3,200.00 |
| 3XML BASIC SHROUD | MUTI | | 17,852.85 | | | |
| 14' OD SMARTSTACK | MUTI | | 256,500.00 | | | |
| LIGHTPOLE | MUTI | | 21,500.00 | | | |
| LIGHTPOLE | MUTI | | 9,666.00 | | | |
| MUSH-41 | MUTI | 6/30/2015 | 8,250.00 | 743.07 | 1,038.45 | 8,250.00 |
| WINDSTOP BRACKET | MUTI | | 748.65 | | | |
| MUSH-41 | MUTI | 6/30/2015 | 11,550.00 | 1,111.17 | 1,149.06 | 11,550.00 |
| HALF CABLE SHROUD | SABRE | 8/31/2015 | 3,975.00 | 268.32 | | 3,975.00 |
| IRC CAGE WITH VERTICALLY HINGED | MUTI | | 92,372.00 | | 10,985.82 | 72,578.00 |
| ENCLOUSRE K BOXES | MUTI | 6/30/2015 | 6,381.00 | | | 6,381.00 |

| Total Invoice | Paid | |
|---|---|---|
| 125,081.00 | YES | |
| 0.00 | | |
| 19,600.00 | YES | |
| 921,677.36 | YES | Muti invoiced balanced |
| 3,424.00 | YES | |
| 0.00 | | |
| 0.00 | | |
| 0.00 | | |
| 0.00 | | |
| 10,031.52 | YES | |
| 0.00 | | |
| 13,810.23 | YES | |
| 4,243.32 | YES | |
| 83,563.82 | YES | |
| 6,381.00 | YES | |

## Vicki E. Pennington

**From:** Timothy Rossetti <trossetti@sabreindustries.com>
**Sent:** Thursday, May 28, 2015 7:16 PM
**To:** Jonathan Fitzhugh
**Cc:** Pete Sandore; Tony Sabatino; Clay McGee; Thomas L. Jagielski
**Subject:** CF Promissory Note
**Attachments:** CF Promissory Note.pdf

Jon,

As promised attached please find the Conceal Fab Promissory note as well as the detail below of expenses incurred on behalf of Conceal Fab which we are seeking reimbursement in the form of a note per the LOA. We will keep the employees on for another week and you agree to execute the note in consideration thereof by 12PM EST 5/28/15.

**Concealfab Cost Summary March - May 2015**

| | Costs |
|---|---|
| CF Payroll Paid 3/16/15 through 5/31/15 | 257,026.10 |
| CF Payroll 6/1/15 - 6/7/15 estimated | 27,310.60 |
| CF Hourly Payroll for Week Ending 5/31/15, To be Paid June 5 (estimate) | 4,000.00 |
| PTO to be paid out at Separation Date | 10,633.27 |
| AP Paid (March through May 31) | 50,990.99 |
| AP Unpaid (March through May 31) | 60,326.53 |
| Open Vendor PO's in Sabre's Name, not yet received against | 18,513.58 |
| Initial Deposit | 160,000.00 |
| Payments to Founder (March and April Payments) | 24,000.00 |
| Jon F. Credit Card (May Statement, current balance) | 4,954.61 |
| Costs to host Verizon MN Reception | 3,803.62 |
| | **$621,559.30** |

**Tim Rossetti**

*Chief Financial Officer and Executive Vice President*

*Sabre Industries, Inc.*

*(267) 263 - 1346 Phone*

**trossetti@sabreindustries.com**

# SECURED PROMISSORY NOTE

THE SECURITY REPRESENTED BY THIS SECURED PROMISSORY NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT, OR AN EXEMPTION FROM REGISTRATION, UNDER SAID ACT.

**New York, New York**
**US$621,559.30** **May 28, 2015**

**SECTION 1.** **Payment of Principal and Interest.**

**CONCEALFAB CORPORATION**, a Colorado corporation (the "**Borrower**"), hereby promises to pay to the order of SABRE INDUSTRIES TELECOM SERVICES, or its respective successors or permitted assigns (the "**Lender**") the principal sum of $621,559.30. The principal amount of this Secured Promissory Note (this "**Note**") remaining unpaid from time to time shall bear interest from the date hereof, until paid in full, payable in accordance with Sections 2 and 3 hereof. The Borrower agrees to repay the entire unpaid principal amount of this Note, and all accrued and unpaid interest thereon, on the Maturity Date. As used herein, "**Maturity Date**" means May 31, 2016.

This Note evidences the advances made by the Lender to the Borrower in connection with that certain term sheet letter agreement, dated as of February 3, 2015, between the Lender and the Borrower, relating to a potential strategic relationship between the Lender and the Borrower and investment by the Lender in the Borrower.

**SECTION 2.** **Interest.**

(a) Interest on all amounts outstanding hereunder shall be payable in arrears on the last Business Day of each calendar month. As used herein, "**Business Day**" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

(b) Interest shall be paid on the unpaid principal amount of this Note at a rate per annum equal to 11% (the "**Interest Rate**"). All interest on this Note shall be calculated on the basis of a 365 day year and the actual number of days elapsed.

(c) Overdue principal and, to the extent permitted by applicable law, overdue interest in respect of this Note shall bear interest at a rate per annum equal to the Interest Rate plus 5%.

(d) Notwithstanding anything herein to the contrary, the interest payable by the Borrower with respect to this Note shall not exceed the maximum amount permitted by applicable law and, to the extent that any payments in excess of such

permitted amount are received by the Lender, such excess shall be considered payments in respect of the principal amount of this Note.

**SECTION 3. Scheduled Payments.**

(a) **Payments.** The Borrower shall repay the principal hereunder on the last Business Day of each calendar month and on the Maturity Date in an amount equal to (i) in the case of each monthly payment due prior to the Maturity Date, **$51,796.61** and (ii) in the case of such payment due on the Maturity Date, an amount equal to the unpaid principal amount of this Note then outstanding.

**SECTION 4. Grant of Security Interest**

(a) The Borrower hereby pledges to the Lender, and hereby grants to the Lender, a security interest in, all of the following property now owned or at any time hereafter acquired by the Borrower or in which the Borrower now has or at any time in the future may acquire any right, title or interest (collectively, the "**Collateral**"), as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Borrower's obligations hereunder:

(a) all Accounts;

(b) all Chattel Paper;

(c) all Deposit Accounts;

(d) all Documents;

(e) all Equipment;

(f) all General Intangibles;

(g) all Instruments;

(h) all Intellectual Property and IP Licenses;

(i) all Inventory;

(j) all Investment Property;

(k) all Letter-of-Credit Rights;

(l) without limiting the generality of the foregoing, all Fixtures, all Pledged Investments, and all Receivables;

(m) all books and records pertaining to the Collateral;

(n) all Goods and other personal property not otherwise described above; and

(o) to the extent not otherwise included, all Proceeds, and products of any and all of the foregoing and all Supporting Obligations with respect to any of the foregoing.

(b) In furtherance of the foregoing, the Borrower agrees to deliver to the Lender duly completed Uniform Commercial Code financing statements and such other like instruments as the Lender may request from time to time to perfect the liens and security interests in the Collateral granted hereunder, and authorizes the Lender to file such instruments in any applicable jurisdiction.

(c) All terms used in this Section 4 that are defined in the Uniform Commercial Code in effect in the State of New York are used herein as so defined.

**SECTION 5. Representations and Warranties.**

The Borrower represents and warrants to the Lender that:

(a) **Organization; Power and Authority.** The Borrower is duly organized, validly existing and in good standing under the laws of its state of incorporation, and is duly qualified and in good standing in each jurisdiction in which such qualification is required by law, other than those jurisdictions as to which the failure to be so qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Borrower. The Borrower has the corporate power and authority to own or hold under lease the properties it purports to own or hold under lease, to transact the business it transacts and proposes to transact, to execute and deliver this Note and to perform the provisions hereof.

(b) **Authorization, etc.** This Note has been duly authorized by all necessary corporate action on the part of the Borrower, and this Note constitutes a legal, valid and binding obligation of the Borrower enforceable against the Borrower in accordance with its terms, except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(c) **Compliance with Laws, Other Instruments, etc.** The execution, delivery and performance by the Borrower of this Note will not (i) contravene, result in any breach of, or constitute a default under, or result in the creation of any lien in respect of any property of the Borrower under any indenture, mortgage, deed of trust, loan, credit agreement, corporate charter or by-laws, or any other material agreement, lease or instrument to which the Borrower is bound or by which the Borrower or any of its properties may be bound or affected, (ii) conflict with or result in a breach of any of the terms, conditions or provisions of any order, judgment, decree, or ruling of any court, arbitrator or governmental authority applicable to the Borrower or (iii) violate any

provision of any statute or other rule or regulation of any governmental authority applicable to the Borrower.

(d) **Governmental Authorizations, etc.** No consent, approval or authorization of, or registration, filing or declaration with, any governmental authority is required in connection with the execution, delivery or performance by the Borrower of this Note, except the financing statements that have been filed in accordance with the Uniform Commercial Code in connection with the obligations hereunder.

(e) **Title; No Other Liens.** Except the security interest granted to the Lender pursuant to this Note, the Borrower owns each item of the Collateral free and clear of any and all liens or claims, options or rights of others. No financing statement or other public notice with respect to all or any part of the Collateral is on file or of record in any public office, except such as have been filed in favor of the Lender, in connection with this Note.

(f) **Perfected Liens**. The security interest granted pursuant to this Note (a) upon completing of the appropriate filings and actions will constitute valid perfected security interests in all of the Collateral in favor of the Lender, as collateral security for the Borrower's obligations hereunder, enforceable in accordance with the terms hereof against all creditors of the Borrower and persons purporting to purchase any Collateral from the Borrower and (b) upon completion of such filings and other actions will be prior to all other liens on the Collateral.

**SECTION 6. Events of Default.**

Except upon the occurrence of an event under (d) or (e) below, whereupon this Note shall become immediately due and payable without notice or declaration by the Lender, the Lender may by written notice to the Borrower, declare this Note immediately due and payable, whereupon this Note and all sums due hereunder shall become immediately due and payable without protest, presentment, demand or notice or without petition to any court, all of which are expressly waived by the Borrower, if any of the following events (each an "**Event of Default**") shall occur:

(a) any amount due under this Note (whether principal, interest or otherwise) shall not be paid as and when due, whether at maturity, by declaration or otherwise; or

(b) any representation by the Borrower herein shall prove to be false or incorrect in any material respect as of the date made; or

(c) the Borrower shall default in the due performance of any other term of this Note; or

(d) the Borrower shall (i) apply for or consent to the appointment of a receiver, trustee or liquidator for itself or any of its assets or properties, (ii) admit in writing its inability to pay its debts as they mature, (iii) make a general assignment for the benefit of creditors, (iv) be adjudicated a bankrupt or insolvent, (v) file a voluntary

petition in bankruptcy, or a petition or an answer seeking reorganization or an arrangement with creditors or to take advantage of any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution or liquidation law or statute, or any answer admitting the material allegations of a petition filed against it in any proceeding under any such law or if action shall be taken by the Borrower for the purpose of effecting any of the foregoing, (vi) have commenced against it any case, proceeding or other action of a nature described in (i) through (v) above which remains undismissed for a period of 60 days or (vii) take or be subject to any action similar to those specified in clauses (i) through (vi) in any jurisdiction; or

(e) an order, judgment or decree shall be entered, without the application, approval or consent of the Borrower, with respect to the Borrower or all or a substantial part of the assets of the Borrower, appointing a receiver, trustee or liquidator of the Borrower, or any similar order, judgment or decree shall be entered or appointment made in any jurisdiction, and such order, judgment or decree or appointment shall continue unstayed and in effect for a period of 60 days; or

(f) the Borrower shall (i) incur or permit to exist any indebtedness for borrowed money (other than this Note) in excess of $100,000, (ii) incur or permit to exist any lien on any Collateral (other than the liens in favor of the Lender created hereunder), (iii) sell, transfer or otherwise dispose of any Collateral, or (iv) undergo any change in ownership from its current ownership as of the date hereof; or

(g) any material provision with respect to the security interest granted herein shall cease, for any reason, to be in full force and effect or the Borrower shall so assert, or any lien created herein shall cease to be enforceable and of the same effect and priority purported to be created thereby.

In addition, upon the occurrence of any Event of Default, the Borrower shall be entitled to exercise any and all of its rights, including, if such Event of Default remains unremedied for 60 days, its right hereunder and at law as a secured creditor to realize against the Collateral, including, without limitation: (i) with respect to any Collateral consisting of intellectual property, to cause the security interest therein to become an assignment, transfer and conveyance of such intellectual property to the Lender or to license or sublicense, whether general, special or otherwise, and whether on an exclusive or a nonexclusive basis, any such intellectual property throughout the world on such terms and conditions and in such manner as the Lender shall determine, and (ii) with or without legal process and with or without prior notice or demand for performance, to take possession of any Collateral and, generally, to exercise any and all rights afforded to a secured party under the applicable Uniform Commercial Code or other applicable law or in equity. Without limiting the generality of the foregoing, the Borrower agrees that the Lender shall have the right to sell or otherwise dispose of all or any part of the Collateral at a public or private sale or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery as the Lender shall deem appropriate. Upon consummation of any such disposition of Collateral pursuant hereto, the Lender shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Collateral so sold. Each such purchaser at any such disposition

shall hold the property sold absolutely, free from any claim or right on the part of the Borrower, and the Borrower hereby waives and releases (to the fullest extent permitted by law) all rights of redemption, stay, valuation and appraisal that the Borrower now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted.

**SECTION 7. Application of Payments.**

Each payment or prepayment received by the Lender hereunder, except as expressly set forth herein, shall be applied, first, to the payment of accrued interest on this Note to the date of such payment and second, to the payment of the principal amount of this Note.

**SECTION 8. Assignment, Etc.**

This Note shall be binding upon the Borrower and the Lender and their respective successors and assigns; provided, however, the Borrower may not assign this Note without the prior written consent of the Lender. The Lender may sell, assign or transfer this Note without any requirement of consent by the Borrower.

**SECTION 9. No Waiver, Cumulative Remedies.**

The Lender shall not by any act (except by a written instrument signed by the Lender), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Event of Default or in any breach of any of the terms and conditions hereof. No failure to exercise, nor any delay in exercising, on the part of the Lender, any right, power or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver by the Lender of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which the Lender would otherwise have on any future occasion. The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any rights or remedies provided by law.

**SECTION 10. Governing Law.**

This Note and the rights and obligations of the Borrower and the Lender under this Note shall be governed by, and construed and enforced in accordance with, the laws of the State of New York (without regard to any conflict of law principles thereof that would result in the applicable of the laws of any other jurisdiction).

**SECTION 11. Waivers of Jury Trial.**

THE BORROWER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVEs TRIAL BY JURY IN ANY LEGAL ACTION OR

PROCEEDING RELATING TO THIS NOTE OR ANY OTHER DOCUMENTS RELATED HERETO AND FOR ANY COUNTERCLAIM THEREIN.

**SECTION 12. Consent to Jurisdiction.**

THE BORROWER HEREBY EXPRESSLY AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK FOR THE PURPOSE OF ANY LITIGATION RELATING HERETO. THE BORROWER FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY REGISTERED MAIL, POSTAGE PREPAID, OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF NEW YORK. THE BORROWER HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

**IN WITNESS WHEREOF,** the Borrower has caused a duly authorized officer of the Borrower, solely in such officer's capacity as such, to duly execute this Note on behalf of the Borrower as of the date hereof.

CONCEALFAB CORPORATION

By_______________________________

Name:

Title:

AGREED TO AND ACCEPTED:

**SABRE INDUSTRIES TELECOM SERVICES**

By: ______________________________
Name:
Title:

# Transcript of the 30(b)(6) Deposition of:
# **ConcealFab through Jonathan Fitzhugh**

Date: **March 13, 2017**

ConcealFab Corporation v. Sabre Industries and Midwest Underground Technology

Civil No. 15-cv-01793-CMA-KLM

Mile High
Court Reporting & Video, Inc.

14143 Denver West Parkway, Suite 100 • Golden, Colorado 80401
(303) 202-0210 • contact@milehighreporting.com
www.milehighreporting.com

218

Q Right. Sabre did –
A Correct.
Q – is that correct?
Okay. And so as part of your complaint, you have argued trade secrets. Do you recall that? You can look at Exhibit Number 3 if you like.
A Yes.
Q Okay. We can look at Exhibit Number 3. Paragraph number 13 says, Upon information and belief, Sabre proposed the LOA in order to gain access and rights to ConcealFab's confidential information and trade secrets –
A I'm sorry, what paragraph?
Q I'm sorry. Paragraph number 13.
A 13.
Q Page 3. Upon information and belief, Sabre proposed the LOA in order to gain access and rights to ConcealFab's confidential information and trade secrets without the necessity of performing pursuant to the term sheet.
A Uh-huh.
Q Okay. So what is the factual basis for your allegation there?
Why do you believe that Sabre proposed the LOA in order to gain access to ConcealFab's confidential

219

information and trade secrets?
A Well, in part due to their behavior after the LOA.
Q Okay. Can you point me to specifics?
A Yes. SVP that we talked about, the large California opportunity, was brought to us as a result of my contractual relationship with Epic Marketing. Conceal -- or Sabre became aware of that opportunity because of that relationship, and when we -- the LOA disappeared, Pete Sandore made it very clear that he was going to target that opportunity.
And then I learned that Patrick Cochran had also made a trip into DGP to make a presentation based on his knowledge of that opportunity. I mean, that was the most egregious behavior that I can think of.
Q Do you think that they shared ConcealFab's confidential information, though? Like, what confidential information was shared with SVP?
A Well, the fact that I had a customer list was part of my -- well, it was confidential information, trade corrects. I mean, not everyone knows that I had that opportunity.
Q Okay.
A It was behind the scenes. The only people who knew outside of ConcealFab was Sabre, because they were

220

operating with us under the LOA.
Q But you eventually got SVP work; is that correct?
A Yes. But I said it was their behavior -- I mean, forget about the outcome. Look at the behavior.
Q But I'm talking about damages, then.
A Oh, I'm sorry. So you were talking about --
Q Well, no, if I move to talk about damages.
Did you eventually get the SVP contract?
A Okay. Yes, we eventually got the SVP contract.
Q Okay.
A Sabre was ineffective in their ability to torpedo my opportunity in this specific instance.
Q So you got the SVP contract?
A Got the SVP contract.
So now let's talk Cincinnati Bell. That was a ConcealFab relationship that we brought into the deal. We had been working on a pole for them. We booked it under Sabre' name.
And upon termination of the LOA, we told Sabre, We want it back. We were advised by our corporate counsel not to try and steal -- take it back because that could be deemed tortuous interference. So we just stayed back, and Sabre continued pursuing it, I suppose ultimately fulfilling it, so there's a damage of whatever the value

221

of that, and the ongoing relationship.
Q Did you lose your ongoing relationship with Cincinnati Bell?
A Yes.
Q Okay. So since the termination of the LOA, Cincinnati Bell has not ordered any products from you?
A Correct.
Q And had they previous to your --
A Yes.
Q – agreement.
And any others?
A So JMA is an OEM partnership agreement we have where we white-label products for them that they in turn resell. Again, we booked the JMA order in Sabre's name. Asked for it back, and they said, Sorry, we've already fulfilled it, presumably with ConcealFab's product.
Q Okay. Have you received any orders from JMA since the termination of the LOA?
A Yes.
Q Okay. So they have continued to do business with you?
A Yes. Again, despite Sabre's best efforts, they were not able to totally torpedo this.
Q Okay.
A So, again, if you're asking why I believe

222

nUmber 13, you know, I think those are three pretty good examples of Sabre's intentions.
Q Okay. Did -- do you know how much -- what the total POs from Cincinnati Bell were to ConcealFab in 2014?
A In 2014, I believe we did roughly 60,000.
Q Okay. And do you have an idea of what the POs that were completed by Sabre total from Cincinnati Bell?
A Inception to date?
Q Just the POs that were issued during this term where you were doing business and you said that they fulfilled them.
A Yeah, we had booked somewhere between 80 and 90,000 in a purchase order for a ConcealFab product.
Q Okay. What do you consider your -- what do you understand trade secrets to mean in this capacity? I mean, you said that they wanted to gain access to your trade secrets.
A Well, in the instance of JMA, it was our bracket design.
Q Okay.
A You know, they learned how to fabricate it, exactly what our detail design was. You don't get that information without fabricating it or getting a hold of the design. That was a trade secret, not a patent. A trade secret.

223

I would say our customer lists are -- and our contractural relationships are part of my trade secrets.
Q Okay. But do you believe that they have disclosed your customer list to anybody?
A That's not my complaint.
Q I'm just asking you that question, though, now.
A Okay. Do I believe they disclosed my customer --
Q Like, the confidential information is defined in the NDA, for example, as a term of art, and so that would have been information that was given to -- to Sabre.
Do you have any reason to believe that they've disclosed that confidential information after the business relationship between you ended?
A I can't point to a specific example, if that's what you're asking me.
Q Yeah. Okay. Any other trade secrets you can think of other than customer lists, the bracket?
A Contractural relationships that we had.
Q Contractural relationships. Okay.
A They have approached some of my partners with similar deals that they could have only gained access to. Pricing, that's another one.
Q Pricing. Okay.

224

THE VIDEOGRAPHER: Excuse me, Mr. Fitzhugh, your mic.
Q (By Ms. Lally) On Paragraph Number 48 --
MS. LALLY: I have half an hour; right?
A 48, you said?
Q (By Ms. Lally) Yep.
A Okay.
Q The term sheet acknowledged that ConcealFab has significant customer penetration at key accounts, including CCI, which you say means Crown Castle --
A Uh-huh.
Q -- is that correct?
-- Verizon and AT&T. Since the termination of the LOA, Sabre through Mr. Cochran -- is that Mr. Patrick Cochran?
A Correct.
Q -- has wrongfully contacted one or more of these key accounts as disclosed ConcealFab's confidential information and/or trade secrets in an attempt to win business.
What is the basis of that allegation?
A I had conversations with a few contacts at each of these customers, who received information from Mr. Cochran. For instance, at Crown Castle, Mr. Cochran led them to believe that Sabre was responsible for

225

producing some of our pole products.
Q Okay. Which pole trucks? Do you know?
A The 12-inch pole, specifically.
Q Okay.
A Verizon -- it wasn't direct; it was indirect. Mr. Cochran led one of their key customers -- or key vendors to believe that the reason Sabre had terminated the relationship with ConcealFab was because when they got in and looked at the deal, that we had misrepresented all of our capabilities and -- yeah. I had to fly to Verizon in New Jersey to put out that fire. You should really talk to Mr. Cochran, now that he's back at Sabre.
I can't think of a specific on AT&T right now. But CCI and Verizon were the most egregious.
Q Did CCI continue to give you work, purchase orders, after this ended?
A Yes. Again, despite their best efforts.
Q Okay. How about Verizon?
A Yes.
Q Do they continue to give you work?
A Yes. Again, despite their best efforts.
Q How about AT&T?
A Yes.
Q Did they continue to give you purchase orders?
A It's unclear, the extent of the -- I mean, we

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-01793-CMA-KLM

CONCEALFAB CORPORATION, a Colorado corporation,

Plaintiff

v.

SABRE INDUSTRIES, INC., a Delaware corporation, and MIDWEST UNDERGROUND TECHNOLOGY, INC., an Illinois corporation

Defendants

---

**DEFENDANTS SABRE INDUSTRIES, INC. AND MIDWEST UNDERGROUND TECHNOLOGY, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S SECOND SET OF WRITTEN DISCOVERY REQUESTS TO DEFENDANTS**

---

Defendants Sabre Industries, Inc. ("Sabre") and Midwest Underground Technology, Inc. ("MUTI", and together with Sabre, "Sabre"), through undersigned counsel, hereby respond and object to Plaintiff's Second Set of Written Discovery Requests to Defendants (the "Requests").

## GENERAL OBJECTIONS

1. Sabre objects to the Requests to the extent they attempt to impose any requirement or discovery obligation greater than or different from those under the Federal Rules of Civil Procedure, the local rules of this Court or any Orders of the Court.

2. Sabre objects to the Requests to the extent they seek documents or information protected by the attorney/client privilege, the work-product doctrine, Rule 408 of the Federal Rules of Evidence or any other applicable privilege.

3. Sabre objects to the Requests to the extent they seek documents or information outside of Sabre's possession custody or control.

4. Sabre objects to the Requests to the extent they seek information which is not relevant to the subject matter of the litigation and/or is not reasonably calculated to lead to the discovery of admissible evidence.

5. Sabre objects to the Requests to the extent they are overly broad, unduly burdensome and/or propounded for the improper purpose of annoying, embarrassing, or harassing Sabre.

6. Sabre objects to the Requests to the extent they are vague and ambiguous.

7. Sabre objects to the Requests to the extent they seek confidential or proprietary information. Sabre will produce such information pursuant to the proposed Modified Stipulated Protective Order filed on April 27, 2016 (Doc. # 51).

8. Sabre incorporates by reference every general objection set forth above into each specific response set forth below. A specific response may repeat a general objection for emphasis or for some other reason. The failure to include any general objection in any specific response does not waive any general objection to that request.

9. Sabre's response is made to the best of Sabre's present knowledge, information and belief. Sabre, through its attorneys of record, have not completed investigation of the facts relating to this case, have not completed discovery in this action, and have not completed preparation for trial. Defendants' responses to Plaintiff's requests are based on information currently known to them and are given without waiving Defendants' right to use evidence of any subsequently discovered or identified facts, documents or communications.

10. Sabre reserves the right to supplement this Response in accordance with Fed. R. Civ. P. 26(e).

## OBJECTIONS AND RESPONSES TO PLAINTIFF'S INTERROGATORIES

**INTERROGATORY No. 1:** Identify all communications you have had with Ericsson from January 1, 2014 to the present regarding becoming an Ericsson Channel Partner and/or Ericsson OEM Partner.

**RESPONSE**: Sabre objects to this request on the grounds that it is overly broad and unduly burdensome particularly due to the fact that Sabre and Ericsson have engaged in regular communications during this period. Subject to and without waiving this objection, Sabre has not identified any communications it has had with Ericsson from January 1, 2014 to the present that specifically and exclusively relate to becoming an Ericsson Channel Partner and/or Ericsson OEM Partner. However, Sabre has participated in regular communication with Ericsson regarding a variety of topics. Sabre will produce documents bates stamped, SABRE001551 through SABRE001770,

reflecting such communications. In addition, Sabre has met with Ericsson on a number of occasions during this time period, including but not limited to the following meetings:

1. On January 12, 2015, members of the Sabre team joined employees at Ericsson at the NCAA Football National Championship Game in Dallas, Texas.

2. On January 16, 2015, Sabre participated in a conference call with employees at Ericsson.

3. On January 23, 2015, Sabre had an in-person meeting with employees at Ericsson.

4. On February 16, 2015, Sabre had an in-person meeting in Dallas, Texas with employees at Ericsson.

5. On March 5, 2015, Sabre joined Ericsson employees for dinner.

6. On April 21, 2015, Sabre invited Ericsson to an event at the Top Golf facilities in The Colony, Texas.

7. On July 9, 2015, Sabre had an in-person meeting in Frisco, Texas with employees at Ericsson.

8. On August 5, 2015, Sabre joined Ericsson employees for dinner.

9. On October 19, 2015, Sabre joined members of the Ericsson team at a Taylor Swift Concert in Dallas, Texas.

10. On February 3, 2016, Sabre had an in-person meeting with Ericsson.

<u>Interrogatory No. 2:</u> Identify all communications you have had with Cincinnati Bell from January 1, 2014 to the present regarding Cincinnati Bell purchasing your products.

**RESPONSE**: Sabre objects to this request on the grounds that it is overly broad and unduly burdensome particularly due to the fact that Sabre and Cincinnati Bell have engaged in regular communications during this period. Subject to and without waiving this objection, Sabre states that from October 2, 2015 to the present, Sabre and Cincinnati Bell participate in a recurring meeting every Tuesday and Friday. Sabre will produce documents, Bates Stamped SABRE001771 to SABRE002295 reflecting these regular communications along with additional communications between the entities.

<u>Interrogatory No. 3:</u> For each response to the Requests for Admission below that is not an unqualified admission, state all facts upon which you based your qualified admission or denial.

**RESPONSE**: Sabre refers to its responses to each Request for Admission below and to its production of documents Bates Stamped SABRE000001 to SABRE002295.

## OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS FOR PRODUCTION

Document Request No. 1: Produce all communications between you and Ericsson from January 1, 2014 to the present.

**RESPONSE:** Sabre objects to this Request on the grounds that it is overly broad, and unduly burdensome. Sabre further objects to this Request to the extent it seeks information not relevant to the subject matter of the litigation and/or is not reasonably calculated to lead to the discovery of admissible evidence. Specifically, this Request seeks all communications between Sabre and Ericsson during the specified time period regardless of whether such communications relate to the subject matter of this litigation. As the Complaint alleges, Sabre and ConcealFab each participate in the Small Cell, Distributed Antennae System ("DAS") and outdoor Distributed Antennae System ("oDAS") segments of the telecom market. Sabre, however, participates in various other segments of the telecom industry and, accordingly, communicates with Ericsson related to products outside of the Small Cell, DAS and oDAS arena. Subject to these objections, Sabre is withholding documents that do not relate to the subject matter of this litigation. Further subject to and without waiving the above objections, Sabre will produce documents responsive to this request that are relevant to the Small Cell, DAS and oDAS markets.

Document Request No. 2: Produce all communications between you and Cincinnati Bell from January 1, 2014 to the present.

**RESPONSE:** Sabre objects to this Request on the grounds that it is overly broad, and unduly burdensome. Sabre further objects to this Request to the extent it seeks information not relevant to the subject matter of the litigation and/or is not reasonably calculated to lead to the discovery of admissible evidence. Specifically, this Request seeks all communications between Sabre and Cincinnati Bell during the specified time period regardless of whether such communications relate to the subject matter of this litigation. As the Complaint alleges, Sabre and ConcealFab each participate in the Small Cell, Distributed Antennae System ("DAS") and outdoor Distributed Antennae System ("oDAS") segments of the telecom market. Sabre, however, participates in various other segments of the telecom industry and, accordingly, may communicate with Cincinnati related to products outside of the Small Cell, DAS and oDAS arena. Subject to these objections, Sabre is withholding documents that do not relate to the subject matter of this litigation. Further subject to and without waiving the above objections, Sabre will produce documents responsive to this request that are relevant to the Small Cell, DAS and oDAS markets.

Document Request No. 3: Produce all catalogues or other documentation advertising and/or explaining your bracket mounting system to customers from January 1, 2014 to the present.

**RESPONSE:** Sabre objects to this Request on the grounds that it is overly broad, and unduly burdensome. Sabre further objects to this Request on the grounds that it is vague and ambiguous, particularly with respect to the terms "bracket mounting system" and "customers." As to the latter term, the word "customers" can mean current, prior or prospective customers. Subject to the above objections, Sabre is withholding documents that, depending on the meaning of the terms "bracket mounting system" and "customers" may be responsive to this Request.

Document Request No. 4: For each response to the Requests for Admission below that is not an unqualified admission, produce all documents and other tangible things that support your qualified admission or denial.

**RESPONSE**: Sabre objects to this Request to the extent it seeks documents or information protected by the attorney/client privilege, the work-product doctrine, or any other applicable privilege. Subject to and without waiving the above objection, Sabre will produce non-privileged documents responsive to this Request.

## OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS FOR ADMISSION

**Request for Admission No. 1:** Admit that you learned how ConcealFab prices its bracket mounting system between July 25, 2014 and June 3, 2015

**RESPONSE**: Denied. To Sabre's knowledge, ConcealFab's bracket mounting system was not finalized during this period and thus its pricing was also not finalized and was subject to change.

**Request for Admission No. 2:** Admit that you learned ConcealFab is an Ericsson OEM Partner between July 25, 2014 and June 3, 2015.

**RESPONSE**: Denied. To Sabre's knowledge, the fact that ConcealFab was an Ericsson OEM Partner was a known fact in the telecom industry prior to July 25, 2014.

Dated: May 3, 2016.

Respectfully submitted,

*s/ Alan D. Schindler*

Jeffrey S. Pagliuca
Laura A. Menninger
Alan D. Schindler
HADDON, MORGAN AND FOREMAN, P.C.
150 East 10th Avenue
Denver, CO 80203
Phone: 303.831.7364

## Angela D. DeVine

**From:** Jonathan Fitzhugh <jfitzhugh@concealfab.com>
**Sent:** Monday, February 22, 2016 10:30 AM
**To:** Angela D. DeVine
**Subject:** FW: Antenna Bracket Quote Request

[redacted]

**From:** Jason Lippert
**Sent:** Friday, February 05, 2016 4:06 PM
**To:** Lague, Mike <mike.lague@cinbell.com>
**Cc:** Jonathan Fitzhugh <jfitzhugh@concealfab.com>; Galey, Keith <keith.galey@cinbell.com>
**Subject:** RE: Antenna Bracket Quote Request

Mike,
Great! We look forward to the business.
I went to look at actual quantity on hand.
We can ship everything by 16th.
Pricing you have is accurate still.
Address is incorrect. PLEASE NOTE: **3525** NORTH CASCADE

**Thank you!**
***Jason Lippert***
*Vice President, Operations*
**ConcealFab Corporation**
3525 N. Cascade Avenue
Colorado Springs, CO 80907
Phone: (719) 599-3400
Mobile: (719) 231-0474
http://www.concealfab.com/

This e-mail and any attachments are for the intended recipient(s) only and may contain proprietary, confidential material. If you are not the intended recipient, (even if the email address above is yours) do not use, retain, copy or disclose any part of this communication or any attachment as it is strictly prohibited and may be unlawful. If you believe that you have received this e-mail in error, please notify the sender immediately and permanently delete. This email may be a personal communication from the sender and as such does not represent the views of the company.

Thank you for your cooperation and assistance.

---

**From:** Lague, Mike [mailto:mike.lague@cinbell.com]
**Sent:** Friday, February 05, 2016 2:55 PM
**To:** Jason Lippert
**Cc:** Jonathan Fitzhugh; Galey, Keith
**Subject:** RE: Antenna Bracket Quote Request

Jason,

Hello. CBT is preparing to execute an order for your antenna bracket hardware as shown below. Can you confirm the information below that you provided at the end of last year?

Also – What is the current lead time for these components? If you could take a look and provide feedback early next week, I would greatly appreciate it.

| Item Number | Part Description | Quantity | PRICE PER | TOTAL / QTY |
|---|---|---|---|---|
| 003002 | Wide Diameter Pole-Top Mount, Brown | 60 | $315.00 | $18,900.00 |
| 003099 | Universal Side Arm Mount, Brown | 10 | $410.00 | $4,100.00 |
| 002769 | Universal Cantenna Sleeve with Single Bolt Adapter | 70 | $185.00 | $12,950.00 |

| | Name | Remit Address |
|---|---|---|
| 12655100 | CONCEALFAB CORPORATION | 3535 NORTH CASCADE AVE COLORADO SPRINGS CO, 80907 |

FX: 719-599-0057

***Thanks,***

***Mike LaGue***
***IEEE Wireless Communications Professional***
***Cincinnati Bell***
***221 East 4th Street (103-960), Cincinnati, OH 45202***
***Wireless: (513) 377-8846 Office: (513) 565-9376***

**Cincinnati Bell**

---

**From:** Jason Lippert [mailto:jlippert@concealfab.com]
**Sent:** Wednesday, December 23, 2015 1:24 PM
**To:** Lague, Mike
**Cc:** Jon Fitzhugh
**Subject:** RE: Antenna Bracket Quote Request

Mike,
Absolutely.

FX: 719-599-0057

Sabre Industries

# QUOTE

*Quote and lead time good for 30 days*

## Sabre Industries

CellXion LLC
5031 Hazel Jones Road
Bossier City, LA 71111
ph 318-213-2840

JOB NO.
DATE February 10, 2016
CUSTOMER ID/PO CinBell
JOB DESCRIPTION Antenna Mounting Products

TO: Keith Galey
Mike Lague

SHIP TO

| SALESPERSON | JOB | REQUESTED DELIVERY DATE | SHIPPING METHOD | SHIPPING TERMS | CUST. SHIP NUMBER | SHIP DATE |
|---|---|---|---|---|---|---|
| Sabre Industries - Bryan Kearse | 0 | | Best Way | | | 4-5 WEEKS ARO |
| PAYMENT METHOD | | | PAYMENT TERMS | Net 30 | | |

| LI # | QTY | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---|---|---|---|---|
| 1 | 10 | 180E051_000; Sidearm Antenna Bracket; Powder Coated Finish - Color Brown | $ 400.00 | $ 4,000.00 |
| 2 | 60 | 180F004_000; Simplified Pole-Top Bracket, Powder Coated Finish - Color Brown | $ 300.00 | $ 18,000.00 |
| 3 | 70 | 180E046_000A; 15" Universal Antenna Adapter, Powder Coated Finish - Color Brown | $ 150.00 | $ 10,500.00 |
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | | | | |
| | | | $ 850.00 | |
| | | | SUBTOTAL | $ 32,500.00 |
| | | | SALES TAX | |
| | | | TOTAL | $ 32,500.00 |

This is a quotation on the goods named. Unless noted otherwise, shipping, taxes, and permitting is not included in this quote. Please contact us should you have any questions.

*THANK YOU FOR YOUR BUSINESS!*

Cincinnati Bell

AN EQUAL OPPORTUNITY EMPLOYER

# Purchase Order

| DATE | PO/RELEASE NO |
|---|---|
| 02/18/16 | 323044 |
| | THIS NUMBER MUST APPEAR ON ALL RELATED DOCUMENTS |

BILL TO

Invoices may be:
1. *Faxed to:* *(513) 562-9200*
2. *Emailed to:* *accounts.payable@cinbell.com*
3. *Mailed to:* *ACCOUNTS PAYABLE 103-1115*
   *P.O. BOX 2301*
   *CINCINNATI, OH 45201-2301*

SUPPLIER

SABRE BUILDING SYSTEMS
5031 HAZEL JONES RD
CELLXION,LLC DBA/
BOSSIER CITY, LA 71111

SHIP TO

CINCINNATI BELL TELEPHONE
% POWER AND TELEPHONE
VZW SMALL CELL PROJECT
4650 LAKE FOREST DRIVE
BLUE ASH, OH 45242

*FREIGHT ON MATERIAL PURCHASED MUST BE PREPAID AND IDENTIFIED SEPARATELY ON INVOICE*

| CBT DIRECT PAY NUMBER | RFQ/CONTRACT | BLANKET ORDER | REQUISITION | TERMS | SHIP VIA | F.O.B. | PAGE |
|---|---|---|---|---|---|---|---|
| 98-002841 | | | | NET 60 | N/A | ALL DELIVERIES ARE F.O.B DESTINATION | 1 |

****** All purchase orders require order acknowledgements be sent to purchasing.request@cinbell.com ******

*(All inquiries should be sent to purchasing.request@cinbell.com)*

| LINE NO. | VENDOR PRODUCT NO. CBT PRODUCT NO. | DESCRIPTION | QUANTITY | UNIT | UNIT PRICE | TOTAL |
|---|---|---|---|---|---|---|
| 1 | 180E051_000<br>MI00 GEN | SIDEARM ANTENNA BRACKET;<br>POWDER COATED FINISH -<br>Required Date: 02/26/16 | 10.00 | EA | 400.0000 | 4,000.00 |
| 2 | 180F004_000<br>MI00 GEN | PART # 180F004_000<br>SIMPLIFIED POLE-TOP BRACK<br>Required Date: 02/26/16 | 60.00 | EA | 300.0000 | 18,000.00 |
| 3 | 180E046_000A<br>MI00 GEN | 15" UNIVERSAL ANTENNA ADA<br>POWDER COATED FINISH<br>Required Date: 02/26/16 | 70.00 | EA | 150.0000 | 10,500.00 |

**TOTAL: 32,500.00**

Rochelle Brown

AUTHORIZED SIGNATURE
Senior Purchasing Lead

2/18/2016
DATE

CONCEALFAB000274

**From:** Doug Huff <dhuff@sabreindustries.com>
**Sent:** Friday, March 13, 2015 6:38 AM
**To:** Timothy Rossetti
**Subject:** RE: ConcealFab Wiring Instructions

Not at all....

Why Monday ?

**From:** Timothy Rossetti
**Sent:** Thursday, March 12, 2015 8:55 PM
**To:** Doug Huff
**Subject:** RE: ConcealFab Wiring Instructions

Ok thanks, had a brief conversation with Pete and it sounded like he wanted to wait until Monday to send the wire, has he talked to you about this?

**Tim Rossetti**

*Chief Financial Officer and Executive Vice President*

*Sabre Industries, Inc.*

*(267) 263 - 1346 Phone*

**trossetti@sabreindustries.com**

**From:** Doug Huff
**Sent:** Thursday, March 12, 2015 4:14 PM
**To:** Timothy Rossetti
**Cc:** jfitzhugh@concealfab.com
**Subject:** FW: ConcealFab Wiring Instructions

Tim,

Here are the wiring instructions for the $160K

Dch

**From:** Jon Fitzhugh [mailto:jfitzhugh@concealfab.com]
**Sent:** Thursday, February 26, 2015 11:58 AM
**To:** Doug Huff
**Subject:** ConcealFab Wiring Instructions

Doug,

Per our discussion, attached are ConcealFab's Bank Wiring Instructions.

-Jon