**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:15-cv-01793-CMA-KLM

CONCEALFAB CORPORATION, a Colorado corporation,

Plaintiff,

v.

SABRE INDUSTRIES, INC., a Delaware corporation, and MIDWEST UNDERGROUND TECHNOLOGY, INC., an Illinois corporation,

Defendants.

---

**[PLAINTIFF'S PROPOSED] FINDINGS OF FACT AND CONLCUSIONS OF LAW, ORDER AND FINAL JUDGMENT**

---

THIS MATTER is before the Court following a bench trial on March 26, 27 and 28, 2018. Having received testimony and exhibits at trial, the Court hereby FINDS AND ORDERS as follows:

## I. <u>CLAIM NO. 1: Breach of the Licensing Operating Agreement ("LOA")</u>

### A. Findings of Fact

1. <u>Element 1: Existence of a Contract</u>

a. Defendant Midwest Underground Technology, Inc. ("MUTI") is a wholly-owned subsidiary or division of Defendant Sabre Industries, Inc. ("Sabre"), Final Pretrial Order, Dkt 126, Sec. 4(A)(4), and Defendants made clear during their dealings with Plaintiff ConcealFab Corporation ("CF") that Sabre and MUTI were each and both of them bound by any agreements reached with CF. *See, e.g.,* Exhibit ("Ex") 2, p 1 ("MUTI and Sabre may be used interchangeably in this agreement"); Ex 3, p 1 ("The term sheet

and the LOA below are inclusive of all Sabre Telecom entities and may pertain to Sabre, MUTI, or Cellxion…”); *also* Trial Transcript (“Trans”) 27:11-13, 78:5-15. Accordingly, both Defendants will collectively and individually be referred to as “Sabre” for the remainder of this Order.

b. CF executed the LOA on March 12, 2015. Ex 85.

c. The LOA stated, “All existing shareholders and option holders must vote (per [CF] Corporation’s By-Laws) to approve this LOA structure in accordance with [CF’s] corporate governance documents.” Ex 3, Sec 4(a). Neither CF’s bylaws nor its corporate governance documents require unanimous shareholder approval. Trans 30:9-11, 85:1-4, 260:13-15, 317:19-318:15.

d. It is a stipulated fact that, on March 12, 2015, CF informed Sabre that “[w]e received an affirmative vote from a majority [of] both the Preferred class standalone and the Common plus Preferred classes combined.” Dkt 126, Sec. 4(A)(11); Ex 57.

e. It is a stipulated fact that Sabre executed the LOA on March 13, 2015. Dkt 126, Sec. 4(A)(12).

f. Under the LOA, Sabre was to absorb a portion of CF’s business into its engineered product group, or “Sabre EPG.” Ex 3, Sec. 2(a) & 3(c)(iii); Trans 88:13-18. Sabre EPG was to receive exclusive use of CF’s intellectual property, processes, designs and systems, Ex 3, Sec. 3(c)(i), Trans 88:19-21; all business development efforts were to be run through Sabre EPG, Ex 3, Sec. 3(c)(iii), Trans 88:22-24; and all new business purchase orders were to be run through Sabre EPG, Ex 3, Sec. 3(c)(v), Trans 88:25-89:2.

g. The LOA required Sabre to provide working capital to Sabre EPG, which included accounts payable and employee liabilities. Ex 3, Sec. 3(c)(iv) & 3(c)(iv)(1); Trans 89:3-5,130:13-25, 457:10-13. The LOA did not require CF to repay any working capital of Sabre EPG in the event the LOA was terminated. Trans 89:6-9, 93:19-22. In exchange for funding the working capital of Sabre EPG, Sabre would keep any intellectual property developed by Sabre EPG, Ex 3, Sec.4(e)(3), and 80 percent of the EBITDA[1] generated by Sabre EPG. Ex 3, 3(d)(i) & Ex 2, Sec. 2(i). CF abandoned any right to intellectual property developed by Sabre EPG because Sabre was paying all the costs associated with the development of that property. Ex 51, p 11; Trans 86:18-87:3, 89:21-190:4.

h. The LOA required certain CF employees, including CF CEO Jonathan Fitzhugh, to become Sabre employees. Ex 3, Sec. 2(a)(i); Glossary, ¶ 16. CF remained responsible for any and all liabilities of those employees prior to their Sabre hire dates, but Sabre was responsible for such liabilities thereafter. Ex 3, Sec. 2(a)(i)(2); Trans 123:24-124:1.

i. Secs. IV(A)(1)(i) and (j) below are incorporated herein.

j. The LOA stated, “In the event the LOA is terminated at any time...Jon Fitzhugh’s employment agreement shall terminate as ‘resignation for good reason’ in the event of termination of the LOA.” Ex 3, Sec. 4(e)(ii). The Employment Agreement, in turn, required Sabre to pay Mr. Fitzhugh a $300,000 severance if he resigned for good

[1] EBITDA stands for “Earnings Before Interest, Taxes, Depreciation and Amortization.” Glossary, ¶ 14.

reason. Ex 4, Sec. 4 & 5(a); Trans 83:24-84:15. It was always agreed between Mr. Fitzhugh and CF that CF would receive the severance. Trans 60:4-13, 238:25-239:2.

k. Sec. IV(A)(1)(n) below is incorporated herein.

l. It is a stipulated fact that Sabre terminated the Term Sheet and LOA on June 3, 2015. Dkt 126, Sec. 4(A)(21).

2. Element 2: Performance of LOA by CF

a. Several CF employees, including Mr. Fitzhugh, became Sabre employees. Trans 98:18-20.

b. CF performed according to the LOA: it gave Sabre exclusive use of its intellectual processes, designs and systems, *id.* at 107:20-23; all business development efforts were run through Sabre EPG, *id.* at 108:9-11; and all new business purchase orders were run through Sabre EPG, *id.* at 361:2-4, 537:3-22.

3. Element 3: Failure to Perform LOA by Sabre

a. Sabre failed to pay accounts payable from CF vendors during the pendency of the LOA. Ex 85. After terminating the LOA, Sabre refused to pay the accounts payable, even when Sabre acknowledged it was "technically" responsible for paying because the debts were incurred on behalf of Sabre EPG during the LOA. Ex 105.

b. Upon termination of the LOA, Sabre refused to pay the severance due under the Employment Agreement. Ex 3, Sec. 4(e)(ii); Ex 4, Sec. 4 & 5(a); Trans 267:16-25.

4. Element 4: Damages Suffered by CF as a Result of Sabre's Beach

a. The total accounts payable that Sabre failed and refused to pay was $66,897.54. Ex 114, p 11, Response to Request for Admission No. 9.

b. CF paid the unpaid accounts payable so that it could continue to receive products from its vendors and remain in business. Trans 130:1-16.

c. The amount of severance that Sabre failed and refused to pay was $300,000. Ex 3, Sec. 4(e)(ii); Ex 4, Sec. 4 & 5(a).

## B. Conclusions of Law

The four elements that must be proven to prevail on a breach of contract claim are set forth in *Baumann v. American Family Mut. Ins. Co.,* No. 11-cv-00789-CMA-BNB, 2012 WL 122850, at *4 (D. Colo. Jan. 17, 2012)(citing *Western Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992)). The Court finds that the LOA was a binding contract between the parties that required CF, on the one hand, to contribute certain personnel, intellectual property, business opportunities, purchase orders and the majority of EBITDA from those orders to Sabre and Sabre EPG; and required Sabre, on the other hand, to pay all the working capital of Sabre EPG during the LOA, and $300,000 to CF if it was terminated.[2]

CF established by a preponderance of the evidence that it performed its duties under the LOA. Sabre cross-examined Mr. Fitzhugh regarding its belief that CF was reluctant to terminate employees and move its manufacturing to Bossier City, Louisiana. Trans 208:11-209:1, 201:21-211:5, 370:3-12; Exs 70 & 74. But the LOA did not require CF to terminate personnel or relocate any of its operations and, as a result, any

[2] The Court finds that the Employment Agreement was incorporated into the LOA. *See Liquid Magnetix Corp. v. Therma-Stor LLC*, No. 13-cv-3151-WJM-KMT, 2014 WL 1389984, at *2 (D. Colo. Apr. 9, 2014)("So long as it is clear what document is being referred to and that the parties intended for it to be a part of the [agreement], ... it is as effectively a part thereof as if recited therein").

perceived reluctance to do so did not constitute a failure to perform according to the LOA. Additionally, by the time Sabre recommended those changes, the CEO of Sabre had refused to execute the Employment Agreement, Sabre had failed to make certain payments pursuant to the LOA, Sabre personnel had disavowed knowledge of various terms of the deal, and at least one Sabre executive had suggested letting CF go into bankruptcy. Trans 109:20-110:14, 112:2-18, 220:22-223:11; Exs 66 & 67. CF was excused from further performance at that point. *See DTC Energy Group, Inc. v. Hirschfeld*, No. 17-cv-01718-PAB-KLM, 2018 WL 1138295, at *10-11 (D. Colo. March 2, 2018)(one party's contractual breach excuses the other party's obligations to perform under the contract); *see also Kaiser v. Market Square Discount Liquors*, 992 P.2d 636, 640 (Colo. App. 1999)(material breach of contract excuses further performance by other party).

CF similarly established that Sabre failed to perform the LOA. Sabre failed and refused to pay accounts payable incurred during the LOA, even though it was required to fund all working capital of Sabre EPG. Sabre also failed and refused to pay the severance due under the Employment Agreement when it terminated the LOA, even though the LOA stated, "Jon Fitzhugh's employment agreement shall terminate as 'resignation for good reason' in the event of termination of the LOA."

Sabre's affirmative defense of failure to perform conditions precedent does not change the conclusion that it breached the LOA.[3] Because this affirmative defense was

[3] Defendants did not identify this affirmative defense in their Answer to Amended Complaint and Counterclaims, Dkt 70, p 15, or in the Revised Scheduling Order, Dkt 77, Sec. 3(b). Rather, Defendants asserted the affirmative defense for the first time in the

not pled with the particularity required by Fed.R.Civ.P. 9(c), the Court presumes the condition precedent is approval of the LOA by CF shareholders. Ex 3, Sec. 4(a).[4] The Court disagrees with Sabre's contention that unanimous shareholder approval was required because the vote was to be "per [CF] Corporation's By-Laws," and "in accordance with [CF's] corporate governance documents," neither of which required unanimous shareholder approval. But even if unanimous consent was required, it is a stipulated fact that Sabre was advised the day before it executed the LOA that only a majority of CF shareholders had approved the LOA. Sabre waived any right to insist upon unanimous shareholder approval when it executed the LOA with knowledge that there was no unanimous shareholder approval. *See High Country Movin', Inc. v. U.S. West Direct Co.*, 839 P.2d 469, 472 (Colo. App. 1992)(waiver of a contract term occurs when a party to the contract is entitled to assert a particular right, knows the right exists, but intentionally abandons that right, which may be shown by a course of conduct signifying a purpose not to stand on a right, leading one, by a reasonable inference, to the conclusion that the right in question will not be insisted upon).

In a breach of contract action, the measure of damages is the amount it takes to place the plaintiff in the position it would have occupied had the breached not occurred. *Acoustic Mktg. Research, Inc. v. Technics, LLC*, 198 P.3d 96, 98 (Colo. 2008). If Sabre

---

Proposed Final Pretrial Order. Dkt 124, Sec. 3(b); Plaintiff's Objection to Non-Stipulated Elements Instructions, Dkt 136.

[4] Sabre also asserted failure "to perform the terms and conditions required by the Term Sheet, which terms/act ConcealFab was required to perform before a contractual duty for Sabre to perform arose." *See* Stipulated Elements Instructions, Sec. 1(B)(1). However, the Term Sheet was a non-binding agreement, Ex 2, Sec. 6(a), so CF had no obligation to perform any of its terms.

had performed as required by the LOA, it would have paid the $66,897.54 in accounts payable incurred during the LOA, and the $300,000 severance due under the Employment Agreement. Accordingly, the amount it takes to place CF in the position it would have occupied had Sabre not breached the LOA is $366,897.54. This figure must be offset by the $112,731.26 due from CF to Sabre under the LOA. *See* Sec. II(B) below.

## II. <u>COUNTERCLAIM NO 5: Breach of the LOA</u>

### A. Findings of Fact

1. <u>Element 1: Existence of a Contract</u>

a. Secs. I(A)(1)(a) through (j) above are incorporated herein.

b. Under the LOA, the portion of CF that was not absorbed by Sabre EPG would be renamed "CFG." Ex 3, Sec. 2 (no subsection)("The current CF company will be renamed CFG…"); Trans 90:15-17.

c. Sabre was required to provide an undetermined amount of working capital to CFG, plus make a pre-payment or deposit of $160,000. Ex 3, Sec. 3(c)(vii) & 3(c)(vii)(1); Trans 90:18-25.

d. The LOA required Sabre to pay CFG $120,000 towards an "Employee/Contractor buyout in March." Ex 3, Sec. 3(b)(ii)(1) & 3(d)(iv). The LOA elsewhere permitted Sabre to pay the $120,000 "Employee/Contractor buyout" in scheduled payments. *Id.* at Sec. 3(c)(vii)(1). The "Employee/Contractor buyout" was at all times understood by both parties to mean buyout of the Consulting Agreement between CF and its founder, Michael Slattery. Ex 8; *see also* Ex 46, p 3 ("…the only

item we would be addressing currently is buying out the founder's consulting agreement…") & p1 ("this is in addition to the 120K to buy out the founders [sic]"); Trans 32:13-19, 80:23-81:8.

e. Unlike amounts paid to support Sabre EPG, the LOA required CF to repay all amounts Sabre contributed to CFG, either as offsets against licensing fees earned during the pendency of the LOA, Ex 3, Sec. 3(d)(iv), or as a note guaranteed by a security interest in CF's intellectual property. Ex 3, Sec. 3(b)(ii)(4), 3(c)(no subsection) & 3(d)(iv); Trans 91:1-7, 93:8-18. The interest rate on any note was to be determined at the time the LOA was executed. Ex 3, Sec. 3(b)(ii)(4) & 3(c)(no subsection). It never was. Trans 91:25-92:3,127:19-20, 301:1-15.

f. It is a stipulated fact that Sabre delivered a draft promissory note to CF on May 28, 2015. Dkt 126, Sec. 4(A)(18); Ex 90.

g. Sabre never paid the $27,310.60 described as "CF Payroll 6/1/2015 – 6/7/2015 estimated" in the cover email to the draft promissory note, and included in the total to be repaid under the note. Ex 90; Ex 114, p 10, Response to Request for Admission No. 7.

h. Sabre never paid the $60,326.53 described as "AP Unpaid (March through May 31)" in the cover email to the draft promissory note, and included in the total to be repaid under the note. Ex 90; Ex 114, p 11, Response to Request for Admission No. 9.

i. It is a stipulated fact that CF did not sign the draft promissory note. Dkt 126, Sec. 4(A)(19).

2. <u>Element 2: Performance by Sabre</u>

a. Sabre paid the $160,000 pre-payment or deposit to CFG on or about March 13, 2015, but never contributed any other working capital to CFG. Trans 98:14-17.

b. It is a stipulated fact that Sabre did not pay the March 2015 "Employee/ Contractor" payment due under the LOA until May 5, 2015. Dkt 126, Sec. 4(A)(13).

c. It is a stipulated fact that Sabre did not pay the April 2015 "Employee/ Contractor" payment due under the LOA until May 5, 2015. *Id.* at Sec. 4(A)(15).

d. Secs. I(A)(3)(a) and (b) above are incorporated herein.

3. Element 3: Failure to Perform Contract by CF

a. Upon termination of the LOA, CF did not repay the $160,000 pre-payment or deposit, or either of the $12,000 "Employee/Contractor" payments, to Sabre.

b. Secs. I(A)(2)(a) and (b) above are incorporated herein.

4. Element 4: Damages Suffered by Sabre as a Result of CF's Breach

a. The amount repayable from CFG to Sabre is $184,000, less any licensing fees earned during the pendency of the LOA. Trans 127:5-13; Ex 3, Sec. 3(b)(ii)(4)("Sabre would first have the right of offset for any monies due to CFG from Sabre) & 3(c)(no subsection)("In the event… the licensing fees due CFG from Sabre are not sufficient to offset balances due to Sabre from CFG…).

b. Sabre EPG had revenue of $1,187,812.25 during the LOA, approximately 30 percent of which was EBITDA. Ex 114, p 7, Response to Interrogatory No. 8 & Ex 96; Trans 544:1-2 & 571:6-7.

c. Sabre CFO Timothy Rossetti testified regarding his assumption that CF received and retained $381,958.47 in revenues from the purchase orders submitted to

CF during the LOA.[5] Ex 146; Trans 551:22-25, 555-22-25. However, Mr. Rossetti also testified that he did not know whether CF had ever invoiced the customers or received any payments from them. Trans 362:13-15, 557:13-18.

d. Secs. I(A)(4)(a)-(c) above are incorporated herein.

**B. Conclusions of Law**

The elements of a breach of contract counterclaim are set forth in *Baumann,* 2012 WL 122850 at *4. Although Sabre initially claimed in this action that the LOA was not a valid contract, Answer to Amended Complaint and Counterclaims, Dkt 70, ("Counterclaims"), Counterclaim ¶ 78, there now appears to be no dispute that the LOA was a binding agreement because both parties assert competing claims for its breach. Whereas CF's breach of LOA claim focuses on the amounts Sabre was obligated but failed to pay during the LOA and upon its termination, Sabre's counterclaim for breach focuses on the amounts Sabre did contribute and which it believes CF must repay.

Sabre alleges that CF breached the LOA by receiving less than 100 percent shareholder approval for the LOA.[6] *Id.* at Counterclaim ¶ 79(a). This assertion fails for

---

[5] Sabre never disclosed that it was seeking this category of damages in connection with its breach of contract counterclaim prior to trial, or even that it believed CF breached the LOA by failing to pay licensing fees. *See, e.g.,* Dkt 70, Counterclaim ¶¶ 77-80; Dkt 77, Sec. 5(b). Sabre is prevented from recovering such damages now. *See Bradley v. Denver Health Hosp. Auth.*, No. 08-cv-02587, 2010 WL 11553419, at *3-4 (D. Colo. March 23, 2010)(motion to strike claim for compensatory damages should be granted where plaintiff failed to disclose existence or computation of claim for compensatory damages until three months after discovery ended).

[6] Sabre also alleged in is Counterclaims that CF breached the LOA by since refusing to acknowledge Sabre's right to retain the intellectual property developed by Sabre EPG during the pendency of the LOA, Dkt. 70, Counterclaim ¶ 79(d), but presented no evidence in support of this allegation at trial.

the same reasons the condition precedent defense fails—the LOA did not require unanimous approval, but even if it did, Sabre waived any right to insist upon unanimity when it executed the LOA with knowledge that only a majority of CF shareholders had approved it. *See* Sec. I(B) above.

Sabre alleged in its Counterclaims that CF breached the LOA by refusing to execute a promissory note for "the prepayments/deposit licensing fees paid by Sabre to CF" and "for amounts paid by Sabre to CF employees."[7] Dkt 70, Counterclaim ¶¶ 79(b) & (c). At trial, however, Mr. Rossetti argued that CF owed Sabre much more than just these two categories of payments—he contended that CF had a duty to repay absolutely everything Sabre contributed during the LOA. Mr. Rossetti supported his position with an interpretation of the LOA that rendered the terms "Sabre EPG" and "CFG" meaningless, and assigned meaning to the symbols "-+--."[8] Trans 554:3-7; 555:13-19. But the rules of contract interpretation require the Court to examine the

---

[7] Although pled as mere failure to execute a promissory note, the Court treats this allegation as a failure to repay amounts due under the LOA for two reasons. First, the LOA did not require CF to execute any note; rather, the LOA itself "reverted" to a note upon termination. Ex 3, Sec. 3((b)(ii)(4). Second, the note Sabre gave CF to execute included amounts it had no obligation to repay, and amounts that Sabre had not (and never has) expended, and claimed a security interest in far more than just CF's intellectual property. Ex. 90, Sec. 4(a); Trans 123:7-124:19, 125:1-4, 128:2-11. As a result, CF did not breach the LOA by refusing to execute the note.

[8] The Court finds that Mr. Rossetti was not a credible witness. He claimed he had several conversations with Mr. Fitzhugh during the negotiation of the LOA, Trans 485:13-15, 486:19-23, 524:23-525:12, but he was never even copied on the emails between Mr. Fitzhugh and Mr. Huff and, during the LOA, Sabre personnel relied upon Mr. Huff, not Mr. Rossetti, to educate them about what the LOA required. Ex 37; Ex 41; Ex 45; Ex 50; Ex 51; Ex 66, p 2; Ex 67. Mr. Rossetti also disavowed discovery responses verified by, and exhibits prepared by other Sabre employees when they contradicted his version of events. Trans 472:14-475:9; 554:8-14; 557:5-7.

entire instrument, and not view clauses or phrases in isolation, to give each word in an instrument meaning if at all possible, and to avoid an absurd result. *See Burr v. Moyer*, No. 10-cv-01503-WJM-MEH, 2012 WL 364072, at *3 (D. Colo. Feb. 2, 2012). “Sabre EPG” and “CFG” are defined terms under the LOA, Ex 3, Sec. 2(a), 3(c)(iii) & 2(no subsection), and thus the Court finds that the parties intended those terms to have separate meaning. The Court also finds that “pre-payments/deposit licensing fees” due from Sabre to CFG are different than “working capital” due from Sabre to Sabre EPG. The LOA required CF to repay “pre-payments/deposit licensing fees” to CFG. Ex 3, Sec. 3(c)(vii)(2)(no subjection) & 3(d)(iv). It did not require CF to repay working capital of Sabre EPG. Any other conclusion would lead to the absurd result that Sabre would get to keep any intellectual property developed by Sabre EPG, and the majority of EBITDA generated by Sabre EPG, without providing any consideration.

The Court also rejects Sabre’s contention that CF must repay amounts Sabre paid to CF workers while they were Sabre employees. The only “employee” amount CF had to repay was the “Employee/Contractor” obligation earmarked for Mr. Slattery. Ex 3, Sec. 3(b)(ii)(4); *see also id.* at Sec. 3(d)(iv)(amounts owed from CFG to Sabre included “the elimination of employee obligations as outlined in [Sec.] 3(b)(ii)”). The Court rejects Sabre’s contention that the duty to repay the “employer/contractor” obligation included all employee liabilities. The phrase “employer/contractor obligations” was modified by the term “these.” *Id.* at Sec. 3(b)(ii)(4). Thus, the obligations to be repaid were not “the” obligations or “all” obligations, but “these” obligations. The provision regarding “these” obligations is a subparagraph of the section addressing payments to an

"Employee/Contractor" that both parties understood at all times was Mr. Slattery. *Id.* at Sec. 3(b)(ii)(4). "These" obligations are, therefore, the amounts paid toward his employee/contractor buyout. The conclusion that "these" obligations did not include "all" employee obligations is also established elsewhere in the LOA: the provision regarding CF employees becoming Sabre employees is in a completely separate section of the LOA, and expressly limits CF's responsibility to "any and all liabilities of these employees **prior** to the Sabre hire date." *Id.* at Sec. 2(a)(i)(2) (emphasis added); *see also* C.R.S. § 8-4-103 (employer is required to pay wages of its employees). CF, therefore, had to repay only two categories of payments: $160,000 in pre-payment/ deposit licensing fees, plus $24,000 for Mr. Slattery's employee/contractor buyout, less any licensing fees earned during the LOA.

The approximate amount of the licensing fees earned during the LOA and due to CF is $71,268.74 ($1,187,812.25 total revenue x 30 percent = $356,343.68 EBITDA x 20 percent = $71,268.74). Mr. Rossetti attempted to diminish the licensing fees due CF when he testified that there were two Sabre EPG segments and the interrogatory responses Sabre provided in discovery identified revenue from the 'other' Sabre EPG segment. Trans 472:14-475:9; 554:8-14. The express terms of the LOA and other exhibits admitted at trial contradict his testimony. *See* Ex 3, Sec. 3(d)(i)("Sabre will accrue licensing fees due CFG at the rates and per the calculations outlined in section 2(i-v) of the term sheet…") & Ex 2, Sec. 2(a)(i)(CF to receive 20 percent of EBITDA "generated by the commercial combined product lines of [CF] and the current MUTI-Sabre/180 line…"); Trans 555:1-12; Ex 46, p 2 (Mr. Rossetti informed in email, "the plan

is to combine the [CF] and 180 product groups...all 180 and [CF] employees would move over to work together to further this EPG...[Mr. Fitzhugh] to lead the entire group including the 180 team"), p 3 (Mr. Rossetti informed in email, "Remember the revenue share/now licensing fee is from combined EBITDA of the newly combined EPG business (180 and [CF])...").

The Court rejects Sabre's claim that it is also entitled to $381,958.47 in revenues it assumes—but does not know and did not prove—CF received from purchase orders submitted to the 'correct' Sabre EPG segment. Where claims for damages are premised on breaches of contract, damages that are speculative, remote, imaginary, or impossible of ascertainment cannot be recovered. *Colorado Nat'l Bank v. Friedman*, 846 P.2d 159, 174 (Colo. 1993). Sabre presented no evidence that CF invoiced, fulfilled and was paid on the purchase orders submitted; even the F.R.E. 1006 summary Sabre prepared for trial repeatedly states, "**assume** CF invoiced and fulfilled." Ex 146 (emphasis added). Moreover, the LOA did not entitle Sabre to 100 percent of the revenues without respect to costs. Rather, the LOA gave Sabre just 45 percent of EBITDA.[9] There was no evidence at trial regarding CF's EBITDA and, thus, no way for the Court to ascertain Sabre's claimed share of the purchase orders. Thus, Sabre both failed to prove that it was damaged because CF realized revenues from purchase orders during the LOA, and failed to identify what its share of those revenues would be

[9] Mr. Rossetti repeatedly testified that Sabre was entitled to 55 percent under the LOA. *See, e.g.,* Trans 565:21-24. Again, however, Mr. Rossetti's testimony is at odds with the plain language of the LOA, which provided, "licensing fees will be accrued by CFG and **due Sabre** at the rate of 45 % of the EBITDA generated by the CFG entity." *See* Ex 3, Sec. 3(d)(i)(emphasis added); *see also* Ex 3, Sec 2 (no subsection)(referencing Sabre's 45 percent interest in CFG).

if they were received. The Court also excuses any further performance of the LOA by CF due to Sabre's prior, material breaches of the LOA. *See DTC Energy Group, Inc.*, 2018 WL 1138295, at *10-11; *Kaiser*, 992 P.2d at 640.

Accordingly, the credit due to Sabre for pre-payments/deposit licensing fees or "these employee/contractor obligations" is $184,000, less $71,268.74 in licensing fees earned during the LOA, or $112,731.26. However, the $366,897.54 in damages that CF sustained as a result of Sabre's breach of the LOA exceed this figure, *see* Sec. 1(B) above, so the amount due from CF is a mere reduction of the damages Sabre must pay to CF.

## III. <u>Claim No. 1: Breach of Mutual Non-Disclosure Agreement</u>

### A. Findings of Fact

1. <u>Element 1: Existence of a Contract</u>

a. It is a stipulated fact that CF and Sabre are competitors in the Small Cell, Distributed Antennae System and outdoor Distributed Antennae System segments of the telecom market, and each has product lines, customer relationships and intellectual property. Dkt 126, Sec. 4(A)(5).

b. It is a stipulated fact that CF and Sabre began discussions in 2014 to combine the two businesses. *Id.* at Sec. 4(A)(6); Trans 479:8-12.

c. It is a stipulated fact that the parties executed a Mutual Non-Disclosure Agreement ("NDA") on August 4, 2014. Dkt 126, Sec. 4(A)(7); Ex 1.

d. The NDA was prepared by Sabre, and executed by CF without any revision. Trans 336:4-14; Ex 5.

e. The NDA required the parties to "keep in confidence…all Confidential Information disclosed to either of them by the other and shall use such Confidential Information only for the purposes of evaluating and engaging in discussion concerning a potential business relationship between the Parties…" Ex 1, Sec. 3(a).

f. The NDA defined "Confidential Information" to include "past present and future business affairs such as finances, customer and/or supplier information, products, services...and all business, marketing, development, sales and other commercial strategies," *id.* at Sec. 2(a); "know-how, trade secrets, tools, methods, techniques, designs, and other information which derives economic value," *id.* at Sec. 2(b); "all designs, specifications, documentation, components, source code, object code, images, icons, schematics, drawing, protocols, [and] processes or depictions…" *id.* at Sec. 2(c).

g. CF had customer and supplier information that it wanted to keep secret, including its relationships with customers such as Cincinnati Bell. Trans 12:12-22, 138:13-22.

h. Sabre did not have a relationship with Cincinnati Bell prior to the LOA. *See* Ex 113, p 3, Response to Interrogatory No. 2 (first identified communication with Cincinnati Bell was October 2, 2015, several months after Sabre terminated the LOA); Trans 138:23-24.

i. CF had trade secrets or design specifications, schematics and drawings that it wanted to keep secret, including a two-part bracket system that allowed antennas to be mounted to either the top or side of light or utility poles. Trans 14:6-15:2. The system

included a "cantenna sleeve" that fit between the bracket and the antenna. *Id.* at 15:3-16. CF's cantenna sleeve makes its mounting system unique. *Id.* at 144:23-145:3.

j. Sabre did not have its own cantenna sleeve prior to the LOA. *Id.* at 145:4-6.

k. The cantenna sleeve CF sold prior to and during the LOA is identifiable by the oval shaped hole in its side. *Id.* at 145:11-146:1; Ex 147, p 10.

2. <u>Element 2: Performance by CF</u>

a. Sec. I(A)(2)(b) above is incorporated herein.

b. Sabre learned Cincinnati Bell was a customer of CF during the LOA because CF ran at least one purchase order from Cincinnati Bell through Sabre EPG. Trans 139:1-3; Ex 114, p 7, Response to Interrogatory No. 8 & Ex 96.

c. Sabre learned how to manufacture at least one CF product during the LOA when it manufactured CF side arm mounts for a CF customer. Trans 342:10-20; Ex 81.

3. <u>Element 3: Failure to Perform Contract by Sabre</u>

a. Sabre asked CF to provide confidential information during the LOA. Ex 82.

b. Sabre then used CF's confidential information to compete with CF. Exs 84, 93, 94, 98 &101.

c. Sabre used CF's cantenna sleeve to fulfill at least one order for an unknown customer. *Compare* Ex 142, p 6, *with* Ex 147, p 10; Trans 146:16-20.

d. In December 2015, Cincinnati Bell sought to order CF products from both CF and Sabre. Exs 108 & 142; Trans 144:14-22.

e. Sabre fulfilled the order for Cincinnati Bell using CF's cantenna sleeve and CF's side arm mount. Trans 146:16-20.

f. When CF learned what Sabre had done, it sent a cease and desist letter to Sabre. *Id.* at 144:7-10. Sabre responded with its own cease and desist letter. *Id.* at 144:11-13; Dkt 70, Counterclaim ¶¶ 73-76.

g. CF has not received an order from Cincinnati Bell since Sabre terminated the LOA. Trans 147:2-4.

4. Element 4: Damages Suffered by CF as a Result of Sabre's Breach

a. CF would have fulfilled the Cincinnati Bell order for $35,950. Ex 108, pp 1-2.

b. The NDA provided, "In the event that either Party violates any of the provisions of this Agreement, the prevailing party shall be entitled to recover all of its reasonable expenses, including attorney's fees through appeals, incurred in addressing such violation." Ex 1, Sec. 9.

c. CF employed counsel to commence and prosecute this action.

**B. Conclusions of Law**

*Baumann*, 2012 WL 122850 at *4, again sets forth the elements that must be proven. With respect to the first element, existence of a contract, Sabre appeared to suggest at trial that it intended the NDA to protect only its confidential information because only its confidential information was being shared in the summer of 2014. Trans 159:24-160:2. The Court rejects this contention. Discussions to combine the two businesses were already underway in 2014, and the plain language of the NDA made the responsibilities of the parties mutual. Even if the language was not clear, principles of contract interpretation require the Court to construe the language in the NDA against the drafter, which was Sabre. *See QFA Royalties LLC v. Bogdanova*, No. 06-cv-01776-

LTB, 2006 WL 3371641, at *3 (D. Colo. Nov. 21, 2016)(quoting *Colorado Interstate Gas Co., Inc. v. Chemco, Inc.*, 833 P.2d 786, 789 (Colo. App. 1991))("if the terms of a contract are ambiguous, they must be strictly construed against the party drafting the contract"). Thus, the NDA required both CF and Sabre to "keep in confidence…all Confidential Information disclosed to either of them by the other and shall use such Confidential Information only for the purposes of evaluating and engaging in discussion concerning a potential business relationship between the Parties…" CF upheld its obligations under the NDA, but Sabre did not.

Specifically, the evidence presented at trial established that Sabre used information and actual parts that it acquired during the LOA to fulfill an order for a CF customer in the way that CF would have fulfilled it. Cincinnati Bell was a CF customer before the LOA. Sabre, however, had no pre-LOA relationship with that customer. The identity of Cincinnati Bell as a customer was confidential information that the NDA prevented Sabre from using for any purpose other than evaluating a potential business relationship with CF. So too was information Sabre acquired during the LOA regarding CF's cantenna sleeve and side arm mount. In December 2015, Cincinnati Bell asked Sabre to provide a quote for side arm mounts, top mounts and cantenna sleeves with CF part numbers. Rather than inform Cincinnati Bell that the parts it sought were CF products, Sabre responded by stating, "we definitely want this business," and with photos showing that it had already used CF parts in the field on at least one prior

occasion.[10] Sabre ultimately fulfilled the Cincinnati Bell order, and CF has not received any other orders or inquiries from Cincinnati Bell, despite its pre-LOA relationship with that customer. These facts establish that Sabre breached the NDA by using CF's confidential information to compete with CF.

The damages to CF as a result of Sabre's breach of the NDA are the $35,950 CF lost when Cincinnati Bell ordered CF products from Sabre instead of from CF, *see Acoustic Mktg. Research,* 198 P.3d at 98 (measure of damages is the amount it takes to place the plaintiff in the position it would have occupied had the breached not occurred), plus the attorney fees and costs CF has incurred in this action and which CF is entitled to recover under the NDA.

## IV. CLAIM NO. 11: Breach of the Employment Agreement

### A. Findings of Fact

1. Element 1: Existence of a Contract

a. The CF Board of Directors would not authorize execution of the Term Sheet until it had seen and approved the Employment Agreement for Mr. Fitzhugh. Trans 36:7-14, 232:7-11; Exs 16 & 138.

b. Sabre prepared the first draft of the Employment Agreement for Mr. Fitzhugh, and provided it to him on January 7, 2015. Ex 18; Trans 44:10-20.

c. The first draft of the Employment Agreement provided that Mr. Fitzhugh's "employment under this Agreement will commence on the date of consummation of the

[10] To the extent Sabre argues it is entitled to use CF's cantenna sleeve and bracket mounting system under the LOA provision permitting competition regarding "pole capabilities and designs," Ex 3, Sec 4(3)(iii)(4), the Court rejects that contention for the reasons identified in Sec. VII(B) below.

acquisition of [CF] Corporation...This Agreement shall automatically terminate without any action on the part of any person and be void *ab initio* if the Stock Purchase Agreement is terminated in accordance with its terms…" Ex 18, Sec. 1. This language was consistent with the Term Sheet also being negotiated in January 2015, which contemplated that Mr. Fitzhugh would become a Sabre employee after Sabre purchased CF. Ex 2, Sec. 4(a); Trans 42:24-43:4, 45:17-46:5.

d. The first draft of the Employment Agreement also provided that Mr. Fitzhugh would receive a signing bonus of $125,000, and would be paid an annual salary of $300,000. Ex 18, Sec. 4 & 7. It further identified the circumstances under which a severance equal to that annual salary would be paid to Mr. Fitzhugh. *Id.* at Sec. 5(a).

e. The parties exchanged multiple drafts of the Employment Agreement between January 7 and 15, 2015, and each draft reflected changes to the definitions of "cause" for termination, "good reason" for resignation, and the conditions upon which the signing bonus would be returned, and the severance would be paid. Exs 20, 21, 22, 24, 26 & 27.

f. The parties agreed upon the final version of the Employment Agreement on January 15, 2015, Ex 4, but it was not executed at that time because Sabre had not yet purchased the assets of CF, and Mr. Fitzhugh had not yet become a Sabre employee. Trans 59:10-60:3, 244:6-18. The Term Sheet contemplated that those events would occur no later than 75 days after its execution. Ex 2, Sec. 9(a).

g. It is a stipulated fact that CF and Sabre/MUTI executed the Term Sheet on or about February 3, 2015. Dkt 126, Sec. 4(A)(9).

h. After executing the Term Sheet, Sabre President of Telecom Doug Huff informed CF that Sabre wanted to restructure the deal as an LOA.[11] Trans 63:14-65:4; Glossary, ¶ 18. The LOA Mr. Huff proposed was much more than what the Term Sheet contemplated. Trans 65:5-8.

i. In response to that news, Mr. Fitzhugh prepared a "thought document" identifying the parties' mutual obligations during the LOA. *Id.* 65:9-66:9, 67:18-68:5. His draft document included the requirement "Sabre to execute Fitzhugh's employment agreement, agreement to include one addendum—'Resignation for Good Reason' to include Sabre not completing the acquisition of CF per the Term Sheet stipulations." Ex 41, p 3 (Fitzhugh Employment Agreement). Mr. Fitzhugh proposed the term because the LOA required him to become a Sabre employee sooner than contemplated under the Term Sheet. Trans 69:5-13.

j. The first draft of the LOA prepared by Sabre accepted that proposal. *See* Ex 45, Sec. 4(c)("Jon Fitzhugh's employment agreement will have a provision for 'resignation for good reason' that may be executed upon the termination of the LOA").

k. The CF Board of Directors would not approve the LOA without first reaching an agreement regarding the Employment Agreement. Trans 259:19-25.

l. CF believed the Employment Agreement was effective the day Mr. Fitzhugh became a Sabre employee. *Id.* at 257:13-23.

---

[11] Sabre appeared to suggest on cross examination that Mr. Huff did not have authority to bind Sabre to the LOA. *See, e.g,* Trans 192:4-15. This suggestion is contradicted by evidence that Sabre was aware Mr. Huff was negotiating the LOA and neither terminated his authority nor informed CF that he had none, *see, e.g.,* Ex 46; that Sabre signed the LOA after Mr. Huff was terminated; and, after execution, frequently asked Mr. Huff to explain the LOA's terms. *See, e.g.,* Ex 66, p 2; Ex 67.

m. Secs. I(A)(1)(h) and (j), and I(A)(2)(a) above are incorporated herein.

n. After the LOA was executed and Mr. Fitzhugh became a Sabre employee, Sabre repeatedly led Mr. Fitzhugh to believe that it would execute the Employment Agreement. Ex 60; Trans 98:25-100:17. Even after Sabre CEO Peter Sandore informed Mr. Fitzhugh that he would not sign the Employment Agreement, Sabre President of Business Development Tony Sabatino promised that it would be performed. Ex 67; Trans 101:5-15,104:19-106:23; Glossary, ¶¶ 33 & 36.

o. Sec. I(A)(1)(l) above is incorporated herein.

p. Mr. Fitzhugh assigned his right to the $125,000 signing bonus under the Employment Agreement to CF. Trans 61:17-62:2.

2. <u>Element 2: Performance by Mr. Fitzhugh</u>

a. Mr. Fitzhugh resigned his employment with CF and accepted employment with Sabre as its Executive Vice President of the DAS and Small Cell Product Segment. Ex 4, ¶ 3; Trans 106:24-107:4.

b. Sabre employed Mr. Fitzhugh as its Executive Vice President of the DAS and Small Cell Product Segment and paid him the salary identified in the Employment Agreement. *See* Ex 4, ¶¶ 3 & 4; Trans 106:24-107:10.

3. <u>Element 3: Failure to Perform Contract by Sabre</u>

a. Sabre did not pay the signing bonus required by the Employment Agreement. Ex 4, ¶ 7; Trans 107:11-14.

b. Sabre did not pay the severance upon termination of the LOA. Ex 4, ¶¶ 4 & 5; Trans 121:8-17.

4. <u>Element 4: Damages Suffered by CF as a Result of Sabre's Breach</u>

a. The amount of the signing bonus Sabre failed and refused to pay was $125,000. Ex 4, ¶ 7.

b. The amount of the severance Sabre failed and refused to pay was $300,000. *Id.* at ¶¶ 3 & 4.

**B. Conclusions of Law**

*Baumann*, 2012 WL 122850 at *4, again sets forth the elements of this claim. With respect to the first element, a contract is formed in Colorado when one party makes an offer, the other accepts it, and the agreement is supported by consideration. *Bovino v. Amazon.com, Inc.*, No. 13-cv-0211-MSK0-MJW, 2015 WL 1361269, at *2 (D. Colo. Sept. 15, 2015)(citing *Sumerel v. Goodyear Tire & Rubber Co.*, 232 P.3d 128, 133 (Colo. App. 2009)). "A benefit to the promisor or a detriment to the promisee, however slight, can constitute consideration." *Clowdis v. Colorado Hi-Tec Moving & Storage, Inc.*, No. 11-cv-00036-CMA-KMT, 2011 WL 5882191, at *8 (D. Colo. Nov. 3, 2011), *report and recommendation adopted*, 2012 WL 895701 (D. Colo. Mar. 15, 2012). The Court finds that the Employment Agreement was a valid contract, the terms of which were accepted on January 15, 2015, and subsequently modified by the LOA on March 13, 2015. Both Mr. Fitzhugh and Sabre provided consideration for the agreement through performance.

Sabre contends that there was no agreement because of its void *ab initio* language. However, that provision was modified by both the changed circumstances and the express language of the LOA. *See United States v. Santa Fe Engineers, Inc.*, 515 F.

Supp. 512, 515 (D. Colo. 1981)(mutual consent to modification may be either explicitly given or inferred from the parties' conduct). When the void *ab initio* language was accepted on January 15, 2015, the parties contemplated that Mr. Fitzhugh would become a Sabre employee after Sabre bought CF's assets. Mr. Fitzhugh became a Sabre employee immediately under the LOA. Additionally, the parties' negotiation of the LOA revealed their agreement that the Employment Agreement would be effective sooner—in initial drafts, the LOA required Sabre to execute the agreement upon termination of the LOA; in the final draft, the agreement was automatically terminated as "resignation for good reason" upon termination of the LOA. It is "well-settled law that the parties to a contract may, by mutual consent, alter all or any portion of the contract by agreeing upon a modification thereof. Where such a modification is agreed upon, the terms thereof govern the rights and obligations of the parties under the contract, and any pre-modification contractual rights which conflict with the terms of the contract as modified must be deemed waived or excused." *Joseph Brazier, Ltd. v. Specialty Bar Products Co.*, No. 06-cv-01416-WDM-KLM, 2008 WL 791942, at *7 (D. Colo. March 21, 2008)(citing *Caven v. American Fed. Sav. & Loan Assoc.*, 837 F.2d 427, 430 (10th Cir. 1988)). The void *ab initio* language was modified by the LOA.

The fact that Sabre never signed the Employment Agreement similarly does not foreclose the conclusion that the parties entered into an enforceable contract. *See Fortner v. Young*, No. 06-cv-02148-BNB-MEH, 2013 WL 791425, at *4 (D. Colo. Mar. 4, 2013); *see also Todd Habermann Constr., Inc. v. Epstein*, 70 F. Supp. 2d 1170, 1173 (D. Colo. 1999)(finding that parties' course of conduct established formation of contract

and that arbitration agreement which was not signed by parties was enforceable); *Griego v. Kokkeler,* 543 P.2d 729, 730 (Colo. App. 1975)(where there is a complete agreement, the fact certain formalities remain to be performed does not reduce the agreement to the status of mere negotiations).

Moreover, Sabre is equitably estopped from denying the validity of the Employment Agreement. To establish a claim of equitable estoppel, “the party to be estopped must know the facts and either intend the conduct to be acted on or so act that the party asserting estoppel must be ignorant of the true facts, and the party asserting estoppel must rely on the other party's conduct with resultant injury.” *Arenberg v. Cent. United Life Ins. Co.*, 18 F. Supp. 2d 1167, 1181 (D. Colo. 1998)(citing *Committee for Better Health Care for All Colorado Citizens by Schrier v. Meyer,* 830 P.2d 884, 891–892 (Colo.1992)). During the negotiations of the LOA and with the express language of that agreement, Sabre led CF to believe that the Employment Agreement would be effective as soon as Mr. Fitzhugh became a Sabre employee. Sabre then repeatedly promised to either execute or perform the Employment Agreement after Mr. Fitzhugh was its employee. CF had no way of knowing that Sabre did not intend to sign or perform, and relied upon Sabre’s representations to its detriment by entering the LOA. Under these circumstances, Sabre cannot now disavow the Employment Agreement through either the void *ab initio* provision or its refusal to execute the contract.

The remaining elements of this claim have been established by a preponderance of the evidence: Mr. Fitzhugh performed as required, but Sabre did not

to the extent it failed to pay the $125,000 sign-on bonus and $300,000 severance,[12] which resulted in $425,000 in damages to CF. *See DSCO, Inc. v. Warren*, 829 P.2d 438, 441 (Colo. App. 1991)(in breach of contract action, the measure of damages is the "benefit of the bargain").

## V. **CLAIM NO 2: Breach of Implied Covenant of Good Faith and Fair Dealing**

### A. Findings of Fact

1. Element 1: Existence of a Contract

   a. In November 2014, CF entered into a Consulting Agreement with Mr. Slattery under which CF was required to make monthly payments of $12,000 to Mr. Slattery during 2015. Trans 21:19-22:2.

   b. Secs. I(A)(1)(a), (b) and (e), and II(A)(1)(d) above are incorporated herein.

2. Element 2: Performance of LOA by CF

   a. Secs. I(A)(2)(a) and (b) above are incorporated herein.

3. Element 3: A Contract Term that Allowed for Discretion on the Part of Sabre, and Sabre Failed to Perform Consistent with the Parties' Reasonable Expectations

   a. The LOA provided that the $120,000 for the "Employee/Contractor" buyout would be paid "with scheduled payment amounts to be determined." Ex 3, Sec 3(c)(vii)(1). CF and Sabre agreed that the $120,000 would be paid in monthly installments of $12,000. Trans 108:12-18.

   b. Secs. II(A)(2)(b) and (c) above are incorporated herein.

[12] The $300,000 severance should not be awarded as damages to CF for breach of the Employment Agreement if it was previously awarded as a category of damages for breach of the LOA. *See* Sec. I(B) above.

c. Sabre made the March and April 2015 payments on May 5, 2015 after informing CF that it did not intend to ever make them and suggested letting CF go into bankruptcy. Trans 109:20-110:14.

d. Sabre never paid the $12,000 due in May 2015. Amended Complaint [Dkt 68], ¶ 33; Dkt 70, Answer ¶ 33; Trans 109:3-5.

4. <u>Element 4: Resulting Damages to CF</u>

a. Sabre knew CF did not have the money to make the monthly payments due to Mr. Slattery under his Consulting Agreement. Trans 66:10-15, 483:6-12, 495:2-21, 506:13-16.

b. Without timely payments from Sabre, CF was unable to make the monthly payments due to Mr. Slattery under the Consulting Agreement. *Id.* at 109:6-9.

c. Mr. Slattery threatened to sue CF after his March and April payments were late and he had not received a May payment. Ex 80.

d. CF informed Sabre of the demand letter it had received from Mr. Slattery no later than May 9, 2015. Trans 116:18-23.

e. CF and Sabre discussed responding to Mr. Slattery's demand letter by buying out his Consulting Agreement. *Id.* at 117:2-14, 118:22-119:7; Ex 83.

f. Mr. Slattery sued CF for breach of his Consulting Agreement. Trans 319:16-24.

g. CF incurred $74,000 in attorney fees and costs responding to Mr. Slattery's lawsuit. *Id.* at 319:25-320:5, 321:22-25.

**B. Conclusions of Law**

The elements of a breach of good faith and fair dealing claim are set forth in *Bolsa Res., Inc. v. AGG Res., Inc.*, No. 11-cv-01293-MSK-KMT, 2011 WL 6370409, at *3 (D. Colo. Dec. 20, 2011)(citing *Western Distrib.*, 841 P.3d at 1057)). The duty of good faith and fair dealing is implied into every contract in order to effectuate the intentions of the parties or to honor their reasonable expectations, and applies when one party has discretionary authority to determine certain terms of the contract, such as quantity, price, or time.[13] *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995). The duty applied to the LOA provisions permitting Sabre to pay the $120,000 toward the "Employee/Contractor" buyout either as a lump sum in March 2015, or in monthly installments of $12,000. Sabre breached the duty when it failed to perform under either schedule.[14]

Sabre's failure to make the payments led to predictable results: CF could not make the payments due to Mr. Slattery under his Consulting Agreement, so Mr. Slattery sued CF for breach of his Consulting Agreement. When the natural and probable

---

[13] Sabre argued in its dispositive motion that CF's claim for breach of the implied covenant of good faith and fair dealing is barred by the economic loss rule. The Court rejected that argument when it ruled on the motion, and it rejects it again now. Breach of the implied covenant of good faith and fair dealing is not a tort claim. Rather, breach of this implied covenant is a contract claim that bars overlapping tort claims under the economic loss rule; it is not itself a claim that is barred by that rule. *Top Rail Ranch Estates LLC v. Walker*, 327 P.3d 321, 329 (Colo. App. 2014)(citing *Jorgenson v. Colorado Rural Props, LLC*, 226 P.3d 1255, 1259 n3 (Colo. App. 2010), and *Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282, 293-294 (Colo. App. 2009)); *see also City of Golden v. Parker*, 138 P.3d 285, 292 (Colo. 2006)("A violation of the duty of good faith and fair dealing gives rise to a claim for breach of contract").

[14] Sabre's affirmative defense of failure to perform conditions precedent fails for the reasons previously stated. *See* Secs. I(B) and II(B) above.

consequence of a wrongful act has been to involve plaintiff in litigation with others, the general rule is that the reasonable expenses may be recovered from the wrongdoer. *Elijah v. Fender*, 674 P.2d 946, 951 (Colo. 1984). CF incurred $74,000 in fees and costs defending the claims Mr. Slattery asserted, and those expenses may be recovered from Sabre for its breach of the duty of good faith and fair dealing. The fact that CF asserted counterclaims against Mr. Slattery in that action does not change this result. *See id.* (the wrong of another doctrine does not require a party to be a defendant in the prior litigation because a party may be placed in a position of having to bring suit as plaintiff to defend his rights); *see also Rocky Mountain Festivals, Inc. v. Parsons Corp.*, 242 P.3d 1067, 1071 (Colo. 2010).

## VI. <u>CLAIM NO 3: Breach of Fiduciary Duty</u>

### A. Findings of Fact

1. <u>Element 1: Sabre was a Fiduciary of CF</u>

    a. Secs. I(A)(1)(f) and (h), and I(A)(2)(a) and (b) above are incorporated herein.

2. <u>Element 2: Sabre Breached a Fiduciary Duty to CF</u>

    a. Sabre anticipated no later than April 15, 2015 that it would "kill this thing if by June 1—Revenue is not offsetting a substantial amount of costs." Ex 65.

    b. Despite this intention, Sabre asked CF to provide its confidential information to the joint venture. *See, e.g.,* Ex 79 ("We are being asked to, and understandably so, begin transferring all of our existing customer accounts . . ."); Trans 114:17-115:11.

    c. Sec. V(A)(4)(d) above is incorporated herein.

d. Sabre continued to ask CF to provide its confidential information to the joint venture. *See, e.g.,* Ex 82 ("Has Tom been given (Tom please confirm) all the pricing, drawings and needs for the below projects").

e. Internally, Sabre gathered information about what intellectual property CF had that it did not. Ex 84.

f. Sabre's Senior Vice President of its Small Cell/DAS Total Solutions division, Patrick Cochran, communicated with CF customers in an attempt to secure their business. *See, e.g.,* Ex 84 ("The markets he thinks he has are dealing direct with us").

g. Sec. I(A)(1)(l) above is incorporated herein.

h. Sabre told CF it terminated the LOA because of Mr. Slattery's demand letter. Trans 120:17-22.

3. <u>Element 3: CF Incurred Damages as a Result</u>

a. Sec. III(A)(3)(b) through (f) above and VII(A)(2)(b) below are incorporated herein.

**B. Conclusions of Law**

The elements of a breach of fiduciary duty claim are set forth in *Brecheisen v. Banner Res.,* No. 15-cv-01184-CMA-MEH, 2016 WL 7868821, at *6 (D. Colo. June 24, 2016)(citing *Graphic Directions, Inc. v. Bush*, 862 P.2d 1020, 1022 (Colo. App. 1993)). With respect to the first element, existence of a fiduciary duty, the Court finds that Sabre owed a fiduciary duty to CF because the parties were joint venturers under the LOA. *See Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 619 (Colo. 1999)("A joint venture exists when there is: (1) a joint interest in property; (2) an express or implied

agreement in profits or losses of the venture; and (3) actions and conduct showing joint cooperation in the venture"). "Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Lindsay v. Marcus*, 325 P.2d 267, 270-271 (Colo. 1958)(quoting *Meinhard v. Salmon*, 164 N.E. 545, 546 (NY Ct. App. 1928)).

Where, as here, one member of a joint venture surreptitiously acts to acquire the subject of the venture to the exclusion of the other, it breaches its fiduciary duty. *McCrea & Co. Auctioneers, Inc. v. Dwyer Auto Body*, 799 P.2d 394, 397-398 (Colo. App. 1990). The evidence establishes that Sabre intended to terminate the LOA, but did not inform CF of that intention. Instead, Sabre gathered all the information it could regarding CF's intellectual property and customer contacts so that it could compete with CF for those customers using CF's intellectual property. Sabre's conduct in this respect breached the NDA and violated the Colorado Uniform Trade Secrets Act. *See* Secs. III above and VII below. The Court finds that Sabre's conduct was also contrary to its fiduciary duties as a joint venturer. The damages sustained by CF as a result of Sabre's breach of fiduciary duty are the same as those for Sabre's misappropriation of trade secrets. Sec. VII(B) below is incorporated herein; *see also* CJI Civil 26:5 (economic losses which plaintiff has had or will probably have in the future, including anything of value or profit the defendant is measure of damages in breach of fiduciary duty case).

## VII. CLAIM NO 4: Misappropriation of Trade Secrets

### A. Findings of Fact

1. Element 1: CF Possessed a Valid Trade Secret

   a. Sec. III(A)(1)(e)-(k) above are incorporated herein.

2. Element 2: Sabre Used the Trade Secret Without Consent

   a. Sec. III(A)(3)(c)-(f) above are incorporated herein.

   b. Ex 142, which includes photographic evidence that Sabre has used CF's cantenna sleeve, was not disclosed to CF until March 7, 2018, less than two weeks before trial.

3. Element 3: Sabre Knew, or Should Have Known, that the Trade Secret Was Acquired by Improper Means

   a. Sec. III(A)(1)(a), (b), (c), (e) and (f) above are incorporated herein.

### B. Conclusions of Law

The elements of a misappropriation of trade secrets claim pursuant to the Colorado Uniform Trade Secrets Act, C.R.S. §§ 7-74-101 to 110, are set forth in *Innovatier, Inc. v. CardXX, Inc.*, No. 08-cv-00273-PAB-KLM, 2011 WL 3293789, at *2 (D. Colo. Aug. 1, 2011)(citing *Gates Rubber Co. v. Bando Chem. Indus., Ltd*, 9 F.3d 823, 847 (10th Cir. 1993). A "trade secret" is defined broadly to include all or part of virtually any information that is of value, whether it be in the nature of scientific, technical, business, financial or professional information, so long as the owner has taken measures to prevent it from becoming available beyond those to whom it has given limited access. *Gognat v. Ellsworth*, 259 P.3d 497, 501 (Colo. 2011)(citing C.R.S. § 7-74-102(4)). The Court finds that CF's bracket cantenna sleeve is a trade secret

because it was unique and proprietary to CF, Sabre did not have its own version of that product before the LOA, and CF sought to prevent Sabre from using it by entering into a NDA prohibiting the use of “confidential information,” including trade secrets, for any purpose other than evaluating a prospective business relationship between the parties.

The second element of the claim has similarly been established by evidence that Sabre used CF’s cantenna sleeve to fulfill one order for Cincinnati Bell and at least one other order for an unknown customer. Its use was not authorized by the NDA, and CF notified Sabre that it did not have consent to use the sleeve when it sent a cease and desist letter. Additionally, Sabre knew or should have known that its acquisition of the cantenna sleeve for competitive purposes was improper because the NDA prohibited it from using any of CF’s confidential information for any purpose other than evaluating a prospective business relationship with CF. *See* C.R.S. § 7-74-102(1)(“improper means” includes “breach or inducement of a breach of a duty to maintain secrecy”).

To the extent Sabre argues it is entitled to use CF’s cantenna sleeve under the LOA provision permitting competition regarding “pole capabilities and designs,” Ex 3, Sec 4(3)(iii)(4), the Court rejects that contention. The Court finds that a “pole” is not the same thing as a device that attaches to a pole.[15] To find otherwise would permit Sabre to use everything it learned during the LOA to compete with CF on all of CF’s product lines when the LOA provision was specifically limited to “pole capabilities and designs.”

[15] CF also did not market its cantenna sleeves as poles. *See* Ex 147 (“Universal Cantenna Sleeve” and “Integrated & Engineered Poles” marketed as separate products).

*See Burr*, 2012 WL 3640702, at *3 (rules of contract interpretation require court to give each word in an instrument meaning if at all possible, and to avoid an absurd result).

The unrebutted evidence presented at trial established that Sabre sold CF's cantenna sleeve to at least one customer other than Cincinnati Bell, Ex 142, p 6, and has continued doing so through the present. Trans 147:5-9. Pursuant to C.R.S. § 7-74-104(1), "the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a [defendant's] unauthorized disclosure or use of a trade secret." Under this rule, the amount of royalties is determined on the basis of the volume of defendant's actual sales of trade secret product; the defendant need not have actually turned a profit on that product. *Computer Assoc's Intern., Inc. v. American Fundware, Inc.*, 831 F. Supp. 1516, 1527 (D. Colo. 1993). Determination of a reasonable royalty is simplified in cases where there is already a royalty agreement in place from which a court might legitimately determine the value which the parties themselves actually assigned to the misappropriated information. *Id.* Here, the parties agreed in the LOA that Sabre would get 45 percent of the EBITDA generated by the CFG entity and CFG would keep 55 percent. Ex 3, Sec.3(d)(ii).The Court finds that 55 percent is a reasonable royalty due from Sabre to CF on the revenue it received selling CF's cantenna sleeve.[16]

[16] The Court finds that the LOA provision requiring Sabre to remit just 20 percent of its EBITDA to CF would be an unreasonably low measure for reasonable royalties. Ex 3, Sec 3(d)(i) & Ex 2, Sec 2(i). Sabre should not be permitted to keep the majority of revenues received from its improper sales of CF's cantenna sleeve because such a result would reward and incentivize misappropriation.

Evidence regarding the amounts Sabre has received from using CF's cantenna sleeve was not available to CF at the time of trial. Accordingly, the Court orders that Sabre disclose all sums it has received from any and all purchase orders that included a cantenna sleeve from June 3, 2015 through the present. *See Smith v. Rogers Galvanizing Co.*, 148 F.3d 1196, 1197-1198 (10th Cir. 1998)(district court has broad discretion to reopen case to accept additional evidence). CF shall be entitled to 55 percent of those revenues, regardless of whether Sabre turned a profit, as reasonable royalties for Sabre's misappropriation of CF's trade secret.[17]

## VIII. CLAIM NO 5: Tortious Interference with Contractual Relationship

### A. Findings of Fact

1. Element 1: CF Had a Contract with Another Party

   a. CF had either express or implied contracts with its vendors to pay for the products they provided to CF. *See, e.g.*, Ex 104, p 3.

2. Element 2: Sabre Knew or Should Have Known of the Contract

   a. Sec. I(A)(1)(g) above is incorporated herein.

   b. CF submitted invoices from its vendors to Sabre for payment during the LOA. Ex 85.

3. Element 3: Sabre Intentionally Induced the Other Party to the Contract Not to Perform the Contract

[17] CF's damages for Sabre's misappropriation of its trade secrets also include the $35,950 CF lost when Sabre fulfilled the Cincinnati Bell order using CF's products. *See* Sec. III(A)(4)(a) above; *see also* C.R.S. § 7-74-104(1)(damages for misappropriation also include actual loss caused by the misappropriation). To the extent this sum has not already been awarded for Sabre's breach of the NDA, it should be awarded here.

a. Sabre knew that its refusal to pay the invoices from CF vendors would cause those vendors not to ship additional products to CF. Ex 104 &106; Trans 467:21-468:1.

b. Sec. I(A)(3)(a) above is incorporated herein.

4. <u>Element 4: Sabre's Actions Caused CF to Incur Damages</u>

a. Sec. I(A)(4)(a) & (b) above are incorporated herein.

**B. Conclusions of Law**

The elements of a tortious interference with contractual relations claim are set forth in *Telluride Real Estate Co. v. Penthouse Affiliates, LLC*, 996 P.2d 151, 155 (Colo. App. 2000)(citing *Memorial Gardens, Inc. v. Olympian Sales & Mgmt. Consultants, Inc.*, 690 P.2d 207 (Colo. 1984)). The Court finds that the first two elements of the claim were established by a preponderance of the evidence because CF submitted its vendors' invoices to Sabre during the LOA, which required Sabre to fund the working capital of Sabre EPG. The Court further finds that Sabre knew its failure and refusal to pay those invoices as required by the LOA would result in the vendors refusing to do further business with CF. Sabre was advised by more than one vendor that non-payment would result in a "credit hold" on CF, Ex 106, and leave CF unable to order any other products, Ex. 104. Sabre's insincere response to that information was, "That's a shame. I hate that they won't be able to order anything." Ex 104. Thus, Sabre intentionally failed and refused to pay the outstanding invoices—despite its responsibilities under the LOA—in order to induce the vendors to cease doing business with CF. CF sustained $66,897.54

in damages when it was required to pay the vendors after Sabre failed and refused to do so.[18]

## IX. CLAIM NO 6: Tortious Interference with Prospective Business Relations

### A. Findings of Fact

1. Element 1: Sabre Knew CF Had a Prospective Business Relationship

a. Sabre knew that CF did not have sufficient funds to operate. *See, e.g.,* Ex 44; Trans 422:15-17, 424:9-25; Ex 46.

b. Sabre was informed that CF would have to find financing if a deal with Sabre was not consummated. *See* Ex 41 ("I think I can push this through fairly quickly on my end, but it likely needs to happen soon else I may have to disengage and go back to raising equity financing again"); Ex 44 ("Unfortunately, given the company's position, I'm at the point where I have to make a go/no-go decision with Sabre based on the likelihood of a deal/financing executing this week").

c. Sabre knew that CF had "significant customer penetration at key accounts, including CCI" a/k/a Crown Castle. Ex 2, p 1; *see also* Exs 96 & 146 (orders from Crown Castle received during LOA).

2. Element 2: Sabre Intentionally Interfered with CF's Prospective Business Relationship

a. Sabre knew that CF's only asset was its intellectual property. Trans 516:8-14.

b. Stipulated Facts 17, 18, 20, 21, 22 and 23 are incorporated herein. Dkt 126, Sec. IV(A)(17), (18), (20), (21), (22) & (23).

---

[18] This sum should not be awarded a second time if already awarded for breach of the LOA. *See* Sec. I(B) above.

c. Sabre recorded an invalid UCC-1 Financing Statement against CF's intellectual property, and refused to release it for nearly two years. *See* Order Granting Plaintiff's Motion for Partial Summary Judgment and Granting in Part Defendant's Motion for Partial Summary Judgment, Dkt 129, Sec. III(A)(1), which is incorporated herein.[19]

d. On at least three occasions, investors declined to invest in CF because of Sabre's invalid lien against CF's only asset. Trans 273:6.

e. Sabre knew that, without financing to fulfill orders, large companies would refuse to do business with CF. *Id.* at 383:5-15; 136:20-25.

3. Element 3: Without Interference, there was a Reasonable Likelihood the Contract Would Have Resulted

a. Crown Castle submitted a purchase order with a value of $1.2 million to CF in 2015. *Id.* at 137:20-24.

4. Element 4: Sabre's Actions Caused CF to Incur Damages

a. One investor ultimately declined to invest in CF because of Sabre's invalid lien. *Id.* at 273:7-13. The amount of the investment lost was $3 million. *Id.* at 273:14-15.

b. After CF struggled to fulfill the $1.2 million purchase order from Crown Castle because of its inability to obtain financing, Crown Castle has not submitted large orders to CF. *Id.* at 136:20-137:19. Orders from Crown Castle are now less than $500,000 a year. *Id.* at 137:25-138:3.

---

[19] Generally, the law of the case doctrine dictates that prior judicial decisions on rules of law govern the same issues in subsequent phases of the same case. *Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1224 (10th Cir. 2007).

**B. Conclusions of Law**

*Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1122 (10th Cir. 2008)(citing *Klein v. Grynberg*, 44 F.3d 1497, 1506 (10th Cir. 2995)) identifies the elements for a tortious interference with prospective business relationship claim. The Court finds that Sabre tortiously interfered with CF's ability to obtain the financing it needed to conduct business by recording an invalid lien against CF's intellectual property. A UCC-1 Financing Statement is a method of giving notice of the existence of a security interest created by a security agreement, the purpose of which "is to put third parties—usually prospective buyers or lenders—on notice that there may be an enforceable security interest" in the debtor's property. *United States v. Beach*, 228 Fed. Appx. 816, 819 n1 (10th Cir. 2007)(quoting *In re Biloxi Casino Belle, Inc. v. First Trust Nat'l Ass'n*, 368 F.3d 491, 499 (5th Cir. 2004)). Thus, Sabre knew its lien would discourage other parties from investing in, or loaning to CF based on Sabre's public (mis)representation that it had a valid security interest in CF's only asset. Moreover, Sabre's decision to interfere in this manner was intentional—Sabre refused to release its lien after CF demanded that it do so, and even after CF filed this lawsuit seeking a declaratory judgment that the lien was invalid.

CF identified two specific opportunities that were lost as a result of the lien: an investment by Strength Capital, and large purchase orders from CCI. Lost profits and lost investment value are an appropriate measure of damages for claims of tortious interference. *Tax Servs of Am., Inc. v. Mitchell*, No. 07-cv-00249-REB-KLM, 2009 WL 464679, at *2 n1 (D. Colo. Jan. 13, 2009); *see also* C.R.S. § 4-9-625(b)("A person is

liable for damages in the amount of any loss caused by a failure to comply with [the Uniform Commercial Code]. Loss caused by a failure to comply may include loss resulting from the debtor's inability to obtain, or increased cost of, alternative financing"). As a result of Sabre's tortious interference with CF's ability to obtain financing, CF lost a $3 million investment opportunity. And, because CF could not obtain financing from Strength Capital or anyone else as a result of Sabre's lien, CF could not fulfill large orders for customers, including one from Crown Castle. CF now receives considerably less business from Crown Castle, resulting in at least $500,000 in damages to CF. Additionally, the UCC permits a debtor to recover $500 in each case from a person that fails to cause the secured party of record to send a termination statement as required by C.R.S. § 4-9-513(a) or (c), C.R.S. § 4-9-625(e)(4), and reasonable attorney's fees and legal expenses, C.R.S. § 4-9-625(i).

## X. CLAIM NO 9: Fraud in the Inducement

### A. Findings of Fact

1. Element 1: Sabre Misrepresented/Concealed a Material Fact

    a. Secs. IV(A)(1)(a) through (n) above are incorporated herein.

2. Element 2: CF Justifiably Relied Upon the Misrepresentation

    a. The CF Board of Directors would never have approved the LOA if it believed Sabre would not execute the Employment Agreement. Trans 259:19-25.

    b. Secs. I(A)(2)(b) and IV(A)(1)(k) above are incorporated herein.

3. Element 3: Reliance Resulted in Damages to CF

    a. Secs. I(A)(1)(l) , IV(A)(3)(b) and IV(A)(4)(b) above are incorporated herein.

**B. Conclusions of Law**

The elements of a fraud in the inducement claim are set forth in *Kirzhner v. Silverstein*, No. 09-cv-02858-CMA-BNB, 2011 WL 4382560, at *9 (D. Colo. Sept. 20, 2011)(citing *J.A. Walker Co., Inc. v. Cambria Corp.*, 159 P.3d 126, 132 (Colo. 2007)). The Court finds that all elements of the claim were proven by a preponderance of the evidence. Specifically, during the negotiations of the LOA and with the express language of that agreement, Sabre led CF to believe that the Employment Agreement would be effective as soon as Mr. Fitzhugh became a Sabre employee. CF had no way of knowing that Sabre did not intend to sign or perform, and relied upon Sabre's representations to its detriment by entering the LOA. "One who suffers injury or loss by being fraudulently induced to enter into a contract may affirm the contractual agreement and seek recovery in tort for damages he suffered as a result of the fraudulent misrepresentations." *Club Matriz, LLC v. Nassi*, 284 P.3d 93, 96 (Colo. App. 2011)(citing *Western Cities Broad., Inc. v. Schueller,* 830 P.2d 1074, 1077 (Colo. App. 1991)).This includes "the value of the loss of the benefit of the claimant's bargain, *i.e.*, the difference between the value of benefits actually received under the contract and the value such benefits would have had if the false representations had been true." *Id.* The difference in value between the benefit CF actually received when Sabre terminated the LOA and what CF would have received had Sabre performed as promised is $300,000.[20]

[20] This sum should not be awarded again if previously awarded as a category of damages for breach of the LOA or breach of the Employment Agreement.

The Court rejects Sabre's affirmative defense of unclean hands for the same reasons it previously dismissed Sabre's counterclaim for fraudulent inducement, *i.e.*, CF did not make any misstatements of past or present fact that Sabre relied upon to its detriment. Dkt 129, Sec. III(A)(2).

## XI. CLAIM NO 10: Unjust Enrichment

CF withdraws its claim for unjust enrichment in light of Sabre's acknowledgement that the LOA is a binding contract.

## XII. COUNTERCLAIM NO 2: Unjust Enrichment

### A. Findings of Fact

1. Element 1: At the Expense of Sabre

a. Mr. Rossetti testified that Sabre incurred the cost of goods sold in connection with $381,958.57 in purchase orders. Ex 146, p 1; Trans 546:6-548:11.

b. In actuality, Sabre failed and refused to pay more costs than it did pay, and most of the costs it did pay were not attributable to any of the purchase orders. *See* Ex 146, p 2 ($33,242.08 of the $48,569.63 in costs Sabre claims it paid were for unattributed "Prod Supplies/Expense). Sec. I(A)(4)(a) above is also incorporated herein.

c. Also, Sabre incurred no costs whatsoever in connection with the vast majority of the purchase orders. *Compare* Ex 146, p 1 *with* Ex 146, pp 5-8; Trans 558:5-564:13.

d. Mr. Rossetti's testimony that Sabre fulfilled some $97,000 worth of purchase orders was contradicted by Ex 146, which identified just two purchase orders fulfilled by

Sabre and the remainder as "assumed CF invoiced and fulfilled." Trans 556:7-21. Mr. Rossetti then said Ex 146 "is not correct." *Id.* at 557:5-7.[21]

2. Element 2: CF Received a Benefit

a. Mr. Rossetti testified regarding his assumption that CF received and retained $381,958.47 in revenues from the purchase orders. *Id.* at 551:22-25.

b. However, Mr. Rossetti also testified that he did not know whether CF had received any payments. *Id.* at 557:13-18.

3. Element 3: Under Circumstances Making it Unjust for CF to Retain the Benefit Without Paying For It

a. The record is devoid of any evidence in support of this element.

**B. Conclusions of Law**

The elements of an unjust enrichment claim are set forth in *Harris Grp., Inc. v. Robinson*, 209 P.3d 1188, 1205 (Colo. App. 2009)(citing *Robinson v. Colo. State Lottery Div.*, 179 P.3d 998, 1007 (Colo. 2008)). Sabre seeks an award of $381,958.47 on the theory that it fulfilled orders for which CF received and retained the payments from customers, and it would be unfair for CF to keep the revenues because Sabre incurred the costs of goods sold in connection with those orders. Ex 146; Trans 544:16-22, 545:5-7. However, the reason Sabre believes it is entitled to these amounts is pursuant to the express terms of the LOA. Trans 549:13-23; Ex 3, Sec 3(c)(v). When an express contract applies between parties to litigation, Colorado law provides that an unjust

[21] This was not the first instance that Mr. Rossetti contradicted the work of other Sabre employees and its counsel during trial. He also said information provided in connection with Sabre's verified Responses and Objections to Plaintiff's Third Set of Written Discovery Requests to Defendants, Ex 114, was incorrect and/or irrelevant. Trans 472:14- 475:9.

enrichment claim that covers the same subject matter is prohibited, as a matter of law, because the express contract precludes any implied-in-law contract. *Greenway Nutrients, Inc. v. Blackburn*, 33 F. Supp. 3d 1224, 1261 (D. Colo. 2014)(citing *Interbank Invs., LLC v. Eagle River Water & Sanitation Distr.*, 77 P.3d 814, 816 (Colo. App. 2003)). The Court rejects Sabre's unjust enrichment claim accordingly.[22]

But even if the relief Sabre sought under an unjust enrichment theory was not already the subject of an express contract, the Court would reject the claim on its merits because Sabre did not actually incur costs in connection with the revenues it believes CF received. Thus, CF did not receive a benefit at the expense of Sabre. To the extent Sabre claims it paid the labor costs associated with the purchase orders, such costs were part of the working capital Sabre was required by the LOA to provide to Sabre EPG, in exchange for which Sabre received 80 percent of the EBITDA generated by Sabre EPG and exclusive ownership of any intellectual property developed by Sabre EPG during the LOA. Ex 3, Sec. 3(d)(i) & Sec. 4(d)(3); Ex 2, Sec. 2(a)(i); Ex 114, p 7, Response to Interrogatory No. 7. Thus, Sabre has already benefitted from its expenditure of payroll costs.

The Court also rejects Sabre's unjust enrichment claim because of its unclean hands, which includes, but is not limited to its breach of the duty of good faith and fair

---

[22] Any attempt by Sabre to collect the $608,966.69 it claims it paid pursuant to the LOA under an unjust enrichment theory is rejected for the same reason—Sabre cannot attempt to recover amounts through an implied-in-law contract when the terms of an express contract do not permit such recovery and, in fact, gave Sabre certain rights in exchange for the amounts it expended. *See* Ex 3, Sec. 3(d)(i) & Sec. 4(d)(3); Ex 2, Sec. 2(a)(i)(giving Sabre 80 percent of EBITDA on amounts generated by Sabre EPG, and exclusive ownership of intellectual property developed by Sabre EPG during LOA).

dealing in performing the LOA, *see* Sec. V above; its fraudulent inducement of CF to accept the LOA, *see* Sec. X above; its breach of fiduciary duty as a joint venturer of CF, *see* Sec. VI above; its misappropriation of trade secrets, *see* Sec. VII above; and its maintenance of an improper lien against CF's intellectual property for a period of nearly two years, Dkt 129, Sec. III(A)(1). Under the unclean hands doctrine, a party engaging in improper or fraudulent conduct relating in some significant way to the subject matter of the cause of action may be ineligible for equitable relief. *Whiting Oil & Gas Corp. v. Atlantic Richfield, Co.*, 321 P.3d 500, 508 (Colo. App. 2010)(citing *Premier Farm Credit, PCA v. W-Cattle, LLC*, 155 P.3d 504, 519 (Colo. App. 2006)). Sabre's conduct prevents it from receiving any equity from this Court.

## XIII. <u>COUNTERCLAIM NO 3: Trade Disparagement</u>

### A. Findings of Fact

1. <u>Element 1: CF Published a Statement with Intent to Harm</u>

a. The record is devoid of evidence that CF published a statement with either the intention that it would result in harm to Sabre, or knowing that the statement was false or in reckless disregard as to its truth or falsity.

2. <u>Element 2: Resulting Pecuniary Harm to Sabre</u>

a. The record is devoid of evidence of pecuniary harm to Sabre as a result of any statement made by CF to any third party.

### B. Conclusions of Law

The elements of a trade disparagement claim under Colorado law are identified in *Pfenninger v. Exempla, Inc.*, 116 F. Supp. 2d 1184, 1197 (D. Colo. 2000)(citing

*Teilhaber Mfg. Co. v. Unarco Materials Storage*, 791 P.2d 1164, 1166 (Colo. App. 1989) and Restatement (Second) of Torts § 623(A) (1976)). Sabre failed to meet its burden of proof with respect to its counterclaim for trade disparagement because it presented no evidence in support of any of the elements of the claim.

## XIV. <u>COUNTERCLAIM NO 6: Tortious Interference with Contractual Relations</u>

### A. Findings of Fact

1. <u>Element 1: Sabre Had a Contract with Another Party</u>

    a. The record is devoid of evidence that Sabre had a contract with a third party.

2. <u>Element 2: CF Knew or Should Have Known of the Contract</u>

    a. The record is devoid of evidence that CF knew or should have known that Sabre had a contract with a third party.

3. <u>Element 3: CF Intentionally Induced the Other Party to the Contract Not to Perform the Contract with Sabre</u>

    a. The record is devoid of evidence that CF intentionally induced the other party to the contract not to perform its contract with Sabre.

4. <u>Element 4: CF's Actions Caused Sabre to Incur Damages</u>

    a. The record is devoid of evidence that CF caused Sabre any damages.

### B. Conclusions of Law

The elements of a tortious interference with contractual relations claim under Colorado law are identified in *Telluride Real Estate Co.*, 996 P.2d at 155 (Colo. App. 2000). Sabre failed to meet its burden of proof with respect to its counterclaim for trade disparagement because it presented no evidence in support of any of the elements of the claim.

**FINAL ORDER AND JUDGMENT**

Based on the foregoing, the Court hereby ORDERS AND DECREES as follows:

A. Final judgment shall, and hereby does, enter in favor of CF and against Sabre and MUTI, jointly and severally:

1. In the amount of $300,000, for breach of the LOA and/or Employment Agreement and/or fraud in the inducement;
2. In the amount of $66,897.54, for breach of the LOA and/or tortious interference with contractual relationship;
3. In the amount of $125,000, for breach of the Employment Agreement;
4. In the amount of $74,000, for breach of the implied covenant of good faith and fair dealing;
5. In the amount of $35,950, for breach of the NDA and/or misappropriation of trade secrets and/or tortious interference with contractual relationship; and
6. In the amount of $3,500,500 for tortious interference with prospective business relationships;

B. Within fourteen (14) days of this Order, Sabre and MUTI shall disclose all sums they have received from any and all purchase orders that included a cantenna sleeve from June 3, 2015 through the present, and CF shall be entitled to 55 percent of those revenues, regardless of whether Defendants turned a profit, as reasonable royalties for Defendants' misappropriation of CF's trade secret, which the Court will enter as a supplemental judgment against Defendants, jointly and severally;

C. CF shall submit a motion supported by affidavit for recovery of its attorney fees within fourteen (14) days of this Order, and the Court will enter a supplemental judgment against Defendants, jointly and severally, awarding reasonable attorney fees for their breach of the NDA and pursuant to C.R.S. § 4-9-625(i);

D. Defendants shall be entitled to a credit of $112,731.26 on the judgment entered against them;

E. CF is the prevailing party in this matter, and is entitled to an award of its costs pursuant to Fed.R.Civ.P. 54(b). CF shall submit its Bill of Costs in the time and manner described by D.C.COLO.LCivR 54.1; and

F. Pre- and post-judgment interest on this and any supplemental judgment shall accrue at the rate of ___ percent per annum, compounded annually, pursuant to 28 U.S.C. § 1961.

DONE AND SIGNED THIS __ day of ______________, 2018

BY THE COURT:

_______________________________________
CHRISTINE M. ARGUELLO
United States District Judge

Dated: June 1, 2018.

Respectfully submitted,

*s/Angela D. DeVine*
Thomas M. Haskins III
Martin D. Beier
Angela D. DeVine
S&D Law
1801 York Street
Denver, CO 80206
Phone: (303) 399-3000
FAX: (303) 399-2650
haskinst@s-d.com
beierm@s-d.com
devinea@s-d.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I certify that on June 1, 2018 a true and correct copy of **[PLAINTIFF'S PROPOSED] FINDINGS OF FACT AND CONLCUSIONS OF LAW, ORDER AND FINAL JUDGMENT** was served via email to the following:

Jeana L. Goosmann
Elizabeth Lally
Goosmann Law Firm, PLC
410 5th Street
Sioux City, IA 51101

*s/Carol Christman*

GW653902