**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-01793-CMA-KLM

CONCEALFAB CORPORATION, a Colorado corporation,

Plaintiff,

v.

SABRE INDUSTRIES, INC., a Delaware corporation AND MIDWEST UNDERGROUND TECHNOLOGY, INC., an Illinois corporation,

Defendants.

---

# DEFENDANTS' POST-TRIAL BRIEF AND PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

Defendants Sabre Industries, Inc. and Midwest Underground Technology, Inc. ("MUTI") (collectively, "Sabre"), hereby submit this Post-Trial Brief and Proposed Findings of Fact and Conclusion of Law:

## I. Sabre's Proposed Findings of Fact Common to Multiple Claims

### A. Background and General Facts

Sabre has been in the telecom business for 40 years. (Trial Transcript volume 3, 487:20-22, March 28, 2018.)[1] Sabre has many different divisions and business lines in the telecom industry, and seeing a need to diversify into the small cell, distributed antennae system ("DAS") and outdoor distributed antennae system ("oDAS") segments

[1] Sabre is a Delaware corporation with a principal place of business in Alvarado, Texas. (*Id.*) MUTI, a wholly-owned subsidiary or division of Sabre, is an Illinois corporation with a principal place of business in Champaign, Illinois. (*Id.*)

of the telecom market, Sabre's parent company acquired 180 Logistics, LLC ("180 Logistics"), which is a company that engineered and manufactured products to support the small cell DAS and oDAS market segments, in April 2014. (Trial Transcript volume 2, 363:18-25; 364:1-2, March 27, 2018; Trial Tr. vol. 3, 487:24-25; 488:1-14.) Like 180 Logistics, ConcealFab ("CF") engineers products for the small cell DAS and oDAS segments of the telecom market (ECF No. 126, p. 8.) In 2014, CF approached Sabre and the Parties began discussions regarding the potential to combine the two businesses. (*Id.*) Sabre saw this potential opportunity as a way to expand its presence in the DAS / oDAS market. (Trial Tr. vol. 3, 487:24-25; 488:1-14; 489:20-24; 490:2-5.) Unbeknownst to Sabre, CF was struggling to stay afloat financially. (Tr. Ex. 122, p. 1, ¶¶3, 6.)

Mr. Peter Sandore ("Sandore") is the former CEO and President of Sabre and current Chairman of the Board. (Trial Tr. vol. 3, 482:3-7.) Mr. Timothy Rossetti ("Rossetti") is Sabre's CFO, Chief Administrative Officer and Executive Vice President. (Trial Tr. vol. 3, 420:12-21.) Mr. Patrick Cochran ("Cochran") is a Senior Vice President of Sabre. (Trial Tr. vol. 2, 335:8-9.) In 2015, Mr. Cochran was Sabre's Vice President for Engineering Solutions. (Trial Tr. vol. 2, 335:10-11.) Mr. Douglas Huff ("Huff") is the former President of Sabre's telecom division. (Trial Transcript volume 1, 25:1-3, March 26, 2018.)

CF was founded by Mr. Michael Slattery ("Slattery").[2] (Trial Tr. vol. 1, 16:11-13.) Mr. Jonathan Fitzhugh ("Fitzhugh") is a shareholder and CEO of CF and a member of its Board of Directors ("Board"). (Tr. Ex. 9; Trial Tr. vol. 1, 5:15-20.) Mr. Fitzhugh has been CF's CEO since March 2013. (Trial Tr. vol. 1, 5:25; 6:1.)

---

[2] CF is a Colorado corporation with a principal place of business in Colorado Springs, Colorado. (ECF No. 126, p. 8.)

At all relevant times, Mr. Chris Odell ("Odell") was on CF's Board. (Trial Tr. vol. 1, 56:11-13; 164:17-20.) Mr. Richard Denton is a CF shareholder, both a current and former member of its Board, and served as the sole member of CF's Special Litigation Committee. (Tr. Ex. 102; Trial Tr. vol. 2, 310:13-24; 311:21-25; 312:1-9.)

**B. The Term Sheet**

From November 2014 to February 2015, CF and Sabre exchanged drafts of a Term Sheet outlining the key terms from which a definitive agreement to combine the two entities could be developed. (ECF No. 126, p. 8.) Mr. Fitzhugh negotiated the Term Sheet with Mr. Huff. (Tr. Exs. 10, 11, 13, 14, and 33; Trial Tr. vol. 1, 25:1-3, 9-13; 26:16-25; 33:2-7; 34:4-8.) CF and Sabre executed the Term Sheet on or about February 3, 2015. (Tr. Ex. 2, p. 6; Tr. Ex. 35; ECF No. 126, p. 8.) Mr. Sandore signed the Term Sheet on behalf of Sabre and Mr. Fitzhugh signed on behalf of CF. (Tr. Ex. 2, p. 6.)

**C. The Licensing Operating Agreement**

After the Term Sheet was executed, it became clear CF needed significant cash to continue its operations. (Tr. Exs. 55 and 102, p. 3-4; Trial Tr. vol. 2, 325:15-18; 326:22-24; Trial Tr. vol. 3, 485:17-25; 486:1-18.) Hoping to keep CF viable through a due diligence period and to make the new relationship work, the Parties negotiated and signed a Licensing Operating Agreement ("LOA") that would permit them to operate jointly for an initial term (through August 30, 2015) and for Sabre to support CF's working capital needs (collectively, the LOA and the Term Sheet are referred to as the "Agreement"). (Tr. Ex. 3, p. 1, ¶1(a); Trial Tr. vol. 3, 483:6-25; 484:1-8, 22-25; 485:1-7; 489:20-24; 490:2-5.)

CF's Board thought that entering into the LOA was in CF's best interest, telling its shareholders: "The Board believes this transaction is the best tangible alternative for CF

to remain viable and allow it to realize the potential of its commercial and government opportunities for the benefit of the Corporation's shareholders." (Tr. Ex. 122, p. 1, ¶3.) CF's Board further stated that the LOA was to provide "an interim solution to address CF's short-term capital requirements and allow both parties to jointly pursue several near term opportunities." (Tr. Ex. 122, p. 1, ¶6.) Mr. Denton noted in his Special Litigation Committee Report that CF's Board made the best deal that it could make under the circumstances, and that "there really were no other more favorable options." (Tr. Ex. 102, p. 7.)

The LOA was executed on March 13, 2015; Mr. Fitzhugh signed on behalf of CF and Mr. Sandore signed on behalf of Sabre. (ECF No. 126, p. 9; Tr. Ex. 3, p. 4.)

Sabre's good-faith in entering the LOA is evidenced by the significant steps it took to try to combine the businesses (discussed further below) *and by the over $900,000 in working capital it expended during the short duration of the Parties' relationship*. (Tr. Ex. 117; Tr. Ex. 145, p. 1-2, 4-5; Tr. Ex. 146; Trial Tr. vol. 3, 509:15-19; 550:13-25; 551:1-5.) (See also Sections XIII(B) and XV(A), below.)

After the LOA was executed, Sabre made good-faith efforts to see if CF's business could be successfully merged into Sabre's business, including sending corporate executives on-site to CF at least twice; attempting to get CF to integrate Sabre's manufacturing techniques and supportive production and cost software; and making recommendations for how CF could reduce overhead costs. (Tr. Exs. 61, 70, and 74; Trial Tr. vol. 2, 387:10-25; 388:1-25; 389:1-25; 390:1-4, 8-23; 391:7-25; 392:1-7, 14-25; 393:1-6; 394:14-25; 395:3-25; 396:1-3, 19-25; 397:1-14; 399:14-25; 400:1-19.)

The LOA called for Sabre to set up a financial reporting segment under its Engineered Products Group ("EPG") to capture the financial information associated with

the Parties' Agreement. (Tr. Ex. 3, p. 1, ¶2(a).) Prior to the LOA, Sabre's EPG consisted of CellXion and legacy work from 180 Logistics (discussed below). (Trial Tr. vol. 3, 487:16-22; 490:10-24.) Accordingly, the "new" CF entity referred to in the Term Sheet and the LOA as "CFG" is the same entity also referred to as the "new" EPG; and the "new" EPG was Sabre's existing EPG (CellXion and 180 Logistics) with the addition of CF post execution of the LOA. (Trial Tr. vol. 3, 491:9-23; 492:1-25; 493:1-4.) Sabre admits the LOA was drafted by businessmen not attorneys, the LOA came together quickly due to CF's pressing need for working capital to sustain its operations, and the interchangeable use of the terms CFG and "new" EPG in the Term Sheet and the LOA is confusing. (*Id.*) After the LOA was signed, Sabre incorporated CF into Sabre's pre-existing EPG and set up a separate accounting entity related to CF that ran alongside the financial reporting for Sabre EPG. (Trial Tr. vol. 3, 487:9-15; 490:10-24; 492:13-20.)

The LOA called for Sabre to provide working capital to CF at Sabre's incremental cost of capital. (Tr. Ex. 3, p. 3, ¶3(c)(vii).) The working capital to be provided by Sabre included an immediate cash infusion of $160,000 in the form of pre-payments or deposit licensing fees to be used to pay part of CF's account payables outstanding as of March 11, 2015. (Tr. Ex. 3, p. 3, ¶3(c)(vii)(1); Tr. Ex. 55; Trial Tr. vol. 1, 93:3-7; 98:14-16; 180:19-25; 181:19-25.) Sabre paid CF the $160,000 required by the LOA. (*Id*.; Trial Tr. vol. 1, 98:14-16.)

The working capital to be provided by Sabre also included the payment of an additional $120,000 toward CF's payments to Mr. Slattery under a November 18, 2014 Consulting Agreement by which Mr. Slattery stopped being an employee of CF and became a consultant. (Tr. Ex. 8; Trial Tr. vol. 1, 21:1-8.) Pursuant to the Consulting

Agreement, CF was to pay Slattery a base monthly fee of $12,000 per month for a total of $144,000. (Tr. Ex. 8; Trial Tr. vol. 1, 21:19-25; 22:1-2.)

The LOA left the terms of Sabre's employee/contract payment(s) to Mr. Slattery open, stating that the payments would be made "with scheduled payment amounts to be determined." (Tr. Ex. 3, p. 3, ¶3(c)(vii)(1).) Sabre paid CF $24,000 towards CF's payments to Mr. Slattery. (Trial Tr. vol. 1, 92:4-21.) Sabre made a $12,000 payment toward the March 2015 "Employee/Contractor" payment in May 2015, and CF accepted this payment in May 2015. (ECF No. 126, p. 9; Trial Tr. vol. 1, 108:23-25; 109:1-2.) Sabre made a $12,000 payment toward the April 2015 "Employee/Contractor" payment in May 2015, and CF accepted this payment in May 2015. (*Id*.)

The LOA provided that Sabre would employ Mr. Fitzhugh and other agreed upon former CF employees. (Tr. Ex. 3, p. 1, ¶2(a)(i)(1).) Pursuant to the LOA, Sabre took on all of CF's employees as "at will" employees of Sabre. (Trial Tr. vol. 1, 98:18-20; Trial Tr. vol. 3, 517:19-21.)

While the LOA was in effect, Sabre continued to fund CF's ongoing working capital requirements. (Tr. Exs. 145 and 146; Trial Tr. vol. 3, 497:12-22; 509:15-19.)

### D. The Termination of the Licensing Operating Agreement

The Term Sheet was non-binding and either party had the right to terminate it at any time. (Tr. Ex. 2, p. 5, ¶6(a).) The LOA, which is incorporated into the Term Sheet, was also non-binding; the LOA contains many provisions regarding the termination of the LOA and either party had the right to terminate it at any time. (Tr. Ex. 3, p. 1, Intro. ¶¶1-3; p. 3, ¶3(c)(ii)(4); p. 3 (unnumbered ¶); p. 4, ¶4(b), 4(e).) Neither the Term Sheet

nor the LOA contain any provisions setting forth the notice requirements that a party must follow to terminate the Agreement between the Parties. (Tr. Exs. 2 and 3.)

On May 26, 2015, Mr. Sandore informed Mr. Fitzhugh that Sabre was terminating the LOA. (Trial Tr. vol. 1, 120:15-22.) After May 26, 2015, Sabre had the right to enforce its post-termination remedies under the LOA, which included the right to attempt to perfect a security interest in CF's intellectual property and the right to demand payment under a Promissory Note (discussed below) based on funds Sabre advanced CF under the LOA. (Tr. Ex. 3, p. 2, ¶3(b)(ii)(4); p. 3, ¶3(c)(vii)(1); p. 3 (unnumbered ¶); ¶3(d)(iv).) On June 3, 2015, Sabre sent a formal letter (dated May 29, 2015) to Mr. Fitzhugh terminating the LOA in writing. (Tr. Ex. 92; Tr. Ex. 99, p. 1.)

### E. The Promissory Note

The LOA states "Sabre will retain the right to offset funds due to [CF] for any amounts that may be owed from [CF] to Sabre (to include <u>but not limited to</u> pre-paid licensing fees and the elimination of employee obligations as outlined in 3(b)(ii)." (Tr. Ex. 3, p. 3, ¶3(d)(iv) (emphasis added).) In the event the LOA was terminated without an acquisition and the licensing fees due to CF from Sabre were insufficient to offset balances due to Sabre from CF, then the balance due from CF to Sabre was to revert to a 1-year note ("Promissory Note") at Sabre's incremental borrowing rate payable in monthly installments, with the rate to be determined at the formal execution of the LOA. (Tr. Ex. 3, p. 2, ¶3(b)(ii)(4); p. 3, ¶3(c)(vii)(1); p. 3 (unnumbered ¶); ¶3(d)(iv).) The Promissory Note was to be guaranteed by a security interest in CF's intellectual property. (*Id.*; Trial Tr. vol. 1, 93:3-7.)

On May 28, 2015, Sabre delivered a draft Promissory Note to CF and provided CF with a breakdown of the amounts Sabre claimed CF needed to reimburse Sabre pursuant to the LOA. (ECF No. 126, p. 9; Tr. Ex. 90; Trial Tr. vol. 1, 121:23-25; 122:1-4; 123:4-6.) The draft Promissory Note called for an 11% interest rate. (Ex. 90, p. 2, §2; Trial Tr. vol. 1, 127:19-20.) Sabre's incremental borrowing rate at the time the Promissory Note was drafted was 11%. (Trial Tr. vol. 3, 514:9-24; 515:20-25; 516:1.) Sabre's current incremental borrowing rate is 11%. (Trial Tr. vol. 3, 515:20-25; 516:1.)

The Parties did not agree as to the amount owed, and CF did not sign the Promissory Note. (ECF No. 126, p. 9; Trial Tr. vol. 1, 128:12-13.) To date, no executed promissory note exists. (ECF No. 126, p. 9.)

### F. The UCC Financing Statement

On May 27, 2015, Sabre recorded a UCC-1 Financing Statement with the Colorado Secretary of State, alleging a right in "all right, title and interests of [CF] in any Intellectual Property." (Tr. Ex. 86; ECF No. 126, p. 9.) On September 11, 2015, a mere 15 weeks later (107 days) the Secretary of State issued a notice that the "UCC-1 Financing Statement was wrongfully filed because no security agreement exists between Sabre Industries Telecom Services and CF Corporation." (Tr. Ex. 87.) In addition, while the notice reflected the ineffective nature of the Financing Statement, Sabre also submitted papers to terminate it on May 18, 2017. (Tr. Ex. 88; ECF No. 126, p. 8.)

## II. <u>CF's Claim 1: Breach of Contract - LOA</u>

### A. Stipulated Elements

The elements of breach of contract are: (1) the existence of a contract; (2) the performance of the contract by the plaintiff; (3) the defendant's failure to perform the

contract; and (4) damages suffered by the plaintiff as a result of the breach. *Conagra Trade Group, Inc. v. Fuel Exploration, LLC*, 636 F.Supp.2d 1166, 1171 (D.Colo. 2009).

**B. Proposed Findings of Fact**

As it pertains to CF's Claim 1, the evidence supports a finding in Sabre's favor because Sabre did not breach the LOA.[3] The LOA left the terms of Sabre's "Employee/Contractor" payment(s) to Mr. Slattery open, and CF accepted the payments as made -- $12,000 per month. (Tr. Ex. 3, p. 3, ¶3(c)(vii)(1).) Additionally, as of May 26, 2015, CF was aware Sabre was terminating the LOA, which Sabre had the right to do, and was aware Sabre would no longer be making payments under the LOA, which would have included the cessation of monthly payments toward CF's "Employee/Contractor" payments and CF's working capital expenses, including payments to CF vendors. (Trial Tr. vol. 1, 120:14-22.) CF, therefore, was not damaged by Sabre's non-payment of these items after termination of the LOA.

Also after May 26, 2015, Sabre had the right to enforce its post-termination remedies under the LOA, which included the right to perfect a security interest in CF's intellectual property. (Tr. Ex. 3, p. 2, ¶3(b)(ii)(4); p. 3, ¶3(c)(vii)(1); p. 3 (unnumbered ¶); ¶3(d)(iv).) *CF presented absolutely no documentary evidence showing that Sabre's UCC-1 Financing Statement resulted in any damages to CF*. (Trial Tr. vol. 1, 135:13-21.)

Even if the Court finds Sabre breached the LOA and that CF was damaged, Sabre's damages due to CF's breach of the LOA and CF's unjust enrichment at the expense of Sabre are greater than CF's damages. (See Sections XIII(B) and XIV.)

---

[3] Sabre incorporates Sections I(C)-(E) and V.

### C. Proposed Conclusions of Law

Together, the Term Sheet and the LOA form a valid contact. (Tr. Exs. 2, 3.) Sabre performed its obligations under the LOA. (Sections I(C).) The Agreement terminated on May 26, 2015, at which time Sabre no longer had any obligation to continue supporting CF under the Agreement because Sabre was not acquiring CF, and the termination provisions of the Agreement required CF to repay the working capital Sabre advanced under the LOA, which repayment was to be secured by a Promissory Note in CF's intellectual property. (Sections I(D)-(E).)

## III. Sabre's Counterclaim 5: Breach of Contract – LOA

### A. Stipulated Elements

See Section II(A), above.

### B. Proposed Findings of Fact

CF breached the LOA and Sabre suffered resulting damages. Sabre added language to the LOA, which CF accepted, to ensure CF's shareholders approved the LOA; this was very important to Sabre. (Trial Tr. vol. 1, 30:2-8; Trial. Tr. vol. 3, 482:24-25; 483:1-5.) CF breached this provision. The LOA did not merely require that "[a]ll existing [CF] shareholders and option holders must vote (per Conceal Fab Corporation's By-Laws) to approve this LOA structure in accordance with CF's corporate governance documents." (Tr. Ex. 3, p. 4, ¶4(a).) Rather, the LOA also required CF to ensure that its "shareholders have <u>evaluated, understand and acknowledge all risk elements</u> associated with this LOA structure and agreement…". (Tr. Ex. 3, p. 4, ¶4(a)(i).) Sabre included this language out of an abundance of caution to avoid any shareholder dispute regarding the Agreement with CF. (Tr. vol. 3, 482:24-25; 483:1-5.)

CF's Board approved the Term Sheet on February 3, 2015, without sharing the Term Sheet with CF's shareholders. (Trial Tr. vol. 1, 203:2-11.) CF solicited shareholder approval of the LOA on March 11, 2015. (Tr. Ex. 122; Trial Tr. vol. 1, 203:12-25.) However, when CF solicited shareholder approval of the LOA, it shared neither the entire Term Sheet (which the LOA supplements) nor the LOA with its shareholders. (Trial Tr. vol. 1, 203:2-11.) Rather, CF solicited shareholder approval of the LOA based on a "summary document." (Tr. Ex. 122; Trial Tr. vol. 1, 203:2-18; Trial. Tr. vol. 2, 296:11-14.) The summary document states that Sabre would be providing working capital to CF in the form of a loan. (Tr. Ex. 122, p. 2 ¶f; Trial Tr. vol. 1, 205:24-25; 206:5-6.) It does not set forth the terms of the loan or reflect the fact that CF had agreed to give Sabre a security interest in its intellectual property. (*Id.*; Trial Tr. vol. 2, 295:21-25; 296:1-10.)

On March 12, 2015, CF informed Sabre that "[w]e received an affirmative vote from a majority [of] both the Preferred class standalone and the Common plus Preferred classes combined." (ECF No. 126, p. 9; Tr. Ex. 57.)[4] However, when CF solicited approval of the LOA, its shareholders were not told and did not understand that the working capital loan Sabre was providing was to be secured vis-à-vis CF's existing intellectual property. (*Id.*) CF did not share this fact with its shareholders until April 11, 2015, when it sent its shareholders a document entitled "Frequently Asked Questions & Answers for Proposed MUTI/CF Transaction." (Tr. Ex. 124, p. 1; Trial Tr. vol. 1, 60:19-25; 61:1-2.)

[4] Pursuant to CF's First Amended and Restated Investor Rights Agreement, if CF's Board and shareholders holding shares sufficient to approve a Change of Control Transaction approve such a transaction, "all shareholders shall, in their respective capacities, consent to and vote all of their shares in favor of . . . the Approved Sale [.]" (Tr. Ex. 9, p. 1, ¶2.)

On May 7, 2015, Mr. Slattery, via his attorneys, sent a Shareholder Demand Letter threatening legal action against Mr. Fitzhugh, Mr. Odell and Mr. Stewart (the "Directors") because of the Agreement between CF and Sabre. (Tr. Ex. 80.) CF shared the Shareholder Demand Letter with Sabre on May 9, 2015. (Tr. Ex. 80; Trial Tr. vol. 1, 116:18-23.) In the Shareholder Demand Letter, Mr. Slattery claimed CF's Directors failed to disclose material terms of the transaction between CF and Sabre. (Tr. Ex. 80.)

The LOA contains no provisions describing the notice requirements that a party must follow to terminate the Agreement. (Tr. Ex. 3.) On May 26, 2015, Mr. Sandore informed Mr. Fitzhugh that Sabre was terminating Agreement because Mr. Slattery's threatened lawsuit posed too great a risk for Sabre to continue moving forward with the Agreement. (Trial Tr. vol. 1, 120:14-22.)

Additionally, CF breached the LOA because it was required to run all "new business purchase orders, not dependent on [its] small business or cleared facility received post the execution of this LOA…through the Sabre EPG segment." (Tr. Ex. 3, p. 3, ¶3(c)(v).) CF did not comply with this provision. (Tr. Ex. 146, p. 1; Trial Tr. vol. 3, 547:5-13; 548:20-25; 549:20-23.)

Finally, CF admits it breached the LOA by refusing to repay Sabre any funds Sabre loaned CF pursuant to the LOA. (Tr. Ex. 3, p. 2, ¶3(b)(ii)(4), p. 3, ¶3(c)(vii)(1), p. 3 (unnumbered ¶); Trial Tr. vol. 1, 91:1-9; 92:22-25; 93:1-2.) The only dispute is how much CF owes Sabre because of CF's breach of the LOA, but CF admits it owes no less than $184,000. (Trial Tr. vol. 1, 91:1-9; 92:22-25; 93:1-2.)

### C. Proposed Conclusions of Law

Together, the Term Sheet and the LOA form a valid contact. (Tr. Exs. 2, 3.) Sabre performed its obligations under the LOA and properly terminated the Agreement on May 26, 2015, at which time Sabre no longer had any obligation to continue to support CF under the Agreement.

CF breached the LOA because: (1) CF refused to repay Sabre the funds Sabre loaned pursuant to the LOA even through CF admits it owes no less than $184,000; and (2) CF has refused to provide Sabre with a 1-year promissory note per the terms of the Agreement; (3) CF failed to ensure its shareholders understood all risk elements associated with the LOA structure and the Agreement; and (4) CF did not run all new business purchase orders that were not dependent on its small business or cleared facility received post the execution of this LOA through Sabre's EPG.

As a result of CF's breaches of the LOA, Sabre has been damaged in the amount of **$919,144.89**. (See Sections XIII(B) and XV(A), below.)

## IV. CF's Claim 1: Breach of Contract – Mutual Non-Disclosure Agreement

### A. Stipulated Elements

Iowa law applies to the Mutual Non-Disclosure Agreement ("NDA"). The same elements as outlined in Section II(A) apply under Iowa law. *Iowa Mortgage Ctr., LLC v. Baccam*, 841 N.W. 2d 107, 110-111 (Iowa 2013).

### B. Proposed Findings of Fact

The NDA was entered into by the Parties in August 2014. (Tr. Ex. 1; Trial Tr. vol. 1, 12:17-25; 16:1-5.)

_*Sabre's Fulfillment of Customer Orders*_: CF contends Sabre used CF's "unique" cantenna sleeve after the LOA was terminated to fulfill an order placed by Cincinnati Bell. (Trial Tr. vol. 1, 15:3-16.) A "cantenna" is industry nomenclature for anything that is shaped like a can at the top of a light pole or utility pole. (Trial Tr. vol. 2, 409:19-25; 410:1-2.)

On December 1, 2015, Mr. Mike Lague of Cincinnati Bell wrote to Mr. Joe McLaurin and Mr. Bryan Kearse of Sabre requesting a quote for: (i) 10 antenna side arm mounts; (ii) 60 antenna top mounts; and (iii) 70 antenna mount cantenna sleeves. (Tr. Ex. 142.) Even through Cincinnati Bell's request was issued to Sabre and lists Sabre as the "vendor," Cincinnati Bell listed CF part numbers in the request. (Tr. Ex. 142, p. 2; Trial Tr. vol. 1, 144:14-25; 145:1-3.)

On December 3, 2015, Mr. Kearse provided information on the requested products and listed the correct Sabre part numbers: (i) antenna top mount-180A044; (ii) antenna side arm mount-180E051; and (iii) antenna mount cantenna sleeve-180E046. (Tr. Ex. 142, p. 1.) The "attachments" line to Mr. Kearse's e-mail also shows he provided specifications sheets for the "180" parts. (Tr. Ex. 142, pp. 1, 7 and 8.) The "180" listed in the part numbers indicate the antenna side arm mounts, top mounts and cantenna sleeves in Sabre's product portfolio were legacy 180 Logistics designs and parts. (Trial Tr. vol. 2, 407:19-25; 408:1, 23-25; 409:1-13.) The final quote issued from Sabre to Cincinnati Bell on February 10, 2016, shows that the antenna side arm mounts, top mounts and cantenna sleeves that were sold to Cincinnati Bell all began with legacy 180 Logistics part numbers. (Tr. Ex. 110.)

On February 18, 2016, Cincinnati Bell erroneously sent CF a purchase order that was meant for Sabre. (Tr. Ex. 111; Trial Tr. vol. 1, 141:2-10.) The purchase order from Cincinnati Bell shows that the antenna side arm mounts, top mounts and cantenna sleeves that were purchased by Cincinnati Bell all began with legacy 180 Logistics part numbers. (Tr. Ex. 111; Trial Tr. vol. 1, 141:2-10.)

*Sabre's Alleged Use of CF's Pricing*: The NDA's definition of "Confidential Information" does not specify the Parties' prices or pricing as being "confidential." (Tr. Ex. 1, pp.1-2, ¶(2)(a).) On February 10, 2016, Sabre sent Cincinnati Bell a quote that simply matched the target price points for the products that Cincinnati Bell provided to Sabre on February 9, 2016. (Tr. Ex. 109, pp. 1-2; Tr. Ex. 110.) Cincinnati Bell's communication to Sabre regarding the requested price points provides no information whatsoever as to how Cincinnati Bell arrived at the prices. (Tr. Ex. 109, pp. 1-2.) Sabre simply agreed to match the prices provided by Cincinnati Bell. (Tr. Ex. 109, pp. 1-2.)

*Sabre's Contacts with "Key Accounts," Vendors & Representatives*: Section 2 of the NDA provides "Confidential Information" shall not include information that was known by or was in the possession of the receiving party, as established by documentary evidence, prior to being disclosed by the receiving party. (Tr. Ex. 1, pp. 1-2, ¶(2)(c).) CF and Sabre are competitors. (ECF No. 126, p. 8.) CF understood the Parties had "key accounts" in common, including Crown Castle, AT&T and Verizon - and the Term Sheet recognizes this fact. (Tr. Ex. 2, p. 1; Trial Tr. vol. 1, 174:1-5, 14-17, 25; 175:1-3.) The Parties also shared and had mutual knowledge of the industry's OEM partners: JMA, Alcatel-Lucent (k/n/a Nokia) and Ericsson. (Trial Tr. vol. 1, 27:23-25; 28:1-3.)

From August 2014 through March 2015, CF had only one OEM partnership - with JMA. (Trial Tr. vol. 1, 161:16-25; 162:1-17.) When the Agreement was terminated, Sabre already had a long-standing working relationship with JMA established over its 40 years as a significant player in the telecom industry. (Trial Tr. vol. 2, 347:17-22; Trial Tr. vol. 3, 487:20-22.)

EPIC is a manufacturing representative for the telecom market based out of California that represented JMA's product line as well as CF's product line. (Trial Tr. vol. 1, 13:23-25; 14:1-2; Trial Tr. vol. 2, 406:11-17.) DAS Group Professionals a/k/a DGP is a middleman for EPIC. (Trial Tr. vol. 1, 104:10-14.) Sabre, via Mr. Sandore, had a long-standing, ongoing relationship with Mr. Selke of EPIC from previous acquisitions and other business ventures. (Trial Tr. vol. 2, 348:5-6; 406:20-22.)

Cincinnati Bell is free to solicit quotes for products and order products from any supplier it chooses. In December 2015, Cincinnati Bell solicited quotes from both Sabre and CF for antenna side arm mounts, top mounts and cantenna sleeves. (Tr. Exs. 108 and 109).

**C. Proposed Conclusions of Law**

Sabre did not breach the NDA. First, CF presented no evidence Sabre breached the NDA by selling Cincinnati Bell CF's "unique" cantenna. Rather, the cantennas and other parts Sabre provided specifications and pricing information for and later sold to Cincinnati Bell were legacy 180 Logistics' parts. Second, even if CF's prices could be deemed "confidential" under the NDA, CF presented no evidence Sabre breached the NDA by matching the prices provided by Cincinnati Bell. Third, CF presented no evidence Sabre disclosed "Confidential Information," as that term is defined in the NDA. CF knew

it was a competitor of Sabre's both before and after the Agreement, and knew both Parties shared many of the same "key accounts" or potential clients, including but not limited to Cincinnati Bell, JMA, and EPIC prior to and after termination of the Agreement. Even if Sabre had breached the NDA, however, CF did not prove damages. (See Section XV(B).)

## V. <u>CF's Claim 9: Breach of Contract—Employment Agreement</u>

### A. Stipulated Elements

See Section II(A), above.

### B. The Doctrines of Promissory Estoppel and Implied Contract Are Insufficient to Bind Sabre to the Unsigned Employment Agreement[5]

#### 1. Promissory Estoppel

To state a claim for promissory estoppel in the employment law context, a plaintiff must show: (1) a promise which the employer should reasonably have expected the employee to consider as a commitment from the employer; (2) reasonable reliance to the employee's detriment, demonstrated by action or forbearance by the employee, induced by the promise; and (3) the existence of circumstances such that injustice can only be avoided by enforcement of the promise. *Price v. Public Service Co. of Colorado*, 1 F.Supp.2d 1216, 1224 (D.Colo. 1998). CF did not meet its burden of proof.

From December 2014 to January 2015, the Parties exchanged drafts of an Employment Agreement related to Mr. Fitzhugh's future employment with Sabre. (Tr. Exs. 4, 18, 20-24, 26-27.) As with the Term Sheet and the LOA, Mr. Fitzhugh negotiated the

---

[5] The Court has requested that the Parties address whether Sabre, by its conduct "can be bound by the Employment Agreement despite not executing it by virtue of doctrines such as estoppel." (Trial Tr. vol. 3, 576:10-15.)

Employment Agreement with Mr. Huff. (Tr. Exs. 4, 18, 20-24, 26-27.) When the Employment Agreement was being negotiated and drafted, the Parties envisioned that the Employment Agreement would be effective if and when Sabre acquired CF via a Purchase Agreement. (Tr. Ex. 4, p. 2, ¶1, "Effective Date.")

After the Term Sheet was signed, but prior to the execution of the LOA, Mr. Huff's employment with Sabre ended. (Trial Tr. vol. 1, 192:4-10.) Mr. Fitzhugh was aware of Mr. Huff's departure from Sabre and knew Mr. Sandore was the only person with authority to sign the Term Sheet and the LOA on behalf of Sabre. (Tr. Ex. 3, p. 4; Tr. Ex. 45, p. 11; Tr. Ex. 50 p. 12; Tr. Ex. 51, p. 12; Trial Tr. vol. 1, 192:4-10.) Regardless of Mr. Huff's departure, Sabre executed the LOA. (Tr. Ex. 3, p. 4.) Sabre, however, did not execute the Employment Agreement at that time, nor did Sabre ever execute it. (Tr. Ex. 4, p. 10; Trial Tr. vol. 1, 98:21-24.) Rather, Sabre considered Mr. Fitzhugh an "at will" employee just like the other CF employees whose salary and benefits (working capital) Sabre agreed to fund as a loan during the course of the LOA. (Tr. Ex. 3, p. 2, ¶ 2(a)(i)(1), p. 3, ¶3(d)(iv); Trial Tr. vol. 1, 98:18-20; Trial Tr. vol. 3, 517:19-21.)

Mr. Fitzhugh's alleged reliance that the Employment Agreement (although unsigned) was effective was unreasonable; in fact, Mr. Fitzhugh knew the Employment Agreement was never in effect. From March 13, 2015 to May 26, 2015, Sabre paid Mr. Fitzhugh a gross salary of $300,000. (Trial Tr. vol. 1, 107:5-10.) Sabre makes bi-weekly payrolls for a total of 24 payrolls per year, on the 15th and the 30th of each month. (Tr. Ex. 145, pp. 1-2). During the duration of the LOA, Sabre paid five full payrolls and two partial payrolls (which were booked as CF salary payroll) in Sabre's system. (Tr. Ex. 145, pp. 1-2, 4-6.) At 24 payrolls per year, Mr. Fitzhugh's gross salary was roughly $12,500 per

payroll or $25,000 a month, which means he was paid at least $62,500 ($12,500 x 5) during the short duration of the LOA. Significantly, Sabre never paid Mr. Fitzhugh the $750.00 vehicle allowance (Tr. Ex. 4, p. 2, ¶ 4) nor the $125,000 sign-on bonus within 30 days of his hire (contemplated by the Employment Agreement), even though Mr. Fitzhugh was on Sabre's payroll for over 70 days (Tr. Ex. 4, p. 3, ¶7; Trial Tr. vol. 1, 107:11-14; Trial Tr. vol. 3, 519:2-8.) Nor did Mr. Fitzhugh ever demand the sign-on bonus. (Trial Tr. vol. 3, 519:12-24.) Also, Sabre did not grant Mr. Fitzhugh 250,000 stock options within 30 days of his hire (also contemplated by the Employment Agreement). (Tr. Ex. 4, p. 3, ¶10). Mr. Fitzhugh was treated the same as every other former CF employee that Sabre took on - he was treated as a salaried, "at will" employee. As such, Mr. Fitzhugh did not reasonably rely on the Employment Agreement being effective.

Mr. Odell testified that CF's Board "assumed" the Employment Agreement was in place and had been signed based on Mr. Fitzhugh's "affirmation that he was going to get paid." (Trial Tr. vol. 2, 306:4-9.) However, the documents provided by CF to its shareholders, both before and after the LOA was signed, make this assumption noncredible. In summarizing the LOA to its shareholders in March 2015, CF stated only that "Jonathan Fitzhugh, CEO and Director of ConcealFab, would resign from ConcealFab and join MUTI as an employee…[s]hould a transaction not consummate, Mr. Fitzhugh would be forced to resign from Sabre." (Tr. Ex. 122, p. 2, ¶d.) Nothing is said regarding an Employment Agreement being consummated as part of the LOA, a sign-on bonus, or stock options, and there is no mention of a severance payment should the deal fail to consummate—only that Mr. Fitzhugh would be forced to resign. (*Id.*)

Further, the April 11, 2015, "FAQ" document sent to CF's shareholders (after the LOA had been in place for almost a month) uses both present and future tense throughout when discussing Mr. Fitzhugh's "proposed relationship" with Sabre and what would happen "if the asset purchase as contemplated was consummated." (Tr. Ex. 124, p. 1.) (Emphasis added.) The FAQ uses future tense to define what the Employment Agreement would provide when it was in place, stating that, "Mr. Fitzhugh's employment contract would also provide Mr. Fitzhugh with a severance payment of one year's base compensation, should his employment be terminated." (*Id*.) Also, Mr. Denton, a member of CF's Board, conceded in the Special Litigation Report that the employment considerations envisioned in the Employment Agreement did not materialize and cited the missing stock options and signing bonus as proof that the Employment Agreement was not in place. (Tr. Ex. 102, p. 12; Trial Tr. vol. 2, 331:16-25; 332:1-8).

The final element of a promissory estoppel claim requires a finding that the circumstances are such that injustice can be avoided only by enforcement of the alleged promises. This element hangs on the Court's discretion – i.e., it is not a question of fact. *Romero v. Denver Public Schools*, 2010 WL 2943528, at *7 (D.Colo. 2010). The truth, as demonstrated by CF's internal documents, is that CF signed the LOA because it was cash-strapped, had missed payroll, and needed significant working capital to continue operations. (Tr. Exs. 55 and 102, pp. 3-4; Trial Tr. vol. 2, 325:15-18; 326:22-24.) During the duration of the LOA, Sabre paid all of CF's working capital needs - it made an initial cash infusion of $160,000 to cover CF's outstanding account payables; it paid $24,000 toward CF's obligations to Mr. Slattery; it paid CF's ongoing accounts payable; and it paid over $232,329 in payroll and over $21,576.77 in benefits. (Tr. Ex. 145, p. 3.) Based on

the above facts, it is hard to see how injustice can only be avoided by awarding Mr. Fitzhugh, and, by extension, CF, $425,000 for 74 days of work. To the contrary, it would be unequitable to force Sabre to pay the sign-on bonus and severance when Mr. Fitzhugh only worked 74 days under the LOA and the acquisition never occurred.

#### 2. Implied Contract

An implied contract arises from the parties' conduct, whereas an express contract arises from written or oral word. *Trujillo v. City of Colorado Springs*, 2008 WL 511890, at *3 (D.Colo. 2008). To show an implied contract, a plaintiff must show: (1) the existence of a contract; (2) performance or justification for nonperformance; (3) failure to perform the contract; and (4) resulting damages. *Steele v. Stallion Rockies Ltd.*, 106 F.Supp.3d 1205, 1221 (D.Colo. 2015). A promise that forms the basis of an enforceable contract "must be sufficiently specific to 'provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" *Id.* (Internal citations omitted.) In addition, in the employment law context, an "employee must show that the employer's actions manifested an intent to be bound." *Id*., (citing *Geras v. Int'l Business Machines*, 638 F.3d 1311, 1315 (10th Cir. 2011).

Mr. Fitzhugh cannot show Sabre intended to be bound by the Employment Agreement merely by virtue of the LOA being signed or by paying him as an "at will" employee. Sabre has many executives without contracts. (Trial Tr. vol. 3, 525:17-22.)

### C. Proposed Findings of Fact

As it pertains to CF's Claim 9 for breach of the Employment Agreement, the evidence warrants a finding in Sabre's favor. As discussed above, equitable remedies such as promissory estoppel and implied contract do not apply in this instance.

If the Employment Agreement is a valid contract, the Court must read it in its entirety and pursuant to its plain language. *Professional Bull Riders, LLC v. Perfect Blend International, LLC*, 2016 WL 54115, at *4 (D.Colo. 2016) ("[W]ritten contracts that are complete and free from ambiguity will be enforced pursuant to their plain language."). Paragraph 1 of the Employment Agreement reflects the understanding of the Parties that the Employment Agreement would be effective *if and when* Sabre acquired CF. (Tr. Ex. 4, p. 2, ¶1.) This understanding never changed, nor was Paragraph 1 of the Employment Agreement amended when the LOA was negotiated. (*Id.*)

Paragraph 1 of the Employment Agreement, reads:

> "1. **Effective Date**: ….This Agreement shall automatically terminate without any action on the part of any person and be void *ab initio*…and neither Sabre nor any other person shall have any liability to Employee under this Agreement if the Closing (as defined in the Stock Purchase Agreement) does not occur."

(Tr. Ex. 4, p 1. ¶1.)

Black's Law Dictionary defines the term "void *ab initio*" as meaning "null from the beginning, as from the first moment when a contract is entered into." *Black's Law Dictionary*, p. 1604 (8th ed. 2004). The Parties never entered into an Asset Purchase Agreement. (Trial Tr. vol. 1, 216:7-9.) The Parties never entered in a Stock Purchase Agreement. (Trial Tr. vol. 1, 216:10-12.) Mr. Fitzhugh is a sophisticated businessman with an MBA from Harvard University. (Trial Tr. vol. 1, 149:1-2.) *White Wave, Inc. v. Dean Foods*, 2001 WL 1833980, at *4 (D.Colo. 2001). ("This is an area of law where formalities are important, as they are the method by which sophisticated businessmen make their contractual rights definite and limit the authority of the courts to redo their deal.") The Employment Agreement, by its own terms, provides that the contract is void *ab initio* under

the undisputed facts of this case; therefore, no employment contract exists and Mr. Fitzhugh was an "at will" employee of Sabre EPG. The LOA was simply an interim agreement that allowed Sabre to "try before it buys" and Sabre never bought.

### D. Proposed Conclusions of Law

The Employment Agreement is not an implied contract. Sabre had no reason to believe Mr. Fitzhugh thought the Employment Agreement was in place merely by virtue of signing the LOA and taking him on as an "at will" employee; there were many provisions of the draft Employment Agreement that did not come to fruition. *Steele*, 106 F.Supp.3d 1205, 1221 (D.Colo. 2015).

The doctrine of promissory estoppel does not bind Sabre to the Employment Agreement. Mr. Fitzhugh's purported reliance that the Employment Agreement was in place was not reasonable given the provisions of the Employment Agreement, such as the vehicle allowance, the sign-on bonus and stock options, that never came to fruition. *Price v. Public Service Co. of Colorado*, 1 F.Supp.2d 1216, 1224 (D.Colo. 1998). However, even if the doctrine of promissory estoppel did apply, the circumstances of this case are not such that injustice can only be avoided by awarding Mr. Fitzhugh $425,000 for 74 days of employment. *Romero*, 2010 WL 2943528, at *7. Mr. Fitzhugh was not getting paid by CF; CF did not have enough cash flow to pay him or its employees. (Tr. Exs. 55 and 102, p. 3-4; Trial Tr. vol. 2, 325:15-18; 326:22-24.) Mr. Fitzhugh was paid by Sabre when CF would not have been able to pay him. (*Id.*) Thus, it is not inequitable for the Court to refuse to award Mr. Fitzhugh, and, by extension CF, a sign-on bonus and severance when the deal did not close and the LOA only lasted 74 days.

"[C]ommon law contract principles ... allow for the formation of contracts without the signatures of the parties bound by them." *Bourret v. Aspect Management Corp.,* 2013 WL 6073637, at *2 (D.Colo. 2013). To the extent the Employment Agreement is a valid contract, the Employment Agreement by its own terms is void *ab initio* because the Parties did not consummate an asset purchase or a stock purchase agreement. (Tr. Ex. 4, p. 1, ¶1.) Accordingly, neither Mr. Fitzhugh nor CF have sustained any damages as a result of Sabre's alleged breach of the Employment Agreement.

## VI. <u>CF's Claim 3: Breach of Fiduciary Duty</u>

### A. Stipulated Elements

To support a claim for breach of fiduciary duty, CF must show: (1) Sabre was a fiduciary of CF; (2) Sabre breached a fiduciary duty to CF; (3) CF incurred resulting damages; and (4) CF's damages were a result of Sabre's breach. *Brecheisen v. Banner Resources,* 2016 WL 7868821, at *6 (D.Colo. 2016).

### B. CF Cannot Meet Its Burden Because Sabre Was Not a Fiduciary[6]

"[I]t is axiomatic that a claim for breach of fiduciary duty necessarily requires as a precondition the existence of a fiduciary relationship between the parties." *Alley v. Aurora Loan Services LLC*, 2011 WL 3799035, at *8 (D.Colo. 2011). Each of CF's claims that Sabre breached its fiduciary duties stem from the LOA, which was not a joint venture agreement but, rather, was merely a contract between commercial parties the object of which was a purely economic benefit. "Entering into a conventional business relationship generally does not create a fiduciary relationship." *Alley*, 2011 WL 3799035, at *8.

---

[6] The Court requested further briefing from the Parties on the first element of this claim; whether Sabre was a fiduciary to CF and, if so, why? (Trial Tr. vol. 3, 576:14-19.)

To constitute a joint venture agreement, the parties must have: (1) a joint interest in property; (2) an express or implied agreement to share in the losses or profits of the venture; and (3) conduct showing cooperation in the venture. *Agland, Inc. v. Koch Truck Line, Inc.,* 757 P.2d 1138 (Colo.Ct.App. 1988). The parties need to have a joint, not several, profit sharing or shared loss. *See Colorado Performance v. Mariposa Assoc.,* 754 P.2d 401 (Colo.App. 1987). This element is not present if one of the parties could have enjoyed an individual profit, while the other might have sustained an individual loss. *Batterman v. Wells Fargo Ag Credit Corp.*, 802 P.2d 1112, 1117–18 (Colo. App. 1990).

The words "profit" and "loss" do not appear in the LOA. (Tr. Ex. 3.) However, Sabre took on all the costs of the venture which included, but were not limited to, loaning CF working capital that was to be repaid by CF's licensing fees. (Tr. Ex. 3, p. 3, ¶¶3(c)(iv), (3)(c)(vii), (3)(c)(vii)(1)-(2).) In the event the Agreement was terminated and those licensing fees were insufficient to repay Sabre, Sabre was to be repaid via a 1-year Promissory Note at Sabre's incremental borrowing rate payable in monthly installments. (Tr. Ex. 3, p. 2, ¶3(b)(ii)(4), p. 3, (unnumbered ¶), ¶3(d)(iv).) Additionally, Sabre incurred the costs of completing CF's purchase orders, even though CF invoiced those orders through its own system and not through Sabre EPG's system as required by the LOA. (Tr. Ex. 146, p. 1; Trial Tr. vol. 3, 547:5-13; 548:20-25.) This resulted in Sabre incurring the cost of those orders while CF kept any profit realized from them. (*Id.*) Even where Sabre may have been able to complete a CF order with products taken from Sabre's pre-existing inventory, this still resulted in a cost of Sabre, which had to produce or purchase that item in the first instance. CF, therefore, retained an individual profit, while Sabre sustained an individual loss on those orders CF invoiced through its own system

rather than Sabre's EPG segment. (*Id*.) Sabre suffered all the losses under the Agreement. (Tr. Ex. 146, p. 1; Trial Tr. vol. 3, 538:5-8; 548:20-25.)

### C. Proposed Findings of Fact

Sabre incorporates Sections I(A)-(C) and VI(B), above.

### D. Proposed Conclusions of Law

CF has not proven its claim for breach of fiduciary duty. Sabre was not a fiduciary of CF, and Sabre suffered all of the losses under the Agreement. *Batterman*, 802 P.2d 1112, 1117–18 (Colo. App. 1990). This was a normal arms-length business transaction devoid of any fiduciary obligations. Moreover, even if Sabre was a fiduciary of CF, CF has failed to prove a breach of any fiduciary duties or any resulting damages. [7]

## VII. <u>CF's Claim 9: Fraud in the Inducement</u>

### A. Stipulated Elements

The elements of fraudulent inducement are: (1) the defendant's misrepresentation of a material fact; (2) the plaintiff's justifiable reliance on that misrepresentation; and (3) resulting damage. *Kirzhner v. Silverstein*, 2011 WL 4382560, at *9 (D. Colo. 2011).

---

[7] The economic loss rule bars CF's claim for breach of fiduciary duty (CF Claim 3) as well as CF's claims related to Sabre's fulfillment of "CF" purchase orders--breach of the covenant of good faith and fair dealing (CF Claim 2) and tortious interference with contractual relationship (CF Claim 5). Pursuant to the economic loss rule "[a] breach of a duty which arises under the provisions of a contract between the parties must be redressed under contract, and a tort action will not lie." *RE/MAX, LLC v. Quicken Loans Inc*., 295 F.Supp.3d 1163, 1169 (D.Colo. 2018) (quoting *Town of Alma v. AZCO Constr., Inc***.**, 10 P.3d 1256, 1264 (Colo. 2000)). Each of these claims relates to Sabre's alleged breach its duties stemming from the LOA, i.e., a contract between commercial parties, "the object of which was a purely economic benefit" and, therefore, is barred by the economic loss rule. *Benton v. Avedon Engineering, Inc*., 2012 WL 5869126, at *10 (D.Colo. 2012).

### B. Concealment of a Material Fact[8]

The mere failure to perform a contractual obligation does not constitute fraud. *State Bank of Wiley v. States,* 723 P.2d 159, 160 (Colo.Ct.App. 1986). However, "[a], promise concerning a future act, when coupled with a present intention not to fulfill the promise, can be a misrepresentation which is actionable as fraud." *Wood v. Houghton Mifflin Harcourt Pub. Co*., 589 F.Supp.2d 1230, 1250 (D.Colo. 2008).

Mr. Fitzhugh negotiated the LOA with Mr. Huff. (Tr. Exs. 41, 45, 50, and 51; Trial Tr. vol. 1, 67:18-25; 68:1-5; 69:14-20; 77:3-9; 85:21-24.) Prior to the execution of the LOA, Mr. Huff's employment with Sabre ended, and he made Mr. Fitzhugh aware of this fact. (Trial Tr. vol. 1, 192:4-10.) Mr. Fitzhugh, like the other CF employees, had the option of working for Sabre after the LOA was signed, and he was treated the same as every other former CF employee that Sabre took on as part of the LOA - as a salaried, "at will" employee - and he understood this. (See Section V(B)(1)-(2).) Mr. Fitzhugh was aware of the fact certain key elements of the Employment Agreement never came to fruition, and that Sabre was not acting as if the Employment Agreement had been executed during the pendency of the LOA. In support of this argument, see Section V(B).

Sabre clearly entered the LOA in good-faith and with the intent of living up to its obligations, as Sabre understood them, under the Agreement, which included providing

[8] The Court requested additional briefing on whether a party's promises to take identified actions can constitute concealment of material facts. (Trial Tr. vol. 3, 576:20-25; 577:1-7.) The elements of the tort of fraudulent concealment are (1) concealment of a material fact that in equity or good conscience should be disclosed; (2) the defendant's knowledge the fact is being concealed; (3) the plaintiff's ignorance of the fact; (4) the defendant's intent that the plaintiff act on the concealed fact; and (5) the plaintiff's action on the concealment results in damages. *See Kirzhner*, 2011 WL 4382560, at *4.

significant working capital to continue CF's operations and taking on CF's employees as "at will" employees so they could meet payroll. (Section 1(C).) Sabre fulfilled its obligations under the LOA during the pendency of the Agreement. (*Id*.) To this end, Sabre expended not less than *$919,144.89* in favor of CF pursuant to the LOA during the short duration of the Agreement and made every attempt to meet its obligations under the LOA. (See Sections I(C), V(B)(1), XIII(B) and XV (A).)

### C. Proposed Findings of Fact

As it pertains to CF's Claim 9 for fraud in the inducement, the evidence warrants a finding in Sabre's favor. Sabre did not fraudulently induce CF to enter the LOA. Sabre entered the LOA in good-faith and fulfilled its obligations to CF under the Agreement during the duration of the Parties relationship which is evidenced by the significant steps it took to try to combine the businesses *and by the over $900,000 in working capital it expended during the short duration of the Parties' relationship*.[9] CF's own Board also thought that entering into the LOA was in the best interest of the company, telling its shareholders as much. (Tr. Ex. 122, p. 1, ¶¶3, 6.) Mr. Denton stated in his Special Litigation Report that CF's Board made the best deal and that "there really were no other more favorable options." (Tr. Ex. 102, p. 7.)

### D. Proposed Conclusions of Law

The facts do not support CF's claim that Sabre fraudulently induced CF to enter into the LOA. Rather, the facts show Sabre entered the LOA in good-faith and intended to perform its obligations under the LOA. (See Sections I(C), V(B)(1), VII(B), XIII(B) and

---

[9] See Sections I(C), V(B)(1), VII(B), XIII(B) and XV(A).

XV(A). Moreover, CF has failed to prove how it was damaged as a result of Sabre's alleged inducement. (See Section XV(B).)

## VIII. CF's Claim 5: Tortious Interference with Contractual Relationship

### A. Stipulated Elements

The elements of tortious interference with contractual relationship are: (1) plaintiff had a contract with a third party; (2) the defendant knew or should have known of such contract's existence; (3) the defendant intentionally induced the other party to the contract not to perform the contract with the plaintiff; and (4) the defendant's actions caused the plaintiff to incur damages. *Telluride Real Estate Co. v. Penthouse Affiliates, LLC*, 996 P.2d 151, 155 (Colo. App. 2000).

### B. Proposed Findings of Fact

As it pertains to CF's Claim 5 for tortious interference with contractual relationship, the evidence warrants a finding in Sabre's favor. CF did not prove Sabre tortiously interfered with any of CF's contractual relationships. (See Section IV(B)).

As required by the LOA, certain purchase orders generated by legacy CF were submitted to Sabre's EPG for completion. (Tr. Ex. 3, p. 3, ¶3(c)(v); Tr. Ex. 146, p. 1; Trial Tr. vol. 2, 361:2-4; Trial Tr. vol. 3, 537:16-19; 549:15-23.) But for Sabre's provision of working capital, it is doubtful CF would have had the manpower or the money to be able to complete these purchase orders. (Tr. Exs. 55 and 102, p. 3-4; Trial Tr. vol. 2, 325:15-18; 326:22-24; Trial Tr. vol. 3, 504:9-21).

Prior to the LOA, Sabre's EPG consisted of CellXion and legacy work from 180 Logistics. (Trial Tr. vol. 3, 487:16-22; 490:10-24.) After the LOA was signed, Sabre incorporated CF into the pre-existing EPG; CF related purchase orders were submitted

to EPG for completion; and Sabre created a separate CF accounting entry that ran alongside the financial reporting for the rest of the Sabre EPG entities. (Trial Tr. vol. 3, 487:9-15; 490:10-24; 492:13-20.) During discovery in this matter, CF asked Sabre to "[i]dentify all purchase orders received by the Sabre EPG segment between March 13, 2015 and June 3, 2015." (Tr. Ex. 114, p. 7; Trial Tr. vol. 3, 473:2-8.) The request included all Sabre EPG purchase orders during that timeframe, which included legacy 180 Logistics orders, and the documents that were produced show the majority of the orders received were for 180 Logistics products as indicated by the "180" in the part numbers. (Tr. Exs. 95, 96; Trial Tr. vol. 2, 407:19-25; 408:23-25; 409:1-13; Trial Tr. vol. 3, 474:3-22.) Accordingly, the only purchase orders at issue are those by Fiber Tech, JMA, and Cincinnati Bell that were submitted to Sabre's EPG pursuant to the LOA and run through Sabre EPG's books and records. (Tr. Ex. 146, p. 1; Trial Tr. vol. 3, 537:16-19; 549:15-23.) CF, in effect, assigned these contracts to Sabre pursuant to the LOA and Sabre's EPG, therefore, had the right to finish these contracts after the LOA was terminated. (*Id*.)

Regardless of the fact that CF had given these purchase orders to Sabre EPG to complete, in June 2015, Sabre reached out to those clients with purchase orders in progress to inform them that CF and Sabre were no longer working together, and to provide them the opportunity to cancel any purchase orders and to reissue those orders directly to CF. (Trial Tr. vol. 2, 356:2-10.) Sabre did not try to influence customers into keeping the purchase order with Sabre. (Trial Tr. vol. 2, 356:2-10.) Fiber Tech, after speaking with Sabre, cancelled its purchase order and re-issued a purchase order directly to CF. (Tr. Ex. 146, p. 1; Trial Tr. vol. 2, 356:22-25; 357:1-3; 406:5-10.) JMA and Cincinnati Bell opted to have Sabre finish certain purchase orders that had been

presented to Sabre's EPG by CF during the pendency of the Agreement. (Tr. Ex. 146, p. 1; Trial Tr. vol. 2, 404:4-13, 406:2-4.) Finally, while the Cincinnati Bell purchase order was for 18-inch octagon pole by CF, Cincinnati Bell opted to have this order filled with Sabre's own SmartStack technology. (Trial Tr. vol. 2, 404:4-13.)

### C. Proposed Conclusions of Law

Sabre did not tortiously interfere with CF's contractual relationships. Sabre had the right to complete the purchase orders / work in progress that had been submitted by CF to Sabre's EPG during the pendency of the LOA. Furthermore, CF presented no evidence as to its damages as a result of Sabre's alleged interference. (See also Section XV(B).)

## IX. CF's Claim 6: Tortious Interference with Prospective Business Relations

### A. Stipulated Elements

To prove tortious interference with prospective business relations, a party must show: (1) the defendant knew the plaintiff had a prospective business relationship; (2) the defendant intentionally interfered with the prospective business relationship; (3) without interference, there was a reasonable likelihood the contract would have resulted; and (4) the defendant's actions caused the plaintiff to incur damages. *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1122 (10th Cir. 2008).

### B. Proposed Findings of Fact

As it pertains to CF's Claim 6 for tortious interference with prospective business relations, the evidence warrants a finding in Sabre's favor. CF did not show Sabre tortiously interfered with any of CF's prospective business relationships. (Sabre incorporates the facts in Sections IV(B) and VIII(B), above.)

*DAS Group / EPIC*: Sabre and CF were both competitors in the DAS/oDAS marketplace before the Agreement was entered into and after the Agreement was terminated. (ECF No. 126, p. 8.) Nothing in the Term Sheet or the LOA prevents the Parties from competing against one another after termination of the Agreement. In fact, the LOA expressly envisioned the Parties would continue to compete against one another in the case of termination of the Agreement: "The organizations agree that each have specific pole capabilities and designs that will be shared and that upon the termination of the LOA, will compete on this product line with no restrictions." (Tr. Ex. 3, p. 4, ¶4(e)(iii)(4).) Further, CF presented no evidence CF failed to get a contract with EPIC or that it was damaged in any way as a result of Sabre's alleged interference.

*Using "Confidential Information" to Win Business from "Key Accounts"*: Sabre has been a significant player in the telecom industry for 40 years, and Sabre did not interfere with CF's "key accounts." (Trial Tr. vol. 2, 347:17-22; Trial Tr. vol. 3, 487:20-22.) Cincinnati Bell is free to solicit quotes for products and order products from any supplier it chooses, and Sabre did not use "Confidential Information" to secure business from Cincinnati Bell.

*Interfering with CF's Lenders*: CF presented nothing but vague testimony and absolutely no documentary evidence showing that its prospective business relationship with any lender was damaged as a result of Sabre's attempts to perfect its rights under the LOA. (Trial Tr. vol. 1, 135:13-21.)

*Other Acquisition Opportunities*: CF's Board agreed and informed CF's shareholders the Agreement with Sabre presented CF with the most attractive opportunity at the time the Agreement was executed. (Tr. Ex. 31, p. 2; Trial Tr. vol. 1, 189:7-10.) Sabre entered into the LOA with the intention of preforming under it. (See Sections I(C)

and XIII(B), above.) Further, CF presented no evidence as to how it was damaged as a result of Sabre's alleged interference with any other potential acquirer of CF.

### C. Proposed Conclusions of Law

CF did not show Sabre tortiously interfered with any of CF's prospective business relations. CF also failed to prove its damages as a result of Sabre's alleged tortious interference with any of its prospective business relations.

## X. CF's Claim 7: Misappropriation of Trade Secrets - C.R.S. 7-74-101 to 110

### A. Stipulated Elements

The elements of misappropriation of trade secrets under the Colorado Uniform Trade Secrets Act are: (1) the plaintiff possessed a valid trade secret; (2) the trade secret was disclosed or used without consent; and (3) the defendant knew, or should have known, that the trade secret was acquired by improper means. *Innovatier, Inc. v. CardXX, Inc.*, 2011 WL 3293789, at *2 (D. Colo. 2011).

To be a "trade secret," the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes. Colo.Rev.Stat. § 7–74–102(4) (2005). In addition, the court must also consider the following factors: "(1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information. *Doubleclick*

*Inc. v. Paikin,* 402 F.Supp.2d 1251, 1257 (D.Colo. 2005). "Improper means" include theft, misrepresentation, or breach of a duty to maintain secrecy. C.R.S. § 7-74-102(1); see generally *L-3 Communications Corp. v. Jaxon Engineering & Maintenance*, 125 F.Supp.3d 1155, 1180–81 (D.Colo. 2015).

**B. Proposed Findings of Fact**

As it pertains to CF's Claim 7 for misappropriation of trade secrets, the evidence warrants a finding in Sabre's favor. CF did not show that Sabre misappropriated any of CF's "trade secrets."

*Sabre's Fulfillment of Customer Order that Included CF Products*: Sabre did not misappropriate any of CF's alleged trade secrets by filling orders with CF products; the evidence shows that Sabre fulfilled Cincinnati Bell's orders with legacy Logistic 180 products and SmartStack technology. Further, to the extent Cincinnati Bell used CF's pricing information, it did so without Sabre's knowledge of where the information came from and CF obviously did not take precautions to guard the secrecy of the information. (See also Sections I(C), IV(B), VIII(B), and XV.)

*Misrepresentation of Contractual Partnerships*: Sabre did not misappropriate any of CF's allege trade secrets by misrepresenting contractual partnerships. Sabre was well established in the telecom marketplace and had pre-existing knowledge of the industry's OEM partners and related market players and potential customers prior to entering to the LOA. (Tr. Ex. 2, p. 1; Trial Tr. vol. 1, 27:23-25, 28:1-3; 174:1-5, 14-17, 25; 175:1-3; Sections IV(B) and VIII(B).)

*Targeting "Key Accounts" & Contacting Customers, Vendors and Representatives*:

Sabre did not misappropriate any of CF's alleged trade secrets by targeting CF's "key accounts." Sabre and CF both acknowledge that they were competitors in the DAS/oDAS market and both Parties had knowledge of the others' contacts with, and pre-existing business relationships with, many of the same "key accounts," customers and vendors. This is reflected in the Agreement itself. (Tr. Ex. 2, p. 1.)

**C. Proposed Conclusions of Law**

CF did not prove it possessed a valid trade secret.[10] CF also did not show that Sabre disclosed or used any valid trade secret held by CF without consent.

CF did not prove Sabre fulfilled customer orders post termination of the LOA with CF products. Further, Sabre had the right to complete the purchase orders CF submitted to the Sabre EPG segment. However, even if Sabre did not have the right to complete the purchase orders CF submitted to the Sabre EPG segment, CF did not prove Sabre used CF's "trade secrets" to complete these orders.

CF's pricing information at issue is not a protected trade secret because it was available from a third-party, Cincinnati Bell, and CF obviously did not take precautions to guard the secrecy of the information. *Doubleclick,* 402 F.Supp.2d at 1257. However, even if CF's pricing information is a "trade secret," CF did not prove Sabre misused the information or acquired it by improper means.

Also, the identity of CF's contractual partners, vendors, and "key accounts" are not protected trade secrets. The Parties acknowledged in the Term Sheet that they have some of the same "key accounts" and are competitors in the DAS/oDAS marketplace with

[10] Sabre incorporates Sections IV(C), VII(C), VIII(C), and X(B).

shared knowledge of and/or preexisting relationships with the same key clients, contractual partners and vendors. (Tr. Ex. 2, p. 1, Intro.)

Nor did CF did not show that Sabre acquired any of CF's alleged "trade secrets" via improper means. See generally *L-3 Communications Corp*., 125 F.Supp.3d at 1180–81. Sabre had and CF had existing relationships with the same key clients, contractual partners and vendors in the DAS/oDAS market and/or that Sabre was provided any protected information, without knowledge of its source, via a third-party.

Additionally, CF did not prove any damages as a result of Sabre's alleged misappropriation of trade secrets.

## XI. CF's Claim 2: Breach of Implied Covenant of Good Faith and Fair Dealing – LOA

### A. Stipulated Elements

To prove a breach of an implied covenant of good faith and fair dealing, CF must show: (1) the existence of a contract; (2) performance by CF, or excusal for CF's lack of performance; (3) a contract term that allowed for discretion on the part of Sabre and Sabre's failure to perform consistent with the Parties' reasonable expectations; and (4) resulting damages. *Western Distrib. Co. v. Diodosio,* 841 P.2d 1053, 1057 (Colo.1992) (internal citations omitted).

### B. Proposed Findings of Fact

As it pertains to CF's Claim 2 for breach of the implied covenant of good-faith and fair dealing, the evidence warrants a finding in Sabre's favor. CF did not prove Sabre breached any such covenants under the Agreement. In support, Sabre incorporates the following sections of this brief as relevant to CF's allegations: (1) *Employee/Contractor*

*Payments*: Sections I(C)-(D), II(B) and III(B); (2) *Termination of the LOA*: Sections I(C)-(D), II(B) and III(B); (3) *Sabre's Fulfillment of "CF" Purchase Orders*: Sections VI(B) and VIII(B); (4) *Entering the LOA to obtain CF's Confidential Information and Trade Secrets*: Sections I(C), II(B), III(B), IV(B) and X(B); (5) *Entering the LOA in order to avoid performance of the Term Sheet*: Sections I(B), I(C), II(B) III(B) and VII(C); (6) *Entering the LOA for the purpose of securing CF's intellectual property rights upon termination of the LOA*: Sections I(B), I(C), II(B) III(B) and VII(C); and (8) *Entering the LOA to Prevent CF from Pursuing Other Acquisition Opportunities*: Sections I(B), I(C), II(B) III(B) and VII(C).

**C. Proposed Conclusions of Law**

The duty of good faith and fair dealing "does not govern pre-contractual negotiations or representations." *Amoco Oil Co*, 908 P.2d 493, 498 (Colo. 1995); see also *Amato v. Mesa Laboratories, Inc*., 2015 WL 5321446, at *4 (D.Colo. 2015). CF's allegations, even if they were true, all relate to Sabre's purported reasons for *entering into* the LOA and the Term Sheet and do not state a claim for breach of the covenant of good faith and fair dealing.

Also, CF did not meet its burden to prove Sabre entered into the LOA to obtain CF's confidential information and trade secrets. (See Sections I(B), IV(B)-(C), VII(B)-(C) and X(C).) Sabre also did not enter into the LOA to avoid performance of the Term Sheet. (See Sections I(B) and VII(C).) In addition, there is simply no evidence Sabre entered into the LOA to prevent CF from seeking other acquisition opportunities. (See Sections I(C), II(C), III(C) and VII(B).)

With respect to CF's other claims, Sabre did not breach the implied covenant of good faith and fair dealing owed to CF with regard to the LOA. CF did not perform its

duties under the LOA, and Sabre certainly did not excuse CF's performance of its obligations under the LOA. (See Sections II (B), II(C), III(B) and III(C).)

Furthermore, Sabre's payment of the "Employee/Contractor" fees under the LOA was discretionary, and Sabre performed consistent with the Parties' reasonable expectations. (Tr. Ex. 3, p. 3, ¶3(c)(vii)(1); Sections I(C) and I(D).)

Pursuant to the LOA, CF submitted purchase order to Sabre EPG and Sabre's completed certain of those purchase orders after the LOA was terminated at the instructions of those clients who asked Sabre EPG to complete the orders. (Tr. Ex. 3, p. 3, ¶3(c)(v); see also Sections IV(C) and VIII(B)-(C).)

Furthermore, Sabre did not excuse CF's obligation to repay Sabre's working capital contributions under the LOA, as evidenced by Sabre's attempts to get CF to live up to the Agreement and provide Sabre with a Promissory Note secured by CF's intellectual property as required by the LOA. (Tr. Ex. 3, p. 2, ¶3(b)(ii)(4); p. 3, ¶3(c)(vii)(1); p. 3 (unnumbered ¶); ¶3(d)(iv); Tr. Ex. 90, p. 4; Tr. Ex. 99.) (Sections I(E), II(C), III(C), Section XIII(B) and XV(A).)

Finally, CF presented no evidence as to its damages resulting from Sabre's alleged breach of the implied covenant of good faith and fair dealing.

## XII. <u>CF's Claim 10: Unjust Enrichment</u>

### A. Stipulated Elements

The elements of unjust enrichment are: (1) at the expense of the plaintiff; (2) the defendant received a benefit; (3) under circumstances making it unjust for the defendant to retain the benefit without paying for it. *Harris Group, Inc. v. Robinson*, 209 P.3d 1188, 1205 (Colo. App. 2009). However, a claim for unjust enrichment is barred by the existence

of express contract(s) that cover the same subject matter as the implied-in-law contract. *Interbank Investments, LLC v. Eagle River Water and Sanitation Distr.*, 77 P.3d 814, 816 (Colo. App. 2003). Accordingly, CF's claim for unjust enrichment is limited to the damages that it can show it sustained as a result of Sabre's breach of an implied-in-law contract(s), i.e., damages that are unrelated to Sabre's alleged breach of the NDA or LOA, both of which are express contracts.

**B. Proposed Findings of Fact**

As it pertains to ConcealFab's Claim 10 for unjust enrichment, the evidence warrants a finding in Sabre's favor because the benefits by which CF allegedly unjustly enriched Sabre are all benefits that are clearly provided for under Section 4(e)(iii)(1)-(4) of the LOA. (Tr. Ex. 3, p. 4.)

**C. Proposed Conclusions of Law**

The LOA is a valid contract. (Tr. Ex. 3.) Any benefit which Sabre allegedly received as a result of Sabre's entitlement to the benefits contained in the LOA are covered by CF's claim for breach of the LOA/contract. (Tr. Ex. 3, p. 4.)

In addition, CF's claim that Sabre was unjustly enriched is defective as a result of an express contract between the Parties covering the same benefits. Moreover, CF failed to prove that Sabre benefited. Sabre took on all of the costs and suffered all of the losses of the failed relationship between the Parties. (Tr. Ex. 3, p. 3, ¶3(c)(iv), ¶3(c)(vii), p. 3 (unnumbered ¶), ¶3(d)(iv); Tr. Ex. 146, p. 1; Trial Tr. vol. 3, 547:5-13; 548:20-25.) *Eagle River Water and Sanitation Distr.*, 77 P.3d 814, 816. Under the circumstances, it is not unjust for Sabre to retain whatever benefits it may have retained as a result of its failed relationship with CF.

## XIII. Sabre's Counterclaim 2: Unjust Enrichment

### A. Stipulated Elements

The elements for unjust enrichment are laid out in Section XIII(A), above.

### B. Proposed Findings of Fact

As it pertains to Sabre's Counterclaim 2 for unjust enrichment, the evidence warrants a finding in Sabre's favor that ConcealFab was unjustly enriched.[11]

The LOA does not define the term "working capital." (Tr. Ex. 3.) CF admits that Sabre paid all of the working capital expenses during the pendency of the LOA. (Trial Tr. vol. 1, 89:3-5.) Regardless, CF contends the LOA does not require it to repay Sabre any of the working capital expenses Sabre paid. (Trial Tr. vol. 1, 89:6-9.) It is CF's position that the LOA requires it to pay Sabre back only "pre-payments/deposit licensing fees," which CF states is comprised only of: (a) the $160,000 initial cash infusion; and (b) the $24,000 Sabre paid toward Mr. Slattery's Consulting Agreement. (Tr. Ex. 3, p. 2, ¶3(b)(ii)(4), p. 3, ¶3(c)(vii)(1), p. 3 (unnumbered ¶); Trial Tr. vol. 1, 91:1-9; 92:22-25; 93:1-2.) However, Sabre expended no less than **$919,144.89** in working capital during the short duration of the Parties' working relationship. (Tr. Ex. 117; Tr. Ex. 145, p. 1-2, 4-5; Tr. Ex. 146; Trial Tr. vol. 3, 550:13-25; 551:1-5.) Not including the $184,000 CF admits it must repay Sabre under the LOA, Sabre expended at least an additional **$735,144,89** toward CF's working capital expenses before it terminated the LOA. (Tr. Ex. 117; Tr. Ex. 145, p. 1-2, 4-5; Tr. Ex. 146; Trial Tr. vol. 3, 550:13-25; 551:1-5.) The additional $735,144.89 paid by Sabre toward CF's working capital is comprised of:

---

[11] Sabre incorporates the facts in Sections I(B)-(E), II(B), III(B), VI(C), and VII(C), above, and Section XV(A), below.

(a) **$381,958.47 (lost purchase orders):** CF submitted certain purchase orders not dependent on its small business status to Sabre to complete, the income for which was supposed to run through the Sabre EPG segment pursuant to the LOA. (Tr. Ex. 3, p. 3, ¶3(c)(v); Tr. Ex. 146, pg. 1; Trial Tr. vol. 3, 547:17-25; 548:1-11.) While CF had Sabre complete the Orders, CF was paid the income and did not remit the income to Sabre. (Tr. Ex. 146, pg. 1; Trial Tr. vol. 3, 547:17-25; 548:1-11.) CF was unjustly enriched by the work CF had Sabre complete. This takes into account the total $415,079.75 in orders CF submitted to Sabre to complete during the term of the LOA, minus $33,121.28 in the funds paid to Sabre for those purchase orders run through Sabre EPG's books and records. (*Id*.) CF presented no evidence that was not paid on directly by the clients, most of whom are well-established, credit worthy companies, or that it did not retain the funds it was paid for the fulfillment of these purchase orders, funds that should have been run through Sabre EPG as required by the LOA. (*Id*., Trial Tr. vol. 3, 557:23-25; 558:1.) Additionally, while Sabre was paid $33,121.28 on the purchase order at issue (Tr. Ex. 146, pg. 1), it cost Sabre at least $48,569.63 to complete this order. (Tr. Ex. 146, pg. 2-8.) <u>This resulted in a net loss of ($15,448.35) on the order it completed and was paid for CF</u>. (Tr. Ex. 146.) <u>Sabre made no revenue off of the work it competed for CF</u>. (Trial Tr. vol. 3, 476:21-23; 572:3-10.)

(b) **$232,329.30 (payroll)**: When the LOA was executed, CF owed back payroll to its employees and could not meet its payroll expenses. (Tr. Ex. 55; Tr. Ex. 102, pp. 3-4; Trial Tr. vol. 1, 182:1-7; Trial Tr. vol. 2, 325:15-18; 326:22-23.) During the duration of the Agreement, Sabre funded the payroll obligations of CF employees, which benefited CF because if payroll had not been paid by Sabre then CF would have continued to

accrue outstanding payroll obligations and may have lost its employees or gone out of business altogether. (Tr. Ex. 145, p. 3.)

(c) **$21,576.77 (employment taxes):** During the duration of the Agreement, Sabre funded the employment taxes of CF employees. (Tr. Ex. 145, p. 3.)

(d) **$26,691.27 (employment benefits)**: During the duration of the Agreement, Sabre funded the employment benefits of CF employees. (Tr. Ex. 145, p. 1-2.)

(e) **$67,634.47 (CF APs/vendors)**: During the duration of the Agreement, Sabre paid $67,634.47 in CF's outstanding accounts payable from the time the LOA was fully executed until CF was given notice of termination on May 26, 2015. (Tr. Ex. 117; Trial Tr. vol. 1, 120:14-22; Trial Tr. vol. 3, 540:20-23.) CF was benefited because Sabre helped to get CF current with some of CF's vendors and CF kept all the benefits of the work the vendors did since CF was, ultimately, paid for the completed purchase orders and Sabre wasn't paid. (Tr. Ex. 146; Trial Tr. vol. 3, 476:21-24; 572:3-10.)

(f) **$4,954.61 (Fitzhugh credit card)**: Sabre funded Mr. Fitzhugh's business travel and entertainment while he was supposed to be driving purchase orders and revenue to Sabre EPG segment under the LOA. Instead, CF had Sabre complete the work while CF retained these benefits. (Tr. Ex. 117; Tr. Ex. 146, pp. 2-8; Trial Tr. vol. 3, 547:17-25; 548:1-11; 541:1-10.)

During the LOA, CF retained the benefits of Sabre's advancement of CF's working capital needs while keeping almost all of the income generated via CF's purchase orders. (Tr. Ex. 146, p. 1; Trial Tr. vol. 3, 547:5-13; 548:20-25; 549:20-23.) When the LOA terminated, CF continued to operate as it had previously, but with the benefit of Sabre's significant cash infusions. Assuming the Court finds CF's argument that the only funds

due to be repaid to Sabre under the LOA are: (1) the $160,000 Sabre advanced as an immediate cash infusion to CF, and (2) the $24,000 Sabre paid toward the employee/contractor payments for a total of $184,000**,** CF was unjustly enriched in the amount of the additional **$735,144.89** paid by Sabre toward CF's working capital expenses under the Agreement and which funds undoubtedly benefited CF.

### C. Proposed Conclusions of Law

Sabre expended significant working capital funds on behalf of CF during the Parties' short relationship. CF accepted the benefit of Sabre's payment of CF's working capital requirements during the Parties' short relationship. Under these circumstances, it would be unjust for CF to retain the benefit of Sabre paying all of CF's working capital expenses without repaying Sabre for those costs. In addition to the $184,000 CF agrees it owes Sabre as a result of CF's breach of the LOA, CF has been unjustly enriched in the amount of $735,144.89.

## XIV. Sabre's Counterclaim 3: Trade Disparagement and Counterclaim 6: Tortious Interference with Contractual Relations

Sabre withdraws these claims.

## XV. Damages

### A. Sabre's Damages

*Sabre's Damages Related to CF's Breach of Contract – LOA*[12]: CF was obligated to provide Sabre with a Promissory Note secured by CF's intellectual property should CF's licensing fees prove insufficient to repay Sabre the working capital contributions it loaned to CF under the LOA. (Tr. Ex. 3, p. 2, ¶3(b)(ii)(4), p. 3 (unnumbered ¶).) *Sabre*

[12] See Sections I(B)-(E), II(B)-(C), III(B-(C), VI(C) and VII(C).

*incured a net loss of (-$15,448.35) on the orders it completed for CF under the LOA.* (Tr. Ex. 146, pg. 2-8; Trial Tr. vol. 3, 547:17-25; 548:1-11). CF admits that it owes Sabre no less than $184,000, which total is comprised of: (a) the $160,000 initial cash infusion from the pre-payments or deposit licensing fees; and (b) the $24,000 for Mr. Slattery's Consulting Agreement, at 11% interest, payable over 12 months and guaranteed by a security interest in CF's intellectual property. (Tr. Ex. 3, p. 2, ¶3(b)(ii)(4), p. 3, ¶3(c)(vii)(1), p. 3 (unnumbered ¶); Ex. 90, p. 2, §2; Trial Tr. vol. 1, 91:1-9; 92:22-25; 93:1-2.)

However, in addition to the payments or deposit licensing fees, the LOA required Sabre to pay CF's working capital expenses. (Tr. Ex. 3, p. 3, ¶¶3(c)(iv), (3)(c)(vii), (3)(c)(vii)(1)-(2).) When CF solicited the approval of the LOA from its shareholders, it sent its shareholders a summary stating that Sabre would be providing working capital to CF in the form of a loan. (Tr. Ex. 122; Trial Tr. vol. 1, 205:24-25; 206:5-6.) While the LOA does not define the term "working capital," it does state, "Sabre will retain the right to offset funds due to [CF] for any amounts that may be owed from [CF] to Sabre (to include **but not limited to** pre-paid licensing fees and the elimination of employee obligations as outlined in 3(b)(ii)." (Tr. Ex. 3, p. 3, ¶3(d)(iv).) (Emphasis added.) Sabre expended not less than $919,144.89 in working capital funds in favor of CF. (See Section XIII(A).)

As a result of CF's breach of the LOA, CF owes Sabre a 1-year note in the amount of $919,144.89 at Sabre's incremental borrowing rate of 11% per annum calculated on the basis of a 365 day year and the actual number of days elapsed from May 26, 2015 until the present (June 1, 2018) for a total amount due and owing of **$1,224,401.72**, which total is comprised of **$919,144.89** in principal and **$305,256.83** in simple interest payable

in monthly installments and guaranteed by a security interest in favor of Sabre in CF's intellectual property.

In the alternative, CF owes Sabre:

(1) Breach of Contract: A 1-year note in the amount of $184,000 at Sabre's incremental borrowing rate of 11% per annum calculated on the basis of a 365 day year and the actual number of days elapsed from May 26, 2015 until the present (June 1, 2018) for a total amount due and owing of **$245,108.16**, which total is comprised of $184,000 in principal and $61,108.16 in simple interest payable in monthly installments and guaranteed by a security interest in favor of Sabre in CF's intellectual property related to CF's breach of the LOA; and

(2) Unjust enrichment: **$735,144.89** as a result of CF's unjust enrichment related to the benefits it retained from Sabre.

**B. CF's Purported Damages**

*CF's Alleged Damages Related to the UCC-1 Financing Statement*: CF presented only vague, unsupported testimony and absolutely no documentary evidence that the UCC-1 prevented the formation of a contract between CF and any potential lender, any current or potential customer, any potential vendor, or any other third party. (Trial Tr. vol. 1, 135:13-21, See Sections I(B)-(F) and IX.)

The "Rule of Certainty" provides "[t]he trier of fact may not base an award of damages on mere speculation, rather, the plaintiff must establish by a preponderance of the evidence that [the plaintiff] has in fact suffered damage and that the evidence introduced provides a reasonable basis for a computation of damages." *Pomeranz v. McDonald's Corp.*, 843 P.2d 1378, 1381 (Colo. 1993) (citing *Bunch v. Signal Oil & Gas*

*Co.*, 505 P.2d 41, 43 (Colo.App.1972) (holding that there must be sufficient competent evidence from which the trier of fact could estimate the amount of damages with a reasonable degree of certainty); *Restatement (Second) of Contracts* § 352 (1981) (damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty). Simply put, CF cannot recover any damages related to the UCC-1 Financing Statement because it has failed to meet its burden of proof.

*CF's Purported Damages Related to Sabre's Alleged Breach of Contract – LOA*: Sabre did not breach the LOA.[13] To the extent the Court disagrees, and finds CF was damaged, Sabre's damages (discussed above) are greater than and offset CF's alleged damages. CF's damages claims remain unclear and uncertain. Sabre believes CF may claim damages related to Sabre's purported breach of the LOA totaling **$587,897.54**, which includes: (1) $96,000 related to the fund CF owed Mr. Slattery as "Employee Contractor" payments (ECF 68, pp. 10-11, ¶56); (2) $300,000 in severance and a $125,000 signing bonus to Mr. Fitzhugh related to the 74 days he worked for Sabre prior to the termination of the Agreement and his return to CF (*Id.*); and (3) $66,897.54 in unpaid CF accounts payable (*Id.*, Tr. Ex. 146, p. 8). Sabre, however, has been damaged in an amount no less than **$919,144.89** due to CF's breach of the LOA. (Section XIII(B).) Additionally, while running the CF purchase orders through Sabre's EPG accounting has caused confusion, the evidence shows that only one CF purchase order was actually billed and collected by Sabre *which resulted in a net loss of ($15,448.35) on the order it*

[13] See Sections I(B)-(F), II(B), II(C), III(B), III(C) and IX, above.

*completed and was paid for CF.* (Tr. Ex. 146.) *Sabre made no revenue off of the work it competed for CF.* (Trial Tr. vol. 3, 476:21-24; 572:3-10.)

*CF's Lack of Damages Related to Sabre's Alleged Breach of Contract – NDA:* CF cannot show that it sustained any damages as a result of Sabre's purported breach of the NDA. Additionally, CF may claim that it is entitled to its attorney fees and costs under the NDA. (Tr. Ex. 1, p. 3, §9; Trial Tr. vol. 1, 16:6-10.) CF's total claimed damages related to this claim are unknown. However, none of these alleged, uncertain damages claims are supported by the facts of the case - which show that Sabre did not breach the NDA (Sections IV(B) and IV(C)) -or the "Rule of Certainty," which provides "the plaintiff must establish by a preponderance of the evidence that [the plaintiff] has in fact suffered damage and that the evidence introduced provides a reasonable basis for a computation of damages." *Pomeranz*, 843 P.2d at 1381.

*CF's Lack of Damages Related to Sabre's Alleged Breach of Contract—Employment Agreement*: To the extent the unsigned Employment Agreement is a valid contract, the Employment Agreement by its own terms is void *ab initio* because a stock or asset purchase agreement never closed. (Tr. Ex. 4, p 1. ¶1).) Further, based on the facts outlined in Section V(B)(1), Mr. Fitzhugh cannot show that Sabre intended to be bound by the unsigned Employment Agreement.

*CF's Purported Damages Related to Sabre's Alleged Breach of Fiduciary Duty*: CF has sustained no damages as a result of Sabre's alleged breach of the fiduciary duty. Sabre was not a fiduciary of CF because the Agreement between the Parties did not call for the Parties to share profits and losses. *Sabre made no revenue off of the Agreement*

and Sabre suffered all of the losses. (Trial Tr. vol. 3, 476:21-24; 572:3-10; see Sections VI(C)-(D).)

*CF's Lack of Damages Related to Sabre's Alleged Fraud in the Inducement*: CF has sustained no damages as a result of Sabre's alleged fraud in the inducement.[14] In fact, the record shows that CF substantially benefited as a result of entering to the LOA to the extent that Sabre provided CF with over $919,144.89 in working capital that allowed CF to continue its operations. CF's Board believed the LOA was "the best tangible alternative for CF to remain viable…." (Tr. Ex. 122, p. 1, ¶3.) Mr. Denton noted in his Report that "there really were no other more favorable options" than entering to the Agreement with Sabre. (Tr. Ex. 102, p. 7.) (See Sections XIII(B) and XV(A).)

*CF's Purported Damages Related to Sabre's Alleged Tortious Interference with Contractual Relationship*: The rule of certainty "requires that together with the fact of damage, *the plaintiff submit substantial evidence*, which together with reasonable inferences to be drawn therefrom provides a reasonable basis for computation of the damage." *Ryskin v. Banner Health, Inc*., 2010 WL 4873671, at *1 (D.Colo. 2010). CF presented no evidence as to its monetary damages as a result of: (1) Sabre's finishing the JMA purchase order(s); (2) Sabre's finishing the Cincinnati Bell purchase order, *which was finished using Sabre's product*; or (3) as a result of Sabre completing any other purchase orders submitted by CF to Sabre's EPG for completion pursuant to the LOA and that Sabre might have finished after termination of the LOA. (See Sections IV(B)-(C) and Sections VIII(B)-(C).)

---

[14] See Sections I(C), V(B)(1), VII(C)-VII(D).)

*CF's Lack of Damages Related to Sabre's Alleged Tortious Interference with Prospective Business Relations*: CF has presented only vague testimony and no documentary evidence as to its damages related to Sabre's alleged interference with any of CF's prospective business relations, including DAS/ Epic, "key accounts," prospective lenders or prospective acquirers. (See Sections IX(B)-(C).) This is not enough to overcome the Rule of Certainty. CF did not meet its burden. *Pomeranz*, 843 P.2d 1378, 1381.

*CF's Lack of Damages Related to Sabre's Alleged Misappropriation of Trade Secrets*: CF presented no evidence as to its damages as a result of Sabre's alleged misappropriation of trade secrets. *Pomeranz*, 843 P.2d 1378, 1381. (See Sections IV(B)-(C), VIII(B)-VIII(C), and X(B)-(C).)

*CF's Purported Damages Related to Sabre's Alleged Breach of Implied Covenant of Good Faith and Fair Dealing – LOA*: CF presented no evidence of damages stemming from Sabre's alleged breach of the implied covenant of good faith and fair dealing.[15] Even if CF's allegations were true, however, CF's claims all relate to Sabre's purported reasons for entering in into the Agreement and, therefore, do not state a claim for breach of the covenant of good faith and fair dealing. The duty of good faith and fair dealing "does not govern pre-contractual negotiations or representations." *Amoco Oil Co*, 908 P.2d at 498; see also *Amato*, 2015 WL 5321446, at *4.

*CF's Lack of Damages Related to Sabre's Alleged Unjust Enrichment*: Even if CF's claim that Sabre was unjustly enriched is not defective because of an express contract

---

[15] See Sections VII(C) and XI(B)-XI(C).)

between the Parties which covers the same benefits. *Interbank Investments, LLC*, 77 P.3d at 816. Under the circumstances of this case it would not be unjust for Sabre to retain whatever benefits it may have retained as a result of its failed relationship with CF. (See Sections XII(B)-(C).)

Dated: June 1, 2018.

**GOOSMANN LAW FIRM, PLC**

By: /s/ Jeana L. Goosmann
Jeana L. Goosmann, AT0002984
Anthony L. Osborn, AT0009513
Elizabeth M. Lally, AT0013010
410 5th Street
Sioux City, IA 51101
Phone: 712-226-4000
Fax: 712-224-4517
lallye@goosmannlaw.com
goosmannj@goosmannlaw.com
osborna@goosmannlaw.com
**ATTORNEY FOR DEFENDANTS SABRE INDUSTRIES, INC. AND MIDWEST UNDERGROUND TECHNOLOGY, INC.**

## CERTIFICATE OF SERVICE

I certify that on JUNE 1, 2018, I served the above *Defendants' Post-Trial Brief And Proposed Findings Of Fact And Conclusions Of Law* via email to:

Angela D. DeVine
S&D Law
1801 York Street
Denver, CO 80206
devinea@s-d.com

*/s/ Celia M. Baker*
Celia M. Baker