**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 15-cv-01793-CMA-KLM

CONCEALFAB CORPORATION, a Colorado corporation,

      Plaintiff,

v.

SABRE INDUSTRIES, INC., a Delaware corporation, and
MIDWEST UNDERGROUND TECHNOLOGY, INC., an Illinois corporation,

      Defendants.

---

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

---

      This case involves a dispute between two competing businesses over whether either party breached agreements concerning their merger or acquisition and, if so, the extent of damages caused by any such breach.

      Beginning on March 26, 2018, the Court presided over the three-day bench trial on Plaintiff ConcealFab Corporation's claims for: (1) breach of contract of the parties' Licensing Operating Agreement and of their Non-Disclosure Agreement; (2) breach of the implied covenant of good faith and fair dealing; (3) breach of fiduciary duty; (4) misappropriation of trade secrets; (5) tortious interference with contractual relationships; (6) tortious interference with prospective business relations; (7) fraud in the inducement; and (8) breach of contract of the Employment Agreement between

ConcealFab's CEO and Defendant Sabre Industries, Inc.,[1] *see* (Doc. # 68 at 10–20); and on Defendants Sabre Industries, Inc. and Midwest Underground Technology, Inc.'s (together, "Sabre") counterclaims for: (1) unjust enrichment, and (2) breach of contract of the Licensing Operating Agreement,[2] *see* (Doc. # 70 at 26–31).  (Doc. ## 137–43.) Having heard the evidence presented at the trial and having reviewed the parties' proposed findings of fact and conclusions of law (Doc. ## 148–49), the Court now enters its findings of fact and conclusions of law.

## I.  <u>FINDINGS OF FACT</u>

### A.  THE PARTIES

Plaintiff ConcealFab and Defendant Sabre are competitors in the small cell Distributed Antennae System ("DAS") and outdoor Distributed Antennae System ("oDAS") segments of the telecom market, and each has product lines, customer relationships, and intellectual property.  (Doc. # 126 at 8.)

ConcealFab is a Colorado corporation that engineers and manufactures small cell DAS and oDAS products for the commercial wireless industry and for the government.  (Testimony of Fitzhugh, Doc. # 141 at 5–6.)  It was founded by Michael Slattery.  Since March 2013, Jonathan Fitzhugh has been ConcealFab's CEO and a member of its Board of Directors.  (*Id.* at 6.)  At all relevant times, Chris Odell and Duncan Stewart were members of ConcealFab's Board of Directors.  (*Id.* at 56.) Richard Denton was a member of the Board of Directors between 2011 and 2013 and

---

[1] ConcealFab withdrew its claim for unjust enrichment.  (Doc. # 148 at 44.)
[2] Sabre withdrew counterclaims for trade disparagement and tortious interference with contractual relations.  (Doc. # 149 at 43.)

then again from June 2015 through the present, and he was the sole member of

ConcealFab's Special Litigation Committee.  (Testimony of Denton, Doc. # 142 at 310–

13.)

Sabre[3] is a Delaware corporation that has been in the telecom industry for 40

years.  (Testimony of Rossetti, Doc. # 143 at 487.)  Sabre sought to diversify into the

small cell DAS and oDAS segments of the telecom industry, and in April 2014, Sabre's

parent company acquired 180 Logistics, LLC ("180 Logistics"), a company that

engineered and manufactured products for the small cell DAS and oDAS markets.  (*Id.*

at 487–88; Testimony of Cochran, Doc. # 142 at 363–64.)  At all relevant times, Peter

Sandore was the CEO and President of Sabre, and he is currently the Chair of the

Board of Sabre.  (Testimony of Rossetti, Doc. # 143 at 482.)  Timothy Rossetti was

Sabre's Executive Vice President and Chief Financial Officer; he presently serves in

those positions and as Sabre's Chief Administrative Officer.  (*Id*. at 420.)  Patrick

Cochran founded 180 Logistics and, in 2015, was the Vice President for Engineering

Solutions for Sabre.  (Testimony of Cochran, Doc. # 142 at 335.)  Cochran is now a

Senior Vice President.  (*Id*.)  Douglas Huff was the President of Sabre's telecom division

until early March 2015.  (Testimony of Fitzhugh, Doc. # 141 at 25, 100.)  Tony Sabatino,

Sabre's Chief Development Officer, replaced Huff as the President of Sabre's telecom

---

[3] Defendant Midwest Underground Technology, Inc. ("MUTI") is a wholly-owned subsidiary or
division of Sabre.  (Doc. # 126 at 8.)  Defendants made clear in their dealings with ConcealFab
that Sabre and MUTI were each and both of them bound by any agreements with ConcealFab.
*See, e.g.*, (Trial Ex. 1 at 2 ("MUTI and Sabre may be used interchangeably in this agreement."))
Both Defendants will collectively and individually be referred to as Sabre in this Order.

division upon Huff leaving the employ of Sabre.  (*Id*. at 101; Testimony of Rossetti, Doc. # 143 at 436.)

**B.    THE NON-DISCLOSURE AGREEMENT**

ConcealFab and Sabre began discussions to combine the two businesses in 2014.  (Doc. # 126 at 8; Testimony of Rossetti, Doc. # 143 at 479.)  In late July 2014, Sabre suggested that the parties enter into a non-disclosure agreement.  (Trial Ex. 5.)  Sabre provided a draft agreement, to which ConcealFab did not make any material changes.  (Testimony of Cochran, Doc. # 142 at 336; Testimony of Fitzhugh, Doc. # 141 at 10–11.)

The parties executed the Non-Disclosure Agreement ("NDA") on August 4, 2014.  (Trial Ex. 1 at 5.)  The preamble to the NDA explained that "the Parties wish to explore a business opportunity of mutual interest, and in connection with this opportunity, each Party may disclose to the other certain business and/or technical information that is non-public, confidential or proprietary in nature."  (*Id.* at 1.)  The NDA defined "Confidential Information" broadly; the term included, among other information:

> (a) past, present and future business affairs such as finances, customer and/or supplier information, products, services, organizational structure and internal practices . . . and all business, marketing, development, sales and other commercial strategies;
> (b) know-how, trade secrets, tools, methods, techniques, designs, and other information which derives economic value, actual or potential, from not being generally known to, or readily ascertainable through proper means by persons who can obtain economic value from its disclosure or use (collectively "Trade Secrets"); [and]
> (c) all designs, specifications, documentation, components, source code, object code, images, icons, schematics, drawings, protocols, processes or depictions, in whole or in part, of any of the foregoing[.]

4

(*Id.*)  The NDA obligated the parties to keep in confidence "all Confidential Information disclosed to either of them by the other" and to "use such Confidential Information only for the purposes of evaluating and engaging in discussion concerning a potential business relationship between the Parties."  (*Id.* at 2.)  Finally, the NDA also required the parties to agree "that any violation or threatened violation of [the NDA] may cause irreparable injury to the other Party, entitling the other Party to seek . . . injunctive relief . . . and . . . [to] pursue any other available remedy, at law or in equity, including the recovery of damages."  (*Id.* at 3.)

The parties have not amended or cancelled the NDA, and it remains in effect. (Testimony of Fitzhugh, Doc. # 141 at 15–16.)

## C.    THE TERM SHEET

Between November 2014 and February 2015, the parties exchanged drafts of a Term Sheet, in which they sought to outline the key terms from which a definitive agreement to combine ConcealFab and Sabre could be developed.  (Doc. # 126 at 8.) Fitzhugh represented ConcealFab and Huff represented Sabre in these discussions. (Trial Exs. 10–14, 33; Testimony of Fitzhugh, Doc. # 141 at 26–37.)

The parties executed the Term Sheet on **February 3, 2015**; Fitzhugh signed the agreement on ConcealFab's behalf, and Sandore signed it on Sabre's behalf.  (Trial Ex. 2 at 6.)  The Term Sheet began with an overview of each entity's "product lines, customer relationships, and intellectual property," which included:

- [Sabre] brings the following: manufacturing capability, engineering expertise as it relates to power, battery back-up, and radio enclosures . . . , backed by a large and credible parent organization, Sabre, and

customer credibility with key accounts such as CCI [Crown Castle], AT&T, VzW [Verizon], Sprint, and others.

- [ConcealFab] brings the following: RF expertise as it relates to antenna concealment, PIM mitigation, and RF interference mitigation, engineering expertise as it relates to sound suppression, electrical integration, and total system integration. In addition, [ConcealFab] has significant customer penetration at key accounts including CCI, Verizon, and AT&T; plus an established marketing/sales footprint with several leading Manufacturing Reps, National Distributors, and OEM partners. [ConcealFab] is working in both the commercial and government markets and an important aspect of the government market in maintaining small business status . . . as [it] works to be an approved secure facility with appropriate clearances.

(*Id.* at 1); *see* (Testimony of Fitzhugh, Doc. # 141 at 173–75.)

The Term Sheet explicitly stated that it was "non-binding on ether party and establishes only the intent of the organizations to work diligently to develop a formal agreement around the basics of the key points as outlined in [the Term Sheet]." (*Id.* at 5.) It called for the parties to "establish an interim plan/agreement that [would] allow for combined efforts in the marketing, business development, customer relationships, and manufacturing areas" within ten days of the execution of the Term Sheet. (*Id.*) The Term Sheet also provided for a 60-day "exclusivity period" "to allow for [the parties] to formulate an agreement acceptable to both parties" and during which ConcealFab could not "solicit, receive, share documents, or take any other action that would be in conflict with the goal of developing a formal agreement." (*Id.* at 6.)

Two provisions of the Term Sheet are notable, as they informed the parties' subsequent discussions about acquisition. First, the Term Sheet contemplated Sabre paying $1.2 million for the "[p]urchase of all the non-cash assets of ConcealFab . . . (including but not exclusive to all IP, processes, designs, etc.)." (*Id.* at 2.) The

purchased assets were to be "setup in a new Sabre entity within [Sabre's] products group" that would "manage all commercial and governmental products and complementary services that are awarded," and what remained of ConcealFab post-acquisition was to "change its name to 'CFG Systems.'" (*Id.*)  ConcealFab was to use the $1.2 million to, among other things, "[f]und employee obligations of ~$250,000.00" (*Id.*)  The Term Sheet also stated that "[a]ll existing shareholders and option holders must vote (per [ConcealFab's] bylaws) to approve this transaction," and that "[f]ull releases will be provided by each shareholder and option holder."  (*Id.*)

Second, the Term Sheet contemplated Fitzhugh leaving the employ of ConcealFab and becoming the "Executive VP of Engineered [P]roducts serving the Small Cell/oDAS/DAS segment" of Sabre upon Sabre's acquisition of ConcealFab.  (*Id.* at 5.)  It also called for "[a]n agreed upon employee base" to transition from ConcealFab to Sabre, where they would "accept employment packages (including non-compete language) and become key team members."  (*Id.*)

Finally, the Term Sheet also included an appendix, "Addendum A, Base & Upside Case," that was created by Fitzhugh and other ConcealFab employees and identified ConcealFab's business opportunities at the time the parties agreed to the Term Sheet.  (*Id.* at 7; Testimony of Fitzhugh, Doc. # 141 at 166–67.)  Among ConcealFab's identified opportunities was "Hill AFB" (Hill Air Force Base), with a "potential lifetime value" of $21 million.  (Trial Ex. 2 at 7.)  Fitzhugh knew at the time that the value of the contract for Hill Air Force Base was $7.9 million, according to the request for proposal ("RFP"), but "believe[d] that the value of [the] contract was going to

be greater than just what was represented in the RFP." (Testimony of Fitzhugh, Doc. # 141 at 168–69.)

On March 6, 2015, approximately one month after the parties executed the Term Sheet, ConcealFab informed Sabre that it had lost that opportunity to provide services to Hill Air Force Base. (Doc. # 126 at 9.)

## D. NEGOTIATION OF AN EMPLOYMENT AGREEMENT

While Fitzhugh and Huff negotiated the Term Sheet, they also collaborated on an Employment Agreement for Fitzhugh's future employment by Sabre, which the Term Sheet contemplated. Fitzhugh represented ConcealFab and Huff represented Sabre in these discussions in January 2015. *See* (Trial Exs. 4, 18, 20–24, 26–27.) Fitzhugh represented to Huff that ConcealFab's Board of Directors needed to review and approve an Employment Agreement before they signed off on the Term Sheet. (Trial. Ex. 15; Testimony of Fitzhugh, Doc. # 141 at 36, 43–44.) Sabre's vice president for human resources drafted an Employment Agreement, the first draft of which Sabre emailed to Fitzhugh on January 7, 2015. (Trial Ex. 18; Testimony of Fitzhugh, Doc. # 141 at 44.) Fitzhugh's and Huff's subsequent drafts reflected changes to the definitions of "cause" for termination and "good reason" for resignation, and to the conditions upon which Fitzhugh's signing bonus would be returned or his severance would be paid. (Trial Exs. 20–22, 24, 26–27.)

The parties finalized the Employment Agreement on or about **January 15, 2015**, prior to the execution of the aforementioned Term Sheet. (Trial Ex. 4; Testimony of Fitzhugh, Doc. # 141 at 57, 216.) Fitzhugh assigned his rights to the $125,000.00 sign-

on bonus and the $300,000.00 in severance pay to ConcealFab. (Testimony of Fitzhugh, Doc. # 141 at 60–61.) At some point thereafter, ConcealFab's Board of Directors approved the January 15, 2015 version of the Employment Agreement. (Testimony of Fitzhugh, Doc. # 141 at 59, 220.) However, **neither party executed the Employment Agreement** at the time because it was intended to go into effect when Fitzhugh became any employee of Sabre. (Trial Ex. 4; Testimony of Fitzhugh, Doc. # 141 at 59–60, 98; Testimony of Odell, Doc. # 142 at 244.)

Under the terms of the final, non-executed Employment Agreement, Fitzhugh was to become an employee of Sabre "on the date of consummation of the acquisition of [ConcealFab] . . . by Sabre . . . (such date, the 'Effective Date')." (Trial Ex. 4 at 2.) The Employment Agreement also provided:

> This Agreement shall automatically terminate without any action on the part of any person and be void *ab initio* if the Asset Purchase Agreement is terminated in accordance with its terms, and neither Sabre nor any other person shall have any liability to [Fitzhugh] under this Agreement if the Closing (as defined in the Stock Purchase Agreement) does not occur.

(*Id.*) Neither an asset purchase agreement or a stock purchase agreement ever occurred between the parties. (Testimony of Fitzhugh, Doc. # 141 at 216.)

The Employment Agreement provided that Fitzhugh's title at Sabre was to be "Executive Vice President – DAS and Small Cell Product Segment" and that he was to report to the president of Sabre's Telecom Segment. (Trial Ex. 4 at 2.) Fitzhugh's annual salary was to be $300,000.00, plus a $725.00 per month stipend for his vehicular costs. (*Id.*) Within 30 days of Fitzhugh's hire date, Sabre was to pay him a $125,000.00 sign-on bonus. (*Id.* at 3.) The Employment Agreement required that

Fitzhugh repay the sign-on bonus to Sabre if he was terminated for cause or resigned

without good reason within the first year of his employment. (*Id.*)

The Employment Agreement also detailed conditions of any potential severance

pay:

> If Sabre terminates [Fitzhugh] without "Cause" (as defined in Paragraph 25) after expiration of the Non-Termination Period, or [Fitzhugh] resigns at any time for "Good Reason" (as defined in Paragraph 25) . . . , [Fitzhugh] shall receive severance pay equivalent to his base salary at the end of employment . . . for a period of one (1) year.
> . . . If [Fitzhugh] ends his . . . employment voluntarily, or is terminated for "Cause" as set forth in Paragraphs 24 and 25, [Fitzhugh] shall not be entitled to any severance.

(*Id.* at 2.) Paragraph 25 of the Employment Agreement defined "Cause" as:

> [T]he material failure by [Fitzhugh] to observe Sabre written policies . . . ; willful misconduct by [Fitzhugh] in the performance of [his] duties hereunder; insubordination; [and] willful unauthorized disclosure or misuse of Confidential Information. . . "Cause" shall not include termination as a result of a job elimination or staff reduction, including any that might occur during a re-organization or restructuring.

(*Id.* at 6.) "At the conclusion of Year 2" of Fitzhugh's employment by Sabre, the

definition of "Cause" was to expand to include "the material failure by [Fitzhugh] to meet

financial and performance criteria as established for the business segment that

[Fitzhugh] is directing." (*Id.*) Paragraph 25 defined "Good Reason" as:

> [T]he occurrence of any of the following without [Fitzhugh's] consent: (1) a materially [sic] reduction in [Fitzhugh's] duties; (B) [Fitzhugh's] annual base salary or annual bonus potential is reduced or [Sabre] fails to pay any material amount of compensation when due; (; [sic] Sabre relocates [Fitzhugh's] principal place of business more than . . . 50 miles away from his current residence; or (E) Sabre materially breaches any material provision of this Agreement.

(*Id.*)

Neither party has ever signed the Employment Agreement.  *See* (Trial Ex. 4 at 10.)

## E.   THE LICENSING OPERATING AGREEMENT

The Term Sheet established target deadlines for the parties' formalized agreements: within ten days of its execution, the parties were to "establish an interim plan/agreement that [would] allow for combined efforts," and within a maximum of 75 days, the parties were to "clos[e]" on a deal.  (Trial Ex. 2 at 5, 6.)  After the parties executed the Term Sheet on February 3, 2015, ConcealFab tried unsuccessfully to schedule a series of meeting to reach these target deadlines, but Huff cancelled them on Sabre's behalf.  (Testimony of Fitzhugh, Doc. # 141 at 63–64.)

On or about February 14, 2015, Huff contacted Fitzhugh to inform him that Sandore and Rossetti had not given their approval to an acquisition and that Sabre wanted to restructure their deal as a licensing operating agreement to together secure near-term business opportunities and to satisfy ConcealFab's need for capital.  (*Id.* at 64–65.)  ConcealFab was, as Fitzhugh well knew, in a precarious financial position at the time.  (*Id.* at 24; Trial Ex. 102 at 3–4.)  It had a significant amount of outstanding accounts payable, many of which were well past due; its total accounts payable was $422,968.26 as of March 11, 2015, for example.  (Trial Ex. 55; Trial Ex. 102 at 3–4; Testimony of Rossetti, Doc. # 143 at 494–96.)  On February 16 and 18, 2015, Fitzhugh responded to Huff's suggestion with "thought document" and a draft list of the party's responsibilities under a licensing operating agreement.  (Trial Exs. 37, 41; Testimony of Fitzhugh, Doc. # 141 at 65–69.)  In turn, Huff proposed a first draft of an agreement on

February 23, 2015.  (Trial Ex. 45.)  The parties continued to exchange drafts through late February and early March 2015.  *See* (Trial Exs. 47, 50, 51; Testimony of Odell, Doc. # 142 at 252; Testimony of Fitzhugh, Doc. # 141 at 85–88.)

On or about March 10, 2015, Huff informed Fitzhugh that he was leaving his employment with Sabre.  (Testimony of Fitzhugh, Doc. # 131 at 100–01.)

On March 12, 2015, Fitzhugh informed Huff that ConcealFab had "received an affirmative vote from a majority [of] both the Preferred class standalone and the Common plus Preferred classes combined" in support of the parties' draft agreement. (Doc. # 126 at 9; Trial Ex. 57.)

On **March 13, 2015**, the parties executed a final Licensing Operating Agreement ("LOA").  (Doc. # 126 at 9; Trial Ex. 3.)  Fitzhugh signed the LOA on behalf of ConcealFab, and Sandore signed it on behalf of Sabre.  (Trial Ex. 3 at 4.)

The LOA began with a preface explaining that in support of their previous agreement to pursue current opportunities, the parties "agree to amend the [T]erm [S]heet with . . . adjustments to facilitate an accelerated ability to execute business opportunities and to support the working capital requirements" of ConcealFab.  (*Id.* at 1.)  The LOA's initial term was from the date of execution through August 30, 2015, and during this period, Sabre had "the sole exclusive right to effectuate [an] acquisition" of ConcealFab.  (*Id.*)

The LOA provided that Sabre would "set up a financial reporting segment under their engineered product group [('EPG')]" to "capture all financial-related results associated" with the parties' collaboration, (*id.*), which the Court henceforth refers to as

the "new Sabre EPG segment," *see* (*id.* at 3). "All commercial and non-small business/non-cleared facility work and opportunities" were to be "marketed, closed, [and] operated" through the new Sabre EPG segment, as were "[a]ny orders post-execution of [the LOA] not depending on [ConcealFab's] small business or cleared facility status." (*Id.* at 2, 3.) The new Sabre EPG segment was also to capture all financial transactions related to such work. (*Id.* at 2.) The working capital for the new Sabre EPG segment would be funded by Sabre, but the LOA clarified that none of ConcealFab's pre-existing accounts payable would "move over to the new Sabre EPG segment." (*Id.* at 3.)

The remaining ConcealFab entity—that which was not absorbed into the new Sabre EPG segment—was to be renamed "CFG." (*Id.* at 2.) "Any Sabre products requiring small business or a cleared facility status" were to run through CFG, "when possible." (*Id.* at 2, 3.)

With respect to employees, the LOA stated that Fitzhugh and "agreed upon employees [would be] terminated from [ConcealFab] as of an agreed upon date (targeted for [March 9, 2015])" and onboarded at Sabre through its "typical . . . onboarding process." (*Id.* at 1.) ConcealFab was responsible for all liabilities of these employees "prior to the Sabre hire date." (*Id.*)

The LOA affirmed the Term Sheet's contemplated "purchase price of $1.2 [million]," approximately $250,000.00 of which was to "[f]und employee obligations." (*Id.* at 2.) The LOA detailed that $120,000.00 of this $250,000.00 in employee obligations was to be directed to an "Employee/Contractor buyout," would "funded through a

prepayment/deposit fee licensing fees," and would be paid to ConcealFab in "scheduled payment amounts to be determined." (*Id.* at 2, 3.) Elsewhere, the LOA again restated that this same $120,000.00 "must be utilized to effectuate a buyout of the current consulting agreement," implicitly referring to the consulting agreement between ConcealFab and its founder, Slattery. (*Id.* at 3; Testimony of Fitzhugh, Doc. # 141 at 92; Testimony of Rossetti, Doc. # 143 at 429.) That consulting agreement, executed November 18, 2014, required ConcealFab to pay Slattery a monthly fee of $12,000.00 for 12 months, for a total of $144,000.00. (Trial Ex. 8; Testimony of Fitzhugh, Doc. # 141 at 21–22.) If the LOA was terminated, the amounts paid by Sabre towards the $250,000.00 in employee obligations "would revert to a 1-year note due [to] Sabre guaranteed by all IP [(intellectual property)] at a rate equivalent to their incremental borrowing rate." (Trial Ex. 3 at 2.)

Under the terms of the LOA, both parties were responsible for licensing fees. As the new Sabre EPG segment acquired business, Sabre would "accrue licensing fees due [to] CFG at the rates and per the calculations outlined" in the Term Sheet. (*Id.* at 3.) And as CFG generated business, it would accrue licensing fees "due [to] Sabre at the rate of 45% of the EBITDA [(earnings before interest, tax, depreciation, and amortization)] generated by the CFG entity." (*Id.*)

Significantly, the LOA called for Sabre to "provide working capital at an amount to be determined to CFG at Sabre's incremental cost of capital," with the "method of funding to be determined." (*Id.* at 3.) The LOA specified:

> **Sabre will pre-pay/deposit licensing fees to CFG** at an amount to be agreed upon at the execution of and during the duration of this LOA. This

amount must be repaid to Sabre prior to any distributions to CFG shareholders. This includes an **immediate infusion of cash to ConcealFab in the amount of [$160,000.00]** on March 13[, 2015,] to be utilized as source of funds to pay current [accounts payable] as per listing received [March 11, 2015,] and as per agreement, 2015 [sic] and **an additional [$120,000.00]** (with scheduled payment amounts to be determined) for the Employee/Contractor which must be utilized to effectuate a buyout of the current consulting agreement.

(*Id.*) (emphases added.) These pre-pay/deposit licensing fees paid by Sabre were to be repaid by CFG "or offset against licensing fees earned and due to CFG from Sabre." (*Id.*)

In the event that "the LOA is terminated without an acquisition and the licensing fees due [to] CFG from Sabre are not sufficient to offset balances due to Sabre from CFG," the LOA required that the balance due from CFG to Sabre to repay the licensing fees would "revert to the form of a 1-year note at Sabre's incremental borrowing rate payable in monthly installments." (*Id.*) This note was to be guaranteed by a security interest in ConcealFab's intellectual property. (*Id.*)

The LOA included three "[a]dditional provisions" bearing on the parties' claims. First, the LOA required that "[a]ll existing shareholders and option holders [of ConcealFab] must vote (per ConcealFab's Corporation's By-Laws) to approve this LOA structure in accordance with ConcealFab's corporate governance documents." (*Id.* at 4.)

Second, in the event that the LOA was terminated, Fitzhugh's "employment agreement shall terminate as 'resignation for good reason.'" (*Id.*) This was the only mention of an employment agreement in the LOA.

Third, the LOA identified the parties' respective licensing rights in the event that the LOA was terminated.  (*Id.*)  Licensing rights "for the concealed shelters and back lobe suppressors" would belong to ConcealFab, though ConcealFab would provide "most favored nation" status and offer reduced pricing on these products to Sabre.  (*Id.*)  Sabre would "retain the exclusive IP [(intellectual property)] rights to their radio cages and shroud portfolio as outlined in Exhibit A," though ConcealFab would receive a ten percent discount on these products.  (*Id.*)  Any intellectual property developed by the new Sabre EPG segment would become the property of Sabre.  (*Id.*)  And finally, the parties agreed that they "each have specific pole capability and designs that will be shared, and that upon the termination of the LOA, will compete on this product line with no restrictions."  (*Id.*)

## F.  PERFORMANCE OF THE LICENSING OPERATING AGREEMENT

The parties vociferously debate the extent to which they performed their obligations under the LOA.  Although there is insufficient evidence to resolve all of these disputes, the Court makes the following findings of fact.

First, in accordance with the LOA, *see* (Trial Ex. 3 at 1), Sabre set up "a financial reporting segment under their engineered product group" to "capture all financial related results" associated with the new Sabre EPG segment.  (Testimony of Rossetti, Doc. # 143 at 493, 535.)  Additionally, what remained of ConcealFab after the parties'

attempted integration was renamed CFG.[4]  *See* (Testimony of Fitzhugh, Doc. # 141 at 121.)

As to Fitzhugh's employment, Fitzhugh immediately began working at Sabre upon the execution of the LOA, and his title was Executive Vice President of the new Sabre EPG segment.  (Testimony of Fitzhugh, Doc. # 141 at 107.)  Between March 13, and May 26, 2015, Sabre paid Fitzhugh a gross annual salary of $300,000.00, the same salary that was identified in the Employment Agreement.  (*Id.*; Trial Ex. 4 at 2.)  In the days after he was onboarded at Sabre, Fitzhugh made multiple inquiries to Sabre about the status of the Employment Agreement, which he and Huff had finalized but not executed some two months prior.  (Testimony of Fitzhugh, Doc. # 141 at 98–101; Trial Ex. 60.)  At the end of March 2015, Sandore told Fitzhugh that Sabre did not intend to execute the Employment Agreement because he, Rossetti, and Sabatino did not understand it to be a part of the parties' deal, to which Fitzhugh responded that execution of the Employment Agreement was part of the deal.  (Testimony of Fitzhugh, Doc. # 141 at 101.)  On April 20, 2015, Sabatino sent an email to Huff—at his personal email address, as he was no longer employed by Sabre—and Fitzhugh, stating that he needed Huff's "help on what was agreed upon specific to the LOA working rules of engagement" because Sandore and Rossetti were "telling [him] that the deal we have right now is not the deal that was agreed upon."  (Trial Ex. 66 at 2.)  The following day,

---

[4] The Court rejects as incredible Rossetti's testimony that CFG and "the new EPG" are the same thing "relative to the working capital discussion."  (Testimony of Rossetti, Doc. # 143 at 442.)  This testimony is contradicted by the express terms of the LOA and by others' more credible testimony.  *See, e.g.*, (Doc. # 3 at 1–2; Testimony of Fitzhugh, Doc. # 141 at 121.)

April 21, 2015, Fitzhugh responded by directing Sabatino to the LOA's text that "Jon

Fitzhugh's employment agreement shall terminate as resignation for 'good reason' in

the event of termination of the LOA." (*Id.* at 1.) Fitzhugh argued that this language in

the LOA "[c]learly . . . point[ed] to [his] employment agreement and impl[ied] is [sic] was

to be executed as part of the LOA." (*Id.*) Sabatino replied to Huff, stating that it

appeared to him that Fitzhugh "has documents that [he] d[id] not have as part of this

deal," including "a January Employment agreement that [he] also did not see," and

asking Huff for the history of the Employment Agreement. (Trial Ex. 67.) At some point

thereafter, Sabatino, Huff, and Fitzhugh had a joint phone conversation about the

Employment Agreement, from which Fitzhugh formed the impression that Sabatino

would impress on Sandore and Rossetti that Sabre needed to live up to its deal and

execute the Employment Agreement. (Testimony of Fitzhugh, Doc. # 141 at 105–06.)

As the Court has already explained, Sabre never executed the Employment Agreement.

Sabre did not pay Fitzhugh the $125,000.00 sign-on bonus, grant him 250,000 stock

options, or pay him the monthly stipend of $725.00 for transportation costs

contemplated by the Employment Agreement, nor did it award Fitzhugh any severance

pay upon termination of his employment with Sabre. (*Id.* at 107, 121; Doc. # 149 at 18–

19; Doc. # 148 at 24.)

With regard to the LOA's requirement that Sabre pre-pay/deposit licensing fees

to CFG in the amount of $120,000.00 "(with scheduled payment amounts to be

determined) for the Employee/Contractor which must be utilized to effectuate a buyout"

of Slattery's consulting agreement, *see* (Trial Ex. 3 at 3), Sabre sought to pay this

amount in monthly installments of $12,000.00 for a period of ten months.  (Testimony of Fitzhugh, Doc. # 141 at 108.)  Sabre made two $12,000.00 payments for the March and April 2015 payments (a total of $24,000.00) on May 5, 2015, which ConcealFab accepted.  (Doc. # 126 at 9.)  Sabre did not make any payments of this sort in May 2015 or at any point thereafter.  (Testimony of Fitzhugh, Doc. # 141 at 109.)  CFG/ConcealFab was subsequently unable to make the monthly payments to Slattery required by their consulting agreement.  (*Id.*)

Sabre complied with the LOA's provision that it would provide working capital to CFG by pre-paying licensing fees, including an "immediate infusion of case to ConcealFab in the amount of [$160,000.00] on March 13[, 2015,] to be utilized as source of funds to pay current [accounts payable]."  *See* (Trial Ex. 3 at 3.)  Sabre timely paid $160,000.00 to ConcealFab.  (Testimony of Fitzhugh, Doc. # 141 at 195; Doc. # 148 at 10.)

## G.    TERMINATION OF THE LICENSING OPERATING AGREEMENT AND FILING OF THE UCC LIEN

On May 26, 2015, Sandore informed Fitzhugh on a telephone call that Sabre was terminating the LOA.  (Testimony of Fitzhugh, Doc. # 141 at 120.)  Several stakeholders from both entities, including Fitzhugh, Sabatino, Sandore, and Rossetti, participated in a joint call the next day, in which they debated how much CFG/ConcealFab owed Sabre upon termination and whether Sabre was obligated to pay Fitzhugh a $300,000.00 severance.  (*Id.* at 121.)

On May 27, 2015, Sabre recorded a UCC-1 Financing Statement with the Colorado Secretary of State (the "UCC Lien").  (Trial Ex. 86; Testimony of Rossetti, Doc.

# 143 at 450.)  The UCC Lien identified ConcealFab as the debtor and listed as collateral "[a]ll right, title, and interests of the Debtor in any Intellecutal Property."  (Trial Ex. 86 at 2.)  Sabre did not inform ConcealFab of the UCC Lien.

Late in the evening of May 28, 2015, Rossetti emailed Fitzhugh a list of "expenses incurred on behalf of ConcealFab [for] which [Sabre was] seeking reimbursement in the form of a note per the LOA" and attached a promissory note. (Trial Ex. 90.)  Rossetti wrote, "[Sabre] will keep the employees on for another week and [ConcealFab] agree[s] to execute the note in consideration thereof" by 12:00 PM EST the following day, May 29, 2015.  (*Id.* at 1; Testimony of Fitzhugh, Doc. # 141 at 122.) The promissory note required ConcealFab to pay a principal of $621,559.30 by May 31, 2016, subject to an 11% interest rate.  (Trial Ex. 90 at 2.)  ConcealFab did not sign the promissory note because it took issue with Sabre's accounting of amounts owed under the LOA.  (Testimony of Fitzhugh, Doc. # 141 at 128; Trial Ex. 91; Testimony of Odell, Doc. # 142 at 269–72.)

On June 3, 2015, Sabre emailed Fitzhugh a letter from Sandore, dated May 29, 2015, in which Sandore formally terminated the LOA and "remind[ed]" ConcealFab of its "obligation to execute a promissory note for the amounts owed to Sabre."  (Trial Ex. 92; Testimony of Fitzhugh, Doc. # 141 at 128–29.)

ConcealFab did not learn of the UCC Lien until later in June or July 2015, when it was applying for financing and a potential financier informed ConcealFab that it needed to amend its term sheet because ConcealFab had a lien against it.  (Testimony of Fitzhugh, Doc. # 141 at 132.)

On July 24, 2015, ConcealFab demanded that Sabre terminate the UCC Lien. (Doc. # 126 at 9–10.) Sabre refused to do so. (Testimony of Fitzhugh, Doc. # 141 at 134.)

On August 19, 2015, ConcealFab initiated this action against Sabre. (Doc. # 1.)

On September 11, 2015, ConcealFab filed an initial financing statement with the Colorado Secretary of State, stating the Sabre's UCC Lien against it "was wrongfully filed because no security agreement exists between [Sabre] and [ConcealFab]." (Trial Ex. 87; Testimony of Fitzhugh, Doc. # 141 at 134–35.)

Nearly two years after Sabre filed the UCC Lien, Sabre terminated it on May 18, 2017. (Trial Ex. 88; Doc. # 126 at 10.)

Neither party has ever repaid any monies that may be owed pursuant to the LOA. ConcealFab concedes that it owes Sabre $184,000.00 for Sabre's initial cash infusion of $160,000.00 and for Sabre's two $12,000.00 payments towards the buyout of Slattery's consulting agreement with ConcealFab but argues that this sum must be reduced "by any licensing fees earned during the pendency of the LOA." (Doc. # 148 at 10; Testimony of Fitzhugh, Doc. # 141 at 127.)

On December 11, 2017, the Court granted ConcealFab's Motion for Partial Summary Judgment (Doc. # 94) and granted in part and denied in part Sabre's Motion for Partial Summary Judgment (Doc. # 97). (Doc. # 129.) The Court entered summary judgment in ConcealFab's favor on its claim for declaratory judgment that the UCC Lien was invalid as a matter law, and it denied as a matter of law ConcealFab's claim for trade disparagement and Sabre's counterclaim for fraudulent inducement. (*Id.*)

## II.    CONCLUSIONS OF LAW

Numerous claims are before the Court: ConcealFab's claims for (1) breach of contract of the parties' Licensing Operating Agreement and of their Non-Disclosure Agreement; (2) breach of the implied covenant of good faith and fair dealing; (3) breach of fiduciary duty; (4) misappropriation of trade secrets; (5) tortious interference with contractual relationships; (6) tortious interference with prospective business relations; (7) fraud in the inducement; and (8) breach of contract of the Employment Agreement, *see* (Doc. # 68 at 10–20); and Sabre's counterclaims for (1) unjust enrichment, and (2) breach of contract of the Licensing Operating Agreement, *see* (Doc. # 70 at 26–31). (Doc. ## 137–43.)  After summarizing the Colorado law of contract interpretation, the Court addresses all breach of contract claims and then turns to the remaining claims.

## A.    COLORADO LAW OF CONTRACT INTERPRETATION

Several of the parties' claims are breach of contract claims.  The Court therefore sets forth Colorado's law of contract interpretation at the outset.  The following principles apply to all the breach of contract claims addressed below.

Contracts "should be interpreted consistently with the well-established principles of contractual interpretation" under Colorado law.  *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008) (quoting *Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 819 (Colo. 2002)).  A court's "primary intent" is to "effectuate the intent of the contracting parties according to the plain language and meaning of the contract." *Albright v. McDermond*, 14 P.3d 318, 322 (Colo. 2000).  "Absent an indication the parties chose to deviate from plain meaning, 'the instrument's language must be

examined and construed in harmony with the plain and generally accepted meaning of the words used.'" *Level 3 Commc'ns*, 535 F.3d at 1154 (quoting *East Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 974 (Colo. 2005)). In other words, "common usage prevails, and 'strained constructions should be avoided.'" *Id.* (quoting *Huizar*, 52 P.3d at 819.)

A court must determine the meaning of a contract "by examination of the entire instrument, and not by viewing clauses or phrases in isolation." *Huizar*, 52 P.3d at 819. Though "it is a basic principle of contract interpretation that a more specific provision controls the effect of general provisions," a contract "is not to be interpreted in a vacuum." *E-470 Pub. Highway Auth. v. Jagow*, 30 P.3d 798, 801 (Colo. App. 2001), *aff'd*, 49 P.3d 1151 (Colo. 2002) (citing *Holland v. Bd. of Cty. Comm'rs*, 883 P.2d 500 (Colo. App. 1994)). Rather, a court must consider "the subject matter, the object of making it, the sense in which the parties naturally understood it at the time it was made, and the purposes and objects to be accomplished thereby." *Total Petroleum, Inc. v. Farrar*, 787 P.2d 164, 167 (Colo. 1990) (internal quotation omitted). When a contract's plain meaning unambiguously resolves the parties' dispute, the court's task is over. *Level 3 Commc'ns*, 535 F.3d at 1154. "It is axiomatic that in the absence of an ambiguity[,] a written contract cannot be varied by extrinsic evidence." *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1314 (Colo. 1984).

Determining whether a written contract is ambiguous is a question of law. *East Ridge of Fort Collins*, 109 P.3d at 974. "Mere disagreement of the parties does not necessarily indicate the documents are ambiguous." *Id.* Rather, a contract is

ambiguous only if it is "fairly susceptible to more than one interpretation." *Id.* (quoting *Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909, 912 (Colo. 1996)). Where appropriate, a court may conditionally admit extrinsic evidence to determine whether the contract is ambiguous. *Id.* If the court, after considering the extrinsic evidence, determines that there is no ambiguity, then the extrinsic evidence must be stricken. *Pepcol Mfg. Co.*, 687 P.2d at 1314 n.3.

When a court determines that a contract is ambiguous, it must then consider extrinsic evidence "in order to determine the mutual intent of the parties at the time of contracting." *Id*. at 1314. This extrinsic evidence may include parol evidence, *East Ridge of Fort Collins*, 109 P.3d at 974, and "any pertinent circumstances attendant upon the transaction, including the conduct of the parties under the agreement," *Pepcol Mfg. Co.*, 687 P.2d at 1314. The Colorado Supreme Court has explained:

> It is well established that when a contract or agreement has been given a practical construction, as reflected by the conduct and acts of the parties in its performance, such construction may, and perhaps even should, be considered by the court in eliminating any ambiguity, and in ascertaining the mutual meaning of the parties at the time of contracting.

*Nahring v. City & Cty. of Denver*, 484 P.2d 1235, 1238 (Colo. 1971). Additionally, the conduct of the parties "before the controversy arose" is considered "a reliable test of their interpretation of the agreement." *East Ridge of Fort Collins*, 109 P.3d at 975 (citing *Town of Estes Park v. N. Colo. Water Conservancy Dist.*, 677 P.2d 320, 327 (Colo. 1984)).

**B. CONCEALFAB'S CLAIM FOR BREACH OF CONTRACT OF THE NDA**

Under Colorado law, to which the parties stipulate, *see* (Doc. ## 148, 149), the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform by the defendant; and (4) damages. *Conagra Trade Grp., Inc. v. Fuel Expl., LLC*, 636 F. Supp. 2d 1166, 1171 (D. Colo. 2009) (citing *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992)). The requirement of "performance" means "substantial performance"—"that is, that any deviations by the performing party from the contract's standards are 'trifling particulars not materially detracting from the benefit the other party would derive from a literal performance,' such that the [other party] 'has received substantially the benefit he expected.'" *Xtreme Coil Drilling Corp. v. Encana Oil & Gas (USA), Inc.*, 958 F. Supp. 2d 1238, 1243 (D. Colo. 2013) (quoting *W. Distrib. Co.*, 841 P.2d at 1058).

The Court finds that ConcealFab has established the first and second elements of its claim that Sabre breached the NDA. First, the parties agree that the NDA is an unambiguous binding contract. *See* (Doc. # 148 at 16; Doc. # 149 at 13; Trial Ex. 1.) And second, Sabre does not assert that Conceal failed to perform under the NDA. *See* (Doc. # 149 at 13–14.)

The Court's conclusion on ConcealFab's claim that Sabre breached the NDA turns on its analysis of the third element, whether Sabre failed to perform according to the terms of the NDA. ConcealFab alleges that Sabre used confidential information it had acquired from ConcealFab during the pendency of the LOA to compete with

ConcealFab, in violation of the NDA.  (Doc. # 148 at 18.)  Specifically, ConcealFab

asserts that Sabre used confidential information about ConcealFab's cantenna sleeve,

side arm mount, and pricing to fulfill an order for non-party Cincinnati Bell, which had

been a customer of ConcealFab.  (*Id.* at 18–19; Testimony of Fitzhugh, Doc. # 141 at

138–47.)

      1.     <u>Factual Findings Specific to the Claim</u>

During the pendency of the LOA, Sabre had access to sensitive information from

ConcealFab, including specifications of and pricing information for its products, such as

its bracket mounting system.  (Testimony of Fitzhugh, Doc. # 141 at 142–43.)

On December 1, 2015, several months after Sabre had terminated the LOA, a

Cincinnati Bell representative wrote to two Sabre employees requesting a quote for:

(i) 10 antenna side arm mounts; (ii) 60 antenna top mounts; and (iii) 70 antenna mount

cantenna sleeves. (Trial Ex. 142 at 2.)  Though Cincinnati Bell's request was sent to

Sabre and listed Sabre as the "vendor," Cincinnati Bell used ConcealFab's part

numbers (e.g., "003009-B;" "002769-A") in its request.  (*Id.* at 2; Testimony of Fitzhugh,

Doc. # 141 at 144–45.)  On December 3, 2015, Sabre replied with information on the

requested products and listed the Sabre part numbers for them (e.g., "180E051";

"180E046").  (Trial Ex. 142 at 1.)  Sabre also attached to its response specification

sheets for the products, which were named by their Sabre part number (e.g.,

"180A004_001A_SpecSheet.pdf").  (*Id.*)  In these communications and elsewhere,

Sabre's part numbers all begin with "180," indicating that they were derived from

products originally designed and manufactured by 180 Logistics before Sabre acquired 180 Logistics. (Testimony of Cochran, Doc. # 142 at 407–09.)

On December 23, 2015, the Cincinnati Bell representative requested information about purchasing the same products in the same quantities from ConcealFab, referring to the products by their names and ConcealFab part numbers (e.g., "003002"; "002769"). (Trial Ex. 108 at 4.) A ConcealFab employee responded with an itemized quote for the requested products. (*Id.*) On February 5, 2016, the Cincinnati Bell employee informed ConcealFab that Cincinnati Bell was preparing to execute an order for the products and confirmed their prices. (*Id.* at 2.)

Also on February 5, 2016, Cincinnati Bell informed Sabre that it would not be placing an order for the products because of Sabre's quoted prices. (Trial Ex. 109 at 3.) In response, Sabre requested the "price points of where [Cincinnati Bell] need[ed] to be with the brackets" to determine whether it could match them. (*Id.* at 2.) Sabre subsequently stated that it would match the price points Cincinnati Bell had provided and on February 10, 2016, sent Cincinnati Bell a revised quote. (*Id.* at 1.) Sabre's revised prices were $10.00 to $35.00 less per product than the prices ConcealFab had offered. *Compare* (*id.* at 2) *with* (Trial Ex. 108 at 1–2.) Sabre's revised quote again used part numbers that began with "180." (Trial Ex. 110.)

On February 18, 2016, Cincinnati Bell executed a purchase order with Sabre for the products. (Trial Ex. 111.) The purchase order included Sabre's part numbers that began with "180" and used the prices Sabre had quoted the week prior. (*Id.*) Cincinnati

Bell did not buy the products from ConcealFab and has not placed any other orders with ConcealFab in the time since.  (Testimony of Fitzhugh, Doc. # 141 at 146–47.)

      2.    <u>Conclusion of Law on the Claim</u>

ConcealFab has failed to demonstrate that Sabre did not perform under the terms of the NDA by soliciting and fulfilling an order from Cincinnati Bell.  At most, the evidence shows that Sabre "was quoting a bracket system very similar in wording to [ConcealFab's system], at prices just under [ConcealFab's] prices," as Fitzhugh himself testified.  (*Id*. at 142.)  Doing so did not violate the NDA.

First, Sabre consistently identified the products it ultimately sold to Cincinnati Bell by its own part numbers that begin with "180", which, as Cochran explained, indicated that the products were legacies of Sabre's earlier acquisition of 180 Logistics and predated the LOA.  (Testimony of Cochran, Doc. # 142 at 407–09.)  Sabre never used ConcealFab's part numbers to identify the products.  That customer Cincinnati Bell mistakenly referred to the products with ConcealFab's part numbers in an email to Sabre does not establish wrongdoing by Sabre—just confusion on the part of Cincinnati Bell.[5]

Second, there is no evidence to substantiate ConcealFab's argument that Sabre used ConcealFab's allegedly confidential pricing information to secure Cincinnati Bell's business.  When Sabre learned that Cincinnati Bell was not going to place an order for

---

[5] The Court rejects ConcealFab's implicit argument that Sabre should have "inform[ed] Cincinnati Bell that the parts it sought were [ConcealFab] parts."  (Doc. # 148 at 20.) ConcealFab was Sabre's competitor, and it would be a dubitable business strategy for Sabre to suggest to potential customers that they should buy products from its competitor.

the products, Sabre asked Cincinnati Bell to provide "price points of where [it] need[ed] to be." Cincinnati Bell provided its "target price points," and Sabre offered to meet them. That these prices were less than the prices ConcealFab had quoted to Cincinnati Bell fails to convince the Court that Sabre used ConcealFab's allegedly confidential pricing information to secure Cincinnati Bell's business.

The Court concludes that ConcealFab has not demonstrated that Sabre failed to perform its obligations under the NDA, and it need not reach the fourth element of a breach of contract claim. ConcealFab's claim that Sabre breached the NDA fails.

## C.    CONCEALFAB'S CLAIM FOR BREACH OF CONTRACT OF THE LOA

As the Court previously explained, the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform by the defendant; and (4) damages. *Conagra Trade Grp., Inc.*, 636 F. Supp. 2d at 1171.

With respect to its claim that Sabre breached the LOA, ConcealFab has established the first and second elements. First, the parties agree that the LOA constituted a binding contract. (Doc. # 148 at 5; Doc. # 149 at 10.) Second, ConcealFab substantially performed its obligations under the LOA, as the Court explains in the context of Sabre's counterclaim for breach of contract of the LOA in Section II(D) below.

The resolution of this claim accordingly depends on its third and fourth elements: whether Sabre failed to perform under the conditions of the LOA and to what extent, if any, ConcealFab incurred damages as a result. ConcealFab contends that Sabre

29

breached the LOA in two ways: first, "Sabre failed to pay accounts payable" for costs that were incurred in behalf of the new Sabre EPG segment during the pendency of the LOA, and second, "Sabre refused to pay the severance" due to Fitzhugh under the terms of the Employment Agreement when it terminated the LOA. (Doc. # 148 at 4.) ConcealFab argues that it suffered $366,897.54 in damages as a result of Sabre's failure to pay for accounts payable and for Fitzhugh's severance pay. (*Id.* at 8.)

       1.    <u>Factual Findings Specific to the Claim</u>

In addition to the findings of fact identified in Section I of this order, the following facts bear on ConcealFab's claim that Sabre breached the LOA.

With respect to ConcealFab's contention that Sabre failed to pay accounts payable, the LOA provided that "Sabre will provide the working capital to the new EPG segment within Sabre [(the new Sabre EPG segment)]" but explicitly stated that "no current [accounts receivable or accounts payable] of [ConcealFab] will move over to the new Sabre EPG segment."[6] (Trial Ex. 3 at 3.) The LOA did not require ConcealFab to pay back working capital for the new Sabre EPG segment upon termination of the LOA. (*Id*.; Testimony of Fitzhugh, Doc. # 141 at 89.)

During the pendency of the LOA, Sabre did not pay for certain accounts payable incurred by the new Sabre EPG segment. (Trial Ex. 85; Testimony of Rossetti, Doc. # 143 at 449–50.) And after terminating the LOA on June 3, 2015, Sabre still refused to pay for certain accounts payable previously incurred by the new Sabre EPG segment.

---

[6] The LOA thereby included accounts payable as a form of working capital. (Trial Ex. 3 at 3; Testimony of Fitzhugh, Doc. # 141 at 129.)

(Trial Exs. 104–06; Testimony of Rossetti, Doc. # 143 at 465–72.)  Sabre concedes that it did not pay a total of $66,897.54 to ConcealFab's vendors for work done on behalf of the new Sabre EPG segment during the pendency of the LOA.  (Trial Ex. 114 at 11; Testimony of Rossetti, Doc. # 143 at 464–65.)  Sabre knew in July 2015 that its failure to pay these accounts payable was causing hardship to ConcealFab, including preventing it from ordering materials from its vendors.  (Trial Exs. 104, 106.) ConcealFab ultimately paid the delinquent accounts payable so that it could conduct business.  (Testimony of Fitzhugh, Doc. # 141 at 129–30.)

As to ConcealFab's contention that Sabre refused to pay Fitzhugh severance pay, the LOA stated that "Jon Fitzhugh's employment agreement shall terminate as 'resignation for good reason' in the event of termination of the LOA."  (Trial Ex. 3 at 4.) The Employment Agreement, which the parties finalized on January 15, 2015, but never executed, stated that if Fitzhugh "resigns at any time for 'Good Reason' (as defined in Paragraph 25 . . . [Fitzhugh] shall receive severance pay equivalent to his base salary at the end of employment . . . for a period of one (1) year."  (Trial Ex. 4 at 2.)  Fitzhugh's base annual salary was $300,000.00.  (*Id.*; Testimony of Fitzhugh, Doc. # 141 at 57.) Fitzhugh had assigned his rights to the severance payment to ConcealFab.  (Testimony of Odell, Doc. # 143 at 267.)

Sabre did not pay Fitzhugh any severance upon its termination of the LOA. Fitzhugh and Odell inquired about severance pay on a phone call after being informed of Sabre's intent to terminate the LOA, to which Sabre responded that it did not sign and

was not bound by the Employment Agreement. (*Id.* at 267–68; Testimony of Fitzhugh, Doc. # 141 at 121.)

      2.    <u>Conclusion of Law on the Claim</u>

ConcealFab has established by a preponderance of the evidence all elements of its breach of contract claim pertaining to the LOA. As the Court previously explained, ConcealFab satisfies the first and second elements—that the LOA constituted a contract and that ConcealFab substantially performed its obligations under the LOA.

In light of its factual findings, the Court concludes that ConcealFab has satisfactorily demonstrated the third element—that Sabre failed to perform its obligations under the LOA—in at least two material respects. First, Sabre failed to pay for working capital expended (specifically, accounts payable accrued) by the new Sabre EPG segment during the pendency of the LOA. Sabre's failure to pay those accounts payable violated the LOA's provision that Sabre was to "provide the working capital" to the new Sabre EPG segment and its corollary that ConcealFab was not obligated to pay Sabre back for working capital spent on the new Sabre EPG segment when Sabre terminated the LOA. Second, Sabre failed to pay Fitzhugh and ConcealFab (by virtue of Fitzhugh's assignment of rights to ConcealFab) $300,000.00 in severance upon its termination of the LOA. Failure to pay Fitzhugh this severance violated the LOA's provision that Fitzhugh's "employment agreement shall terminate as resignation for good reason" in the event of the LOA.[7]

---

[7] The Court concludes that the doctrine of promissory estoppel binds Sabre to the Employment Agreement for the reasons it explains in Section II(E)(1) below.

ConcealFab has also proven the damages it suffered as a result of Sabre's breaches of the LOA. In a breach of contract action, the measure of damages is the amount it takes to place the plaintiff in the position he would have occupied had the breach not occurred. *Acoustic Mktg. Research, Inc. v. Technics, LLC*, 198 P.3d 96, 98 (Colo. 2008). Here, the damages were the $66,897.54 in accounts payable that Sabre did not pay and the $300,000.00 in severance pay Sabre did not award Fitzhugh. ConcealFab's damages under its breach of contract claim for the LOA therefore amount to $366,897.54.[8] *See* (Doc. # 148 at 8.)

## D. SABRE'S COUNTERCLAIM FOR BREACH OF CONTRACT OF THE LOA

The elements of Sabre's counterclaim for breach of contract of the LOA are: (1) the existence of a contract; (2) performance by the claimant (here, by Sabre) or some justification for nonperformance; (3) failure to perform by the opposing party (ConcealFab); and (4) damages. *See Conagra Trade Grp., Inc.*, 636 F. Supp. 2d at 1171.

The first and second elements of Sabre's counterclaim are not in dispute. First, as the Court previously stated, the parties agree that the LOA constituted a binding contract. (Doc. # 148 at 5; Doc. # 149 at 10.) Second, ConcealFab concedes that Sabre performed the obligations relevant to its counterclaim: it contributed working capital to CFG in the forms of "an immediate infusion of cash" in the amount of

---

[8] This sum must be offset by the amount that ConcealFab owes Sabre for its breach of LOA, which the Court addresses next in Section II(D).

$160,000.00 and of two payments towards the $120,000.00 total allotted to the buyout of Slattery's consulting agreement. (Doc. # 148 at 10.)

Thus, Sabre's ability to satisfy the third and fourth elements of its breach of contract claim are determinative. Sabre alleges that ConcealFab breached the LOA in four ways: (1) ConcealFab "refused to repay Sabre the funds Sabre loaned pursuant to the LOA even though [ConcealFab] admits it owes no less than $184,000.00;" (2) ConcealFab "has refused to provide Sabre with a 1-year promissory note per the terms of the [LOA];" (3) ConcealFab "failed to ensure its shareholders understood all risk elements associated with the LOA;" and (4) ConcealFab "did not run all new business purchase orders that were not dependent on its small business or cleared facility received post the execution of th[e] LOA through [the new Sabre EPG segment]." (Doc. # 149 at 13.) Sabre claims that it has been damaged by those breaches in the amount of $919,144.89. (*Id.*) The Court separately addresses each of these four distinct theories.

     1.    <u>Whether ConcealFab failed to repay Sabre's loans of working capital to CFG</u>

          *a.*    *Findings of Fact Specific to the Allegation*

As the Court described in Section I, the LOA required Sabre to loan CFG "working capital" at an amount to be determined and "at Sabre's incremental cost of capital." (Trial Ex. 3 at 3.)

> **Sabre will pre-pay/deposit licensing fees to CFG** at an amount to be agreed upon at the execution of and during the duration of this LOA. This amount must be repaid to Sabre prior to any distributions to CFG shareholders. This includes an **immediate infusion of cash to ConcealFab in the amount of [$160,000.00]** on March 13[, 2015,] to be

utilized as source of funds to pay current [accounts payable] as per listing received [March 11, 2015,] and as per agreement, 2015 [sic] and **an additional [$120,000.00]** (with scheduled payment amounts to be determined) for the Employee/Contractor which must be utilized to effectuate a buyout of the current consulting agreement.

(*Id.*) (emphases added.)  These pre-pay/deposit licensing fees paid by Sabre were to be repaid by CFG "or offset against licensing fees earned and due to CFG from Sabre."

(*Id.*)  Licensing fees due to CFG from Sabre were to be "accrue[d] . . . at the rates and per the calculations outlined in section 2(i–v) of the [T]erm [S]heet as generated by the [new Sabre EPG segment]."[9]  (*Id.*)

Sabre timely pre-paid/deposited $160,000.00 in licensing fees to CFG/ConcealFab on March 13, 2015.  (Testimony of Fitzhugh, Doc. # 141 at 195; Doc. # 148 at 10.)  It also pre-paid/deposited $24,000.00 towards the $120,000.00 total for the buyout of Slattery's consulting agreement on May 4, 2015; CFG accepted these payments.  (Doc. # 126 at 9.)  Sabre thus pre-paid/deposited a total of $184,000.00 with CFG.

Pursuant to the LOA, CFG/ConcealFab was obliged to repay this $184,000.00 in pre-paid/deposited licensing fees "at Sabre's incremental cost of capital" or offset that value "against licensing fees earned and due to CFG from Sabre."  (Trial Ex. 3 at 3.)

---

[9] Section 2(a)(i) of the Term Sheet stated that ConcealFab was entitled to "20% of the EBITDA generated by the commercial combined product lines of [ConcealFab] and current MUTI-Sabre/180 line servicing the small cell, DAS, and oDAS markets," and Section 2(a)(ii) stated that ConcealFab was entitled to "25% of the EBITDA generated by the combined governmental combined [sic] product lines of [ConcealFab] and the current MUTI-Sabre/180 line servicing the small cell, DAS, and oDAS markets."  (Trial Ex. 2 at 3.)

ConcealFab concedes that it has not repaid Sabre any portion of the $184,000.00 pre-paid/deposited licensing fees. (Doc. # 148 at 10.)

> b. *Conclusion of Law on the Allegation*

Upon making these findings of fact, the Court concludes that Sabre has satisfactorily demonstrated all four elements of its allegation that ConcealFab breached the LOA by failing to pay back Sabre's prepaid/deposited licensing fees. The Court described at the start of this section that the first two elements of the claim are undisputed. As to the third element, Sabre has demonstrated that ConcealFab failed to perform its obligations under the LOA by failing to repay the $184,000.00 in licensing fees that Sabre pre-paid to/deposited with CFG. ConcealFab admits that it has not repaid this sum and that it failed to perform this provision of the LOA. *See* (Doc. # 148 at 10.) With regard to the fourth element, Sabre has also proven that it incurred damages as a result of ConcealFab's failure to repay the $184,000.00 in licensing fees; ConcealFab also concedes its damage to Sabre. *See* (*id.*) Sabre therefore prevails on its counterclaim that ConcealFab breached the LOA to the extent that the counterclaim rests on this specific theory of breach.

As to the precise amount of Sabre's damages, ConcealFab owes Sabre $266,984.00 for the repayment of the $184,000.00 in licensing fees. See (Doc. # 149 at 45.) The $184,000.00 was loaned "at Sabre's incremental cost of capital;" stated differently, ConcealFab owes Sabre interest on the $184,000.00 in licensing fees Sabre paid. (Trial Ex. 3 at 3.) Sabre's incremental cost of capital was, at all relevant times, its "incremental borrowing rate of 11% per annum calculated on the basis of a 365 day

year," from May 26, 2015, to the present (July 10, 2019). (Doc. # 149 at 44; Trial Ex. 90 at 2; Testimony of Rossetti, Doc. # 143 at 514–16.) ConcealFab thus owes $82,984.00 in simple interest, in addition to the principal amount of $184,000.00, for a total of $266,984.00. Sabre's damages under this allegation of its breach of contract claim for the LOA therefore amounts to $266,984.00.

      2.    <u>Whether ConcealFab refused to provide Sabre with a promissory note</u>

      *a.    Findings of Fact Specific to the Allegation*

The Court's recitation of facts in Section I details most facts relevant to Sabre's theory that ConcealFab breached the LOA by refusing the sign the promissory note it delivered on May 28, 2015, or by otherwise failing to proactively draft and execute a one-year note for the amounts it owed Sabre at the time of the LOA's termination.

In brief, the LOA called for a one-year note in two provisions. (Trial Ex. 3.) First, the LOA contemplated a purchase price of $1.2 million, approximately $250,000.00 of which would be used to satisfy ConcealFab's obligations to its employees. (*Id.* at 2.) "If for some reason the LOA is terminated, the amounts paid related to these employee/contractor obligations would revert to a 1-year note due [to] Sabre guaranteed by all IP at a rate equivalent to their incremental borrowing rate." (*Id.*)

Second, the LOA required Sabre to provide working capital to CFG by pre-paying/depositing $280,000.00 in licensing fees; CFG was obligated to repay Sabre's pre-payment/deposit or offset it against licensing fees it was owed. (*Id.* at 3.) The LOA stated that if the LOA is terminated and "the licensing fees due [to] CFG from Sabre are not sufficient to offset balances due to Sabre from CFG," then the balance would revert

to a one-year note "at Sabre's incremental borrowing rate payable in monthly installments" and "guaranteed by a security interest in the IP of ConcealFab." (*Id.*) By the date it terminated the LOA, Sabre had pre-paid/deposited $184,000.00, as the Court explained in Section II(D)(1)(a).

On May 26, 2015, Sabre informed CFG that it was terminating the LOA. (Testimony of Fitzhugh, Doc. # 141 at 120.) Two days later, on May 28, 2015, Sabre emailed CFG/ConcealFab a promissory note for the amount of $621,559.30, at an 11% interest rate, and, in the body of the accompanying email, listed the expenses it contended it was owed by CFG:

1. " CF Payroll Paid 3/16/15 through 5/31/15": $257,026.10;
2. "CF Payroll 6/1/15 – 6/7/15 estimated": $27,310.60;
3. "CF Hourly Payroll for Week Ending 5/3115, To be Paid June 5 (estimate)": $4,000.00;
4. "PTO to be paid out at Separation Date": $10,633.27;
5. "AP Paid (March through May 31)": $50,990.99;
6. "AP Unpaid (March through May 31)": $60,326.53;
7. "Open Vendor PO's in Sabre's name, not yet received against": $18,513.58;
8. "Initial Deposit": $160,000.00;
9. "Payments to Founder (March and April Payments)": $24,000.00;
10. "Jon F. Credit Card (May Statement, current balance)": $4,954.61; and
11. "Costs to host Verizon MN Reception": $3,803.62.

(Trial Ex. 90.) Sabre stated that it would keep "the employees on for another week" if CFG/ConcealFab "agree[d] to execute the note in consideration thereof" by noon the following day, May 28, 2015. (*Id.*)

ConcealFab did not then and subsequently has not signed the promissory note drafted by Sabre. (Testimony of Fitzhugh, Doc. # 141 at 128; Testimony of Odell, Doc. # 142 at 269–72.)

###### b.  Conclusion of Law on the Allegation

Sabre has not established by a preponderance of the evidence the third element of its breach of contract claim—that ConcealFab failed to perform its obligations under LOA by declining to sign the promissory note Sabre sent on May 28, 2015, or by otherwise executing another one-year promissory note.

ConcealFab was not obligated by the LOA to sign the promissory note Sabre drafted in the amount of $621,559.30 because Sabre's calculation of what ConcealFab owed it was contrary to the express terms of the LOA.  The LOA required ConcealFab to pay Sabre back, via one-year notes, only: (1) "the amounts [Sabre] paid related to [the $250,000.00 in] employee/contractor obligations" as part of its $1.2 million purchase of ConcealFab, and (2) the amount Sabre pre-paid/deposited in licensing fees to CFG, which, at the time of the LOA's termination, was $184,000.00.  (Trial Ex. 3 at 2–3).  The LOA did **not** require CFG/ConcealFab to repay the working capital Sabre invested in the new Sabre EPG segment.[10]  Yet the promissory note Sabre proposed to

---

[10] Rossetti testified at trial that "[t]he LOA specifies that working capital will be repaid." (Testimony of Rossetti, Doc. # 143 at 453.)  Rossetti supported his position with an interpretation of the LOA that rendered the terms "Sabre EPG" and "CFG" meaningless, and assigned meaning to the symbols "-+--."  (*Id.* at 554–55.)  But the rules of contract interpretation require the Court to examine the entire instrument, and not view clauses or phrases in isolation, to give each word in an instrument meaning if at all possible, and to avoid an absurd result.  *See Burr v. Moyer*, No. 10-cv-01503-WJM-MEH, 2012 WL 364072, at *3 (D. Colo. Feb. 2, 2012).  "Sabre EPG" and "CFG" are defined terms under the LOA, *see* (Trial Ex. 3), and thus the Court finds that the parties intended those terms to have separate meaning. The Court also finds that "pre-payments/deposit licensing fees" due from Sabre to CFG are different than "working capital" due from Sabre to the new Sabre EPG segment.

Any other conclusion would lead to the absurd result that Sabre would get to keep any intellectual property developed and the majority of EBITDA generated by the new Sabre EPG segment without providing any consideration.  The Court does not credit Rossetti's testimony on this issue.

ConcealFab included large sums of working capital Sabre had invested in the new Sabre EPG segment during the pendency of the LOA, including $257,026.10 in "CF Payroll Paid 3/16/15 through 5/31/15", $50,990.99 in accounts payable "[p]aid (March through May 31", and $60,326.53 in accounts payable "[u]npaid (March through May 31)."  (Trial Ex. 90 at 1.)  Accordingly, ConcealFab did not breach the LOA by refusing to sign Sabre's inaccurate promissory note.

To the extent that Sabre argues ConcealFab breached the LOA by not providing Sabre with **any** one-year promissory note,[11] that argument also fails to convince the Court that ConcealFab did not perform its obligations.  The LOA did not place the burden on ConcealFab to draft and execute a note.  (Trial Ex. 3.)  Rather, the LOA stated that the balances CFG/ConcealFab owed Sabre upon termination of the LOA "would revert to a 1-year note."  (*Id.* at 2, 3.)  ConcealFab therefore did not run afoul of any obligation to proactively draft and execute a promissory note; it had no such obligation.

Sabre's second theory of how ConcealFab breached the LOA fails for these reasons.

---

[11] The precise contours of Sabre's argument regarding the one-year note are unclear to the Court.  In its proposed findings of fact and conclusion of law, Sabre baldly asserts that "[ConcealFab] has refused to provide Sabre with a 1-year promissory note per the terms of the [LOA]."  (Doc. # 139 at 13.)  Sabre does not explain that assertion.

3.   Whether ConcealFab failed to secure its shareholders' knowing approval of the LOA

   a.   *Findings of Fact Specific to the Allegation*

As the Court described in Section I, the LOA contained as an "[a]dditional

[p]rovision":

> All existing shareholders and option holders must vote (per [ConcealFab's] By-Laws) to approve this LOA structure in accordance with ConcealFab's corporate governance documents.
>> i. The shareholders have evaluated, understand, and acknowledge all risk elements associated with this LOA structure and agreement and acknowledge that non-performance in achieving the forecasts as set forth may negatively impact their equity and holdings in [ConcealFab].

(Trial Ex. 3 at 4.)  ConcealFab's bylaws required an affirmative vote by a majority of

shareholders in support of a transaction like the one contemplated by the LOA.

(Testimony of Fitzhugh, Doc. # 141 at 75; Testimony of Odell, Doc. # 142 at 260.)

On or about March 11, 2015, ConcealFab sent its shareholders a summary of the

LOA.  (Trial Ex. 122; Testimony of Fitzhugh, Doc. # 141 at 203.)  The summary, drafted

by Fitzhugh, ConcealFab's Board of Directors, and its corporate counsel, explained that

the Board of Directors had recently approved a "[t]ransaction" (the LOA) with Sabre to

"pursue an interim solution to address ConcealFab's short term capital requirements

and allow both parties to jointly pursue several near term opportunities" while the parties

"continu[ed] to negotiate [a] prospective asset sale transaction."  (Trial Ex. 122 at 1.)

The summary explained the financial terms of the LOA:

> Sabre/MUTI will delay payment of the upfront $1.2M purchase price until certain financial hurdles are met or Sabre in its sole discretion decides to consummate the transaction.  **Sabre will fund working capital requirements of CFG in the form of a loan** until such time as CFG

> Systems becomes financially viable. The Sabre reporting segment will
> accrue royalties for ConcealFab in the same manner as the full acquisition.
> No distributions to shareholders will occur until all debts accumulated are
> repaid from either CFG earnings or from royalties generated by the new
> financial segment.

(*Id.* at 2) (emphasis added). A voting document to approve the transaction

accompanied the summary of the LOA. (Trial Ex. 123; Testimony of Fitzhugh, Doc.

# 141 at 203.) ConcealFab did not send the shareholders the LOA or Term Sheet.

(Testimony of Fitzhugh, Doc. # 141 at 203.)

On March 12, 2015, ConcealFab informed Sabre that it had "received an

affirmative vote from a majority [of] both the Preferred class standalone and the

Common plus Preferred classes combined" in support of the parties' LOA. (Doc. # 126

at 9; Trial Ex. 57.) The parties executed the LOA the following day, March 13, 2015.

(Doc. # 126 at 9.)

In early April 2015, ConcealFab sent its shareholders a document entitled

"Frequently Asked Questions & Answers for Proposed MUTI/ConcealFab Transaction."

(Trial Ex. 124; Testimony of Odell, Doc. # 142 at 258.) The FAQs document stated that

"upon the termination of the proposed acquisition for any reason, . . . any capital

contributed by Sabre during interim period would convert to a one year promissory note

payable to CFG back to Sabre collateralized by ConcealFab's IP." (Trial Ex. 124 at 1–

2.)

On May 7, 2015, Slattery, ConcealFab's founder and a shareholder who was

then a consultant to ConcealFab, met with ConcealFab to discuss his dissatisfaction

with his consulting agreement. (Testimony of Odell, Doc. # 142 at 260–62.) Later that

day, Slattery's counsel sent to ConcealFab a "Shareholder Demand [Letter] to Enforce Corporate Rights." (Trial Ex. 80.) Slattery's demand letter asserted in relevant part:

> The Directors have breached their fiduciary duties to ConcealFab by failing to disclose material terms of the proposed transaction between ConcealFab and [Sabre] in its May 10 [sic], 2015, communication to shareholders.
>      The Directors have also breached their fiduciary duties to ConcealFab by permitting . . . [Sabre] to take control or possession of substantially all of ConcealFab's assets without the shareholder approval required by Colorado law and the terms of ConcealFab's [LOA] with [Sabre].

(*Id.*) Slattery advised ConcealFab that he sought "to commence a derivative shareholder lawsuit against all or some of the Directors." (*Id.*)

ConcealFab promptly disclosed Slattery's demand letter to Sabre.[12] (Testimony of Fitzhugh, Doc. # 141 at 117; Testimony of Odell, Doc. # 142 at 262–63.) Sabre initially indicated that it wanted to "work through" any challenges presented by the demand letter. (Testimony of Fitzhugh, Doc. # 141 at 117.) The parties discussed what payments ConcealFab might offer to Slattery, and ConcealFab informed Sabre that it was "moving ahead" with a special litigation committee "to review and act on the claims" in the demand letter and was "contemplating re-soliciting shareholder approval." (Trial Ex. 83; Testimony of Odell, Doc. # 142 at 264.)

---

[12] Rossetti testified at trial that Sabre did not receive notice of Slattery's demand letter "until the discovery process started," and that "when [Sabre] heard [it was] being threatened to be sued by Mr. Slattery," it "decided to terminate the [joint venture]. [Sabre] didn't want to be sitting here in litigation." (Testimony of Rossetti, Doc. # 143 at 521.) The Court finds this testimony to be incredible in the face of contradictory evidence. Slattery and Odell both credibly testified that that ConcealFab quickly informed Sabre of Slattery's demand letter because ConcealFab understood it to be a materially adverse event. (Testimony of Fitzhugh, Doc. # 141 at 117; Testimony of Odell, Doc. # 142 at 262–63.) An email from Fitzhugh to Rossetti, Sandore, and Sabatino, dated May 19, 2015, confirms that ConcealFab had repeatedly discussed the demand letter with Sabre. (Trial Ex. 83.)

On May 26, 2015, Sabre informed ConcealFab of its decision to terminate the LOA in a telephone call. (Testimony of Fitzhugh, Doc. # 141 at 120.) Sandore explained to Fitzhugh on that call that the risks to Sabre posed by Slattery's demand letter were too great for Sabre to proceed with the parties' agreement. (*Id.*; Testimony of Odell, Doc. # 142 at 266.)

b.    *Conclusion of Law on the Allegation*

Sabre has not demonstrated that ConcealFab breached the LOA by "fail[ing] to ensure its shareholders understood all risk elements associated with the LOA Structure." (Doc. # 149 at 13.) The LOA plainly required that ConcealFab's shareholders vote to approve the LOA structure in accordance with ConcealFab's bylaws. (Trial Ex. 3 at 4.) It is undisputed that ConcealFab's shareholders did so.

The Court is not convinced otherwise by Sabre's argument that Slattery's demand letter proves that ConcealFab failed to ensure its shareholders understood and acknowledged "all risk elements associated th[e] LOA structure." The sentence in the LOA after the requirement of the shareholders' approval, "The shareholders have evaluated, understand, and acknowledge all risk elements associated with this LOA structure . . . ," (*id.*), did not impose a measurable, objective duty on ConcealFab. Its terms were subjective and vague. Moreover, ConcealFab did take action to ensure that its shareholders' votes were informed; it sent a two-page summary of the LOA to all shareholders in advance of voting. Sabre's contention that this summary was insufficient because it referred only to a "loan," not to the one-year promissory note secured by an interest in ConcealFab's intellectual property contemplated by the LOA,

is unpersuasive.  The LOA did not obligate ConcealFab to share the LOA itself with its shareholders.  Moreover, the Court credits Fitzhugh's testimony that ConcealFab thought "the LOA, as drafted, was confusing" and that they therefore "draft[ed] something that [ConcealFab] thought was easier to understand" for the shareholders. *See* (Testimony of Fitzhugh, Doc. # 141 at 206–07.)

Sabre's contention also fails because Slattery's demand letter—without more—does not establish that ConcealFab's shareholders did not understand the risks associated with the LOA at the time they voted to approve it.  Extensive evidence was presented that Slattery was upset with ConcealFab for its inability to pay him what he was owed under their consulting agreement and frequently threatened ConcealFab with legal action.  *E.g.*, (Testimony of Odell, Doc. # 142 at 261; Testimony of Fitzhugh, Doc. # 141 at 16–20.)   In light of this uncontradicted evidence, Slattery's assertion that ConcealFab failed to adequately inform its shareholders of material terms of the LOA is less than reliable.

Accordingly, Sabre has not satisfied the third element of its breach of contract claim.  The Court rejects Sabre's third breach of contract theory, that ConcealFab breached the LOA by failing to ensure its shareholders of the risks inherent in the LOA.

4.      Whether ConcealFab did not run all applicable orders through the new Sabre EPG segment

a.      *Findings of Fact Specific to the Allegation*

The LOA provided, "All new business purchase orders, not dependent on CFG's small business or cleared facility[,] received post the execution of th[e] LOA will run through [the new Sabre EPG segment]."  (Trial Ex. 3 at 3.)

*b.*   *Conclusion of Law on the Allegation*

Sabre's fourth breach of contract theory, that ConcealFab did not run all new orders not dependent on ConcealFab's status as a small business or as a cleared facility through the new Sabre EPG segment, is easily dismissed.  Sabre has not presented any credible evidence in support its theory.  At trial, it relied solely on Rossetti's testimony, *see* (Testimony of Rossetti, Doc. # 143 at 546–50), and on a single chart Sabre created in preparation for trial, *see* (*id.* at 546–47; Trial Ex. 146 at 1). Rossetti claimed that the chart showed orders that CFG fulfilled and collected on during the pendency of the LOA that did not depend on its status as a small business or as a cleared facility.  (Testimony of Rossetti, Doc. # 143 at 546–50.)  He testified that these orders, with a total value of $381,658.47, should have run through the new Sabre EPG segment.  (*Id.*)

The Court finds that the chart and Rossetti's related testimony are utterly uncompelling.  The disposition of 33 out of the 35 orders reflected on the chart is "Unknown, assume [ConcealFab] invoiced and fulfilled."  (Trial Ex. 146 at 1.)  Rossetti conceded on cross-examination that Sabre does not know whether CFG/ConcealFab actually fulfilled these 33 orders, whether CFG/ConcealFab charged the customers the amounts identified in the chart, and whether CFG/ConcealFab collected on the amounts identified in the chart; rather, Sabre made assumptions in creating the chart. (Testimony of Rossetti, Doc. # 143 at 555–57.)  Rossetti also acknowledged that the chart does not reflect any costs CFG/ConcealFab may have incurred in fulfilling these

orders.  (*Id.* at 558.)  Sabre therefore cannot establish that CFG/ConcealFab filled these orders during the pendency of the LOA.

Moreover, even if it was fact that CFG/ConcealFab filled some or all of the orders reflected on the chart while the LOA was in effect, Sabre lacks evidence that these orders did not depend on ConcealFab's status as a small business or cleared facility. Sabre offered up only Rossetti's testimony that it was his position that the orders "were not small business or cleared facility" orders.  (*Id.* at 549.)  Rossetti's testimony is insufficient.

For these reasons, Sabre falls far short of demonstrating that CFG/ConcealFab failed to perform its obligations to run certain orders through the new Sabre EPG segment.  The Court accordingly rejects Sabre's fourth and final breach of contract theory.

## E.  CONCEALFAB'S CLAIM FOR BREACH OF CONTRACT OF THE EMPLOYMENT AGREEMENT

The elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform by the defendant; and (4) damages.  *Conagra Trade Grp., Inc.*, 636 F. Supp. 2d at 1171.

The Court made the factual findings pertinent to ConcealFab's claim for breach of contract of the Employment Agreement in Section I(D).  It is undisputed that the parties never formally executed the Employment Agreement.  However, the parties vigorously dispute whether the Employment Agreement was nonetheless an

enforceable contract.  The Court therefore begins by address the first element of

ConcealFab's breach of contract claim.

### 1.    The Existence of a Contract

The Court concludes that the Employment Agreement was a valid contract.

In order to establish the existence of a contract, the evidence must show that the

parties agreed upon all essential terms.  *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*,

713 P.2d 882, 888 (Colo. 1986) (citing *Fed. Lumber Co v. Wheeler*, 643 P.2d 31, 36

(Colo. 1981)).  The parties' agreement is evidenced by their manifestations of mutual

assent.  *Id*. (citing Restatement (Second) of Contracts, § 17(1) (1981) ("the formation of

a contract requires a bargain in which there is a manifestation of mutual assent . . . ")).

As to the formation of an implied contract, "evidence of the parties' conduct, their oral

statements and their writing, and other evidence illuminating the circumstances

surrounding the making of an agreement are admissible to clarify the intent and purpose

of the parties."  *Id*. (citing *Miller v. L.C. Fulenwider, Inc.*, 362 P.2d 570, 574 (Colo.

1961)).  "[I]t is the conduct itself which establishes the agreement."  *Osband v. United

Airlines, Inc.*, 981 P.2d 616, 621 (Colo. App. 1998); *see also New York Life Ins. Co. v.

K N Energy, Inc.*, 80 F.3d 405, 412 (10th Cir. 1996); *Fair v. Red Lion Inn*, 920 P.2d 820,

825 (Colo. App. 1995).  However, where the conduct includes a promise that forms the

basis of an enforceable contract, the promise "must be sufficiently specific to provide a

basis for determining the existence of a breach and for giving an appropriate remedy.'"

*Steele v. Stallion Rockies Ltd.*, 106 F. Supp. 3d 1205, 1221 (D. Colo. 2015) (citing

*Sunderlun v. Pub. Serv. Co. of Colo.*, 944 P.2d 616, 620 (Colo. App. 1997)).  In the

context of employment agreements, the employee must also "'show that the employer's actions manifested an intent to be bound.'" *Id*. (quoting *Geras v. Int'l Bus. Mach. Corp*., 638 F.3d 1311, 1315 (10th Cir. 2011)). The employee bears the burden of establishing the existence of an implied contract. *Reynolds v. Cobe Cardiovascular, Inc*., No. 04-cv-01056-EWN-OES, 2005 WL 3454753, *18 (D. Colo. Dec. 16, 2005) (citing *Continental Air Lines, Inc. v. Keenan*, 731 P.2d 708, 712 (Colo. 1987))

The conduct of ConcealFab, Fitzhugh, and Sabre establish that the parties long intended for Fitzhugh and Sabre to enter into a contract for employment and that they agreed upon all essential terms. As the Court described in Section I(D), Sabre's vice president for human resources wrote a first draft of the Employment Agreement in early January 2015, and in the weeks that followed, Sabre and ConcealFab worked together to settle on mutually-agreeable language. The parties finalized the Employment Agreement on January 15, 2015. The only reason Fitzhugh and Sabre did not execute the Employment Agreement immediately was because the agreement was designed to go into effect when Fitzhugh became a Sabre employee.

When Sabre shared its intent to restructure its deal with ConcealFab as a licensing operating agreement in February 2015, and the parties negotiated the LOA in March 2015, neither Sabre's communications to ConcealFab nor its behavior suggested that its intentions for the Employment Agreement had changed. In the parties' early discussions about the LOA, Fitzhugh and Huff in fact explicitly discussed execution of the Employment Agreement. *See, e.g*., (Trial Ex. 41.) The final version of the LOA, executed by ConcealFab and Sabre on March 13, 2015, directly referred to the

Employment Agreement, as if it would be in effect when Fitzhugh became an employee of Sabre: "Jon Fitzhugh's employment agreement shall terminate as 'resignation for good reason' in the event of termination of the LOA."  (Trial Ex. 3 at 4.)

Upon execution of the LOA, Fitzhugh immediately began to work for Sabre as its Executive Vice President of the new Sabre EPG segment, as the Employment Agreement provided he would, and he was paid at a gross annual salary of $300,000, also as the Employment Agreement provided he would be.  When Fitzhugh inquired about the status of the Employment Agreement, Sabre's human resources personnel told him it was forthcoming.  (Testimony of Fitzhugh, Doc. # 141 at 100.)  It was not until the end of March 2015 that Sandore informed Fitzhugh that Sabre did not believe it was bound by the Employment Agreement.  Even after Sabre represented that it would not execute the Employment Agreement, Sabatino came to understand from Fitzhugh and Huff that execution of the Employee Agreement was part of Sabre's deal with ConcealFab; Sabatino told Fitzhugh and Huff that he was going to tell Sandore and Rossetti that Sabre "need[ed] to live up to the deal" and execute the Employment Agreement.

On the basis of these facts, the Court concludes that the evidence of ConcealFab's and Sabre's conduct, their oral statements, and their written communications demonstrate that both parties intended for the Employment Agreement to be in effect as of the beginning of Fitzhugh's employment with Sabre—until Sandore said otherwise, without warning, in late March 2015.  *See I.M.A., Inc.*, 713 P.2d at 888. Moreover, because the parties finalized the Employment Agreement, their mutual

assent was "sufficiently specific to provide a basis for determining the existence of a breach and for giving an appropriate remedy." *See Steele*, 106 F. Supp. 3d at 1221. Finally, Sabre's actions—from paying Fitzhugh the salary and awarding him the title promised in the Employment Agreement to Sabatino's recognition that execution of the Employment Agreement was a term of the parties' deal—manifested an intent to be bound by the Employment Agreement. *See id*. ConcealFab has carried its burden to establish that the parties implicitly executed the Employment Agreement. It thereby satisfies the first elements of its breach of contract claim under the Employment Agreement.

2.    The Remaining Elements of the Claim

ConcealFab has established the remaining elements of the claim by a preponderance of the evidence, and Sabre does not argue otherwise, *see* (Doc. # 149 at 17–24):   Fitzhugh performed as required by the Employment Agreement; Sabre breached the Employment Agreement by failing to pay Fitzhugh the $125,000.00 sign-on bonus and $300,000.00 severance; and ConcealFab incurred damages into amount of $425,000.00 as a result. Because the Court has already accounted for Sabre's failure to pay Fitzhugh/ConcealFab $300,000.00 in severance pay in its conclusions on ConcealFab's claim for breach of contract of the LOA in Section II(C)(2), it will not duplicate this award of damages to ConcealFab. Thus, ConcealFab damages for its claim of breach of contract of the Employment Agreement are limited to the $125,000.00 sign-on bonus.

**F.    CONCEALFAB'S CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

Under the Colorado law, a duty of good faith and fair dealing is implied in every contract. *New Design Constr. Co., Inc. v. Hamon Contractors, Inc.*, 215 P.3d 1172, 1181 (Colo. App. 2008) (quoting *Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462, 466 (Colo. 2003)). "Good faith performance of a contract involves 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'" *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995) (quoting *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359, 1363 (Colo. App. 1994)). Each party to a contract has "a justified expectation that the other will act in a reasonable manner with its performance." *Wells Fargo Realty Advisors Funding, Inc.*, 872 P.2d at 1363. "When one party uses discretion conferred by the contract to act dishonestly or to act outside of accepted commercial practices to deprive the other party of the benefit of the contract, the contract is breached." *Id.*; *see Miller v. Bank of New York Mellon*, 2016 COA 94, ¶ 40. However:

> [T]he duty of good faith and fair dealing does not obligate a party to accept a material change in the terms of the contract or to assume obligations that vary or contradict the contract's express provisions. Nor does the duty of good faith and fair dealing inject substantive terms into the parties' contract. Rather, it requires only that the parties perform in good faith the obligations imposed by their agreement.

*Id.*; *see Amoco Oil Co.*, 908 P.2d at 498. A plaintiff may rely on the duty of good faith and fair dealing "when the manner of performance under a specific contract term allows for discretion on the part of either party." *City of Golden v. Parker*, 138 P.3d 285, 292 (Colo. 2006) (quoting *Amoco Oil Co.*, 908 P.2d at 498). Discretion in performance

occurs when "'when the parties, at formation, defer a decision regarding performance terms of the contract,' leaving one party with the power to set or control the terms of performance after formation."  *Id.* (quoting *Amoco Oil Co.*, 908 P.2d at 498).

A violation of the duty of good faith and fair dealing gives rise to a claim for breach of contract.  *City of Golden v. Parker*, 138 P.3d 285, 292 (Colo. 2006).  The plaintiff alleging a violation of the duty of good faith and fair dealing must establish: (1) the existence of a contract with a term that allowed for discretion on the part of the defendant; (2) performance by the plaintiff; (3) the defendant's failure to perform under the relevant term in a manner consistent with the parties' reasonable expectations; and (4) resulting damages to the plaintiff.  *Bolsa Resources, Inc. v. AGC Resource, Inc.*, No. 11-cv-01293, 2011 WL 6370409, *3 (D. Colo. Dec. 20, 2011) (citing *W. Distrib. Co.*, 841 P.2d at 1058).

ConcealFab's claim that Sabre breached its duty of good faith and fair dealing is narrowly focused on a single term of the LOA—that Sabre would pre-pay working capital to CFG/ConcealFab in the amount of $120,000.00 "(with scheduled payment amounts to be determined) for the Employee/Contractor which must be utilized to effectuate the buyout of the current consulting agreement."  *See* (Doc. # 148 at 28–31.)

The Court stated the factual findings relevant to this claim in Sections I(E)–(F). In brief, ConcealFab had a consulting agreement with Slattery that required ConcealFab to pay Slattery a monthly fee of $12,000.00 for 12 months.  The provision concerning Sabre's pre-payment of $120,000.00 in working capital to "effectuate the buyout of the current consulting agreement" was included to allow CFG/ConcealFab to make at least

ten of the monthly payments it owed Slattery. Sabre sought to pre-pay the $120,000.00 it owed CFG/ConcealFab in monthly installments of $12,000.00 over the course of ten months. The parties stipulate that Sabre made two $12,000.00 payments for the March and April 2015 payments on May 5, 2015, which CFG/ConcealFab accepted, but Sabre made no further monthly payments. (Doc. # 126 at 9.)

The first and second elements of ConcealFab's claim for breach of the duty of good faith and fair dealing are satisfied. First, the LOA is a contract with a provision that allowed for discretion on the part of Sabre—the provision that left open the schedule on which Sabre would pre-pay $120,000.00 in working capital to CFG for purposes of buying out Slattery's consulting agreement. Second, for the reasons described above, CFG/ConcealFab substantially performed its obligations under the LOA.

The Court concludes, however, that ConcealFab's claim for breach of the duty of good faith and fair dealing fails at the third element; ConcealFab has not established that Sabre failed to perform "under the relevant term in a manner consistent with the parties' reasonable expectations." *See Bolsa Resources, Inc.*, 2011 WL 6370409 at *3. ConcealFab failed to introduce evidence to establish what it and Sabre reasonably might have expected under the LOA. The language of the LOA itself suggests that the parties hadn't yet come to an agreement on when Sabre would make the $120,000.00 pre-payment of working capital, and ConcealFab's only evidence that Sabre agreed to pre-pay the $120,000.00 sum in monthly payments of $12,000.00 was Fitzhugh's testimony. Without more, the Court remains unconvinced of the parties' reasonable

expectations under the LOA. The Court therefore rejects ConcealFab's claim that Sabre breached the implied covenant of good faith and fair dealing.

## G.    CONCEALFAB'S CLAIM FOR BREACH OF FIDUCIARY DUTY

"A claim for breach of fiduciary duty is a tort aimed at remedying economic harm suffered by one party due to a breach of duties owed in a fiduciary relationship." *Rocky Mountain Expl., Inc. v. Davis Graham & Stubbs LLP*, 2018 CO 54, ¶ 60 (citing *Accident & Injury Med. Specialists, P.C. v. Mintz*, 2012 CO 50, ¶ 21). A fiduciary relationship imposes on one party a duty of care that is independent of any contractual obligations. *Accident & Injury Med. Specialists, P.C.*, ¶ 23 (citing *Town of Alma v. AZCO Constr.*, 10 P.3d 1256, 1263 (Colo. 2000)). "Independent legal duties of care owed by a fiduciary include a duty to act with utmost loyalty on behalf of, and for the benefit of, the other party." *Id.* (citing *Bernhard v. Farmers Ins. Exch.*, 915 P.2d 1285, 1289 (Colo. 1996)). To recover for breach of fiduciary duty in Colorado, the plaintiff must prove the following: (1) the defendant was acting as a fiduciary of the plaintiff; (2) the defendant breached a fiduciary duty to the plaintiff; (3) the plaintiff incurred damages; and (4) the defendant's breach of fiduciary duty was a cause of the plaintiff's damages. *Brecheisen v. Banner Resources, LLC*, No. 15-cv-01184-CMA-MEH, 2016 WL 7868821, *6 (D. Colo. June 24, 2016) (citing *Graphic Directions, Inc. v. Bush*, 862 P.2d 1020, 1022 (Colo. App. 1993)).

The findings of fact relevant to this claim are discussed in Section I. ConcealFab asserts that Sabre owed it a fiduciary duty "because the parties were joint venturers under the LOA" and that Sabre breached that fiduciary duty by not informing ConcealFab of its intent to terminate the LOA and by "gather[ing] all the information it

could regarding [ConcealFab's] intellectual property and customer contacts so that it could compete with [ConcealFab] for those customers using [ConcealFab's] intellectual property." (Doc. # 148 at 32–33.) Sabre argues that it was not a fiduciary of ConcealFab and thus had no fiduciary obligation to it. (Doc. # 149 at 24–26.) In light of the parties' disagreement over whether Sabre was a fiduciary of ConcealFab, the Court begins with an analysis of the first element of a breach of fiduciary duty claim—whether Sabre was acting as a fiduciary of ConcealFab.

"A fiduciary relationship exists between two [parties] when one is under a duty to act or give advice for the benefit of the other on matters within the scope of the relationship." *Rocky Mountain Expl., Inc.*, ¶ 60 (citing *Accident & Injury Med. Specialists, P.C.*, ¶ 21). Colorado law recognizes certain fiduciary relationships as a matter of law, "including the relationships between an attorney and a client and between a trustee and a trust beneficiary" and "when one party occupies a superior position relative to another and assumes a duty to act in the dependent party's best interest." *Id*. Relevant here, Colorado law also "recognize[s] the fiduciary nature of the relationship that exists between the parties to a joint venture." *Id*. (citing *Lucas v. Abbott*, 601 P.2d 1376, 1379 (Colo. 1979)). "Three elements must be present to establish a joint venture: (1) a joint interest in property, (2) an express or implied agreement to share in the losses and profits of the venture, and (3) conduct showing cooperation in the venture." *Agland, Inc. v. Koch Truck Line, Inc.*, 757 P.2d 1138, 1138–39 (Colo. App. 1988) (citing *Breckenridge Co. v. Swales Mgmt. Corp.*, 522 P.2d 737, 739 (Colo. 1974)).

However, "[f]iduciary relationships that derive from a special relationship of trust, reliance, influence, and control," like those arising from a joint venture, "are distinguishable from business relationships involving parties dealing at arm's length for mutual benefits." *Accident & Injury Med. Specialists, P.C.*, ¶ 24 (citing *Devery Implement Co. v. J.I. Case Co.*, 944 F.2d 724, 730 (10th Cir. 1991) ("Certainly, most contracts involve a degree of the factors indicative of reposed trust and confidence . . . however, only those instances which involve a veritable 'substitution of will of the defendant for that of the plaintiff in material matters involved in the transaction' will give rise to fiduciary duties."). "[M]ost business relationships or contractual relationships, such as those between a buyer and seller, do not by themselves create fiduciary obligations, and fiduciary obligations should be extended reluctantly to commercial or business transactions." 37 C.J.S. Fraud § 11; *see Accident & Injury Med. Specialists, P.C.*, ¶ 24 (citing 37 C.J.S. Fraud § 11).

The Court concludes that no fiduciary relationship existed between ConcealFab and Sabre because ConcealFab has not demonstrated that the second element requisite to the formation of a joint venture—"an express or implied agreement to share in the losses and profits of the venture"[13]—existed in its dealings with Sabre. *See Agland, Inc. v. Koch Truck Line, Inc.*, 757 P.2d at 1138–39. As best this Court can infer, ConcealFab argues that the LOA's provisions regarding the new Sabre EPG segment

---

[13] "This element . . . is not present if one of the parties to the alleged joint venture receives a fixed sim, irrespective of the venture's profits and losses . . . or if one of the parties could have enjoyed an individual profit, while the other might have sustained an individual loss." *Batterman v. Wells Fargo Ag Credit Corp.*, 802 P.2d 1112, 1117 (Colo. App. 1999).

created joint profit sharing.  *See* (Doc. # 148 at 31.)  The Court is not convinced.  The LOA does not directly address profits or losses, and it does not clearly explain how any profits realized or losses sustained by the new Sabre EPG segment would be shared by Sabre and CFG/ConcealFab.  *See* (Trial Ex. 3.)  ConcealFab did not present any evidence at trial regarding the sharing of the new Sabre EPG segment's losses and profits.  As a result, there is insufficient evidence that ConcealFab and Sabre agreed to share in the losses and profits of the new Sabre EPG segment, and, consequently, the Court cannot conclude that the parties were engaged in a joint venture.

For these reasons, ConcealFab's claim for breach of fiduciary duty fails at the first element of the claim.  ConcealFab has not demonstrated that Sabre was acting as its fiduciary.

## H.    CONCEALFAB'S CLAIM FOR MISAPPROPRIATION OF TRADE SECRETS

ConcealFab brings its claim for misappropriation of trade secrets pursuant to the Colorado Uniform Trade Secrets Act, Colo. Rev. Stat. §§ 7-74-101–110.  (Doc. # 68 at 13–14.)  Under the Act, "to prove misappropriation of a trade secret, a plaintiff must show: (i) that he or she possessed a valid trade secret; (ii) that the trade secret was disclosed or used without consent, and (iii) that the defendant knew, or should have known that the trade secret was acquired by improper means."  *Gates Rubber Co. v. Bando Chem. Indus.*, 9 F.3d 823, 847 (10th Cir. 1993).  The Act defines a trade secret as:

> scientific or technical information, design, process, procedure, formula, improvement . . . or other information relating to any business or profession which is secret and of value. To be a 'trade secret' the owner thereof must have taken measures to prevent the secret from becoming available to

persons other than those selected by the owner to have access thereto for
limited purposes.

*Innovatier, Inc. v. CardXX, Inc.*, No. 08-cv-00273-PAB-KLM, 2011 WL 3293789, *2 (D.

Colo. Aug. 1, 2011) (quoting Colo. Rev. Stat. § 7-74-102(4)).  Factors considered in

determining whether a trade secret exists include:

> (1) the extent to which the information is known outside the business; (2)
> the extent to which it is known to those inside the business, i.e., by the
> employees; (3) the precautions taken by the holder of the trade secret to
> guard the secrecy of the information; (4) the savings effected and the value
> to the holder in having the information as against competitors; (5) the
> amount of effort or money expended in obtaining and developing the
> information; and (6) the amount of time and expense it would take for others
> to acquire and duplicate the information.

*Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003) (quoting *Colo.*

*Supply Co. v. Stewart*, 797 P.2d 1303, 1306 (Colo. App. 1990)).  "Improper means"

includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty

to maintain secrecy, or espionage through electronic or other means."  Colo. Rev. Stat.

§ 7-74-102(1).

ConcealFab asserts that its "bracket cantenna sleeve is a trade secret" and

alleges that Sabre used its bracket cantenna sleeve "to fulfill one order for Cincinnati

Bell and at least one other order for an unknown customer."  (Doc. # 148 at 34–37.)  It

thereby merely reprises the argument it makes in its claim of breach of contract of the

NDA, *see* (*id.* at 16–21), which this Court rejected in Section II(B).  In response, Sabre

contends that ConcealFab has not proven "it possessed a valid trade secret" in its

bracket cantenna sleeve and incorporates the arguments it makes with respect to

breach of the NDA.  (Doc. # 149 at 34–36, 16–17.)  The Court stated the findings of fact

relevant to ConcealFab's misappropriation of trade secrets claim in its analysis of ConcealFab's claim for breach of contract of the NDA in Section II(B).

Even assuming ConcealFab possessed a valid trade secret in its bracket cantenna mount, the Court concludes that ConcealFab has not established that Sabre used that trade secret in its dealings with Cincinnati Bell or any other customer, and ConcealFab thus fails to satisfy the second element of its misappropriation of trade secrets claim. The Court incorporates herein its conclusions of law on ConcealFab's claim for breach of contract of the NDA, found at Section II(B) above, and declines to repeat its analysis here. In short, that Sabre quoted a bracket system very similar in name and pricing to ConcealFab's bracket cantenna sleeve is insufficient to establish that Sabre disclosed or used ConcealFab's bracket cantenna sleeve without ConcealFab's consent. The Court rejects ConcealFab's claim for misappropriation of trade secrets.

I.     **CONCEALFAB'S CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS**

Colorado recognizes the tort of intentional interference with contractual relations. *Mem'l Gardens, Inc. v. Olympian Sales & Mgmt. Consultants, Inc.*, 690 P.2d 207, 210 (Colo. 1984). Tortious interference with a contract requires that: (1) the plaintiff have a contract with another party; (2) the defendant knew or should have known of such contract's existence; (3) the defendant intentionally induced the other party to the contract not to perform the contract with the plaintiff; and (4) the defendant's actions caused the plaintiff to incur damages. *Telluride Real Estate Co., v. Penthouse Affiliates,*

*LLC*, 996 P.2d 151, 155 (Colo. App. 1999) (citing *Mem'l Gardens, Inc.*, 690 P.2d at 210).

ConcealFab asserts that Sabre intentionally interfered with ConcealFab's contracts with its vendors by failing to pay the vendors' invoices for products the new Sabre EPG segment purchased while the LOA was in effect—that is, Sabre failed to pay $66,897.54 in accounts payable for obligations incurred by the new Sabre EPG segment. (Doc. # 148 at 4–5, 37–39.) It claims that Sabre knew that its refusal to pay the vendors' invoices would cause the vendors to discontinue their business relationships with ConcealFab after Sabre terminated the LOA. (*Id.*) ConcealFab claims that it subsequently paid the $66,897.54 in overdue accounts payable so that it could continue to receive products from its vendors and remain in business. (*Id.* at 5, 38.) Sabre does not address its nonpayment of the accounts payable the new Sabre EPG segment incurred while the LOA was in place; it assumes ConcealFab asserts tortious interference of contractual relations under a different theory. (Doc. # 149 at 29–31.)

The basic findings of fact relevant to this claim are set forth in Sections I(E)–(G). Under the terms of the LOA, Sabre was to fund all of the working capital for the new Sabre EPG segment. (Trial Ex. 3 at 3.) It is undisputed that Sabre did not pay $68,897.54 owed to ConcealFab's vendors for products they delivered to the new Sabre EPG segment during the LOA's lifetime. (Trial Ex. 114 at 11; Testimony of Rossetti, Doc. # 143 at 465.) After Sabre had terminated the LOA on May 26, 2015, ConcealFab directed its vendors to Sabre for payment of the invoices for products delivered to the

new Sabre EPG segment while the LOA was in place. *E.g.*, (Trial Ex. 104 at 2; Trial Ex. 105 at 3.) The vendors informed Sabre's controllers that the invoices were long overdue and that the vendors had to place ConcealFab on "credit hold" because of the outstanding invoices. *E.g.*, (Trial Ex. 104 at 1; Trial Ex. 106 at 1.) As at least two vendors explained to Sabre, the credit holds prevented ConcealFab from placing any orders for product with their vendors. (*Id.*) Sabre's assistant controller responded on July 10, 2015, to one such vendor, "That's a shame. I hate that [ConcealFab] won't be able to order anything." (Trial Ex. 104 at 1.)

The Court concludes that ConcealFab has proven that Sabre tortiously interfered with ConcealFab's contracts with its vendors. Sabre's receipt of the invoices owed to the vendors for products delivered to the new Sabre EPG segment satisfies the first and second elements of the claim. *See Telluride Real Estate Co.,* 996 P.2d at 155. As to the third element, Sabre intentionally induced the vendors to put ConcealFab on a credit hold and to refuse to deliver new product to ConcealFab by deliberately not paying invoices it knew were its responsibility under the terms of the LOA. *See id.*; *see also* (Trial Ex. 105; Trial Ex. 106.) Moreover, Sabre refused to pay the invoices knowing that by doing so, it was causing harm to ConcealFab. *See* (Trial Ex. 106 at 1; Testimony of Rossetti, Doc. # 143 at 468.) Finally, because ConcealFab was effectively forced to pay the invoices—a total of $66,897.54—in order to stay in business after Sabre terminated the LOA and refused to pay the invoices, Sabre caused ConcealFab to incur damages. *See Telluride Real Estate Co.,* 996 P.2d at 155; *see also* (Testimony of Fitzhugh, Doc. # 141 at 130.) Accordingly, the Court enters judgment in favor of ConcealFab on its claim

for tortious interference with contractual relationships.  However, because the Court already addressed the $66,897.54 in damages in the context of ConcealFab's claim for breach of contract of the LOA in Section II(E)(2) above, it does not award ConcealFab any additional damages.  *See* (Doc. # 148 at 39 n.18.)

## J.   CONCEALFAB'S CLAIM FOR TORTIOUS INFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

"To establish a claim for tortious interference with prospective business relations, a plaintiff must show intentional and improper interference preventing the formation of a contract."  *Klein v. Grynberg*, 44 F.3d 1497, 1506 (10th Cir. 1995) (citing *Dolton v. Capital Fed. Sav. & Loan Ass'n*, 642 P.2d 21, 23 (Colo. App. 1981)).  The plaintiff need not prove an underlying contract but must prove "a reasonable likelihood or probability that a contract would have resulted; there must be something beyond a mere hope."  *Id.* (citing *Wasalco, Inc. v. El Paso Cty.*, 689 P.2d 730, 732 (Colo. App. 1984); *Tose v. First Penn. Bank, N.A.*, 648 F.2d 879, 898 (3rd Cir. 1981)).  A defendant can intentionally and improperly interfere with a prospective business relationship "either by inducing or causing [the] third party not to enter into or continue relations, or by preventing the plaintiff from acquiring or continuing the relations."  *Id.* (citing *Behunin v. Dow Chem. Co.*, 650 F. Supp. 1387, 1393 (D. Colo. 1986)).

ConcealFab alleges that Sabre tortuously interfered with its prospective business relations by recording an invalid lien against its intellectual property with the Colorado Secretary of State (the UCC Lien) and thereby impeded its attempts to obtain the financing it needed to continue operations.  (Doc. # 148 at 41.)  ConcealFab identifies two specific prospective business relations that were interrupted by Sabre's filing of the

UCC Lien: "an investment by Strength Capital, and large purchase orders from CCI[/Crown Capital]." (*Id.*) Sabre counters that ConcealFab's claim fails because at trial, ConcealFab "presented nothing by vague testimony and absolutely no documentary evidence showing that its prospective business relationship with any lender was damaged as a result of Sabre's attempts to perfect its rights under the LOA." (Doc. # 149 at 32.) The Court made findings of fact regarding the UCC Lien in Section I(G) above.

ConcealFab's claim for tortious interference with prospective business relations fails because ConcealFab has not proven a reasonable likelihood or probability that a significant investment by Strength Capital or large purchase orders by CCI would have resulted but for the UCC Lien Sabre filed against it. *See Klein*, 44 F.3d at 1506. Fitzhugh's brief, vague testimony about how the UCC Lien caused ConcealFab to lose financing opportunities and negatively impacted ConcealFab's customer relations is insufficient to establish such a likelihood or probability, especially given the dearth of documentary evidence in support of the claim. *See* (Testimony of Fitzhugh, Doc. # 141 at 135–38); *see also Klein*, 44 F.3d at 1506 (finding that the plaintiff's "mere hope" of a prospective relationship with investors was too speculative to support an award of tortious interference with prospective business advantage.") The Court rejects ConcealFab's claim for tortious interference with prospective business relations.

## K.     CONCEALFAB'S CLAIM FOR FRAUD IN THE INDUCEMENT

Under Colorado law, "[t]he elements of a fraudulent inducement claim are: (1) the defendant's misrepresentation of a material fact; (2) the plaintiff's justifiable reliance on

that misrepresentation; and (3) such reliance resulting in damage to the plaintiff."
*Kirzhner v. Silverstein*, No. 09-cv-01858-CMA-BNB, 2011 WL 4382560, *9 (D. Colo. Sept. 20, 2011) (citing *J.A. Walker Co., Inc. v. Cambria Corp.*, 159 P.3d 126, 132 (Colo. 2007)). "One who suffers injury or loss by being fraudulently induced to enter into a contract may affirm the contractual agreement and seek recovery in tort for damages he suffered as a result of the fraudulent misrepresentations." *Club Matrix, LLC v. Nassi*, 284 P.3d 93, 96 (Colo. App. 2011) (quoting *West. Cities Broad., Inc. v. Schueller*, 830 P.2d 1074, 1077 (Colo. App. 1991), *aff'd*, 849 P.2d 44 (Colo. 1993)). Such damages may include "the value of the loss of the benefit of the claimant's bargain, i.e., the difference between the value of benefits actually received under the contract and the value such benefits would have had if the false representations had been true." *Id.* (quoting *West. Cities Broad., Inc.*, 830 P.2d at 1077).

ConcealFab asserts that Sabre fraudulently induced it to execute the LOA by leading ConcealFab "to believe that the Employment Agreement would be effective as soon as Mr. Fitzhugh became a Sabre employee." (Doc. # 148 at 43.) It claims $300,000.00, the amount the Employment Agreement provided for Fitzhugh's severance pay, as its damages from Sabre's alleged fraudulent inducement. (*Id.*) Sabre responds it entered into the LOA "in good-faith and with the intent of living up to its obligations, as[it] understood them, under the [LOA]." (Doc. # 149 at 27.) As for ConcealFab's impression that the Employment Agreement would become effective upon execution of the LOA, Sabre counters that ConcealFab knew that Huff, with whom it had negotiated the LOA, was no longer employed by Sabre prior to it executing the

LOA.  (*Id.*)  Sabre asserts that Fitzhugh "had the option of working for Sabre after the LOA was signed," and when he chose to do so, "he was treated the same as every other former [ConcealFab] employee that Sabre took on as part of the LOA—as a salaried, 'at will' employee—and he understood this."  (*Id.*)  The Court made findings of fact relevant to these arguments in Sections I(D)–(F) above.

The Court concludes that ConcealFab has proven its claim for fraudulent inducement.  First, Sabre—through Huff—represented to ConcealFab that the Employment Agreement would go into effect when Fitzhugh became a Sabre employee, and Sabre did nothing to indicate that it had changed its intentions for the Employment Agreement after Huff left its employ and Sabre restructured its deal with ConcealFab as a licensing operating agreement.  Second, when ConcealFab executed the LOA, it was justifiably relying on Sabre's representations that it would execute the Employment Agreement.  ConcealFab's reliance was justifiable because not only had Sabre (through its employee, Huff) assured it as much, but the LOA itself made explicit references to the Employment Agreement.  And third, ConcealFab was damaged, as it was never awarded the severance pay provided for in the Employment Agreement.  ConcealFab thus satisfies all three elements of its fraudulent inducement claim, and the Court enters judgment in its favor on the claim.  However, because the Court has already awarded ConcealFab $300,000.00 for the severance pay for Sabre's breach of the LOA in Section II(C)(2), it will not award any damages to ConcealFab on this claim.  *See* (Doc. # 148 at 43 n.20.)

## L.    SABRE'S COUNTERCLAIM FOR UNJUST ENRICHMENT

Unjust enrichment is an equitable theory of relief that does not rely upon a promise between the parties.  *Harris Grp., Inc. v. Robinson*, 298 P.3d 1188, 1205 (Colo. App. 2009).  "The elements of unjust enrichment are: (1) at the expense of a plaintiff; (2) a defendant received a benefit; (3) under circumstances making it unjust for the defendant to retain the benefit without paying for it."  *Id.* (citing *Robinson v. Colo. State Lottery Div.*, 179 P.3d 998, 1007 (Colo. 2008)).  However, equitable relief, including a claim for unjust enrichment, generally "may not be used to fashion relief when there is a 'plain, simply, [and] adequate remedy at law.'"  *Id.* (quoting *Szaloczi v. John R. Behrmann Revocable Trust*, 90 P.3d 835, 842 (Colo. 2004)).  In a contractual context, "a party cannot recover for unjust enrichment by asserting a quasi-contract when an express contract covers the same subject matter because the express contract precludes any implied-in-law contract."[14]  *Interbank Inv., LLC v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 816 (Colo. App. 2003) (citing *Printz Servs. Corp. v. Main Elec., Ltd.*, 949 P.2d 77 (Colo. App. 1997), *aff'd in part and rev'd in part*, 980 P.2d 522 (Colo. 1999)).

Sabre contends that ConcealFab was unjustly enriched because, while the LOA was in effect, Sabre paid $735,144.89 towards CFG's working capital expenses "under

---

[14] This principle has two exceptions.  "First, a party can recover on a quasi-contract when the implied-in-law contract covers conduct outside the express contract or matters arising subsequent to the express contract. . . .  Second, a party can recover on a quasi-contract when the party 'will have no right under an enforceable contract.'"  *Interbank Inv., LLC v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 816 (Colo. App. 2003) (citing *Scott Co. v. MK–Ferguson Co.*, 832 P.2d 1000 (Colo. App. 1991); quoting *Backus v. Apishapa Land & Cattle Co.*, 44 615 P.2d 42, 44 (Colo. App. 1980)).

the [LOA]."  (Doc. # 149 at 43.)  It argues that "it would be unjust for [ConcealFab] to retain the benefit of Sabre paying all of [CFG/ConcealFab's] working capital expenses without repaying Sabre for those costs."  (*Id.*)  ConcealFab argues that Sabre's counterclaim for unjust enrichment fails because "the reason Sabre believes it is entitled to these amounts is pursuant to the express terms of the LOA."  (Doc. # 148 at 45.) Because the LOA is an express contract that covered the subject matter at issue— Sabre's funding of ConcealFab/CFG's working capital needs—ConcealFab asserts the Colorado law precludes Sabre's unjust enrichment claims.  (*Id.* at 45–46.)

The Court agrees with ConcealFab that Sabre's claim for unjust enrichment cannot stand because Colorado law recognizes that "a party cannot recover for unjust enrichment by asserting a quasi-contract when an express contract"—here, the LOA— covers the same subject matter because the express contract precludes any implied-in-law contract."[15]  *Interbank Inv., LLC*, 77 P.3d at 816.  The LOA indisputably addresses Sabre's provision of ConcealFab/CFG's working capital in Section 3(c)(v), *see* (Trial Ex. 3 at 3), and Rossetti testified as much, *see* (Testimony of Rossetti, Doc. # 143 at 549). The Court therefore rejects Sabre's counterclaim for unjust enrichment.

### III.  CONCLUSION

For the foregoing reasons, the Court ORDERS that judgment be entered in favor of ConcealFab on its claims for breach of contract of the LOA; breach of contract of the

---

[15] Neither of the exceptions to this principle applies to the case at hand.  *See Interbank Inv., LLC*, 77 P.3d at 816.  Sabre does not argue otherwise.  *See* (Doc. # 149 at 40–43.)

Employment Agreement; tortious interference with contractual relations; and fraud in the inducement. The Court denies ConcealFab's other claims for relief. It is

FURTHER ORDERED that judgment be entered in favor of Sabre on its claim for breach of contract of the LOA. The Court denies Sabre's other claim for relief. It is

FURTHER ORDERED that final judgment be entered holding Sabre liable for $224,913.54 in damages to ConcealFab.[16] It is

FURTHER ORDERED that each party shall bears its own costs and attorneys' fees.

DATED: July 22, 2019

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge

---

[16] ConcealFab is entitled to damages in the amount of $366,897.54 on its breach of contract of the LOA claim and in the amount of $125,000.00 on its breach of contract of the Employment Agreement claim, for a total of $491,897.54. Sabre is entitled to damages in the amount of $266,984.00 on its breach of contract of the LOA claim. Reducing ConcealFab's total damages by the amount it owes in damages to Sabre, ConcealFab is owed $224,913.54 in damages from Sabre.